Despite more than 100 pages of confusing and repetitive assertions, a violation of GAAP is, at most, all the Complaint alleges with respect to Mr. Burke. Plaintiffs' claims boil down to the allegations that ANR: (i) improperly accounted for liabilities and deferred costs relating to minimum interest guarantees, management fees, policy surrender rates and the nature of the Transamerica contract; (ii) failed to adjust for experience in performing loss recognition testing to determine amortization expenses; (iii) failed to disclose certain accounting policies and methods; and (iv) failed to disclose risks and uncertainties relating to the Transamerica contract, and that each of these alleged deficiencies violated certain GAAP principles. (See, e.g., Compl. ¶¶ 222, 225-255). The bulk of the allegations relate to accounting judgments and statements that were made prior to the time Mr. Burke started as CFO of the Company. The allegations relating to statements made after Mr. Burke started as CFO of ANR primarily concern the propriety of ANR's establishment and increase of reserves and write-downs relating to the Transamerica contract. (Compl. ¶¶ 145, 147, 151-52, 155-56, 164-71, 174-78, 181-83, 189-91, 193-95, 197). Plaintiffs' support for these allegations is the simple fact that ANR later modified its accounting treatment of certain items and restated results.

At best, plaintiffs allege that GAAP was violated. It simply does not follow, however, that defendants, especially Mr. Burke, have committed securities fraud.

1-NY/1661308.2
CARMODY & TORRANCE LLP
Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

21

Certainly, plaintiffs have not met the Reform Act's standard requiring specific facts giving rise to a strong inference of severe recklessness. *Chill*, 101 F. 3d at 270.[11]

### 2. Alleging Accounting Fraud Is Not A Perfunctory Task, Especially Given The Accounting Judgments At Issue In This Case

It is a common misperception that financial accounting for public companies involves little judgment or discretion on the part of management. To the contrary, many courts have recognized that "[g]enerally accepted accounting principles" are not a "canonical" set of rules requiring identical treatment of identical transactions; rather, they prescribe a range of reasonable treatments to be chosen from by management. *Thor Power Tool Co. v. Comm'r,* 439 U.S. 522, 544 (1979); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999); *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015,1021 (5th Cir. 1996); *In re Cirrus Logic Sec. Litig.,* 946 F. Supp. 1446, 1457 (N.D.Cal. 1996). Further, depending on the accounting issue presented, management will be required to make ***judgments*** as to the proper

---

[11] Moreover, ANR's independent auditors reviewed and approved the very accounting policies and practices that plaintiffs now challenge. (2000 10-K, Chlapowski Decl. Exh. 17 at 21; 2001 10-K, Chlapowski Decl. Exh. 1 at 25). These clean audit opinions negate an inference of scienter, especially in the absence of any allegations that defendants sought to defraud or keep important information from the auditors. *See In re First Union Sec. Litig.,* 128 F. Supp. 2d 871, 894 (W.D.N.C. 2001) (no scienter where "financial statements were audited by independent auditors, KPMG, who provided a clean opinion that the Company's financial statements were fairly presented in accordance with GAAP"); *see also In re Digi Int'l, Inc. Sec. Litig.,* No. 00-3162, No. 00-3227, 2001 WL 753869, at *3 (8th Cir. Jul. 5, 2001) ("the undisputable fact that the defendants were in consultations with their outside accountants and legal counsel during the period in question is itself evidence which tends to negate a finding of scienter"); *Mathews*, 1994 WL 269734, at *7 (rejecting scienter allegations in part because "[d]efendants also conferred with and relied in good faith on their outside auditor").

treatment of a given item, and make **estimates** as the amount to be recorded for a specific item.  Often, critical questions arise with respect to the **timing** of various accounting entries, especially with respect to write-offs, reserves and amortization. Accordingly, in order to allege an accounting fraud from which a strong inference of scienter may be drawn, plaintiffs must allege specific facts "explaining why the allegedly fraudulent accounting decision 'is not merely the difference between two permissible judgments,' because flexible accounting concepts 'do not always (or perhaps ever) yield a single correct figure.'" *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. at 1457 (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994)).[12]

This is especially true where, as here, plaintiffs' allegations, involve the timing of revenue recognition, the timing and setting of reserves, and the timing and size of write-downs and charges to earnings – subjective matters of accounting judgement. This is not a case in which, for example, the Company is accused of physically falsifying contracts or accounting records, or shipping boxes of bricks instead of computers and recording revenue nonetheless.  The Complaint alleges that, from the

---

[12]  *See also In re Oak Technology Sec. Litig.*, No. 96-20552 SW., 1997 WL 448168, at *9 (N.D. Cal. Aug. 1, 1997) (conclusory allegation that defendants should have recognized loss earlier failed to support finding that "accounting decision is the result of fraud and not 'merely the difference between two permissible judgments'") (internal citation omitted); *Leonard v. NetFRAME Systems, Inc.*, No. C-95-0238 DLJ, 1995 WL 798923, at *3 (N.D. Cal. Aug. 8, 1995) (granting motion to dismiss where plaintiff failed to plead facts showing that accounting practices were "not based on permissible business judgment"); *see also Siegel v. Lyons,* No. C-95-3588 DLJ, 1996 WL 438793, at *5-6 (N.D. Cal. Apr. 26, 1996) (granting motion to dismiss where plaintiff failed to allege evidence of falsity at time of accounting decision, and there was "no reason to suspect that [the practices] were based on anything other than a permissible business judgment").

inception of the alleged fraudulent scheme, ANR's financial statements were false and misleading because they failed properly to re-evaluate recoverability and adjust amortization schedules relating to its recognition of deferred acquisition costs, failed to properly consider the effect of the nature and risks of the Transamerica contract in its accounting and improperly recorded its revenue for life reinsurance and annuity reinsurance contracts as a single business segment – each of which involved the subjective application of the judgment of management based upon information available to them at the time and did not involve Mr. Burke, who was not at the Company at the time many of the judgments were made. (*See, e.g.,* Compl. ¶¶ 79, 248-50).[13]

The primary allegations against Mr. Burke shed light on the significant problems with plaintiffs' claims. These claims relate principally to ANR's decision to establish reserves and write down certain costs, decisions that necessarily involve a high degree of management discretion and judgment. (Compl. ¶¶ 145, 147, 155-56, 164, 172(b), 176, 190). It is well-settled that merely failing to provide adequate reserves is not a violation of the securities laws. *See, e.g., Shapiro v. UJB Fin.*

---

[13] In fact, Accounting Principle Board Opinion No. 22, to which plaintiffs refer in support of the allegations that defendants failed to disclose ANR's accounting policies, practices and trends (Compl. ¶ 225), specifically notes that "applying generally accepted accounting principles requires that judgment be exercised as to the relative appropriateness of acceptable alternative principles and methods of application in specific circumstances of diverse and complex economic activities." APB Op. No. 22 ¶ 5. Similarly, the application of Statement of Financial Accounting Standards ("FAS") 115, cited by plaintiffs in support of defendants' alleged GAAP violations, (Compl. ¶ 251), requires "'the substantial application of judgment of the totality of circumstances.'" *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 552 (N.D. Tex. 2003) (quoting *Lemmer v. Nu-Kote Holding, Inc.*, No. CIV. A. 398CV0161L., 2001 WL 1112577, at *10 (N.D. Tex. Sept. 6, 2001).

1-NY/1661308.2
CARMODY & TORRANCE LLP
Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

24

*Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("mere failure to provide adequate reserves .

. . does not implicate the concerns of the federal securities laws"); *Gannon v. Cont'l

Ins. Co.*, 920 F. Supp. 566, 583 (D.N.J. 1996) (failure to take loss reserves does not

support a claim because "even more than most accounting judgments, the setting of

reserves based on the likelihood of future events are matters of subjective

management judgment").

With respect to reserves, plaintiffs must allege the method whereby the

allegedly inadequate reserves were established, what is allegedly required by GAAP,

the manner in which the method utilized and the reserves actually established

departed from GAAP, and how defendants acted with severe recklessness in failing

to comply with GAAP – how their failure to accrue adequate reserves was intentional

or at least severely reckless.  *See Greebel*, 194 F.3d at 205 ("Without any information

on FTP's experience with past return rates, the size of its reserve for returns, or how

the reserve changed over time, it is difficult to infer that FTP's revenue recognition

decisions were unreasonable enough to violate GAAP, or that they give rise to a

strong inference of scienter"); *DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir.

1990) (requiring "concrete examples" of why reserves were inadequate).[14]

---

[14]  *Christidis v. First Penn. Mortgage Trust*, 717 F.2d 96,100 (3d Cir.
1983)(dismissing reserve-based claims based on absence of allegations that the
responsible parties knew or should have known that reserve estimates were derived
in a manner inconsistent with reasonable accounting practices); *Siegel*, 1996 WL
438793, at *5-6 (plaintiff must allege specific circumstances or transactions indicating
that the loss reserves were inadequate); *Stack v. Lobo*, 903 F. Supp. 1361, 1368-69
(N.D. Cal. 1995) (same); *Stack v. Lobo*, Civ. No. 95-20049 SW, 1995 WL 241448, *4-
5 (N.D. Cal. Apr. 20, 1995) (same); *Fox v. Equimark Corp.*, 782 F. Supp. 295, 300
(W.D. Pa. 1991) (same).

With respect to write-downs, the pleading requirements are similar to those relating to reserves. At a minimum, plaintiffs must allege the specific accounting method they assert was violated, the specific manner in which that method was violated, the amount of the accounting error and some basis from which to infer that defendants intended to defraud the investing public by concealing the need for the write down from the investing public. *Clark v. TRO Learning, Inc.*, No. 97 C 8683, 1998 WL 292382, at * 2 (N.D. Ill. May 20, 1998) (allegations concerning timing of corporate write off failed where plaintiff failed to allege which transactions and customers were implicated by the alleged GAAP violations, by how much and when) (citing *DiLeo*, 901 F.2d at 626); *Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140, 1151-52 (N.D. Ill. 1995) (dismissing allegations that the Company should have taken an accounting write-down earlier than it did because it knew the impact adverse trends would have on the Company's revenues in the following year because plaintiffs failed to allege facts which would provide a basis to infer that the company actually concealed an earlier decision to write-down its assets); *see Malin v. Ivax Corp.*, 17 F. Supp. 2d 1345, 1360 (S.D.Fla. 1998), aff'd, 226 F.3d 647 (11th Cir. 2000).[15] Plaintiffs do not meet these exacting standards.

---

[15]  *See also In re MCI Worldcom, Inc. Sec. Litig.*, 191 F.Supp. 2d 778, 790 (S.D. Miss. 2002) (dismissing claim for lack of scienter where plaintiffs failed to plead facts showing that decision to write-off accounts at a particular date and not earlier was unreasonable); *Molinari v. Symantec Corp.*, No. C-97-20021-JW, 1998 WL 78120, at *8 (N.D. Cal. Feb. 17, 1998) (dismissing, as insufficiently particular, allegations that the defendants knew that the write-off and the corresponding recorded loss would be required, as demonstrated by the fact of the write-off); *Greenberg v. Howtek, Inc.*, 790 F. Supp. 1181, 1187-88 (D.N.H. 1992) (same).

Similarly, plaintiffs cannot plead scienter based upon ANR's restatement. *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (defendant's subsequent revelation of an accounting policy change and retroactive announcement of decreased earnings did not create scienter); *In re MSC Industrial Direct Co., Inc.,* No. 02CV4422(ADS)(WDW), 2003 WL 22118961, at *8 (E.D.N.Y. Sept. 13, 2003) (restatement insufficient to plead securities fraud); *Glickman,* 1996 WL 88570, at *15 (restatement based on the premature recognition of revenue did not constitute fraud).[16] ANR's restatement is not an "admission" that defendants knew or recklessly disregarded that ANR's accounting policy violated GAAP when it originally reported its financials for the first three quarters of fiscal 2000. *See In re Paracelsus Corp. Sec. Litig.,* 61 F. Supp. 2d 591, 599 (S.D. Tex. 1998) (rejecting allegation that restatement due to the discovery of accounting errors constituted admission that the statements were materially misleading when issued). In particular, the restatement does not give rise to an inference of scienter on the part of Mr. Burke, who had no connection or relationship with the Company at the time the original accounting judgments had been made.

---

[16] *See also In re e.spire Comm., Inc. Sec. Litig.,* 127 F. Supp. 2d at 745 ("[t]hat a restatement of financials occurred is not sufficient to raise a strong inference of scienter"); *In re Segue Software, Inc. Sec. Litig.,* 106 F. Supp. 2d 161, 169-70 (D. Mass. 2000) (a restatement of earnings, without more, does not support a 'strong inference' of fraud, or for that matter, a weak one); *In re Peritus Software Servs.,* Inc. Sec. Litig., 52 F. Supp. 2d 211, 224 (D. Mass. 1999) (restatement of income based on revenue recognition practices did not raise inference of fraudulent intent); *In re FAC Realty Sec. Litig.,* 990 F. Supp. 416, 422 (E.D.N.C. 1997) ("[m]erely reporting a loss in a year-end financial statement does not, of course, prove that earlier statements were fraudulent").

Indeed, all plaintiffs truly allege is that the write-downs, increases in reserves and accounting restatements should have occurred earlier. This is classic fraud by hindsight. As stated by the Seventh Circuit: "[N]o matter when [a write-down takes place], someone may say that [defendants] should have acted sooner. *If all that is involved is a dispute about the timing of the write-off, based on estimates of the probability that a particular debtor will pay, we do not have fraud.*" *DiLeo*, 901 F.2d at 626-27 (emphasis added); *see Stevelman*, 174 F.3d at 84 "'[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud'") (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995)); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of claims based on plaintiff's reference to disclosures made in later annual reports and allegations that they should have been made in earlier reports).[17] Indeed, fraud by hindsight claims based upon accounting restatements and reserve-based claims are routinely rejected. *See, e.g., Stevelman*, 174 F.3d at 85 (allegations regarding accounting irregularities and overly optimistic statements were impermissible fraud by hindsight); *Shields*, 25 F.3d at 1129 (misguided optimism

---

[17]    *See Steiner v. Shawmut Nat'l Corp.*, 766 F. Supp. 1236, 1247 (D. Conn. 1991) ("vague allegations that, as shown by subsequent developments, the corporation's true financial picture was not so bright in some respects as its annual reports had painted and that the defendants knew, or were reckless in failing to know " are inadequate (internal citation omitted)); *Coates v. Heartland Wireless Communications, Inc.*, 26 F. Supp. 2d 910, 921-22 (N.D. Tex. 1998) (allegations that, because defendants announced a write-down, they "must have known earlier that such a . . . write-down would be required" are an impermissible attempt to "plead fraud by hindsight"); *Kriendler*, 877 F. Supp. at 1153-54 (allegations that, in essence, "'try to penalize [the defendants] for failing to show greater clairvoyance'" in connection with a write down of assets are not viable) (quoting *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992)).

regarding adequacy of loan loss reserves was fraud by hindsight and was not actionable); *Zucker v. Sasaki*, 963 F. Supp. 301, 305-06 (S.D.N.Y. 1997) (argument that write-off of acquisition suggested that auditor should have known acquisition would fail earlier is nothing more than impermissible fraud by hindsight); *Grossman*, 1995 WL 552744, at *12 (allegations that loan reserve proved inadequate and that defendant "knew or was reckless in not knowing" that reserves were inadequate was mere fraud by hindsight and did not support inference of fraud). Accordingly, in the absence of specific facts demonstrating that Mr. Burke knew or was reckless in not knowing that the accounting decisions he was making were improper, and in light of the fact that he had not previously been with the Company, plaintiffs' claims against him should be dismissed.

Finally, what plaintiffs ignore in their allegations is that it was during Mr. Burke's reign as CFO that the reserves were increased, the write-offs were taken, and the restatements occurred and with each such disclosure, the stock price declined. Thus, the facts concerning the alleged accounting fraud do not give rise to a strong inference of scienter with respect to Mr. Burke, they give rise to a strong inference of good faith and honesty on his part.

## II.    SEVERAL ALLEGED MISSTATEMENTS AND OMISSIONS CONTAINED IN ANR'S CONFERENCE CALLS ARE NON-ACTIONABLE FORWARD-LOOKING STATEMENTS

Under the Reform Act, a defendant is not liable for any forward-looking statement that ultimately turns out to be incorrect, if it is identified as forward-looking and is accompanied or qualified by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). Further, even if the safe harbor

does not apply, a plaintiff must demonstrate that forward-looking statements were made with "actual knowledge" that they were false in order to establish liability for the statement. 15 U.S.C. § 78u-5(c)(1)(B)(i).

In the case of an oral forward-looking statement, the Reform Act's safe harbor applies if the oral statement is accompanied by a cautionary statement that the oral statement is forward looking and that "the actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A). In addition, the oral forward-looking statement must be accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document or portion thereof. The oral statement must identify the written document or portion thereof containing such additional information, and the information contained in the written document must qualify as a cautionary statement. 15 U.S.C. § 78u-5(c)(2)(B). *See also Coble v. Broadvision Inc.*, No. C 01-01969 CRB., 2002 WL 31093589, at *9 (N.D. Cal. Sept. 11, 2002); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 880 n.29; *In re Home Health Corp. of America, Inc. Sec. Litig.*, No. CIV. A. 98-834., 1999 WL 79057, at *19 n.11 (E.D. Pa. Jan. 29, 1999). As explained below, the safe harbor insulates Mr. Burke from liability for many of the statements plaintiffs challenge.

### A. Many Of The Statements Made By Mr. Burke During ANR's Earnings Conference Calls Were Forward-Looking Statements

Plaintiffs' claims against Mr. Burke rely largely on statements that he made during the company's earnings conference calls. According to the Complaint, the allegedly false or misleading statements made by or potentially attributable to Mr.

1-NY/1661308.2
CARMODY & TORRANCE LLP
Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
30

Burke included the following statements made during three of the company's

earnings conference calls:

- Mr. Doyle projected earnings for 2002 of between $1.80 and $1.90 per share. (Compl. ¶ 147);

- Mr. Burke stated that "[t]he Company believes that there is a low probability of any future write-offs on the contract." (Compl. ¶ 147);

- Mr. Burke and Mr. Doyle affirmed that the reserves for future losses on the Transamerica contract were reasonable. (Compl. ¶ 176);

- Mr. Burke stated that "[a]s we discussed before, our largest annuity contract which represents 62% of our annuity assets is expected to break even going forward." (Compl. ¶ 178);

- Mr. Doyle stated that "[o]ur plan for the year should deliver a $1.40 to $1.35 per share." (Compl. ¶ 178); and

- When asked by an analyst whether there were likely to be any further surprises in store from ANR in the future, Mr. Doyle responded that the company had provided full and detailed disclosures about Transamerica, and Mr. Burke stated that the Company had provided fences to limit the exposure on the contract, both suggesting there would be no future surprises. (Compl. ¶ 197).

Because their "truth or falsity is discernible only after [they are] made," and

therefore they "necessarily refer to future performance," all of the foregoing

statements are forward-looking statements that are protected by the Reform Act's

safe harbor.  *See Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999).[18]

### B.    Mr. Burke's Oral Forward-Looking Statements Are Protected By The Safe Harbor of the Reform Act

At the beginning of each earnings conference call, prior to making any

substantive statements, Mr. Burke stated that :

> This conference call contains forward-looking statements.  These
> statements are subject to known and unknown risks and
> uncertainties that may cause actual future experience and results to
> differ materially from the statements made.  I also want to refer you
> to our 10-K for a complete description of our business operations.

Mr. Burke's prefatory statement triggered the safe harbor, thereby precluding

his liability for the forward-looking statements contained in the call.  As required by

the Reform Act, Mr. Burke notified participants that forward-looking statements would

be made during the call, and specifically informed participants that actual results may

differ materially from the forward-looking statements.  *See* 15 U.S.C. § 78u-

5(c)(2)(A).  Mr. Burke was not required to separately identify each forward-looking

statement or to repeat his warning each time throughout the course of the calls.  *See*

---

[18]    A forward-looking statement is "a statement containing a projection of
revenues, income (including income loss), earnings (including earnings loss) per
share, capital expenditures, dividends, capital structure, or other financial items."  15
U.S.C. § 78u-5(i)(1)(A).  A "statement of the plans and objectives of management for
future operations, including plans or objectives relating to the products or services of
the issuer," a "statement of future economic performance," or "any statement of the
assumptions underlying or relating to any statement described" in 15 U.S.C. § 78u-
5(i)(1)(A) is also a forward-looking statement.  15 U.S.C. § 78u-5(i)(1)(B), (C), (D).
Moreover, "mixed statements" – statements that contain both historical observations
and assumptions about the future – are also treated as forward-looking statements
subject to the Reform Act's safe harbor provisions.  *See, e.g., Harris,* 182 F.3d at
806-07.

*Wenger*, 2 F. Supp. 2d at 1242; *Coble*, 2002 WL 31093589, at *9 (projections in conference call protected by safe harbor based on warning at the beginning of call); *In re Sec. Litig. BMC Software*, 183 F. Supp. 2d at 910 (rejecting plaintiff's argument that safe harbor did not apply based on statement at the beginning of conference call).

Mr. Burke also specifically referred participants in the conference calls to a written document – the company's Annual Report on Form 10-K – for more information. 15 U.S.C. § 78u-5(c)(2)(B).[19] The 2000 10-K and the 2001 10-K each contain a warning that forward-looking statements are subject to risks and uncertainties, that future results may differ materially from the information contained in forward-looking statements, and a description of "[t]he factors that could affect forward-looking statements." (2000 10-K, Chlapowski Decl. Exh. 17 at 10; 2001 10-K, Chlapowski Decl. Exh. 1 at 11). *See* 15 U.S.C. § 78u-5(c)(1)(A).

The 2000 10-K specifically lists numerous factors that could affect forward-looking statements, including uncertainties in general economic and business conditions; changes in interest rate levels and the liquidity of certain securities; changes in applicable laws and government regulations; the ability of the Company to successfully implement its operating strategies; changes in the level of the

---

[19]    The conference calls containing the forward-looking statements to which the Complaint refers took place on October 26, 2001, April 24, 2002 and August 16, 2002. (Compl. ¶¶ 147, 175, 197). Accordingly, the operative 10-K's to which Mr. Burke referred were the Annual Report on Form 10-K for 2000 (the "2000 10-K"), which was filed and March 15, 2001 and was in effect at the time of the October 2001 call, and the Annual Report on Form 10-K for 2001 (the "2001 10-K"), which was filed on  March 28, 2002 and was in effect at the time of the April 2002 and August 2002 calls.

Company's operating expenses; material changes in mortality and morbidity experience; material changes in persistency; and the acquisition of complimentary companies and potential resulting indebtedness, difficulty assimilating the personnel and operations of an acquired company; and difficulty in realizing expected synergies and could disrupt its ongoing business and distract management and resources. (2000 10-K, Chlapowski Decl. Exh. 17 at 10).

The 2001 10-K provides even greater detail about thirteen risk factors that could cause the Company's actual results of operations or financial condition to differ from those contained in forward-looking statements including, among others:

- a decline in the Company's financial ratings;

- incorrect calculations of reinsurance liabilities or improperly structured investments could result in unexpected losses;

- general economic conditions could adversely affect the markets for interest rate sensitive securities and equity securities;

- the ability of the Company's cedants to manage funds withheld assets and make appropriate investments;

- unanticipated withdrawal or surrender activity may require the disposition of assets on unfavorable terms; and

- prolonged general economic downturn or prolonged downturn in equity and other capital markets.

(2001 10-K, Chlapowski. Decl. Exh. 1 at 11-13).[20]  The 2001 10-K also informs investors that the financial statements are prepared using estimates and assumptions based upon the best information available and management's best judgment at the time, referring specifically to reserve estimates, and discloses that "actual results could differ materially from our estimates." (2001 10-K, Chlapowski Decl. Exh. 1 at 13).

In order for the safe harbor to apply, the 10-K's must contain "**meaningful** cautionary statements identifying **important factors** that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1) (emphasis added).  This means that the cautionary statement must set forth factors that are "relevant to the [forward-looking statement] and must be of a nature that the factor or factors could actually affect whether the forward-looking statement is realized." *Asher v. Baxter Int'l, Inc.*, Nos 02 C 5608, 02 C 5742, 02 C 5807, 02 C 6085, 02 C 6175, 02 C 6267, 2003 WL 21825498, at *10 (N.D. Ill. July 24, 2003)

---

[20]  Plaintiffs assert that the revision of the 2001 10-K to include greater detail about the risks that had been disclosed in more general terms in the 2000 10-K constituted an admission that the risk factors contained in the 2000 10-K had been false. (Compl. ¶ 165).  As set forth above, however, absent allegations that defendants knew the statements were false or misleading at the time the original statements were made, "'[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'" *Stevelman*, 174 F.3d at 84 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995)).  Mr. Burke was not affiliated with the Company at the time the 2000 10-K was issued and did not make the statements contained therein.  The fact that after Mr. Burke joined the Company the risk disclosures were improved does not establish that the prior risk disclosures were inadequate and further demonstrates Mr. Burke's lack of culpability. *See supra* Point I.D.2.

(dismissing claims relating to forward-looking statements based on cautionary statements contained in company's public filings).[21]

The risk disclosures contained in ANR's 10-K's provide relevant information about factors that could affect whether Mr. Burke's forward-looking statements would be realized. They thus constitute meaningful cautionary statements within the meaning of the Reform Act, rendering Mr. Burke's forward-looking statements during the company's earnings conference calls non-actionable. [22]

### C.    Claims Based Upon Mr. Burke's Forward-Looking Statements Must Be Dismissed Because Plaintiffs Fail To Allege Mr. Burke's Actual Knowledge

Even if the 2000 10-K and 2001 10-K did not contain sufficient cautionary statements for purposes of the safe harbor, plaintiffs' claims relating to Mr. Burke's

---

[21]    See also Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 843-44 (N.D. Ill. June 13, 2003) (risks should be tailored to the company's business rather than warn of general risks applicable to any business); Harris v. Ivax Corp., 998 F. Supp. 1449, 1454 (S.D. Fla. 1998), aff'd, 182 F.3d 799 (11th Cir. 1999) (cautionary statements directly addressed substance of challenged statements and were tailored to address uncertainty of projection); H.R. Conf. Rep. 104-369 (November 28, 1995) at 43, 1995 U.S.C.C.A.N. 730, 742 ("cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business").

[22]    Notably, many of the factors contained in the 2000 10-K and 2001 10-K in fact relate directly to the issues identified in the Complaint, specifically cautioning investors about the very matters plaintiffs allege were withheld. The correlation between the risk disclosures in the 10-K's and the allegedly misleading statements strengthens the conclusion that the disclosures were meaningful, although it is not necessary for safe harbor protection. See H.R. Conf. Rep. 104-369 (November 28, 1995) at 44, 1995 U.S.C.C.A.N. 730, 743 ("[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor"); Harris, 182 F.3d at 807 (same); Asher, 2003 WL 21825498, at *10 (same); Stavros, 266 F. Supp. 2d at 843 ("the language need not explicitly refer to the risk that ultimately caused the projection to differ from the actual results").

forward-looking statements must be dismissed under the second prong of the safe harbor, which requires that the Complaint allege with particularity facts giving rise to a strong inference that defendants had "actual knowledge" of the falsity of the forward-looking statements when they were made. *See* 15 U.S.C. §§ 78u-5(c)(1)(B)(i), 78u-4(b)(2); *The High View Fund*, 27 F. Supp. 2d at 427 n.3.

As set forth in detail above, the Complaint does not allege a single fact supporting the assertion that Mr. Burke knew any information at the time of his alleged misstatements that would make him aware that his statements were false or misleading. *See supra* Point I.C. Absent such allegations, plaintiffs cannot demonstrate that Mr. Burke had actual knowledge of the falsity of any of his statements, and the claims relating to his forward-looking statements must therefore be dismissed pursuant to the safe harbor.

**III.    MR. BURKE'S ALLEGED MISSTATEMENTS ARE NOT ACTIONABLE AS A MATTER OF LAW BECAUSE THEY CAUSED THE MARKET PRICE OF ANR'S STOCK TO DECREASE, THEREBY NEGATING THE NECESSARY ELEMENT OF RELIANCE**

Reliance is an essential element of a Section 10(b) and Rule 10b-5 claim. *Press v. Chem. Inv. Serv.*, 166 F.3d 529, 539 (2d Cir. 1999). Plaintiffs attempt to invoke the "fraud on the market" presumption of reliance recognized by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). (Compl. ¶¶ 274-79). The fraud on the market doctrine provides a rebuttable presumption of reliance with

1-NY/1661308.2

CARMODY & TORRANCE LLP    50 Leavenworth Street    37
Attorneys at Law    Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

respect to materially misleading statements or omissions involving a security that is actively traded in an open and developed market. *Basic*, 485 U.S. at 247-50.[23]

The United States Supreme Court observed in *Basic* that the presumption of reliance does not apply in the face of a "showing that severs the link between the alleged misrepresentation and . . . the price receive (or paid) by the plaintiff" including a showing that "the market price would not have been affected" by an alleged misrepresentation, because under those circumstances "the basis for finding that the fraud has been transmitted through the market price would be gone." *Basic*, 485 U.S. at 248. In particular, the Fifth Circuit recently held that "if the market price was not *actually* affected by the statement, reliance on the market price does not *of itself* become reliance on the statement," and a claim based on the fraud on the market theory may be dismissed. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 418 (5th Cir. 2001).[24]

The price of ANR's common stock during the putative class period was not artificially inflated by Mr. Burke's alleged misrepresentations and omissions. (Chlapowski Decl. Exh. 14). On the contrary, the market price **declined** or remained

---

[23] The fraud on the market theory presumes reliance on the market price of shares traded in a well-developed, efficient market because the price reflects all publicly available information and plaintiffs' reliance on the integrity of the price may be presumed. *Basic*, 485 U.S. at 27.

[24] The Third Circuit has reached the same result in the context of a materiality analysis. *See Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) ("[i]n the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock"); *Oran*, 226 F.3d at 282-83 (in an efficient market materiality may be measured by looking to the movement, of the price of the firm's stock following disclosure of information, and that "price stability is dispositive of the question of materiality").

relatively unchanged after each of Mr. Burke's allegedly false and misleading statements:

| Alleged Misstatement | Prior Day's Closing Price | Closing Price That Day | Following Day's Closing Price |
|---|---|---|---|
| October 25, 2001 press release (Compl. ¶ 145) | $33.250 | $32.850 | $24.010 |
| November 14, 2001 10-Q (Compl. ¶ 151) | $22.990 | $23.150[25] | $23.000 |
| January 15, 2002 press release (Compl. ¶ 155) | $24.020 | $23.530 | $19.510 |
| March 28, 2002 10-K (Compl. ¶ 164) | $18.660 | $19.350 | $19.080 |
| April 24, 2002 conference call (Compl. ¶ 175) | $20.230 | $20.600 | $19.640 |
| May 15, 2002 10-Q (Compl. ¶ 178) | $19.130 | $18.990 | $19.100[26] |
| July 25, 2002 press release (Compl. ¶ 181) | $13.400 | $12.870 | $6.300 |
| August 16, 2002 conference call (Compl. ¶ 197) | $7.700 | $6.760 | $6.000 |
| November 5, 2002 press release (Compl. ¶ 200) | $4.780 | $7.390 | $4.350 |
| November 12, 2002 press release (Compl. ¶ 201) | $3.590 | $3.760 | $3.250 |
| November 19, 2002 press release (Compl. ¶ 202) | $3.750 | $4.080 | $2.240 |

In *Nathenson*, the stock price declined over the several months after the purportedly fraudulent announcements that allegedly inflated the stock price. The Court held that there was no reliance on the allegedly false statements. Similarly,

---

[25] The Court in *Nathenson* made it clear that the impact on the stock price is not simply a one-day impact, but is examined over time. *Nathenson*, 267 F. 3d at 417-18.

[26]  The stock closed at $18.990 on May 17, 2002 and at $18.800 on May 20, 2002.  (Chlapowski. Decl. Exh. 14).

ANR's stock price history demonstrates that that there was **no link** between the alleged misrepresentations made by Mr. Burke and the price paid by plaintiffs. Thus, the fraud on the market theory does not apply with respect to the statements plaintiffs attribute to Mr. Burke and plaintiffs therefore have failed to allege reliance. *See Basic,* 485 U.S. at 248; *Nathenson,* 261 F. 3d at 415.

## IV.    THE CLAIM AGAINST MR. BURKE FOR CONTROL PERSON LIABILITY MUST ALSO BE DISMISSED

Plaintiffs allege that Mr. Burke is liable as a controlling person of the Company under Section 20(a) of the 1934 Act. 15 U.S.C. § 78t. Plaintiffs' control person claim against Mr. Burke fails because the Complaint does not adequately allege, as required by Section 20(a), that Mr. Burke controlled ANR **and** that he "'was in some meaningful sense a culpable participant' in the primary violation." *Rich v. Maidstone Fin., Inc.,* No. 98 Civ. 2569 (DAB)., 2002 WL 4, at *11 (S.D.N.Y. Dec. 20, 2002) (quoting *SEC v. First Jersey Securities,* 101 F.3d 1450, 1472 (2d Cir. 1996).[27]

The heightened pleading requirements of the Reform Act apply to the "culpable participation" element of a Section 20(a) claim, since the Reform Act sets forth that, for any claim requiring proof that "the defendant acted with a particular state of mind," plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Accordingly, plaintiffs must allege specific facts giving rise to a "strong inference" that Mr. Burke was a culpable participant in the alleged underlying Section

---

[27] *See also In re Allied Capital Corp. Sec Litig.,* 2003 WL 1964184, at *7; *In re Deutsche Telekom AG Sec. Litig.,* No. 00-Civ. 9475, SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002); *In re Twinlab Corp. Sec. Litig.,* 103 F. Supp. 2d 193, 208 (E.D.N.Y. 2000).

10(b) violation . *See Maidstone Fin. Inc.*, 2002 WL 31867724, at *12. As a result, conclusory allegations are insufficient to establish culpable participation and control person liability. *Id.* at *37.[28]

Plaintiffs fail to allege Mr. Burke's culpable participation in the underlying alleged fraud here. *See, e.g., Steed Finance LDC v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 280 (S.D.N.Y. 2003) (dismissing Section 20(a) claims for failure to plead culpable participation on the same basis as scienter was insufficiently pled for Section 10(b) claim); *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 428 (S.D.N.Y. 2000) (plaintiffs required to plead "facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom the person had control, was engaging in fraudulent conduct"); *Mishkin v. Ageloff*, No. 97 Civ. 2690 LAP, 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998) (plaintiffs required to plead "particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud").

Plaintiffs' Section 20(a) claim against Mr. Burke is based solely upon his position in the Company, the fact that he signed certain allegedly misleading documents, and the allegation that he participated in, controlled, or was aware of the Company's operations and the content of the allegedly false and misleading statements disseminated to the public. (Compl. ¶¶ 293). As set forth in detail above,

---

[28]  *See also In re Deutsche Telekom*, No. 00 Civ. 9475 SHS, 2002 WL 244597, at *7 (the element of culpable participation are satisfied "where facts are pled with sufficient particularity that a strong inference is raised that the section 20(a) control person knew or should have known that the controlled person was engaging in fraudulent conduct"); *Mishkin*, 1998 WL 651065, at *25 (plaintiff must allege

plaintiffs fail to meet their burden of pleading culpable participation, since the Complaint does not allege a single specific fact to give rise to a strong inference that Mr. Burke acted with a culpable state of mind in making the allegedly false or misleading statements at issue. *See supra* Point I.C. Plaintiffs' conclusory allegations that Mr. Burke knew or recklessly disregarded information relating to the issues raised in the Complaint, absent any explanation or further detail, simply fail to satisfy the heightened pleading standard pursuant to Section 20(a). *See Maidstone Fin., Inc.*, 2002 WL 31867724, at *12.[29] The Section 20(a) claim therefore cannot be sustained and should be dismissed.

## CONCLUSION

For the foregoing reasons, the Consolidated Class Action Complaint should be dismissed in its entirety, with prejudice.

Dated: Waterbury, Connecticut
October 3, 2003

By: _____
James K. Robertson, Jr. (ct05301)
Thomas J. Sansone (ct00671)
CARMODY & TORRANCE LLP
50 Leavenworth Street
P.O. Box 1110
Waterbury, Connecticut 06721-1110
Telephone: (203) 573-1200

---

particular facts giving rise to strong inference of required state of mind for culpable participation).

[29] In any event, Mr. Burke cannot be liable pursuant to Section 20(a) with respect to accounting practices and related statements that were made before he began working at the Company. Even assuming Mr. Burke became a control person of ANR when he commenced his position in September 2001, he cannot have been considered a control person of the Company or a culpable participant in the alleged misconduct prior to that date, before he had any relationship with the Company.

**MORGAN, LEWIS & BOCKIUS, LLP**
Francis S. Chlapowski
Randi B. Pincus
101 Park Avenue, 44th Floor
New York, NY 10178
Telephone: (212) 309-6000
Facsimile:  (212) 309-6001

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, this 3rd day of October, 2003, to the following:

David R. Scott
Erin Green Comite
Scott & Scott LLC
108 Norwich Avenue
Colchester, CT 06415

Beth Kaswan
Ann Lipton
Milberg Weiss Bershad Hynes & Lerach
One Pennsylvania Plaza
New York, NY 10119

Marc Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901

Andrew M. Schatz
Schatz & Nobel
330 Main Street
Hartford, CT 06106-1817

James E. Miller
Shepherd Finkelman Miller & Shah, LLC
One Lewis Street
Hartford, CT 06103
Elias A. Alexiades
Attorney Elias A. Alexiades
215 Church Street
New Haven, CT 06525

Gary R. Battistoni
Drinker Biddle & Reath LLP
One Logan Square
Philadelphia, PA 19103-6996

John W. Cannavino
Cummings & Lockwood, LLC
Four Stamford Plaza
107 Elm Street
Stamford, CT 06902

Terence J. Gallagher
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901

Thorn Rosenthal
Cahill Gordon & Reindel, LLP
80 Pine Street
New York, NY 10005-1702

Lawrence W. Andrea
Law Offices of Lawrence W. Andrea
57 North Street, Suite 313
Danbury, CT 06810

James T. Shearin
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006

R. Nicholas Gimbel
McCarter & English, LLP
Mellon Bank Center
1735 Market Street, Suite 1700
Philadelphia, PA 19103

Thomas J. Sansone

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------- x
```
SHERRY SCHNALL, Individually and         :       CONSOLIDATED CIVIL ACTION
On Behalf of All Others Similarly Situated,   :    02-CV-2133 (GLG)
                                         :
            Plaintiff,                   :       ALL CASES
                                         :
      v.                                 :
                                         :
ANNUITY AND LIFE RE (HOLDINGS),          :
LTD., XL CAPITAL, LTD., LAWRENCE S.      :
DOYLE, FREDERICK S. HAMMER, JOHN F.      :
BURKE, WILLIAM W. ATKIN, BRIAN           :
O'HARA, AND MICHAEL P. ESPOSITO JR.      :
                                         :
            Defendant.,                  :
```
------------------------------------------------------- x
```

**FRANCIS S. CHLAPOWSKI**, hereby declares under the penalty of perjury:

1.     I am a member of the law firm of Morgan, Lewis & Bockius LLP,

attorneys for defendant John F. Burke.  I submit this declaration in support of Defendant John F.

Burke's Motion to Dismiss the Consolidated Amended Class Action Complaint (the

"Complaint"), in order to provide to this Court certain documents relied upon by the Mr. Burke

in the accompanying Memorandum of Law that may properly be considered on a motion to

dismiss.

2.     Annexed hereto as Exhibit 1 is a true and correct copy of the Annual

Report on Form 10-K for the year ended December 31, 2001, filed by Annuity and Life Re

(Holdings), Ltd. ("ANR") with the Securities and Exchange Commission ("SEC") on March 28,

2002.

3.     Annexed hereto as Exhibit 2 is a true and correct copy of ANR's press

release entitled "Annuity & Life Re September 30, 2001 Earnings Report," dated October 25,

2001.

4.      Annexed hereto as Exhibit 3 is a true and correct copy of a transcript, created by a court reporter, of ANR's October 26, 2001 earnings telephone conference call and a compact disc containing a true and correct digital recording of the October 26, 2001 earnings telephone conference call.

5.      Annexed hereto as Exhibit 4 is a true and correct copy of ANR's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001, filed with the SEC on November 14, 2001.

6.      Annexed hereto as Exhibit 5 is a true and correct copy of ANR's press release entitled "Annuity & Life Re: Fourth Quarter Charge – Additional 2002 Guidance," dated January 15, 2002.

7.      Annexed hereto as Exhibit 6 is a true and correct copy of ANR's press release entitled "Annuity & Life Re March 31, 2002 Earnings Report:  Operating Earnings Meet Expectations," dated April 23, 2002.

8.      Annexed hereto as Exhibit 7 is a true and correct copy of a transcript, created by a court reporter, of ANR's April 24, 2002 earnings telephone conference call and a compact disc containing a true and correct digital recording of the April 24, 2002 earnings telephone conference call.

9.      Annexed hereto as Exhibit 8 is a true and correct copy of ANR's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002, filed with the SEC on May 15, 2002.

10.      Annexed hereto as Exhibit 9 is a true and correct copy of ANR's press release entitled "Annuity & Life Re:  The Company Will Report a Loss for the Second Quarter Due to Charges on its Transamerica Re Annuity Reinsurance Contract.  The Company Will Also

2

Restate 2001 and First Quarter 2002 To Adopt FAS 133 With Minimal Cumulative Financial Impact. Life Revenues Increase 50%," dated July 25, 2002.

11.    Annexed hereto as Exhibit 10 is a true and correct copy of ANR's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, filed with the SEC on August 15, 2002.

12.    Annexed hereto as Exhibit 11 is a true and correct copy of a transcript, created by a court reporter, of ANR's August 16, 2002 earnings telephone conference call and a compact disc containing a true and correct digital recording of the August 16, 2002 earnings telephone conference call.

13.    Annexed hereto as Exhibit 12 is a true and correct copy of ANR's press release entitled "Annuity & Life Re to Restate Financial Statements," dated November 19, 2002.

14.    Annexed hereto as Exhibit 13 is a true and correct copy of ANR's Current Report on Form 8-K, filed with the SEC on November 19, 2002.

15.    Annexed hereto as Exhibit 14 is a true and correct copy of the unadjusted daily price of ANR stock from October 2, 2000 to September 30, 2003.

16.    Annexed hereto as Exhibit 15 is a true and correct copy of SEC Form 4 filed on behalf of John F. Burke for November, 2001.

17.    Annexed hereto as Exhibit 16 is a true and correct copy of SEC Form 4 filed on behalf of John F. Burke for May 2002.

3

18.     Annexed hereto as Exhibit 17 is a true and correct copy of ANR's Annual Report on Form 10-K for the year ended December 31, 2000, filed with the SEC on March 15, 2001.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: October 2, 2003
        New York, New York

FRANCIS S. CHLAPOWSKI

4