# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHERRY SCHNALL, Individually and On Behalf of All Others Similarly Situated, | ) Civil Action No. 02-CV-2133 (GLG) |
| | ) |
| | ) Consolidated Action |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ANNUITY AND LIFE RE (HOLDINGS), LTD., XL CAPITAL, LTD., LAWRENCE S. DOYLE, FREDERICK S. HAMMER, JOHN F. BURKE, WILLIAM W. ATKIN, BRIAN O'HARA, AND MICHAEL P. ESPOSITO, JR., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) November 19, 2003 |
| | ) |

**LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION TO
THE MOTIONS TO DISMISS FILED BY DEFENDANTS JOHN F. BURKE,
FREDERICK S. HAMMER, XL CAPITAL LTD.,
BRIAN O'HARA AND MICHAEL P. ESPOSITO, JR.**

## TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ..................................................................................................5

I.  BACKGROUND FACTS.............................................................................................5

    A.  Annuity & Life Re is Launched by XL Capital ...........................................5

    B.  ANR's Reinsurance Contract with Transamerica.........................................6

    C.  ANR's Accounting For The Transamerica Contract ..................................12

II. ANR'S FALSE AND MISLEADING STATEMENTS THROUGHOUT
    THE CLASS PERIOD................................................................................................14

    A.  False and Misleading Financial Statements...............................................14

        1.  Failure to Fully Account for Obligations to Policyholders.......................14

        2.  Failure to Recognize Expenses for Minimum Interest Payments.............15

        3.  Failure to Write-Down Deferred Acquisition Costs .................................15

    B.  False and Misleading Statements about the Risks of ANR's Business ................17

        1.  False Claim that ANR was Not Exposed to Market Risk.........................17

        2.  False Representations Regarding the Source of Earnings .........................18

        3.  False Denials that ANR Held Derivatives .................................................18

III. THE HISTORY OF ANR'S FALSE FINANCIAL REPORTING .....................................19

ARGUMENT .................................................................................................................29

I.  THE ALLEGATIONS OF THE COMPLAINT SATISFY THE PLEADING
    REQUIREMENTS OF RULE 12(b)(6) AND THE PSLRA FOR §10(b) .....................29

    A.  Rule 12(b)(6) and the Elements of a §10(b) Claim................................29

    B.  None of the Moving Defendants Disputes that Plaintiffs Have Adequately
        Stated a Claim for Violations of §10(b) Against ANR, Doyle, and Atkin ...........30

    C.  All of the Individual Defendants Made Statements for PSLRA Purposes ............30

i

       1.      The Directors "Spoke" By Signing the Annual 10-Ks ...............................30

       2.      The Group Pleading Doctrine Allows the False Statements to be Attributed to the Director Defendants.........................................................32

  D.    The Complaint Adequately Pleads Scienter .........................................................36

       1.      Plaintiffs Have Properly Pled Conscious Misbehavior and Recklessness.36

       2.      Plaintiffs Have Alleged Motive and Opportunity......................................53

  E.    The Complaint Properly Pleads Reliance ..............................................................56

  F.    Defendants' Statements are Not Protected as "Forward-Looking" ......................59

       1.      The Statements Identified by Burke are Not Forward Looking ...............59

       2.      Many Statements Appeared in Written Form and Were not Permitted to Incorporate Cautionary Language By Reference .................60

       3.      The Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........................................................61

       4.      Burke Actually Knew that His Statements Were False ............................63

II.    THE COMPLAINT PROPERLY ALLEGES CONTROL-PERSON LIABILITY AGAINST ALL OF THE DEFENDANTS ........................................................................64

  A.    Plaintiffs Need Not Plead that Allegedly Controlling Persons "Culpably Participated" in the Underlying Violation ............................................................64

  B.    If "Culpable Participation" Must be Pled, the PSLRA's Heightened Pleading Standards Do Not Apply.........................................................................68

  C.    Plaintiffs Have Properly Alleged Control Person Liability Under Any Reading of the Pleading Requirements.................................................................70

       1.      Plaintiffs Have Alleged the Existence of a Primary Violation .................70

       2.      Plaintiffs have Properly Alleged Control....................................................70

       3.      Plaintiffs Have Properly Alleged Culpable Participation .........................75

III.   CONCLUSION....................................................................................................................80

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ABC Arbitrage v. Tchuruk,*
  291 F.3d 336 (5th Cir. 2002) ...................................................................................47

*Adams v. Amplidyne, Inc.,*
  No. 99-4468, 2000 U.S. Dist. LEXIS 21383 (D.N.J. Oct. 24, 2000) .........................39

*In re Adaptive Broadband Sec. Litig.,*
  No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887 (N.D. Cal. Apr. 2, 2002) ..............42

*Aldridge v. A.T. Cross Corp.,*
  284 F.3d 72 (1st Cir. 2002).........................................................................................54

*In re Allaire Corp. Secs. Litig.,*
  224 F. Supp. 2d 319 (D. Mass. 2002) ........................................................................47

*In re American Bank Note Holographics Sec. Litig.,*
  93 F. Supp. 2d 424 (S.D.N.Y. 2000)...................................................................33, 43

*In re Ames Dep't Stores Sec. Litig.,*
  991 F.2d 953 (2d Cir. 1993).......................................................................................56

*In re Amylin Pharms, Inc. Sec. Litig.,*
  No. 01cv1455 BTM (NLS), 2002 U.S. Dist. LEXIS 19481
  (S.D. Cal. Oct. 9, 2002) .............................................................................................53

*In re Ashanti Goldfields Sec. Litig.,*
  184 F. Supp. 2d 247 (E.D.N.Y 2002) ...................................................................44, 46

*In re BankAmerica Corp. Sec. Litig.,*
  78 F. Supp. 2d 976 (E.D. Mo. 1999)..........................................................................62

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988)............................................................................................29, 50

*In re Blech Sec. Litig.,*
  No. 94 Civ. 7696 (RWS), 2002 U.S. Dist. LEXIS 19835
  (S.D.N.Y. Oct. 17, 2002) ...........................................................................................76

*Brown v. Enstar Group, Inc.,*
  84 F.3d 393 (11th Cir. 1996) .....................................................................................67

*Bryant v. Avado Brands, Inc.,*
  187 F.3d 1271 (11th Cir. 1999) .................................................................................59

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997).................................................................................57, 59

*Burstyn v. Worldwide Xceed Group,*
  No. 01 Civ. 1125 (GEL), 2002 U.S. Dist. LEXIS 18555
  (S.D.N.Y. Sept. 30, 2002) ..........................................................................................48

*In re CINAR Corp. Sec. Litig.,*
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ............................................................32, 43, 79

*In re Cabletron Sys.,*
    311 F.3d 11 (1st Cir. 2002).................................................................... *passim*

*In re Campbell Soup Co. Sec. Litig.,*
    145 F. Supp. 2d 574 (D.N.J. 2001) ..........................................................46

*Carpenter v. Harris, Upham & Co.,*
    594 F.2d 388 (4th Cir. 1979) ...................................................................67

*In re Cell Pathways Sec. Litig.,*
    No. 99-752, 2000 U.S. Dist. LEXIS 8584 (E.D. Pa. June 20, 2000)...........................39

*Chambers v. Time Warner,*
    282 F.3d 147 (2d Cir. 2002)....................................................................61

*Chill v. GE,*
    101 F.3d 263 (2d Cir. 1996)....................................................................37

*Christidis v. First Penn. Mortgage Trust,*
    717 F.2d 96 (3d Cir. 1983) .....................................................................46

*Rich v. Maidstone,*
    No. 98 Civ. 2569 (DAB), 2000 U.S. Dist. LEXIS 24510 (S.D.N.Y. Dec. 20,
    2002) ...........................................................................................71

*In re Atlantic Fin. Fed. Sec. Litig.*
    No. 97 Civ. 4760 (JKG), 1990 U.S. Dist. LEXIS 15965 (E.D. Pa. 1990)..................58

*In re Emex Corp. Sec. Litig.*
    No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528 (S.D.N.Y. Sept. 17,
    2002) ........................................................................................71, 76

*Ross v. Bolton,*
    No. 83 Civ. 8244 (WK), 1989 U.S. Dist. LEXIS 7704 (S.D.N.Y. Apr. 4, 1989)........65

*In re Complete Management Inc. Sec. Litig.,*
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................33, 48

*In re Computer Assocs. Class Action Sec. Litig.,*
    75 F. Supp. 2d 68 (E.D.N.Y. 1999) ........................................................46

*Conley v. Gibson,*
    355 U.S. 41 (1957)...............................................................................29

*Cosmas v. Hassett,*
    886 F.2d 8 (2d Cir. 1989) ...........................................................33, 39, 53

*In re Credit Suisse First Boston Corp. Sec. Litig.,*
    1998 U.S. Dist. LEXIS 16560 (S.D.N.Y. Oct. 19, 1998) ...........................58

*Credit Suisse First Boston Corp. v. ARM Fin. Group,*
    2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001) ............................62

iv

*Cromer Fin. Ltd. v. Berger,*
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)........................................................76

*DGM Investments Inc. v. New York Futures Exchange,*
    265 F. Supp. 2d 254 (S.D.N.Y. 2003).......................................................38

*Danis v. USN Communications, Inc.,*
    73 F. Supp. 2d 923 (N.D. Ill. 1999) .........................................................52

*Degulis v. LXR Biotechnology,*
    928 F. Supp. 1301 (S.D.N.Y. 1996)..........................................................33

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ...................................................................46

*DiVittorio v. Equidyne Extractive Indus.,*
    822 F.2d 1242 (2d Cir. 1987)............................................................31, 46

*Drobbin v. Nicolet Instrument Corp.,*
    631 F. Supp. 860 (S.D.N.Y. 1986)...........................................................74

*EP Medsystems v. Echocath Inc.,*
    235 F.3d 865 (3d Cir. 2000).....................................................................60

*Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003)......................................................................59

*In re Employee Solutions Litig.,*
    1998 U.S. Dist. LEXIS 16444 (D. Ariz. Sept. 22, 1998)............................60

*In re Enron Corp. Sec. Litig.,*
    No. H-01-3624, 2003 U.S. Dist. LEXIS 1668 (S.D. Tex. Jan. 28, 2003)...................65

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995) ...................................................................40

*First Interstate Bank, N.A. v. Pring,*
    969 F.2d 891 (10th Cir. 1992) ..................................................................67

*In re First Merchants Acceptance Corp. Sec. Litig.,*
    1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998) .............................46

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,*
    270 F.3d 645 (8th Cir. 2001) ............................................................ *passim*

*Foman v. Davis,*
    371 U.S. 178 (1962)...................................................................................80

*G. A. Thompson & Co. v. Partridge,*
    636 F.2d 945 (5th Cir. 1981) ...................................................................67

*Gabriel Capital L.P. v. Natwest Fin. Inc.,*
    122 F. Supp. 2d 407 (S.D.N.Y. 2000).......................................................76

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000).....................................................................29

*Glazer v. Formica Corp.,*
    964 F.2d 149 (2d Cir. 1992)......................................................................58

*Greebel v. FTP Software,*
    194 F.3d 185 (1st Cir. 1999)...............................................................46, 55

*Greenberg v. Howtek, Inc.,*
    790 F. Supp. 1181 (D.N.H. 1992)............................................................47

*Hallet v. Li & Fung Ltd.,*
    No. 95 Civ. 8917 (JSM) ,1997 U.S. Dist. LEXIS 15509
    (S.D.N.Y. Oct. 16, 1997) ..........................................................................58

*Harrison v. Dean Witter Reynolds, Inc.,*
    974 F.2d 873 (7th Cir. 1992) ...................................................................67

*Harrison v. Enventure Capital Group, Inc.,*
    666 F. Supp. 478 (W.D.N.Y. 1987) .........................................................69

*In re Hayes Lemmerz,*
    271 F. Supp. 2d 1007 (E.D. Mich. 2003)................................................54

*In re Health Management, Inc. Securities Litig.,*
    970 F. Supp. 192 (E.D.N.Y. 1997) ....................................................33, 68

*Helwig v. Vencor Inc.,*
    251 F.3d 540 (6th Cir. 2001) .......................................................... *passim*

*Hemming v. Alfin Fragrances Inc.,*
    690 F. Supp. 239 (S.D.N.Y. 1988)...........................................................69

*Hollinger v. Titan Capital Corp.,*
    914 F.2d 1564 (9th Cir. 1990) .................................................................67

*Holmes v. Baker,*
    166 F. Supp. 2d 1378 (S.D. Fla. 2001) ...................................................56

*Howard v. Everex Sys.,*
    228 F.3d 1057 (9th Cir. 2000) .................................................................32

*Hudson Venture Partners, L.P. v. Patriot Aviation Group, Inc.,*
    No. 98 Civ. 4132 (DLC), 1999 U.S. Dist. LEXIS 1518
    (S.D.N.Y. Feb. 16, 1999).........................................................................36

*In re IBM Sec. Litig.,*
    163 F.3d 102 (2d Cir. 1998)......................................................................47

*In re Indep. Energy Holdings PLC Sec. Litig.,*
    154 F. Supp. 2d 741 (S.D.N.Y. 2001)............................................. *passim*

*In re Initial Pub. Offering Sec. Litig.,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................. *passim*

*In re Interpublic Sec. Litig.,*
    No. 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844
    (S.D.N.Y. May 30, 2003)..........................................................................67

*Jacobs v. Coopers & Lybrand,*
No. 97 Civ. 3374 (RPP), 1999 U.S. Dist. LEXIS 2102
(S.D.N.Y Feb. 26, 1999) ...................................................................................75

*Kalnit v. Eichler,*
264 F.3d 131 (2d Cir. 2001)..............................................................................55

*In re Kidder Peabody Sec. Litig.,*
10 F. Supp. 2d 398 (S.D.N.Y. 1998)................................................................37

*Kurzweil v. Philip Morris,*
1997 U.S. Dist. LEXIS 4451 (S.D.N.Y. 1997)................................................64

*Lanza v. Drexel & Co.*
479 F.2d 1277 (2d Cir. 1973)............................................................................66

*In re Lernout & Hauspie Sec. Litig.,*
208 F. Supp. 2d 74 (D. Mass. 2002) ...........................................................32, 47

*In re Leslie Fay Companies Inc. Sec. Litig.,*
918 F. Supp. 749 (S.D.N.Y. 1996)..............................................................73, 75

*Lindelow v. Hill,*
No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 19, 2001) ...................39

*In re Livent, Inc Sec Litig,*
78 F. Supp. 2d 194 (S.D.N.Y. 1999).........................................................33, 52, 73

*In re Livent Sec. Litig.,*
148 F. Supp. 2d 331 (S.D.N.Y. 2001)...................................................66, 69, 76, 79

*McGann v. Ernst & Young,*
102 F.3d 390 (9th Cir. 1996) ............................................................................55

*In re McKesson HBOC, Inc. Sec. Litig.,*
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................................................42, 48

*In re Mercator Software Inc Sec. Litig.,*
161 F. Supp. 2d 143 (D. Conn. 2001)...........................................................42, 54

*Metge v. Baehler,*
762 F.2d 621 (8th Cir. 1985) ............................................................................67

*In re MicroStrategy Inc. Secs. Litig.,*
115 F. Supp. 2d 620 (E.D. Va. 2000) ..........................................................48, 49

*Nanopierce Tech. v. Southridge Capital Mgmt.,*
No. 02 Civ. 0767 (LBS), 2002 U.S. Dist. LEXIS 24049
(S.D.N.Y. Oct. 10, 2002) ..................................................................................56

*Nathenson v. Zonagen, Inc.,*
267 F.3d 400 (5th Cir. 2001) .......................................................................53, 59

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West
Holding Corp.,*

320 F.3d 920 (9th Cir. 2003) ................................................................................57

*In re Nortel Networks Corp. Sec. Litig.,*
238 F. Supp. 2d 613 (S.D.N.Y. 2003)............................................46, 60, 62

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000).............................................................. *passim*

*In re Number Nine Visual Tech. Corp. Sec. Litig.,*
51 F. Supp. 2d 1 (D. Mass. 1999) ...............................................................46

*In re Oxford Health Plans, Inc. Sec. Litig.,*
187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................31, 32

*In re Par Pharmaceutical Inc Sec. Litig.,*
733 F. Supp. 668 (S.D.N.Y. 1990)..............................................................69

*In re PetSmart Sec. Litig.,*
61 F. Supp. 2d 982 (D. Ariz. 1999) ............................................................32

*Pirraglia v. Novell,*
339 F.3d 1182 (10th Cir. 2003) ..................................................................54

*Press v. Chemical Inv. Servs. Corp.,*
166 F.3d 529 (2d Cir. 1999)................................................................36, 52

*In re Quintel Entm't Inc. Sec. Litig.,*
72 F. Supp. 2d 283 (S.D.N.Y. 1999)....................................................65, 68

*In re Ramp Networks Sec. Litig.,*
201 F. Supp. 2d 1051 (N.D. Cal. 2002) ....................................................47

*Rehm v. Eagle Fin. Corp.,*
954 F. Supp. 1246 (N.D. Ill. 1997) ...........................................................48

*In re Reliance Sec Litig,*
91 F. Supp. 2d 706 (D. Del. 2000).................................................35, 52, 60

*In re Reliance Sec. Litig.,*
135 F. Supp. 2d 480 (D. Del. 2001)............................................................32

*In re Resource Am. Secs. Litig.,*
No. 98-5446, 2000 U.S. Dist. LEXIS 10640 (E.D. Pa. Jul. 26, 2000)........................55

*Ressler v. Liz Claiborne, Inc.,*
75 F. Supp. 2d 43 (E.D.N.Y. 1998) ...........................................................55

*Robbins v. Moore Med. Corp.,*
788 F. Supp. 179 (S.D.N.Y. 1992)......................................................56, 69

*Rochez Bros., Inc. v. Rhoades,*
527 F.2d 880 (3d Cir. 1975)........................................................................67

*Rothman v. Gregor,*
220 F.3d 81 (2d Cir. 2000)..............................................................41, 48, 54

*Ruskin v. TIG Holdings Inc.,*
No. 98 Civ. 1068 (LLS) 2000 U.S. Dist. LEXIS 11517
(S.D.N.Y. Aug. 14, 2000) ...............................................................................62, 77, 78

*In re Sears Roebuck & Co.*
2003 U.S. Dist. LEXIS 19126 (N.D. Ill. Oct. 23, 2003) ..............................................44

*SEC v. First Jersey Sec.,*
101 F.3d 1450 (2d Cir. 1996) ............................................................................ *passim*

*San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos.,*
75 F.3d 801 (2d Cir. 1996) ...........................................................................................57

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63 (2d Cir. 2001) ............................................................................... *passim*

*In re Scholastic Inc Sec Litig,*
No. 97 Civ. 2447, 1998 U.S. Dist. LEXIS 13910 (S.D.N.Y. 1998) ............................61

*In re Sci. Atlanta Inc Sec. Litig.,*
239 F. Supp. 2d 1351 (N.D. Ga. 2002) .......................................................................62

*Scritchfield v. Paolo,*
274 F. Supp. 2d 163 (D.R.I. 2003) ..............................................................................58

*In re Seebeyond Techs Sec. Litig.,*
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................................55, 62

*Shapiro v. UJB Fin. Corp.,*
964 F.2d 272 (3d Cir. 1992) ........................................................................................44

*Shaw v. Digital Equip. Corp.,*
82 F.3d 1194 (1st Cir. 1996) .................................................................................40, 60

*Shields v. Citytrust Bancorp., Inc.,*
25 F.3d 1124 (2d Cir. 1994) ..................................................................................53, 74

*In re Shopko Sec. Litig.,*
No. 01-C-1034, 2002 U.S. Dist. LEXIS 23887 (E.D. Wis. Nov. 5, 2002) ......41, 43, 46

*In re Smartalk Teleservices, Inc. Sec. Litig.,*
124 F. Supp. 2d 527 (S.D. Ohio 2000) .......................................................................50

*In re Solv-Ex Corp. Sec. Litig.,*
210 F. Supp. 2d 276 (S.D.N.Y. 2000) .........................................................................75

*Stavros v. Exelon Corp.,*
266 F. Supp. 2d 833 (N.D. Ill. 2003) ..........................................................................43

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
250 F.3d 87 (2d Cir. 2001) ............................................................................64, 66, 67

*In re Sunbeam Sec. Litig.,*
89 F. Supp. 2d 1326 (S.D. Fla. 1999) .........................................................................42

*In re Symbol Technology Class Action Litig.,*
950 F. Supp. 1237 (E.D.N.Y. 1997) ...........................................................................55

*Tatz v. Nanophase Techs. Corp.*,
No. 01 C 8440, 2003 U.S. Dist. LEXIS 9982 (N.D. Ill. June 12, 2003)......................58

*Teachers Retirement Sys. v. ACLN*,
No. 01 Civ. 11814 (MP), 20003 U.S. Dist. LEXIS 7869
(S.D.N.Y. May 9, 2003)....................................................................................71

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000)....................................................54

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ..................................................................54, 64

*Thomson Kernaghan & Co. v. Global Intellicon, Inc.*,
No. 99 Civ. 3005 (DLC), 2000 U.S. Dist. LEXIS 6650
(S.D.N.Y. May 17, 2000)....................................................................73

*In re Twinlab Corp. Sec. Litig.*,
103 F. Supp. 2d 193 (E.D.N.Y. 2000) ..............................................78, 79

*In re U.S. Aggregates Inc Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ..............................................55

*In re U.S. Bioscience Sec. Litig.*,
806 F. Supp. 1197 (E.D. Pa. 1992) ..............................................35, 36, 53

*In re Unicapital Corp. Secs. Litig.*,
149 F. Supp. 2d 1353 (S.D. Fla. 2001) ..............................................62

*United States v. Simon*,
425 F.2d 796 (2d Cir. 1969)..............................................................51, 56

*In re Vivendi Universal*,
No. 02 Civ. 5571, 2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003) ...62, 70, 71

*Wilson v. Bernstock*,
195 F. Supp. 2d 619 (D.N.J. 2002) ..............................................55

*In re Worldcom, Inc. Sec. Litig.*,
No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 8245
(S.D.N.Y. May 19, 2003)................................................................ *passim*

*In re WRT Energy Sec. Litig.*,
No. 98 Civ. 3610 (JFK), 1999 U.S. Dist. LEXIS 3883
(S.D.N.Y. Mar. 29, 1999) ................................................................43

*In re Xerox Corp. Sec. Litig.*,
165 F. Supp. 2d 208 (D. Conn. 2001)..............................................38, 43

## OTHER AUTHORITIES

15 U.S.C. § 78................................................................................ *passim*

17 C.F.R. § 240.12b-2................................................................65, 71, 76

*Black's Law Dictionary* 385 (7th ed. 1999) ..............................................69

Lead Plaintiffs, Communication Workers of America and Midstream Investments, Ltd,

submit this single brief in response to the three separate Motions to Dismiss the Consolidated

Amended Complaint ("Complaint") filed by (i) John F. Burke, (ii) Frederick S. Hammer, and

(iii) XL Capital, Ltd, Brian O'Hara, and Michael P. Esposito. This memorandum will refer to

these briefs as the "Burke Brief" the "Hammer Brief," and the "XL Capital Brief," respectively.

## PRELIMINARY STATEMENT

This case arises out of Defendants' materially false and misleading statements concerning

the financial performance of Annuity & Life Re (Holdings) ("ANR" or "the Company"). As

detailed in the Complaint, beginning on March 15, 2000, and continuing until October 2001 (the

"Class Period"), Defendants reported tens of millions of dollars of income on a massive annuity

reinsurance contract that was actually generating *losses*. Defendants concealed these losses from

investors by engaging in a series of blatantly improper accounting practices. Among these were

Defendants' failure to recognize expenses on its income statements for incurred (and often paid)

obligations to policy holders imposed by state law, and failure to reevaluate the profitability of

its largest annuity contract in the face of adverse experience that diverged drastically from

expectations. Even after Defendants performed these reevaluations halfway through the Class

Period, they did so improperly, by manipulating the factors used in its "loss recognition testing"

to avoid recognizing further losses and to cover up their fraud.

Perhaps most egregiously, for the first half of the Class Period, Defendants steadfastly

assured investors that ANR was *virtually free from market risk*. The truth, however, was that

the success of ANR's annuity segment, and indeed the ability of ANR to survive as a going

concern, were overwhelmingly dependent on the vicissitudes of the equity markets. Defendants'

fraud was so pervasive that, by the end of it all, ANR was forced to acknowledge through

successive restatements that it had consistently, repeatedly, and materially misstated virtually all

of its financial statements issued throughout the Class Period. As a result of ANR's belated public disclosure of its huge losses, ANR lost the favorable ratings it needed to satisfy covenants in its reinsurance agreements, became unable to write new business, and, ultimately, warned investors that it might no longer be able to continue as a going concern. Defendants' fraud caused ANR's share price to rise to a peak of $36.98 before plummeting to $2.24 at the end of the Class Period, when the Defendants issued their final, devastating disclosures.

Notably, in their briefs, *no moving Defendant disputes* that the Complaint properly pleads §10(b) claims against ANR, its President and CEO, Lawrence Doyle, or against its CFO, William Atkin. In fact, neither ANR nor Doyle has even moved to dismiss the Complaint; instead, both have filed answers that *admit* many of plaintiffs' allegations. Similar, Atkin has not challenged the suffiency of Plaintiffs' claims against him, but rather has raised supposed technical deficiencies in the procedures used to effect his joinder. *No moving Defendant disputes* that ANR's financial statements were materially false and misleading, or that the Complaint fails to allege *why* each statement was false and misleading; indeed, Defendants cannot make such an argument in light of ANR's multiple restatements. Finally, *no moving Defendant disputes* that ANR's accounting practices violated Generally Accepted Accounting Principles ("GAAP") for precisely the reasons detailed in the Complaint. Thus, *no dispute exists* that plaintiffs have stated a claim for securities fraud — the only remaining question posed by the Defendants is *who* should be held responsible for that fraud.

Defendants argue that they personally cannot be held responsible because the accounting involved here is "confusing" or "complex," and that nothing in the Complaint evidences anything other than a good-faith attempt to make accounting judgments in an area of extreme uncertainty. However, although some background explanation is required, the accounting

irregularities and misstatements in this case did not result from a reasonable misunderstanding of arcane GAAP details. To the contrary, the fraud was fundamental to the basic financial underpinnings of ANR's reinsurance business, and, in fact, is devastatingly simple to understand.

At bottom, plaintiffs' allegations — which are not only undisputed, but to which ANR admitted in its Answer filed September 30, 2003 ("ANR Answer") — boil down to this: ANR signed a contract (the "Transamerica contract") where the only hope of breaking even — much less turning a profit — was to earn a return of more than 6.25% on a particular pool of assets. Both before and during the Class Period, ANR consistently failed to earn a return that even approached the necessary 6.25%. Despite never earning the required 6.25% return on the Transamerica contract, Defendants repeatedly reported profits on it, covered up ANR's problems with rosy projections that were dependent on achieving a remarkable *10%* investment return, and repeatedly assured investors that ANR was "not directly exposed to market risk." ¶¶71, 76. All of these statements are attributable to the moving Defendants, and Defendants either knew or were reckless in not knowing that the statements were false.

Each of the moving individual Defendants' principal defense (except Atkin) is that plaintiffs have not shown that he individually knew about the problems with the Transamerica contract. This argument is pure makeweight. The Transamerica contract represented between 45% and 97% of ANR's reported liabilities to policyholders during the Class Period, and 83% of ANR's reported assets in 1999. Given the stark dislocation — each quarter, for years — between the return ANR was earning on its investments versus what it was required to pay policyholders, Defendants would have needed to be willfully blind to miss ANR's problems.

Moreover, it is inconceivable that any of the Director-defendants were kept in the dark about the reasons for the sudden announcement, halfway through the Class Period, of the

"retirement" of ANR's CFO, William Atkin, in an error-laden press release so hastily drafted that it did not even identify Atkin's *last name*. Nor is it likely that the Director-defendants were unaware that shortly after announcing his "retirement," Atkin sold virtually all of his ANR holdings, resulting in proceeds of over $2 million. Certainly Burke, who immediately replaced Atkin, must have had some inkling of the circumstances of his appointment. Nor can Burke fairly disavow the calculations of "write-offs" and "reserves" he personally vouched for, and which served to delay ANR's day of reckoning and cover up its prior false financial reports.

XL Capital has not been sued under §10(b) as a primary violator, but only has been sued in connection with its "control" of ANR. XL Capital claims that it cannot be held liable as a "control person" under the federal securities laws because the Complaint fails to demonstrate that XL Capital, as a minority ANR shareholder, possessed any control over ANR's policies or financial reporting. However, XL Capital placed its *President and CEO*, defendant Brian O'Hara, and its *Chairman of the Board*, Michael Esposito, on ANR's Board of Directors. Even more damningly, XL Capital *admitted* that it possessed control over ANR when, in its annual report filed with the SEC for the year 2000, it stated: "Although the Company [XL] has beneficial ownership of only 11% of ALRe's [ANR's] outstanding common shares, XL is *deemed to have significant influence* as the Company has representatives on ALRe's board of directors." (emphasis added) ¶296.[1] In light of this extraordinary representation, XL cannot now be heard to disclaim responsibility for ANR's fraud.

---

[1] Annuity and Life traded on the NASDAQ Small Market Stock Exchange under the symbol ALRE until August 2, 2001. Thereafter, it traded on the NYSE under the symbol "ANR."

## STATEMENT OF FACTS

**I.    BACKGROUND FACTS**

**A.    Annuity & Life Re is Launched by XL Capital**

ANR is a Bermuda-based reinsurance company.  As a reinsurer, ANR provides insurance to other insurance companies, known as "cedents." ¶43.  ANR reinsures primary insurers directly, and also reinsures other reinsurers.  ¶.  Such reinsurance of other reinsurers is known as "retrocessional" insurance.  ¶43.  ANR specializes in providing reinsurance for two kinds of products: annuities, which are an investment vehicle typically offered by insurance companies, and life insurance. ¶2, 40.

In December 1997, XL Capital created ANR, and installed Lawrence Doyle as its President and CEO. ¶48.  At that time, ANR's Board of Directors consisted of Doyle, Frederick S. Hammer, Robert M. Lichten, Michael P. Esposito, and Charles G. Collis.  These five people, plus CFO Andrew S. Lerner, represented all of ANR's executive officers and directors at the time.  *See* Hammer Exh. A.  ANR's Registration Statement stated that "The Company has developed and its Board of Directors has approved underwriting guidelines, with the objective of controlling the risks of the reinsurance policies written as well as to determine appropriate pricing levels." Hammer Exh. A.  In early 1998, William Atkin replaced Andrew Lerner as CFO.

Of ANR's five directors, two were affiliated with XL Capital (formerly known as EXEL): Doyle had been an Executive Vice President of XL until he became the head of ANR, and Esposito was (and remains) Chairman of XL's Board of Directors.  *See* XL Exh. A.  Of the remaining three directors, Collis resigned once the offering was completed, *see* Hammer Exh. A, and Lichten soon thereafter became a director of one of XL Capital's major subsidiaries, *see* XL Exh. A.  In February 1998, Brian O'Hara, President and CEO of XL Capital, became an ANR Director, as did Robert Clements, a director of another XL Capital subsidiary.  *See* XL Exh. A.

5

By April 2000, XL had become ANR's single largest shareholder. *See* XL Exh. A (announcing

impending transaction with Risk Capital). In its Registration Statement, signed by Esposito,

Hammer, and Lichten, ANR stressed the value of Doyle's past insurance experience with XL

Capital and other companies:

> The Company has begun assembling a senior management team of experienced
> insurance and reinsurance professionals to implement its [business] strategy. The
> Company's President and Chief Executive Officer, Lawrence S. Doyle,
> has over 32 years of experience in the insurance and reinsurance industries and was
> formerly the President and Chief Executive Officer of GCR Holdings Limited . . .
> from its formation as a Bermuda reinsurer specializing in catastrophe risk in 1993
> until its acquisition by EXEL Limited in 1997, when Mr. Doyle became an
> Executive Vice President of EXEL . . . . In addition to Mr. Doyle, the Company's
> Board of Directors includes Frederick S. Hammer, Michael P. Esposito, Jr. and
> Robert M. Lichten . . . Management believes that the extensive insurance and
> financial services expertise possessed by the Company's directors and President
> and Chief Executive Officer should provide the Company with a competitive
> marketing advantage.

¶258; Hammer Exh. A.

The Registration Statement, as well as subsequent ANR filings (Hammer Exh. A; XL

Exh. A) also explained that as of its inception, ANR contracted with a company called Inter-

Atlantic Securities Corporation to assist ANR with recruiting senior management and

"develop[ing] products, financial planning, management of assets and liabilities." XL Exh. A.

Inter-Atlantic Securities and its parent (together, "Inter-Atlantic") were headed by none other

than Esposito, Hammer, and Lichten. *See* XL Exh. A; Hammer Exh. A. Interestingly, although

the agreement with Inter-Atlantic called for ANR to make five annual payments of $600,000

beginning in 1999, ANR prepaid its entire balance due, minus a 10% discount, in 1999, resulting

in an immediate payment of $2.7 million to Inter-Atlantic. XL Exh. A.

### B.    ANR's Reinsurance Contract with Transamerica

This lawsuit revolves around a particular annuity reinsurance contract signed by ANR in

September 1998, just months after its initial public offering. ¶¶50-51. In this contract, ANR

agreed to provide retrocessional insurance to a company called Transamerica Occidental Life

Insurance ("Transamerica"), which itself had agreed to provide reinsurance to a primary insurer

known as IL Annuity & Life ("IL Annuity").  The underlying annuity policies that were sold by

IL Annuity, reinsured by Transamerica, and retrocessionally insured by ANR, were part of a

series called VisionMark.  ¶57.

The specific features of the VisionMark annuity policies are described more fully in the

Complaint, ¶¶58-60, but two points are particularly relevant to this litigation.  First, VisionMark

policyholders were told that, for the premiums that they paid upon the purchase of the policy,

they would later be paid annuities (most annuity policies had 10-30 year terms) based upon the

market performance of certain categories of IL Annuity investments.  So, if the investments did

well, the policyholders would share in the benefits.  However, if the investments did poorly, the

policyholders had a safety net.  These policies were "fixed," meaning that they promised a

guaranteed minimum interest rate to policyholders, even if the underlying investments did

poorly.  ¶58.  At all times relevant to this litigation, state law controlled the minimum interest

rates guaranteed to policyholders.  These state laws required that the annuity policies sold by IL

Annuity include a return to policyholders on their premiums of *at least* 3% to 3.5% annual

interest, calculated on a cumulative basis for the life of the policy.  ¶¶56-57.  Moreover, IL

Annuity needed to pay these minimum annual returns regardless of any portfolio management

fees it would otherwise have charged and collected from policyholders.  ¶57.

The second relevant point about the VisionMark policies is that IL Annuity chose to

invest 70% of the premiums earned on the VisionMark policies in convertible bonds. ¶60.

Convertible bonds are corporate bonds that, for a fee, can be "converted" into the common stock

of the issuing company.  If the market price of the issuers' stock appreciates above the price for

7

conversion in the bond, the bonds' value increases.  In exchange for this convertible feature, the bonds typically pay a lower interest rate than ordinary corporate bonds.  ¶60.  As ANR would later admit in an 8-K filed on the last day of the Class Period, "While convertible bonds would typically be expected to produce lower investment [i.e., interest] income than other fixed income securities, convertible bonds provide the potential for higher total returns through the underlying equity component of the bonds." ¶60.  Thus, because 70% of the assets supporting the VisionMark policies were invested in convertible bonds, the profitability of the VisionMark policies depended in large part on the performance of the equity markets.  ¶60.

IL Annuity arranged for Transamerica to reinsure 80% of the risk associated with the VisionMark policies, and Transamerica reinsured 64% of the risk to ANR.  Thus, IL Annuity was left with 20% of the risk; Transamerica held 16% of the risk; and ANR assumed the bulk of the risk — 64%, to be precise — associated with the VisionMark policies.  ¶62.  ANR's contract with Transamerica, and Transamerica's contract with IL Annuity, were "modified coinsurance" arrangements.  In a "modified coinsurance" structure, the ceding insurer retains ownership and control over the assets that support the policies, but allocates a portion of those assets to the reinsurer.  ¶44.  The reinsurer then lists its allocable share of these investments as an asset on its own balance sheet, called "Funds Withheld at Interest."  ¶47.  In ANR's case, by reinsuring 64% of the VisionMark business through a "modified coinsurance" arrangement, ANR assumed the lion's share of the risk that the returns on the investments (e.g., the corporate bonds) might be inadequate to cover the associated obligations to VisionMark policyholders, while allowing IL Annuity to retain the control and decision making as to which particular investments were purchased.  ¶44.  Transamerica provided ANR with information about the performance of the investments and changes in policyholder account status on a monthly basis.  ¶261.

The Transamerica contract represented a massive share of ANR's business. During the Class Period, the Transamerica contract accounted for between 61% and 95% of ANR's reported "Funds Withheld at Interest" assets, the item on ANR's balance sheet that aggregated all the investments that supported all of ANR's reinsured annuity contracts. The Transamerica contract was also responsible for between 45% and 97% of ANR's assumed liabilities to annuity policyholders. ¶63. At the end of 1999, the portion of the Funds Withheld at Interest asset associated with Transamerica totaled $1.51 billion. ¶73. Additionally, as is typical in modified coinsurance structures, ANR assumed some of the *costs* associated with the policies that it reinsured – specifically, costs associated with brokers' commissions on those policies. As is required under GAAP, ANR deferred its recognition of these costs, and instead listed them as an asset on its balance sheet called "deferred acquisition costs," or DAC. ¶47. These costs were to be amortized over the life of ANR's reinsurance contract, using a schedule based upon ANR's projected lifetime profits on the contract. ¶47. In 1999, of the $203 million total deferred acquisition costs ANR reported on its balance sheet, $201.5 million was allocable to the Transamerica contract. ¶63. At the end of 1999, the portion of ANR's reported liabilities to policyholders associated with the Transamerica contract totaled a staggering $1.6 billion. ¶55.

In other words, because the VisionMark policyholder obligations were substantially supported by convertible bonds, and the modified coinsurance arrangement ceded the risks and rewards of the investments and policies to ANR, ANR began its existence by tying its entire future to one big bet on the equity markets in general, and the performance of issuers' stock underlying the convertible bonds in particular. ¶63. None of these extraordinary risks were disclosed to the public until late in the Class Period.

The bet was a particularly risky one because of the effect of the statutory minimum interest guarantees on ANR's liabilities to policyholders. Each policyholder was guaranteed a 3 to 3.5% annual return on his premiums, even *after* IL Annuity deducted fees for managing the investment portfolio. IL Annuity's annual management fee was 2.75% during the Class Period. ¶57. Because the policyholder was entitled to the full 3% to 3.5% annual return on his premiums, the investments purchased with the premium dollars (*i.e.*, here primarily the corporate bonds) needed to earn at least 6.25% (2.75 plus 3.5) merely to meet policyholder obligations. ¶57. For ANR to turn a profit, the investment returns also needed to cover ANR's expense for the amortization of the deferred costs (*i.e.*, brokers' commissions), as well as ANR's own operating costs. ¶57. The bonds never performed at this required rate. ¶58. Indeed, ANR has *admitted* that the investments included in the Funds Withheld at Interest asset consistently performed at rates well below 6.25%. *See, e.g.*, ANR Answer at ¶¶55, 65, 73, 83.

In fact, both before and during the Class Period, the Funds only performed above 6.25% in a *single quarter* — and even that performance was only possible because IL Annuity undertook an extraordinary liquidation of its investments. ¶110. Because the Funds consistently performed so poorly, ANR experienced stunning losses. Nonetheless, ANR not only failed to acknowledge the losses, but instead actually reported *net income* on the Transamerica contract for half the Class Period. ¶¶63, 79, 128; 139; ANR Answer at ¶63; Doyle Answer at ¶63.

Additionally, as discussed above, ANR set an amortization schedule for deferred costs based on projected profits over the life of its reinsurance contracts. ¶47. Such a schedule would, in the ordinary case, allow ANR (or any reinsurer), to slowly offset earnings with these deferred costs, while still earning a profit on the contract. However, because the rate at which these costs are recognized depends upon projected future profits, GAAP requires that the reinsurer

periodically reevaluate the projections in light of actual experience, and to make as-needed adjustments to the amortization schedule. If at any time it appears that profits on the contract will not fully offset deferred costs, the reinsurer is required to immediately recognize those costs as an immediate and unrecoverable expense, or a "write-off" of DAC. ¶47. Thus, in the context of the Transamerica contract, ANR was required to periodically reevaluate its experiences to determine whether it would be able to recover its $200 million of deferred costs. However, as described above, the gap between ANR's investment earnings and the amounts guaranteed to policyholders under state law ensured that such costs were unrecoverable.

ANR's dire situation was aggravated by another factor —the extraordinarily high numbers of VisionMark policyholders who were choosing to prematurely cash out their policies and obtain their cash surrender value payments rather than wait until the annuity periods ran their course. ¶67. Again, as *admitted* by ANR, before the start of the Class Period, VisionMark policyholders began surrendering their policies at alarming rates, well in excess of those ANR had projected when it had priced the contract. In fact, by the end of 2001, even though ANR had projected surrender rates of 4%, VisionMark surrender rates had actually reached a staggering 26%. ¶67; ANR Answer at ¶67. When policyholders surrendered their policies and received cash, the overall base of ANR's investment assets used to fund policyholder obligations was depleted, so that even if the equity markets rebounded in the future there would be lower total gains on the Transamerica contract's investment assets to make up for past deficiencies. ¶41. Policyholder surrenders also imposed an immediate payment obligation on ANR, and, because the policyholders were guaranteed investment returns that were higher than those ANR had earned, ANR was forced to fund the excess payments out of its own income from other sources.

¶42. These two factors – low investment returns coupled with high surrenders – guaranteed that the Transamerica contract was in a loss position from which it would never recover.

### C.    ANR's Accounting For The Transamerica Contract

ANR accounted for the Transamerica reinsurance contract as a "universal life-type" or "investment-type" insurance contract.  ¶234.  Under GAAP, and ANR's own published accounting method, ¶¶46, 234, for this type of contract, ANR's allocable share (*i.e.*, 64%) of the investments purchased by IL Annuity was recorded as an asset on ANR's balance sheet, called "Funds Withheld at Interest." ¶47.  The "Funds Withheld" item on ANR's financial statements represented all of its Funds Withheld on all of its annuity reinsurance arrangements, aggregated together.  ¶47.  Simultaneously, ANR reported the amounts estimated as due to policyholders under ANR's various reinsurance annuity contracts, including the Transamerica contract, through a single liability entry on ANR's balance sheet, called "Interest Sensitive Contracts Liability" (sometimes referred to as policyholder "reserves"). ¶85.

Under the accounting method used by ANR, ANR would report revenues on the Transamerica contract based on ANR's share of the investment returns earned on the Transamerica Funds Withheld at Interest.  ANR's principal expenses on the Transamerica contract were the amounts ANR credited to policyholder accounts as the increases in the balances due to them.  The amounts periodically added to policyholder liability accounts should have (but did not) take into account the minimum interest guarantees imposed under state law. ¶66; ANR Answer at ¶66.  Under GAAP, amounts credited to policyholders (and currently recognized as expense) must at least be enough to cover the aggregate cash surrender values of all outstanding policies — *i.e.*, the total liabilities recognized and reported on the balance sheet as due to policyholders as of the balance sheet date had to be enough to cover amounts that would have to be paid to policyholders if all policyholders chose to surrender their policies on

the balance sheet date.  ¶47.  Because minimum interest guarantees were not taken into account for the first half of the Class Period, ANR's liabilities were consistently understated for the first half of the Class Period.  ¶66.

ANR's failure to accrue for minimum interest guarantees had another effect.  When policyholders surrendered their policies – as they did here at very high rates – ANR was required to pay them the full amount due.  Any amount paid to policyholders in excess of their account balances needed to be reported by ANR as an immediate expense.  ¶87.  But instead, ANR paid the full amount, and then reported the full amount as a *reduction* in its liabilities remaining due to other policyholders.  ¶66; ANR Answer at ¶66.  Correction of this blatant accounting error was one of the reasons for ANR's massive restatement for 2000 and 2001.  ¶208.

As mentioned earlier, another major asset and item of expense associated with the Transamerica contract involved the broker commissions that were paid when the annuity policies were originally sold.  These costs (about $200 million) were originally "capitalized" and reported as an asset on ANR's balance sheet, called "deferred acquisition costs."  Each accounting period, a portion of this asset was amortized — *i.e.*, removed from the balance sheet and recognized as an expense on the income statement.  The original amortization schedule (which dictated the rate at which deferred costs would be recognized as an expense in each reporting period) was a function of the projected lifetime profitability of the Transamerica contract. If, as ultimately occurred, the factors used to originally price and estimate the overall profitability of the contracts (*e.g.*, the projected surrender rates and cash surrender value payments, and the projected returns on investment assets) turned out to be more optimistic than actual experience, then under GAAP, ANR had to "accelerate" its amortization – i.e., "write-off" the DAC and recognize large immediate expenses as unrecoverable due to adverse contract experience.  ¶47.  Indeed, if the

updates of the lifetime profitability calculations (or "loss recognition testing") showed that the Transamerica contract would yield lifetime *losses* rather than profits, even before taking into account the deferred costs, then *all* the remaining DAC on the balance sheet had to be then "written off" and immediately recognized as expense on the current income statement.  ¶47. During the Class Period, this result was avoided by plugging into the loss recognition testing artificially high assumptions of future rates of return on the corporate bonds.  That is, in order to conclude that it was possible that the Transamerica contract might earn profits in the future, (and thereby avoid current "write-offs"), ANR assumed that in the following years the corporate bonds that underlay the Transamerica contract would yield 10% returns. ¶154; 157.

## II.    ANR'S FALSE AND MISLEADING STATEMENTS THROUGHOUT THE CLASS PERIOD

The nature of the Transamerica contract, and the problems ANR was experiencing on that contract, were concealed from investors throughout the Class Period through an extraordinary series of fraudulent financial statements and flat-out lies about the risks ANR had assumed. These false statements can be grouped into five different basic categories.

### A.    False and Misleading Financial Statements

### 1.    Failure to Fully Account for Obligations to Policyholders

As discussed above, ANR was required to report on its balance sheet its current liabilities to policyholders — including the amounts due to policyholders as a result of their state-guaranteed minimum interest rates.  By failing to timely report these increases in liabilities to policyholders, ANR under-reported its expenses on its income statements, and over-reported its overall earnings.  ¶¶66, 79, 86, 96, 121, 128, 139.  As *admitted* by ANR,  throughout most of the Class Period, ANR simply *failed* to account for statutory minimum interest obligations when crediting policyholders' accounts.  ANR Answer at ¶66.  Instead, ANR credited policyholders'

accounts based solely on the performance of the assets underlying the VisionMark policies. Because the assets performed well below the minimum interest rates, ANR's liabilities (and expenses) were consistently, and massively, understated, and its earnings overstated, for most of the Class Period. ¶66.

### 2.    Failure to Recognize Expenses for Minimum Interest Payments

As described above, ANR should have been regularly posting amounts due to policyholders' accounts based upon the higher of: (1) the rates guaranteed by state law or (2) the annuity policy's crediting provisions. ANR did not do so; instead, it credited based on the annuity policy crediting provision without considering minimum amounts due. ANR then exacerbated this reporting deficiency when policyholders surrendered their policies for their cash surrender value. Whenever a policyholder surrendered his policy, ANR (through Transamerica, and through IL Annuity) paid the policyholder the cash he was due. Because ANR had not accrued for amounts due policyholders under state minimum interest laws, the amount paid to the policyholder often exceeded the amount of ANR's recorded liabilities (or reserve) for that policyholder. Thus, when making the payout, ANR should have closed out the policyholder's account balance and recognized an expense for the shortfall. *Instead*, ANR simply reduced its reported liabilities by the *full amount* it paid the policyholder. By doing so, ANR under-reported and misstated the remaining balance of its liabilities to other policyholders. And, again, ANR under-reported its expenses, and thereby over-reported its earnings. ¶¶87, 96, 100, 117, 128, 139; ANR Answer at ¶¶87, 96, 100, 117, 128, 139.

### 3.    Failure to Write-Down Deferred Acquisition Costs

As discussed above, when ANR first entered into the agreement with Transamerica, ANR determined the rate at which it would amortize its deferred costs based upon its projected profits over the life of the contract. The contract profitability estimate, and the DAC amortization

schedule, should have been updated and changed because the original assumptions for the factors used to calculate the contract's profitability were proven to be wrong through actual experience. ¶47.  ANR entirely *failed* even to review its DAC amortization throughout the first half of the Class Period.  ¶206.  This was particularly egregious because ANR specifically represented in its SEC filings that it was carefully reviewing the amortization rate "based on historical and anticipated future experience, which is updated at the end of each accounting period." ¶¶72, 109. Based upon the monthly reports by Transamerica that showed poor performance on the Funds Withheld coupled with startlingly high policyholder surrenders, it was obvious to ANR and the other Defendants that they could not continue to use the original, now-stale estimates to assume that the original DAC amortization rate was adequate.  These reports from Transamerica made it critical that ANR reevaluate its ability to recover its costs at all.  If ANR determined that required policyholder payments would exceed investment returns, the remaining capitalized costs needed to be immediately "written off" and recognized as an expense on the current income statement.  Nonetheless, as ANR eventually admitted in its SEC filings, it did not even review its DAC amortization rate until the third quarter of 2001.  ¶206.

Even after ANR began to review its amortization schedule and acknowledge (and expense) a portion of its deferred costs as unrecoverable, ANR avoided immediately recognizing the full extent of the losses by using baseless and wildly optimistic assumptions about future investment returns in determining the size of its write-down and expense.  ANR was required to adjust its amortization schedule in light of *historical* experience (as it promised investors), ¶¶72, 109, 167, and to use this experience to inform its assumptions about future performance of these same investment assets.  ANR failed to do so.  Specifically, even though the corporate bonds and other investments had consistently yielded returns far *below* 6.25%, ANR adjusted its DAC

amortization based upon projections that in the following year convertible bonds would magically yield *10% returns*. ¶¶154, 157.  Through this blatant manipulation of its loss recognition testing, defendants (and particularly John Burke who personally endorsed the legitimacy of the this calculation) knowingly understated ANR's losses and postponed its day of reckoning — to the further injury of class members who continued to purchase ANR stock at still-inflated prices.

### B.    False and Misleading Statements about the Risks of ANR's Business

### 1.    False Claim that ANR was Not Exposed to Market Risk

As described above, the profitability of the Transamerica contract — which represented a massive share of ANR's business — was heavily dependent on the performance of the equity markets.  With 70% of the assets invested in convertible bonds, ANR's only chance to recoup its costs and earn a profit was if the stock of the issuing corporations appreciated in value.  ¶¶60-65.  Incredibly, however, ANR repeatedly told investors that "the carrying value of the Funds Withheld at Interest is *not directly exposed to market risk* with respect to the assets held by the ceding company." ¶71, 76; *see also* ¶112.  These statements were brazenly false, because ANR's ability to earn a profit on its annuity segment and indeed ANR's very existence was almost *entirely* dependent on the vicissitudes of the markets, and particularly the market for the stock of the convertible bond issuers.  In fact, ANR was forced to admit the falsity of its earlier representations toward the end of the Class Period.  After repeatedly assuring investors that there was *no* market risk in its Funds Withheld at Interest asset over the past two years, ¶¶71, 76, 112, ANR suddenly switched gears in its 2001 10-K, filed in March 2002, and confessed that "The annuity product line is generally regarded as market and interest rate sensitive." ¶165.

17

### 2.    False Representations Regarding the Source of Earnings

In a similar vein, ANR repeatedly misrepresented the source of its "profits" in the annuity segment.  Because ANR was so heavily invested in convertible bonds, ANR's profitability depended on appreciation in the value of the *stock* of the issuing companies, a factor that was subject to enormous volatility and uncertainty.  Notwithstanding this fact, ANR repeatedly told investors that "The profitability of [the annuity] agreements is dependent on earning a *targeted spread between the interest earned on the Funds Withheld at Interest*, and the interest credited to the policyholder liabilities." ¶¶71, 75, *see also* ¶¶112, 169.  With these statements, ANR falsely represented that it was dependent only on the *interest* it earned on the bonds, a factor the investing public would fairly view as stable and readily discernible, thus keeping investors unaware of the true risks associated with ANR's business.  Investors' ability to discern the true risks and trends in ANR's earnings was further hampered by ANR's failure to report its earnings experience for the different segments of its business – i.e., the annuity versus life reinsurance businesses. ¶¶248-250

### 3.    False Denials that ANR Held Derivatives

In its Reports on Form 10-K during the Class Period, ANR repeatedly represented that it did not hold a particular type of investment known as a derivative.  ¶¶77, 99.  Derivatives, and embedded derivatives, are assets with a value that depends upon the fluctuating values of other, related assets.  Convertible bonds, such as those held in the Funds, contain embedded derivatives because the bonds' value depends, in part, on the fluctuating market price of the stock of the issuing company.  Thus, despite its representations to shareholders, ANR most definitely *did* hold derivatives throughout the Class Period — and it was forced to admit as much in July 2002. ¶183.  As described above, the influence of the changing values of derivatives to ANR's profitability greatly enlarges the risks to public investors.

18

## III.    THE HISTORY OF ANR'S FALSE FINANCIAL REPORTING

The Class Period begins on March 15, 2000.  On that day, ANR filed its Report on Form 10-K for 1999, signed by Doyle, Atkin, Hammer, Esposito, and O'Hara.  ¶69.  As the Complaint explains, in 1999, the Funds Withheld at Interest earned a return of only 4.2%, and surrender rates had accelerated far beyond what ANR had predicted when the contract was first signed. ¶73, 79(c).  Nonetheless, in the 1999 10-K, ANR did *not* tell investors that it needed a return above 6.25%, and did *not* tell investors about the sharp increase in policyholder surrenders. ¶79. In fact, ANR went out of its way to conceal these facts from investors; it reported its income from surrender fees — an ominous indicator of surrender rates — as "other income," without disclosing the source of the income. ¶74.  Simultaneously, ANR did not even disclose the rate of return on the Funds Withheld investment assets; instead, it merely noted the size of the Funds and, separately, the income they earned, leaving it to investors to try to fit the pieces together. This omission was striking in light of ANR's ready disclosure of the much better return on its own, directly held investments.  As the 1999 10-K stated, "The average yield rate earned on . . . the invested assets, *excluding Funds Withheld*, was 6.29% for the year." ¶73 n.2 (emphasis added).  The omission also suggested that ANR already knew its financial predicament and was actively misleading investors.

Additionally, the 1999 10-K contained many of the false statements described above. ANR falsely claimed profits based on the Transamerica contract; falsely claimed that the assets in the Funds were free from market risk; underreported its liabilities; falsely claimed to amortize its deferred costs in light of historical experience; falsely claimed that its annuity business was dependent on earning sufficient amounts of interest; falsely claimed not to hold derivatives; and specifically with respect to surrendering policyholders, under-reported expenses for payments made to them, and under-reported the balance of liabilities due to remaining policyholders.

¶¶69-81.  The 1999 Form 10-K also confirms that this false reporting did not result from any innocent mistake about ANR's obligations to pay policyholders state-mandated minimum interest rates, because it explicitly acknowledges ANR's responsibility for these statutory policyholder obligations.  ¶71.  Investors, however, were not told that ANR failed to account for these obligations in its reporting of expected liabilities to policyholders.  ¶79(b).

Throughout all of 2000, ANR continued in precisely the same manner.  The Funds continued to perform at rates well below the necessary 6.25% threshold, and surrender fees (reported only as "other income") continued to rise, reaching levels as high as $1.8 million in the fourth quarter of 2000.  ¶¶83, 93, 98, 104.  Despite this fact, ANR repeated the false representations from the 1999 10-K and continued to use its fraudulent reporting methods.  ¶¶86, 96, 100, 115 121.  Doyle and Atkin praised ANR's performance and endorsed startling optimistic earnings projections. ¶¶82, 89, 90, 101, 104.  Throughout 2000 and the early part of 2001, ANR's share price steadily rose in reaction to its positive earnings reports, from a price of $17.63 per share just before ANR announced the acquisition of the Transamerica contract in September 1998, ¶51, to a price of $31.26 per share after announcing its first quarter earnings reports for 2001, ¶132.

In March 2001, ANR issued its 2000 10-K, signed by Doyle, Atkin, Hammer, Esposito, and O'Hara.  The 2000 10-K repeated the same false statements and financial information from early earnings reports, ¶¶107-121, and claimed that operating income had reached $44.8 million, described in ANR's Annual Report to Shareholders as a 21% increase over 1999 earnings. ¶120.  In fact, as would later be revealed, of ANR's reported income for 2000, *39.6%* was attributable to the Transamerica contract.  This income would eventually be entirely wiped out by subsequent (and long-delinquent) charges made against earnings.  ¶¶63, 155.

ANR's 2000 10-K even amplified the false statements made in earlier reports. For one thing, ANR went out of its way to emphasize the Funds' purported lack of exposure to market risk by saying that "a 100 basis point change in interest rates would not have a significant impact on the net investment spread earned by the Company. . . ." ¶112. This statement was indisputably false; due to the slim profit margins (reportedly) earned on ANR's assets, a 100 basis point (1%) change in the investment return (i.e., $116 million in reported investment income) *would* have a dramatic effect on earnings. ¶114.

Additionally, the 2000 10-K offered the extraordinary representation that in accounting for its liabilities to policyholders, ANR charged to expense any "benefit claims incurred in the period in excess of related clients' account balances and interest credited to clients' account balances." ¶116. In fact, as described, ANR did *not* recognize excess claims as expense, but instead *reduced* the balance of its reported liabilities to remaining policyholders — which was one of the gross accounting errors that would ultimately cause the Company to restate its earnings for all of 2000 and 2001. ¶¶117, 139; ANR Answer at ¶¶ 117, 139.

ANR's 2000 10-K was different from its 1999 10-K in one final significant respect. In the first, second, and third quarters of 2000, ANR's Funds had performed at rates well below 6.25%, ranging from 5.16% to 5.5%. ¶¶ 83, 93, 98. However, for the full year, ANR's financial statements indicated that the Funds had earned a return of 7.6%. ¶112. In fact, as ANR failed to disclose, this startling turnaround was caused by a sudden, massive one-time liquidation of appreciated assets performed by IL Annuity in the fourth quarter of the year. ¶110. IL Annuity's gimmick to boost the annual return of the Funds resulted in a return of 14.6% for the

fourth quarter, [2] almost three times the rate of return for the rest of the year.  Nonetheless,

ignoring the aberrational quality of these fourth quarter results, ANR continued to claim profits

on the Transamerica contract and failed to reevaluate its schedule for amortizing its deferred

costs. ¶¶109, 206.

On May 1, 2001, ANR announced its results for the first quarter of 2001, and, as before,

persisted with its fraudulent financial reporting.  Surrender fees had reached a new quarterly high

of *$3.13 million*, but, once again, ANR reported these fees only as "other" income, and failed to

reevaluate profitability of the Transamerica contract or the recoverability of its deferred costs.

Instead, ANR reported total income for the quarter of $11.6 million. ¶¶124, 206.

The very next day, however, ANR issued a short press release announcing the sudden

retirement of its Chief Financial Officer, defendant William Atkin.  The entire text of the odd,

apparently hasty release stated:

> Annuity & Life Re (Holdings), Ltd. reported on Wednesday that Chief Lawrence
> S. Doyle, CEO, stated that "Bill would like to spend more time with his family in
> sunny Florida next winter.  We will certainly miss Bill, as he is one of the original
> five members of management who have been instrumental in building our
> franchise. He is likely to work for the company as a consultant to assist in the
> transition. We are now beginning a search for a new CFO.

The release was so quickly drafted that it did not identify "Bill" as "Bill Atkin," the current CFO,

and it identified CEO Doyle as "Chief Lawrence S. Doyle, CEO."  Although the release did not

even identify Atkin's termination date, SEC filings would eventually show that he officially left

the Company on August 31, 2001.  ¶125.  Also in May, and continuing through July 2001,

---

[2] The reported carrying values of investment assets did not include unrealized gains or losses.
By selectively choosing to liquidate certain appreciated investments, IL Annuity "realized" and
recognized the gains, and included them in the reported investment rate of return that was then
also included in ANR's reporting.  "Unrealized" gains and losses attributable to the changes in
market value of the corporate bonds and other investments that IL Annuity chose to continue to
hold in its investment portfolio did not affect ANR's reported investment rate of return.

newly-resigned CFO Atkin exercised virtually all of his stock options, and sold all of his stock, at prices near their Class Period (and historical) highs, ultimately reaping in excess of $2,250,000.  Atkin had not sold one single share of ANR stock prior to this time.  Amazingly, however, ANR failed to report these insider sales for 2001, and was forced to correct its reporting one year later. ¶¶130, 270-272.

In July and August, the Company issued its results for the second quarter of 2001 — the last financial reports that would carry Atkin's signature.  Crucially, these financial reports contained ANR's first, partial disclosure.  Now, just weeks before Atkin's "retirement," and *after* he had divested himself of his ANR holdings, in its August 2001 10-Q, ANR *finally* admitted that the mysterious "other" income was, in fact, surrender fees — and by now, those fees had climbed to $4.64 million.  The 10-Q also disclosed that ANR was "conducting a reinsurance audit of a reinsurance client company" and that the findings of the audit "may impact our operating results in a future period."  Despite these two hints of the ultimately devastating disclosures that would follow, ANR repeated the false statements contained in its earlier financial reports. ¶¶133-139.

### The Truth Begins to Emerge

Beginning in the fourth quarter of 2001, ANR slowly began to disclose the truth to investors.  However, until the end of the Class Period, each new revelation was coupled with a new lie or a continuing false representation, so that ANR shares remained inflated, in part, until ANR's final, stunning revelations to the market in November 2002.

First, at the end of October 2001, ANR finally announced that it had experienced losses from, among other things, a $24.7 million write-down of the deferred costs associated with "our annuity business."  The day after the announcement, ANR shares dropped from a closing price of

$32.85 to a closing price of $24.01.  ¶¶145-146.  In discussing the write-offs with investors, the Company also disclosed that surrender rates had far exceeded Company expectations.  However, Burke — who had replaced Atkin as CFO in September — assured investors that "[t]he Company believes that there is a low probability of any future write-offs on the contract."  ¶147. Doyle also projected earnings for the year of $1.80 to $1.90 per share.  ¶147.  Despite ANR's partial disclosures, these statements merely perpetuated the fraud because — as would later be revealed — the relatively small addition to expense for the write-off (as compared to the losses that were belatedly recognized and announced), as well as Burke's comment about future write-offs, and Doyle's comment about earnings, were all predicated on projections that the Company would, beginning the following year, achieve a *10% return* on the convertible bonds underlying the Transamerica contract.  ¶154.  Given ANR's past experience of returns well below 6.25% — dropping as low as 3.83% in the second quarter of 2001 — such a projection was not only unreasonable, but wholly divorced from reality.  ¶¶83, 93, 98, 126, 136, 154.  It cannot be credibly contended that this false statement was anything but a calculated decision to cover-up ANR's earlier false financial reporting and to continue to mislead the investing public.

The consequences of these false statements were felt when, only three months later, ANR announced that it would be reporting an additional $33 million in losses on the Transamerica contract.  This figure, which included a "reserve" against future losses, brought total reported losses for the year to $57.7 million, entirely wiping out earlier reported profits on the Transamerica contract.  ¶155.  ANR finally revealed that it had been liable for minimum interest guarantee payments — tacitly admitting that it had failed to properly account for such payments in its reported liabilities and expenses.  ¶155.  Notably, ANR did *not* disclose the IL Annuity management fees that added a crushing burden to ANR's ability to earn a profit.  Burke once

again assured investors that no further losses would be incurred, because ANR's reserves were now "realistic." ¶156. At this time, ANR issued new earnings projections for 2002 of $1.70 to $1.80 per share. ¶¶155-156. However, once again, ANR continued to perpetuate its fraud because — as it had done three months earlier — all of the calculations had been based on the manifestly unrealistic assumption of 10% future returns on the convertible bonds in ANR's Funds Withheld at Interest. ¶157. Additionally, ANR still did not disclose that 70% of the Funds underlying the Transamerica contract were invested in convertible bonds. ¶160.

ANR's share price dropped sharply in the wake of these partial disclosures, but the market was still partly assuaged by ANR's irrationally optimistic outlook. Unaware of the havoc that IL Annuity's 2.75% management fee was wreaking on ANR's balance sheet, ¶¶159-160, analysts continued to recommend the stock, ¶158, 160.

In March 2002, ANR filed its 2001 10-K, signed by Doyle, Burke, Hammer, Esposito, and O'Hara. ANR falsely reiterated that it had established its reserves against future losses based upon "reasonable assumptions about future investment performance," ¶164, and informed investors that it was pursuing arbitration claims against the "cedent" (ANR had not yet identified Transamerica by name) whose contract had caused the losses. Now, for the first time, ANR added an additional disclosure to the mix — instead of its rosy assurances that it was not subject to market risk, ANR finally confessed to investors that its annuity segment was "market and interest rate sensitive," and that minimum interest guarantee payments could cause losses if the assets failed to perform. ¶165. But, ANR not only *failed* to disclose the degree to which it was dependent on convertible bonds, but also reiterated its false claim that profitability on the annuity segment was dependent on its ability to earn sufficient *interest* — omitting the critical fact that ANR was also dependent on growth in the equity markets. ¶169.

In April 2002, ANR reported its first quarter results.  Burke and Doyle both falsely affirmed that ANR had properly reserved against future losses, *concealing* that these so-called "reserves" were inadequate because they were predicated upon an unsupportable assumption that in the following year, the returns on the convertible bonds underlying the Transamerica contract would magically grow to 10%. ¶176.  Had defendants performed loss recognition testing using legitimate factors drawn from the actual performance of ANR's investments, the deferred costs would have been immediately expensed, and earnings immediately reduced.  If the DAC was thus properly adjusted, there would have been no later surprise "write-downs."  Finally, Doyle emphasized that it was only the 3% to 3.5% minimum interest guarantee — *and not IL Annuity's management fees* — that was causing the difficulty.  Doyle explicitly told investors that because of 3% to 3.5% minimum guarantees, ANR needed to make at least 5.5% to earn a profit — completely ignoring the fact that actually, ANR needed to earn in excess of 6.25% because of the 2.75% fees charged by IL Annuity. ¶177.  After these new false reassurances, Burke concluded the call by telling analysts that ANR's "largest annuity contract" (i.e., the Transamerica contract) "is expected to break even going forward," ¶178.  Once again, this statement was false because it was based on the unrealistic assumptions described above.

Notwithstanding ANR's assurances that it was well-reserved against future losses, in second quarter earnings reports released in July and August 2002, ANR announced *another* write-down of $24 million in deferred costs on the Transamerica contract, resulting in losses for the second quarter of over $20 million.  ANR now finally disclosed that the Transamerica contract was heavily dependent on convertible bonds. ¶183.  At this time, ANR also disclosed the manifestly unrealistic assumptions it had used in its earlier projections, reserves, and write-downs.  Because it had severely overestimated the performance of convertible bonds for the first

26

half of the year, ANR now announced that it was projecting *zero* return for the remainder of the

year. ¶191. Once again, however, ANR continued to perpetuate its fraud by falsely attributing

the new write-downs to recent market declines (rather than to ANR's manipulation of the factors

used in its loss recoverability testing) and by failing to disclose the existence of the 2.75%

management fees charged by IL Annuity. ¶¶182, 184.

Also for the first time, ANR directly disclosed the yield on its Funds Withheld at Interest:

5.14% for the quarter, instead of leaving it to investors to calculate the yield for themselves by

comparing reported earnings to the size of the Funds. However, as ANR would later reveal, the

5.14% figure was an aggregate across several contracts. The investments in the Funds Withheld

for the Transamerica contract, alone, had yielded only 3.8% for the quarter. ¶196.

Finally, in its August 2002 10-Q filed with the SEC, ANR announced that it would be

restating its financial results as far back as 2001, to account for the embedded derivatives it had

failed to disclose in other contracts, and to properly reclassify the reserves it had taken on the

Transamerica contract as further write-downs of deferred costs. ¶¶183, 190.

In September 2002, ANR announced that Doyle would be immediately resigning from

the Company, and that Hammer and non-defendant Lichten would be heading a "Transition

Committee" to manage the Company until a new CEO could be found. ¶199; Burke Exh. 13.

On November 8, 2002, ANR announced that its arbitration claim against Transamerica

had been denied. The final market revelations came eleven days later, on November 19, 2002.

On that date, ANR issued an 8-K and finally disclosed the last piece of the puzzle — the

management fees imposed by IL Annuity that had made this contract a losing proposition from

the beginning.[3]  At this time, ANR also disclosed that it had not even reviewed the schedule for amortizing its deferred costs until the third quarter of 2001 — long after the problems with the contract had reached critical levels. ¶206.  ANR also announced that it would now restate its financial results back through all of 2000 to properly account for *two years' failure* to properly account for minimum interest guarantee payments, and for its failure to properly write-down its deferred costs. ¶208.  At this time, ANR admitted that despite its earlier denials, it did, in fact, hold embedded derivatives in its Transamerica contract, ¶209, and disclosed that the convertible bond holdings had drastically deteriorated: although they were carried on ANR's financial statements as having a value of $559 million, in fact, their true market value was only $512.6 million — representing an as of yet "unrealized" loss of $46 million, or 8.3%. ¶207.  Finally, ANR disclosed that due to these various problems, its financial viability was seriously in jeopardy. ¶210.  The day after the announcement, ANR's share price plunged from a previous closing price of $4.08 to a closing price of $2.24. ¶211.

In March 2003, ANR filed an amended 10-K for 2000 and 2001, and amended 10-Qs for the first three quarters of 2002, thus restating virtually all of its Class Period financial statements. The new 10-K contained numerous charts explaining ANR's myriad restatements, write-downs, and reclassifications, and disclosed that ANR's ability to continue as a going concern was seriously in jeopardy.  ¶217.  On July 2, 2003, ANR filed another amended 10-K, this time to correct the 10-K filed for 2002.  Even then, ANR warned that more financial restatements might still occur, because the Company could "provide no assurance as to whether [the SEC] will require us to make any further changes to the financial, pro forma or other information and data included in this report or in other periodic reports we have filed with the SEC." ¶220.

---

[3] At this time, ANR claimed the management fee was only 2.5%; later, ANR would disclose that the fee was 2.75%.  ¶204.

## ARGUMENT

**I.    THE ALLEGATIONS OF THE COMPLAINT SATISFY THE PLEADING REQUIREMENTS OF RULE 12(b)(6) AND THE PSLRA FOR §10(b)**

### A.    Rule 12(b)(6) and the Elements of a §10(b) Claim

To state a claim under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), a plaintiff must allege: (1) a misrepresentation or omission of material fact; (2) in connection with the purchase or sale of a security; (3) made with scienter; (4) that the plaintiff relied upon; (5) causing damages. *See Basic Inc. v. Levinson*, 485 U.S. 224, 230-232 (1988). A court may only dismiss a complaint pursuant to Rule 12(b)(6) if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In assessing the Complaint, the court must draw all reasonable inferences in plaintiffs' favor. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001); *Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000).

Additionally, with respect to the element of scienter, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that the Complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This statutory requirement did not change the pre-existing standard for pleading scienter in the Second Circuit. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307 (quotations omitted).

**B.** **None of the Moving Defendants Disputes that Plaintiffs Have Adequately Stated a Claim for Violations of §10(b) Against ANR, Doyle, and Atkin**

In this case, the Complaint alleges §10(b) claims against ANR, Doyle, Atkin, Burke, Hammer, Esposito, and O'Hara. ANR and Doyle have both answered the Complaint. No defendant has filed a motion to dismiss arguing that the Complaint fails to plead §10(b) claims against ANR, Doyle, or Atkin. Similarly, no defendant disputes that ANR's financial statements were false, or that the false statements were material to investors. The PSLRA requires a complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Here, all of the moving defendants have tacitly conceded that the Complaint meets these standards. The only issue remaining in this case is *who* was responsible for the ANR fiasco. Given ANR's small size, its extensive reliance on the Defendant senior officers and directors, the Defendants' admitted expertise in these matters, and their blatant efforts to cover up the full extent of ANR's problems, the Complaint properly creates a strong inference that these Defendants were complicit in ANR's fraud.

**C.** **All of the Individual Defendants Made Statements for PSLRA Purposes**

Although Burke does not dispute that he made statements within the meaning of §10(b), defendants Hammer, O'Hara, and Esposito insist that they did not "speak" and therefore cannot be held liable for any false statements. *See* Hammer Br. 8-9; XL Br.9-10. To the contrary, all three of these defendants can be held liable for ANR's corporate documents.

**1.** **The Directors "Spoke" By Signing the Annual 10-Ks**

In this action, plaintiffs have alleged – and ANR has *admitted* – that ANR's annual reports, filed with the SEC, contained *massive* misstatements regarding ANR's earnings during the Class Period. These misstatements went to the heart of ANR's ability to continue as a going

concern, ¶¶210, 217, and continued for a period of years.  These overstated financial reports were personally signed – and therefore personally endorsed – by Hammer, O'Hara, and Esposito. ¶¶69, 107, 164.  Plaintiffs have alleged that each of these defendants acted at least recklessly by endorsing ANR's fraudulent financial statements. ¶256.  Nothing in the PSLRA, Rule 9(b), or basic notions of fairness, forbids holding directors responsible for fraudulent documents that they knowingly or recklessly publicly endorse.

Hammer, Esposito, and O'Hara claim that no corporate documents can be attributed to them under the "group pleading" doctrine.  The "group pleading" doctrine "allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999).  The doctrine is used to demonstrate that defendants "spoke" for §10(b) purposes when "corporate" statements have not been attributed to them personally.  *See DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1248 (2d Cir. 1987) (complaint need not allege "specific connection between insiders or affiliates and fraudulent representations" in corporate documents).

Here, Hammer, Burke, and Esposito each *signed* ANR's fraudulent 10-Ks.  By signing, each defendant, individually, endorsed the contents of the 10-K, and thus "spoke" for §10(b) purposes.  Therefore, there is no need to resort to the group pleading doctrine, and defendants' arguments are wholly beside the point.  *See, e.g.*, *In re Cabletron Sys.*, 311 F.3d 11, 41 (1st Cir. 2002) (outside directors are responsible for contents of documents they sign); *Howard v. Everex Sys.*, 228 F.3d 1057, 1061-1062 (9th Cir. 2000) (to sign a document is to make a statement for §10(b) purposes); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767

(S.D.N.Y. 2001) (by signing prospectus, outside director "speaks"); *In re Reliance Sec. Litig.*,

135 F. Supp. 2d 480, 504 (D. Del. 2001) (following *Howard*; "by signing the documents . . .

[outside director] defendants made statements under section 10(b)"); *In re Lernout & Hauspie*

*Sec. Litig.*, 208 F. Supp. 2d 74, 84 (D. Mass. 2002) ("Each defendant may be held responsible for

the false and misleading statements contained in the financial statements he signed.").[4]

### 2.    The Group Pleading Doctrine Allows the False Statements to be Attributed to the Director Defendants

Even if their signatures are not enough to attribute false statements in the Form 10-Ks to

the Defendant-directors, the "group pleading" doctrine may still be used to attribute to Hammer,

Esposito, and O'Hara the false statements contained in ANR's 10-Ks.  Under this doctrine, they

may also be held liable for the false statements in ANR's press releases and quarterly filings.

The group pleading doctrine is an exception to Rule 9(b), which normally requires a

complaint to identify each defendant's connection to the allegedly fraudulent statement.  Despite

defendants' arguments to the contrary, it is well-accepted in this Circuit that the group pleading

doctrine has survived the PSLRA.  *See, e.g.*, *Oxford*, 187 F.R.D. at 142; *see also In re CINAR*

*Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 318-19 (E.D.N.Y. 2002); *In re Health Management, Inc.*

*Securities Litig.*, 970 F. Supp. 192, 208-09 (E.D.N.Y. 1997); *In re American Bank Note*

*Holographics Sec. Litig.,* 93 F. Supp. 2d 424, 442 (S.D.N.Y. 2000); *In re Complete Management*

*Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 326 n.7 (S.D.N.Y. 2001).

---

[4] Notably, Hammer relies on cases from California in arguing that his signature, alone, is not
sufficient to make him a §10(b) actor.  Hammer Br. at 14.  These cases were all decided before
the Ninth Circuit's ruling in *Howard v. Everex*.  Of the cases cited by XL Capital, only a single
one found a complaint to be insufficiently particular as to the individual defendants where those
defendants had actually signed SEC filings.  That case, *In re PetSmart Sec. Litig.*, 61 F. Supp. 2d
982 (D. Ariz. 1999), was decided before *Everex*, and, significantly, only held that the group
pleading doctrine would not be sufficient to attribute scienter to the defendants.  See id. at 998.

The group pleading doctrine permits plaintiffs to "allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors." *In re Livent, Inc Sec Litig*, 78 F. Supp. 2d 194, 219 (S.D.N.Y. 1999). "Consequently, where ... the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a [group-published document], plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery." *Degulis v. LXR Biotechnology*, 928 F. Supp. 1301, 1311-1312 (S.D.N.Y. 1996).

Outside directors may fall within the ambit of the group pleading doctrine when "by virtue of their status or special relationship with the corporation," it is reasonable to hold them responsible for group-published documents. *Indep. Energy Holdings,* 154 F. Supp. 2d at 768; *see also Cosmas v. Hassett*, 886 F.2d 8, 12 (2d Cir. 1989) (directors held responsible for press releases); *Livent*, 78 F. Supp. 2d at 219 (outside directors responsible for group published statements). In this case, Defendants Hammer, Esposito and O'Hara did occupy such status, and thus the requirements of Rule 9(b) are satisfied.

It is clearly reasonable to attribute ANR's statements to Hammer because:

- Hammer was Chairman of ANR's Board of Directors, and sat on its Executive Committee, its Finance and Investment Committee, and its Corporate Governance Committee, ¶22

- Hammer had extensive experience in the industry, ¶¶258, 262;

- Hammer headed ANR, with non-defendant Lichten, at the end of the Class Period, thus creating an inference that he was familiar with ANR's day-to-day activities prior to that time, ¶199;

- ANR's Registration Statement emphasizes its reliance on Hammer's expertise, and identifies him as part of ANR's "senior management team," ¶¶258-259;[5]

- Hammer was one of the principals of Inter-Atlantic, which provided consulting services to ANR regarding its management, investments, and business strategy for $2.7 million, Hammer Exh A; X: Exh. A;

- ANR represented that its Board of Directors — which included Hammer — approved its underwriting guidelines and any deviations from those guidelines, ¶¶70, 108, 166, 260.

Similarly, it is reasonable to attribute ANR's statements to Esposito and O'Hara because:

- As XL Capital admitted, O'Hara and Esposito were placed on ANR's Board specifically to monitor ANR's business, ¶296;

- O'Hara and Esposito both had extensive expertise in the insurance industry because, among other things, they headed XL Capital — ANR's parent and founder, ¶¶25-26, 48;

- ANR's Registration Statement emphasizes its reliance on Esposito's expertise, and identifies him as part of ANR's "senior management team,"¶258;

- Esposito sat on ANR's Executive Committee and its Finance and Investment Committee, ¶26

- ANR paid Inter-Atlantic, a company headed by, inter alia, Esposito, $2.7 million for assistance "in the development of products, financial planning, and the management of assets," XL Exh. A;

- In exchange for, among other things, the right to nominate O'Hara to the ANR Board of Directors, XL Capital purchased ANR shares from Risk Capital. Esposito occupied a seat on the Board of Risk Capital. The transaction made XL ANR's single largest shareholder, *see* XL Exh. A;

- Esposito occupied a seat on ANR's Audit Committee when the Company was first formed, *see* Hammer Exh. A;[6]

---

[5] Defendant Hammer disputes that he was identified as a member of ANR's "senior management team" in ANR's Registration Statement. *See* Hammer Br. at 4. In fact, the very document he submits supports plaintiffs' allegations. In the Registration Statement, there is a paragraph emphasizing ANR's "senior management team" and listing, among others, Doyle, Hammer, and Esposito. Hammer Exh. A. at 6.

- ANR represented that its Board of Directors approved its underwriting guidelines and any deviations from those guidelines, ¶¶70, 108, 166, 260.

Courts have frequently applied the doctrine to directors who had far less involvement with the Company than those here. *See In re Reliance Sec Litig*, 91 F. Supp. 2d 706, 721 (D. Del. 2000) (presumption appropriate for members of Executive, Audit, or Financial Oversight Committees).

Additionally, ANR's small size makes it even more likely that these defendants participated in its management and were responsible for company documents. During the Class Period, ANR had between fourteen and thirty-four employees in total, and only between eleven and fifteen Bermuda-based employees. ¶257. For a company of this size, the "group pleading" presumption is particularly appropriate. As the court stated in *In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197 (E.D. Pa. 1992):

> Outside directors can be of two very different kinds. The paradigmatic outside director is, say, a college president who sits on the Board of a large corporation . . . . When the outside director is of this type . . . [s]uch a director's role on the Board is not intended or expected to be of a hands-on variety . . . . Here, however, the outside directors are of an entirely different profile. All of the outside director defendants are alleged to have experience in the [relevant] industry . . . [W]e must infer from plaintiffs' complaint that a seventeen percent shareholder in a start-up company would not appoint someone . . . who did not have a great deal of expertise.

*Id.* at 1203. Given the directors' background and experience, and the small size of the company, the "group published" doctrine applied to them. *Id*. at 1203-04.

---

[6] XL Capital argues that no fault can be attributed to Esposito and O'Hara because, among other things, the Complaint does not allege that Esposito or O'Hara sat on ANR's Audit Committee. *See* XL Br. at 5, 9. Actually, as demonstrated by ANR's Registration Statement, Esposito *did* occupy a seat on ANR's Audit Committee in its earlier days. *See* Hammer Exh. A. Although Esposito did not sit on the Audit Committee during the Class Period, the fact that he occupied such a position at one time demonstrates his familiarity with accounting in general and ANR's accounting in particular.

**D.    The Complaint Adequately Pleads Scienter**

For corporate defendants, scienter can be pled against the corporation directly, *see Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999), or by imputing the mental state of individual defendants to the corporation, *see Cabletron*, 311 F.3d at 40.  "Because direct evidence of fraudulent intent is rare, a plaintiff can satisfy the pleading requirements concerning scienter by alleging facts that give rise to a strong inference of fraudulent intent." *Hudson Venture Partners, L.P. v. Patriot Aviation Group, Inc.*, No. 98 Civ. 4132 (DLC),1999 U.S. Dist. LEXIS 1518, *7 (S.D.N.Y. Feb. 16, 1999).  Such facts include showing defendants' "motive and opportunity to commit fraud, or . . . strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307.

In this case, other than Burke's vague discussion of how write-offs and reserves involve complicated accounting judgments, Burke at 22-24, none of the moving defendants disputes that the Complaint adequately states §10(b) claims against ANR (or against defendants Doyle and Atkin).  Thus, for the purposes of this motion, it may be *assumed* that ANR, through its agents, issued false and misleading statements with recklessness or intent to defraud.  Thus, the only remaining question is whether the agents who so acted (and whose mental state is attributable to ANR) include Burke, Hammer, Esposito, and O'Hara.

**1.    Plaintiffs Have Properly Pled Conscious Misbehavior and Recklessness**

Plaintiffs may plead scienter by alleging conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.  An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness" *Chill v. GE*, 101 F.3d 263, 269 (2d Cir. 1996)

(citations omitted).  Reckless conduct "encompasses willful blindness." *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 415 (S.D.N.Y. 1998).  "[S]ecurities fraud claims typically have suffced to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308.  "[A]llegations of recklessness [are also] sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Id.*

In this case, the plaintiffs have alleged the existence of a number of specific facts that Defendants knew or should have known, and that undermined their public representations.  Specifically, plaintiffs have alleged:

- That ANR was, in fact, exposed to extraordinary market risk on its annuity business, despite explicit representations to the contrary in its annual Form 10-Ks and other public filings, ¶¶71, 76, 112;

- That ANR failed to reevaluate the recoverability of its deferred costs on the Transamerica contract, despite representations in its 10-Ks that these reviews were conducted based on ANR's actual experience, ¶¶72, 109;

- That the Transamerica contract needed returns in excess of 6.25% to be profitable, ¶58;

- That the returns on the Funds underlying the Transamerica contract tended to range between  4 and 5.5%, ¶¶83, 93, 98, 110-112, 126, 136, 151, 168;

- That the surrender rates on the Transamerica contract were far higher than ANR's projections, reaching levels of 26% for a time when ANR had predicted 4% surrender rates, ¶67;

- That ANR failed to account for minimum interest guarantee obligations when reporting policyholder liabilities and expenses, ¶66;

- That the expenses ANR recognized for its write-downs and reserves on the Transamerica contract from October 2001 through July 2002 were

based on assumptions of returns on convertible bonds of 10%, despite the
fact that the bonds had performed nowhere near that level in the past,
¶¶154, 157.

The last fact has particular significance. These calculations were performed *after* the
highly suspicious "retirement" of ANR's CFO. By this time, everyone clearly knew that the past
accounting for the Transamerica contract had been hopelessly flawed and the use of the baseless
10% earnings projection was a calculated attempt by Burke, Doyle, and the Directors to cover up
and forestall the recognition of the full extent of the losses incurred. *See DGM Investments Inc.*
*v. New York Futures Exchange*, 265 F. Supp. 2d 254, 260 (S.D.N.Y. 2003) (bad faith cover-up of
prior manipulations by others demonstrates knowledge of manipulations); *In re Xerox Corp. Sec.*
*Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (false statements made to cover up problems
are actionable under §10(b)). Thus, plaintiffs have pled that defendants had "knowledge of facts
or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.

Additionally, courts routinely infer that officers and directors of corporations are aware
of facts relating to a business's core operations, particularly when the problems are as massive as
the ones here. The Complaint shows that the Transamerica contract made up a huge portion of
ANR's business, representing between 61% and 95% of its reported Funds Withheld at Interest
asset during the Class Period, almost 40% of ANR's reported income for 2000, and between
45% and 97% of ANR's reported liabilities to policyholders during the Class Period. ¶63. It is
thus inconceivable that even outside directors would have been ignorant about the factors and
risks critical to the success of the business. "[W]here the alleged fraud relates to the core
business of the company, knowledge of the fraud may be imputed to the individual defendants."
*In re Cell Pathways Sec. Litig.*, No. 99-752, 2000 U.S. Dist. LEXIS 8584 (E.D. Pa. June 20,
2000) As the Second Circuit explained:

> In our view, the amended complaint herein satisfies the scienter requirement of
> Rule 9(b). As already discussed, the amended complaint alleges facts from which
> one can reasonably infer that sales to the PRC were to represent a significant part
> of Inflight's business. These facts give rise to a strong inference that the
> defendants, who the amended complaint alleges were directors of Inflight, had
> knowledge of the PRC import restrictions, since the restrictions apparently
> eliminated a potentially significant source of income for the company.

*Cosmas,* 886 F.2d at 13; *see also Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS

10301, at *24 (N.D. Ill. July 19, 2001) (where misrepresentations "concern matters fundamental"

to the company, there is a strong inference that "every office or director" knew of falsity or acted

with reckless disregard"); *Adams v. Amplidyne, Inc.*, No. 99-4468, 2000 U.S. Dist. LEXIS

21383, at *23 (D.N.J. Oct. 24, 2000) (strong inference that officers and directors have knowledge

of "core business" matters).

The Complaint alleges that profits on the Transamerica contract were directly tied to the

performance of convertible bonds, and such profits could only materialize with an appreciation

in the value of the underlying stock.  Nonetheless, in all three 10-Ks, the Director defendants

signed on to representations that ANR's earnings were based on *interest spreads*, ¶¶75, 112, 169;

and, in the 1999 and 2000 10-Ks, the Directors signed on to representations that ANR was free

from market risk.  ¶¶71, 76, 112.  The Complaint alleges that the losses associated with the

contract were massive — in 2001 alone, ANR's (belated) write-offs for the contract wiped out all

earlier reported profits on the contract – and still this was just a hint of the losses to which

Defendants would eventually admit.  After the Class Period, ANR (and the other defendants)

were forced to admit that ANR might not continue as a going concern.  ¶217.  Indeed, here, there

were actually a *series* of write-offs in the latter half of the Class Period, and with each new

charge the Defendants assured investors that they were monitoring the Transamerica contract and

that the write-offs taken would resolve the problem.  ¶¶147, 155-156.  Nonetheless, each time,

Defendants' rosy predictions were proven false, because — as was finally disclosed to investors

in July 2002 — the Defendants' earlier statements were premised on undisclosed, wildly

unrealistic projected returns on ANR's investments that flew in the face of the assets' actual,

historical performance.  At the very least, in the wake of Atkin's departure and just before the

first write-off, each Defendant was painfully aware that he needed to focus on ANR's financial

reporting, and yet these false statements continued.  Courts routinely hold that large write-offs

coming on the heels of optimistic statements suggest scienter, particularly when there is no

intervening event that would explain the discrepancy between the defendants' optimism and the

ultimate financial results.  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996)

("we need not turn a blind eye to the obvious: the proximity of the date of the allegedly

fraudulent statements . . . [to] the date on which disclosure was eventually made"); *Fecht v. Price

Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (shortness of time between optimistic statement and

disclosure of problems is "circumstantial evidence that the optimistic statements were false when

made"); *Helwig v. Vencor Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc) (inference of scienter

from "closeness in time of an allegedly fraudulent statement . . . and the later disclosure of

inconsistent information").  As the Second Circuit stated:

> the magnitude of this write-off renders less credible the proposition that during the Class
> Period, [defendant] GT believed it likely that it could recover those royalty advances
> through future sales . . . .  The write-off suggests something remarkable: prior to the
> fourth quarter of 1997, GT was unable to appreciate that the poor performance of its
> products . . . required [certain accounting treatment] but suddenly realized that $ 73.8
> million . . . needed to be expensed.

*Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *see also Scholastic*, 252 F.3d at 77 (large

write-offs "undermine[], at the pleading stage, the argument that defendants were unaware of the

[problems] until shortly before [announcing the charges]").

Indeed, it is hard to imagine how Defendants could make the stunning representations

here *without* being at best reckless, and at worst cynically acting to cover up the extent of their

earlier errors and false reports.  For instance, Defendants continued to refuse to recognize the

DAC as unrecoverable (and thus represented to shareholders that they believed the Transamerica

contract would generate enough earnings to offset the DAC) – by assuming a 10% future return

on convertible bonds that was utterly irreconcilable with their actual experience.  ¶¶154, 157.

Thus, Defendants either knew their financial statements were misstated and lied about it, or they

did not attempt to determine the truth or falsity of their statements even *after* they undeniably

knew about serious problems with this contract.  *Cf. In re Shopko Sec. Litig.*, No. 01-C-1034,

2002 U.S. Dist. LEXIS 23887, *29-30 (E.D. Wis. Nov. 5, 2002)  (defendant "had a duty to

investigate" the true causes of the problems before speaking; obvious falsity suggested either

intentional deception or "reckless disregard of the truth").  This is precisely the kind of thing that

creates a strong inference of scienter.  *See Scholastic*, 252 F.3d at 77 (scienter pled where

defendants "failed to adjust revenues" in light of historical experience); *Fla. State Bd. of Admin.*

*v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) (recklessness pled when plaintiffs

allege that defendants knew that actual financial performance differed from projected

performance).

      Here, where the errors were so massive, and the Transamerica transaction so central to

ANR's profitability (and to ANR's survival), the conclusion that the Defendants were aware of

the true facts contradicting their public statements is virtually inescapable.  As the court

explained in *In re Mercator Software Inc Sec. Litig.*, 161 F. Supp. 2d 143 (D. Conn. 2001),

which also was a case in which there was no dispute about the falsity of earlier financial

statements:

> There also can be no dispute that defendants had a duty to exercise a certain level
> of care when making financial disclosures.  These were not disclosures
> concerning future performance.  These were statements about past performance
> concerning expenses as to which senior corporate management allegedly had

records available and about which they had knowledge or should have had
knowledge by virtue of the [type of information involved] . . . .  Additionally . . .
these were misstatements of a magnitude of nearly one hundred percent [] or
more.

*Id.* at 150.

An inference of scienter is also created from the fact that Atkin "resigned" under
suspicious circumstances and subsequently sold *all* of his ANR stock.  The firing of executives
— and, in particular, the firing of a CFO in a case involving significant accounting fraud — is a
classic hallmark of scienter.  *See In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002
U.S. Dist. LEXIS 5887, *42-43 (N.D. Cal. Apr. 2, 2002) (resignations and shifting of personnel
before financial restatements contributes to inference of scienter); *McKesson*, 126 F. Supp. 2d at
1274 (public firings in conjunction with restated financials contributes to inference of scienter);
*In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (circumstances
surrounding termination of key executive contribute to inference of scienter); *Mercator*, 161 F.
Supp. 2d at 150.  And, because Atkin's "retirement" was announced in May 2001, it is simply
inconceivable that ANR and its officers and directors were ignorant of the fraud from May 2001
onward.

### a.    Knowledge and Recklessness are Pled Against Burke

Burke argues that plaintiffs have failed to allege scienter because they have not explained
how he "knew" of adverse facts, Burke Br. at 17-20, because the timing of write-downs is a
matter of "judgment," Burke Br. at 22-28, and because GAAP violations and restatements do not
give rise to an inference of scienter, Burke Br. at 20-22.  All three arguments are unavailing.

First, Burke's knowledge of the undisclosed facts that rendered his statements false and
misleading can hardly be doubted.  There is the obvious inference to be drawn from the fact that
Burke was hired as CFO immediately upon Atkin's hastily announced departure.  It is highly

unlikely that Burke was unaware of the circumstances that precipitated his hiring.  Then, the

argument that Burke, ANR's CFO, somehow remained "unaware" of the true historical financial

factors that should have been used to perform ANR's loss recovery testing for amortization of

DAC — or that he was unaware that the 10% assumed future returns was contrived to avoid the

immediate recognition of additional incurred losses – is simply nonsense.  It should be obvious

that the CFO would be aware of the basic financial facts about the company's largest contract —

if he was not, then he acted recklessly by signing off on ANR's financial statements.  For this

reason, it is common for courts to infer that senior management — and, in particular, financial

officers in cases involving accounting allegations — have knowledge of the affairs of the

company, particularly when the alleged fraud involves large amounts of money or significant

business.  *See CINAR,*, 186 F. Supp. 2d at 316 (scienter properly pled against CFO because

"subsequent admissions of misrepresentations, coupled with the defendants' continuous intimate

knowledge of company affairs" is enough to infer recklessness); *Am. Bank Note Holographics,*

*Inc.*, 93 F. Supp. 2d at 446-447;  *Xerox Corp.*, 165 F. Supp. 2d at 223; *In re WRT Energy Sec.*

*Litig.*, No. 98 Civ. 3610 (JFK), 1999 U.S. Dist. LEXIS 3883, *41-42 (S.D.N.Y. Mar. 29, 1999).[7]

Further, it was Burke himself who vouched to the public for the adequacy of the

announced "loss reserves"— and assured that additional DAC write-offs were unlikely.  Through

such statements, Burke repeatedly held himself out as knowledgeable about ANR affairs

generally and the Transamerica contract in particular.  As the court concluded in *In re Sears*

*Roebuck & Co.*, "Logically, defendants in their positions would be expected to have knowledge

of the facts" regarding the business segment at issue "at the time they were making statements

---

[7] *See also Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003) (officers of a
company can be assumed to know of facts "critical to a business's core operations or to an
important transaction that would affect a company's performance"); *Shopko*, 2002 U.S. Dist.
LEXIS 23887, at * 30-31.

about" that segment of business. 2003 U.S. Dist. LEXIS 19126, *12 (N.D. Ill. Oct. 23, 2003).

Burke personally told investors that "there is a low probability of further write-offs on this

contract," ¶147, that reserves on the Transamerica contract were "realistic," ¶156, that the

Company had used "the same lapse rates used to calculate our write off in . . . 2001" in

calculating the January 2002 write-off, ¶156, and that the Company was "comfortable" with

reserve levels in April 2002, ¶176. With these statements, Burke represented to the public that

he was familiar with the basic facts of the contract, and should not now be heard to argue that

plaintiffs have not pleaded "how it is" that Burke "had knowledge" of ANR's problems. Burke

Br. at 20. *Cf. In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 270 (E.D.N.Y 2002)

(defendant's public statements regarding company's investments demonstrates personal

knowledge of those investments).

Next, Burke argues that write-downs and reserves are a matter of "judgment" and that the

securities laws are not violated by a mere failure to provide adequate reserves. To the extent that

Burke suggests that improper reserving simply cannot be the basis of a securities fraud claim,

Burke Br. at 24-25, even the cases he cites do not stand for that proposition. *See, e.g. Shapiro v.*

*UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("There is nothing unique about

representations and omissions regarding loan loss reserves that removes them from the purview

of the antifraud provisions of the federal securities laws."). In fact, the Second Circuit has

emphasized that failure to adequately reserve constitutes securities fraud, *see Scholastic*, 252

F.3d at 74, and that failure to take write-downs in a timely fashion constitutes securities fraud,

*see Novak*, 216 F.3d at 312 (rejecting argument that defendants' failure to take write-downs

"supported nothing more than an inference that the managers of AnnTaylor disagreed over

matters of business judgment").

Burke's next argument appears to rest on the proposition that the Complaint fails to demonstrate that his "discretion and judgment" was fraudulent, because the Complaint does not adequately particularize its allegations. Burke Br. at 25-26. The first obvious point is that the "judgment" associated with the timing of write-downs and the size of reserves, like any "judgment call," necessarily involves some consideration of actual, *known* facts. A judgment becomes fraudulent when the speaker *disregards* known facts. *See Helwig*, 251 F.3d at 540 (scienter may be inferred from corporate executives' "disregard of the most current factual information before making statements"). Here, the Complaint explains – in great detail – that Burke disregarded known facts regarding the investment returns on convertible bonds when exercising his "so-called" judgment. ¶¶154, 157. The Complaint also details the exact historical facts and misstatements in financial reporting that had a direct effect on ANR's "write-offs" and "reserves," including the problems with ANR's accounting for policyholder liabilities, *e.g.*, ¶¶79, 87. The Complaint provides the precise dollar amounts by which ANR misclassified minimum guarantee interest payments, *e.g*, ¶¶87, 128. The Complaint provides, in excruciating detail, the exact return that ANR needed to break even on its Transamerica contract, and the returns that ANR was actually earning. The Complaint also describes the discrepancies between ANR's projected surrender rates when it priced the contract, and the actual surrender rates that ANR experienced both before and during the Class Period. ¶67. Such detail is quite sufficient to demonstrate Burke's "judgments" were not based upon known facts, and that therefore he acted with scienter. Thus, no further detail is required. *Cf. Shopko*, 2002 U.S. Dist. LEXIS 23887, *34 n.6 (no further particularity required when the "missing" facts would have "little if any relevance to plaintiffs' claim").

Any number of complaints have been sustained with allegations far less particular than those here. [8]  *See, e.g.*, *DiVittorio,* 822 F.2d at 1248 (allegation that property did not contain "nearly" the amount of coal represented in an offering memorandum meets 9(b) standards); *Cabletron*, 311 F.3d at 32-33 (explaining that complaints do not need to provide more than basic facts).[9]  In short, "[i]t is difficult to conceive of a complaint pled with more particularity than the one presented. . . . As it is, this complaint is [114] pages long, identifies the source of all factual assertions, and is replete with repleading of the same facts, merely to satisfy formalistic requirements. In many respects, if this complaint is not specific enough, no complaint is." *In re Allaire Corp. Secs. Litig.*, 224 F. Supp. 2d 319, 341 (D. Mass. 2002).  Or, more simply, "the

---

[8] Many of the cases cited by Burke involved dismissals of complaints that contained only the most vague allegations of wrongdoing.  For instance, in *Christidis v. First Penn. Mortgage Trust*, 717 F.2d 96 (3d Cir. 1983), Burke Br. at 25 n.14, the complaint was dismissed because of the "complete absence of *any* disclosure" about the manner in which defendants violated reasonable accounting practices.  *Id.* at 100 (emphasis added).  And in *Greebel*, the plaintiffs had already had the benefit of discovery; the First Circuit has since explained that the particularity requirements are less stringent when discovery has been stayed.  *See Cabletron*, 311 F.3d at 33.  Similarly, in *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) (Burke Br. at 25) the Seventh Circuit highlighted the fact that media attention had resulted in a "flood of information released about [the relevant company] since 1984 offer[ing] ample fodder if there is indeed a tale to tell." *Id.* at 627.  Here, plaintiffs have not yet had the benefit of discovery.

[9] *See also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 626 (S.D.N.Y. 2003) (alleged failure to recognize "billions of dollars" in impaired assets and overstatements of "hundreds of millions, if not billions, of dollars" in revenue is sufficiently particular); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 26-27 (D. Mass. 1999); *Ashanti*, 184 F. Supp. 2d at 256-257; *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 593 (D.N.J. 2001); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999); *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998).  Indeed, many of the cases that Burke cites for the proposition that the Complaint must be more "particular" reflect only various courts' skepticism that the facts alleged demonstrated any false statements in the form of accounting violations *at all*. Burke's own summary of *Greebel v. FTP Software*, 194 F.3d 185 (1st Cir. 1999) shows that in that instance, the court did not even believe that plaintiffs had established the existence of GAAP violations. Burke Br. at 25.  By contrast, in this instance, falsity — not to mention GAAP violations — is *undisputed*.

PSLRA may have changed federal securities law; it did not eliminate it." *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002).[10]

Finally, as for Burke's argument that scienter cannot be inferred from GAAP violations and restatements, the answer is simply that these facts are like anything else:  the inferences depend on the context.[11]  Although some GAAP violations, standing alone, may not give rise to an inference of scienter, courts routinely recognize that massive GAAP violations, write-downs, and restatements can indeed become so extreme that there is a strong inference that the defendant was aware of the problem. "When significant GAAP violations are described with particularity . . . they may provide powerful indirect evidence of scienter. After all, the books do not cook themselves." *Lernout & Haupsie*, 208 F. Supp. 2d at 87 (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)); *see also Scholastic*, 252 F.3d at 77 (two large write-offs at end of Class Period suggests that defendants knew of problems earlier); *Rothman*, 220 F.3d at 92 (same); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware of Eagle's true financial status and the stronger is the inference that defendants must have known about the discrepancy."); *In re MicroStrategy Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 636-637 (E.D. Va. 2000) (citing cases; "the alleged GAAP

---

[10] Burke argues, in a footnote, that he cannot be blamed for false statements that were blessed by ANR's auditors.  Burke Br. at 22 n.11.  Leaving aside the fact that plaintiffs have filed a complaint against ANR's auditors, No. 3:03-CV-1826 (AWT), once again, it is well-accepted that an issuer is responsible for the accuracy of its own financial statements, and the blessing of an auditor does not vitiate the inference of fraud.  *See, e.g., In re Ramp Networks Sec. Litig.*, 201 F. Supp. 2d 1051, 1074 (N.D. Cal. 2002); *Lernout & Haupsie*, 208 F. Supp. 2d at 86.

[11] Amazingly, Burke cites *Greenberg v. Howtek, Inc.*, 790 F. Supp. 1181 (D.N.H. 1992).  In that case, the court dismissed the complaint in part because the court believed that projections regarding future results are simply not actionable as a matter of law.  *See id.* at 1185.  It is now indisputable that projections are, in fact, actionable under §10(b).  *See In re IBM Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

violations and the subsequent restatements are of such a great magnitude—amounting to a night-and-day difference with regard to MicroStrategy's representations of profitability—as to compel an inference that fraud or recklessness was afoot.").

Notably, in this case, the market analysts had the same suspicion. As one analyst put it when ANR announced its first write-down:

> This strikes us as a sudden and dramatic shift in the accounting for this business. The company has been booking a significant level of profits, rather than losses, for this business. . . . We're somewhat perplexed about how lapse [surrender] assumptions could change so significantly in a short period of time, particularly since management now indicates that it has been concerned about poor persistency for two years.

¶148. *See Scholastic*, 252 F.3d at 76 (scienter inferred because of "[t]he sharp criticism from industry analysts" after true facts were revealed); *see also Burstyn v. Worldwide Xceed Group*, No. 01 Civ. 1125 (GEL), 2002 U.S. Dist. LEXIS 18555, at *18 (S.D.N.Y. Sept. 30, 2002) (GAAP violations of sufficient magnitude "raises questions about defendants' credibility, makes the press statements increasingly suspect, and by doing such, further supports a strong inference of scienter" (citing *In re Complete Management Inc.*, 153 F. Supp. 2d at 327)).

If there was ever a case where it was appropriate to infer scienter from the existence of restatements, this is the case. After three write-downs in nine months, the Company first announced in July 2002 that it would be restating its financial statements back through the beginning of 2001 to correct accounting for embedded derivatives. ¶183. One month later, the Company announced that the restatement would also involve changes to the accounting on the Transamerica contract. ¶190. Three months later, the Company announced that it would be restating all of its financial statements back to the beginning of 2000 — encompassing virtually the entire Class Period — to alter its accounting on the Transamerica contract. ¶202. The Company then filed its new amended 2001 10-K, which included the 2000 restatements. ¶214.

48

The amended 2001 10-K, filed in March 2003, is criss-crossed with charts and tables attempting to explain to investors the myriad accounting errors that necessitated the corrections. In April 2003, the Company filed is 2002 10-K, but in July 2003, the Company restated the 2002 10-K. ¶220. Finally, in July 2003, the Company warned investors that further restatements might still be forthcoming. ¶220. Under these circumstances, it is virtually inconceivable that a court is not permitted to draw the obvious inference that "fraud or recklessness was afoot." *Microstrategy*, 115 F. Supp. 2d at 636-637.

Burke attempts to convince the Court that even if he knew the facts rendering his statements false and misleading, the Complaint still fails to establish that he understood the *significance* of those facts. Not only is this argument not the law — recklessness is pled if defendants had "knowledge of facts or access to information contradicting their public statements," *Novak*, 216 F.3d at 308 — but it is utterly eviscerated by the allegations in the Complaint. *First*, Burke assumed his duties after Atkin's highly suspicious departure, suggesting that Burke — and everyone else at the Company — was aware of the fraud by at least May 2001. *Second*, Burke signed off on financial statements that represented that ANR was not exposed to interest rate fluctuations in its annuity segment, ¶152, and that calculated write-offs of DAC and reserve levels were based upon returns that the Company had never been able to achieve, ¶¶154, 157. *Third*, Burke signed off on financial statements that appeared deliberately engineered to *obscure* the actual return on the Funds Withheld at Interest, so as to prevent investors from noticing ANR's difficulties. *E.g.*, ¶¶151, 168. Scienter may be inferred when defendants "disclos[e] accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication." *Helwig*, 251 F.3d at 552. *Fourth*, Burke participated in a conference call in which Doyle flatly *lied* to investors by falsely telling

them that ANR needed only a *five percent* return on its investments to earn a profit on the Transamerica contract.  ¶177.  "[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements.  If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context."  *In re Smartalk Teleservices*, *Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000).

Burke asks the Court to believe that he acted with "good faith and honesty" because, during his tenure, ANR took write-offs, created reserves, and its stock price declined.  Burke Br. at 29.  The subtext of Burke's argument appears to be that he was entitled to lie to investors about the extent of ANR's problems so that he could trickle out the bad news and thus soften the eventual blow.  Clearly the blow was not softened for those lass members who purchased *after* Burke's comments, because those investors purchased stock while the prices remained inflated. Had Burke told the whole truth, these investors would have suffered no injury.  Nor do the securities laws permit corporate executives to lie to shareholders "for their own good" any more than they permit lies intended to harm shareholders.  As the Supreme Court explained in *Basic v. Levinson*, corporations are not permitted to lie to shareholders to "maximize[] shareholder wealth."  485 U.S. at 234-235.  To "creat[e] an exception to a regulatory scheme founded on a prodisclosure legislative philosophy, because complying with the regulation might be 'bad for business,' is a role for Congress, not this Court."  *Id.* at 239; *cf. United States v. Simon*, 425 F.2d 796, 809 (2d Cir. 1969) (in context of criminal securities fraud, the government's burden "was not to show that defendants were wicked men with designs on anyone's purse, which they obviously were not, but rather that they had certified a statement knowing it to be false").

Finally, as described above, the far more likely motive for the manipulation of the assumptions used to perform ANR'S loss calculations was to cover up ANR's prior false reporting and delay its day of reckoning.  In sum:

> Undoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness will surely be the focus of any trial of this case. We will not prejudge that issue.  But neither the district court, nor we, can conduct a battle of experts on a motion to dismiss.  Rather, we must assume the truth of the allegations pleaded with particularity in the complaint.  The strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case.

*Green Tree*, 270 F.3d at 666.

### b.    There is a Strong Inference of Scienter For Hammer, Esposito, and O'Hara

Esposito, O'Hara, and Hammer insist that there is no inference of scienter because the Complaint contains nothing but generalized allegations based solely on their status as directors. *See* XL Br. at 7; Hammer Br. at 19-20.  However, for the same reasons that it is proper to attribute group published information to these defendants, it is also proper to infer that they were aware of the massive inaccuracies in ANR's financial reports.  Specifically:

- All three signed ANR's annual financial reports, filed with the SEC, despite the fact that these financial reports massively misstated the basic parameters of ANR's largest annuity contract, and falsely proclaimed ANR to be free from market risk;

- In the wake of Atkin's bizarre departure, all three were on notice of the fundamental inaccuracies in ANR's financial statements, and, most crucially, were alerted to the fact that ANR had failed to reevaluate the Transamerica contract until October 2001; and

- All three signed ANR's 2001 10-K which, among other things, avoided additional write-downs on the Transamerica contract by using highly unrealistic projected returns of 10%.

At some point, even the most disengaged director is confronted with such damning facts that he must begin to ask probing questions – or found to be reckless.  Here, the first write-offs, if not

Atkin's suspect resignation, clearly indicated that action by the directors was required to put a

stop to ANR's false financial reporting.  Additionally, the Complaint shows that such basic,

fundamental knowledge of ANR's business is not  attributed to these defendants based solely on

their titles, but also on their particular relationships with ANR.  As detailed above, these

defendants were intimately involved in ANR's affairs.  Courts routinely attribute knowledge

even to outside directors when the fraud is of sufficient magnitude and/or the directors were

sufficiently involved with the company to justify the inference of fraud.  *See, e.g.*, *Reliance*, 91

F. Supp. 2d at 720 (to dismiss claims against outside directors would make it impossible to plead

scienter absent evidence of "specifically greedy comments from an authorized corporate

individual" (quoting *Press*, 166 F.3d at 538); *Danis v. USN Communications, Inc.,* 73 F. Supp.

2d 923, 939 (N.D. Ill. 1999).[12]

Moreover, as mentioned above, the Complaint shows that during the Class Period, ANR

was a very small company.  ¶257.  Just as a company's small size renders it more appropriate to

apply the group pleading doctrine to outside directors, so too a small size make it more likely

that high-level corporate executives are aware of the problems.  *See, e.g.*, *Nathenson v. Zonagen,*

*Inc.*, 267 F.3d 400, 424-25 (5th Cir. 2001) (small size of company contributes to inference of

scienter); *In re Amylin Pharms, Inc. Sec. Litig.*, No. 01cv1455 BTM (NLS), 2002 U.S. Dist.

LEXIS 19481, at *22  (S.D. Cal. Oct. 9, 2002) (high level corporate defendants properly charged

with knowledge of falsity because the corporation was small); *see also U.S. Bioscience*, 806 F.

---

[12] *Livent*, 78 F. Supp. 2d at 194, cited by XL Capital, is distinguishable.  There, the judge determined that the Complaint created no inference that the outside-director defendants had knowledge of the company's false statements.  *Id.* at 219.  But in *Livent*, the court determined that the fraud was carefully concealed by its perpetrators, and that for this reason, there was no inference that the directors were aware of it.  *See id.* at 219.  In this case, however, the plaintiffs have alleged that the false statements would have been exceedingly obvious to anyone with access to any inside ANR information at all.

Supp. at 1203 (inference of outside directors' involvement in false statements is stronger for "small start-up company").

### 2.    Plaintiffs Have Alleged Motive and Opportunity

Because plaintiffs have adequately alleged that defendants acted with recklessness, they need not also plead facts showing Defendants' "motive and opportunity" to commit fraud.  *See Cosmas*, 886 F.2d at 13.  However, plaintiffs bolster the inference of fraud with allegations of Defendants' motive and opportunity to commit fraud.  *See Novak*, 216 F.3d at 307.  To plead motive, plaintiffs must plead the existence of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).  These allegations taken in conjunction with plaintiffs' other facts, are "part of the overall picture of scienter." *Green Tree*, 270 F.3d at 664.

Plaintiffs have alleged that all of the Defendants were motivated to perpetuate the fraud because the actual poor performance on the Transamerica contract was so extreme and the exposure to loss so great that disclosure of the truth threatened ANR's very existence.  To continue as a reinsurer, ANR was heavily dependent on its ability to maintain its financial ratings and meet its collateral obligations.  ¶269.  The poor performance on the Transamerica contract threatened to frustrate that ability.  With its trickle-down approach to the release of bad news on Transamerica, Defendants hoped to dilute their partially disclosed losses with other strong results on its remaining business.  These types of motives – to benefit the corporate business, rather than to contribute to an individual's private wealth – have been recognized by the Second Circuit as potentially creating an inference of scienter.  *See Rothman*, 220 F.3d at 81; *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993).  Here, ANR knew that revealing the losses on the Transamerica contract would cause it to violate its financial covenants to its cedents, thus causing it to lose all of its contracts --  which is precisely what happened once ANR was forced

to disclose the extent of its fraud.  ¶269.  Moreover, Atkin's strange and hasty departure in the

middle of the Class Period demonstrates that executives' careers were at stake.  "This is more

than the usual concern by executives to improve financial results; the executives' careers and the

very survival of the company were on the line."  *Cabletron*, 311 F.3d at 39; *see also Pirraglia v.*

*Novell*, 339 F.3d 1182, 1191 (10th Cir. 2003) (motivation for officers to keep their jobs creates

inference of scienter); *Helwig*, 251 F.3d at 540 (same); *Aldridge v. A.T. Cross Corp.*, 284 F.3d

72, 83 (1st Cir. 2002) (scienter inferred because "success of the new products . . . was important

to [executives'] survival and that of the company"); *Mercator*, 161 F. Supp. 2d at 150; *In re*

*Hayes Lemmerz*, 271 F. Supp. 2d 1007, 1018 (E.D. Mich. 2003) (massive restatements coupled

with motive to conceal debt and inflate profits gives rise to inference of scienter (citing *In re*

*Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010 (N.D. Ohio 2000)).

Burke argues that any allegation that he intentionally committed fraud is "negated" by the

fact that he purchased ANR shares during the Class Period, and XL Capital makes a similar

argument in the context of control-person liability.  It has been repeatedly recognized that "the

PSLRA neither prohibits nor endorses the pleading of insider trading as evidence of scienter,"

but instead only requires that plaintiffs "meet the 'strong inference' standard." *Greebel*, 194 F.3d

at 197.  A number of cases have held that stock purchases *do not* negate the inference of scienter

when plaintiffs rely on other facts to establish the inference.  *See, e.g.*, *Green Tree*, 270 F.3d at

663; *In re Resource Am. Secs. Litig.*, No. 98-5446, 2000 U.S. Dist. LEXIS 10640, at *22 (E.D.

Pa. Jul. 26, 2000); *In re U.S. Aggregates Inc Sec. Litig.*, 235 F. Supp. 2d 1063, 1072 (N.D. Cal.

2002).[13]  Indeed, it is absurd to suggest that defendants' failure to *aggravate* their fraud with

potentially criminal insider trading somehow negates an inference of other improper action.[14]

Unlike in *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), nothing here "defies economic

reason."  Burke Br. at 16 (quoting *Kalnit*).  It is entirely plausible that corporate executives might

*recklessly* misrepresent a company's financial affairs to the public while simultaneously hoping

for a miraculous market turnaround that will eventually cause reality to catch up to their false

statements.  *See Simon*, 425 F.2d at 809 ("Defendants may have harbored the illusion that the

dexterity of Continental's treasurer in 'juggling cash' would enable it to survive. Moreover, men

who find themselves in a bad situation of their own making do not always act with full

rationality."); *Green Tree*, 270 F.3d at 662 ("The investors allege that . . . defendants recklessly

attempted to sweep the problem under the rug hoping a change in the economy would ameliorate

the problem.  We cannot conclude that this is a case in which the motive theory is too irrational

to add to the weight of other circumstantial allegations . . . ."); *Nanopierce Tech. v. Southridge*

---

[13] *See also McGann v. Ernst & Young*, 102 F.3d 390, 396 (9th Cir. 1996) ("a party that introduces fraudulent information into the securities market does no less damage to the public because that party did not trade stocks"); *In re Seebeyond Techs Sec. Litig.*, 266 F. Supp. 2d 1150, 1168 (C.D. Cal. 2003) (stock purchases do not negate scienter when other facts, taken as a whole, create strong inference of recklessness); *cf. Wilson v. Bernstock*, 195 F. Supp. 2d 619, 638 (D.N.J. 2002) ("[I]ndividual corporate defendant's retention or sale of his or her stock holdings does not conclusively negate any inference of scienter" and will instead only undermine scienter allegations in the absence of other scienter allegations).

[14] The citations offered by Burke and XL Capital are not to the contrary.  In *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43 (E.D.N.Y. 1998), the court found that stock purchases negated the inference of scienter because the plaintiff's *motive* theory rested on allegations of insider selling.  *See id.* at 60.  Moreover, the court only considered defendants' stock sales in conjunction with plaintiff's *motive* allegations, and not in conjunction with allegations of recklessness.  *See id.* at 60-61.  And *In re Symbol Technology Class Action Litig.*, 950 F. Supp. 1237 (E.D.N.Y. 1997), cited at XL Br. 21, was decided at the *summary judgment* stage.  In that case, the court did *not* conclude that insider purchases defeated scienter; instead, the court noted that plaintiffs had failed to allege motive, and that, at the summary judgment stage, plaintiffs had failed to put forth evidence to demonstrate recklessness.  *See id.* at 1245-1246.

*Capital Mgmt.*, No. 02 Civ. 0767 (LBS), 2002 U.S. Dist LEXIS 24049, *16 n.7 (S.D.N.Y. Oct.

10, 2002) ("Just because a manipulator loses money doesn't mean he wasn't trying."); *Robbins v.*

*Moore Med. Corp.*, 788 F. Supp. 179, 191 n.8 (S.D.N.Y. 1992) (inference of scienter is not

negated by irrationality of a scheme; "irrational schemes have as much potential to defraud

investors as do rational schemes").

> As the court stated in *Holmes v. Baker*, 166 F. Supp. 2d 1378, 1378 (S.D. Fla. 2001):

> It is Defendants' position that there can be no scienter because Defendants would
> have been defrauding themselves by investing in AVS during the Class Period.
> The pitfalls with adopting Defendants' argument, as a blanket rule, are clear.
> Corporate officers would be inclined, or perhaps instructed by counsel, to
> purchase stock after the initiation of a securities fraud lawsuit to negate any
> possible inference of fraud. Accordingly, the Court declines to adopt a general
> holding that where there are insider purchases, there can be no scienter. Rather,
> the Court shall examine the circumstances surrounding each defendant who
> purchased stock to determine what conclusions to draw.

## E.    The Complaint Properly Pleads Reliance

Burke urges that this Court hold – as a matter of law – that the market did not "rely" on

his false statements during the Class Period, and that therefore his fraud had no effect. Burke Br.

at 37-40. Typically, in a "fraud on the market" case, the court presumes that material

information is incorporated into a corporation's stock price, and that investors "rely" on false

statements by purchasing the stock at market price. *See In re Ames Dep't Stores Sec. Litig.*, 991

F.2d 953, 967 (2d Cir. 1993). Burke argues that this presumption has been conclusively rebutted

here – *not* because his false statements (such as his representations that no further write-offs

would be forthcoming, ¶¶147, 156, 176) were not *material*, but because the stock price dropped

during his tenure. The argument is a patent bid for this Court to resolve disputed issues of fact.

The Complaint plainly alleges that Burke issued "partial disclosures" of the ANR fraud,

while simultaneously furthering the fraud by lying to investors. ¶¶153-154, 157, 164-179, 184,

187. With each new announcement, ANR's stock price fell. Burke's argument requires this

Court to hold, as a matter of law, that the stock price would *not* have dropped any further if he had revealed the full truth – i.e., that the losses on the Transamerica contract were far greater than those disclosed, to the point of jeopardizing ANR's ability to survive as a going concern.

*First*, Burke's argument fails because of the massive stock price drop that ANR experienced when the full extent of the fraud was finally revealed at the end of the Class Period. Courts routinely hold that such a stock price drop upon full disclosure is strong evidence that the stock was inflated prior to that time. *See, e.g.*, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003); *San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

*Second*, the Complaint repeatedly shows how analysts believed Burke's false representations, and made recommendations based upon them. ¶¶158-160, 187. These reports also establish that at least some portion of the market had faith in Burke's assurances that the Transamerica losses had been contained.

*Third*, any number of courts have recognized the concept of the "partial disclosure" – i.e., that some portion of the fraud may be revealed to investors, but the fraud may nonetheless be continued due to additional false statements or defendants' failure to reveal the full extent of the fraud. *See, e.g.*, *Hallet v. Li & Fung Ltd.*, No. 95 Civ. 8917 (JSM), 1997 U.S. Dist. LEXIS 15509, *2 (S.D.N.Y. Oct. 6, 1997); *Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 U.S. Dist. LEXIS 9982, *7 (N.D. Ill. June 12, 2003); *In re Atlantic Fin. Fed. Sec. Litig.*, No. 97 Civ. 4760 (JKG), 1990 U.S. Dist. LEXIS 15965, *5-6 (E.D. Pa. 1990). Indeed, the Second Circuit has explained that a partial disclosure triggers a *duty* to disclose the full truth: "[W]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to

57

make it complete and accurate." *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992); *see also In re Credit Suisse First Boston Corp. Sec. Litig.*, 1998 U.S. Dist. LEXIS 16560, *17 (S.D.N.Y. Oct. 19, 1998) ("a defendant may not deal in half-truths").

    *Fourth*, the argument is a factual one.  Burke is asking this Court to determine that it was *not* his false statements that caused ANR's stock price to drop at the end of the Class Period, that it was *not* his projections in October 2001 that caused the stock price to drop when they were proved false in January 2002, and that it was *not* his false projections in January 2002 that caused the stock price to drop when they were proved false in July 2002.  This is obviously a dispute inappropriate for resolution at this time.  *See Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 188 (D.R.I. 2003) ("The Court is loath [] at this early stage, to reach legal conclusions regarding market reliance from ambiguous market history by engaging in its own projections about likely market movement. . . .").  The Second Circuit recently held in the context of loss causation that the precise cause of a stock price drop should *not* be resolved on motion to dismiss, but instead "is a matter of proof at trial."  *Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).[15]

---

[15] Burke's citations to *Zonagen*, 267 F.3d at 400 and *Burlington*, 114 F.3d at 1410 are unavailing.  In neither case did the court hold that, on a motion to dismiss, a court may attempt to determine what factors, precisely, caused a company's stock price to drop.  Instead, in both cases, the courts held that a stock's *failure* to drop following corrective disclosure could – in the absence of any explanation – be taken as evidence that the market had not relied on previous false statements.  *Burlington*, 114 F.3d at 1425; *Zonagen*, 267 F.3d at 417. In *Zonagen*, the court also noted that the company's stock price had dropped following the falsely positive statements, but that plaintiffs *had no explanation* for the pattern.  267 F.3d at 418 ("no allegation either explaining this or asserting that [false representations] . . . affected the price of Zonagen stock").  The Complaint here clearly alleges that Burke's false statements were coupled with partial disclosures that caused the share price to drop somewhat, and that the revelation of the previously undisclosed facts at the end of the Class Period caused ANR's already-battered share price to plunge by nearly 50%.  ¶202.  At this stage of the litigation, the court simply cannot conclude that plaintiffs' account is necessarily untrue.

### F.    Defendants' Statements are Not Protected as "Forward-Looking"

"Forward-looking" statements, such as projections or predictions, may be protected by

the PSLRA's "safe harbor" provision, which states that projections are inactionable if they are:

> accompanied by meaningful cautionary statements identifying important factors
> that could cause actual results to differ materially from those in the forward-
> looking statement; or . . . the plaintiff fails to prove that the forward-looking
> statement . . . was made with actual knowledge by that person that the statement
> was false or misleading.

15 U.S.C. § 78u-5(c)(1)(a)(i).  None of Burke's statements qualifies for safe harbor protection.

### 1.    The Statements Identified by Burke are Not Forward Looking

The PSLRA's safe harbor, based on the judicially-created "bespeaks caution" doctrine,

only protects *forward looking* statements.  *See, e.g.*, *Helwig*, 251 F.3d at 559 (en banc); *Bryant v.*

*Avado Brands, Inc.*, 187 F.3d 1271, 1276 n.7 (11th Cir. 1999).  Burke argues that his statements

about the  adequacy and reasonableness of reserves qualify for safe harbor protection.  Reserve

calculations have a critical effect on a company's financial results, because when a reserve for

liabilities or losses is created or is increased, there is a simultaneous increase in expense, and

thus a corresponding decrease in earnings.  Because calculation of reserves necessarily involves

the assessment of both historical facts and future projections, reserve calculations are not

"forward looking" statements under the securities laws.  *See, e.g.*, *EP Medsystems v. Echocath*

*Inc.*, 235 F.3d 865, 876 (3d Cir. 2000); *Shaw*, 82 F.3d at 1213; *Reliance*, 91 F. Supp. 2d at 721;

*In re Employee Solutions Litig.*, 1998 U.S. Dist. LEXIS 16444, at *9-10 (D. Ariz. Sept. 22,

1998).[16]

---

[16] Indeed, discussing the reserves in its 2001 10-K, ANR expressly (and falsely) told investors
that its assumptions were "reasonable" ones. ¶164.  Burke, as signatory and CFO, was
responsible for this representation.

The PSLRA itself recognizes the same principle. Reserve calculations are part of a corporation's financial statements, and are prepared in accordance with GAAP. The PSLRA's safe harbor explicitly does *not* apply to statements that purport to be prepared in accordance with GAAP. *See* 15 U.S.C. §78u-5(i). Thus, under the PSLRA's own terms, reserve calculations do not reap the benefit of the safe harbor.

Similarly, Burke's statement that there was a "low probability" of future write-offs was not forward-looking. ¶147. Although Burke argues that the "truth or falsity" of this statement could only be determined by reference to the future, Burke Br. at 31, this is not true. Based solely on information existing at the time, there was actually a *high* probability of future write-offs, because in the future ANR would necessarily need to correct its current reporting errors — *i.e.* its contrived use of projected 10% returns that were inconsistent with its bonds' actual, known performance. ¶154. As an assertion of present circumstances, this statement does not qualify for safe harbor protection. *See Nortel Networks*, 238 F. Supp. 2d at 613.

### 2.    Many Statements Appeared in Written Form and Were not Permitted to Incorporate Cautionary Language By Reference

The PSLRA provides that, for *oral statements*, cautionary language may be "incorporated by reference" if the speaker specifically references a "readily available" written document where a listener can find the appropriate cautionary statements. *See* 15 U.S.C. § 78u-5(c)(2)(B)(i). The language is plain: only oral statements may incorporate cautionary language by reference.[17]

The Complaint alleges that ANR's *press releases* quoting Burke's statements (and listing Burke as a contact) were false and misleading. ¶¶147, 155. The Complaint does *not* include any

---

[17] The legislative history is also quite clear: the PSLRA creates a "special safe harbor for issuers who make oral forward-looking statements." H.R. Conf. Rep. 104-369, at 43, reprinted in, 1995 U.S.C.C.A.N. 730, 742. The House explained that "[U]nder certain circumstances, it may be unwieldy to make oral forward-looking statements relying on the first prong of the safe harbor." H.R. Conf. Rep. 104-369, at 45, reprinted in 1995 U.S.C.C.A.N. 730, 744.

claims based on the October 2001 and January 2002 conference calls per se, but instead relies only on press releases issued after the calls.  These press releases are written documents, and may not incorporate by reference language from the 10-Ks.  Thus, the appropriate question is whether *these press releases*, which projected, among other things, "a low probability of future write-offs," ¶147, earnings per share of $1.70 to $1.80, ¶155, and that the Company was "on track to meet our 2002 earnings and growth objectives," ¶174, contained appropriate cautionary language.  Burke does not even *cite* the cautionary language in the press releases, and his arguments should fail for this reason alone.[18]

### 3.    The Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language

Any remaining forward looking statements were not accompanied by "meaningful" cautionary language as the PSLRA requires.  Under both the PSLRA and the judicially-created bespeaks caution doctrine, the cautionary language may not be "boilerplate" and must instead identify *specific*, *known* risk factors.  *See, e.g.*, *Helwig*, 251 F.3d at 558-59; *In re Unicapital Corp. Secs. Litig.*, 149 F. Supp. 2d 1353, 1375 (S.D. Fla. 2001).  Cautionary language is insufficient when it is "generic."  *See, e.g.*, *In re Vivendi Universal*, No. 02 Civ. 5571 (HB), 2003 U.S. Dist. LEXIS 19431, at * 83 (S.D.N.Y. Nov. 3, 2003)  (cautionary language must "render reliance on the misrepresentation unreasonable"); *Ruskin v. TIG Holdings Inc.*, No. 98 Civ. 1068 (LLS), 2000 U.S. Dist. LEXIS 11517, at * 19 (S.D.N.Y. Aug. 14, 2000) ("General risk disclosures in the face of specific known risks which border on certainties" do not insulate false

---

[18] In fact, because the press releases – and not the conference calls – formed the basis for the allegations in the Complaint (and are not judicially-noticeable SEC filings), the conference calls are well outside the boundaries of the Complaint and therefore should not even be considered on a motion to dismiss.  *See Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002); *see also In re Scholastic Inc Sec Litig*, 97 Civ. 2447, 1998 U.S. Dist. LEXIS 13910, *4 (S.D.N.Y. 1998) (court may not consider transcript of conference call on motion to dismiss when complaint only refers to summaries of call contained in other documents).

projections); *Nortel Networks*, 238 F. Supp. 2d at 629 n.15 ("warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described").[19]

In this case, each press release contained the same cautionary language, warning of "the competitive environment," "investment risk," and "the impact of unforeseen economic changes." *See* Burke Exhs 5, 6, 9.[20]  This vague language, which remained unchanged from release to release, is the very definition of "boilerplate."  *See* Black's Law Dictionary 167 (7th ed. 1999) ("Boilerplate . . .  Ready-made or all-purpose language that will fit in a variety of documents.").

As for the cautions contained in the 2000 10-K and the 2001 10-K, it should first be observed that the 2001 10-K did not *exist* until March 2002.  ¶164.  Thus, only the earlier 2000 10-K could possibly protect Burke's assertions from October 2001 and January 2002.  The 2000 10-K only listed risk factors associated with general changing economic conditions that affect all businesses, such as "material changes in the company's operating expenses," "uncertainties relating to general economic and business conditions," "changes in interest rate levels and the liquidity of certain securities," Burke Exh. 17 at 10.  These  warnings could not suffice to caution investors about the true risks associated with Burke's reassurances that there would be no more write-offs.  As for the 2001 10-K, it was not filed until March 2002, and thus could only have

---

[19] *See also In re Seebeyond Techs.*, 266 F. Supp. 2d at 1165-1166 (cautionary language must identify specific known risks); *In re Sci. Atlanta Inc Sec. Litig.*, 239 F. Supp. 2d 1351, 1362 (N.D. Ga. 2002) (same); *Credit Suisse First Boston Corp. v. ARM Fin. Group*, 2001 U.S. Dist. LEXIS 3332, *23 (S.D.N.Y. Mar. 27, 2001) ("[W]arnings of specific risks. . .do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described"); *In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 997 n.10 (E.D. Mo. 1999) ("defendants' boilerplate warnings as to the risk of market volatility are not sufficient to alert the market" of the risks at issue).

[20] Burke does not include the press release describing the October 2001 conference call referenced at ¶147 of the Complaint.  That press release, however, contains the same "cautionary" language.

protected the later-issued false projections from April 2002 and July 2002.  But, just as with the earlier 10-K, the 2001 10-K also failed to inform investors of the critical fact that Burke's projections were based upon unrealistic investment returns that were inconsistent with past performance on the bonds.

In fact, the risk warnings contained in ANR's SEC filings were themselves deceptive.  In October 2001 and January 2002, the 2000 10-K on file with the SEC explicitly reassured investors that risks on the contract had been largely eliminated, thus undermining any warnings that simultaneously issued.  ¶112; Burke Exh. 17 at 18.  Moreover, both the 2000 10-K and the (later issued) 2001 10-K falsely told investors that ANR's annuity line was dependent on earning a spread in *interest rates*, ¶¶112, 169, thus hiding the fact that ANR's annuity line was heavily dependent on *stock* prices because of the convertible bond investments, ¶¶60-61.

### 4.    Burke Actually Knew that His Statements Were False

The PSLRA does not protect statements made with actual knowledge of their falsity.  15 U.S.C. § 78u-5(c)(1)(a)(i).  In the context of a projection or prediction, a statement is "false" if it "lacks a reasonable basis."  *See Time Warner*, 9 F.3d at 266  (projections are actionable if they "were without a basis in fact"); *Kurzweil v. Philip Morris*, 1997 U.S. Dist. LEXIS 4451, *26 (S.D.N.Y. 1997) (projections are false if made without reasonable basis).  Therefore, a false projection or prediction is actionable if the speaker had "actual knowledge" that the prediction lacked a reasonable basis when made.  *See Indep. Energy Holdings*, 154 F. Supp. 2d at 767.

Here, for the reasons stated above with respect to Burke's scienter, Burke had actual knowledge that his statements were false — legitimate loss recognition testing, using known historical factors, would have shown that the contract was generating losses and would continue to do so. Thus, Burke's statements are not entitled to safe harbor protection.

## II.    THE COMPLAINT PROPERLY ALLEGES CONTROL-PERSON LIABILITY AGAINST ALL OF THE DEFENDANTS

Section 20(a) of the Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Liability under §20(a) as a controlling person is a "separate inquiry from that of primary liability and provides an alternative basis of liability."  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001).  Once a plaintiff makes out a prima facie case of control-person liability under § 20(a), "the burden shifts to the defendant to show that he acted in good faith, and that he did not directly or indirectly induce the act or acts constituting the violation."  *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (internal citations and quotations omitted).

Defendants maintain that even if the plaintiffs have alleged a primary violation, they have failed to plead a claim for control person liability under §20(a).  Defendants' argument is based on three critical assumptions:  First, that a plaintiff must plead that the controlling person "culpably participated" in the underlying violation; second, that such "culpable participation" must be pled in accord with the heightened pleading requirements of the PSLRA; and third, that plaintiffs have failed to meet that standard.  Defendants are wrong on all three points.

### A.    Plaintiffs Need Not Plead that Allegedly Controlling Persons "Culpably Participated" in the Underlying Violation

To state a Section 20(a) claim, plaintiffs must plead: (1) a primary violation by a controlled person; and (2) control of the primary violator.  *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 297-98 (S.D.N.Y. 1999).  No moving Defendant contends that ANR is not a "primary violator" of the securities laws.  To establish control, the plaintiff must show that "the

defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey*, 101 F.3d at 1472-1473 (quoting 17 C.F.R. § 240.12b-2).  With controlling-person liability, "Congress sought to reach persons who tried to evade responsibility under common law of agency by standing behind the scenes and having 'dummies' under their control commit the primary violations." *In re Enron Corp. Sec. Litig.*, No. H-01-3624, 2003 U.S. Dist. LEXIS 1668, at *44 (S.D. Tex. Jan. 28, 2003); *see also Ross v. Bolton*, No. 83 Civ. 8244 (WK), 1989 U.S. Dist. LEXIS 7704, at *9 (S.D.N.Y. Apr. 4, 1989) (same).

There is currently a split among district courts in this Circuit as to whether, in addition to pleading the existence of a primary violation, and control of the primary violator, plaintiffs must also plead that the Defendant was a "culpable participant" in the fraud.  *See In re Livent Sec. Litig.*, 148 F. Supp. 2d 331, 351-355 (S.D.N.Y. 2001) (discussing development of the split).  The split arises because, although the statute clearly envisions that it is the *defendants'* burden to prove good faith, the Second Circuit in *Lanza v. Drexel & Co* stated that Congress intended to impose liability on directors who were "in some meaningful sense culpable participants in the fraud." 479 F.2d 1277, 1299 (2d Cir. 1973).  Although *Lanza* was not a pleading case, and *did not discuss* which party should have the *burden* of demonstrating culpability (or lack thereof),[21] many district courts interpreted *Lanza* to require that plaintiffs actually plead "culpable participation" in their complaints.  *See In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 393-395 (S.D.N.Y. 2003) (tracing courts' interpretations).  This interpretation of the statute put some courts in the odd position of requiring plaintiffs to plead an element — culpable

---

[21] If anything, *Lanza* affirmed that defendants have the burden to establish good faith as a defense.  *See Lanza*, 479 F.2d at 1300, 1316-17 (repeatedly discussing the "good faith defense" to §20(a) liability).

participation — for which they would not have the burden of proof at trial.  *See Livent*, 148 F. Supp. 2d at 354.

In recent cases, the Second Circuit repeated what had, by then, become a common (although by no means universally accepted) interpretation in the district courts that Section 20(a) claims require plaintiffs to plead culpable participation.  *See Suez Equity*, 250 F.3d at 101; *First Jersey*, 101 F.3d at 1472.  Notably, however, whenever the Second Circuit was called upon specifically to apply the pleading standard, rather than just state the general rule, the Second Circuit stressed that a *primary violation*, coupled with *control*, would be sufficient.[22]  For instance, in *Suez Equity*, the court stated:

> The complaint alleges that [primary violator] was an officer of the [alleged control person] and that he had primary responsibility for the dealings of that [control person] and the other corporate defendants. . . .  While somewhat broad, this allegation is sufficient to plead controlling person liability for the [alleged control person] derived from [] the purported primary violator.

*Suez Equity*, 250 F.3d at 101.  Similarly, in *First Jersey*, the court stated:

> As discussed . . . above, the district court properly found that First Jersey violated the 1934 Act; and, for the reasons discussed . . . above, there can be no question that Brennan was a controlling person with respect to First Jersey.  Hence, in order to escape controlling person liability, Brennan had the burden of showing that he did not induce the Firm's violations and that he maintained and enforced a reasonable and proper system of supervision . . . .

*First Jersey*, 101 F.3d at 1473.

---

[22] Notably, most circuits have explicitly rejected the notion that plaintiffs must plead culpable participation; instead, they have concluded that plaintiffs need only allege primary violation, plus control.  *See G. A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc); *First Interstate Bank, N.A. v. Pring*, 969 F.2d 891, 896-97 (10th Cir. 1992); *Brown v. Enstar Group, Inc*., 84 F.3d 393, 396 (11th Cir. 1996).  Only the Third and Fourth Circuits require plaintiffs to plead culpable participation, which the Third Circuit has failed to define, *see Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890-91 (3d Cir. 1975), and the Fourth Circuit has defined as "something more than negligence."  *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir. 1979)

Observing that good faith is a *defense*, and that it would be anomalous to require plaintiffs to plead the absence of an affirmative defense in their complaints, several district courts have correctly held that culpable participation need *not* be pled in the complaint; instead, it is the defendant's burden to show good faith. *See, e.g.*, *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844, *43 (S.D.N.Y. May 30, 2003) ("[P]laintiff must plead only the existence of a primary violation by a controlled person and the direct or indirect control of the primary violator by the defendant in order to state a claim under Section 20(a)."); *Quintel*, 72 F. Supp. 2d at 297-98; *In re Health Mgmt*, 970 F. Supp. at 206.

In *In re Worldcom Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 8245 (S.D.N.Y. May 19, 2003) the court concluded that "[t]he concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a)." *Id.* at *60. Explaining that "there is no required state of mind for a defendant's culpable participation in a Section 20(a) offense," the court carefully reviewed Second Circuit precedent and noted that the Second Circuit has repeatedly held that plaintiffs may establish Section 20(a) liability without any pleading, or proof, of defendants' knowledge or intent to commit securities fraud. *See id.* at *58-59. Significantly, the court observed "Indeed, if Section 20(a) contained the requirement that scienter be pleaded and proved, there would be little purpose served by Section 20(a) since a defendant who acts with scienter is liable under Section 10(b)." *Id.* at 73 n.18. Thus, the court held that because there is no state-of-mind requirement in the concept of "culpable participation," plaintiffs need only allege such participation in accord with Rule 8(a) standards. *See id.* at *59-60;

**B.    If "Culpable Participation" Must be Pled, the PSLRA's Heightened Pleading Standards Do Not Apply**

Even if "culpable participation" must be pled, the PSLRA's pleading standards for scienter are inapplicable. Defendants point out that a number of district court cases have held that "culpable participation" must be pled in accordance with PSLRA's pleading standards for scienter. These courts have failed to follow the plain text of the statute and the purpose behind it.

To begin, as discussed above, it is plain that even if there is a "culpable participation" pleading requirement, the burden of proof remains on *defendants* to show that they acted in good faith. *See, e.g.*, *First Jersey*, 101 F.3d at 1472-1473; *Livent*, 148 F. Supp. 2d at 354. The PSLRA's heightened pleading requirements are quite specific. According to the statute:

> In any private action arising under this title *in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind*, the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. 78u-4(b)(2) (emphasis added). By its terms, heightened pleading only applies when the *plaintiff* must prove a particular state of mind, and *not* when *defendant* must prove its own good faith. Therefore, if plaintiffs must "plead" more than they must "prove," they need not do so *with particularity*. It is sufficient merely to allege culpable participation generally.[23]

---

[23] At most, the element of culpable participation need only be pled under pre-PSLRA standards. Prior to the PSLRA, for those courts that required "culpable participation" to be pled at all, a complaint was sufficient if it alleged "either direct factual assertions or at least facts from which a reasonable inference may be drawn in support" of allegations of culpable participation. *In re Par Pharmaceutical Inc Sec. Litig.*, 733 F. Supp. 668, 679 (S.D.N.Y. 1990) (quoting *Harrison v. Enventure Capital Group, Inc.*, 666 F. Supp. 478, 479 (W.D.N.Y. 1987)). For instance, the standard is met where, based on the complaint's allegations, "one can imagine a scenario in which the 'controlling persons' encouraged and permitted the issuance" of statements known to be false. *Hemming v. Alfin Fragrances Inc.*, 690 F. Supp. 239, 245 (S.D.N.Y. 1988) (quoted in *Par Pharm*, 733 F. Supp. at 679); *see also Robbins*, 788 F. Supp. at 189 (culpable participation pled where defendants were directors or officers and signed false SEC filings).

Additionally, as Judge Scheindlin carefully explained in the *IPO Securities Litigation*, there is no reason to believe that "culpable participation" is equivalent to "scienter" or any state of mind at all:

> "Culpable" means: "Guilty; blameworthy" *Black's Law Dictionary* 385 (7th ed. 1999). Certainly conduct can be blameworthy though it was done unintentionally or unknowingly. . . The term "culpable participation" is therefore more closely analogous to the (criminal) concept of actus reus, i.e., culpable conduct, than it is to mens rea, i.e., culpable state of mind.

241 F. Supp. 2d at 394 n.123. The court observed that the Second Circuit has never equated the phrase "culpable participation" with scienter, and that to do so would undercut Congress's intent to expand the public's available remedies for securities fraud violations. *See id.* at 395-396. The court concluded that, because plaintiffs need not allege a particular state of mind, only the pleading requirements of Rule 8(a) would apply. *See id.* at 396; *see also Vivendi Universal*, 2003 U.S. Dist. LEXIS 19431, at * 83  (following *Suez Equity*, culpable participation need only be pled in accord with Rule 8(a)).

Finally, the PSLRA requires heightened pleading only if "a defendant acted with a particular state of mind." 15 U.S.C. § 78u-4(b)(2). Even if the phrase "culpable participation" refers, in some sense, to the defendant's state of mind, there is no reason to believe it refers to a *particular* state of mind, such as intent to defraud. As Judge Scheindlin explained, culpability could just as easily attach to *negligence*, since the defendant must necessarily show that he was *not* negligent in order to establish his good faith defense. *See IPO Sec. Litig.*, 241 F. Supp. 2d at 396 n.125; *see also First Jersey*, 101 F.3d at 1473 (defendant may only avoid §20(a) liability if he proves that he "enforced a reasonable and proper system of supervision and internal control"). Because there is no "particular" state of mind here — *any* state of mind other than good faith and due diligence will incur liability — heightened pleading does not apply.

### C.    Plaintiffs Have Properly Alleged Control Person Liability Under Any Reading of the Pleading Requirements

However the pleading requirements are defined, plaintiffs have properly alleged controlling person liability against the moving Defendants.

### 1.    Plaintiffs Have Alleged the Existence of a Primary Violation

First, plaintiffs have properly alleged primary violations by ANR.  Defendants ANR and Doyle have both answered the Complaint; neither has moved to dismiss on the ground that plaintiffs have failed to state a claim for primarily liability against them.  Therefore, this element is met.

### 2.    Plaintiffs have Properly Alleged Control

Plaintiffs have properly alleged that all of the moving Defendants possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *First Jersey*, 101 F.3d at 1472-1473 (quoting 17 C.F.R. § 240.12b-2).  The phrase "control" "has been construed as requiring only some indirect means of discipline or influence short of actual direction by the alleged controlling person." *IPO Sec. Litig.*, 241 F. Supp. 2d at 395.  To withstand a motion to dismiss, plaintiffs need only plead facts that create a "reasonable inference" of control.  *See, e.g.*,; *Vivendi Universal*, 2003 U.S. Dist. LEXIS 19431, at *82; *Teachers Retirement Sys. v. ACLN*, No. 01 Civ. 11814 (MP), 2003 U.S. Dist. LEXIS 7869, at *38 (S.D.N.Y. May 9, 2003); *Rich v. Maidstone*, No. 98 Civ. 2569 (DAB), 2000 U.S. Dist. LEXIS 24510, at *35 (S.D.N.Y. Dec. 20, 2002); *In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528, at * 28 (S.D.N.Y. Sept. 17, 2002); *Indep. Energy Holdings*, 154 F. Supp. 2d at 770.

### a.  XL Capital Defendants

XL Capital, acting through Esposito, O'Hara, and other XL agents, exercised pervasive control over ANR. XL was ANR's single largest shareholder, XL's officers and directors staffed ANR's Board, and XL agents separately contracted with ANR to provide consulting services. This is quite enough to create a "reasonable inference" that XL Capital, as well as its Chairman of the Board (Esposito) and its President and CEO (O'Hara) possessed some "indirect means of influence" to control ANR's policies.

Any argument that XL Capital did not exercise such control should be immediately foreclosed by XL's *admission* that it maintained control over ANR. Though XL Capital entirely fails to address this point in its brief, XL Capital's 2000 10-K stated:

> ALRe [ANR] is a Bermuda-based company and is a leading provider of annuity and life reinsurance to insurance companies in North America. Although the Company [XL] has beneficial ownership of only 11% of ALRe's outstanding common shares, ***XL is deemed to have significant influence as the Company has representatives on ALRe's board of directors.***

¶296. This admission should end any question as to the control of XL, or the control of its agents Esposito and O'Hara, who exercised control on XL's behalf. If, however, more allegations of control are needed, the Complaint overflows with them.

First, ANR was XL Capital's brainchild, launched by XL Capital and staffed with its own hand-picked personnel. XL placed Esposito and O'Hara, its highest ranking personnel (Chairman of the Board, and President and CEO, respectively) on ANR's Board of Directors. In addition, non-defendants Lichten and Clements occupied seats on ANR's Board and were closely affiliated with XL, and defendant Doyle was a former XL officer who was chosen to head the new venture. In April 2000, XL consolidated its control over ANR by purchasing the ANR shares held by a company known as Risk Capital. Risk Capital, in turn, shared many directors with ANR — including defendant Esposito. *See* XL Exh. A. As a result of the deal,

XL Capital not only became ANR's largest single shareholder, but also obtained Risk Capital's

right to select a nominee for election to ANR's Board of Directors.  XL announced that

defendant O'Hara would be its nominee.  *Id*.  Finally, after Doyle resigned at the end of the Class

Period, Lichten, along with Hammer, took over ANR until a new CEO could be found.  Burke

Exh. 13.  Esposito, as well as Lichten, occupied seats on ANR's Executive Committee and

ANR's Finance and Investment Committee.  *See* ¶26; XL Exh. A.  Thus, XL Capital's

representations to its own shareholders were accurate — high-level executives of ANR were

affiliated with XL Capital, and exercised control over ANR on XL's behalf.

XL Capital's authority over ANR was further consolidated by ANR's relationship with

Esposito's consulting company, Inter-Atlantic.  Inter-Atlantic was headed by several important

ANR directors and officers, including Esposito and Lichten, a director of XL America.  ANR

paid $2.7 million in 1999 to Inter-Atlantic to help it form its management policies; thus, once

again, Esposito and Lichten (and, through them, XL) were in a position, both formally and

informally, and through contract, to direct ANR's actions.  *See* XL Exh. A.

ANR itself stressed the importance of Esposito and Inter-Atlantic to its operations.  Not

only did ANR state that Inter-Atlantic would provide assistance "in the development of products,

financial planning, and the management of assets," XL Exh. A, but ANR highlighted Esposito's

contributions by listing Esposito among the "senior management team" being assembled by

ANR, and assuring investors of Esposito's "extensive insurance and financial expertise." ¶258.

Finally, Esposito and O'Hara, as representatives of XL, signed ANR's annual financial

statements.  "Where it is alleged that a defendant signed an SEC filing that contained the

misrepresentations that are the subject of the Section 10(b) claim, this is sufficient to allege

control of the authors of the filing, and the management and policies of the corporation behind

the misrepresentations." *Worldcom*, 2003 U.S. Dist LEXIS 8245, at *72; *see also Thomson*

*Kernaghan & Co. v. Global Intellicom, Inc.*, No. 99 Civ. 3005 (DLC), 2000 U.S. Dist. LEXIS

6650, at *20 (S.D.N.Y. May 17, 2000) (signing false SEC filing raises inference of control);

*Livent*, 78 F. Supp. 2d at 222 (same).

     In sum, the totality of the Complaint's allegations is more than sufficient to establish the

control possessed by Esposito, O'Hara, and XL Capital.  As the court stated in *In re Leslie Fay*

*Companies Inc. Sec. Litig.*, 918 F. Supp. 749 (S.D.N.Y. 1996):

> [Plaintiff] does not rest solely on a 12% stock ownership in support of its section
> 20 "controlling person" claim; nor does [plaintiff] assert liability based solely on
> the [defendants'] positions as outside directors. In short, [defendants] attempt[] to
> isolate various indicia of control and argue that each, by itself, does not establish
> control person liability. Of course, we must consider the total effect of the various
> indicia of control in combination.

*Id.* at 762.

     XL Capital can cite no case with even remotely similar facts that has failed to find that a

complaint raised a "reasonable inference" of control.  XL identifies a number of cases in which

courts *have* found control based on a larger block of stock ownership than XL Capital's 12%

ownership of ANR.  Obviously, none of these cases purport to hold that a 12% block is not

enough, especially when coupled with additional indicia of control.

     Next, XL argues that "minority board representation" is not enough to establish control,

citing *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860 (S.D.N.Y. 1986).  *Drobbin*

involved a request for a *preliminary injunction*, where the court issued findings of fact after

"extensive discovery and an evidentiary hearing." *Id.* at 863. *Drobbin* did not purport to hold that

an allegation of minority Board representation would not be sufficient to withstand a motion to

dismiss. *Cf. Cabletron*, 311 F.3d at 33 (court should evaluate complaint in light of degree of

discovery that has so far occurred); *Shields*, 25 F.3d at 1127 (complaint's allegations held insufficient after plaintiff had opportunity for discovery).

Finally, XL offers the halfhearted argument that Esposito and O'Hara were "required" to sign ANR's filing. *See* XL Br. at 3. XL does not identify the source of this obligation, and plaintiffs are aware of only an SEC requirement that *more than half* of the Board sign annual filings — *not* that any particular member sign. *See* SEC General Instruction D to Form 10-K. Even if XL is correct that the SEC required these signatures on publicly-filed documents, this fact would hardly absolve the XL Defendants of responsibility. The SEC does not require signatures for cosmetic effect, but as a representation that the signatory has read the document and endorses its contents. *See Worldcom*, 2003 U.S. Dist. LEXIS 8245, at *73 ("[A]s a practical matter, just what is a signature on an SEC filed document meant to represent if it does not represent a degree of responsibility for the material contained in the document?"); *Id.* at *75 ("[A]pprovals through signing sufficiently allege control over those who have been alleged to have violated Section 10(b), at least in connection with the misrepresentations and omissions in those documents."); *In re Solv-Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276, 285 (S.D.N.Y. 2000) (inference of control raised by allegation that each Defendant participated in operations of Company and signed false SEC filing).[24] If O'Hara and Esposito were required to sign ANR's

---

[24] *See also Leslie Fay,* 918 F. Supp. at 763 ("[E]ach [defendant] signed at least one of the allegedly fraudulent documents, which, [plaintiff] argues, supports the inference that defendants exercised a degree of control over the company's operations and representations. Such allegations are sufficient at the pleadings stage under § 20(a)."); *Jacobs v. Coopers & Lybrand*, No. 97 Civ. 3374 (RPP), 1999 U.S. Dist. LEXIS 2102 (S.D.N.Y Feb. 26, 1999) at *52 ("It does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report. Under § 20(a) the plaintiff needs only to allege that the defendant had control; the defendant may argue good faith and lack of participation as an affirmative defense in a later stage of the proceedings.").

financial statements, this facts would conclusively establish their control, because they would have the power to alter ANR's policies by threatening to withhold their (necessary) signatures.

### b.        Burke and Hammer

Burke does not dispute that he exercised "control" over ANR for the purposes of control-person liability.

Hammer exercised control through his signature on ANR's financial statements.  He also had responsibility for ANR's policies "by contract," 17 C.F.R. § 240.12b-2, as one of the principals of ANR's consulting firm, Inter-Atlantic.  Hammer Exh. A; XL Exh. A.  He served as Chairman of the Board of Directors, and personally headed the Company in the last two months of the Class Period.  ¶22.  ANR emphasized Hammer's expertise in its own SEC Registration Statement. ¶¶258, 262.  For these reasons, as well as for the reasons stated above with respect to the XL Capital defendants, the Complaint sufficiently alleges Hammer's control.

### 3.        Plaintiffs Have Properly Alleged Culpable Participation

### a.        XL Capital Defendants

Just as courts disagree over whether plaintiffs need to plead culpable participation at all, and over whether such pleading is subject to the standards of Rule 8 or is instead subject to the heightened pleading of the PSLRA, so too do courts disagree as to what mental state is embraced by culpable participation.  As discussed above, some have concluded that "culpable participation" may mean only negligence.  *See IPO Sec. Litig.*, 241 F. Supp. 2d. at 396 n.125.  Others have stated that culpable participation means recklessness, *see Livent*, 148 F. Supp. 2d at 355, requiring plaintiffs to show that the defendant "knew or should have known" of the primary violation, yet "took no steps to prevent the primary violation."  *See Cromer Fin. Ltd. v. Berger*,

137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001);[25] *Gabriel Capital L.P. v. Natwest Fin. Inc.*, 122 F. Supp. 2d 407, 426 (S.D.N.Y. 2000);[26] *In re Emex Corp. Sec. Litig.*, 2002 U.S. Dist. LEXIS 17528, at *30; *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2002 U.S. Dist. LEXIS 19835, at *59-60 (S.D.N.Y. Oct. 17, 2002).

For the reasons above, plaintiffs have satisfied any pleading standard that may apply to §20(a) claims against O'Hara and Esposito, and against XL Capital, on whose behalf they acted. Each was "negligent," and also "knew or should have known" of the fraud. By signing ANR's SEC filings, the defendants failed to prevent the violations — and, indeed, cooperated in them. *See Ruskin,* 2000 U.S. Dist. LEXIS 11517, at * 21 (culpable participation alleged because Director defendant corporation, and as Chair and CEO of affiliated corporation, knew or should have known of false statements in documents that he had a duty to supervise).

Further, culpable participation is demonstrated through business dealings XL Capital maintained with ANR, including those involving the Transamerica contract. When ANR first announced its difficulties, XL Capital took affirmative steps to prop up the Company by selling ANR $10 million of insurance against future losses on the Transamerica contact. ¶156. By this action, XL Capital enabled ANR to avoid an even larger write-off for that period, and thus enabled ANR to continue its fraud. Additionally, after the Class Period, ANR announced that it had contracted with XL to "sell" XL five of its remaining profitable contracts to ease its liquidity

---

[25] *Cromer Finance* was decided by Judge Cote. Later, in *Worldcom*, Judge Cote concluded that "culpable participation" did not refer to any particular state of mind, and therefore was not subject to heightened pleading. *Worldcom*, 2003 U.S. Dist. LEXIS 8245, at *60.

[26] *Gabriel Capital*, relied upon in Burke Br. at 41, was decided by Judge Scheindlin. Later, in *IPO Securities Litigation*, Judge Scheindlin repudiated her *Gabriel Capital* opinion, stating that after revisiting the issue of the PSLRA pleading requirements, she had determined that "culpable participation" was not subject to heightened pleading. *IPO Sec. Litig.*, 241 F. Supp. 2d at 396 n.128.

pressures, resulting in an immediate loss to ANR of $20 million. ¶212. In exchange for these

*profitable* aspects of ANR's business, XL paid ANR $44 million in cash, and contracted with

ANR for ANR to retrocessionally insure a portion of the new contracts from XL. ¶212

(describing the announcement in which the arrangement was described). Plaintiffs learned that,

after they filed their Complaint, XL Capital recaptured the contracts from ANR, thus canceling

the retrocessional agreement and forcing ANR to write-off an additional $20 million in

connection with the recapture. As Plaintiffs advised in their Memorandum in Support of Their

Motion to Lift the Discovery Stay, XL has actively inserted itself into ANR's affairs and may

deplete ANR of what few assets it has left:

> ANR, despite its dire financial circumstances, has warned that it may soon
> transfer its cash to its affiliated company and defendant in the case, XL Capital.
> ANR and XL Life Ltd. ("XL Life"), a subsidiary of XL Capital, have entered into
> several 50% quote share reinsurance contracts, which have resulted in an ANR
> recorded loss of $26.5 million. *Id*. at 10. On August 4, 2003, XL Life also served
> the Company with a notice announcing its intention to recapture this entire 50%
> quote share reinsurance contract with the Company. *Id*. XL Life has also given
> notice that it is canceling other agreements with ANR, including a $10 million
> reinsurance policy and two annuity reinsurance contracts between the Company
> and XL Life or its affiliates. *Id*. at 11, 16. In response to the dissolution of these
> contracts and termination of the relationship between the Company and XL Life,
> ANR has disclosed: "The Company is in discussions with XL Life regarding
> these other relationships. The outcome of these discussions cannot be determined
> at this time." *Id*. at 15. ANR also notes the possibility of soon being "forced" to
> make **"substantial cash adjustment payments"** to XL Life. *Id*. at 10. (emphasis
> added).

Thus, XL not only controlled ANR through the placement of its top personnel on ANR's

Board, and not only was ANR's single largest shareholder, but also propped up ANR's business,

and drained ANR of its profitable contracts. Under any standard of pleading, such actions are

sufficient to show that XL engaged in culpable conduct.

The XL Defendants offer nothing in their brief to contradict plaintiff's allegations of

culpable participation. For instance, in *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193

(E.D.N.Y. 2000), cited at XL Br. 17, the court held that plaintiffs alleged no facts to suggest that the defendants had not "unknowingly approv[ed] credible but fraudulent financial reports prepared by subordinates." *Id.* at 208.  As described above, the Complaint is filled with examples of how the fraudulent financial statements would *not* have been credible to anyone with access to even the most basic information about ANR's business.  And in *Livent*, cited at XL Br. 18,  the court refused to find culpable participation by the director-defendants because the fraudulent scheme — by its very nature — required the primary violators to carefully cover their tracks. 148 F. Supp. 2d at 371.  Because the scheme was alleged to be hidden even from the directors, the court could not conclude that culpable participation had been adequately pled.  *See id.*.  By contrast, the Complaint here alleges that the scheme was widespread and obvious, involving plainly inconsistent returns on one of ANR's massive contracts, representing $1.6 billion in liabilities.  Moreover, plaintiffs have pled that by May 2001, when Atkin resigned, and certainly by the time of the first "write-off" in October 2001, all of the Defendants knew that the jig was up and that ANR was trying to cover its tracks.

Finally, XL Capital insists that any inference of culpable participation is refuted by XL's acquisition of ANR stock during the Class Period.  As discussed above, in the context of Burke, XL's acquisitions cannot negate the inference of culpability.

### b.    Burke and Hammer

Burke may be deemed a culpable participant in the fraud for the same reasons that render him liable for false statements under §10(b).  Hammer may be deemed a culpable participant in the fraud, both for reasons similar to those identified for Esposito and O'Hara, and for the reasons set forth with respect to Hammer's liability under Section 10(b).[27]

---

[27] Hammer observes that courts frequently apply the same standards for assessing control-person claims brought under Section 15 of the Securities Act of 1933 as they do for §20(a) claims.

Hammer argues that the Complaint fails to identify the "participation" for which he is "culpable."  As described above, "culpable participation" is alleged when a controlling person fails to exercise his control to prevent the violation.  In this case, Hammer was complicit in the fraud because he signed and endorsed ANR's fraudulent SEC filings, even after Atkin's departure and the first write-off in October 2001.  ¶164.  Additionally, Hammer acquiesced in the fraud through his actions as a member of the ANR management team, ¶258, and as a consultant on ANR management policies, XL Exh. A.

Hammer, once again erroneously characterizing the Complaint as based on nothing more than his status as an outside director, contends that limitations on §10(b) actions would be improperly evaded if mere status as an outside director was sufficient to maintain an action pursuant to §20(a).  *See* Hammer Br. at 23.  First, as described above, not all directors are required to sign financial statements — therefore, not all directors should receive the same inference of control as should apply to Hammer.  And if all *signing* directors are subject to potential liability under §20(a), this is not an unwarranted result.  As Judge Cote stated in *Worldcom* in the context of the "control" prong of §20(a), the role of an outside director, and the significance of a signature, would be eviscerated if the court were not permitted to draw any inferences from the fact of the signature.  *See* 2003 U.S. Dist. LEXIS 8245, at *74.  In this case, it would clearly *not* be inappropriate to impose liability on defendants who repeatedly signed annual financial statements that were as overwhelmingly false as the ones involved in this case.

---

Hammer Br. at 23 n.4  In fact, courts in this Circuit have generally recognized that Section 15 claims do not require any allegation of culpable participation at all.  *See Twinlab*, 103 F. Supp. 2d at 209; *CINAR*, 186 F. Supp. 2d at 310; *Indep. Energy Holdings*, 154 F. Supp. 2d at 753-54. Plaintiffs therefore urge that this Court adopt Hammer's position that the two types of claims be held to similar standards.

III.    CONCLUSION

For the reasons given above, this Court should deny Defendants' motions to dismiss. However, should this Court grant Defendants' motions in whole or in part, Plaintiffs respectfully request that this Court grant leave to amend pursuant to Rule 15(a).  Leave to amend should be "freely given."  Fed. R. Civ. P. 15(a); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).


Dated: November 19, 2003

 Respectfully submitted,                    **SCOTT + SCOTT, LLC**


                                    _____/s/_____
                                    David R. Scott (Juris No. 16080)
                                    Erin Green Comite (Juris No. 24886)
                                    108 Norwich Avenue
                                    P.O. Box 192
                                    Colchester, CT 06415
                                    Telephone:    (860) 537-3818
                                    Facsimile:    (860) 537-4432

                                    **Co-Lead Counsel for Lead Plaintiffs**

                                    **MILBERG WEISS BERSHAD HYNES
                                      & LERACH LLP**
                                    Beth Kaswan
                                    Ann M. Lipton
                                    One Pennsylvania Plaza
                                    New York, NY  10119
                                    Telephone:    (212) 594-5300
                                    Facsimile:    (212) 868-1229

                                    **Co-Lead Counsel for Lead Plaintiff**s

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2003, I caused a true and correct copy of LEAD

PLAINTIFFS' CONSOLIDATED OPPOSITION TO THE MOTIONS TO DISMISS FILED BY

DEFENDANTS JOHN F. BURKE, FREDERICK S. HAMMER, XL CAPITAL LTD., BRIAN

O'HARA AND MICHAEL P. ESPOSITO, JR.to be served by first-class, postage prepaid U.S.

mail on counsel of record listed on the attached Service List.


_____/s/_____
Erin Green Comite

81

**Annuity and Life Re (Holdings), Ltd. Service List**

**Attorneys for Plaintiffs**

Andrew M. Schatz
Jeffrey S. Nobel
Patrick A. Klingman
SCHATZ & NOBEL
330 Main Street
Hartford, CT 06106-1817

James E. Miller
SHEPHERD FINKELMAN MILLER &
SHAH, LLC
One Lewis Street
Hartford, CT 06103

Attorney Elias A. Alexiades
ATTORNEY ELIAS A. ALEXIADES
215 Church Street
New Haven, CT 06525

Beth Kaswan
Ann Lipton
MILBERG WEISS BERSHAD HYNES
  & LERACH
One Pennsylvania Plaza
New York, NY 10119

Marc Edelson
HOFFMAN & EDELSON
45 West Court St.
Doylestown, PA  18901

**Attorneys for Defendants**

Gary R. Battistoni
DRINKER BIDDLE & REATH
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996

John W. Cannavino
Karen L. Allison
CUMMINGS & LOCKWOOD, LLC
Four Stamford Plaza
107 Elm Street
Stamford, CT 06902

James F. Stapleton
Kenneth W. Ritt
Terence J. Gallagher
DAY, BERRY & HOWARD, LLP
One Caterbury Green
Stamford, CT 06901

Thorn Rosenthal
Tammy Roy
CAHILL GORDON & REINDEL, LLP
80 Pine Street
New York, NY 10005-1702

Lawrence W. Andrea
LAW OFFICES OF
  LAWRENCE W. ANDREA
57 North Street, Suite 313
Danbury, CT 06810

James T. Shearin
PULLMAN & COMLEY, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT  06601-7006

Thomas J. Sansone
CARMODY & TORRANCE
50 Leavenworth Street
P. O. Box 1110
Waterbury, CT 06721-1110