## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| COMMUNICATIONS WORKERS OF AMERICA; MIDSTREAM INVESTMENTS LTD, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>KPMG LLP (UNITED STATES), KPMG LLP (UNITED KINGDOM), AND KPMG in BERMUDA,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO._____

JURY TRIAL DEMANDED

OCTOBER 23, 2003

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

Page

Page

SUMMARY OF THE COMPLAINT...................................................................................2

JURISDICTION AND VENUE ......................................................................................10

PARTIES. ...........……………………………………………………………………….10

PLAINTIFFS' CLASS ACTION ALLEGATIONS...................................................13

SUBSTANTIVE ALLEGATIONS ...............................................................................15

FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE
         CLASS PERIOD..................................................................................................29

KPMG'S KNOWING AND RECKLESS ISSUANCE OF FALSE AUDIT REPORTS .............85

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
         DOCTRINE .......................................................................................................107

COUNT I VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE
         10B-5 PROMULGATED THEREUNDER AGAINST ANR AND THE
         INDIVIDUAL DEFENDANTS .............................................................................109

JURY TRIAL DEMANDED................................................................................................112

i

Plaintiffs, through their attorneys, bring this action on behalf of themselves and all others similarly situated, on personal knowledge as to themselves and their activities, and on information and belief as to all other matters, based on investigation conducted by counsel, including, *inter alia*, review of United States Securities and Exchange Commission ("SEC") filings by Annuity and Life Re (Holdings), Ltd. ("ANR" or "the Company"), press releases and other public statements issued by the Company, securities analysts' reports and advisories about the Company, newspaper articles and reports from the media, and consultations with experts in the insurance industry and in forensic accounting. Plaintiffs believe that substantial additional evidentiary support will be developed for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE COMPLAINT

1.    This is a class action brought by Plaintiffs under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all other persons who purchased the securities of ANR between March 15, 2000 and November 19, 2002, inclusive (the "Class Period"). Plaintiffs complain of a fraudulent scheme and deceptive course of business, described in detail herein, that injured purchasers of ANR securities.

2.    ANR is a Bermuda corporation, formed in 1997 as a holding company for subsidiaries whose purpose was to sell annuity and life reinsurance products. As a reinsurer, ANR and its subsidiaries (collectively referred to as ANR) indemnify other insurance companies (the "primary insurer" or "ceding company") against their obligations to their own policyholders. On the annuity side of its business, ANR made all of its profits on investment "spreads" – *i.e.*, the difference between the amount of money earned on the investments purchased from annuity policyholders' premium payments (*e.g.*, ANR's investment revenues), and the amount of money

2

ANR credited to the accounts, or liabilities, due to policyholders in accordance with their annuity contracts. Such credits to policyholders' accounts were treated as one of ANR's expenses.

3.      Additionally, ANR had other expenses associated with its annuity reinsurance contracts, principally commissions paid to brokers. Those commissions were capitalized at the outset of a reinsurance agreement (i.e., treated as an asset on ANR's balance sheet), and then amortized each year against profits expected to be earned over the life of the associated reinsurance contract. At the outset of a new contract, ANR would project its expected profits, and then determine how quickly or slowly to amortize its deferred costs based upon those projections. ANR also represented that every quarter, it would reevaluate its expected profits in light of its actual experience, and adjust the amortization schedule accordingly. If a contract failed to perform, ANR was required to "write down" its costs, i.e., acknowledge them as an immediate and unrecoverable expense.

4.      ANR chose its Bermuda location in order to avoid United States corporate taxes, and thus minimize expenses and underprice competitors. However, the same Bermuda location that permitted ANR such cost-benefits also placed on ANR peculiar liquidity pressures. Many of ANR's client companies were based in the United States and subject to state regulations. Those regulations required reinsurers either to be qualified by the state, or to post collateral for their obligations. Because ANR was not registered as an insurer in any United States jurisdiction, it was forced to post millions of dollars of collateral for its clients. In order to obtain that collateral from banks, ANR needed to maintain strong financial ratings; additionally, many of its contracts with clients specifically required ANR to maintain strong financial ratings. Any dip in ANR's financial ratings below certain triggering points had the potential to completely wipe out its business.

3

5.      KPMG is a worldwide firm of certified public accountants and auditors. KPMG, through its Bermuda and United States offices, served as ANR's auditor and principal accounting firm, commencing prior to the Class Period and continuing at all relevant times. KPMG represented in audit reports incorporated into ANR's financial statements, publicly filed with the SEC, from March 2000 through August 2002, that, based upon its audits conducted in accordance with Generally Accepted Auditing Standards ("GAAS"), ANR's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles ("GAAP"). However, as a result of the facts alleged in this case, ANR was forced to restate its financial statements for a number of reporting periods, including those audited and certified by KPMG, and to take a series of extraordinary charges to reverse falsely reported profits from earlier periods. As a result, ANR lost the favorable financial ratings on which its business depended, and is now teetering on the verge of insolvency.

6.      In 1998, ANR signed a contract with Transamerica Occidental Life Insurance ("Transamerica"), a major United States insurance company and itself a major reinsurer to other companies, to provide retrocessional insurance (reinsurance of another reinsurer) for a massive book of annuity policies. With this contract, ANR assumed $1.6 billion in liabilities, which represented 96% of its liabilities to policyholders at the start of the Class Period. Under the terms of this reinsurance contract, ANR indemnified Transamerica (and, through Transamerica, the primary insurer, a company called IL Annuity and Insurance Company ("IL Annuity")) for a percentage of the total liabilities due from IL Annuity to the annuity policyholders. In exchange, ANR was awarded a corresponding share of the various investment securities that IL Annuity had purchased with the policyholder premiums. Under ANR's arrangement with Transamerica (and Transamerica's with IL Annuity), known as a modified coinsurance arrangement, ANR

4

permitted IL Annuity to control and manage these investment securities, but ANR assumed all of the risk associated with the performance of its share of the investments. In other words, ANR got the benefit if the investments performed well (beyond amounts due as interest to policyholders, and beyond ANR's other costs) but ANR also assumed the risk that the investment assets would perform poorly, thus leaving ANR on the hook to pay policyholders' annuities in accord with the terms of the annuity contracts.

7.      The underlying annuities reinsured by ANR had an unusual feature. Policyholders were given the opportunity to tie their investment returns to the performance of particular types of securities. The policyholder would choose to have the returns on his premiums track his selected security type, and then he would be credited with interest based on the market performance of the chosen security type. The premiums paid to IL Annuity were then invested in the same category of security chosen by the policyholder. But, no matter how poorly the chosen securities might perform, the laws of the various states in which the annuity policies were sold required that policyholders receive a certain minimum interest rate on their premium payments, generally between 3 and 3.5%. As a result of these statutory safeguards, known as minimum interest guarantees, policyholders had the opportunity to share in the upside if their chosen security performed well, but if the security performed poorly, the policyholder at least had the guarantee of a 3 to 3.5% annual compounded interest return on his premiums. Thus, under the IL Annuity product, it was to the policyholder's advantage to choose highly volatile investment securities.

8.      As it turned out, 70% of the IL Annuity policyholders chose to peg their returns to convertible bonds. Convertible bonds are bonds issued by corporations that, like regular bonds, pay a stated interest rate, but are "convertible" into common stock of the issuing corporation.

The bonds typically pay a relatively low interest rate in exchange for the convertible feature. But the conversion feature only has value if the underlying stock of the corporation appreciates in value – otherwise, the bondholder is left with a low-paying bond. In the case of IL Annuity's bonds, the bonds' interest rate was not high enough to cover the guaranteed returns to the policyholders, plus costs.

9.      Because 70% of the policyholders chose the convertible bond investment strategy, and because their premiums were then invested in convertible bonds, this meant that the risk ANR assumed by reinsuring the policies was essentially one big bet on the stock market – a bet that over the life of the annuity contracts (generally ten to thirty years), the stock prices of the issuing companies would rise above the bonds'/conversion price, thus generating sufficient investment returns to profit both ANR and the policyholders. Here, the gamble was lost however, because large numbers of policyholders prematurely surrendered their policies and withdrew the premiums they had paid (plus interest, minus a surrender fee) before the equity markets performed as hoped.

10.      Additionally, IL Annuity charged all policyholders an annual management fee of 2.75% of the policyholders' share of the investment portfolio. Despite this fee, however, policyholders were still entitled to 3 to 3.5% guaranteed interest on their gross premiums, under state law. Therefore, ANR needed to earn an annual investment return of at least 6.25% (3.5% plus 2.75%) to fund the statutory minimum interest guarantees to policyholders. ANR's inability to meet these crediting requirements from earnings on its investments became glaringly apparent as policy surrenders soared, and the amounts held in policyholder accounts were insufficient to pay out their cash surrender values, including the minimum interest guarantees.

6

11.    ANR entirely failed to account for these statutory guarantees when reporting its policyholder expense and liabilities on financial statements filed with the SEC.  Thus, throughout the Class Period, ANR's reported liabilities (and the associated expense for these obligations to policyholders) were drastically understated and its financial statements materially misstated in violation of GAAP.  Moreover, even though surrender rates had far exceeded expectations, ANR failed to reevaluate its basic assumptions about the profitability of the annuity contracts and its ability to recoup its costs.  Finally, none of these income recognition practices and risks were disclosed in ANR's Form 10-Ks.  Nonetheless, KPMG falsely represented in its audit opinions that ANR's financial statements were fairly presented in accordance with GAAP.

12.    KPMG either knew the representations in its audit opinions about ANR's financial reporting were false or was reckless in failing to plan and perform the audit procedures required by GAAS that would have shown that ANR's financial statements were materially misstated and violated GAAP.  It was readily apparent from a cursory review of ANR's financial records that ANR's financial condition and earnings were largely dependent upon the terms of the reinsurance agreement with Transamerica to reinsure a $1.6 billion block of IL Annuity's annuity business.  Despite KPMG's necessary knowledge that the profitability of the Transamerica contract depended in large part on ANR's share of IL Annuity's obligations to policyholders (including for minimum interest guarantees required under state law), KPMG did not even obtain basic information from ANR, Transamerica, or IL Annuity about the details of the policyholder obligations, or payments to policyholders upon surrender, and whether these policyholder payments had been fully expensed.  According to ANR, this policyholder information simply was not collected until late in the Class Period.  KPMG knowingly violated GAAS (and falsely represented that it had complied with GAAS in publicly issued audit reports)

7

by issuing unqualified opinions while, in fact, KPMG was laboring under a "scope limitation" to its audit because it did not possess the critical audit evidence required to issue unqualified opinions. Nor did KPMG timely require ANR to correct its financial statements through restatement upon learning that KPMG's own earlier issued audit reports were wrong and investors continued to rely upon them.

13.     Needless to say, none of these facts were disclosed to investors until late in the Class Period, and until the SEC forced a series of restatements to ANR's public filings. Investors were not advised of the nature of the risks associated with the actual investments that comprised over a billion dollars of ANR's assets. Investors were not informed even of the existence of the 2.75% management fees or the effect of the minimum interest guarantees on ANR's high risk investment strategy, much less that ANR had grossly underreported its liabilities to policyholders by failing to account for these guaranteed interest payments. Investors were not informed of the drastically high surrender rates that called into question all of ANR's assumptions in pricing and establishing its contract with Transamerica, and were not informed of ANR's expenses for these increased policyholder obligations. Finally, investors were not told that the devastating impact of ANR's initial, flawed assumptions on the required amortization of its capitalized commission costs would more than wipe out all of the profits ANR reported for the Transamerica contract during the Class Period.

14.     In the Form 10-Ks, that were reviewed by KPMG as part of KPMG's audit, instead of informing investors of the extraordinary risks and problems with this contract, ANR amazingly represented to investors that "We are not directly exposed to market risk with respect to the assets underlying the annuity reinsurance agreements we enter into." Investors were falsely told that ANR's annuity business was "dependent on earning a targeted spread between

8

the interest earned on the [assets underlying the policies], and the interest credited to the policyholder liabilities," a statement that gave no hint that ANR was actually depending upon appreciation in stock values.  Investors were assured that every quarter, ANR conducted "recoverability" and "loss recognition" testing of its deferred costs, to confirm that the capitalized costs would eventually be recouped against future profits earned on the insurance contract, and that it adjusted its amortization schedule based on estimates of these profits that had been "updated" each quarter to account for the contract's actual past performance.  From its audits, KPMG was well aware that ANR had made such representations in its Form 10-Ks; and because (as KPMG had represented in its audit reports) KPMG's audits included assessing "the significant estimates made by management," KPMG was also aware that ANR had entirely failed even to initiate a review of the recoverability of its capitalized costs until late in the Class Period.  Thus, KPMG knowingly violated GAAS and knowingly issued false audit reports representing that ANR's sunny and grossly misleading financial statements were prepared in accordance with GAAP.  These false audit reports were relied upon by investors who used ANR's inflated earnings and otherwise misleading financial statements in making their investment decisions.  Each successive quarter, ANR referred investors back to its audited annual filings to assist in evaluating ANR's current performance.

15.     Once ANR finally began to dribble out the true facts with respect to the abysmal operational and financial performance of the Transamerica contract and the extraordinary market risks it faced, ANR's stock price steadily fell from a Class Period high of $36.98 to a price of $2.24 on the last day of the Class Period.  ANR ultimately was required to restate virtually all of its SEC filings during the Class Period. ANR's financial ratings were sharply downgraded, forcing ANR to relinquish most of its client base.  ANR has announced that it has ceased writing

9

new business, and both ANR and KPMG have warned that ANR's ability to continue as a going concern is seriously in doubt.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

18.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c).   Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.   KPMG conducts substantial business in this District, and many transactions in ANR securities are believed to have occurred within this District.

## PARTIES

20.    Plaintiffs Communication Workers of America ("CWA") purchased the common stock of ANR at artificially inflated prices during the Class Period and has been damaged thereby.   The certification of CWA containing its purchases is attached as Exhibit A to this Complaint.

21.    Plaintiffs Midstream Investments, Ltd., ("Midstream Investments") purchased the common stock of ANR at artificially inflated prices during the Class Period and has been

10

damaged thereby. The certification of Midstream Investments containing its purchases is attached as Exhibit B to this Complaint.

22.    Defendant KPMG in Bermuda ("KPMG Bermuda"), which has offices at Crown House, Par-La-Ville Road, Hamilton HM 08 Bermuda, issued audit opinions incorporated into ANR's financial reports, publicly filed with the SEC, from March 2000 through August 2001.

23.    Defendant KPMG LLP ("KPMG UK") has headquarters at 8 Salisbury Square, London, EC4Y 8BB.

24.    Defendant KPMG LLP ("KPMG USA"), has offices at 345 Park Avenue, New York, NY 10154.

25.    Defendants KPMG UK, KPMG USA, and KPMG Bermuda are collectively referred to herein as "KPMG."

26.    During the Class Period, KPMG purported to audit ANR's financial statements for the fiscal years ended December 31, 1999, December 31, 2000, and December 31, 2001, in accordance with "GAAS" and knowingly or recklessly issued materially false and misleading unqualified audit opinions representing that those financial statements were fairly presented in accordance with GAAP. Additionally, KPMG wrongfully consented to the use of its false unqualified opinions with respect to ANR's financial statements for 1999, 2000, and 2001 in ANR's Annual Reports and Reports on Form 10-K, filed by ANR with the SEC and otherwise disseminated to the investing public during the Class Period, and failed to require ANR to timely correct the audited financial statements upon which investors continued to rely.

27.    KPMG, by virtue of its position as an independent accountant and auditor of ANR, had access to the files and key employees of the Company at all relevant times. As a result of the auditing services it provided to ANR, KPMG had continual access to and knowledge

11

of ANR's confidential internal corporate, financial, operating, and business information, and had the opportunity to observe and review the Company's business, business practices, and material corporate transactions, and to test the Company's internal and publicly reported financial statements as well as the Company's internal controls and structures. KPMG knew or recklessly disregarded that ANR had misstated its true financial and operating situation, and intentionally or recklessly failed to take steps which, as ANR's auditor, KPMG could and should have taken to fully and fairly disclose that situation to the investing public. KPMG falsely represented that its audits of ANR's 1999, 2000, and 2001 financial statements had been conducted in accordance with GAAS, and wrongfully issued "clean" or unqualified opinions or certifications that those financial statements fairly presented ANR's financial condition and results of operations in conformity with GAAP. ANR incorporated those audit opinions into all of its financial statements from March 2000 through August 2002. Even when faced with irrefutable proof that earlier financial statements it had audited and certified were materially misstated, KPMG failed to take action to prevent the continued reliance by investors upon its false audit opinions.

28.     For each of the years 1999, 2000, and 2001, KPMG signed a "clean" audit opinion. The signature on each opinion represented that it was issued by "KPMG," with no qualifying language. The contact address listed was that of KPMG Bermuda.

29.     KPMG UK's Annual Reports include the financial performance of KPMG Bermuda. As recently as July 2003, the KPMG Bermuda website directed interested visitors to the KPMG UK Annual Report for a statement of KPMG Bermuda's financial performance.

30.     KPMG USA is a member of the American Institute of Certified Public Accountants ("AICPA") SEC Practice Section. Its membership in that section, and its adherence

12

to section guidelines for foreign associated firms, qualifies KPMG Bermuda to practice before the SEC and to audit the financial statements of public companies.

31.    The audit of ANR was jointly conducted by auditors from the New York office of KPMG USA and by auditors from KPMG Bermuda.  The Connecticut office of KPMG also conducted the statutory audits of Annuity & Life Reassurance America, Inc., one of ANR's major subsidiaries, for public filing with the State of Connecticut.

32.    As a result of the conduct alleged herein, including KPMG's knowing and reckless issuance of false audit opinions, KPMG is liable to the plaintiffs and the other members of the Class.  KPMG's misconduct (i) deceived the investing public regarding ANR's business, operations, management, earnings, and the intrinsic value of ANR securities; and (ii) caused plaintiffs and other members of the Class to purchase ANR securities at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of ANR between March 15, 2000 and November 19, 2002, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which defendants have or had a controlling interest, and all those who are excluded from the Class in Civil Action No. 02-CV-2133.

34.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ANR had between 25,499,999 and 26,106,328 shares of common stock outstanding, which were actively traded on the NYSE and the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

13

can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ANR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

36. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

37. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by defendants' acts as alleged herein;

b. whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the financial performance of ANR; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

38. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

14

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

39.    Reinsurance is a type of insurance that is sold to other insurance companies, to protect them against risks that the ceding insurance companies assume when they contract with their policyholders. Annuity reinsurance, which is at issue here, provides reinsurance to companies that sell annuities. Annuities are a type of investment vehicle offered by insurance companies and others, in which a consumer pays a premium, or a set of premiums, in exchange for the right to receive a set of payments at a specified future date. For fixed annuities (including the type at issue here) the policyholder is guaranteed to receive certain minimum payments or interest rates; thus, the insurance company selling the policy must be sure to invest the premiums that it receives from policyholders so as to achieve a return that will exceed the guaranteed payouts, plus commissions and other expenses. In order to properly calibrate the difference, or "spread," between the investment returns earned by the insurance company and the payments guaranteed to policyholders, the insurance company must calibrate projected market movements and the length of the policy terms.

40.    Additionally, annuity policies typically allow the policyholder to "surrender" the policy and receive his initial investment, plus interest, minus a surrender fee, at a date prior to annuitization. Such policies also pay out benefits if the policyholder dies. Thus, in making investment calculations, the insurer must take into account projected surrenders and annuitant mortality, which not only impose an immediate payment obligation on the insurer, but also deplete the underlying assets available for the insurance company to invest. High surrender rates

15

also increase the risk that an annuity contract, over its life, will be unprofitable to the primary insurer, and thus to the reinsurer, because poor market performance on invested premiums in early years will not be "smoothed out" by later investment returns earned during periods when the market is more robust.

41.    Finally, annuities, as an insurance product, are subject to various state regulations intended to protect the policyholders. During the Class Period, these regulations required that policyholders receive a minimum guaranteed interest rate on their premiums of 3 to 3.5%. Thus, during the Class Period, insurers needed to invest the premiums received in such a fashion as to receive returns that exceeded contractual guaranteed rates, and also state mandated minimum interest rates, by a sufficient margin to cover the insurer's costs, and provide a profit. Surrenders represent a particular hazard when considered in conjunction with statutory interest guarantees, because, as described above, if a policyholder surrenders at a time when market interest rates have been low, the insurer will be forced to make an immediate payment to meet the guaranteed minimum, and will not have time to wait for interest and other investment returns to rise over the life of the policy.

42.    Due to these various risks, many primary insurers do not want to bear all of the investment risk associated with these transactions. Therefore, they "reinsure" their business with another insurance company. In some cases, the reinsurer will, too, obtain insurance against its own risk from a second reinsurer, known as a retrocessionaire. In a typical reinsurance contract, the primary insurer ("cedent") will pay the reinsurer some portion of the premiums it receives from the policyholders. The reinsurer will then invest those premiums so as to achieve the returns necessary to render the overall transaction profitable.

16

43.    In some reinsurance arrangements, however, the ceding company does not pay a portion of the premiums to the reinsurer. Instead, the ceding company retains ownership of the premiums and the assets purchased with those premiums, and the reinsurer shares in the investment income and risks associated with the investments chosen by the ceding company. The ceding company then cedes a percentage of its liabilities to the policyholders to the reinsurer. In these arrangements, known as "modified coinsurance" structures, both the ceding company and the reinsurer ordinarily share the same investment risk, because both have their fortunes tied to the identical set of investments. Thus, the only differences between their respective positions are: (1) the percentage of risk ceded under the contract's terms; and (2) each party's ability to bear the risk due to its other expenses and unrelated business transactions.

44.    During the Class Period (and before), ANR conducted its annuity reinsurance entirely on the model described above, i.e., allowing its cedents to retain ownership of the assets supporting the annuity policies. The reinsurance agreements typically remained in force for the life of the underlying policies reinsured, which on average ranged from ten to thirty years. With respect to its principal annuity reinsurance contract, ANR was the retrocessionaire for an annuity product reinsured by Transamerica. For this transaction, Transamerica had a modified coinsurance agreement with the primary insurer who sold the annuities to policyholders. Thus, Transamerica was allocated a share of the investments made by the primary insurer, as well as of its annuity policy liabilities, and Transamerica allocated a share of those investments and liabilities to ANR.

45.    Under GAAP, the type of annuity product involved in the Transamerica contract is called a "universal life-type" or "investment-type" product (as distinguished from traditional insurance), and is accounted for under a method of accounting whereby the principal sources of

17

revenues are the investment returns earned on the underlying investments purchased with policyholder premiums. The principal expense is the interest credited to policyholders' accounts.

46.    On its financial statements, ANR classified its share of the investments held by ceding companies or their ceding primary insurer as an asset called "Funds Withheld at Interest." The dollar amount of the Funds Withheld at Interest equaled ANR's share of the carrying value of the various assets purchased by the ceding companies for ANR's annuity contracts (primarily the Transamerica contract), as well as the accumulated income earned on those assets. ANR also reported the amount of liabilities it had assumed under its annuity reinsurance contracts for any given quarter; these liabilities included the premiums paid by the policyholder, plus the amount of interest credited to each policyholder's account. Under GAAP, these liabilities should have at least equaled the amount of money the policyholders could have gotten if they immediately surrendered their policies ("cash surrender values") — which, during the Class Period, they did not, because ANR failed to credit policyholders' accounts for the minimum interest amounts to which they were entitled, upon surrender, under state law. Finally, ANR failed to expense properly its "Deferred Acquisition Costs" ("DAC"). DACs are costs, mostly commissions, associated with obtaining a particular reinsurance contract. As is typical in the industry, ANR did not immediately absorb these costs as expenses in the period in which they were incurred. Instead, the costs were treated as an asset ("capitalized") and amortized over the life of the annuity reinsurance contract and used to offset a portion of the income purportedly earned on the contract in each reporting period. The precise manner in which these costs were amortized depended upon ANR's projected profits over the life of the contract. However, under GAAP and ANR's income recognition policies, based upon "loss recognition" and "recoverability" testing, when a contract appeared that it would not generate enough income to offset the costs associated

18

with it in accord with the original actuarial assumptions, ANR was required to "write down" a portion of the DAC, recognizing it as an immediate expense. Because the costs were amortized over the life of the reinsurance contract, and because the profitability of the contract depended in part upon surrender rates, actual surrender rates were particularly important for ANR's determination of whether the costs were recoverable. High surrender rates would reduce the asset base of policyholder deposits that generated the revenues against which the deferred costs could be amortized, thus resulting in the need to accelerate the rate of amortization, resulting in immediate expenses and an acknowledgment of part of the deferred costs as unrecoverable. If (as occurred here) the actual performance of the invested assets, the state imposed minimum interest guarantees, fees imposed, and high surrender rates indicated the overall contract was unprofitable, then DAC would need to be immediately expensed. Additional expense might also need to be recognized for deficiencies in the liabilities credited to policyholders' accounts.

47.    ANR was established by XL Capital in December 1997. Lawrence Doyle ("Doyle"), ANR's President and CEO throughout most of the Class Period, was recruited by XL Capital to head the new venture. At the time, there were no Bermuda-based reinsurers specializing in life and annuity reinsurance, and it was believed that ANR could compete successfully in the reinsurance market by taking advantage of the fact that Bermuda has no corporate income tax, which would reduce ANR's costs to do business. These reduced costs, it was believed, would permit ANR to underprice its competitors.

48.    However, there was a significant risk associated with the Bermuda location. Primary insurers in the United States are required, under state laws, to maintain certain pools of funds known as "statutory reserves" to ensure that they will be able to meet their payout obligations. One of the main benefits to a primary insurer of reinsuring its liabilities is that,

19

under state law, the insurer is permitted to reduce its reserves, and thus free up capital, to the extent that the reinsurer has assumed responsibility for payouts. However, most state laws require that the reinsurer be licensed or accredited in the state, in order to guarantee that the reinsurer will be able to meet those payout obligations. Because ANR, as an offshore reinsurer, was not licensed or accredited in its cedents' states, ANR was required to post collateral for the obligations it had assumed, with letters of credit or other facilities. ANR's ability to obtain letters of credit in order to post collateral was directly tied to its credit-worthiness; additionally, many of its contracts with its cedents required ANR (or its operating subsidiaries) to maintain certain financial strength ratings. Because of these requirements, it was necessary that ANR maintain its ratings with the major credit-rating agencies, else it risked losing all of its clients, and thus all of its business.

49.      ANR held its initial public offering in April 1998 at $15 per share, and in its first day of trading, saw its share price rise 52% to $22.75. The business model was met with raves by analysts; as Prudential Securities put it on August 3, 1998:

> Annuity and Life is a low cost provider in the rapidly growing reinsurance
> industry, and we anticipate as much as a 60% total return to investors if the
> company achieves the business volume we are expecting in the second half of
> 1998.

50.      That business was obtained on September 29, 1998, when ANR issued a press release announcing its completion of a "significant annuity transaction" with a "leading U.S. insurance company." As would eventually be revealed, this annuity transaction was a high stakes gamble covering a single annuity product issued by the primary insurer, IL Annuity, that was reinsured by Transamerica. Through the end of 1999, this single contract represented 83% of ANR's reported assets, and 97% of ANR's reported liabilities to policyholders totaling $1.65 billion were attributable to this contract. Doyle was quoted in the press release as stating that the

20

transaction, coupled with another early contract, "provides our company with an excellent

business base during our first six months of operation. We are very pleased that we are able to

provide reinsurance benefits to two of the premier companies in the life and annuity business

sector." Upon this announcement, ANR shares rose from a closing price of $17.63 on the day

before the announcement to a closing price of $19.75 the day after.

      51.     ANR reported total net income for the year of approximately $19 million.  On the

Company's Report on Form 10-K for 1998, certified by KPMG as compliant with GAAP, the

Company stated:

> The Company has developed and its Board of Directors has approved
> underwriting guidelines with the objective of controlling the risks of the
> reinsurance policies written as well as to determine appropriate pricing level. Any
> deviation from the approved guidelines requires the approval of the Board.
> Subject to the approval of the Board the guidelines may be amended from time to
> time in response to changing industry conditions, market developments, changes
> in technology and other factors. In implementing the underwriting guidelines the
> Company utilizes an experienced underwriting team to select opportunities with
> acceptable risk/return profiles. The Company determines whether to assume any
> particular reinsurance business by considering many factors, including the type of
> risks to be covered, actuarial evaluations, historical performance data for the
> cedent and the industry as a whole, the cedent's retention, the product to be
> reinsured, pricing assumptions, underwriting standards, reputation and financial
> strength of the cedent, the likelihood of establishing a long term relationship with
> the cedent and the market share of the cedent. Pricing of the Company's
> reinsurance products are based on the Company's sophisticated actuarial and
> investment models which incorporate a number of factors including assumptions
> for mortality, expenses, demographics, persistency and investment returns as well
> as certain macroeconomic factors, such as inflation, and certain regulatory factors,
> such as taxation and surplus requirements.

      52.     For each quarter in 1999, the Company continued to report profits.  For the year

ended December 31, 1999, ANR posted net income of $35.7 million.  As would later be

revealed, $13.6 million, or 38%, was attributable to the Transamerica contract.  Despite the razor

thin profit margins reportedly earned on a billion-dollar-plus investment portfolio, ANR

represented to investors in its Report on Form 10-K for 1999 that "We are not directly exposed

to market risk with respect to the assets underlying the annuity reinsurance agreements we enter into."

53.    On February 17, 2000, ANR announced its earnings for the year, claiming that operating income had increased 120% over the prior year, for a profit of $1.36 per share. Doyle was reported in a press release as commenting, "Our business has now achieved critical mass, which will enable us to maintain our conservative underwriting and investment strategy." As Prudential reported on February 22, 2000:

> Annuity and Life Re's earnings momentum, having posted its sixth straight quarter of earnings growth, is evidence of its leading position in the offshore reinsurance space. Given its success to date, we believe ALRE is in a solid position to benefit from increased demand for life and annuity reinsurance[1] . . . .

## Undisclosed Adverse Facts Affecting ANR's Business

54.    KPMG served as ANR's outside auditor from its inception. As KPMG knew or recklessly disregarded, ANR's annuity business — and the "significant annuity transaction" with Transamerica announced in 1998 — was not concluded on terms nearly as favorable as ANR stated to the public. Moreover, ANR did not even obtain the fundamental information from Transamerica necessary to properly account for the Transamerica contract – that is, basic information about the accounts of those policyholders who surrendered or otherwise claimed benefits under their policies. Without such basic information, ANR was not able to properly account for its liabilities and profits under the Transamerica contract, and KPMG was unable to conduct a proper audit of ANR's financial statements. Nonetheless, KPMG repeatedly certified that it had conducted an audit in accordance with GAAS, and that ANR's financial statements were fairly presented consistent with GAAP.

---

[1]    ANR was listed on the NASDAQ as "ALRe." The symbol was changed to "ANR" when the Company switched to the NYSE in mid-2001.

55.    Despite ANR's assurances that it was not exposed to market risk, both ANR and KPMG were aware that ANR was most definitely exposed to market risk on the Transamerica contract. ANR also was exposed to extraordinary risks with respect to various other actuarial assumptions it had used to price its annuity reinsurance product, including policyholder surrender rates, management fees charged by the primary insurer, and state-mandated minimum interest guarantees. These risks loomed especially large, because ANR's "Funds Withheld at Interest" for the Transamerica contract (later revealed as $1.51 billion at the end of 1999), its capitalized costs associated with this contract (later revealed as $201.5 million at the end of 1999), and its reported liabilities on the contract (later revealed as $1.6 billion at the end of 1999) were so massive compared to profits (reportedly) generated ($13.6 million in 1999), that even a slight miscalculation of the valuation of its investments, the amortization rate for its deferred acquisition costs (which itself was dependent on an assessment of overall contract profitability), or the required crediting rate to policyholders (including for surrendered policies) would decimate ANR's earnings statement. Throughout the Class Period, KPMG knew that the factors that ANR had used to price its annuity reinsurance product (and hence to calculate expected profits and amortize costs) were far more optimistic than its actual experience. KPMG also knew that due to such adverse experience, ANR was reporting profits on the Transamerica contract even though ANR was actually experiencing *losses* on that contract. Despite this knowledge, KPMG continued to certify ANR's financial statements even though ANR did not revise its assumptions to develop new calculations of the overall profitability of the Transamerica contract, or to recognize additional amortized costs until the third quarter of 2001.

56.    ANR's profits on its annuity segment primarily depended upon the "spread" between the investment returns earned by ANR on the "Funds Withheld at Interest," assets

23

selected and managed by its cedents, and the interest owed to the policyholders under their fixed annuity contracts. As described above, policyholders were due a state mandated annual return of at least 3 to 3.5% on their premium payments. Thus, on a typical annuity contract, a reinsurer would need to generate investment income at a rate higher than 3.5% in order to cover its acquisition and administrative expenses and generate a profit.

57.    The Transamerica contract however, was far from typical. Under this contract, ANR agreed to provide retrocessional insurance to Transamerica, which itself had provided reinsurance to IL Annuity. IL Annuity, a subsidiary of a larger company known as Indianapolis Life Insurance Company, primarily sold a series of fixed annuity products known as Visionmark, and it was these policies that Transamerica reinsured. IL Annuity charged each Visionmark policyholder an annual 2.75% administrative fee. However, each policyholder was still entitled to the full 3.5% guaranteed under state law. Because a 3.5% return to the Visionmark policyholders was guaranteed, but IL Annuity charged a fee of 2.75% to each policy, simply to break even — before even considering ANR's deferred acquisition costs (DAC) or ANR's own operating expenses — the premiums needed to be invested in securities that would produce a minimum cumulative return of 6.25%. Once DAC was taken into account – at the inception of the Class Period, the unamortized costs associated with the Transamerica contract were in excess of $200 million – the returns on the assets needed to be considerably higher just to avoid massive losses.

58.    Despite the necessity of such a return, the assets supporting the Visionmark policies simply did not produce such returns, making the Transamerica contract a losing proposition almost from its inception. ANR had a modified coinsurance arrangement with Transamerica, and Transamerica had a modified coinsurance arrangement with IL Annuity. IL

24

Annuity thus ultimately held and managed all of the assets, leaving ANR with no control as to how they were directed. IL Annuity's Visionmark policies were unusual, in that under these contracts, the policyholder could choose to "link" his or her policy to the performance of certain types of securities, and the performance of those securities would determine the ultimate interest rate earned by the policyholder (provided that state law minimum interest guarantees were also satisfied). Such a system provided a significant incentive to policyholders to adopt an "aggressive" investment strategy – they would be sure to profit from any appreciation in the value of their "linked" investments, while simultaneously enjoying a statutory safety-net, in the form of state-mandated minimum interest guarantees, if their chosen investments failed to perform. For the same reason, these contracts imposed extraordinary risks on ANR, because it was effectively forced to guarantee a yield of at least 6.25% (2.75% to IL Annuity, and 3.5% to policyholders).

59.    Policyholders could choose from any of four investment strategies: convertible bonds, high yield bonds, investment grade bonds, and a guaranteed one year strategy. Although IL Annuity was not obligated to invest the premiums received under these policies in accord with the strategy chosen by the policyholder, it typically did so. Those chosen investments were the same that underpinned the "Funds Withheld at Interest" asset reported on ANR's balance sheet, and which ANR relied upon to satisfy its assumed liabilities and to generate a profit.

60.    As it turned out, nearly 70% of Visionmark policyholders chose the "convertible bond" strategy. Convertible bonds are corporate bonds that can be "converted" into common stock of the issuing company (when the market price of the issuer's stock appreciates above the conversion price of the bond) and typically pay a lower interest rate than ordinary bonds, in exchange for giving the bondholders the benefits of the convertible feature. As ANR would later

25