admit in an 8-K filed on the last day of the Class Period, November 19, 2002, "While convertible bonds would typically be expected to produce lower investment (i.e., interest) income than other fixed income securities, convertible bonds provide the potential for higher total returns through the underlying equity component of the bonds."

61.    The value of convertible bonds is a function of the interest rate they pay combined with the stock value of the issuing company.  As ANR itself would explain to investors in its November 19, 2002 8-K:

> The investment value of convertible bonds is influenced by changes in interest rates, with investment value declining as interest rates increase and increasing as interest rates decline, and by the credit standing of the issuer and other factors. The conversion value of convertible bonds is determined by the market price of the underlying common stock. If the conversion value is above the market value of the underlying common stock, the price of the convertible bonds is governed principally by their investment value. To the extent the market price of the underlying common stock approaches or exceeds the conversion price, the price of the convertible bonds will be increasingly influenced by their conversion value. Consequently, the value of convertible bonds may be influenced by changes in the equity markets.

62.    IL Annuity, in accord with its usual practice, directed these policyholders' premiums toward investments in convertible bonds, leading to an asset pool of which 70% consisted of convertible bonds.  Additionally, another 5% of its policyholders chose the "high yield" or junk bond strategy; IL Annuity thus directed 5% of those premiums toward junk bonds. The contracts between Transamerica, ANR, and IL Annuity provided that, out of all of the Visionmark policies sold by IL Annuity, IL Annuity would retain the risk associated with only 20% of those policies.  Transamerica retained 16% of the risk, and ANR assumed a whopping 64% of the Visionmark risk.

63.    The Transamerica contract represented a massive portion of ANR's business, accounting for between 61% and 95% of its reported Funds Withheld at Interest assets during the Class Period, 39.6% of ANR's reported income (or almost $16 million) in the year 2000, and

26

between 45% and 97% of its reported liability to policyholders during the Class Period. Moreover, as the losses recognized in later periods showed, because of the sheer size of the costs expended to acquire this contract and the slim or negative earnings margins earned on a billion dollars plus of policyholder deposits, the risk that losses on this contract would dwarf possible earnings on the remainder of ANR's contracts was enormous. At the end of 1999, heading into the beginning of the Class Period, the unamortized costs associated with the Transamerica contract (DAC) totaled $201,473,796, out of a total reported DAC of $203,510,250. Thus, because the Transamerica deal represented such a massive share of ANR's business, representing nearly all of its acquisition costs at the inception of the Class Period and such a huge portion of its assets and liabilities, ANR's choice to assume the bulk of the risk associated with Visionmark essentially meant that ANR had, almost from the Company's inception, tied its fortunes to the convertible bond market generally, the equity markets, and this particular annuity product in particular, essentially betting its future on the hope that the appreciation of the issuing companies' stock would exceed the bond's conversion prices and thereby earn an annual average investment return well above 6.25%.

64.    ANR's risk was exacerbated by the extraordinarily slim margin of ANR's annuity income as a percentage of the underlying annuity assets – i.e., tiny fluctuations in the valuation or rate of return on the underlying investments assets or rate of amortization of capitalized acquisition costs could wipe out profits and result in massive losses to ANR.

65.    Throughout the Class Period, investors were not informed that the profitability of the Transamerica contract depended on ANR's ability to earn such precariously high returns on the assets supporting the contract, nor were they informed that the Company's profitability depended on the performance of the equity markets. Moreover, as KPMG knew, throughout the

27

Class Period, the risks associated with the contract materialized, and the assets performed poorly,

producing returns that made it impossible for ANR to recoup its costs in obtaining the contract.

For instance, in 2001, the assets supporting the Transamerica contract produced returns of a mere

3.94%, far below the minimum necessary to avoid staggering losses.

66.      Additionally, as KPMG knew (or would necessarily have known if it performed

any audit procedures to confirm ANR's reported liabilities of more than $1 billion) in accounting

for its expected liabilities under the contract, ANR only credited to each policyholder's account

the amount of interest that the policyholder had earned in relationship to its selected asset

portfolio in that accounting period.  In other words, when ANR credited interest to the

policyholder, ANR simply failed to account for the fact that the policyholder was guaranteed a

minimum 3 to 3.5% return, on top of the 2.75% management fees that IL Annuity had already

claimed.  Thus, ANR's financial statements violated the GAAP requirement that the credited

liabilities at least cover the policy's cash surrender value.  KPMG publicly approved ANR's

false and significantly-understated liabilities for most of the Class Period, up through March 28,

2002, and permitted its audit opinions to stand uncorrected through the end of the Class Period.

67.      Worse, ANR simply did not collect the information from Transamerica needed to

determine whether, and to what extent, it was actually making statutory minimum interest

payments in excess of the liabilities it had recognized – payments that should have been

immediately expensed.  Thus, until ANR restated its financial statements for 2000 and 2001,

ANR did not even recognize and report as an expense the minimum guaranteed interest

payments it had actually paid out to policyholders when they surrendered their policies.

68.      Compounding the problems caused by low returns and ANR's failure to properly

account for guaranteed liabilities, beginning in the middle of 1999, Visionmark policyholders

28

began surrendering their policies at extremely high rates, thus forcing IL Annuity to make immediate payouts, which at times exceeded the amounts thus far earned on the assets underlying the policies, and making it impossible for ANR to simply "wait out" the depressed market environment. Policy surrenders were so high that as of 2001, they had reached a rate of 26% — by contrast, ANR had estimated that it would experience an approximate surrender rate of 4% when it initially priced the contract. Moreover, the high surrender rates made it necessary for ANR to reevaluate the assumptions it had used to set a schedule for amortizing its deferred costs – but, as ANR would later admit, it failed *even to reevaluate* the lifetime profitability assumptions that controlled the amortization schedule until late 2001, nearly two years after the problem first arose. Under GAAS, KPMG was required to evaluate ANR's critical estimates, including its reserves to satisfy policyholder obligations.

69.    ANR (and KPMG) concealed from investors the problems with low yields, high surrender rates, and ANR's failure to recognize as expense the amounts necessary to credit policyholder accounts under state law, until halfway through the Class Period. When the SEC forced ANR (and KPMG) to finally reveal some of the problems — and to recognize millions of dollars of losses on its Transamerica contract as a result — ANR and KPMG still concealed the extent of the losses by ANR's failure to fully take appropriate charges to income, and failing to reveal to investors the size and nature of the risk it had assumed.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

70.    The Class Period begins on March 15, 2000. On that day, ANR filed its Report on Form 10-K for 1999, reporting its full results for that year. The Report claimed net income for the year of $35.7 million, but rather than separating revenues and expenses attributable to

29

ANR's annuity business, versus ANR's life reinsurance business, both portions of the business

were reported together. The 10-K explained:

> In June 1997, the Financial Accounting Standards Board (FASB) issued SFAS
> No. 131, "Disclosure about Segments of an Enterprise and Related Information."
> This Standard requires public companies to report financial and descriptive
> information about their reportable operating segments. Operating segments, as
> defined, are components of an enterprise about which separate financial
> information is available that is evaluated regularly by the chief operating
> decision-maker in deciding how to allocate resources and in assessing
> performance. To date the Company has written of [sic] a number of ordinary life
> reinsurance and annuity reinsurance contracts. The Company views life and
> annuity reinsurance as one business segment and accumulates financial data for
> this segment when assessing performance and allocating resources. As the
> Company only has one business segment at the current time, management feels
> that the information presented in the balance sheet and statement of operations is
> sufficient to understand the business segment of the Company.

71.     The Report went on to substantially reiterate the representation in the 1998 10-K,

quoted at ¶51, that underwriting guidelines had been carefully written, subject to Board

approval, and with the use of an "experienced underwriting team."

72.     The Report then described its annuity reinsurance business in the following

manner:

> *The products reinsured under these agreements are general account deferred
> annuity policies containing minimum interest guarantees and market value
> adjustment features.* . . . Under the reinsurance agreements the ceding company
> is obligated to credit interest on the outstanding amounts of these funds based on
> the return of the underlying assets held by the ceding companies in segmented
> portfolios. The underlying assets, which include fixed income and convertible
> fixed income securities, are managed by investment managers appointed by the
> original cedant in accordance with investment guidelines and policies that are
> included in the reinsurance agreements. *Accordingly, the carrying value of the
> Funds Withheld at Interest is not directly exposed to market risk with respect to
> the assets held by the ceding company.* . . . The profitability of these agreements
> is dependent on earning a targeted spread between the interest earned on the
> Funds Withheld at Interest, and the interest credited to the policyholder liabilities.

Notably, ANR's disclosure of the existence of minimum interest guarantees was the first and last

time that the Company would make such a disclosure (and, in fact, the Company did not reveal

30

that the guarantees were mandated by law, and implied that the "market value adjustment" might alter the minimum), until near the end of the Class Period when ANR would be forced to acknowledge losses related to the minimum interest guarantees. Despite this disclosure, ANR immediately suggested that it was not responsible for such guarantees with the following representation:

> The product type reinsured and the structure of the reinsurance agreement tend to mitigate the interest rate sensitivity of this business. Further, due to the structure of the reinsurance agreement, *we are not directly exposed to market risk with respect to the assets underlying the reinsurance agreements.*

73.    The 10-K went on to discuss deferred acquisition costs:

Deferred policy acquisition costs

The costs of acquiring new business, principally allowances, which vary with and are primarily related to the production of new business, are deferred. *Deferred policy acquisition costs are subject to recoverability testing at the time of the policy issuance and loss recognition testing at the end of each accounting period. . . .*

For universal life and investment-type products, *deferred policy acquisition costs are amortized over the expected average life of the contracts as a constant percentage of the present value of estimated gross profits arising principally from investment results, mortality and expense margins and surrender charges based on historical and anticipated future experience, which is updated at the end of each accounting period. . . .* The effect on the amortization of deferred policy acquisition costs of revisions to estimated gross profits are reflected in earnings in the period such estimated gross profits are revised.

The 10-K reported that total unamortized deferred acquisition costs were $203.5 million. (As would later be revealed, $201.5 million of the total remaining deferred acquisition costs, were associated with the Transamerica contract).

74.    The Report stated that total Funds Withheld at Interest were $1.533 billion (of which, as would later be revealed, $1.514 billion were associated with Transamerica). Income earned on the Funds was $64.6 million for the year, creating a yield of only 4.2%, well below the 6.25% needed to break even, without considering the $201.5 million of unamortized deferred

31

costs associated with the Transamerica contract. Strikingly, however, the 10-K did not actually calculate and disclose the yield on the Funds; instead, it simply reported the size of the Funds and, in a separate section, the income earned on the Funds. This failure actually to calculate the yield for investors was particularly noteworthy because ANR did separately report the yields for its own, directly-held, investments.[2]

75.     The Report also listed "other income," a category that was not defined in the Report, but later would be revealed to represent *surrender fees* from the Transamerica contract, meaning that policyholders were reclaiming their premiums and their 3 to 3.5% guaranteed interest payments, causing ANR to make immediate payments in excess of the returns it had earned on the assets supporting the contract. "Other" income for 1999 was reported at $3.2 million.

76.     The 10-K represented:

> The *profitability of the deferred annuity reinsurance product line depends on earning a targeted spread between the interest rate earned on the supporting asset base and the interest rate credited to the underlying annuity liability*. This spread is interest rate sensitive, as fluctuations in the general level of interest rates from period to period may cause fluctuations in the results of operations.

77.     With respect to these potential fluctuations in interest rates, under the section titled "Quantitative and Qualitative Disclosures About Market Risk" (a required section under 17 C.F.R. § 229.303), the Company explained that, with respect to the investments supporting its life reinsurance segment, it was subject to the risk of changing interest rates; however, with respect to its annuity segment, ANR stated, "We are not directly exposed to market risk with respect to the assets underlying the annuity reinsurance agreements we enter into."

---

[2]     In fact, ANR appeared to go deliberately out of its way to *avoid* reporting the inadequate yield on the Funds that supported its annuity business, by stating, "The average yield rate earned on an annualized basis on the invested assets, *excluding Funds Withheld*, was 6.29% for the year ended December 31, 1999." (emphasis added)

32

78.    Additionally, in a section regarding recent changes to accounting standards, the

Company stated:

> In June 1998, the Financial Accounting Standards Board (FASB) issued
> Statement No. 133 "Accounting for Derivative Instruments and Hedging
> Activities." This Statement establishes accounting and reporting standards for
> derivative instruments, including derivative instruments embedded in other
> contracts, and for hedging activities. *The Company currently does not hold any*
> *derivatives* and does not engage in any derivative hedging activities, although it
> may do so in the future. Management has reviewed this new Statement and has
> concluded that it is not likely to significantly affect its current financial reporting.

79.    The 10-K stated:

> Management of the Company has primary responsibility for preparing the
> accompanying financial statements and for their integrity and objectivity. *The*
> *financial statements included in this report were prepared in accordance with*
> *generally accepted accounting principles in the United States applied on a*
> *consistent basis.* The financial statements include amounts that are based on
> management's best estimates and judgements. Management also prepared the
> other information presented in the annual report and is responsible for its accuracy
> and consistency with the financial statements. *Management of the Company has*
> *established and maintains a system of internal controls* designed to provide
> reasonable assurance as to the integrity and reliability of the financial statements,
> the protection of assets from unauthorized use or disposition and the prevention
> and detection of fraudulent financial reporting.

80.    The 10-K also included an audit opinion signed by KPMG, dated February 8,

2000, which stated that ANR's 1999 and 1998 financial statements were presented fairly in

conformity with GAAP and that KPMG's audit was performed in accordance with GAAS:

> We have audited the consolidated financial statements of Annuity and Life Re
> (Holdings), Ltd. and subsidiaries as listed in the accompanying index. In
> connection with our audits of the consolidated financial statements, we have also
> audited the financial statement schedule listed in the accompanying index. These
> consolidated financial statements and financial statement schedule are the
> responsibility of the Company's management. Our responsibility is to express an
> opinion on these consolidated financial statements and financial statement
> schedule based on our audits.
>
> *We conducted our audits in accordance with United States generally accepted*
> *auditing standards.* Those standards require that we plan and perform the audits
> to obtain reasonable assurance about whether the financial statements are free of
> material misstatement. An audit includes examining, on a test basis, evidence

33

supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company and its subsidiaries as at December 31, 1999 and 1998 and the results of their operations and cash flows for the years ended December 31, 1999 and 1998 in conformity with United States generally accepted accounting principles.* Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

(emphasis added)

81.     ANR's financial statements, and KPMG's audit opinion, in the 1999 10-K were materially false and misleading for the reasons stated at ¶¶214-255. Additionally, the statements were materially false and misleading because:

a.      ANR had reported income based upon the Transamerica contract, even though, for that period, the contract had generated losses due to the fact that the assets supporting the contract had not performed sufficiently to cover ANR's obligations to policyholders and its costs;

b.      ANR's reported liabilities were grossly understated, because ANR had credited policyholders' accounts based solely on the income earned on the Funds Withheld at Interest asset, and had not credited the accounts for interest guaranteed under state laws;

c.      Surrenders of the policies underlying the Transamerica contract were unusually high, and (as would later be revealed) had been unusually high since the second half of 1999, thus depleting the asset base supporting those policies and causing ANR to make immediate payments to policyholders in excess of the interest that ANR had credited to their accounts. Specifically, as later would be disclosed, ANR made at least $100,000 in such minimum interest payments. In fact, surrender rates were increasing at such an alarming rate

34

that by the end of 2001, they would reach an annual rate of 26%, on a contract that had been priced based upon an assumption of approximately a 4% annual surrender rate;

      d.                Because the Funds Withheld at Interest consisted chiefly of assets supporting the Transamerica contract, and because 70% of these assets were invested in convertible bonds, the profitability of the annuity segment was not merely dependent on earning a proper interest rate spread between invested assets and credits to policyholders' accounts, as the Company had represented. Instead, the profitability of ANR's annuity business was also heavily dependent on the equity markets. As the Company later would reveal, "To the extent the market price of the underlying common stock approaches or exceeds the conversion price, the price of the convertible bonds will be increasingly influenced by their conversion value. Consequently, the value of convertible bonds may be influenced by changes in the equity markets."

      e.                Contrary to the Company's representations, ANR most certainly was exposed to grave market risk with respect to the assets underlying its annuity reinsurance agreements, because the only way ANR could hope to break even, much less earn a profit, on the Transamerica contract was if the stock of the companies issuing the convertible bonds appreciated in value;

      f.                Despite the Company's claim to reevaluate the recoverability of deferred acquisition costs every reporting period, and to adjust amortization based upon historical information, the Company had not done so with respect to the Transamerica contract, and in fact would not do so until the third quarter of 2001. Had the Company properly evaluated its deferred costs in light of experience, it would have recognized a current expense, and declared most, if not all, of the costs as unrecoverable;

35

g.         As the Company eventually would reveal, it was exposed to derivatives – for investments reported as Funds Withheld at Interest. Derivatives, and embedded derivatives, are essentially assets whose value are dependent upon the fluctuating values of other, related assets. Convertible bonds, such as those held in the Funds, contain embedded derivatives because the bonds' value depends, in part, on the fluctuating market price of the stock of the issuing company (to which the bond is convertible at a fixed conversion price). Although ANR eventually would conclude that it need not employ FAS 133 to the assets associated with the Transamerica contract (due to the effective date of FAS 133), ANR also eventually would admit that it did, however, hold derivatives in the Funds, and that these derivatives had the potential to add significant volatility to its financial results.

h.         KPMG had failed to conduct its audit in accordance with GAAS, because it had not obtained sufficient information about IL Annuity's obligations and payments to policyholders for which ANR was responsible under its reinsurance contract with Transamerica, to determine whether ANR had properly accounted for those obligations and payments;

i.         KPMG had failed to conduct its audit in accordance with GAAS because it ignored ANR's blatant violations of GAAP, described above, as well as several "red flags," such as ANR's failure to reevaluate its outdated estimate of the profitability of the Transamerica contract in light of strikingly adverse historical performance, and its false representations about market risk and lack of exposure to derivatives.

82.    The statements were also false and misleading because ANR falsely insisted that the "product type reinsured" mitigated ANR's exposure to fluctuations in interest rates – when in

36

fact, precisely the opposite was true, because ANR was ultimately responsible for minimum interest guarantee payments.

83.    In sum, the overall profitability of the Transamerica contract – which represented the lion's share of ANR's business – depended on the spread over time between the investment returns on the portfolio of investments chosen, in part, by policyholders, and: (1) the size of the guaranteed minimum interest rate; and (2) the expenses charged by IL Annuity.  Because of the extraordinary "minimum" payments guaranteed by ANR (as inflated by the fees paid to IL Annuity), the profitability of the Transamerica contract and indeed ANR's continued viability, turned on: (1) the surrender rates on the policies; and (2) the performance of the stocks of the issuers of the convertible bonds in the equity markets.  Yet nothing in ANR's financial statements disclosed the existence of these risks, or the degree to which they had materialized during the year.  Despite these facts, KPMG issued a "clean" audit opinion, even without access to some of the basic information necessary to audit the performance of the contract.

84.    On May 15, 2000, ANR filed its Report on Form 10-Q for the first quarter.  The Report announced earnings for the first quarter of 2000, reporting net income for the period of $7,814,000.  Of this figure, $1.8 million was reported as uncategorized "other" income.  ANR also reported that it had credited $8,427,558 in interest to its policyholders, and that its Funds Withheld at Interest asset now totaled $1.586 billion (as above, the vast majority of this amount was associated with the Transamerica contract).  ANR noted that it carried deferred acquisition costs of nearly $194 million (as again, the vast majority of these costs were associated with the Transamerica contract).  The Report also stated that the Funds Withheld at Interest had earned a total of $21.8 million for the period, which, in annualized terms, meant that the Funds were achieving a yield of only 5.5%, well below the 6.25% needed to break even, without considering

37

the massive, unamortized deferred costs associated with the Transamerica contract. Just as in the 1999 10-K, ANR did not actually calculate and disclose the yield on the Funds; instead, it simply reported the size of the Funds and, in a separate section, the income earned on the Funds, even though ANR did separately report the yields for its own, directly-held, investments.

85.    Additionally, as ANR knew but did not disclose, the $1.8 million in "other income" consisted largely of surrender fees from the Transamerica contract, meaning that policyholders were reclaiming their premiums and their 3 to 3.5% guaranteed interest payments, causing ANR to make immediate payments in excess of the returns it had earned on the assets supporting the contract and invalidating the assumptions used to set the schedule for deferring and amortizing the capitalized costs. The report stated that "These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Company's Form 10K for the fiscal year ended December 31,1999," thereby incorporating by reference the fraudulent 1999 10-K, the misleading reassurances that ANR's annuity product carried little investment risk, and KPMG's false audit opinion.

86.    Just as in the 1999 10-K, ANR claimed, "The Company does not hold any derivatives and does not engage in any derivative hedging activities, although it may do so in the future."

87.    Thus, ANR's statements regarding its first quarter 2000 results were materially false and misleading for the reasons stated at ¶¶81-83 above and ¶¶214-255 below. Additionally, ANR's reported income was materially false and misleading for another reason. As discussed above, ANR recorded its liabilities under its annuity policies as "Interest Sensitive Contracts Liability," and included in those liabilities all of the interest that it had credited to the

38

policyholders. In the normal course of things, when a policyholder received a payout under the policy, that payout would be deducted from ANR's reported liabilities and the particular account would be closed. But, as described above, the interest that ANR credited to each account every quarter was tied to returns on its investment portfolio regardless of amounts actually due policyholders for minimum interest guarantees. Additionally, ANR's liability calculations did not cover the 2.75% management fees imposed by IL Annuity on policyholders, but ANR was forced to absorb because of the net amount guaranteed to policyholders under state law. Therefore, to the extent that the interest ANR credited every quarter was less than the guaranteed interest rate, ANR's expected liabilities under these contracts were too low, and its reported profits too high. Moreover, because ANR had not yet fully credited policyholder accounts for their full cash surrender value (because it had failed to credit at the required minimum rate), whenever a policyholder surrendered his policy and claimed his minimum interest rate, ANR was required to record any payments in excess of the policyholder's account balance as an immediate expense. Instead, ANR recorded even these excess payments as a reduction in its liabilities due on other remaining policyholder contracts. In other words, it simply subtracted the full payment from its reported liabilities, without taking into account the fact that it had never properly recognized the full amount due in its reported liabilities. Therefore, as eventually would be revealed, ANR's reported financial results for the first quarter of 2000 were materially false and misleading because ANR had made $336,037 worth of minimum interest payments that it improperly had failed to record as an expense, and instead had recorded as a reduction in its remaining liabilities to other policyholders. Most importantly, these undisclosed minimum interest guarantee payments demonstrated that ANR's method of crediting policyholder

39

liabilities (and recognizing related expense) was inadequate and failed to properly account for

ANR's true obligations for future policyholder payments.

88.     Reacting to ANR's misleading earnings reports, Prudential Securities commented

on April 24, 2000, that "In the annuity business, interest spreads were better than expected,

boosting earnings in this business 20% sequentially to $4.1 million."

89.     On June 9, 2000, Prudential reported that Doyle and Atkin had "endorsed" its

projections of earnings growth over the next two years of 25%.

90.     After the close of trading on July 24, 2000, ANR issued a press release

announcing its results for the second quarter of 2000.  The Company claimed net income of $7.8

million for the quarter, of which $1.6 million was attributable to "other" income.  The Company

credited $7.48 million in interest to its annuity policyholders, and total Funds Withheld at

Interest stood at $1.53 billion.  ANR reported unamortized, deferred policy acquisition costs of

$182 million.

91.     On August 14, 2000, ANR repeated this information in its Report on Form 10-Q

for the second quarter of 2000, and also noted that the Funds Withheld at Interest had earned

$20.611 million for the quarter, resulting in an annualized yield rate for the quarter of a mere

5.38%.  Just as in earlier financial statements, ANR did not actually calculate and disclose the

yield on the Funds; instead, it simply reported the size of the funds and, in a separate section, the

income earned on the Funds, even though ANR did separately report the yields for its own,

directly-held, investments.  Additionally, as in the previous statements, the 10-Q made no

mention of the fact that the "other" income of $1.6 million from the quarter came from unusual,

and dangerously high, surrender fees on the Transamerica contracts.  The 10-Q also stated that,

"These consolidated financial statements should be read in conjunction with the audited

40

consolidated financial statements and notes thereto contained in the Company's Form 10K for the fiscal year ended December 31,1999 and Form 10-Q for the fiscal quarter ended March 31, 2000," thereby incorporating by reference the false 1999 10-K, the misleading reassurances that ANR's annuity product carried little investment risk (and KPMG's false audit opinion). Notably, despite the fact that it had been improperly subtracting minimum interest payments on surrendered policies from its remaining reported liabilities due to other policyholders, as described in ¶87, the Company made the misleading statement that its liabilities had been reduced because of "benefit payments made by the Company under the reinsurance agreements." Just as in the 1999 10-K, ANR claimed, "The Company does not hold any derivatives and does not engage in any derivative hedging activities, although it may do so in the future."

92.     ANR's earnings reports for the quarter were materially false and misleading for the reasons stated at ¶¶81-83 above and ¶¶214-255 below.  Additionally, as eventually would be revealed, ANR had made minimum interest payments of $588,066 that it had improperly failed to record as an expense, and instead had improperly recorded as a reduction in its liabilities to other policyholders.

93.     Within a week after the initial earnings announcement, ANR shares had risen from a closing price of $23.77 to a closing price of $24.62.

94.     On August 3, 2000, Standard & Poor's affirmed its single A- rating of ANR's operating subsidiaries, citing the Company's "superior levels of capitalization, market acceptance, focused execution of its business plan, conservative investment portfolio, and lean management."

95.     On August 23, 2000, A.M. Best affirmed its A- (Excellent) financial strength rating for ANR's operating subsidiaries, citing "the company's progress in implementing its

41

business plan, superior capitalization, financial flexibility and conservative approach to

underwriting. The rating also reflects the management team's experience and ability to leverage

relationships with prominent life insurance and annuity writers by providing customized life

reinsurance products." On August 31, 2000, Fitch affirmed its A rating for ANR's operating

subsidiaries, citing ANR's "conservatively structured investment portfolio, strong management

team, good operating performance, low expense levels and the competitive advantages the

company derives from its Bermuda domicile."

96.    On October 30, 2000, after the close of trading, ANR issued a press release

announcing that its third quarter earnings had increased 21% over the prior year. The release

claimed that net income had increased to $10.9 million for the quarter, that "other" income

totaled $1.7 million, that $4.73 million in interest had been credited to policyholders' accounts,

that Funds Withheld at Interest equaled $1.453 billion, and that the Company still had total

unamortized deferred acquisition costs of $193 million (the bulk of which were attributable to

Transamerica).

97.    On November 14, 2000, the Company filed its Report on Form 10-Q for the third

quarter, which also reported that the Company had earned income on its Funds Withheld of

$18,735,000, creating a yield rate for the quarter of 5.16%. Just as in earlier financial statements,

ANR did not actually calculate and disclose the yield on the Funds, despite doing so for its own,

directly-held, investments. The 10-Q stated: "These consolidated financial statements should be

read in conjunction with the audited consolidated financial statements and notes thereto

contained in the Company's Form 10-K for the fiscal year ended December 31, 1999 and Form

10-Qs for the fiscal quarters ended March 31, 2000 and June 30, 2000," thereby incorporating by

reference the fraudulent 1999 10-K, the misleading reassurances that ANR's annuity product

42

carried little investment risk, and KPMG's false audit opinion.  Despite having erroneously

treated minimum interest payments as a reduction in liabilities rather than additional charges to

earnings, the Company also represented that liabilities under the annuity contracts had decreased

in part due to "benefit payments made by the Company under the reinsurance agreements."  Just

as in the 1999 10-K, ANR claimed, "The Company does not hold any derivatives and does not

engage in any derivative hedging activities, although it may do so in the future."

98.    The statements regarding ANR's third quarter 2000 results were materially false

and misleading for the reasons stated at ¶¶81-83 above and ¶¶214-255 below.  Additionally, as

eventually would be revealed, taking into account minimum interest payments, ANR had made

minimum interest payments of $588,066 that it had improperly failed to record as an expense,

and instead had recorded as a reduction in its liabilities to other policyholders.

99.    On October 31, 2000, ANR held a conference call to discuss its third quarter

results, at which ANR management expressed comfort with analysts' projections of earnings per

share growth in 2001 of 25%, or at least $2.05 per share for the year.  The day of the conference

call, ANR's share price rose from a closing price of $26.50 to a closing price of $27.56.  By

November 2, 2000, ANR's share price closed at $28.19.  J.P. Morgan commented on October 31,

2000, "We continue to think that the shares are attractive and reiterate our Buy rating and $32

price target."  On November 1, 2000, Prudential Securities reported, "In a nutshell, ALRE

[ANR] is a growth story in a sector with few other growth names.  Looking at a PEG (price to

earnings ratio divided by growth rate) of less than 0.7, ALRE is one of the most affordable

growth names in the financial services sector."

100.    On January 10, 2001, J.P. Morgan raised its share price targets on ANR,

commenting:

43

We believe Annuity and Life Re is well positioned in the life reinsurance market as a start-up Bermuda-based life reinsurer. As a Bermuda-domiciled insurer ALRE does not have to pay any corporate income taxes and, as a result, it can afford to offer more attractive pricing on reinsurance risks than many of its competitors. In addition, as a start-up reinsurer, ALRE has a clean capital base and does not have any exposure like that of many of its peers (i.e., Unicover, U.K. pension misselling, or health or HMO reinsurance).

101.    On February 12, 2001, after the market closed, ANR issued a press release, announcing "record results for quarter ended December 31, 2000." The Company reported net income of $13,450,000 for the quarter (of which $1.83 million consisted of "other" income), and net income of $40 million, or $1.46 per share, for the year. The report stated that ANR had credited $42.4 million in interest to annuity policyholders, Funds Withheld at Interest stood at $1.53 billion, and unamortized acquisition costs stood at $228.7 million. As later would be revealed, $1.243 billion of the Funds Withheld at Interest were attributable to Transamerica, and $161.4 million of the remaining unamortized costs were attributable to Transamerica. The Company would also later reveal that 39.6% of reported net income for 2000 was attributable to the Transamerica contract. Finally, ANR acknowledged that at least as far back as 2000, it was aware of the hefty IL Annuity fees that further undercut its earnings on the Transamerica contract.

102.    As later would be revealed, the earnings report was materially false and misleading, for the reasons stated at ¶¶81-83 above and ¶¶214-255 below. Moreover, as eventually would be revealed, ANR actually had made nearly $1.3 million in minimum interest payments that it improperly had failed to record as an expense, and instead had recorded as a reduction in its own liabilities to other policyholders.

103.    On February 14, 2001, Prudential Securities reported:

As we've said in the past, we continue to be of the mindset that ALRE is a growth story in a sector with few other growth names. Looking beyond insurance, companies with the potential to post 20%+ EPS growth rates are fading fast. We

44

remain strong believers in ALRE's ability to successfully execute its business plan.

104.    On March 15, 2001, ANR filed its Report on Form 10-K for 2000.  The Report repeated the financial information contained in the earnings report, noting that income for the year had increased by 6 cents per share over the prior year.  As in the 1999 10-K, the annuity segment and the life insurance segment were reported together, and the Company explained that:

> To date the Company has written of [sic] a number of ordinary life reinsurance and annuity reinsurance contracts. The Company views life and annuity reinsurance as one business segment and accumulates financial data for this segment when assessing performance and allocating resources. As the Company only has one business segment at the current time, management feels that the information presented in the balance sheet and statement of operations is sufficient to understand the business segment of the Company.

105.    The Report repeated, in substantially the same language, ANR's representations from earlier reports regarding the Company's underwriting guidelines, and further represented:

> Management of the Company has primary responsibility for preparing the accompanying consolidated financial statements and for their integrity and objectivity. *The consolidated financial statements included in this report were prepared in accordance with accounting principles generally accepted in the United States of America applied on a consistent basis.* The consolidated financial statements include amounts that are based on management's best estimates and judgements. Management also prepared the other information presented in the annual report and is responsible for its accuracy and consistency with the consolidated financial statements.

> Management of the Company has established and maintains a system of internal controls designed to provide reasonable assurance as to the integrity and reliability of the consolidated financial statements, the protection of assets from unauthorized use or disposition and the prevention and detection of fraudulent financial reporting.

106.    The Report claimed that:

> Deferred policy acquisition costs are subject to recoverability testing at the time of the policy issuance and loss recognition testing at the end of each accounting period. . . . For . . . investment-type products, deferred policy acquisition costs are amortized over the expected average life of the contracts as a constant percentage of the present value of estimated gross profits arising principally from investment results, mortality and expense margins and surrender charges based on

45

historical and anticipated future experience, which is updated at the end of each
accounting period. . . . The effect on the amortization of deferred policy
acquisition costs of revisions to estimated gross profits are reflected in earnings in
the period such estimated gross profits are revised.

107.    Additionally, the report stated that total income earned on Funds Withheld for the

year was $116,522,000, equating to a return on investments in the fourth quarter of nearly

14.5%. Such a dramatic increase over prior quarters' returns was only possible because IL

Annuity, who controlled the underlying assets, conducted an extraordinary (and selective)

liquidation of its portfolio, thus allowing a sudden recognition of capital gains on appreciated

investments that boosted the quarter's overall investment returns. IL Annuity's liquidation

caused a drastic increase in its realized and reported capital gains as compared to its reported

capital gains in surrounding quarters and years.

108.    Thus, because the strikingly higher investment performance was obtained through

the aberrational liquidation of portfolio assets, this short term improvement did not affect the

longer term trends, which showed that the interest owed policyholders under state law (after

management fees) consistently exceeded ANR's investment returns. As a result, this one-time

improvement in investment returns could not sustain the estimated gross profits on the life of the

Transamerica contract, which controlled the (inadequate) recognition of deferred acquisition

costs on the current year 2000 financial statements.

109.    Because of this drastic improvement in investment performance for the fourth

quarter, the ultimate overall yield for the Funds Withheld for the year was roughly 7.6%, just

barely above the 6.25% necessary to break even before considering the nearly $200 million in

deferred costs. Nonetheless, under the heading "Quantitative and Qualitative Disclosures about

Market Risk," the Report declared:

The annuity product line is generally regarded as interest sensitive as fluctuations
in the general level of interest rates may cause fluctuations in the results of

46

operations. ***The future earnings and cash flows of the annuity product line are
primarily dependent on earning a spread between the interest earned on the
supporting asset base, the interest rate credited to or priced into the liabilities
and the persistency of the underlying business. We believe the interest rate risk
associated with our annuity reinsurance product line is mitigated to a large
extent because of the product types reinsured and the modified coinsurance
structure of our reinsurance agreements.*** Additionally, actions taken by us and
the ceding company may further mitigate the effect of such market movements.
The model used by the Company indicates that ***a 100 basis point change in
interest rates would not have a significant impact*** on the net investment spread
earned by the Company as of December 31, 2000 or December 31, 1999.

110.    These statements were false and misleading because the fourth quarter investment

rate was clearly attributable to factors unrelated to the interest rate earned on the investment

portfolio, which existed largely of convertible bonds whose paid interest rates would not likely

change over this period.

111.    Additionally, these statements were false and misleading because actions by

neither ANR nor Transamerica could "mitigate" the investment shortfall for investment

decisions under IL Annuity's control.  Finally, due to the slim profit margins as a percentage of

ANR's assets and liabilities, a 100 basis point (1%) change in the investment return (i.e., $116

million in investment income) would have a dramatic effect on earnings, particularly if the

amounts paid to policyholders were ultimately determined under state minimum interest

guarantee laws.

112.    These statements were also false and misleading for the reasons stated at ¶¶81-83

above and ¶¶214-255 below.

113.    The Report claimed that:

Premiums for universal life and investment-type contracts are reported as deposits
to policyholders' account balances. . . .  Policy benefits and claims that are
charged to expense include benefit claims incurred in the period in excess of
related clients' account balances and interest credited to clients' account balances.

47

114.    This statement was false because, as described above, the Company was not recognizing the minimum interest guarantee payments as expense, despite the fact that such payments were in excess of the surrendering policyholders' account balances.  Instead, the Company was deducting such payments from its reported liabilities.  Nor was the Company recognizing as expense liabilities that had accrued (but were yet unpaid) to policyholders for its statutory minimum interest guarantee liabilities.

115.    The 10-K reported total Funds Withheld at Interest at year end 2000 to be $1.53 billion; as would eventually be revealed, $1.243 billion of this figure was associated with Transamerica.  The report also stated that total unamortized deferred acquisition costs were $228.7 million; later, it would be revealed that $160 million of these costs were associated with Transamerica.  The report did not disclose how much of the costs that had been amortized during the year was attributable to Transamerica.

116.    Just as in the 1999 10-K, ANR claimed, "The Company does not hold any derivatives and does not engage in any derivative hedging activities, although it may do so in the future."

117.    The 2000 10-K also included an audit opinion issued by KPMG, dated February 5, 2001, stating that ANR's 2000 and 1999 financial statements were presented in conformity with GAAP and that KPMG's audit was performed in accordance with GAAS:

> We have audited the consolidated financial statements of Annuity and Life Re (Holdings), Ltd. and subsidiaries as listed in the accompanying index. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule listed in the accompanying index.  These consolidated financial statements and financial statement schedule are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.
>
> ***We conducted our audits in accordance auditing standards generally accepted in the United States of America***.  Those standards require that we plan and

48

perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company and its subsidiaries as at December 31, 2000 and 1999 and the results of their operations and cash flows for the years ended December 31, 2000, 1999 and 1998 in conformity with accounting principles generally accepted in the United States of America.* Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

(Emphasis added)

118.   These statements were false for the reasons stated at ¶¶81-83 above and ¶¶214-255 below. In addition, KPMG's claim to have conducted its audit in accordance with GAAS was false because KPMG ignored the significant "red flag" of the drastic and anomalous fourth quarter increase in yield on the Funds Withheld at Interest, just in time to allow ANR to appear to break even for the year (without considering the deferred acquisitions costs). KPMG also ignored the additional "red flag" that ANR publicly claimed to charge benefit payments in excess of liability to expense, but in fact, ANR had not even collected the data from Transamerica -- and KPMG had not reviewed the data -- that would enable ANR to calculate the amount of such payments. Moreover, even the most cursory review of ANR's financial records would necessarily have disclosed to KPMG that ANR had not taken its obligations for minimum interest guarantees into account when reporting its liabilities.

119.   In sum, despite ANR's claim to charge liabilities in excess of policyholders' accounts as expenses, ANR did *not* record such liabilities as they accrued every quarter. ANR did not even *collect* the data necessary to record such liabilities when the policyholder claimed

49

benefits. Thus, ANR could not possibly have been recording such "excess benefits" as it claimed to do in its 2000 10-K. Despite this obvious falsity, KPMG issued a "clean" audit opinion.

120.    After the close of the market on May 1, 2001, the Company issued a press release announcing first quarter results. The release reported net income for the quarter of $11.72 million, a growth of nearly $4 million over the prior year. The release stated that Funds Withheld at Interest now totaled $1.494 billion, and unamortized deferred acquisition costs stood at over $233 million. The Company claimed to have credited $6.7 million in interest to policyholders' accounts, and reported $3.13 million in "other" income, which would only later be revealed to consist mainly of surrender fees from policies underlying the Transamerica contracts. This extraordinary level of surrender fees confirmed that the fundamental assumptions (e.g., relating to surrender rates, minimum interest guarantees, and investment returns) underlying ANR's outdated estimate of overall contract profitability were erroneous, that it would not earn the income necessary to continue to defer its acquisition costs for this contract. Thus, there continued to be no legitimate basis under GAAP for ANR's failure to recognize those capitalized costs immediately as an expense. The high number of surrenders also indicated that ANR's calculation of its incurred liabilities to policyholders was grossly inadequate.

121.    The next day, on May 2, the Company issued a short press release announcing the sudden retirement of its Chief Financial Officer, William Atkin. The entire text of the odd, apparently hasty release stated:

> Annuity & Life Re (Holdings), Ltd. reported on Wednesday that Chief Lawrence S. Doyle, CEO, stated that "Bill would like to spend more time with his family in sunny Florida next winter. We will certainly miss Bill, as he is one of the original five members of management who have been instrumental in building our franchise. He is likely to work for the company as a consultant to assist in the transition. We are now beginning a search for a new CFO."

50

122.    The release was so quickly drafted that it did not identify "Bill" as "Bill Atkin," and it identified CEO Doyle as "Chief Lawrence S. Doyle, CEO." Although the release did not even identify Atkin's termination date, SEC filings would eventually show that he officially left the Company on August 31, 2001.

123.    On May 14, 2001, the Company filed its Report on Form 10-Q for the first quarter of 2001, repeating the information contained in the earnings release. The Report also noted that the Funds Withheld at Interest had earned income of $18 million – which meant an annualized yield of only 4.8%, far below the minimum necessary to break even on the Transamerica contract, far below the 14.5% yield supposedly earned on the same assets in the prior quarter, and earned in a period where surrender rates had shot up dramatically. Just as in earlier financial statements, ANR did not actually calculate and disclose the yield on the Funds, despite doing so for its own, directly-held, investments. The Report did not reveal the sharp increase in surrender rates to investors, nor the extraordinary losses this portended for the Transamerica reinsurance contract over its life. Instead, the Report stated that: "These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Company's Form 10 K for the fiscal year ended December 31, 2000," thereby incorporating by reference the fraudulent 2000 10-K, the misleading reassurances that ANR's annuity product carried little investment risk, and KPMG's false audit report.

124.    Just as in the 1999 10-K, ANR claimed, "The Company does not hold any derivatives and does not engage in any derivative hedging activities, although it may do so in the future."

125.    The information contained in ANR's reports of its results for the first quarter of 2001 were materially false and misleading for the reasons stated in ¶¶81-83 above and ¶¶214-

51

255 below.  Additionally, as would later be revealed, ANR had made $1.6 million in minimum

interest payments that it had improperly failed to record as an expense, and instead had recorded

as a reduction in its liabilities to other policyholders.

126.    Also in May 2001, IL Annuity and Indianapolis Life – the companies that had

originally written the Visionmark policies that had been reinsured by Transamerica – were

merged into a larger insurance company known as AmerUs Group.  The merger was announced

with great fanfare, and, as part of the deal, the Indianapolis Life Chair, President, and CEO,

Larry R. Prible, was made a Vice Chair of AmerUs's Board of Directors, and a member of

AmerUs's "senior operating team."  However, on July 17, just two months after the merger,

AmerUs abruptly announced Prible's "retirement."

127.    Also in May 2001, and continuing through July 2001, newly-resigned CFO

William Atkin exercised virtually all of his stock options, and sold all of his stock, all at prices

near their Class Period (and historical) highs, ultimately reaping profits in excess of $2,250,000.

These facts, however, were concealed from the public, because the Company misreported insider

sales for 2001, only to correct its reports one year later.

128.    On May 22, 2001, Prudential issued a report on ANR rating it "Strong Buy," and

stating that first quarter results "were largely consistent with our expectations."  The report went

on to praise ANR's "disciplined underwriting approach," explaining that "[t]he initial business

strategy, which is in place today, employs an experienced underwriting team that uses

sophisticated actuarial and investment model techniques to select acceptable levels of

risk/return."

129.    After the report issued, ANR's share price rose from a closing price on May 22, 2001 of $29.60 to a closing price of $31.26 on May 23, 2001, on heavy trading volume. Within a week, on May 30, 2001, ANR shares closed at $34.55.

130.    After the close of trading on July 30, 2001, ANR issued a press release announcing earnings for the second quarter of 2001. The release announced an increase in operating income of 26% over the previous year, and boasted a net income for the quarter of $13.2 million. The release stated that "Underwriting and investment results were favorable." Funds Withheld at Interest were reported at $1.5 billion, with interest credited to policyholders' accounts reported at $4.5 million. Unamortized, deferred policy acquisition costs stood at $246 million, and "other" income – which the Company would shortly, finally reveal to represent drastic increases in policy surrenders — had risen to $4.64 million.

131.    The earnings report, coupled with ANR's imminent switch to the NYSE from its previous NASDAQ listing, had a drastic effect on ANR's share price. After closing at $35.06 on July 30, ANR's share price had risen to $36.20 by August 5.

132.    On July 30, 2001, A.M. Best upgraded the financial strength ratings of ANR's operating subsidiaries to A (Excellent), from the previous A- (Excellent) rating. A.M. Best announced, "The rating [] considers the group's favorable risk adjusted capitalization, financial flexibility and conservative approach to underwriting. In addition, the rating reflects the management team's experience and ability to leverage relationships with prominent life insurance and annuity writers by providing customized life and annuity reinsurance products through a disciplined underwriting approach."

133.    On August 13, 2001, ANR filed its Report on Form 10-Q for the second quarter of 2001. The Report repeated the information contained in the earnings announcement, and

53

reported that Funds Withheld at Interest had earned $14.56 million, reflecting a yield on the Funds of just 3.83%. Just as in earlier financial statements, ANR did not actually calculate and disclose the yield on the Funds, despite doing so for its own, directly-held, investments.

134.    Tellingly, however, in this 10-Q — issued after Atkin announced his retirement, after he divested himself of all of his ANR holdings, and only weeks before his official retirement --- the Company finally explained that its mysterious "other" income consisted mostly of surrender fees, and that surrenders had increased from the prior year. Separately, the 10-Q mentioned that ANR was "conducting a reinsurance audit of a reinsurance client company" and that the findings of the audit "may impact our operating results in a future period," but no further information about the facts precipitating the audit was given.

135.    Strikingly, this 10-Q, unlike the earlier 10-Q's, had a separate section titled "Quantitative and Qualitative Disclosures About Market Risk," but said only that "There have been no material changes since December 31, 2000," and directed investors to refer to the 2000 10-K's discussion of market risks. Thus, even more explicitly, ANR deliberately repeated the reassuring representation from the 2000 10-K that "[T]he interest rate risk associated with our annuity reinsurance product line is mitigated to a large extent because of the product types reinsured and the modified coinsurance structure of our reinsurance agreements" that it knew to be false.

136.    The second quarter 10-Q also stated, "These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Company's Form 10K for the fiscal year ended December 31, 2000 and Form 10-Q for the fiscal quarter ended March 31, 2001," thereby incorporating by reference the fraudulent 2000 10-K, and KPMG's false audit opinion.

54