137.    ANR's reported results for the 2001 second quarter were materially false and misleading for the reasons stated at ¶¶81-83 above and ¶¶214-255 below.  Moreover, it would later be revealed that, taking into account minimum interest payments, ANR had actually made $3.3 million in minimum interest payments, that it had improperly failed to record as an expense, and instead had recorded as a reduction in its own liabilities to other policyholders.

138.    For the first half of the year, ANR had claimed a total of $6 million of income on the Transamerica contract, even though the contract was actually generating losses, both with respect to unrecoverable acquisition costs, and with respect to ANR's unrecognized liability to policyholders for minimum interest guarantees.

139.    Three days after ANR filed the 10-Q, on August 16, 2001, Fitch affirmed its A rating on ANR's operating subsidiaries, and upgraded its outlook from "Stable" to "Positive." That day, the Company's shares reached their Class Period – and historical – high of $36.98.

**The Truth Begins to Emerge**

140.    Beginning in October 2001, ANR slowly began to trickle bits of information and half-truths about its actual financial performance and the state of its business to the investing public.  This information provided additional "red flags" to KPMG, highlighting items that KPMG needed to examine during its audits, and signaling to KPMG that it needed to force its audit client to restate its financial statements.  However, the full extent of the fraud continued to be withheld from investors.

141.    After the close of trading on October 25, 2001, ANR issued a press release announcing its results for the third quarter of 2001.  The release announced a loss for the third quarter of $39.9 million, reportedly reflecting losses from September 11, losses incurred on a life insurance contract from 1998, and a write-down of $24.7 million of deferred acquisition costs associated with "our annuity business."  The release gave no further information about the DAC

55

write-down except to quote Doyle as stating, "Unfortunately two of the programs written in our first year have resulted in a large loss." ANR stated that it would "pursue appropriate action to recover damages from the ceding company" with respect to its losses on the annuity contract. This announcement clearly advised KPMG that it needed to scrutinize the flawed factors used to determine the lifetime profitability of the annuity contract resulting in the $24.7 million write-down -- i.e., the Transamerica contract -- and whether flawed factors had been used in determining DAC amortization for earlier periods.

142.    The day after the announcement, ANR shares dropped from a closing price of $32.85 to a closing price of $24.01 on very heavy volume.

143.    On October 26, 2001, the Company held a conference call with analysts to discuss the quarter's results. As summarized in a second press release, on the call, Doyle projected earnings for 2002 of between $1.80 to $1.90 per share. Newly-hired CFO John Burke ("Burke") explained that "[t]he Company believes that there is a low probability of any future write-offs on the contract." At this time, however, the Company did not reveal that it had been forced to pay minimum interest guarantees on the contract for which it had not appropriately credited policyholder accounts (or recognized expense). More crucially, the Company did not reveal that it needed an overall effective return on its Transamerica investment portfolio above 6.25% to avoid losses. Instead, ANR represented to analysts that the problems were solely due to high surrender rates. For instance, on October 29, Bear Stearns reported the information it had received from ANR management:

> The company's $24.7 million DAC charge relates to a $1.1 billion block of annuities. ANR recognized that higher lapse rates have been depleting the asset base. When ANR reinsured it, the block averaged between one and three years old. It appears that agents have begun to aggressively exchange the products for teaser annuities that offer high first year crediting rates, which are enticing in a low interest rate environment.

56

144.    Other analysts expressed more doubt about ANR's explanations.  As Keefe,

Bruyette, & Woods reported on October 29, 2001:

> The $24.7 million DAC writedown was associated with a large block of fixed
> annuities that the company reinsured in 1998.  This block originally had deposits
> of $1.6 billion, but this has declined to approximately $1.1 billion.  The book
> *currently has a surrender rate of 22%*, well in excess of pricing expectations.
> Management has now determined that future revenues will probably not be
> sufficient to amortize the remaining DAC balance, and that a writedown is
> necessary to avoid the deferral of losses.  *This strikes us as a sudden and*
> *dramatic shift in the accounting for this business.  The company has been*
> *booking a significant level of profits, rather than losses, for this business*.  This
> means that the level of DAC amortization in prior quarters was so modest that the
> amortization, along with benefits and expenses, was covered while still providing
> for a significant profit in each period.  This stands in contrast to the revised view
> that an appropriate level of amortization against the prior DAC balance would
> generate material future losses, rather than profits.  *We're somewhat perplexed*
> *about how lapse assumptions could change so significantly in a short period of*
> *time, particularly since management now indicates that it has been concerned*
> *about poor persistency for two years.*

(emphasis added)

This announcement clearly advised KPMG to evaluate the historical surrender rates (and their

impact on ANR estimates) for the Transamerica contract as part of its audit procedures.  The

report (and conference call) included "red flags" that KPMG also should have noted indicating

that it was required, under GAAS, to evaluate and investigate the past accounting for the

Transamerica contract to determine if earlier issued financial statements needed to be restated (or

KPMG's earlier clean audit opinions needed to be withdrawn).

145.    Similarly, Prudential Securities stated on October 29: "Who Can You Trust?  The

magnitude of ANR's 3rd quarter loss may *draw into question management's ongoing*

*credibility*."  Also on October 29, Fitch Ratings issued a press release announcing that although

it was maintaining its A rating on ANR's operating subsidiaries, it was downgrading its outlook

from "Positive" to "Stable."

57

146.    After these reports issued, ANR's stock fell again, from a closing price on October 29, 2001 of $24.46 to a closing price of $22.65 on October 30.

147.    On November 14, 2001, ANR filed its Report on Form 10-Q for the third quarter of 2001.  Surrender fees for this quarter reached $5.513 million.  In addition to repeating the information contained in the earnings report, the 10-Q stated that Funds Withheld at Interest stood at $1.599 billion, and deferred policy acquisition costs (after the write-down) stood at $233 million.  The Company claimed to have credited $10 million of interest to policyholders' accounts, and to have earned $19,440,000 on its Funds Withheld at Interest – for an annualized yield for the quarter of 4.86%.  Just as in earlier financial statements, ANR did not actually calculate and disclose the yield on the Funds, despite doing so for its own, directly-held, investments.  By this time, KPMG was undeniably aware that, in light of the identified DAC write-down for the Transamerica contract, these disclosures were grossly inadequate under GAAP.

148.    Despite such low yields (and, in fact, as would later be revealed, the rate for the Transamerica contract alone – without counting other annuity reinsurance contracts – was far lower), the Company still repeated its statements from the second quarter 10-Q that "[t]here have been no material changes since December 31, 2000. Please refer to 'Item 7A: Quantitative and Qualitative Disclosures About Market Risk' in our Annual Report on Form 10-K."  Thus, the Company incorporated by reference its earlier false reassurance that "the interest rate risk associated with our annuity reinsurance product line is mitigated to a large extent because of the product types reinsured and the modified coinsurance structure of our reinsurance agreements."

149.    The third quarter 10-Q also stated "These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes

58

thereto contained in the Company's Form 10K for the fiscal year ended December 31, 2000 and Form 10-Q for the fiscal quarters ended March 31, 2001 and June 30, 2001," thus incorporating by reference the fraudulent 2000 10-K and KPMG's false audit opinion.

150.    ANR's earnings reports were false and misleading for the reasons stated at ¶¶81(b), (d)-(i), 82, above, and ¶¶214-255 below.  Moreover, as would later be revealed, ANR had actually made $4.4 million in minimum interest payments that it had improperly failed to record as an expense, and instead had recorded as a reduction in its own liabilities to other policyholders.

151.    Additionally, Doyle's earnings projections, and Burke's comment that the Transamerica contract would not require further write-offs, (representations that would be obvious to any auditor as requiring review and confirmation) were false and known to be false, because with the exception of a single quarter of suspiciously aberrational returns, the Transamerica contract had not once produced the yield necessary to avoid losses.  In fact, as would later be revealed, the third quarter 2001 write-off was calculated by projecting investment returns of 10% in future years on the convertible bonds underlying the Transamerica contract, even though the bonds had yet to yield such a high return.  In other words, ANR had avoided the immediate recognition of additional millions of dollars of deferred acquisition expenses only by assuming that the stock underlying the convertible bonds would appreciate and provide the returns necessary to reverse years of losses on this contract.  Nothing in the experience on the Transamerica contract, or in the information provided to ANR by its cedents, supported such an assumption.  Indeed, as ANR would eventually reveal, by the end of 2001, the market value of the convertible bonds had deteriorated by $23.5 million.  Again, the valuation of assets reported

at over $1 billion on the balance sheet under review, would necessarily come under scrutiny by an auditor performing any audit at all.

152.    On January 15, 2002, less than three months after Burke's assurance that further write-offs would not be necessary, (and during KPMG's annual audit for the 2001 financial statements) ANR announced that it would be taking further losses on the Transamerica contract, and lowered its earnings projections to $1.70 to $1.80 per share for 2002. In a press release listing Doyle and Burke as contacts, the Company announced a total charge to earnings for the quarter of $33 million, which recognized past losses incurred on the contract due to the minimum interest guarantee payments it had made earlier in the year, and established a "reserve" to account for additional liabilities due remaining policyholders for minimum guaranteed interest. Thus, by 2001 year end, ANR recognized a total of $57.7 in additional expenses for the Transamerica contract — losses which, as the Company would eventually reveal, completely wiped out all earlier-reported profits on the contract. This was the first time since the 1999 10-K that the Company had even mentioned the existence of minimum interest guarantees, and the only time the Company had disclosed that they affected the contract's profitability. It was also the first time that the Company acknowledged (tacitly) that it had failed to reserve (and recognize expenses) for such obligations and payments in its reporting of policyholder liabilities. Nonetheless, KPMG, in violation of GAAS, did not require ANR to restate its earlier misstated financial statements, nor did it take steps to withdraw its earlier false audit opinions.

153.    The Company also announced that it had contracted with XL Capital for an additional $10 million in insurance against future losses on the Transamerica contract. The release quoted Burke as explaining the reserves for future losses as "realistic," because "[o]ur estimate of the Company's exposure assumes the same lapse rates used to calculate our write off

60

of deferred acquisition costs in the third quarter of 2001." It would have been obvious to any auditor conducting any audit at all that this representation required review and confirmation.

154.    Burke's characterization of the adequacy of the reserves was materially false and misleading. First, the estimate of ANR's exposure announced after the third quarter was itself grossly understated. The high surrender rate trends and variances in investment spread assumptions that ultimately led to earnings charges exceeding $85 million were apparent beginning in June 1999, and required material changes to the amortization of the deferred costs years earlier. Moreover, as the Company (and KPMG) knew, but did not disclose, the reserves had been calculated by assuming a yield rate on the Transamerica convertible bonds of 10%, even though the bonds had performed nowhere near that level in the past, and the equity markets upon which such a robust return would depend were severely depressed.

155.    Market reaction was swift. The day after the announcement, on January 16, 2002, ANR stock tumbled from its previous closing price of $23.53 to a closing price of $19.51, hitting a 52-week low of $19.08 during the day. Standard & Poor's reacted by placing ANR's operating subsidiaries on CreditWatch with negative implications, and Fitch, likewise, placed ANR's subsidiaries on Rating Watch Negative. A week later, the stock had dropped to $17.12. Still, ANR's proffered explanation – that it had been given inaccurate information about lapse rates by Transamerica – assuaged market-watchers. For instance, J.P. Morgan securities stated on January 16, 2002:

> Annuity&Life Re has only written one new annuity contract in each of the last two years and has a total of three annuity contracts on its books. The company has not experienced high lapses in the other two contracts and their profitability appears to be holding up.
>
> Management is pursuing legal action that may result in a reversal of some of the related charges but this could take up to 18 months and the amount of such a reversal is uncertain. The company's position in the legal action is that there was

excessive churning in the contract and lapse trends have deviated significantly from the information that ANR was initially given.

The life insurance pipeline is still quite strong. The company expects life premiums to reach approximately $230 million in 2001, slightly short of our $240 million estimate but up over 50% from 2000. . . .

We reiterate our Market Performer rating and are lowering our 12-month price target from $24 to $22, which assumes a multiple of 13 times our 2002 estimate.

These explanations were red flags to KPMG that the Transamerica contract required an extensive audit review, and that ANR's earlier filed and audited financial statements likely needed to be restated. Despite being on notice that ANR was pursuing legal action against Transamerica, KPMG took no steps to closely evaluate or confirm the factors used in the accounting for the Transamerica contract.

156.    ANR's failure to disclose its true situation (and KPMG's endorsement of this omission through issuance of yet another clean audit opinion) left many analysts in the dark about the extent of the problem and the extraordinary risk that ANR had assumed — and failed to disclose — when the contract was first assumed. For instance, on January 16, 2002, Bear Stearns continued to stick to its earlier "Neutral" rating of the stock, and reported:

Our understanding is that these annuities, which contain LMIGs [lifetime minimum interest guarantees], provide crediting rates based on the performance of the underlying assets, which are primarily in convertible bonds. *When the performance of the invested assets falls short of a given threshold, the policyholder is credited with the minimum guaranteed interest rate, which we suspect to range between 2.5%-3.5%.*

(Emphasis added)

Similarly, Keefe, Bruyette, & Woods reported on January 17, 2002:

The newly announced charge stems from the fact that assets allocated to a convertible bond fund option in the contract have not generated a sufficient return to fund minimum interest rate guarantees, *which are 3.5% for most of the policyholders.*

(Emphasis added)

62

157.    Additionally, although ANR revealed that its problems stemmed from the poor performance of convertible bonds, it did not disclose that such bonds represented 70% of its Transamerica portfolio.  ANR thus failed to disclose the degree to which its profits were dependent on the equity markets, leaving analysts to conclude that ANR's reserving had been conservative.  For instance, on February 8, 2002, Bear Stearns reported on the situation favorably, stating, "In our view, the assumptions used by ANR to determine its DAC write-down in 3Q01 and the latest 4Q01 charge leaned toward the conservative side." Also on February 8, Fitch affirmed its A rating on ANR's operating subsidiaries, although it changed its outlook to Negative from Stable, and A.M. Best announced that it was reviewing its ratings of ANR's operating subsidiaries.

158.    On March 1, 2002, ANR announced that it would file a shelf registration with the SEC to raise $200 million in debt offerings.  The registration represented ANR's first attempt in its existence to raise funds through debt rather than equity.

159.    On March 11, 2002, the Association of Insurance and Financial Analysts held its annual conference in Naples, Florida.  At the conference, Doyle represented that despite the recent write-downs, he still expected ANR to grow by 20% from its then-current base.  He also told attendees that the Company's reserves for the Transamerica contract were sufficient.

160.    On March 28, 2002, the Company filed its Report on Form 10-K for 2001.  The Company explained that of the charges it had taken in the fourth quarter, approximately $20 million, related to reserves for future minimum interest payments in addition to the $10 million worth of coverage it had purchased from XL Capital to protect against future losses.  The Company represented that:

> The liability for the annuity reinsurance is included on our Balance Sheet as
> Interest Sensitive Contracts Liabilities, and includes a provision for minimum

63

guarantees expected to be paid in the future. ***While management has made what it believes to be adequate provision for future costs based upon reasonable assumptions about future investment performance*** and surrenders, the provision is an estimate.

The 10-K also explained that ANR was pursuing an arbitration claim against Transamerica "based upon certain actions and/or omissions by the cedent that we assert have deprived us of the benefit of this reinsurance transaction."

161.    This 10-K differed strikingly from the Company's earlier reports, most notably in the section titled "Quantitative and Qualitative Disclosures About Market Risk." In glaring contrast to the Company's earlier cavalier representations that the Company had little to fear from changing interest rates or market fluctuations with respect to its annuity products, this time the Company finally acknowledged,

> "The annuity product line is generally regarded as market and interest rate sensitive. . . . All assets supporting interest sensitive liabilities are managed by the Company's cedents. . . . If the assets managed by the cedents do not accumulate at rates sufficient to meet state mandated minimum guarantees prior to the policyholder surrendering the policy, the Company could be forced to fund these minimum guarantees resulting in losses to the Company."

162.    This revised statement of risk served as an admission that earlier representations had been false. The terms of the Transamerica contract had not changed, and thus, the risks associated with that contract had not changed since the Company's earlier reports had been filed. Nonetheless, in violation of GAAS, KPMG did not require ANR to restate its earlier filed, and false, financial statements.

163.    ANR also substantially repeated the language from prior 10-Ks regarding its underwriting methods. However, in a telling change from the prior 10-Ks, ANR made a significant alteration. Where prior 10-Ks had stated "Pricing of our reinsurance products is based on our sophisticated actuarial and investment models," the new 10-K deleted the word

"sophisticated," and represented only that "Pricing of our reinsurance products is based on actuarial and investment models. . . ."

164.    In the 2001 10-K, The Company reported unamortized deferred acquisition costs were $230 million (later, it would be reveal that $102.3 million of this reported DAC was due to the Transamerica contract, even after the DAC write-downs from the third quarter). With respect to deferred costs, the Company represented:

> Deferred policy acquisition costs are *subject to recoverability testing at the time of policy issuance and loss recognition testing at the end of each accounting period. . . .* For universal life and investment-type products, *deferred policy acquisition costs are amortized* over the expected average life of the contracts as a constant percentage of the present value of estimated gross profits arising principally from investment results, mortality and expense margins and surrender charges *based on historical and anticipated future experience, which is updated at the end of each accounting period.*

165.    The Company also reported Funds Withheld at Interest totaling $1.488 billion, of which $962 million was allocable to the Transamerica contract. The Company also reported income on the Funds of $71 million, which reflected a yield rate of only about 4.7%. Moreover, as the Company knew, but did not disclose, yield on the Funds associated with the Transamerica contract alone was only 3.94%. Just as in earlier financial statements, ANR did not actually calculate and disclose the yield on the Funds, despite doing so for its own, directly-held, investments.

166.    The 2001 10-K also stated:

> Profitability of the annuity reinsurance line is primarily dependent on earning a spread between the interest rate earned on the assets under management and the interest rate credited to the policyholder.

The 2001 10-K further represented, as its basis for failing to report its life segment and annuity segment separately:

> The Company writes a number of ordinary life reinsurance and annuity reinsurance contracts. The Company views life and annuity reinsurance as one

65

business segment and accumulates financial data for this segment when assessing performance and allocating resources.

167.    The 2001 10-K disclosed that, for the full year, the Company had paid $5.12 million in dividends.

168.    The 2001 10-K also stated:

Management of the Company has primary responsibility for preparing the accompanying consolidated financial statements and for their integrity and objectivity. *The consolidated financial statements included in this report were prepared in accordance with accounting principles generally accepted in the United States of America applied on a consistent basis.* The consolidated financial statements include amounts that are based on management's best estimates and judgements. Management also prepared the other information presented in the annual report and is responsible for its accuracy and consistency with the consolidated financial statements.

Management of the Company has established and maintains a system of internal controls designed to provide reasonable assurance as to the integrity and reliability of the consolidated financial statements, the protection of assets from unauthorized use or disposition and the prevention and detection of fraudulent financial reporting.

169.    Additionally, the 2001 10-K incorporated KPMG's audit opinion, dated February 11, 2002. The opinion stated that ANR's 2001 and 2000 financial statements were presented fairly, in conformity with GAAP, and that KPMG's audit was performed in accordance with GAAS:

We have audited the consolidated financial statements of Annuity and Life Re (Holdings), Ltd. and subsidiaries as listed in the accompanying index. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule listed in the accompanying index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

*We conducted our audits in accordance with auditing standards generally accepted in the United States of America.* Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial

66

statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company and its subsidiaries as at December 31, 2001 and 2000 and the results of their operations and cash flows for the years ended December 31, 2001, 2000 and 1999 in conformity with accounting principles generally accepted in the United States of America.* Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

(emphasis added)

170.    The 2001 10-K functioned as only a partial, and still inaccurate, disclosure, while simultaneously contributing to and reinforcing the fraud on the investing public for the reasons stated at ¶¶81(b),(d),(f-i), above and ¶¶214-255 below.  For example:

a.    The Report did not reveal that the management fees imposed on policyholders on the Transamerica contract meant that minimum interest guarantees would cause additional losses unless the Funds Withheld at Interest performed at a rate well above 6.25%;

b.    The Report represented that reserves for future losses were adequate, and based on reasonable assumptions, when in fact the assumptions of 10% returns on convertible bonds bore no resemblance to their actual performance thus far;

c.    The Company did not properly revisit and adjust its DAC amortization each quarter to account for historical experience, and in fact had based its DAC write-downs on assumptions that were inconsistent with historical experience, including the assumption of a 10% return on convertible bonds;

d.    The Company did not reveal that the convertible bonds supporting the Transamerica contract, that had failed to perform to expectations, represented 70% of that portfolio;

67

      e.          The Company still failed to segment and separately report its revenues, expenses, and profits for its annuity and life reinsurance businesses.

171.    Thus, KPMG's assurances that the financial statements in the 2001 10-K were presented fairly in accordance with GAAP, and that its own audit was conducted in accordance with GAAS, were false for the reasons stated at ¶¶81(h-i), 214-255. By this time, because of ANR's partial disclosures with respect to its minimum interest guarantee payments and DAC write-offs, KPMG undeniably knew it had to closely evaluate and confirm the factors used in the accounting for the Transamerica contract. Thus, KPMG knowingly or recklessly failed to follow GAAS and falsely represented that ANR's financial statements were presented fairly in accordance with GAAP.

172.    After the close of trading on April 23, 2002, ANR issued a press release announcing its earnings for the first quarter of 2002. Although the Company admitted that the Transamerica contract would not generate further income, the Company did not disclose that losses had been incurred, or provide the historical performance factors from which these losses could be derived. In a conference call with analysts on April 24, 2002, Burke explained that going forward, the Company would be reporting its results for the annuity segment, and the life segment, separately. As part of the explanation for the change, Burke explained, "Our belief is that this type of presentation is far more meaningful and informative to you. It is also the basis upon which Larry monitors results." Both Doyle and Burke affirmed that the reserves set up for future policyholder payments on the Transamerica contract were reasonable. Doyle stated, "We think we're well-reserved on the annuity contract at this point as we made significant provisions last year for that contract." Burke agreed, telling one analyst:

> When we set up the reserve in the end of the year '01, we did it with the intention that we'd have the multi-year horizon, and the reason that we purchased the XL

68

stop loss cover was to provide a corridor for any volatility in the underlying securities. . . . . [A]s we sit here today, we are comfortable with what we have.

173.    Continuing with the fraudulent concealment of the true extent of the problems with the Transamerica contract, Doyle reinforced the impression that it was only the Company's failure to meet minimum interest guarantees of 3% — and not the management fees on top of that – that were responsible for the losses.  When one analyst asked whether the Company would be seeking new business reinsuring annuity contracts, Doyle responded:

> Effectively, as you know, under State statutes in the US, the contracts have a minimum guarantee of 3% which the policyholder deserves long term.
> Effectively you've gotta make your spread over and above that *which means you've gotta make five and a half percent roughly*, which is without much risk in terms of the investments you put your money into, so it doesn't give you much of a leeway for any error.  So effectively we have not marketed ourselves at all in that business, you know, for 6 months.

This explanation suggested that 3%, and only 3%, represented ANR's minimum-interest guarantee exposure on the Transamerica contract.  In fact, in many states, the minimum interest guarantee was 3.5%, and payable on the entirety of the policyholder's premiums, regardless of any management fees assessed by IL Annuity.  Thus, ANR was responsible for payments of 6.25% to satisfy the minimum interest requirements, even before allowing for the amortization of its own deferred costs.

174.    Finally, in the course of the call, Burke additionally told analysts, "As we discussed before, our largest annuity contract which represents 62% of our annuity assets is expected to break even going forward."  Doyle then stated, "Our plan for the year should deliver a $1.40 to $1.35 per share."

175.    On May 15, 2002, ANR filed its Report on Form 10-Q for the first quarter of 2002.  The 10-Q repeated ANR's earlier representation that net income for the quarter had been $8.245 million, and disclosed that unamortized, deferred costs stood at $242 million, while

69

Funds Withheld at Interest stood at $1.478 billion. Income earned on the Funds for the quarter totaled $18.547 million, thus demonstrating a yield of only 5% – and even that figure included the yields on assets from other annuity contracts that performed significantly better than the Transamerica assets. Just as in earlier financial statements, ANR did not actually calculate and disclose the yield on the Funds, despite doing so for its own, directly-held, investments. The Company reported surrender fees of $3.9 million.

176.    Additionally, the first quarter 10-Q stated "These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Company's Form 10-K for the fiscal year ended December 31, 2001," thereby incorporating the fraudulent 2001 10-K and KPMG's false audit opinion.

177.    ANR's reported results for the first quarter of 2002 were materially false and misleading for the reasons stated at ¶169.

178.    Additionally, ANR now admitted that: (1) Doyle regularly "monitored" ANR's financial results (¶171), and (2) the Company's earlier representations that life and annuity constituted a single segment of business were simply false.

179.    Notwithstanding ANR's repeated representations that it was "comfortable" with reserves, and that the reserves had been established with "reasonable" assumptions, on July 25, 2002, after trading had closed, ANR issued a press release announcing another write down of $24 million in acquisition costs associated with the Transamerica contract, resulting in losses for the second quarter of over $20 million. The Company attributed the write down to "[r]ecent poor performance in financial markets" that caused ANR to "reevaluate its previous assumptions about future investment performance." The release went on to represent:

> *As a result of the continuing significant decline of financial markets, the assets underlying the Company's annuity reinsurance contract with Transamerica Re*

70

*have not achieved the assumptions utilized in estimating the 2001 charge*. The Company has reevaluated the assumptions utilized in its fourth quarter charge, and will record additional charges associated with this contract of $24 million in the second quarter of 2002.

Larry Doyle, CEO of Annuity & Life Re commented, "*It's unfortunate that the financial markets continued to deteriorate through the first six months of 2002*, and we have to record additional charges on this contract."

(emphasis added)

180.    The release also announced that the Company would restate earlier financial results going back through the first quarter of 2001, to implement the accounting change for embedded derivatives, FAS 133. The Company explained that it held embedded derivatives through the "annuity reinsurance agreements, which are standard industry modified coinsurance agreements or coinsurance with funds withheld agreements." In fact, as the Company would later reveal at the end of the Class Period, despite its earlier claims not to hold embedded derivatives, that its earlier statements had been false: "Because of the nature of the assets underlying our Transamerica contract, which are roughly 67% convertible bonds, the bifurcation and separate accounting for the embedded derivatives contained in this contract would add significant volatility to our reported results." Despite the intensive audit review that is necessarily a part of such a restatement, KPMG, in violation of GAAS, still did not require ANR to correct its financial statements for the misstatements of income and policyholder liabilities associated with the Transamerica contract, nor did KPMG take steps to withdraw its earlier false audit opinions.

181.    The next day, on July 26th, ANR shares plunged from their previous closing price of $12.87 to a closing price of $6.30, on extremely heavy trading volume. All three ratings agencies lowered ANR's operating subsidiares' ratings to A- from A.

182.    Despite the announcement, however, the market still was not aware of the full truth, because ANR still had not revealed that the yields on its investments were not adequate to

71

fund the liabilities due to policyholders under state law (i.e., 6.25%), and that it was relying upon

hoped-for appreciation in the values of the stocks underlying its convertible-bond investments in

order to avoid losses on the Transamerica contract. For instance, Bear Stearns issued a "Buy"

recommendation on July 29, 2002, explaining:

> Most of these fixed annuity contracts were written around 3Q98 [third quarter of
> 1998] and offer a guaranteed minimum crediting rate of 3.5%. According to
> management, most of these contracts developed lifetime minimum interest rate
> guarantee (LMIG) exposure for ANR at 2000 year-end/beginning 2001. ***Hence,
> ANR's LMIG exposure, which resulted from the underlying convertible bond
> performance falling below the guaranteed 3.5% compound annual return,
> began at approximately the start of 2001.***

(emphasis added)

In fact, as ANR would eventually reveal, minimum interest payments had stretched back as far

as 1999, and it would have to restate its earnings as far back as early 2000 for its earlier failure to

recognize an expense for these payments.

183.    After trading closed on July 29, 2002, ANR apprised the market that it would be

delaying its earnings release for the second quarter of 2002, because both the Transamerica

losses and the FAS 133 restatement were "still being reviewed by the Company's auditors"—

*i.e.*, KPMG. Within the week following the announcement, ANR shares dropped from a closing

price of $8.05 of July 29 to a closing price of $6.99 on August 6.

184.    On August 15, 2002, ANR issued a press release announcing second quarter

results, and filed its Report on Form 10-Q for the second quarter of 2002. Both documents

explained that because SEC review was still pending, the 10-Q could not be certified by the

Company's accountants. The Company announced that the total write-down for the second

quarter was $24,796,000, and Doyle was quoted in the press release as stating, "It is unfortunate

that the recent poor performance of the convertible bond market has resulted in an additional

charge on our largest annuity contract." The 10-Q also announced that, in addition to the

72

restatements for FAS 133, the Company would be reclassifying the "reserves" for future minimum interest payments that it had established in 2001 as additional write-downs of deferred costs. This change in classification resulted in further restatements of prior results, although the change did not have an effect on the amount of the total reported losses for 2001. In fact, in light of the overall lack of profitability of the Transamerica contract, accrued minimum interest obligations and high surrender rates, ANR needed to both write-down its deferred costs and increase its liability reserves (and recognize the related expense), and yet this step was not taken. Nor did KPMG require ANR to restate its misstated financial statements for 2000.

185.    The 10-Q finally disclosed to the market the unrealistic assumptions that had been used when calculating the losses in 2001, explaining that:

> In connection with our write down of deferred acquisition costs for 2001, we assumed that convertible bonds, which comprise 70% of the portfolio of invested assets managed by the ceding company under our largest annuity reinsurance contract, would produce an annual investment return of 10% for calendar year 2002, and 8% thereafter. . . . Although management believed that these estimates were reasonable when made, continuing poor equity market performance and slightly higher mortality rates during 2002 required us to revise our estimates of the impact of future minimum interest guarantee payments on profits arising from our largest annuity reinsurance contract, resulting in the additional $24,796,000 write off of deferred acquisition costs during the second quarter of 2002. In estimating the amount of this additional write off, we considered actual investment results achieved by the convertible bonds in the portfolio of invested assets for the first half of 2002, **and assumed an annual investment return of 0% on convertible bonds for the remainder of 2002, with an 8% return assumed for 2003 and thereafter**.

(emphasis added)

186.    The effect of ANR's sudden projection of a zero-percent return for the second half of 2002, from its former projection of a 10% return for the first half of the year, was to create an assumption of a 5% return for all of 2002, a return that was far closer to ANR's actual experience in 2002 (4.5% return) than the 10% projection had been. In other words, for the past six months, ANR had assumed a return on its convertible bonds of twice the actual return, and

73

then had compensated for the overestimate by assuming a zero-percent return for the rest of the year. Despite these obviously pie-in-the-sky projections, however, in order to manipulate and inflate its financial reporting, and thus its stock price, ANR -- with KPMG's approval --was still calculating its projections based on an assumption of an 8% return in 2003 and later years, a return it had yet to experience.

187.    ANR also revealed that surrender rates had been, and continued to be, shockingly high – by year end 2001, surrender rates had reached an alarming 26%, and that surrender rates had continued to increase in 2002, requiring the Company to increase its projected surrender rate to 28% for the full year.

188.    The Report also disclosed that surrender fees had reached $6.16 million – which was the largest quarterly figure yet – and that the Funds Withheld at Interest had a yield rate for the first half of the year of 5.14%. For the first time, ANR actually directly reported the yield on the Funds, without forcing readers to perform calculations to determine the yield. Finally, the 10-Q disclosed that the Company had not yet written down the complete balance of the acquisition costs associated with Transamerica, and thus had not yet recognized those costs as unrecoverable. Instead, capitalized Transamerica acquisition costs remained on balance sheet at $53 million.

189.    The Report stated that Citibank was now seeking ANR to post security of $89 million for a letter of credit it had issued. The letter of credit was being used as collateral for ANR's reinsurance agreements, because many of its primary-insurer clients required such collateral as a matter of state law. ANR acknowledged that it would have to raise equity capital in order to meet Citibank's demands. As the 10-Q explained:

> *During July 2002, following our announcement of our intention to write down deferred acquisition costs on our largest annuity reinsurance contract, three*

74

*rating agencies reduced the financial strength ratings of each of our operating subsidiaries.* . . . These downgrades in our ratings, together with Citibank's request that we secure our outstanding unsecured letters of credit and our general need to satisfy the collateral requirements of our ceding companies, will require us to raise additional capital. *If we are unable to raise such additional capital, our ability to write new business will be limited and the historical growth rates we have achieved since commencing operations in 1998 will likely not be achieved in future periods.* There can be no assurance that we will be able to raise additional capital on terms that are acceptable to us that will allow us to maintain our current book of business or grow that business in the future.

(emphasis added)

190.    The 10-Q also stated that, apart from the pending restatement due to FAS 133, "These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Company's Form 10-K for the fiscal year ended December 31, 2001," thereby incorporating by reference the fraudulent 2001 10-K and KPMG's false audit opinion.

191.    Despite the additional disclosures, ANR's financial reports still failed to reveal the full truth, for the reasons stated at ¶ 169:

a.       ANR had not disclosed that it needed a yield of more than 6.25% on its Transamerica Funds Withheld at Interest in order to avoid further losses;

b.       ANR had not disclosed that, although the total yield on the Funds was 5.14%, the Transamerica Funds were performing substantially less well, and the figure was skewed because of better performances on other annuity reinsurance contracts that could not be used to offset Transamerica losses. Specifically, as ANR would eventually reveal, the Transamerica assets produced a yield of only 3.8% for the first nine months of 2002;

c.       ANR still had not fully written down its acquisition costs associated with the Transamerica contract as unrecoverable, despite the fact that with the

75

exception of a single quarter, the Funds had never performed as necessary to avoid losses during the Class Period.

192.    In a conference call with analysts the next day, an analyst asked whether there were likely to be further surprises in store.  In response, Doyle stated, "[T]his [Transamerica] has become a very small contract, and we think we have given full and detailed disclosures so people have a better handle on what it is and how it's been reserved."  Burke added: "[T]he item that has created the most volatility for us is the Transamerica contract, and I think we have provided some fairly good fences for you folks to put a ring around what kind of exposure you have got there.  It is our view that the markets are drastically overreactive to it."

193.    On September 12, 2002, the Company announced that Doyle would be immediately resigning from the Company, and that Hammer and another member of the Board of Directors would head a "Transition Committee" to manage the Company until a new CEO could be found.  In late September and early October, both Standard & Poor's and A.M. Best downgraded their ratings on ANR's operating subsidiaries.

194.    On November 5, 2002, ANR announced that it would delay its report of third quarter results.  No explanation was given, but three days later, on the morning of November 8, 2002, ANR announced that its arbitration claim against Transamerica had been denied.  That day, the stock closed at $3.64, down from its previous closing price of $4.40.  On November 12, 2002, ANR announced that it would delay reporting its financial results for the third quarter of 2002 due to "ongoing discussions with the Staff of the Securities and Exchange Commission regarding the Staff's accounting review of the Company's prior filings."

**More Revelations to the Market**

195.    On November 19, 2002 after the close of trading, ANR issued a press release with the following text:

76

Annuity & Life Re (Holdings), Ltd. (NYSE: ANR) (the "Company") today announced that, *in connection with its ongoing discussions with the Staff of the Securities and Exchange Commission (the "SEC") regarding the Staff's review of the Company's prior public filings, the Company will restate its financial statements for the fiscal years ended December 31, 2000 and 2001* . . . . [B]ased on information now in the Company's possession, portions of the $33,000,000 charge will be allocated across certain prior quarters. *The restatement of the Company's financial statements for the fiscal year ended December 31, 2000 will recognize approximately $2,800,000 of minimum interest guarantee payments made during that year that the Company was not made aware of until 2002.* These payments will also impact the amortization of the Company's deferred acquisition costs. The restatement of our net income for the fiscal year ended December 31, 2000 is not expected to reduce our reported net income of $39,000,000 by more than three percent. The Company also intends to restate the financial statements included in its Forms 10-Q filed for the quarters ended March 31 and June 30, 2002.

(emphasis added)

196.    On that day, the Company also filed a Report on Form 8-K with the SEC, which finally revealed the nature of the risks it had always faced on the Transamerica contract:

> We are [] subject to investment risk based on the difference between the interest rates earned on the investments managed by us or our ceding companies and the credited interest rates paid under policies reinsured by us. . . . Significant declines in the financial markets generally also increase our investment risk, because the return we receive on our assets may not be sufficient to fully offset the cost of benefits due under certain reinsured policies.
>
> * * *
>
> Persistency or lapse risk is the risk that policyholders maintain their policies for different periods of time than expected. This includes policy surrenders and policy lapses. Surrenders are the voluntary termination of a policy by the policyholder, while lapses are the termination of the policy due to non-payment of premium. Surrender and lapse rates that are higher than what we assumed when pricing a contract can cause us to increase the rate of amortization of our deferred acquisition costs for the annuity policies and certain types of life insurance that we reinsure, which would adversely affect our results of operations. If the actual surrender and lapse rates remain too high for too long, as has been the case with our annuity reinsurance contract with Transamerica Occidental Life Insurance Company, we may conclude that the contract could be unprofitable over its expected lifetime, and we could be required to write down our deferred acquisition costs. Surrenders also usually involve the return of the policy's cash surrender value to the policyholder, which reduces the asset base on which we earn investment income and, in some cases, premiums. In addition, with respect to

77

our Transamerica contract, if a surrendering policyholder is entitled to a guaranteed minimum interest rate on his or her invested premiums, we will be required to pay our proportionate share of any shortfall between that guaranteed amount and the actual value of the policyholder's account. We have been required to make significant minimum interest guarantee payments under this contract, as discussed below.

* * *

Under our Transamerica annuity reinsurance contract, the minimum interest guarantee provisions take effect when the policyholder dies, his or her policy annuitizes or his or her policy is surrendered. ***Our aggregate minimum interest guarantee exposure equals our proportionate share of the excess of each policyholder's premiums deposited compounded at the minimum guarantee interest rate over the policyholder's actual account value. This excess is calculated after expenses are deducted from the gross investment returns and such expenses generally accrue at a rate of approximately 2.5% of the assets annually.*** Our minimum interest guarantee exposure is calculated on a policyholder by policyholder basis. The amount by which the value of certain policyholder accounts exceeds the minimum guarantee amount does not offset our exposure to the amount by which the value of other policyholder accounts is less than the minimum guarantee. . . . ***Our minimum interest guarantee exposure can increase during any period in which the actual investment performance of the underlying assets less expenses deducted from the gross investment returns lags the minimum guaranteed interest rate.***

(emphasis added)

197.    Although ANR at this time reported that expenses accrued at a rate of 2.5%, it would later reveal that expenses charged to policyholders actually accrued at a rate of 2.75%.

198.    The Company explained the details behind the Visionmark policies, including how policyholders could choose particular investment strategies, and reported:

Our largest annuity reinsurance contract, which was effective as of September 30, 1998, is with Transamerica Occidental Life Insurance Company. The contract is a retrocessional reinsurance arrangement covering VisionMark fixed annuity products issued by IL Annuity and Insurance Company. ***Since the middle of 1999, the surrender rate of the VisionMark policies has been higher than we had anticipated when pricing the reinsurance contract.***

(emphasis added)

78

199.    For the first time, ANR disclosed the degree to which the Transamerica Funds Withheld at Interest, considered alone, had underperformed.  Specifically, ANR admitted that for the first nine months of 2002, Transamerica Funds had yielded only 3.8%, as compared to a yield rate of 5.8% for Funds Withheld generally.  For the first time, ANR also revealed that, despite its earlier representations that it had, each quarter, revised its assumptions based on "historical experience," it had not altered the assumptions underlying the Transamerica contract until the third quarter of 2001:

> [D]uring the third quarter of 2001 *we initiated a review of the recoverability of the deferred acquisition costs associated with this contract* utilizing revised assumptions for expected future returns on invested assets and persistency rates.

(emphasis added)

200.    In fact, the Company revealed the composition of the assets underlying the Transamerica portfolio, and showed that the convertible bonds, which were carried on the books as having a value of $558,874,974, had deteriorated to the point where their market value was only $512,621,786 — a loss of *$46 million*, or 8.3%.  Similarly, IL Annuity's high yield investments, carried on the books at $41,097,061, were now only worth $36,312,346.

201.    The Company explained that it would be required to restate all of its financial reports, going back through the first quarter of 2000, to properly account for its minimum interest payments over the past two years, and for its failure to timely write-down its deferred acquisition costs associated with the Transamerica contract.  As the Company explained, it had never before disclosed to the market that it had been making minimum interest payments throughout 2000, and it disclosed such payments for 2001 only in the fourth quarter of that year, requiring it to reallocate those payments across prior quarters:

> [W]e are in the process of restating our financial statements to allocate a portion of the charge recorded in the fourth quarter of 2001 across prior periods and we may reallocate a portion of the charge recorded in the third quarter of 2001 across

79

prior periods as well. *The restatement of our financial statements for the year ended December 31, 2000 will also recognize approximately $2,800,000 of lifetime minimum interest guarantee payments made in that year.*

\* \* \*

*During 2001, we paid approximately $13,500,000 under our annuity reinsurance contract with Transamerica to cover our proportionate share of the shortfall that arose because the net investment returns on the assets related to these policies substantially underperformed the minimum interest guarantees* for surrendered policies. In addition, in the fourth quarter of 2001, we recorded a charge of approximately $19,500,000 related to expected future minimum interest guarantees. *The $13,500,000 expense for minimum interest guarantees for the year ended December 31, 2001 is comprised of payments of $1,600,000, $3,300,000, $4,400,000, and $4,200,000 with respect to the first, second, third, and fourth quarters of 2001, respectively.*

(emphasis added)

202.    Unbelievably, ANR admitted that for most of the Class Period, it *had not even possessed* much of the basic data needed to calculate the minimum interest liabilities (and payments) it was required, under GAAP, to recognize and report in its financial statements. This information was also obviously critical for review by KPMG in performing an audit under GAAS. Specifically, ANR stated:

> We have received monthly settlement reports from Transamerica since the inception of the contract, but those reports did not disclose minimum interest guarantee payments as a separate line item. Instead, the minimum interest guarantee payments were included as a very small percentage of the "Total Benefits Paid" line item on the settlement reports. We reviewed the monthly settlement reports received from Transamerica and analyzed policyholder surrenders and settlements, as well as the performance of the investments underlying our obligations under the contract. In addition, monthly and quarterly conference calls were typically held with Transamerica to discuss significant developments under the contract, as well as mutually agreed upon plans for future management activities relating to the contract. These settlement reports, together with our supplemental analysis and discussions with Transamerica, formed the basis for reporting financial results under the contract. *As is customary in the reinsurance industry, particularly for retrocessionaires, we relied on Transamerica and IL Annuity to monitor investment performance, surrenders and other activity under the contract and advise us of trends and developments, including whether minimum interest guarantee payments were being made. We were not specifically informed by Transamerica that minimum interest*

80

*guarantee payments had been made until the third quarter of 2001, and, consequently, did not know that monthly cash settlements with Transamerica included a minimum interest guarantee payment component until that time.*

*We periodically requested additional information from Transamerica since the contract's inception, including information related to possible minimum interest guarantee payments, and Transamerica did deliver a file in June 2000 that contained the information needed to estimate expected minimum interest guarantee payments as of December 31, 1999.* At the time, we believed that the financial results under the contract were being adversely affected by high surrender rates on the underlying policies, but we did not believe that we had any meaningful exposure to minimum interest guarantee payments. Using assumptions based on information available to us at the time this file was received, the file indicated that expected minimum interest guarantee payments would have been approximately $100,000 as of December 31, 1999, which is consistent with our belief at the time that our exposure to minimum interest guarantee payments was not significant. Further, *based on data now available to us,* we do not believe that the amount of these potential payments increased significantly during the course of 2000. Together with Transamerica, we conducted an audit of IL Annuity's records related to this contract during the Summer of 2001, but that audit was focused on the reasons for the high surrender rates and did not detect the potential liability for minimum interest guarantee payments.

*We also did not believe that we had any liability for minimum interest guarantee payments because from the inception of the contract through the first three quarters of 2000, the investment performance of the assets supporting the liabilities under the Transamerica contract had generally exceeded or was only slightly less than the minimum guaranteed interest rate.* During October and November of 2000, the performance of the assets did decline significantly, but rebounded in December 2000 and January 2001. Subsequent to January 2001, the assets began producing negative returns. In light of this declining performance, our pricing actuary for this contract began to focus on the possibility that minimum interest guarantee payments might be being made by IL Annuity, and he questioned Transamerica as to whether minimum interest guarantee payments were causing unanticipated shifts in the monthly cash flows at the end of the second quarter of 2001. He was advised by Transamerica that it did not think that the shift in cash flows was the result of minimum interest guarantee payments. When we were notified by Transamerica in the third quarter of 2001 that minimum interest guarantee payments had in fact been made under this contract, but that Transamerica was unable to quantify the amount or timing of the payments made, we requested additional detailed information regarding such payments and our exposure to future minimum interest guarantee payments. *Between November 7, 2001 and December 5, 2001, we received files containing detailed policyholder information that enabled us to perform our own analysis of our minimum interest guarantee obligations and to estimate expected future minimum interest guarantee payments. Using these files and with the assistance*

81

*of third-party consultants, we developed, refined and tested models to estimate past minimum interest guarantee payments and expected future minimum interest guarantee payments.*

203.    Incredibly, as described above, ANR was still claiming that its assets had had a sufficiently high yield for most of the Class Period to met the minimum interest payments – but, of course, the assets had almost *never* performed well enough to do so.

204.    Finally, ANR revealed, despite its earlier claims not to hold embedded derivatives, "Because of the nature of the assets underlying our Transamerica contract, which are roughly 67% convertible bonds, the bifurcation and separate accounting for the embedded derivatives contained in this contract would add significant volatility to our reported results."

205.    ANR then explained the havoc that its restatements were wreaking on its business:

> Based on our projections of our ceding companies' statutory reserve cessions, *in order to satisfy our obligations under our existing reinsurance agreements, we will need to post $140.0 million to $230.0 million of additional collateral by December 31, 2002. Our ability to meet these additional security requirements is dependent upon our ability to raise capital and/or otherwise expand our collateral funding capacity, neither of which we have been able to do successfully given, among other reasons, the pending restatement of our financial statements for 2000 and 2001.* We are seeking to retrocede or sell certain of our reinsurance agreements to reduce our aggregate collateral requirements, but we have no agreements to do so at this time. If we are unable to meet the security requirements of our cedents, we may be required to cease writing new business. In addition, we may be in violation of our existing reinsurance contracts and subject to the remedies set forth therein. Our cedents may also ask that the agreements be recaptured. These recaptures could result in losses, but could also improve our liquidity and our ability to meet the collateral requirements of our remaining cedents.

The 8-K also stated:

> In the third quarter of 2002, A.M. Best downgraded the financial strength ratings of Annuity and Life Reassurance and Annuity and Life Reassurance America from "A-" to "B++." The financial strength ratings of Annuity and Life Reassurance and Annuity and Life Reassurance America have also been downgraded by Standard & Poor's from "A-" to "BBB+" and from "A" to "BBB+" by Fitch Ratings. These downgrades in our ratings have adversely

82

affected our ability to enter into new reinsurance treaties and raise capital. Further downgrades may adversely affect our ability to retain existing business, effectively preclude us from writing new business, and permit some of our ceding companies to terminate certain reinsurance agreements.

206.    The next day, ANR shares plunged from a previous closing price of $4.08 to a closing price of $2.24.

**Post-Class Period Events**

207.    On January 2, 2003, ANR announced that, in an effort to reduce its requirements to post collateral for its reinsurance agreements, it had novated five profitable life insurance contracts to XL Capital, resulting in a reduction in its collateral requirements, but also causing an immediate loss of $20 million in acquisition costs associated with those contracts.

208.    On January 16, 2003, ANR announced that it had ceased writing new business, and that it would no longer be accepting new business under its existing treaties. The Company also disclosed that it could not meet the collateral requirements of several clients. On February 24, 2003, the Company issued a second press release announcing further losses for the fourth quarter of 2002, and disclosing that it still had not been able to post required collateral.

209.    On March 21, 2003, ANR restated virtually all of its financial statements during the Class Period. Specifically, ANR filed an amended 10-K that restated both 2000 and 2001, and filed amended 10-Qs for each of the first three quarters of 2002. These filings revealed the minimum interest payments in 2000 and the gross disparity between book value and carrying value for IL Annuity's convertible bond investments at the end of 2001. Notably, the amended 2001 10-K explained that expenses associated with the IL Annuity policies accrued at a rate of 2.75%, rather than the 2.5% that the Company had disclosed in its November 2002 8-K. In explaining the history behind its dealings with Transamerica, the Company admitted that, at least as far back as 2000, it had been aware of the high "asset management expenses" associated with

83