the contract. Had KPMG performed any audit at all, it too knew of these expenses at least since its annual audit of ANR's 2000 financial statements.

210.    The Amended 10-K also altered the language regarding the Company's underwriting methods. Whereas earlier 10-Ks, and the original 2001 10-K, represented that "In implementing the underwriting guidelines we utilize an *experienced* underwriting team," the new, Amended 10-K for 2001 deleted the word "experienced," and instead promised only that "In implementing the underwriting guidelines, we utilize an underwriting team. . . ."!

211.    Finally, the Amended 10-K contained the following warning pertaining to ANR's ability to continue as a going concern:

> [T]he Company incurred significant operating losses in the second and third quarters of 2002, and has announced that it anticipates reporting a significant loss for the year 2002. Further, the financial strength ratings of the Company's operating subsidiaries were downgraded in July, 2002 by A.M. Best, Standard & Poor's, and Fitch Ratings, and there have been further downgrades since that date. Also, the Company is required to post collateral for the statutory reserves ceded to it by U.S. based insurers and reinsurers. The Company did not have sufficient available cash and investments to satisfy the collateral requirements asserted by its cedents as of December 31, 2002 under certain of its reinsurance treaties. The Company's cedents now assert that the Company must satisfy additional collateral requirements of approximately $140 million, which includes collateral requirements asserted as of December 31, 2002 and additional collateral requirements asserted since that date. . . . Certain providers of letters of credit issued on behalf of the Company totaling approximately $59 million have also demanded the return or collateralization of those letters of credit. As a result of the Company's inability to satisfy its obligations, certain parties have claimed that the Company is in breach of its agreements. As a consequence, certain parties have sought and others may seek remedies for such claimed breaches by the Company, and the Company may be required to enter into arbitration or litigation proceedings with those parties. . . .

> The Company engaged a financial advisor in September 2002 to assist it in seeking to raise capital, but the Company has not been able to successfully raise new capital to date. The Company has ceased to write new business and has notified its existing clients that it will not be accepting any new business under existing treaties on their current terms. These aforementioned factors raise substantial doubt about the Company's ability to continue as a going concern . . . .

212.    On April 23, 2003, ANR issued a press release announcing that it had been warned of a potential delisting from the NYSE due to the fact that its share price had fallen below $1.00.

213.    On March 14, 2003, AmerUs – the company that took over IL Annuity in 2001 – filed its Report on Form 10-K for 2002.  The Report disclosed that in 2002, IL Annuity had ceased to write new business.

214.    On July 2, 2003, ANR filed yet another amended 10-K, this one to correct the 10-K it had filed for 2002.  Even now, after a seemingly endless parade of partial disclosures of extraordinary charges and restatements, ANR has warned that the final shoe may yet not have dropped; investors may still continue to see additional financial statement revisions as instigated by the SEC.  The Company stated, "While we believe that the Securities and Exchange Commission has completed its review of certain of our prior public filings, we can provide no assurance as to whether it will require us to make any further changes to the financial, pro forma or other information and data included in this report or in other periodic reports we have filed with the SEC."  Importantly, ANR never suggested that KPMG had required restatements of ANR's false financial statements — as it was KPMG's responsibility to do under GAAS.

**KPMG'S KNOWING AND RECKLESS ISSUANCE OF FALSE AUDIT REPORTS**

215.    KPMG issued unqualified audit opinions for its annual audits of ANR's 1999, 2000, and 2001 financial statements.  The unqualified reports were included in ANR's Form 10-Ks filed with the SEC for 1999 through 2001, inclusive, and were incorporated by reference into ANR's interim filings on Form 10-Q during the Class Period.  These reports stated that ANR's financial statements were "present[ed] fairly. . . in conformity with accounting principles generally accepted in the United States of America" and that KPMG had "conducted [its] audits in accordance with auditing standards generally accepted in the United States of America."  In

85

accordance with Rule 10-01(d) of Regulation S-X and Item 310(b) of Regulation S-B, KPMG

also performed a review of ANR's interim financial statements before they were publicly filed

on Forms 10-Q.  Through March 21, 2003, despite mounting evidence KPMG received in its

quarterly reviews and annual audits, KPMG failed to require ANR to correct its false financial

statements by filing restated financial statements or to withdraw its earlier unqualified audit

opinions on those financial statements.  As described below, ANR's financial statements were

false and violated numerous provisions of GAAP.  Among other things, the financial statements

materially misstated (and understated) ANR's liabilities to policyholders, and materially

misstated (and understated) the associated expenses for these liabilities and for deferred

acquisition costs.  The consequences of these misstatements and violations of GAAP were that,

for most of the Class Period, ANR falsely reported profits on its $1.6 billion Transamerica

annuity contract when ANR should have reported huge losses.

      216.    Because of the prominence of the Transamerica contract – in 1999, it represented

83% of ANR's reported assets, 97% of its reported liabilities, and 38% of its reported profits –

and because of the extraordinary number of significant GAAP violations associated with ANR's

financial reporting, KPMG either knew ANR was issuing false financial statements in violation

of GAAP, or would have known these facts had KPMG not recklessly performed its audits in

violation of GAAS, as further described below.

**Violations of Generally Accepted Accounting Principles (GAAP)**

      217.    Throughout the Class Period, KPMG represented that ANR's financial statements

were fairly presented in conformity with GAAP, which are recognized by the accounting

profession and the SEC as the uniform rules, conventions and procedures necessary to define

accepted accounting practice at a particular time.  However, KPMG knowingly and/or recklessly

permitted ANR to use improper accounting practices and to make misleading and inadequate

86

disclosures, all in violation of GAAP (and SEC reporting requirements), to falsely inflate ANR's reported earnings and to underreport ANR's policyholder liabilities during the Class Period. Although KPMG had a continuing obligation to require ANR to correct its materially misstated financial statements (or to withdraw its unqualified opinions), ANR did not restate its Class Period financial statements for the matters described herein until March 21, 2003 -- and then the restatement was only done upon the SEC's discovery of the wrongful accounting.

218.    ANR's financial statements violated GAAP in the following ways:

a.        In reporting earnings, ANR materially misstated expenses for paid and accrued policyholder obligations and for the amortization of DAC, as well as the net income attributable to the Transamerica contract.  ANR also materially misstated its statement of financial condition by materially understating the reported balances due policyholders and the balance of its deferred acquisition costs for the Transamerica contract.  Each of these misstatements constituted "errors" or "irregularities," (*i.e.*, intentional as distinguished from inadvertent, errors), rather than merely changes in estimates, for the reasons stated herein.  Under GAAP, and particularly APB Opinion No. 20, ANR had a continuing obligation to restate the financial statements for those matters, which it failed to do until March 2003;

b.        ANR improperly failed to disclose the composition and valuation of the various investments in its Funds Withheld at Interest asset and the critical accounting policies and methods used to report and value policyholder obligations, as well as to recognize revenue and expense on the Transamerica contract;

c.        ANR improperly failed to segment its accounting for its annuity business;

87

d.          ANR improperly failed to disclose risks and uncertainties related

to the Transamerica contract; and

e.          ANR violated FAS 97 and SFAS No. 60 that govern the financial

reporting of certain types of insurance companies.

## Violations of Fundamental GAAP Requirements

219.    As a result of the accounting improprieties detailed above, ANR's reported

financial results violated, among other things, the following provisions of GAAP for which

KPMG is necessarily responsible:

a.          The principle that financial reporting should provide information

that is useful to present and potential investors in making rational investment decisions and that

information should be comprehensible to those who have a reasonable understanding of business

and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

b.          The principle of materiality, which provides that the omission or

misstatement of an item in a financial report is material if, in light of the surrounding

circumstances, the magnitude of the item is such that it is probable that the judgment of a

reasonable person relying upon the report would have been changed or influenced by the

inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶ 132);

c.          The principle that financial reporting should provide information

about how management of an enterprise has discharged its stewardship responsibility to owners

(stockholders) for the use of enterprise resources entrusted to it.  To the extent that management

offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

accountability to prospective investors and to the public in general.  (FASB Statement of

Concepts No. 1, ¶ 50);

88

   d.   The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1, ¶ 42);

   e.   The principle that financial reporting should be relevant and reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶ 58-59);

   f.   The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2, ¶ 80); and

   g.   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

**Other Violations of Generally Applicable GAAP**

  220. APB Opinion No. 22, "Disclosure of Accounting Policies," states that the reporting entity must identify and describe its accounting principles, and the methods of applying those principles that materially affect the determination of financial position, changes in financial position, or results of operations. APB 22 ¶12. ANR's financial statements entirely failed to adhere to this standard. ANR's financial statements filed with the SEC on form 10-K for 1999

and 2000 contained only the following grossly inadequate description of its accounting methods

and practices for accounting for the Transamerica investments and policyholder liabilities:

> Policy benefit liabilities for annuities and interest sensitive life insurance products
> are reported at the accumulated fund balance of these contracts. Policy benefit
> liabilities include both mortality and morbidity claims in the process of settlement
> and claims that have been incurred but not yet reported. Actual experience in a
> particular period may be worse than assumed experience and, consequently, may
> adversely affect our operating results for the period.

221.    Moreover, GAAP provides that an estimated loss from a loss contingency "shall

be accrued by a charge to income" if: (i) information available . . . indicated that it is probable

that an asset had been impaired or a liability had been incurred at the date of the financial

statements; and (ii) the amount of the loss can be reasonably estimated. SFAS No. 5, ¶ 8.  SFAS

No. 5 also requires that financial statements disclose contingencies when it is at least reasonably

possible (i.e., greater than a slight chance) that a loss may have been incurred.  The disclosure

shall indicate the nature of the contingency and shall give an estimate of the possible loss or a

range of loss, or state that such an estimate cannot be made.  Up until January of 2002, ANR

neither increased its recorded liabilities to policyholders for accrued or future anticipated

minimum interest guarantee obligations, nor did it disclose any loss contingencies related to

minimum contract benefits and its inability to achieve income on the Funds Withheld at Interest

sufficient to meet these minimum benefits.

222.    In addition, FASB Interpretation No. 14, "Reasonable Estimation of the Amount

of a Loss," states that if the reasonable estimate of a particular loss contingency is a range, an

amount shall be accrued for the loss.  As discussed above, until January 2002, ANR accrued no

amount for the obligations inherent in its Transamerica contract due to minimum guaranteed

benefits.

223.    The SEC considers the disclosure of loss contingencies to be so important to an

informed investment decision that it promulgated Regulation S-X, which provides that, although

disclosures in interim period financial statements may be abbreviated and need not duplicate the

disclosures contained in the most recent audited financial statements, "where material

contingencies exist, disclosure of such matters shall be provided even though a significant

change since year end may not have occurred." 17 C.F.R. §210.10-01 (emphasis added).

224.    ANR also violated GAAP by failing to expense its non-recoverable deferred

acquisition costs in its interim financial statements.  As indicated by APB Opinion No. 28, ¶ 17,

Interim Financial Reporting:

> The amounts of certain costs and expenses are frequently subjected to year-end
> adjustments even though they can be reasonably approximated at interim dates.
> To the extent possible such adjustments should be estimated and the estimated
> costs and expenses assigned to interim periods so that the interim periods bear a
> reasonable portion of the anticipated annual amount.

225.    In addition, FASB Statement of Concepts No. 5 ("CON5") states that "[a]n

expense or loss is recognized if it becomes evident that previously recognized future economic

benefits of an asset have been reduced or eliminated. . . ."

226.    As discussed above, ANR's financial statements failed to disclose the risks and

uncertainties related to the Transamerica contract, in violation of GAAP.  In that regard, GAAP

requires that financial statements disclose significant risks and uncertainties associated with an

entity's business.  Disclosure of Risks and Uncertainties, Statement of Position No. 94-6.  ANR's

financial statements, in violation of GAAP and approved by KPMG, failed to disclose the

existence of, or the potential adverse consequences ensuing from the Transamerica contract.

Specifically, ANR failed to disclose that: (1) actual surrender rates associated with the

Transamerica policies were far higher than had been contemplated when the contract was priced;

(2) the ability of the investment returns on the Transamerica contract assets to cover obligations

91

due policyholders, and thus the profitability of the contract as a whole, depended not only on interest rates but also on the performance of the equity markets; and (3) the profitability of the contract depended upon ANR's ability to earn yields on the Funds that were significantly higher than minimum interest guarantees and fees imposed by IL Annuity associated with the policies.

227.    Indeed, as the Company eventually was forced to admit (in SEC filings approved by KPMG), various of these misstatements resulted in restatements of its financial statements for 2000, 2001, and the first three quarters of 2002, because those financial statements had not been prepared in conformity with GAAP and SEC accounting requirements when they were issued. In view of "the potential dilution of public confidence in financial statements resulting from restating the financial statements of prior periods," according to GAAP, a retroactive adjustment through a restatement of financial statements is reserved for material accounting errors (or irregularities) that existed at the time the financial statements were prepared.  See APB Opinion No. 20, Accounting Changes, 18, 27, 34-38.  Since GAAP allows only for correction of errors that are "material," by restating its financial statements, ANR (and KPMG who signed off on the restatements) admitted the materiality of the errors in its previously issued financial statements for 2000 and 2001, and the interim quarters.

**Violations of GAAP Requirements Relating to Insurance Companies**

228.    In its 10-Ks throughout the Class Period, ANR purported to account for the Transamerica contract as a universal-life or investment-type annuity contract.  Universal life-type contracts and investment-type contracts are subject to the provisions of FAS 97, "Accounting and Reporting by Insurance Enterprises for Certain Long-Duration Contracts and for Realized Gains and Losses from the Sale of Investments."

229.    For those contracts classified as universal life-type contracts, FAS 97 requires that reported liabilities be equal to the sum of various charges, plus "the balance that accrues to the

92

benefit of policyholders at the date of the financial statements," and "any probable loss (premium deficiency) as described in paragraphs 35-37 of Statement 60." Statement 60, referenced in the standard, is SFAS No. 60, Accounting and Reporting by Insurance Enterprises ("SFAS 60").

230.  The portions of SFAS 60, incorporated by reference into FAS 97, state that the "premium deficiency" that must be calculated and accrued as a liability consists of the sum of:

a.        present value of future payments for benefits determined using revised assumptions based on actual and anticipated experience;

b.        minus the present value of future gross premiums [which, for these single-premium policies, is zero];

c.        minus liability for future policy benefits, reduced by deferred costs.

231.  Additionally, if a contract is treated as an investment-type contract, FAS 97 ¶ 18 provides that in determining the insurance company's liability for future policy benefits, "In the absence of a stated account balance or similar explicit or implicit contract value, the cash value, measured at the date of the financial statements, that could be realized by a policyholder upon surrender shall represent [an] element of liability. . . ." In other words, at any given time, ANR's recorded liability should have been at least the amount then due to the policyholder on the financial reporting date, if he chose to surrender his policy, which would necessarily include the amount due upon surrender for interest as required by state law. The fact that ANR had to pay, and recognize expense for, minimum interest guarantees upon payment, demonstrates that its method for accruing for policyholder liabilities was flawed, and understated its liabilities and expenses. ANR also thereby violated FAS 97.

93

232.    Additionally, SFAS 60, incorporated by reference into FAS 97, requires that in the event of a premium deficiency, the company shall take a charge to income and "(a) a reduction of unamortized acquisition costs or (b) an increase in the liability for future policy benefits." Under such circumstances, "future changes in the liability shall be based on the revised assumptions. . . . The liability for future policy benefits using revised assumptions based on actual and anticipated experience shall be estimated periodically for comparison with the liability for future policy benefits (reduced by unamortized acquisition costs) at the valuation date."

233.    Ultimately, then, ANR was required to credit policyholder accounts to bring them up to their current cash surrender values – including for guaranteed minimum interest benefits – and to also accrue for additional future payments calculated using actual and anticipated experience. Its failure to do so constituted a violation of FAS 97.

234.    ANR was not only required to consider statutory minimum guaranteed interest obligations in its accrual of liabilities to policyholders, but was also required to recognize a loss when historical experience – through the performance of the Funds Withheld at Interest and the high surrender rate – demonstrated that the income earned on the Funds was insufficient to cover expected liabilities. SFAS 60 requires that any premium deficiency be recognized either through an increase in liabilities (and a corresponding recognition of expense), or through a write-down (and expensing) of deferred acquisition costs. Therefore, ANR's failure to take such charges (despite its claims to subject the deferred costs to loss recognition and recoverability testing at the end of each accounting period) violated GAAP and materially inflated ANR's income, and thus its stock price, by understating its expenses.

94

**ANR Improperly Failed to Report its**
**Financial Results By Segments**

235.    ANR's financial statements failed to disclose and report its financial results by segments in contravention of GAAP. SFAS No.131, Disclosures about Segments of an Enterprise and Related Information ("SFAS 131"), requires that a public business enterprise report a measure of segment profit or loss, certain specific revenue and expense items, and segment assets. It requires reconciliations of total segment revenues, total segment profit or loss, total segment assets, and other amounts disclosed for segments to corresponding amounts in the enterprise's general-purpose financial statements. It requires that all public business enterprises report information about the revenues derived from the enterprise's products or services (or groups of similar products and services), and about major customers regardless of whether that information is used in making operating decisions.

236.    In addition, SFAS 131 requires that a public business enterprise report descriptive information about the way that the operating segments were determined, the products and services provided by the operating segments, differences between the measurements used in reporting segment information and those used in the enterprise's general-purpose financial statements, and changes in the measurement of segment amounts from period to period.

237.    ANR's financial statements were false and misleading, and violated GAAP, because, until the first quarter of 2002, ANR failed to disclose and report its financial results separately for its life segment and its annuity segment, even though, as the Company would eventually admit when it finally segmented its life and annuity businesses in 2002, Doyle, the President and CEO of the Company, reviewed Company results on this segmented basis. ANR's internal financial reports, and the nature of their presentation, would have been available to KPMG, and the inadequacy in ANR's public presentation of its segment's results readily

95

apparent. ANR's failure to disclose its business by segments allowed the Company to mask the degree to which its massive deferred policy acquisition costs were attributable only to the annuity side of the business, to mask the degree to which its mysterious "other income" (surrender fees) were due to a single side of the business, and to mask the income and trends in income (as well as the slim margins earned on the substantial investment assets) that it was reporting on the annuity segment – which itself consisted mainly of Transamerica. Thus, coupled with the other information concealed from investors, ANR's failure to disclose the relative performances of its business segments prevented investors from understanding the risks associated with the Company.

**ANR Improperly Failed to Disclose its Full**
**Risks Related to the Funds Withheld at Interest**
**Associated with the Transamerica Contract**

238.     SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities ("SFAS 115"), requires that securities be separately classified as either available-for-sale or as held-to-maturity. It also requires that all reporting enterprises shall disclose the aggregate fair value, gross unrealized holding gains, gross unrealized holding losses, and amortized cost basis by major security type as of each date for which a statement of financial position is presented.

239.     This accounting standard finds a parallel in SEC Regulation S-K, Item 305, "Quantitative and Qualitative Disclosures About Market Risk," codified at 17 C.F.R. § 229.303. As detailed above, for much of the Class Period, ANR not only failed to make required market risks disclosures, but bizarrely represented to investors that there was virtually no market risk associated with its Funds Withheld at Interest.

240.     Thus, ANR completely failed to comply with these accounting and regulatory standards with respect to its disclosures regarding the Funds Withheld at Interest. Investors were kept in the dark about the composition of the Funds, much less how they were valued, or their

96

carrying value in relation to their market value, until the SEC finally forced ANR to make such disclosures at the end of the Class Period.

241.    ANR's financial statements were false and misleading because, without any disclosure of the assets underlying the Funds Withheld at Interest – and, in fact, without any disclosure as to what investments it covered, and how they were accounted for or valued – investors were completely unable to appreciate the risks associated with ANR's massive gamble that the stocks of the companies issuing the convertible bonds would rise sufficiently to cover the minimum interest guarantees to the policyholders.  Moreover, investors' misunderstanding as to the nature of the Funds was exacerbated by ANR's repeated, false representations that its annuity business depended on interest rate spreads, rather than on the performance of the equity markets. Had KPMG performed any audit at all, these reporting deficiencies would have been obvious.

**KPMG's Violations of Generally Accepted Auditing Standards**

242.    In certifying ANR's 1999, 2000, and 2001 financial statements, KPMG falsely represented that its examination was made in accordance with GAAS.  Those representations, which were contained in its unqualified audit opinion letters issued in connection with the respective financial statements for those years, were materially false and misleading in that the audits conducted by KPMG were, as KPMG knew or recklessly ignored, *not* performed in accordance with GAAS in the following respects:

a.          GAAS provides that an unqualified audit opinion may not be issued where an auditor is unable to obtain sufficient competent evidential matter to perform necessary audit procedures.  (AU § 508.22).  ANR's disclosures at the end of the Class Period, as well as its Answer to Plaintiffs' Amended Complaint filed in 02-CV-2133, reflects that information critical to KPMG's audit was not obtained by ANR at the time of KPMG's audit.

97

(*See* ANR Answer ¶¶87, 117,140,208.)  Under these circumstances, under GAAS, KPMG should have issued a disclaimer or a qualified audit opinion;

        b.          KPMG violated GAAS by failing to adequately plan its audit procedures to address the significant risks of material errors and irregularities associated with ANR's financial statements (AU § 312.08);

        c.          KPMG violated GAAS in the performance of its audit procedures by failing to obtain and evaluate evidential matter to determine whether the amounts for ANR's assets, liabilities, revenue, and expenses reported in ANR's financial statements were valued appropriately (AU §§ 326.02, 326.07) and that ANR's critical estimates (*e.g.*, for policyholder reserves and deferred acquisition costs) were reasonable (AU § 342); and

        d.          Each year, KPMG reissued its earlier unqualified audit opinion on ANR's misstated financial statements, instead of requiring ANR to restate those financial statements for information KPMG had discovered after the audit (AU § 561).

     243.    To properly plan the nature and extent of its audit procedures to be performed, KPMG was required to consider the "inherent" risks that the financial statements contained material misstatements (whether caused by error or fraud), and the risks that it would not "detect" such misstatements.  (AU § 312.27).

     244.    The following factors demonstrated an extraordinarily high inherent risk of misstatements in ANR's financial statements:

        a.          Concentration of investments in a single investee;

        b.          Substantial unrealized investment losses;

        c.          The acceptance of additional investment risk to support high interest-crediting rates;

        d.        Significant amounts of investments in derivatives and structured securities;

        e.        Lack of conservatism in determining benefit liabilities;

        f.        Sensitivity of benefit liabilities to management estimates;

        g.        Actual expenses that are substantially higher than those assumed in pricing;

        h.        Product pricing assumptions that are based on competitive market pricing without regard to expected costs;

        i.        Significant increases in surrenders or lapses of contracts;

        j.        Negative spreads on investment contracts;

        k.        Inadequate testing of cash-flow or interest-rate scenarios;

        l.        Asset maturities that are not consistent with expected payouts of contract holder liabilities;

        m.        Significant asset-liability mismatches.

*Audit and Accounting Guide for Life and Health Insurance Entities* ("AAG-LHI"), §§4.04, 4.05, 4.06.

    245.    Based on these known risk factors, KPMG should have planned to intensely test ANR's policyholder reserves and its estimates, including performing extensive testing of the adverse variances in the factors used to price ANR's $1.6 billion Transamerica contract versus ANR's actual experience for this contract. As ANR has admitted, and as would be readily apparent to an auditor evaluating ANR's financial statements, the profitability of the Transamerica contract was necessarily a function of the rates of return earned on the IL Annuity convertible bonds, ANR's policy surrender rates, fees and expenses charged by the primary

99

insurer, and minimum interest guarantees. (ANR Answer ¶55). ANR also publicly represented in its Form 10-Ks that the profitability of the Transamerica contract depended on ANR's ability to earn a spread between the yield of the Funds Withheld at Interest and its liabilities to policyholders. Thus, KPMG, under GAAS, was required to plan to obtain and evaluate evidential matter for each of these factors, and then to evaluate the reasonableness of ANR's estimates in consideration of these factors. In its audit opinions, KPMG represented that it assessed the "significant estimates made by management." If KPMG obtained this Transamerica audit evidence, it knew that ANR's financial statements were misstated. If KPMG did not, it knowingly or recklessly violated GAAS and it recklessly represented that ANR's financial statements were fairly presented in accordance with GAAP.

246.    Under GAAS, KPMG had to plan to intensely test ANR's reserves and ANR's assumptions regarding the recoverability of the deferred acquisition costs because ANR's actual experience on this contract by the end of 1999 was materially at odds with its optimistic assumptions when it priced the contract and set a schedule for DAC amortization. Specifically, the Funds Withheld at Interest were not producing a yield nearly adequate to meet minimum guarantees plus expenses, and surrender rates were far in excess of those ANR had projected. In fact, ANR *concedes* that actual performance of the Transamerica contract was far worse than had been projected in its pricing. (ANR Answer ¶¶ 55, 67), a fact that KPMG would have known if it had conducted any audit at all.

247.    GAAS requirements specific to the insurance industry confirm that KPMG issued its false audit opinion either knowingly or recklessly. AAG-LHI states that an auditor must test that the results of the entity's experience for factors used to develop deferred acquisition cost factors for contracts or lines of business that have substantially different lapse experience than

100

expected. (AAG-LHI 10.71) AAG-LHI also requires the auditor to review studies comparing

actual and projected experience (gross profits, investment yields, and expenses) with those

assumed for adverse deviation from the original assumptions that may indicate potential loss

recognition situations. (AAG-LHI 10.71) Thus, under GAAS, KPMG was obligated to develop

an audit plan and then test the recoverability of deferred acquisition costs. Instead, KPMG

recklessly failed even to obtain evidence of the amounts necessary to begin performing these

required tests.

248.    With respect to detection risk, the auditor must consider whether planned

procedures are adequate to detect material misstatements. Detection risk refers to the extent and

nature of the audit tests and procedures used by the auditor in evaluating his client's financial

reporting. It arises partly from uncertainties that exist when the auditor does not examine 100

percent of an account balance or a class of transactions, and partly because of other uncertainties

that may arise because an auditor might select an inappropriate auditing procedure, misapply an

appropriate procedure, or misinterpret the audit results. The amount of detection risk that is

acceptable in planning audit procedures in an audit should bear an inverse relationship to

inherent risk; the less inherent risk and control risk the auditor believes exists, the greater

detection risk that can be tolerated. (AU § 312.28)

249.    Based upon the high degree of inherent risk that ANR's financial statements

contained material misstatements, GAAS required that KPMG plan and perform audit

procedures that tolerated only minimal degrees of detection risk — *i.e.*, KPMG was required to

extensively test ANR's accounts and estimates, and obtain audit evidence with a high level of

reliability (such as confirmatory information from disinterested third parties). In conducting an

audit, an auditor obtains the required sufficient "competent evidential matter" through

101

inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. (AU § 326.01)

250.    Despite these risk factors and KPMG's obligation to plan and perform an audit consistent with GAAS, KPMG entirely failed to perform an audit that conformed with these standards. Specifically:

a.    KPMG did *not* obtain the evidential matter required to evaluate ANR's liabilities to policyholders. As ANR admitted, it did not obtain information from Transamerica sufficient to determine its obligations for minimum interest guarantee payments throughout most of the Class Period. Such information was necessary for KPMG to conduct required audit procedures to test ANR's reported liabilities (and associated policyholder expenses). Under these circumstances, KPMG was required to qualify or disclaim its opinions due to an inability to obtain sufficient competent evidential matter as to an assertion of material significance in ANR's financial statements. (AU §508.22-.23) Nonetheless, KPMG knowingly or recklessly issued a "clean" audit opinion falsely representing that, based upon its audit conducted in accordance with GAAS, ANR's financial statements were fairly presented in accordance with GAAP.

b.    As ANR admitted, it did not review the recoverability of deferred acquisition costs until the third quarter of 2001, despite the higher than expected surrender rates and the ominously low investment returns earned on the Funds Withheld at Interest. Therefore, KPMG obviously did not adequately test ANR's estimate for the recoverability of the deferred acquisition costs as required by AU § 342 until that time.

c.    As ANR admitted, when it finally did write down the deferred acquisition costs in the third quarter of 2001, it did so based on a projected performance of the Funds

102

Withheld at Interest that was totally at odds with its actual experience. KPMG thus again either failed to conduct its required review of the reasonableness of ANR's estimate, or based on its review, knew that ANR had used flawed factors in developing the accounting estimates. (AU § 342.09)

        d.    KPMG recklessly issued a "clean" audit opinion, falsely representing that ANR's financial statements were presented fairly in accordance with GAAP, without investigating striking "red flags," including: (1) the failure of ANR's Funds Withheld at Interest to perform at a level consistent with ANR's assumptions used to price the Transamerica contract and to determine the recoverability of its costs; (2) skyrocketing surrender rates exceeding the pricing assumptions; (3) ANR's failure to adjust its assumptions for its actual experience and then timely conduct loss recoverability testing based upon the current and corrected factors; (4) the startling jump in the yield purportedly earned on the Funds Withheld at Interest in the fourth quarter of 2000 (which suggested that policyholder statutory reserve requirements had been met only by "realizing" capital gains through selectively liquidating investments that had appreciated); (5) ANR's failure to reserve for and credit policyholder accounts for interest owed them under state law, and its failure even to recognize an expense for amounts actually paid to policyholders upon surrender for these minimum interest guaranteed payments; (6) ANR's failure to obtain information about the statutory interest obligations to policyholders and minimum interest guarantee payments sufficient to allow it to account for such obligations and payments in its reported expenses; (7) ANR's failure to recognize as expense the 2.75% fees charged by IL Annuity; (8) ANR's blatantly false claim to be free from market risk when the bulk of its assets were invested in convertible bonds (and the profitability of the Transamerica contract thereby depended on the performance of the derivative stock); (9) ANR's blatantly false

103

claim that it did not hold embedded derivatives, (10) ANR's failure to disclose fundamental, material aspects of its business, including the nature of the assets contained in more than $1 billion of its Funds Withheld at Interest investments, its failure to disclose information by business segments, its failure to disclose the risks inherent in its Transamerica contract, and its failure to disclose the factors it used to amortize its deferred acquisition costs and recognize expenses on the Transamerica contract.

251.    Additionally, in order to evaluate the reasonableness of ANR's critical estimates, KPMG was required either to obtain the services of an independent actuary or, if qualified, was required to employ its own actuarial expertise to determine whether the assets supporting the Transamerica contract were sufficient to support expected liabilities.  AAG-LHI § 5.40.

252.    The responsibilities of such an actuary (whether obtained by KPMG or employing KPMG's own actuarial expertise) are outlined in the Actuarial Opinion Memorandum Regulation promulgated by the National Association of Insurance Commissioners (NAIC), as it existed during the Class Period.  This Regulation explained that one of the most basic and fundamental tasks of an actuary is to conduct a process known as asset adequacy analysis.  Asset adequacy analysis involves a process known as cash flow testing, in which the actuary tests several hypothetical scenarios under changing economic conditions, and considers whether, under such scenarios, the insurance company is able to meet its obligations.  The Regulation sets forth seven basic scenarios for all actuaries to consider in conducting this analysis (although the actuary should also consider other scenarios as circumstances warrant).  The seven basic scenarios require a consideration of the following hypothetical interest rates:

a.          Level with no deviation;

104

b.        Uniformly increasing over 10 years at one-half of one percent and then level;

c.        Uniformly increasing at one percent per year over five years and then uniformly decreasing at one percent per year to the original level at the end of 10 years and then level;

d.        An immediate increase of three percent and then level;

e.        Uniformly decreasing over 10 years at one-half of one percent per year and then level;

f.        Uniformly decreasing at one percent per year over five years and then uniformly increasing at one percent per year to the original level at the end of 10 years and then level; and

g.        An immediate decrease of three percent and then level.

Cash flow testing under various of these mandated scenarios would have corroborated what was obvious by merely looking at the yields during the Class Period: that the yields on the investments constituting the Funds Withheld at Interest were entirely insufficient to satisfy policyholder liabilities incurred under the Transamerica contract. For instance, merely projecting level market interest rates – i.e., no changes in the future – would have shown the deficiencies. An immediate decrease in market interest rates would have similarly devastating consequences, because even if a gain could be reaped on the appreciation of the value of the bonds, there would be limited opportunities to reinvest the capital gains in other assets that would have the capacity to earn the necessary returns.

253.    Additionally, the Actuarial Standards Board has explained that cash flow testing is a particularly appropriate method of asset adequacy analysis where "cash flows of existing

105

assets, policies, or other liabilities may vary, or where the present value of combined asset,

liability, or other cash flows may vary under different economic or interest-rate scenarios,"

Actuarial Standard of Practice (ASOP) No. 22,[3] which is precisely the situation here.  ASOP No.

7,[4] which provides instructions on cash flow testing, requires that the actuary consider "the

insurer's investment strategy" (which, in this case, would have required consideration of the

convertible-bond strategy), and the sensitivity of such investments to external events – such as,

in this case, changes in equity markets that affect the valuation of the underlying stock for the

convertible bonds.  The actuary must also consider "the historical experience of similar assets"

and "other known factors that are likely to have a material effect on asset cash flows, particularly

those factors that are likely to have an effect on . . . investment rate-of-return risk."

      254.    ASOP No. 11 addresses reinsurance situations, and specifically mandates that

ceding companies and assuming companies "test net statement liabilities independently."  This

standard requires that the insurance company's statement of liabilities "make appropriate

provision for all of the company's unmatured obligations according to the actuary's best estimate

of future experience . . . ."  KPMG (and its actuary, if any) violated AU § 342 by failing to

follow basic and accepted actuarial standards and practices in evaluating the reasonableness of

ANR's critical estimates.

      255.    Finally, as KPMG received information through its reviews conducted for ANR's

quarterly reports and subsequent annual audits, demonstrating that ANR's earlier filed annual

financial statements that KPMG had audited and certified were false, KPMG was required to

---

[3]     ASOP No. 22 was revised in September 2001; the earlier version similarly recommended cash flow testing for situations in which "future cash flows may differ under different economic or interest-rate scenarios."

[4]     The current version of ASOP No. 7 was adopted in April 2002.  Prior versions do not differ materially from the sections quoted here.

take steps to prevent continued reliance by investors, including plaintiffs, on its erroneous audit opinions. (AU § 561). Despite the mounting evidence that ANR had materially misstated its earlier audited and certified financial statements, only in March 2003, after the intervention of the SEC did ANR restate its public filings for the matters described in this case.

256.    Thus, KPMG acted either intentionally or recklessly in falsely representing in its unqualified opinions that it had complied with GAAS in conducting its audits, and then again by failing to timely require that ANR correct its earlier false financial statements through restatement.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

257.    The market for ANR securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, ANR's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired ANR securities relying upon the integrity of the market price of ANR's securities and market information relating to ANR, including upon KPMG's false audit reports, and have been damaged thereby.

258.    During the Class Period, KPMG materially misled the investing public, thereby inflating the price of ANR's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make KPMG's statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's financial reporting as alleged herein.

259.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

107

damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, KPMG made or caused to be made a series of materially false or misleading statements about ANR's earnings and financial condition, and the audit it had performed to confirm ANRs financial reporting. ANR (and KPMG) consistently misrepresented and concealed the extraordinary risks associated with the Transamerica contract and materially misstated the amounts reported on ANR's financial statements with respect to its performance. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ANR and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. KPMG's materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

260.    At all relevant times, the market for ANR's securities was efficient for the following reasons, among others:

a.          ANR's stock met the requirements for listing, and was listed and actively traded on the NYSE and the NASDAQ, a highly efficient and automated market;

b.          As a regulated issuer, ANR filed periodic public reports with the SEC, the NYSE, and the NASDAQ; and

c.          ANR regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

108

261.    ANR was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

262.    As a result of the foregoing, the market for ANR's securities promptly digested current information regarding ANR from all publicly available sources and reflected such information in ANR's stock price. Under these circumstances, all purchasers of ANR's securities during the Class Period suffered similar injury through their purchase of ANR's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### VIOLATION OF SECTION 10(B) OF
### THE EXCHANGE ACT AND RULE 10B-5
### PROMULGATED THEREUNDER AGAINST KPMG

263.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

264.    During the Class Period, KPMG carried out a plan, scheme and course of conduct which was intended to and, during the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (ii) cause plaintiffs and other members of the Class to purchase ANR's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, KPMG took the actions set forth herein.

265.    KPMG (a) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading to maintain artificially high market prices for ANR's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

109

266.    KPMG, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the financial performance of ANR as specified herein.

267.    KPMG made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made about ANR and its financial performance and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and that operated as a fraud and deceit upon the purchasers of ANR securities during the Class Period.

268.    KPMG had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to it and obviously were required to be reviewed and assessed in its audits.  KPMG's material misrepresentations and/or omissions were done knowingly or recklessly and had the necessary purpose and effect of concealing ANR's earnings and financial condition and future business prospects from the investing public and supporting the artificially inflated price of ANR's securities.  As demonstrated by KPMG's misstatements of the Company's business, operations and earnings during the Class Period, KPMG, if it did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

269.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ANR's securities was

110

artificially inflated during the Class Period.  In ignorance of the fact that market prices of ANR's

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false

and misleading statements made by KPMG, or upon the integrity of the market in which the

securities trade, and/or on the absence of material adverse information that was known to or

recklessly disregarded by KPMG but not disclosed during the Class Period, plaintiffs and the

other members of the Class acquired ANR securities during the Class Period at artificially high

prices and were damaged thereby.

270.    At the time of said misrepresentations and omissions, plaintiffs and other

members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs

and the other members of the Class and the marketplace known the truth regarding the problems

that ANR was experiencing, and the material misstatements in its financial reporting, which were

not disclosed by ANR or KPMG, plaintiffs and other members of the Class would not have

purchased or otherwise acquired their ANR securities, or, if they had acquired such securities

during the Class Period, they would not have done so at the artificially inflated prices which they

paid.

271.    By virtue of the foregoing, KPMG has violated Section 10(b) of the Exchange

Act, and Rule 10b-5 promulgated thereunder.

272.    As a direct and proximate result of KPMG's wrongful conduct, plaintiffs and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's securities during the Class Period.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the

Federal Rules of Civil Procedure on behalf of the Class defined herein;

111

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against KPMG for all damages sustained as a result of its wrongdoing, and the false financial reporting of ANR, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  October 23, 2003

**SCOTT + SCOTT, LLC**

_____
David R. Scott (Juris No. 16080)
Erin Green Comite (Juris No. 24886)
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone:     (860) 537-3818
Facsimile:     (860) 537-4432

**MILBERG WEISS BERSHAD HYNES
  & LERACH LLP**
Beth Kaswan
Ann M. Lipton
One Pennsylvania Plaza
New York, NY  10119
Telephone:     (212) 594-5300
Facsimile:     (212) 868-1229

112