UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------x
SHERRY SCHNALL, Individually and
On behalf of All Others Similarly
Situated

        Plaintiff,

       -against-

ANNUITY AND LIFE RE (HOLDINGS),LTD.,   **No. 3:02 CV 2133 (GLG)**
XL CAPITAL, LTD., LAWRENCE S. DOYLE,   **OPINION**
FREDERICK S. HAMMER, JOHN F. BURKE,
WILLIAM W. ATKIN, BRIAN O'HARA, AND
MICHAEL O. ESPOSITO JR.

       Defendants.
------------------------------------x

Before this court is defendant Frederick S. Hammer's motion to dismiss the consolidated amended class action complaint. For the reasons set forth below, the court **denies** defendant's Motion to Dismiss **(Doc. #68)**.

## I. Factual History and Procedural Background

This matter was commenced on December 2, 2002; subsequently, eight other cases were filed against Annuity and Life Re (Holdings), Ltd. ["ANR"], and its officers and directors. On April 3, 2003, the court granted a motion to consolidate all nine actions, with Schnall as the lead case and Communications Workers of America and Midstream Investments, Ltd. as lead plaintiffs. (Doc. #33). On July 11, 2003, plaintiffs filed a consolidated amended class action complaint against defendants, ANR, XL Capital, Ltd., Lawrence S. Doyle ["Doyle"], Frederick S. Hammer

1

["Hammer"], John F. Burke ["Burke"], William W. Atkin ["Atkin"], Brian O'Hara ["O'Hara"], and Michael P. Esposito Jr. ["Esposito"], [collectively the "Individual Defendants"], alleging violations of federal securities laws, which injured purchasers of ANR securities between March 15, 2000 and November 19, 2002 [hereinafter the "Class Period"]. Plaintiffs also allege that ANR's stock price fell from a Class Period high of $36.98 to $2.24 on the last day of the Class Period.

In the consolidated amended class action complaint, plaintiffs allege the following background facts. ANR is a Bermuda corporation formed in 1997 as a holding company to sell annuity and life reinsurance products. Defendant Hammer was the Chairman of the Board of Directors of ANR, as well as a Director and sat on the Executive Committee, the Finance and Investment Committee and the Corporate Governance Committee during the Class Period. From approximately September 12, 2002 until the end of the Class Period, defendant sat on the Transition Committee of the Board of Directors to oversee management of ANR.

ANR and its subsidiaries indemnify other insurance companies ("primary insurers" or "ceding companies") against their obligations to their own policyholders in exchange for a reinsurance premium. Many of ANR's client companies are based in the United States and are subject to state regulation. Those regulations require reinsurers to either be qualified by the state or to post collateral in connection with their reinsurance agreements.

2

In 1998, a few months after the initial public offering, ANR executed a contract with Transamerica Occidental Life Insurance ["Transamerica"], a U.S. based insurance and reinsurance company, to provide reinsurance for an approximately $1.6 billion book of annuity policies. Under the contract, ANR indemnified Transamerica and the primary insurer, IL Annuity and Insurance Company ["IL Annuity"], for a percentage of the total liabilities due from IL Annuity to the annuity policyholders. In return, ANR received a proportional share of the securities which IL Annuity purchased with the policyholder premiums. The underlying annuity policies were part of a series called VisionMark which allowed policyholders to select among four investment strategies. Various state laws also require that fixed annuity policyholders receive a minimum guaranteed interest rate of 3% to 3.5% per annum. This minimum was paid regardless of the annual management fee of approximately 2.75% which IL Annuity charged all policyholders. Therefore, ANR needed to earn an annual investment return of 6.25% to fund the minimum interest guarantees to policyholders.

Approximately 70% of the premiums on the VisionMark policies held by IL Annuity were invested in convertible bonds; such bonds convert into common stock of the issuing company if the stock price rises above a certain price. The convertible bonds generally paid a lower interest rate than other corporate bonds, but had the potential for higher total returns depending on the performance of the equity markets. Il Annuity assumed 20% of the risk of the Visionmark policies, with Transamerica retaining 16%

3

and ANR assuming 64% of the risk. The decline in the stock market in 1999, the low earnings on investments and the higher than expected surrender rates adversely impacted ANR's financial performance.

Plaintiffs allege, *inter alia*, that ANR made a series of misstatements and omissions between March 15, 2000, and August 16, 2002, regarding the risks of the Transamerica contract, the aforementioned 2.75% management fee, its method of accounting for liabilities for the guaranteed interest payments, the surrender rates and associated expenses, the impact of ANR's initial assumptions on the amortization of capitalized commission costs, and that the financial statements were not prepared in accordance with Generally Accepted Accounting Principles ["GAAP"]. Plaintiffs allege that these false and misleading statements and omissions were made in financial statements and in public filings with the Securities and Exchange Commission ["SEC"], in ANR's Annual Report to Shareholders, and in certain press releases and conferences to financial analysts.

Plaintiffs further allege that the SEC required ANR to restate all of its SEC filings during the Class Period. ANR's financial ratings were sharply downgraded and it ceased writing new business. ANR's status as an on going concern is in question.

## II. Standard of Review

In deciding a motion to dismiss, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. See Easton v. Sundram, 947

4

F.2d 1011, 1014-15 (2d Cir. 1991), *cert. denied*, 504 U.S. 911 (1992). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (footnote omitted). The issue on a motion to dismiss "is not whether the plaintiff will prevail, but whether he is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citation omitted).

For purposes of a motion to dismiss, the court deems a complaint to include "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir.2000)(citations omitted).

### III. Discussion

The consolidated amended class action complaint contains two counts. The first alleges that ANR and the Individual Defendants engaged in securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The second count alleges "control person" liability under Section 20(a) of the Exchange Act against the Individual Defendants and XL Capital, LTD. Defendant moves to dismiss because of plaintiffs'

5

failure to plead scienter with particularity as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), ["PSLRA"].

A. Section 10(b) Claims

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). As a claim made pursuant to section 10(b) asserts securities fraud, it must also comply with the pleading requirements of PSLRA, as well as the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. The PSLRA requires a complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); see In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286, at *2 (S.D.N.Y. June 1, 1998), as well as "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Complying with Rule 9(b), a Section 10(b) claim must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir.1999); see also Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.2000), cert. denied, 531 U.S. 1012 (2000).

The U.S. Court of Appeals for the Second Circuit has found

6

that the PSLRA pleading requirements are essentially a codification of the Second Circuit's interpretation of what is required by Rule 9(b). See Novak, 216 F.3d at 309-311 ("the PSLRA did not change the basic pleading standard for scienter in this circuit").

### 1. Group Pleading Doctrine

In order to state a claim for violation of section 10(b) and the corresponding Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir.2000). Defendant maintains that he is not liable under the group pleading doctrine and that plaintiffs have not set forth specific allegations regarding defendant's participation in the day-to-day operations of ANR. (Def.'s Mem. at 13). Defendant also claims that the complaint fails to particularize the nature of his participation in the alleged fraud, that he is not a proper defendant and notes his status as an "outside director." (Id.). Plaintiffs counter that defendant signed ANR's fraudulent 10-Ks and, thus, "spoke for § 10(b) purposes." (Pls.' Opp. at 31).

"The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." Elliott Associates, L.P. v. Covance, Inc., No. 00 CV 4115, 2000 WL 1752848, at *12

7

(S.D.N.Y. Nov.28, 2000). Courts have recognized that "primary liability under Rule 10b-5 [and § 10(b)] may be imposed "not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y.1999). Thus, a member of the upper level management, such as the CEO or CFO, who had knowledge of the fraud, and assisted in its perpetration by failing to disclose or correct the fraud when he had a duty to do so, may be held liable under § 10(b) and Rule 10b-5. Rich v. Maidstone Fin., Inc., No. 98 CV 2569, 2002 WL 31867724, at *8-9 (S.D.N.Y. Dec.20, 2002). Although the group pleading doctrine was adopted before the PSLRA was enacted, district courts in the Second Circuit have concluded that neither the PSLRA nor the decision in Central Bank v. First Interstate Bank, 511 U.S. 164 (1994)(precluding secondary liability for aiding and abetting a § 10(b) violation), and its progeny affect its vitality. In re CINAR Corp. Securities Litigation, 186 F.Supp.2d 279, 318-19 (E.D.N.Y.2002).

"As such, [the group pleading doctrine] is extremely limited in scope. One such limitation is that it is limited to group-published documents, such as SEC filings and press releases." Elliott Assocs., 2000 WL 1752848, at *12. Furthermore, the doctrine only applies where the officers or directors of the company "participated in the preparation and dissemination" of the group published document. Degulis v. LXR Biotech., Inc., 928 F.Supp. 1301, 1311-12 (S.D.N.Y.1996)("Consequently, where ... the

defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a prospectus, plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery."). As the court noted in In re XOMA Corp. Securities Litigation, No. C-91-2252, 1990 WL 357807 (N.D.Cal. Dec. 27, 1991), "outside directors, although almost by definition excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider." Id. at *6; see also Sperber Adams Associates v. JEM Management Associates Corp., No. 90 CIV. 7405, 1992 WL 138344 at *5 (S.D.N.Y. June 4, 1992) (outside director who prepared and distributed offering materials is insider for purposes of Rule 9(b) particularity inquiry).

The court disputes defendant Hammer's characterization of himself as an "outsider" and concludes that the application of the group pleading doctrine is warranted in this case. First, the Form S-1 Registration Statement dated December 24, 1997, which defendant Hammer attached to his motion to dismiss, describes defendant and other ANR officers and directors, as "owners, directors and/or officers of Inter-Atlantic", a United States corporation with a broker-dealer subsidiary which provides investment banking services for insurance companies. (Def.'s Exh. A at 42). The Registration Statement further detailed a five-year

9

financial advisory services contract between ANR and Inter-Atlantic at the annual rate of $600,000, as well as a $2 million payment to Inter-Atlantic for financial services provided to ANR in connection with its formation and the initial public offering. (Id.). Furthermore, ANR is a small corporation, which had eleven Bermuda based employees and two U.S. based employees in 1999, thirteen Bermuda based employees and seven U.S. based employees in 2000, and fourteen Bermuda based employees and nine U.S. based employees in 2001. (Am. Compl. ¶ 257).

Second, plaintiffs claim that defendant was Chairman of the Board of Directors of ANR, sat on the Transition Committee from September 12, 2002 until the end of the Class Period to oversee management of ANR, and served on the Executive Committee, the Finance and Investment Committee and the Corporate Governance Committee during the Class Period. (Am. Compl. ¶¶ 22, 199). Third, the complaint alleges that defendant signed the Form 10-K for the years 1999, 2000, and 2001. (Am. Compl. ¶¶ 69, 107, 164). Accordingly, the court finds that plaintiffs' allegations as to defendant Hammer's position are sufficient to warrant the application of the group pleading doctrine.

2. Motive and Opportunity

The court next turns to the issue of whether defendant made any materially false statements or omitted any material facts with scienter. A plaintiff may establish the requisite scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or

10

(b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." Novak, 216 F.3d at 307. Plaintiffs have alleged that defendants were motivated to perpetuate the fraud in order to maintain ANR's financial ratings and to satisfy conditions on existing contracts, attract new business and post required letters of credit as collateral for its reinsurance agreements. (Am. Compl. ¶ 269). Plaintiffs also claim that the executive careers of the Individual Defendants were "at stake." (Pls.' Opp. at 53). In light of Hammer's ANR board position and position with Inter-Atlantic with access to insider information, defendant certainly had the opportunity to commit fraudulent acts. The next issue is whether plaintiffs have sufficiently pled motive.

"Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct." In re Scholastic Corp. Sec. Litigation, 252 F.3d 63, 74 (2d Cir.2001) cert. denied, 534 U.S. 1071 (2001). Sufficient motive allegations entail concrete benefits that a defendant could realize as a result of one or more of the false statements and wrongful nondisclosures alleged. Novak, 216 F.3d at 307. Motives that are generally possessed by most corporate officers and directors will not suffice. Instead, plaintiffs must assert a concrete and personal benefit to the individual defendant that will result from the fraud. Id. Thus, the motive and opportunity elements are generally met when corporate insiders misrepresent material facts

11

to keep stock prices high in order to sell their own shares at a profit. Id. However, the Second Circuit has held that the desire for the corporation to appear profitable is an insufficient motive to establish scienter. Id.; see also Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir.2001); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir.1995); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir.1994) (allegation that defendants manipulated stock price in order to protect executive positions and compensation and prestige derived therefrom insufficient to support an inference of fraudulent intent).

Here, the only motives offered by plaintiffs are defendants' desire to maintain ANR's financial ratings and attract new business, and that Hammer's career was at stake. Therefore, in keeping with Second Circuit precedent, the court concludes that these allegations of motive to commit fraud are insufficient to give rise to a strong inference of fraudulent intent so as to meet the requirements of the Securities Reform Act for pleading scienter.

### 3. Conscious Misbehavior or Recklessness

Having concluded that plaintiffs' consolidated amended class action complaint fails to sufficiently demonstrate defendant Hammer's motive and opportunity to defraud, the court now considers whether plaintiffs have demonstrated strong circumstantial evidence of defendant's conscious misbehavior or recklessness. "[I]t is still possible to plead scienter by identifying circumstances indicating conscious behavior by the

12

defendant, though the strength of the circumstantial allegations must be correspondingly greater." In re Initial Public Offering Sec. Litig., 241 F.Supp.2d 281, 329 (S.D.N.Y.2003).

Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir.2000). The Second Circuit has clarified that a strong inference of recklessness or conscious misbehavior may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. Novak, 216 F.3d at 311.

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Novak, 216 F.3d at 308. However, corporate officials "need not be clairvoyant" and are only responsible for information reasonably available to them. Novak, 216 F.3d at 309. Nor are corporate

13

officials required to paint "an overly gloomy or cautious picture of current performance and future prospects," provided that their public statements are consistent with reasonably available data. Id.

Here, plaintiffs allege generally that the Individual Defendants had access to material adverse non-public information, and that the Individual Defendants knew or recklessly disregarded that adverse facts had not been disclosed to the investing public and that affirmatively false and misleading statements were being made to the public. (Am. Compl. ¶28). Plaintiffs also allege that the Individual Defendants were "involved in drafting, producing, reviewing, and/or disseminating [] false and misleading statements and . . . knew or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws." (Am. Compl. ¶30). Plaintiffs generally allege that ANR's financial statements were false and misleading because the Individual Defendants improperly accounted for liabilities and deferred costs related to the minimum interest guarantees, the management fees, policy surrender rates and the nature of the Transamerica contract, failed to adjust experience in performing loss recognition testing to determine amortization expenses, and failed to disclose the risks associated with the Transamerica contract.

In their complaint, plaintiffs allege that on October 25, 2001, ANR issued a press release announcing a third quarter loss

of $39.9 million, which was attributed to losses from September 11, losses incurred on a life insurance contract from 1998 and a write-down of $24.7 million of deferred acquisition costs associated with the annuity business. (Am. Compl. ¶ 145). The next day, ANR held a conference call with analysts to discuss the third quarter results, during which defendant Burke allegedly stated that "the Company believes that there is a low probability of any future write-offs on the contract." (Am. Compl. ¶ 147). Plaintiffs allege that ANR did not reveal its obligations to pay minimum interest guarantees and that ANR represented to analysts that the problems were solely due to high surrender rates. (Am. Compl. ¶ 147). Plaintiffs also allege that defendants' statement about write-offs was false and that the third quarter 2001 write-off was calculated by projecting investments returns of 10%. (Am. Compl. ¶ 154). Plaintiffs also allege that on January 15, 2002, ANR issued a press release announcing a fourth quarter charge of $33 million, which recognized past losses on the contract due to minimum interest guarantee payments and established a reserve to account for additional liabilities due remaining policyholders for guaranteed interest. (Am. Compl. ¶ 155). Plaintiffs allege that this is the first time that ANR disclosed the existence of minimum interest guarantees and that they affected profitability. (Am. Compl. ¶ 155).

Plaintiffs also allege that certain of the Individual Defendants, including defendant Hammer, signed the Form 10-K for 2001, which reported, <u>inter alia</u>, $20 million in reserves for

15

future minimum interest payments in addition to $10 million in extra coverage purchased from XL Capital against future losses (Am. Compl. ¶ 164); revised the section titled "Quantitative and Qualitative Disclosures About Market Risk" (Am. Compl. ¶ 165); reported Funds Withheld of $1.488 billion, of which $962 million was allocable to the Transamerica contract, with a yield of 4.7% totaling $71 million (Am. Compl ¶ 168); and did not disclose that the yield on funds associated with Transamerica was only 3.94% (Am. Compl ¶ 168).

Plaintiffs allege that the 2001 10-K report was inaccurate and fraudulent because it did not disclose that the management fees imposed on policyholders under the Transamerica contract meant that minimum interest guarantees would cause additional losses unless the Funds Withheld at Interest performed above 6.25%; the representation that reserves for future losses were adequate was erroneous because it assumed a 10% return on the convertible bonds which bore no resemblance to actual performance; that the write-downs of the deferred amortization costs were inconsistent with historical experience; and that ANR did not disclose that the convertible bonds underlying the Transamerica contract represented 70% of that portfolio; and that ANR did not segment and separately report its revenues, expenses and profits for its annuity and life insurance businesses. (Am. Compl ¶ 172).

In the present case, there is no dispute that misstatements were made, which affected the Company's profits. On March 21,

16

2003, ANR issued restated financial statements for the fiscal years ended December 21, 2000 and 2001, and quarterly statements for the quarters ended March 31, 2002, June 30, 2002, and September 30, 2002. (Am. Compl ¶ 214). ANR disclosed that there is doubt about the Company's ability to continue as an on going concern. (Am. Compl ¶ 217). On April 23, 2003, ANR disclosed that the New York Stock Exchange warning that the stock might be delisted. (Am. Compl ¶ 218). There also can be no dispute that defendant Hammer had a duty to exercise a certain level of care when making financial disclosures. These were not disclosures concerning future performance. These were statements about past performance concerning expenses relating to the Transamerica contract, as to which Hammer had knowledge or should have had knowledge. See Rothman, 220 F.3d at 90 (finding that plaintiffs had sufficiently alleged scienter based not upon the company's overly optimistic predictions of sales, but rather on its failure to expense royalty advances after poor sales were known).

Accordingly, the court finds that, when the allegations of the amended complaint, which are accepted as true for purposes of this motion, are read in their totality, plaintiffs have alleged sufficient facts from which a reasonable jury could find reckless conduct on the part of defendant Hammer. This is sufficient to meet the pleading standards for scienter in the Second Circuit. See Novak, 216 F.3d at 308; Rothman, 220 F.3d at 90-91.

B. Control Person Liability under § 20

To establish a prima facie claim of control person liability

17

under Section 20(a) of the Exchange Act, a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. See 15 U.S.C. § 78t(a); Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.1998) (quoting SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1472 (2d Cir.1996), cert. denied, 522 U.S. 812 (1997)). The control person liability provisions of Section 20(a) of the Exchange Act are similar to those of Section 15 of the Securities Act. Although worded differently, both provisions are generally interpreted the same way. See Wallace v. Buttar, 239 F.Supp.2d 388, 395 n.1 (S.D.N.Y.2003).

However, a split has emerged among the district courts in this circuit as to whether Section 15 claims require that plaintiffs allege the additional element of "culpable participation." Cf. DeMaria v. Andersen, 153 F.Supp.2d 300, 314 (S.D.N.Y.2001) (requiring a showing of culpable participation), with In re Deutsche Telekom AG Sec. Litig., No. 00 Civ. 9475, 2002 WL 244597, at *6-7 (S.D.N.Y. Feb.20, 2002) (requiring only a showing of control over primary violator); see also Dorchester Investors v. Peak Trends Trust, No. 99 Civ. 4696, 2003 WL 223466, at *3 (S.D.N.Y. Feb. 3, 2003) (discussing cases and concluding that majority of courts have not required a showing of culpable participation). The Second Circuit has yet to pass on this issue.

If plaintiffs have adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled. In re Scholastic Corp., 252 F.3d at 77-78. Control is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." See also First Jersey, 101 F.3d at 1472-73 (adopting this standard for Section 20(a) claim). A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002); In re IPO Sec. Litig., 241 F.Supp.2d at 352.

In the present case, the facts as pleaded support the reasonable inference that defendant participated in the allegedly fraudulent representations. Defendant signed multiple disclosures filed with the SEC that are alleged to have contained actionable misrepresentations, including Forms 10-K and registration statements. "The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents." In re Worldcom, Inc. Securities Litigation, No. 02 CIV 3288 (DLC),

19

2003 WL 21219049, at *24 (S.D.N.Y. May 19, 2003). "These approvals through signing sufficiently allege control over those who have been alleged to have violated Section 10(b), at least in connection with the misrepresentations and omissions in those documents." Id. at *25.

### IV. Conclusion

Accordingly, for the reasons set forth above, the court **denies** defendant Frederick S. Hammer's Motion to Dismiss **(Doc. #68)** the consolidated amended class action complaint.

SO ORDERED.

Date: February 4, 2004
      Waterbury, Connecticut.

_____
GERARD L. GOETTEL,
United States District Judge