# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHERRY SCHNALL, Individually and on Behalf: | | |
| of All Others Similarly Situated, | : | |
| | : | **CONSOLIDATED CIVIL ACTION** |
| Plaintiff, | : | **NO. 3:02-CV-2133 (GLG)** |
| v. | : | |
| | : | |
| ANNUITY AND LIFE RE (HOLDINGS), LTD., | : | |
| XL CAPITAL, LTD, LAWRENCE S. DOYLE, | : | |
| FREDERICK S. HAMMER, JOHN F. BURKE, | : | |
| WILLIAM W. ATKIN, BRIAN O'HARA, AND | : | |
| MICHAEL P. ESPOSITO JR., | : | **FEBRUARY 24, 2004** |
| | : | |
| Defendants. | : | |

## DEFENDANT FREDERICK S. HAMMER'S
## ANSWER TO CONSOLIDATED AMENDED COMPLAINT

Defendant Frederick S. Hammer ("Hammer"), by his attorneys, answers the

consecutively-numbered paragraphs of plaintiffs' Consolidated Amended Complaint as follows:

Plaintiffs' Heading:
"SUMMARY OF COMPLAINT"

1.      Admits that plaintiffs purport to bring this action as a class action on behalf of the

class as defined, but denies the remaining allegations.

2.      Admits the allegations of the first, second and fourth sentences (except denies that

ANR and its subsidiaries should be referred to collectively as ANR for all purposes), and further

admits, that, for an annuity reinsurance contract, ANR normally expects over the life of the

contract to make its profits primarily by earning "spreads" between amounts due policyholders

and the earnings derived from investment of policyholder premiums, but denies the remaining

allegations.

3.      Admits the allegations of the first, second and third sentences.  Hammer also admits that ANR's public filings stated:  that ANR conducted loss recognition testing at the end of each accounting period; that ANR updated historical and anticipated future experience at the end of each accounting period; and that ANR reflected revisions to estimated gross profits in earnings in the accounting period such estimates were revised.  Hammer denies the remaining allegations.

4.      Admits that ANR is a Bermuda corporation not subject to United States corporate taxes; that most of ANR's client companies are based in the United States and subject to state regulations; that ANR and Annuity and Life Reassurance, Ltd., ANR's Bermuda operating subsidiary, were not registered or licensed to do business in any United States jurisdiction, and, as a result, needed to post collateral in connection with a number of reinsurance agreements; that ANR sometimes posted collateral by obtaining letters of credit from banks; that ANR's financial ratings were sometimes important in connection with obtaining such letters of credit; and that some of ANR's contracts contain provisions relating to ANR's financial ratings.  Hammer denies the remaining allegations.

5.      Admits the allegations of the first and third sentences (except for the characterization of the Transamerica contract as "massive," which is denied); that ANR's 1999 10-K reported interest sensitive contracts liabilities to policyholders of approximately $1.6 billion; that the predominance of those liabilities was attributable to the Transamerica contract; that ANR's Transamerica contract was a modified coinsurance arrangement; that IL Annuity controlled and managed the investment of policyholder premiums, and that ANR assumed its share of risk in the event that the investments supporting its Funds Withheld at Interest asset

failed to earn a sufficient total return to pay the sums due surrendering policyholders.  Hammer denies the remaining allegations.

6.    Admits that the Transamerica contract differs significantly from ANR's other annuity reinsurance contracts in that the annuity products reinsured allowed policyholders to select among four "investment strategies;" that IL has retained investment managers, which have historically invested policyholder premiums consistent with the policyholder's selected investment strategy; that IL has historically credited rates reflecting the yield (consisting of income plus net realized capital gains and losses, less IL Annuity's targeted gross margin or aggregate expenses) on the assets then supporting the selected investment strategy; that various state laws require that fixed annuity policyholders receive minimum guaranteed interest of 3% to 3.5% per annum; and that holders of the underlying annuity policies had the opportunity to earn more than the guaranteed minimum interest rate if their selected investment strategy performed well.  Hammer denies the remaining allegations.

7.    Admits the allegations of the second and third sentences (except for the characterizations of the interest rate bonds pay as "guaranteed," and of that convertible bonds pay as "typically," "relatively low," which are denied); that at various points in time, consistent with policyholder investment strategy selections, approximately 70% of the premiums held and managed by IL Annuity were invested in convertible bonds; and that IL Annuity made minimum interest guarantee payments to various surrendering policyholders because the earnings (net of fees and including net realized capital gains and losses) on the assets supporting their selected investment strategies, after application of the total return adjustment, were insufficient to cover the minimum interest guarantees.  Hammer denies the remaining allegations.

8.    Denied.

9.      Admits that IL Annuity charged policyholders an annual management or administrative fee of approximately 2.5% of the assets plus some additional investment management expenses, for total expenses at certain times of approximately 2.75% of the assets annually; that under various state laws, policyholders were entitled to minimum guaranteed interest of 3% to 3.5% per annum; and that ANR did not in its public filings state the approximate percentage of assets amount of IL Annuity's aggregate annual expenses until the filing of its November 19, 2002 8-K. Hammer denies the remaining allegations.

10.      Admits that ANR did not in its public filings state the approximate percentage of assets amount of IL Annuity's aggregate annual expenses until ANR's filing of its November 19, 2002 8-K; that ANR did not in its public statements make reference to higher than expected surrender rates on a large annuity contract until its July 31, 2001 conference call, and to minimum interest guarantee payments on that contract until its January 15, 2002 press release; and that discussions between ANR and the SEC staff resulted in ANR's decision to restate its 2000 and 2001 financial statements. Hammer denies the remaining allegations.

11.      Admits that plaintiffs have accurately quoted a sentence and another part of a sentence from ANR's 1999 10-K (but denies that the portions plaintiffs have italicized were italicized or emphasized in the original, and that the words plaintiffs have bracketed appeared in the original), and that ANR's public filings stated: that ANR conducted loss recognition testing at the end of each accounting period; that ANR updated historical and anticipated future experience at the end of each accounting period; and that ANR reflected revisions to estimated gross profits in earnings in the accounting period such estimates were revised. Hammer denies the remaining allegations.

12.    Admits that ANR's financial ratings were at various times downgraded; that ANR has announced that it has ceased writing new reinsurance agreements and does not anticipate resuming to do so in the foreseeable future; and that ANR and its auditor have stated that there is substantial doubt about ANR's ability to continue as a going concern.  Hammer denies the remaining allegations.

Plaintiffs' Heading:
"<u>JURISDICTION AND VENUE</u>"

13.    Denied.

14.    Denied as legal conclusions.

15.    Admits that certain of the acts and transactions of which plaintiffs complain involved use of the mails and the facilities of national securities markets, but denies the remaining allegations.

16.    Denies as a legal conclusion the allegation that venue is proper; lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the last clause and, consequently, denies them; and denies the remaining allegations.

Plaintiffs' Heading:
"<u>PARTIES</u>"

17.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Communication Workers of America purchased ANR common stock, and, consequently, denies that allegation, and denies the remaining allegation of the first sentence. Admits the allegations of the second sentence.

18.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Midstream Investments, Ltd. purchased ANR common stock, and, consequently,

denies that allegation, and denies the remaining allegation of the first sentence. Admits the allegations of the second sentence.

19.    Admitted, except denies that Annuity and Life Re (Holdings), Ltd. is an operating company that directly provides reinsurance, and that ANR has any reinsurance contracts that indemnify the ceding company for all of the risks associated with the underlying insurance policies.

20.    Admits the allegations of the first and third sentences; that XL Capital, Ltd. filed a 13D, Amendment, No. 2, as of March 15, 2000, which stated that XL owned approximately 11.6% of ANR's common stock; that ANR's 2000 Proxy Statement stated that XL owned 11.1% of ANR's common stock; that XL filed a 13D, Amendment No. 4, as of November 27, 2001, which stated that XL owned approximately 12.9% of ANR's common stock; that ANR's 2001 Proxy Statement stated that XL owned 12.9% of ANR's common stock; and that XL did not further amend its 13D during the Class Period. Hammer denies the remaining allegations.

21.    Admitted.

22.    Admits that Hammer was throughout the Class Period the non-executive Chairman of ANR's Board of Directors; that from approximately September 12, 2002 until the end of the Class Period, Hammer was a non-executive Member of the Transition Committee of ANR's Board of Directors that was formed to oversee the management and operations of ANR until a new President and Chief Executive Officer was identified; and that Hammer was at various times a member of ANR's Board of Directors' Executive Committee, Finance and Investment Committee and Corporate Governance Committee. Hammer denies the remaining allegations.

23.    Admitted, (except denies that Burke was ANR's Treasurer).

24.     Admitted.

25.     Admitted.

26.     Admits the allegations of the second sentence, that Esposito was throughout the Class Period a Director of ANR and the non-executive Chairman of XL Capital's Board of Directors, and that Esposito was at certain times a member of ANR's Board of Directors' Executive Committee.  Hammer denies the remaining allegations.

27.     Admits that plaintiffs have chosen to refer to the referenced defendants collectively as the "Individual Defendants," but denies that those defendants should be grouped together for all purposes.

28.     Admits the allegations of the first and third sentences (except for the implicit allegation that each Individual Defendant, whether a director, officer or both, and irrespective of the time period during which he was with ANR, had identical access to information and participated in the same meetings and conversations, which is denied).  ANR also admits that Hammer, Esposito and O'Hara signed ANR's 1999, 2000, and 2001 10-Ks; that Doyle signed ANR's 1999, 2000 and 2001 10-Ks, and ANR's 2000, 2001 and first and second quarter 2002 10-Qs; that Atkin signed ANR's 1999 and 2000 10-Ks and ANR's 2000 and first and second quarter 2001 10-Qs; and that Burke signed ANR's 2001 10-K and third and fourth quarter 2001 and 2002 10-Qs.  Hammer denies the remaining allegations.

29.     Denied, except admits that each of the Individual Defendants was provided with copies of certain of the Company's reports, filings and/or press releases prior to or shortly after their issuance.

30.     Admits that the defendants who were officers, during the times that they were officers, directly participated in the management of the Company and had access to certain

confidential and proprietary information concerning the Company, and that the director

defendants had access to certain confidential and proprietary information concerning the

Company, but denies the remaining allegations.

31.    Denied.

32.    Denied, except admits that each of the Individual Defendants participated,

although to different extents and at different times, in the drafting, preparation and/or approval of

certain of the public filings and statements of which plaintiffs complain.

33.    Denied.

Plaintiffs' Heading:
"PLAINTIFFS' CLASS ACTION ALLEGATIONS"

34.    Admits that plaintiffs purport to bring this action as a class action on behalf of the

class as defined, but denies the remaining allegations.

35.    Admits the allegations of the first, second and fourth sentences.  Hammer lacks

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

what plaintiffs know or believe, and, consequently, denies those allegations.  Hammer denies the

remaining allegations.

36.    Lacks knowledge or information sufficient to form a belief as to the truth of the

allegations and, consequently, denies them.

37.    Admits that plaintiffs have retained counsel competent and experienced in class

and securities litigation, but lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations and, consequently, denies them.

38.    Admits that certain common questions of law and fact exist, but denies the

remaining allegations.

39.    Denies that any class member is entitled to damages, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and, consequently, denies them.

Plaintiffs' Heading:<br>"<u>SUBSTANTIVE ALLEGATIONS</u>"

Plaintiffs' Subheading:
"<u>Background Facts</u>"

40.    Admits the allegations of the first three sentences, and the first clause of the fourth sentence, but denies the remaining allegations.

41.    Admits that annuity policies often have the features described in the first two sentences, and that higher than originally anticipated surrender rates can have an adverse impact on a contract's profitability, but denies the remaining allegations.

42.    Admits the allegations of the first sentence and that various state laws require that fixed annuity policyholders receive minimum guaranteed interest of 3% to 3.5% per annum, but denies the remaining allegations.

43.    Admits, except for the allegations about what constitutes a "typical" reinsurance contract, which are denied.

44.    Admits the allegations of the first four sentences, but denies the remaining allegations.

45.    Admitted (except for the characterization of the Transamerica contract as ANR's "principal" annuity reinsurance contract, which is denied).

46.    Admits that IL Annuity's Visionmark policies underlying ANR's Transamerica contract are "investment-type" products within the meaning of FAS 97, but denies the remaining allegations.

47.     Admits the allegations of the third, fifth, sixth, seventh, eighth, ninth and tenth sentences; that ANR did not credit policyholders' accounts to reflect potential minimum interest guarantee payments that might be due if policyholders surrendered immediately; and that historical surrender rates were one factor ANR considered in conducting loss recognition testing. Hammer denies the remaining allegations.

48.     Admits, on information and belief, that as of December 1997, there were no Bermuda-based reinsurers specializing in life and annuity reinsurance. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what "was believed" as of that time, and, consequently, denies those allegations. Hammer denies the remaining allegations.

49.     Admits the allegations of the second, third, fourth and sixth sentences (except denies that ANR's ability to obtain secured letters of credit was necessary directly tied to ANR's credit-worthiness), and that, because ANR was not licensed or accredited in United States jurisdictions, ANR was required to post collateral in connection with some of its reinsurance contracts. Hammer denies the remaining allegations.

50.     Admits the allegations of the first sentence. Lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, consequently, denies them.

51.     Admits that plaintiffs have correctly quoted portions of ANR's September 29, 1998 press release and that the "significant annuity transaction" was ANR's Transamerica contract relating to IL Annuity's underlying Visionmark policies, but denies the remaining allegations.

52.     Admitted.

53.     Admits the allegations of the first, second and third sentences and that plaintiffs have correctly quoted a portion of a sentence from ANR's 1999 10-K, but denies that the portion plaintiffs have italicized was italicized or emphasized in the original, and denies the remaining allegations.

54.     Admits the allegations of the first and second sentences.  Lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, consequently, denies them.

Plaintiffs' Subheading:
"Undisclosed Adverse Facts
Affecting ANR's Business" - - Denied.

55.     Admits that plaintiffs have correctly stated the dollar amounts appearing in the third sentence; that policyholder surrender rates, fees and expenses charged by the primary insurer and minimum interest guarantee payments were factors that could potentially affect the contract's profitability; that ANR throughout the Class Period knew that surrender rates were far higher than ANR had assumed in pricing the product; and that ANR knew throughout the Class Period that the rates of total return IL Annuity earned on the assets IL Annuity had invested in convertible bonds were, in general, at first somewhat and later considerably lower than those ANR had assumed in pricing the product.  Hammer denies the remaining allegations.

56.     Admits the allegations of the second sentence and that, for an annuity reinsurance contract, ANR normally expects over the life of the contract to make its profits primarily by earning "spreads" between amounts due policyholders and the earnings derived from investment of policyholder premiums, but denies the remaining allegations.

57.     Admits the allegations of the second and third sentences; that the Transamerica contract differs significantly from ANR's other annuity reinsurance contracts in certain respects;

that IL Annuity charged policyholders aggregate annual expenses, which at certain times were approximately 2.75% of the assets; and that various state laws entitled fixed annuity policyholders to minimum guaranteed interest of 3% to 3.5% per annum.  Hammer denies the remaining allegations.

58.     Admits the allegations of the second, third and fourth sentences (except for the characterization of the underlying annuities as "unusual," which is denied), but denies the remaining allegations.

59.     Admitted.

60.     Admits the allegations of the second and third sentences; that at various points in time, consistent with policyholder investment strategy selections, approximately 70% of the premiums held and managed by IL Annuity were invested in convertible bonds; and that plaintiffs have correctly quoted a portion of a sentence from ANR's November 19, 2002 8-K (except denies that the parenthetical "(i.e., interest)" appears in that portion).  Hammer denies the remaining allegations.

61.     Admits the allegations of the second sentence and that plaintiffs have correctly quoted a portion of ANR's November 19, 2002 8-K, but denies the remaining allegations.

62.     Admits that plaintiffs have correctly stated the approximate percentages of total policyholder premiums that IL Annuity had, at various points in time, invested in convertible bonds and "high-yield" bonds, respectively, and that plaintiffs have correctly stated the quota shares of IL Annuity, Transamerica and ANR under the reinsurance agreements, but denies the remaining allegations.

63.     Admits that of ANR's 2000 income as reported in ANR's 2000 10-K, approximately 39.6%, or almost $16 million, represented income on the Transamerica contract. ANR also admits the allegations of the third sentence.  Hammer denies the remaining allegations.

64.     Denied.

65.     Admits that ANR knew throughout the Class Period that the rates of total return IL Annuity had earned on the assets IL Annuity had invested in convertible bonds were, generally, at first somewhat and later considerably lower than those ANR had assumed in pricing the product; and that for 2001 the yield on ANR's "Funds Withheld at Interest" asset relating to the Transamerica contract was 3.94%, but denies the remaining allegations.

66.     Admits that ANR did not credit each policyholder's account for any minimum interest guarantee payment the policyholder might be entitled to receive in the event such person immediately surrendered the policy, and that ANR restated its 2000 and 2001 financial statements in part to reflect as expenses minimum interest guarantee payments that ANR only later learned it had been making during those times, but denies the remaining allegations.

67.     Admits that Visionmark policyholder surrender rates were higher than ANR had anticipated in pricing from mid-1999 on, and extremely high relative to pricing throughout the Class Period; that ANR later learned that certain surrendering policyholders had during 1999, 2000 and the first three quarters of 2001 received minimum interest guarantee payments; that ANR has since continued to make such payments; and that ANR at times revised the surrender rate assumptions it used in setting its deferred acquisition cost amortization schedule.  Hammer denies the remaining allegations.

68.     Denied.

Plaintiffs' Heading:
"FALSE AND MISLEADING STATEMENTS
AND OMISSIONS DURING THE CLASS PERIOD" - - Denied.

69.    Admits (except, with respect to the first sentence, admits only that plaintiffs purport to define the Class Period as beginning on March 15, 2000, but denies the remaining allegations).

70.    Denied.

71.    Admits that plaintiffs have correctly quoted portions of ANR's 1999 10-K, but denies that the portions plaintiffs have italicized were italicized or emphasized in the original, and denies the remaining allegations.

72.    Admits that plaintiffs have correctly quoted portions of ANR's 1999 10-K and that plaintiffs have correctly cited the reported deferred acquisition cost amounts, but denies that the portions plaintiffs have italicized were italicized or emphasized in the original.

73.    Admits the allegations of the first sentence; that the income earned on ANR's Funds Withheld at Interest asset for 1999 was $64.6 million; that plaintiffs have correctly calculated the approximate yield earned from the Funds; that ANR did not specifically calculate and set forth that yield; and that plaintiffs have in the footnote correctly quoted a portion of ANR's 1999 10-K (except denies that the portion plaintiffs have italicized was italicized or emphasized in the original).  Hammer denies the remaining allegations.

74.    Admits that ANR's 1999 10-K listed a category of revenue called "other," that a portion of that revenue consisted of surrender fees received from policyholders surrendering Visionmark policies; that ANR later learned that certain of the surrendering policyholders had received minimum interest guarantee payments; and that the "other" revenue for 1999 was approximately $3.2 million.  Hammer denies the remaining allegations.

75.    Admits that plaintiffs have correctly quoted a portion of ANR's 1999 10-K, but denies that the portion plaintiffs have italicized was italicized or emphasized in the original.

76.    Admits that plaintiffs have correctly quoted a portion of a sentence from ANR's 1999 10-K (except denies that the portion of ANR's 1999 10-K that plaintiffs have italicized was italicized or emphasized, and that the words "we enter into" appeared, in the original), and that the quoted portion was in the section titled "Quantitative and Qualitative Disclosures About Market Risk," which is required under 17 C.F.R. § 229.305 (not 17 C.F.R. § 229.303). Hammer denies the remaining allegations.

77.    Admitted, except denies that the portion of ANR's 1999 10-K that plaintiffs have italicized was italicized or emphasized, and that the third sentence directly followed the second in the original.

78.    Admitted, except denies that the portion of ANR's 1999 10-K that plaintiffs have italicized was italicized or emphasized in the original.

79.    Denied.

(a)    Denied.

(b)    Denied.

(c)    Admits that the surrender rates for the policies underlying the Transamerica contract had been higher than expected during the second half of 1999, and that ANR later learned that it had in 1999 made approximately $100,000 in minimum interest guarantee payments. Hammer denies the remaining allegations.

(d)    Admits that during 1999 the predominance of ANR's Fund Withheld at Interest asset was attributable to the Transamerica contract, and that at various points in time, consistent with policyholder investment strategy selections, approximately 70% of the premiums

held and managed by IL Annuity were invested in convertible bonds, and that plaintiffs have correctly quoted two sentences from ANR's November 19, 2002 8-K, but denies the remaining allegations.

       (e)     Denied.

       (f)     Denied.

       (g)     Admits the allegations of the second sentence; that ANR in mid-2002 concluded, and publicly stated, that it "had embedded derivatives in certain of its fixed annuity reinsurance contracts that are required to be bifurcated from their host contracts and accounted for separately pursuant to FAS 133;" that ANR also concluded and publicly stated, that it need not apply FASB 133 to the Transamerica contract because ANR acquired that contract prior to the transition date ANR elected under FAS 133, as amended by FAS 137; and that ANR has publicly stated that if it applied FASB 133 to the Transamerica contract, the bifurcation and separate accounting for the embedded derivatives contained in that contract would add significant volatility to ANR's reported results.  Hammer denies the remaining allegations.

80.    Denied.

81.    Admits that the overall profitability of the Transamerica contract to ANR over time depended primarily on earning a targeted spread between amounts due policyholders, which could include minimum interest guarantee payments, and the earnings derived from investment of policyholder premiums; and that ANR's 1999 10-K did not discuss surrender rates for, or the returns on the assets supporting, the Transamerica contract.  Hammer denies the remaining allegations.

82.    Admitted (except for the allegations that ANR's April 19, 2000 press release reported "other" income of $1.8 million, and that the release quoted Doyle as referring to the annuity "segment," which are denied).

83.    Admits the allegations of the first and third sentences (except for matters of emphasis, which are denied); that ANR's first quarter 2000 10-Q repeated some of the information contained in the earnings release and reported that the Funds Withheld at Interest asset had earned a total of $21.8 million for the period; and that plaintiffs have correctly calculated the approximate yield on ANR's Funds Withheld at Interest asset.  Hammer denies the remaining allegations.

84.    Admits that a portion of the "other" revenue consisted of surrender fees from the Transamerica contract; that ANR did not in its first quarter 2000 10-Q state the sources of "other" revenue; that ANR later learned that certain of the surrendering policyholders received payments for minimum interest guarantees; and that plaintiffs have correctly quoted a portion of ANR's first quarter 2000 10-Q.  Hammer denies the remaining allegations.

85.    Admitted, except denies that the portion of ANR's 1999 10-K and first quarter 2000 10-Q that plaintiffs have italicized was italicized or emphasized in the originals.

86.    Denied.

87.    Admits the allegations of the second and third sentences; that ANR's recorded "Interest Sensitive Contracts Liability" did not credit policyholders' accounts for any minimum interest guarantee payments that might be due in the event that policyholders immediately surrendered their policies; that minimum interest guarantee payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had in the first quarter of 2000 made approximately $336,037 of minimum interest guarantee payments which, in light

of ANR's lack of knowledge, it had failed to record as an expense and had instead recorded as a reduction in its liabilities; and that ANR's restated financial statements restated that item as an expense. Hammer denies the remaining allegations.

88.     Admits that plaintiffs have correctly quoted a sentence from a Prudential Securities "Annuity & Life Re Company Update" dated April 24, 2000, but denies the remaining allegations.

89.     Admits that in a Research Note dated June 8, 2000, Prudential Securities stated that "ALRe's Management endorses . . . earnings growth of 25%" over the next two years. Hammer denies the remaining allegations.

90.     Admitted (except for the allegations that the release reported net income for the quarter of $7.8 million, and that $1.6 million of that was attributable to "other" income, which are denied).

91.     Admitted.

92.     Admits that on August 3, 2000, Standard & Poor's issued a press release affirming its single A- counterparty credit and financial strength ratings of Annuity and Life Reassurance Ltd., ANR's Bermuda operating subsidiary, and that plaintiffs have correctly quoted a portion of the release. Hammer denies the remaining allegations.

93.     Admitted, except for the allegation that ANR's second quarter 2000 10-Q reported all of the information contained in its earnings release, and the characterization of the yield rate as "mere," which are denied.

94.     Admits that ANR's second quarter 2000 10-Q did not discuss the sources of the "other" revenue; that some of the "other" revenue came from surrender fees relating to the Transamerica contract; that plaintiffs have correctly quoted fragmentary portions of ANR's

second quarter 2000 10-Q; and that because ANR did not know that minimum interest guarantee payments were being made, ANR had not expensed such payments, but had instead reduced its reported liabilities. Hammer denies the remaining allegations.

95.     Admits, except denies that the portion of ANR's second quarter 2000 10-Q and 1999 10-K that plaintiffs have italicized was italicized or emphasized in the originals.

96.     Admits that minimum interest guarantee payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had in the second quarter of 2000 made approximately $588,066 of minimum interest guarantee payments which, in light of ANR's lack of knowledge, it had failed to record as an expense and had instead recorded as a reduction in its liabilities; and that ANR's restated financial statements restated that item as an expense. Hammer denies the remaining allegations.

97.     Admits the allegations of the first sentence (except denies that the first clause plaintiffs have placed in quotes is an accurate quotation from A.M. Best's August 23, 2000 release and report); that on August 31, 2000, Fitch issued a press release affirming its A financial strength rating for Annuity & Life Reassurance, Ltd., ANR's Bermuda operating subsidiary; and that plaintiffs have correctly quoted a portion of Fitch's release. Hammer denies the remaining allegations.

98.     Admits the allegations of the first four sentences (except for the allegations that ANR's October 30, 2000 press release reported net income of $10.9 million and "other" income of $1.7 million, which are denied); that plaintiffs have correctly quoted certain fragmentary portions of ANR's third quarter 2000 10-Q; and that because ANR did not know that minimum interest guarantee payments had been made during the third quarter of 2000, ANR did not then

expense such payments, but instead treated them as reducing its liabilities.  Hammer denies the remaining allegations.

99.     Admits that plaintiffs have correctly quoted a portion of ANR's third quarter 2000 10-Q and 1999 10-K, but denies that the portion plaintiffs have italicized was italicized or emphasized in the originals.

100.    Admits that minimum interest guarantee payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had in the third quarter of 2000 made minimum interest guarantee payments of approximately $588,066, which, in light of ANR's lack of knowledge, it had failed to record as an expense and had instead recorded as a reduction in its liabilities; and that ANR's restated financial statements restated that item as an expense.  Hammer denies the remaining allegations.

101.    Admits the allegations of the first sentence; lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Bear Stearns reported, and, consequently, denies them; and denies the remaining allegations.

102.    Admits the allegations of the first and second sentences, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, consequently, denies them.

103.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and, consequently, denies them.

104.    Admits the allegations of the first six sentences (except for the allegation that ANR's February 12, 2001 release reported "other" income of $1.83 million, which is denied), and that ANR later stated that during 2000 it had sought to determine the validity of "unexpected increases in asset management expenses."  Hammer denies the remaining allegations.

105.    Admits that minimum interest guarantee payments should be recorded as expenses; that ANR later learned that it had made approximately $1.3 million in minimum interest payments during the fourth quarter of 2000, which, in light of ANR's lack of knowledge, it had failed to record as an expense and had instead recorded as a reduction in its liabilities; and that ANR later restated its financial statements to recognize that item as an expense.  Hammer denies the remaining allegations.

106.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and, consequently, denies them.

107.    Admitted, except for the allegations that ANR's 2000 10-K noted that income had increased 6 cents per share over the prior year, and reported ANR's "annuity segment" and "life insurance segment" together, which are denied.

108.    Admits that plaintiffs have correctly quoted portions of ANR's 2000 10-K, but denies that the portions plaintiffs have italicized were italicized or emphasized in the original, and denies the remaining allegations.

109.    Admits that plaintiffs have correctly quoted portions of ANR's 2000 10-K, but denies that the portions plaintiffs have italicized were italicized or emphasized in the original.

110.    Admits that ANR's 2000 10-K stated that total income earned on Funds Withheld at Interest for the year was $116,522,000.  Hammer lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the second or third sentences and, consequently, denies them.  Hammer denies the remaining allegations.

111.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first clause of the first sentence and, consequently, denies those allegations, and denies the remaining allegations.

112.    Admits that plaintiffs have correctly quoted a portion of ANR's 2000 10-K (except denies that the portion italicized by plaintiffs was italicized or emphasized in the original) and that plaintiffs have correctly calculated the approximate yield on ANR's Funds Withheld at Interest asset for 2000, but denies the remaining allegations.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Admits that plaintiffs have correctly quoted a portion of ANR's 2000 10-K, except denies that the words "and interest credited to clients' account balances" appeared in the original.

117.    Admits that minimum interest guarantee payments should be recorded as expenses; that ANR later learned that it had during 2000 made minimum interest guarantee payments, which, in light of ANR's lack of knowledge, it failed to record as an expense and instead recorded as a reduction in its liabilities; and that ANR's restated financial statements restated this item as an expense.  Hammer denies the remaining allegations.

118.    Admitted.

119.    Admits that plaintiffs have correctly quoted all but an omitted word ("currently" follows "Company" in the original) of a sentence from ANR's 2000 10-K, but denies that the portion italicized by plaintiffs was italicized or emphasized in the original, and denies the remaining allegations.

120.    Admits, except for the characterization that the 2000 10-K "went on to assure investors," which is denied.

121.    Denied.

122.    Admits that Doyle gave an interview to the Wall Street Transcript, which the Wall Street Transcript published on April 2, 2001, and that plaintiffs have correctly quoted a portion of Doyle's answer to one of the questions posed to him (except denies that the number "10" preceded the words "of whom;" "10" followed those words). Hammer denies the remaining allegations.

123.    Admits that ANR's April 26, 2001 press release stated that ANR would pay a dividend of 5 cents per share and that ANR intended to transfer the listing of its common stock to the NYSE. Hammer denies the remaining allegations.

124.    Admits the allegations of the first three sentences (except for the allegation that ANR's May, 2001 earnings release reported net income of nearly $4 million over the prior year, which is denied); that ANR's May 1, 2001 press release stated that ANR had credited approximately $6.7 million in interest to policyholders' accounts and reported approximately $3.13 million of "other" revenue; and that ANR later stated that its other income consisted primarily of net surrender fees. Hammer denies the remaining allegations.

125.    Admits that plaintiffs have correctly quoted ANR's May 2, 2001 press release and the allegations of the last sentence, but denies the remaining allegations.

126.    Admits the allegations of the first and third sentences (except denies that ANR's first quarter 2001 10-Q repeated all the information contained in ANR's May 1, 2001 earnings release); that ANR's first quarter 2001 10-Q stated that approximately $18 million of income had been earned on its Funds Withheld at Interest asset; that plaintiffs have correctly calculated the approximate annualized yield that such income represented on those funds; that the 10-Q did not discuss surrender rates on the Transamerica contract; and that plaintiffs have correctly quoted a fragment of the 10-Q. Hammer denies the remaining allegations.

127.    Admits that plaintiffs have correctly quoted a sentence from ANR's first quarter 2001 10-Q, but denies that the portion italicized by plaintiffs was italicized or emphasized in the original.

128.    Admits that minimum interest guarantee payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had during the first quarter of 2001 made minimum interest guarantee payments of approximately $1.6 million, which, in light of ANR's lack of knowledge, it had failed to record as an expense and instead recorded as a reduction in its liabilities; and that ANR's restated financial statements restated that item as an expense.  Hammer denies the remaining allegations.

129.    Admits that IL Annuity had originally written the Visionmark policies, which had been reinsured by Transamerica; that AmerUs Group acquired Indianapolis Life, of which IL Annuity was a subsidiary, in or about May, 2001; that Larry R. Prible had been Chairman, President and CEO of Indianapolis Life prior to the acquisition; and that in or about July, 2001, AmerUs announced Prible's retirement.  ANR lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and, consequently, denies them.

130.    Admits that after ANR announced his retirement, Atkin and/or his wife in May and July of 2001 exercised the bulk of his and/or her options to purchase ANR shares and then sold the shares, and also sold his and/or her other ANR stock; that Atkin and/or his wife sold his and/or her shares for more than $2,250,000 above his and/or her cost or basis; that Atkin's and/or his wife's transactions were publicly reported on Forms 4 filed with the SEC in June and August of 2001; that ANR's Proxy Statement, filed on April 12, 2002, erroneously reported certain information relating to those transactions; and that ANR's 2001 10-K-A, filed on March 21, 2003, corrected the error.  Hammer denies the remaining allegations.

131.    Admits, except for the characterization that Prudential Securities "praised" ANR's underwriting approach, which is denied.

132.    Admitted, except for the characterization that trading volume on May 22, 2001 was "heavy," which is denied.

133.    Admits the allegations of the first, second, fourth and fifth sentences (except denies that ANR's July 24, 2001 press release stated the per share amount of the dividend); that ANR's July 30, 2001 press release reported that net operating income had increased by 26% over the previous year; and that ANR's second quarter 2001 10-Q stated that deferred policy acquisition costs were approximately $246 million, that "other" revenue was approximately $4.64 million, and that the "other" income consisted primarily of net surrender fees.  Hammer denies the remaining allegations.

134.    Admits that ANR's share price closed at $35.06 on July 30, 2001, but denies the remaining allegations.

135.    Admitted.

136.    Admitted, except the allegation that ANR's second quarter 2001 10-Q repeated all the information contained in ANR's July 30, 2001 earnings announcement, and the characterization of the yield as "just," which are denied.

137.    Admits that ANR's second quarter 2001 10-Q, which was issued after Atkin's transactions in ANR shares and after ANR had announced his retirement, but before his August 31, 2001 retirement, stated that "other income" was "primarily derived from net surrender fees," and that surrender and withdrawal levels during the three and six month period ended June 30, 2001 had increased as compared to the three and six month period ended June 30, 2000.  ANR

also admits that plaintiffs have correctly quoted portions of the 10-Q. Hammer denies the remaining allegations.

138.    Admits that ANR's second quarter 2001 10-Q, unlike its earlier 10-Qs, had a separate section titled "Quantitative and Qualitative Disclosures about Market Risks;" that the 10-Q referred readers to Item 7A of ANR's 2000 10-K; and that plaintiffs have correctly quoted portions of the 10-Q. Hammer denies the remaining allegations.

139.    Admits that minimum interest guarantee payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had in the second quarter of 2001 made minimum interest guarantee payments of approximately $3.3 million, which, in light of ANR's lack of knowledge, ANR had failed to record as an expense and had instead recorded as a reduction in its liabilities; and that ANR's restated financial statements restated this item as an expense. Hammer denies the remaining allegations.

140.    Admits that minimum interest guarantee payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had in the first half of 2001 made minimum interest guarantee payments of approximately $4.9 million, which, in light of ANR's lack of knowledge, ANR had failed to record as an expense and instead recorded as a reduction in its liabilities; that, also because ANR did not know that it was making minimum interest guarantee payments, ANR did not then write down a related amount of deferred acquisition costs; that ANR's restated financial statements restated the minimum interest guarantee payments as expenses and wrote down the related deferred acquisition costs; that prior to the restatements, ANR had recognized approximately $6 million of income on the Transamerica contract during the first six months of 2001; and that after the restatements ANR recognized losses on the Transamerica contract for that period. Hammer denies the remaining allegations.

141.    Admits that on August 16, 2001, three days after ANR filed its second quarter 2001 10-Q, Fitch affirmed its A financial strength rating on, and revised its rating outlook from Stable to Positive for, Annuity & Life Reassurance, Ltd., ANR's Bermuda operating subsidiary. Hammer denies the remaining allegations.

142.    ANR admits that plaintiffs have correctly quoted portions of ANR's August 21, 2001 press release, which quoted portions of Standard & Poor's August 21, 2001 release (except denies that the portions plaintiffs have italicized were italicized or emphasized in the originals); that plaintiffs have correctly stated the date of the release, the contact person referred to, and ANR's web address, where press releases are available; and that the releases stated that Standard & Poor's had raised, *inter alia*, its financial strength ratings on ANR's operating subsidiaries from A- to A.  Hammer denies the remaining allegations.

143.    Denied.

Plaintiffs' Subheading:
"The Truth Begins to Emerge" - - Denies the implication that ANR's previous statements were deliberately and materially deceptive.

144.    Denied.

145.    Admits the allegations of the first and second sentences and that plaintiffs have correctly quoted portions of ANR's October 25, 2001 press release.  Hammer denies the remaining allegations.

146.    Admitted.

147.    Admits the allegations of the first and third sentences; that ANR's October 26, 2001 press release stated that Doyle had during the conference call "provided guidance on earnings in the $1.80 to $1.90 per share range;" and that in its October 26, 2001 conference call, ANR discussed high surrender rates; but did not discuss minimum interest guarantee payments.

Hammer lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Bear Stearns reported and, consequently, denies those allegations. Hammer denies the remaining allegations.

148.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, consequently, denies them.

149.    Admits that on October 29, 2001, Fitch affirmed its A financial strength rating on, and revised the rating outlook from Positive to Stable for, Annuity & Life Reassurance, Ltd., ANR's Bermuda operating subsidiary.  Hammer lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence, and, consequently, denies them.  Hammer denies the remaining allegations.

150.    Admits the allegations of the first sentence concerning the stock price and that ANR's October 29, 2001 press release stated that ANR would pay a 5 cent per share dividend on its common shares.  Hammer denies the remaining allegations.

151.    Admits the allegations of the first, third, fourth and fifth sentences (except the allegation that ANR's third quarter 2001 10-Q repeated all the information contained in ANR's October 25, 2001 earnings release, which is denied), and that the 10-Q reported "other income" of $5.513 million, which was "primarily net surrender fees."  Hammer denies the remaining allegations.

152.    Admits that plaintiffs have correctly quoted portions of ANR's second and third quarter 2001 10-Qs and 2001 10-K, but denies the remaining allegations.

153.    Admits that ANR later learned that it had in the third quarter of 2001 made approximately $4.4 million in minimum interest guarantee payments, which, in light of ANR's lack of knowledge, ANR had failed to record as an expense and had instead recorded as a

reduction in its liabilities; and that ANR's restated financial statements restated that item as an expense.  Hammer denies the remaining allegations.

154.    Denied.

155.    Admits that on January 15, 2002, ANR issued a press release, listing Doyle and Burke as contacts, which stated that ANR would "take a fourth quarter charge of approximately $33 million related to minimum interest guarantees" on its Transamerica contract, and that the charge comprised "payments for 2001 and a reserve for anticipated future payments;" that the release stated that ANR expected its net operating income for the full year 2002 to be between $1.70 and $1.80 per share; and that as of its January 15, 2002 release, ANR had announced that, for the third quarter and fourth quarters of 2001, ANR would recognize charges of $57.7 million in expenses for the Transamerica contract consisting of a deferred acquisition cost writedown, minimum guarantee payments and a reserve for such future payments.  Hammer denies the remaining allegations.

156.    ANR admits that its January 15, 2002 press release stated that "XL Capital has agreed to provide additional protection for up to $10 million for possible losses related to the minimum interest guarantees under this contract in excess of our charge," and quoted Burke as saying that, with respect to ANR's provision for 2001 minimum interest guarantee payments and a reserve for future liability and the assumptions ANR used in calculating those, "we believe our assumptions and actions are realistic."  ANR also admits that plaintiffs have correctly quoted a portion of the release.  Hammer denies the remaining allegations.

157.    Denied.

158.    Admits the allegations of the first, second and fourth sentences and the first clause of the third sentence, and that on January 16, 2002, Fitch placed its financial strength rating of

Annuity & Life Reassurance, Ltd., ANR's Bermuda operating subsidiary, on Rating Watch Negative. Hammer lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what J. P. Morgan stated and about what "market-watchers" thought and, consequently, denies those allegations. Hammer denies the remaining allegations.

159.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Bear Stearns and Keefe Bruyette & Woods reported, and, consequently, denies those allegations, and denies the remaining allegations.

160.    Admits the allegations of the third sentence regarding A.M. Best, and that on February 8, 2002, Fitch affirmed its A rating on, and changed the rating outlook from Stable to Negative for, Annuity & Life Reassurance, Ltd., ANR's Bermuda operating subsidiary. Hammer lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what analysts concluded and Bear Stearns reported and, consequently, denies those allegations. Hammer denies the remaining allegations.

161.    Admits the allegations of the first two sentences and that ANR's shelf registration represented ANR's first attempt to sell debt securities in the public market. Hammer denies the remaining allegations.

162.    Admits the allegations of the first sentence, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and, consequently, denies them.

163.    Denied.

164.    Admits the allegations of the first and last sentences; that plaintiffs have correctly quoted portions of ANR's 2001 10-K (but denies that the portion plaintiffs have italicized was italicized or emphasized in the original); and that the 10-K stated that during 2001, ANR

"established additional reserves of $20.0 million related to the Transamerica contract," and that XL Capital had "agreed to provide protection for up to $10 million against further deterioration in this contract." Hammer denies the remaining allegations.

165.     Admits that plaintiffs have correctly quoted a portion of ANR's 2001 10-K, but denies the remaining allegations.

166.     Admits that plaintiff have correctly quoted portions of ANR's 2001 10-K and prior 10-Ks, but denies that the portions plaintiffs have italicized were italicized or emphasized in the originals, and denies the remaining allegations.

167.     Admits the allegations of the first sentence (except denies that $102.3 million of the DAC was due to the Transamerica contract) and that plaintiffs have correctly quoted portions of ANR's 2001 10-K, but denies that the portions plaintiffs have italicized were italicized or emphasized in the original.

168.     Admits the allegations of the first, second and fourth sentences, and that the yield on ANR's Funds Withheld at Interest asset relating to the Transamerica contract for 2001 was 3.94%, which ANR stated in its 2001 10-K-A, but not in its 2001 10-K.   Hammer denies the remaining allegations.

169.     Admits that plaintiffs have correctly quoted portions of ANR's 2001 10-K, but denies the remaining allegations.

170.     Admitted.

171.     Admitted.

172.     Denied.

(a)     Admits that ANR's 2001 10-K did not specifically state the approximate percentage of assets amount of IL Annuity's aggregate annual expenses, but denies the remaining allegations.

(b)     Admits that ANR's 2001 10-K stated that "[W]hile management has made what it believes to be adequate provision for future costs based upon reasonable assumptions about future investment performance and surrenders, the provision is an estimate.  Actual amounts paid may be significantly higher or lower than the current reserve."  Hammer denies the remaining allegations.

(c)     Admits that because ANR did not know during 2000 and the first three quarters of 2001 that it had been making minimum interest guarantee payments, ANR did not then incorporate such payments into its DAC amortization analysis, and that ANR's restated financial statements did so.  Hammer denies the remaining allegations.

(d)     Admits that ANR's 2001 10-K did not discuss the approximate percentage of policyholder premiums that IL Annuity had invested in convertible bonds, but denies the remaining allegations.

(e)     Admits that ANR's 2001 10-K reported its annuity and life business as one business segment, but denies the remaining allegations.

173.    Admits the allegations of the first sentence and that ANR's 2001 Annual Report twice mentioned ANR's A ratings from Standard & Poor's, A.M. Best and Fitch.  Hammer denies the remaining allegations.

174.    Admits the allegations of the first and third sentences, and that ANR's April 23, 2002 press release reported net income for the quarter of $8.245 million, stated that the

Transamerica contract "no longer generates income," and did not "warn" of "future losses." Hammer denies the remaining allegations.

175.    Admitted, except denies that the portion of Burke's quotation that plaintiffs have italicized was emphasized in Burke's statement, and further denies that Burke "began" the conference call by explaining that ANR would in the future report results for its annuity and life segments separately.

176.    Admits that plaintiffs have substantially correctly quoted parts of certain statements made by Doyle and Burke, respectively, on ANR's April 24, 2002 conference call, but denies the remaining allegations.

177.    Admits that plaintiffs have substantially correctly quoted portions of a statement made by Doyle during ANR's April 24, 2002 conference call (but denies that the portion plaintiffs have italicized was emphasized by Doyle) and that many states require that fixed annuity policyholders receive minimum guaranteed interest of 3% to 3.5% per annum on their premium payments, but denies the remaining allegations.

178.    Admitted, except denies that the portion of Burke's statement during the April 24, 2002 conference call that plaintiffs have italicized was emphasized by Burke; that ANR's first quarter 2002 10-Q reported "surrender fees of $3.9 million;" that the yields on the Funds Withheld at Interest assets for other annuity contracts were "significantly" better than the yield on the assets supporting the Transamerica contract; and that the 5% yield on the Funds Withheld at Interest asset is properly characterized as "only."

179.    Denied.

180.    Denied, except admits that while Doyle was ANR's CEO and a director, he regularly monitored ANR's financial results.

181.    Admits that on July 25, 2002, ANR issued a press release announcing a write-down of approximately $24 million in deferred acquisition costs relating to the Transamerica contract; that ANR on August 15, 2002 issued a press release announcing a second quarter loss of over $20 million; and that plaintiffs have in the second sentence correctly quoted portions of ANR's July 25, 2002 press release.  Hammer denies the remaining allegations.

182.    Admitted, except denies that the portions of ANR's July 25, 2002 press release plaintiffs have italicized were italicized or emphasized in the original.

183.    Admits that ANR's July 25 2002 press release stated that it would implement FAS 133 and restate its financial results "for the year 2001 and the first quarter of 2002," and that ANR and its auditors had concluded that ANR's "annuity reinsurance agreements, which are standard industry modified coinsurance agreements or coinsurance funds withheld agreements, contain embedded derivatives."  Hammer also admits that plaintiffs have correctly quoted a sentence from ANR's November 19, 2002 8-K (except denies that the portion plaintiffs have italicized was italicized or emphasized in the original).  Hammer denies the remaining allegations.

184.    Denied.

185.    Admitted.

186.    Admitted.

187.    Admits that ANR later learned that it had made minimum interest guarantee payments relating to the Transamerica contract in 1999, 2000 and the first three quarters of 2001; that, in light of ANR's lack of knowledge, ANR had failed to record these payments as expenses, but had instead recorded them as a reduction in its liabilities; and that ANR's restated 2000 and 2001 financial statements restated these items as expenses.  Hammer lacks knowledge or

information sufficient to form a belief as to the truth of the allegations concerning the comments of Bear, Stearns and, consequently denies them.  Hammer denies the remaining allegations.

188.    Admitted.

189.    Admits the allegations of the first, second and fourth sentences, and that ANR's August 15, 2002 press release and second quarter 2002 10-Q stated that because of the pending SEC review, KPMG, ANR's independent auditor, was not able to complete its review of ANR's financial statements in ANR's second quarter 2002 10-Q.  Hammer denies the remaining allegations.

190.    Admits the allegations of the second sentence, and that ANR's second quarter 2002 10-Q stated that it would reclassify "the $19,500,000 reserve component of the $33,000,000 charge taken in the fourth quarter of 2001 in connection with minimum interest guarantees" as a "writedown of deferred acquisition costs."  Hammer denies the remaining allegations.

191.    Admits that plaintiffs have correctly quoted portions of ANR's second quarter 2002 10-Q, but denies that the portions plaintiffs have italicized were italicized or emphasized in the original, and denies the remaining allegations.

192.    Admits, as ANR's second quarter 2002 10-Q stated, that in estimating the amount of the second quarter  2002 charge for the Transamerica contract, ANR had "assumed an annual investment return of 0% on convertible bonds for the remainder of 2002, with an 8% return assumed for 2003 and thereafter."  Hammer denies the remaining allegations.

193.    Admits that ANR's second quarter 2002 10-Q stated that in connection with ANR's writedown of deferred acquisition costs for the Transamerica contract, ANR had "assumed annual policyholder lapse rates of 26% for 2002 and 21% for 2003," which was

"consistent with our experience for 2001," and that ANR had increased its assumed lapse rate for the second half of 2002 to 28%. Hammer denies the remaining allegations.

194.     Admits that ANR in its second quarter 2001 10-Q reported that "surrender fees and other revenues" were $6.16 million, which consisted "primarily" of "net surrender fees" and was a higher figure than prior quarters, and that the yield on ANR's Funds Withheld at Interest asset for the first six months of 2001 was 5.14%; that the 10-Q was the first time ANR had in its public filings specifically stated the yield on its Funds Withheld at Interest asset; and that the 10-Q stated that if management's estimates regarding future lapse rates and investment returns did not "prove to be accurate," ANR might "be required to write down additional deferred acquisition costs" on the Transamerica contract. Hammer denies the remaining allegations.

195.     Admits that ANR's second quarter 2002 10-Q stated that ANR had unsecured letters of credit with Citibank of approximately $89 million; that these letters had been "posted as security to allow certain of our ceding companies to take credit on their statutory financial statements for reinsurance obtained from us;" that Citibank had requested that those letters be secured; and that ANR was "seeking to raise capital to fund its collateral requirements and eliminate the need for Citibank's unsecured letters of credit." Hammer also admits that plaintiffs have correctly quoted portions of the 10-Q, except denies that the portions plaintiffs have italicized were italicized or emphasized in the original. Hammer denies the remaining allegations.

196.     Denied.

(a)     Admits that ANR's second quarter earnings release and 10-Q did not state that a yield of more than 6.25% was needed "to avoid further losses" on its Transamerica contract, but denies the remaining allegations.

(b)    Admits that the annualized yield on ANR's Funds Withheld at Interest asset relating to the Transamerica contract was 3.8% for the first nine months of 2002, and that the average annualized yield on ANR's Funds Withheld at Interest asset for the first six months of 2002 was 5.14%.  Hammer denies the remaining allegations.

(c)    Admits that ANR had not fully written off all its deferred acquisition costs for the Transamerica contract, but denies the remaining allegations.

197.    Admits that plaintiffs have substantially correctly quoted portions of statements made by Doyle and Burke, respectively, in ANR's August 16, 2002 conference call, but denies that Burke said "are drastically overreactive" (the words were "have drastically overreacted"), and that the portion plaintiffs have italicized was emphasized by Doyle.  Hammer denies the remaining allegations.

198.    Denied.

199.    Admits that ANR's September 12, 2002 press release stated: that "Mr. Doyle has resigned as President, Chief Executive Officer and a director of the company, but he has agreed to remain with the Company on an interim basis to assist with certain projects;" that "[u]ntil an appropriate replacement is identified, a Transition Committee of the Board of Directors will oversee the management and operations of the Company;" and that Hammer and another Board member were the non-executive Members of the Transition Committee.  Hammer also admits the allegations of the second and third sentences.  Hammer denies the remaining allegations.

200.    Admitted.

201.    Admitted, except denies that the date of ANR's press release was November 12, 2002 (the press release was issued on November 13, 2002).

Plaintiffs' Subheading:
"<u>More Revelations to the Market</u>" - - Denied.

202.     Admits that plaintiffs have correctly quoted a portion of ANR's November 19, 2002 press release, but denies that the portions italicized by plaintiffs were italicized or emphasized in the original.

203.     Admits that plaintiffs have correctly quoted portions of ANR's November 19, 2002 8-K, but denies that the portions italicized by plaintiffs were italicized or emphasized in the original, and denies the remaining allegations.

204.     Admits that ANR's November 19, 2002 8-K stated that "such expenses generally accrue at a rate of approximately 2.5% of the assets annually," and that ANR's 2001 10-K-A, filed on March 21, 2003, stated that "such expenses generally accrue at a rate of approximately 2.75% of the assets annually," but denies the remaining allegations.

205.     Admits that plaintiffs have correctly quoted a portion of ANR's November 19, 2002 8-K, but denies that the portion italicized by plaintiffs was italicized or emphasized in the original, and denies the remaining allegations.

206.     Admits that ANR's November 19, 2002 8-K stated that for the first nine months of 2002, the yield on ANR's Funds Withheld at Interest Asset related to the Transamerica contract had been 3.8% and that the average yield on ANR's Funds Withheld at Interest Asset had been 5.8%, and that plaintiffs have correctly quoted a portion of the 8-K (but denies that the portion plaintiffs have italicized was italicized or emphasized in the original).  Hammer denies the remaining allegations.

207.     Admits that ANR's November 19, 2002 8-K provided data supplied to ANR by Transamerica as of September 30, 2002 regarding the assets held and managed by IL Annuity,

showing, *inter alia*, the "type of security," "book value," "market value," and "percentage of total," and that plaintiffs have correctly quoted the stated book value and market value of the convertible bonds and "below investment grade U.S. corporate bonds," respectively.  Hammer denies the remaining allegations.

208.    Admits that minimum interest guarantee interest payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had been making such payments during 2000 and the first three quarters of 2001, which, in light of ANR's lack of knowledge, ANR had failed to record as expenses and had instead recorded as a reduction in its liabilities; that, also because of ANR's lack of knowledge that it had been making minimum interest guarantee payments, ANR had not then adjusted its related deferred acquisition costs on the Transamerica contract; that ANR's restated 2000 and 2001 financial statements restated minimum interest guarantee interest payments as expenses and made related DAC adjustments; that ANR's November 19, 2002 8-K stated that ANR would be restating its 2000 and 2001 and first and second quarter 2002 financial statements; and that plaintiffs have correctly quoted portions of the 8-K (but denies that the portions italicized by plaintiffs were italicized or emphasized in the original).  Hammer denies the remaining allegations.

209.    Hammer admits that plaintiffs have correctly quoted a sentence from ANR's November 19, 2002 8-K, but denies that the portions italicized by plaintiffs were italicized or emphasized in the original.  Hammer denies the remaining allegations.

210.    Hammer admits that plaintiffs have correctly quoted portions of ANR's November 19, 2002 8-K, but denies that the portions italicized by plaintiffs were italicized or emphasized in the original, and denies the remaining allegations.

211.    Admitted.

Plaintiffs' Subheading:
"Post-Class Period Events"

212.     Admits that ANR's January 2, 2003 press release stated:   that ANR had
"transferred five blocks of life reinsurance business to XL, which has in turn entered into a 50%
quota share reinsurance contract with the Company with respect to four of those blocks of
business;" that the transfer enabled ANR "to satisfy a substantial portion of the collateral
requirements under its reinsurance contracts;" and that ANR expected "to record a non-cash
charge in the fourth quarter of 2002 of at least $20 million in connection with the writedown of
deferred acquisition costs associated with the contracts transferred to XL."  Hammer denies the
remaining allegations.

213.     Admits the allegations of the second sentence, and that on February 24, 2003,
ANR issued a press release stating that it had "ceased writing new business and had notified its
existing customers that it will not be accepting any new business under its existing treaties on
their current terms."  Hammer denies the remaining allegations.

214.     Admits the allegations of the first two sentences (except for matters of emphasis,
which are denied); that ANR's restated financial statements for 2000 treated minimum interest
guarantee payments ANR had only later learned that it was then making as an expense; and that
ANR's 2001 10-K-A stated that expenses associated with the Transamerica contract "generally
accrue at a rate of approximately 2.75% of the assets annually," and that ANR had during 2000
sought to determine the validity of "unexpected increases in asset management expenses."
Hammer denies the remaining allegations.

215.     Admits the allegations of the second sentence; that ANR's Proxy Statement, filed
on April 12, 2002, had erroneously reported certain information relating to Atkin's transactions in

ANR securities; and that ANR's 2001 10-K-A corrected the error. Hammer denies the remaining allegations.

216.    Admits that plaintiffs have correctly quoted portions of ANR's 1999, 2000 and 2001 10-Ks and ANR's 2001 10-K-A, and that the wording of the latter differs from that of the former, but denies the remaining allegations.

217.    Admits that plaintiffs have correctly quoted a portion of ANR's 2001 10-K-A, but denies the remaining allegations.

218.    Admits that on April 21, 2003, ANR issued a press release announcing: that it had been notified by the NYSE that ANR did not satisfy the NYSE's "continued listing standards as of [April 8, 2003] because the average closing price of the Company's common shares had been below $1.00 for a 30 consecutive trading day period;" that the NYSE would commence delisting proceedings if the Company could not "achieve a $1.00 average share price for 30 consecutive trading days within six months of the receipt of this notification;" and that the NYSE was "considering whether the Company continues to meet certain of the NYSE's qualitative continued listing standards due to concerns over the Company's financial condition." Hammer denies the remaining allegations.

219.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and, consequently, denies them.

220.    Admits that on July 2, 2003, ANR filed a 2002 10-K-A and that plaintiffs have correctly quoted a sentence from the 10-K-A, but denies the remaining allegations.

Plaintiffs' Heading:
"DEFENDANTS' FALSE AND MISLEADING
FINANCIAL STATEMENTS" - - Denied.

Plaintiffs' Subheading:
"Violations of Generally Accepted Accounting Principles (GAAP)" – Denied.

221.    Admits that each of ANR's Class Period 10-Ks contained a "Report of

Management," which included a statement that "[t]he consolidated financial statements included

in this report were prepared in accordance with accounting principles generally accepted in the

United States of America applied on a consistent basis," and a "Report of Independent Auditors,"

which stated the auditors' opinion that "the consolidated financial statements . . . present fairly, in

all material respects, the financial position of the Company and its subsidiaries . . . and the results

of their operations and cash flows . . . in conformity with accounting principles generally accepted

in the United States of America."  Hammer further admits that each of its Class Period 10-Qs

prior to August 15, 2002 contained a section titled "Basis of Presentation," which stated that

"[t]he accompanying unaudited consolidated financial statements of the Company have been

prepared in accordance with accounting principles generally accepted in the United States of

America ("U.S. GAAP") for interim financial information and in accordance with Regulation S-

X.  Accordingly, they do not include all information in the footnotes required by U.S. GAAP for

complete financial statements."  Hammer denies the remaining allegations.

222.    Denied.

(a)    Denied.

(b)    Admits that ANR later learned that it had during 2001 and 2002 made

minimum interest guarantee payments; that, in light of ANR's lack of knowledge, ANR had not

then made related deferred acquisition cost adjustments; and that ANR's restated 2000 and 2001 financial statements made such adjustments.  Hammer denies the remaining allegations.

       (c)     Denied.

       (d)     Denied.

223.   Admitted.

224.   Admits the allegations of the first and third sentences (except lacks knowledge or information sufficient to form a belief as to the truth of the exact quotation plaintiffs make from the AICPA professional standards, and, consequently, denies that allegation), and that management has primary responsibility for preparing financial statements that conform to GAAP, but denies the remaining allegations.

Plaintiffs' Subheading:
"ANR Improperly Failed to Disclose Significant
Accounting Policies, Practices and Relevant Trends" - - Denied.

225.   Admits the allegations of the first sentence, but denies the remaining allegations.

226.   Denied.

227.   Admits that ANR did not in its public statements discuss the specific future lapse rate assumptions it was using to determine its deferred acquisition cost amortization until its October 26, 2001 conference call, and that ANR did not in its public statements discuss the future investment return assumptions it was using for that purpose until its January 16, 2002 conference call.  Hammer denies the remaining allegations.

228.   Admitted.

229.   Admitted, except denies that the portion of SEC Interpretive Release No. 34-26831 that plaintiffs have italicized was italicized or emphasized in the original and that

plaintiffs have correctly quoted the Release (the final portion actually reads "and reasonably likely to have material effects on the registrant's financial condition or results of operation").

230.   Admitted.

231.   Admits that ANR knew that Visionmark policyholder surrender rates were higher than ANR had anticipated in pricing from mid-1999 on, and knew throughout the Class Period that surrender rates were extremely high relative to pricing; that ANR later learned that it had during 2000 and the first three quarters of 2001 made minimum interest guarantee payments, which, in light of ANR's lack of knowledge, it had failed to record as expenses and had instead recorded as a reduction in its liabilities; that ANR's restated financial statements restated these items as expenses; and that ANR did not until the filing of its November 19, 2002 8-K specifically describe in its public filings the approximate percentages of policyholder premiums that IL Annuity had invested, respectively, in all the various investment strategies, the yield on ANR's Funds Withheld at Interest asset for the Transamerica contract, the book and market values of the assets invested in the various investment strategies, and how various factors affect the prices of convertible bonds.  Hammer denies the remaining allegations.

Plaintiffs' Subheading:
"ANR Improperly Failed to Acknowledge Losses,
or Accrue Liabilities for Future Policy Benefits" - - Denied.

232.   Admitted.

233.   Admits that minimum interest guarantee payments in connection with surrenders should be recorded as expenses; that ANR later learned that it had during 2000 and the first three quarters of 2001 made such payments, which, in light of ANR's lack of knowledge, it had failed to record as expenses and had instead recorded as a reduction of its liabilities; and that ANR's

restated financial statements restated these items as expenses.  Hammer denies the remaining allegations.

234.    Admits that ANR accounted for the Transamerica contract as an investment-type contract within the meaning of FAS 97, but denies the remaining allegations.

235.    Admits that plaintiffs have correctly quoted portions of FAS 97 and SFAS 60, and the allegations of the second sentence.  Hammer denies the remaining allegations.

236.    Admits that SFAS 60, ¶¶ 35-37 contain some of the wording cited by plaintiffs, but denies the remaining allegations.

237.    Admits that plaintiffs have correctly quoted portions of FAS 97, ¶18 (except denies that the bracketed "[an]" appears in the original), but denies the remaining allegations.

238.    Admits that plaintiffs have correctly quoted portions of SFAS 60 (except denies that the portions italicized by plaintiffs were italicized or emphasized in the original), but denies the remaining allegations.

239.    Denied.

240.    Denied.

241.    Admits the allegations of the first, second and third sentences concerning the partial contents of SFAS 5, and that until January 15, 2002, ANR had not recorded any minimum interest guarantee payments as expenses, established a reserve for anticipated future minimum interest guarantee obligations or disclosed loss contingencies related to minimum interest guarantee payments, but denies the remaining allegations.

242.    Admits that FASB Interpretation No. 14 is titled "Reasonable Estimation of the Amount of a Loss," and that plaintiffs have paraphrased a portion of one paragraph of the Interpretation (but omitted other portions), and that until January 15, 2002 ANR had not recorded

any minimum interest guarantee payments as expenses, or established a reserve for future minimum interest guarantee obligations, but denies the remaining allegations.

243.    Admitted, except denies that the portion of Regulation S-X plaintiffs have italicized was italicized or emphasized in the original, and lacks knowledge and information sufficient to form a belief as to the truth of the allegations concerning what the SEC thought in promulgating Regulation S-X, and, consequently, denies those allegations.

244.    Admits that plaintiffs have correctly quoted a portion of APB Opinion No. 28, ¶ 17, but denies the remaining allegations.

245.    Admitted.

246.    Denied.

247.    Admits that ANR later learned that it had in 2000 and the first three quarters in 2001 made minimum interest guarantee payments, which, in light of ANR's lack of knowledge, it had failed to record as expenses and had instead recorded as a reduction of its liabilities; that ANR's restated financial statements restated these items as expenses; that ANR decided, as a result of discussions with the SEC staff, to restate its 2000, 2001 and interim 2002 financial statements to, *inter alia*, implement FASB 133, which ANR had not known or believed to be applicable prior to mid-2002; that ANR's restated financial statements implemented FASB 133 regarding accounting for "embedded derivatives;" and that plaintiffs have correctly quoted a fragmentary portion of APB Opinion No. 20.  Hammer denies the remaining allegations.

Plaintiffs' Subheading:
"ANR Improperly Failed to Report
Its Financial Results by Segments" - - Denied.

248.    Admits that SFAS No. 131 is titled "Disclosures About Segments of an Enterprise and Related Information" and requires public business enterprises to report information by business segment where certain conditions are met, but denies that SFAS No. 131 required ANR prior to reporting its 2002 quarterly results, to report its annuity and life businesses as separate segments, and denies the remaining allegations.

249.    Hammer incorporates by reference his answer to paragraph 248 above, as if set forth fully herein.

250.    Admits that beginning in 2002, ANR's president and CEO began to review ANR's results separately for ANR's life and annuity segments, but denies the remaining allegations.

Plaintiffs' Subheading:
"ANR Improperly Failed to Disclose its
Full Risks Related to the Funds Withheld at
Interest Associated with the Transamerica Contract" - - Denied.

251.    Admits that plaintiffs have correctly quoted a portion of SFAS No. 115 (except denies that the portion that plaintiffs have italicized was italicized or emphasized in the original), but denies the remaining allegations.

252.    Admits that SEC Regulation S-K, Item 305, 17 C.F.R § 229.305 (not 17 C.F.R. § 229.303) is titled "Quantitative and Qualitative Disclosures about Market Risk," but denies the remaining allegations.

253.    Denied.

254.    Denied.

Plaintiffs' Subheading:
"<u>ANR's Materially False and Misleading Financial Statements</u>" - - Denied.

255.    Denied.

(a)    Denied.

(b)    Denied.

(c)    Denied.

(d)    Denied.

(e)    Denied.

(f)    Denied.

(g)    Denied.

(h)    Denied.

Plaintiffs' Heading:
"<u>ADDITIONAL SCIENTER ALLEGATIONS</u>"

256.    Admits that ANR had access to the information its cedent, Transamerica, supplied concerning the nature of the annuity policies issued by IL Annuity and the performance of the reinsurance contract, and that ANR understood the significance to the contract's long-term profitability of surrender rates, state-imposed minimum interest guarantees and investment returns on, *inter alia*, the assets invested in convertible bonds.  Hammer also admits that the Individual Defendants each had access to some of the foregoing information (but denies that each individual defendant had identical access whether he was an officer, a director or both, and irrespective of when he was with the Company).  Hammer lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what XL Capital, Ltd.

knew or understood regarding the foregoing, and, consequently, denies those allegations. Hammer denies the remaining allegations.

Plaintiffs' Subheading:
"Defendants' Knowledge of the Falsity of ANR's Representations" - - Denied.

257.    Admits the allegations of the second, third, fourth and fifth sentences, but denies the remaining allegations.

258.    Admits that ANR filed its Registration Statement with the SEC on December 24, 1997, and that plaintiffs have correctly quoted portions of the Registration Statement (except denies that the portions italicized by plaintiffs were italicized or emphasized in the original), but denies the remaining allegations.

259.    Admits that plaintiffs have correctly quoted a portion of ANR's Registration Statement, but denies the remaining allegations.

260.    Denied.

261.    Admits that ANR's 2001 10-K-A stated:   that Transamerica had supplied ANR with monthly settlement reports and that ANR analyzed policyholder surrenders and the investment performance of the assets underlying the contract; that ANR had noticed that surrenders for the policies from mid-1999 on had been higher than anticipated in pricing; and that ANR had during 2000 sought to determine the validity of "unexpected increases in asset management fees."  Hammer denies the remaining allegations.

262.    Admits that the Individual Defendants have the experience set forth in ANR's 2000 and 2001 Proxy Statements, but denies the remaining allegations.

263.    Admits that during ANR's April 24, 2002 conference call, Burke stated that, going forward, ANR would be reporting separately its results for the annuity and life segments

and that "[o]ur belief is that this type of presentation is far more meaningful and informative to you.  It is also the basis upon which Larry monitors results."  Hammer denies the remaining allegations.

264.    Admits that defendants Doyle, Hammer, Esposito and O'Hara signed each 10-K during the Class Period; that defendant Atkin signed the 1999 and 2000 10-Ks; and that defendant Burke signed the 2001 10-K.  ANR further admits that each of the foregoing 10-Ks contained a "Report of Management," which stated: that "[m]anagement of the Company has established and maintains a system of internal controls designed to provide reasonable assurance as to the integrity and reliability of the consolidated financial statements;" that "[m]anagement of the Company has primary responsibility for preparing the consolidated financial statements and for their integrity and objectivity;" and that "[t]he consolidated financial statements included in this report were prepared in accordance with accounting principles generally accepted in the United States of America applied on a consistent basis."  Hammer denies the remaining allegations.

265.    Admits that each of ANR's 10-Ks stated: that under Bermuda law, Annuity & Life Reassurance, Ltd., ANR's Bermuda operating subsidiary, was "required to submit an annual actuary's certificate when filing its Statutory Financial Return;" that the "certificate must state whether or not in the opinion of the insurer's approved actuary, the aggregate amount of the liabilities of the insurer in relation to long term business as at the end of the relevant year exceeded the aggregate amount of those liabilities as shown in the insurer's statutory balance sheet;" that Annuity & Life, Reassurance, Ltd.'s approved actuary was Robert P. Mills; that Bermuda law "provides that the value of the long term business assets of an insurer carrying on long term business must exceed the amount of its long-term business liabilities by at least

$250,000;" and that Annuity & Life Reassurance, Ltd. "met the minimum statutory capital and surplus requirements" as of the end of the year covered by the particular 10-K.  ANR also admits:  that several of its 10-Ks stated that ANR's underwriting and pricing were based in part on actuarial models developed by an "experienced underwriting team;" that the NAIC has promulgated an Actuarial Opinion and Memorandum Regulation, which has been adopted in substance in various states of the United States (but denies that that Regulation applies to the actuarial work that must be performed pursuant to Bermuda law in connection with the actuarial certificate that accompanies a Bermuda insurer's Statutory Financial Return); and that plaintiffs have in general terms in the fourth, fifth and sixth sentences correctly described certain aspects of the process known as cash flow testing as explained by the Regulation.  Hammer denies the remaining allegations.

266.    Admits that plaintiffs have correctly quoted certain fragmentary portions of ASOP Nos. 22 and 7, but denies that those standards, which are promulgated by the American Academy of Actuaries, apply to the actuarial work that must be performed pursuant to Bermuda law in connection with the actuarial certificate that accompanies a Bermuda insurer's Statutory Financial Return.  Hammer denies the remaining allegations.

267.    Admits that plaintiffs have correctly quoted portions of ASOP No. 11 (except denies that the portions that plaintiffs have italicized were italicized or emphasized in the original), but denies that that standard, which was promulgated by the American Academy of Actuaries, applies to the actuarial work that must be performed pursuant to Bermuda law in connection with the actuarial certificate that accompanies a Bermuda insurer's Statutory Financial Return.  Hammer denies the remaining allegations.

268.    Denied.

Plaintiffs' Subheading:
"Defendants' Motive to Commit Fraud" - - Denied.

269.     Admits that financial ratings were important to ANR's business, but denies the remaining allegations.

270.     Admits that Atkin, ANR's former CFO, sold his ANR stock between May and July, 2001, and publicly filed Forms 4 reflecting such sales in June and August, 2001; that ANR's Proxy Statement, filed on April 12, 2002, erroneously reported certain information relating to Atkin's transactions in ANR securities; and that ANR's 2001 10-K-A, filed on March 21, 2003, corrected the error.  Hammer denies the remaining allegations.

271.     Admits that prior to ANR's announcement of Atkin's retirement, Atkin and/or his wife held 142,499 options to purchase ANR stock at prices below the market price, and owned 21,527 shares of ANR's stock; that in May and July of 2001, Atkin and/or his wife exercised the bulk of his and/or her options to purchase ANR's stock and then sold the shares, and also sold his and/or her other ANR stock; that Atkin and/or his wife sold his and/or her shares for more than $2,250,000 above his and/or her cost or basis; that Atkin's total cash compensation for 2000 was approximately $500,000; that ANR in its public statements first made specific reference to difficulties with its Transamerica contract during ANR's July 31, 2001 conference call; that ANR in its public filings first stated that its "other income" consisted primarily of net surrender fees in its second quarter 2001 10-Q, filed on August 13, 2001;  and that ANR announced its first charge related to the Transamerica contract on October 25, 2001.  Hammer denies the remaining allegations.

272.     Admits that Atkin had not sold ANR stock prior to May 2001, but denies the remaining allegations.

273.    Denied.

Plaintiffs' Heading:
"APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET-DOCTRINE" – Denied.

274.    Admits that ANR securities traded first on NASDAQ and later on the NYSE, but denies the remaining allegations.

275.    Denied.

276.    Denied.

277.    Admits the allegations of subparagraphs (a), (b), and (c), but denies the remaining allegations.

278.    Admits that ANR was followed by several securities analysts employed by major brokerage firms who at times wrote reports, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, consequently, denies them.

279.    Lacks knowledge or information sufficient to form a belief as to the allegations of the first sentence, and, consequently, denies them.  Hammer denies the remaining allegations.

Plaintiffs' Heading:
"NO SAFE HARBOR" – Denied.

280.    Denied.

Plaintiffs' Heading:
"<u>COUNT I</u>" – Denied.


Plaintiffs' Subheading:
"<u>Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against ANR and the Individual Defendants</u>" – Denied.


281.    Hammer incorporates by reference his answers to paragraphs 1 to 280 above, as if set forth fully herein.

282.    Denied.

283.    Denied.

284.    Denied.

285.    Denied.

286.    Denied.

287.    Denied.

288.    Denied.

289.    Denied.

290.    Denied.

291.    Denied.

Plaintiffs' Heading:
"COUNT II" - - Denied

Plaintiffs' Heading:
"Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants and XL Capital" – Denied.

292.    Hammer incorporates his answers to paragraphs 1 to 291 above by reference, as if set forth fully herein.

293.    Denied.

294.    Denied.

295.    Denied.

296.    Admits that plaintiffs have correctly quoted a portion of XL Capital's 2000 10-K (except denies that the portion plaintiffs have italicized was italicized or emphasized, and that the bracketed symbols appeared, in the original), but denies the remaining allegations.

WHEREFORE, Hammer respectfully asks that this Court grant judgment in his favor and against plaintiffs, together with his attorneys' fees and costs in this action and such other and further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

297.    The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

298.    The Complaint fails to plead fraud with particularity as required by the Private Securities Litigation Reform Act of 1995 and Federal Rule of Civil Procedure 9(b).

## THIRD AFFIRMATIVE DEFENSE

299.    To the extent the Complaint is based on any forward-looking statement by ANR, plaintiffs are barred from recovery by the "bespeaks caution" doctrine because ANR provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of each forward-looking statement to render each such forward-looking statement immaterial.

## FOURTH AFFIRMATIVE DEFENSE

300.    To the extent that the Complaint is based on any forward-looking statement contained in ANR's public disclosures, plaintiffs are barred from recovery by the safe harbor provision of the Private Securities Litigation Reform Act of 1995 because (i) each such forward-looking statement was identified as a forward-looking statement and was accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ from those in the forward-looking statement; (ii) assuming that any such forward-looking statement was false and misleading, and Hammer denies that any forward-looking statement was false or misleading, the forward-looking statement was not made with actual knowledge that it was false or misleading; and (iii) each such forward-looking statement was immaterial.

## FIFTH AFFIRMATIVE DEFENSE

301.    To the extent they have been damaged, if at all, plaintiffs' failure to mitigate their damages limits or bars recovery.

## SIXTH AFFIRMATIVE DEFENSE

302.    Plaintiffs cannot recover against Hammer because the losses, if any, sustained by plaintiffs resulted from causes other than the acts and occurrences alleged in the Complaint.

<u>SEVENTH AFFIRMATIVE DEFENSE</u>

303.    Each of ANR's Class Period 10-Ks contained a "Report of Independent Auditors," which stated that KPMG had audited ANR "in accordance with auditing standards generally accepted in the United States of America," and that, in KPMG's opinion, ANR's "consolidated financial statements . . . present fairly, in all material respects, the financial position of the Company and its subsidiaries. . . . and the results of their operations and cash flows . . . in conformity with accounting principles generally accepted in the United States of America."

304.    KPMG also reviewed the accounting principles ANR applied in issuing its interim quarterly financial statements, and did not disagree with management's opinion that those statements were prepared in accordance with GAAP.

305.    Hammer recognizes that ANR's financial statements are the primary responsibility of management.  Nevertheless, Hammer respected KPMG's expertise and in good faith relied, when signing ANR's 10Ks and approving other ANR public filings and statements, on KPMG's unqualified opinions that ANR's year-end financial statements fairly presented in all material respects the financial position of ANR and its subsidiaries in conformity with GAAP, and on KPMG's interim quarterly reviews of the accounting principles ANR applied, and non-disagreement with management's opinion that ANR's interim quarterly financial statements were prepared in accordance with GAAP.

### EIGHTH AFFIRMATIVE DEFENSE

306.    To the extent that plaintiffs establish that ANR made false and misleading representations or omissions, which Hammer denies, plaintiffs' claims are barred by the "truth on the market" corollary to the "fraud on the market" theory of reliance because the information misrepresented or omitted was known to the market, already in the public domain and/or reasonably available to shareholders.

### NINTH AFFIRMATIVE DEFENSE

307.    Plaintiffs' claims are barred because plaintiffs failed to exercise due diligence in connection with their purchase of ANR shares.

### TENTH AFFIRMATIVE DEFENSE

308.    To the extent that plaintiffs establish that ANR made material misrepresentations or omissions, which Hammer denies, plaintiffs are barred from recovery because they did not rely on such misrepresentations and/or omissions.

### ELEVENTH AFFIRMATIVE DEFENSE

309.    Plaintiffs' claims are barred by the applicable statute of limitations.

### TWELFTH  AFFIRMATIVE DEFENSE

310.    Hammer acted in good faith in connection with the statements, omissions, actions and/or inactions of which plaintiffs complain.

## THIRTEENTH AFFIRMATIVE DEFENSE

311.    In the event that plaintiffs establish that ANR is liable to plaintiffs, which Hammer denies, Hammer did not culpably participate in any of the statements, omissions, actions and/or inactions giving rise to any such ANR liability.

## FOURTEENTH AFFIRMATIVE DEFENSE

312.    Hammer lacked the power to control the actions of ANR.

WHEREFORE, Hammer respectfully asks that this Court grant judgment in his favor and against plaintiffs, together with his attorneys' fees and costs in this action and such other and further relief as the Court deems just and proper.

DEFENDANT FREDERICK S. HAMMER

By_____
    James F. Stapleton (ct04267)
    Terence J. Gallagher (ct22415)
    Day, Berry & Howard, LLP
    One Canterbury Green
    Stamford, Connecticut 0901
    Tel. (203) 977-7300
    Fax  (203) 977-7301

       and

    Edward M. Posner (ct09775)
    Gary R. Battistoni (ct24690)
    Drinker Biddle & Reath LLP
    One Logan Square
    18th and Cherry Streets
    Philadelphia, PA  19103-6996
    Tel. (215) 988-2700
    Fax (215) 988-2757

    R. Nicholas Gimbel, Esq.
    McCarter & English, LLP
    Mellon Bank Center
    Philadelphia, PA  19103
    Tel. (215) 979-3800
    Fax (215) 979-3899

    Attorneys for Defendant
    Frederick S. Hammer

## <u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY that a copy of the foregoing was mailed on this 24th day of February, 2004, via first-class mail, postage prepaid, to the following counsel:

David R. Scott, Esq.
Erin Green Comite, Esq.
Karen M. Leser, Esq.
Scott & Scott LLC
108 Norwich Ave.
Colchester, CT 06415

Peter E. Siedman, Esq.
Beth Kaswan, Esq.
Ann M. Lipton, Esq.
Milberg, Weiss, Bershad, Hynes & Lerach LLP
One Pennsylvania Plaza
New York, New York 10119

John W. Cannavino, Esq.
Robert Sickinger, Esq.
Cummings & Lockwood LLC
Four Stamford Plaza
107 Elm Street
Stamford, CT 06902

James H. Bicks, Esq.
Wiggin & Dana LLP
400 Atlantic Street, 7th Floor
P.O. Box 110325
Stamford, CT 06911

John R. Horvack, Jr., Esq.
Carmody & Torrance LLP
50 Leavenworth St., P. O. Box 1110
Waterbury, CT 06721

Joseph T. Baio, Esq.
Kelly M. Hnatt, Esq.
Michelle J. Nadel, Esq.
Willkie, Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019

Thorn Rosenthal, Esq.
Tammy Roy, Esq.
Cahill, Gordon & Reindel
80 Pine Street
New York, NY 10005

Lawrence W. Andrea, Esq.
57 North Street, Ste. 313
Danbury, CT 06810

James T. Shearin, Esq.
Peter S. Olson, Esq.
Pullman & Comley LLC
850 Main St., P. O. Box 7006
Bridgeport, CT 06601

Marc Edelson, Esq.
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901

Frederick S. Gold, Esq.
Morgan P. Rueckert, Esq.
Shipman & Goodwin LLP
300 Atlantic Street
Stamford, CT 06901

Steven D. Ecker, Esq.
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103

_____
Terence J. Gallagher