UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*

*FEB 26  2 44 PM '04*

U.S. DISTRICT COURT
NEW HAVEN, CONN.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
SHERRY SCHNALL, Individually and
On behalf of All Others Similarly
Situated

        Plaintiff,

        -against-

ANNUITY AND LIFE RE (HOLDINGS),LTD.,   **No. 3:02 CV 2133 (GLG)**
XL CAPITAL, LTD., LAWRENCE S. DOYLE,   <u>OPINION</u>
FREDERICK S. HAMMER, JOHN F. BURKE,
WILLIAM W. ATKIN, BRIAN O'HARA, AND
MICHAEL O. ESPOSITO JR.

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

     Before the court is defendant John F. Burke's motion to
dismiss the consolidated amended class action complaint. For the
reasons set forth below, the court **denies** defendant's Motion to
Dismiss (Doc. #73).

<u>I. Factual History and Procedural Background</u>

     This matter was commenced on December 2, 2002; subsequently,
eight other cases were filed against Annuity and Life Re
(Holdings), Ltd. ["ANR"], and its officers and directors. On
April 3, 2003, the court granted a motion to consolidate all nine
actions, with Schnall as the lead case and Communications Workers
of America and Midstream Investments, Ltd. as lead plaintiffs.
(Doc. #33). On July 11, 2003, plaintiffs filed a consolidated
amended class action complaint against defendants, ANR, XL
Capital, Ltd., Lawrence S. Doyle ["Doyle"], Frederick S. Hammer

["Hammer"], John F. Burke ["Burke"], William W. Atkin ["Atkin"], Brian O'Hara ["O'Hara"], and Michael P. Esposito Jr. ["Esposito"], [collectively the "Individual Defendants"], alleging violations of federal securities laws, which injured purchasers of ANR securities between March 15, 2000 and November 19, 2002 [hereinafter the "Class Period"]. Plaintiffs also allege that ANR's stock price fell from a Class Period high of $36.98 to $2.24 on the last day of the Class Period.

In the consolidated amended class action complaint, plaintiffs allege the following background facts. ANR is a Bermuda corporation formed in 1997 as a holding company to sell annuity and life reinsurance products. Burke was the Chief Financial Officer, Senior Vice President, Corporate Secretary and Treasurer, and Principal Accounting and Financial Officer of ANR from approximately September 17, 2001 until the end of the Class Period.

ANR and its subsidiaries indemnify other insurance companies ("primary insurers" or "ceding companies") against their obligations to their own policyholders in exchange for a reinsurance premium. Many of ANR's client companies are based in the United States and are subject to state regulation. Those regulations require reinsurers to either be qualified by the state or to post collateral in connection with their reinsurance agreements.

In 1998, a few months after the initial public offering, ANR executed a contract with Transamerica Occidental Life Insurance

2

["Transamerica"], a U.S. based insurance and reinsurance company, to provide reinsurance for an approximately $1.6 billion book of annuity policies. Under the contract, ANR indemnified Transamerica and the primary insurer, IL Annuity and Insurance Company ["IL Annuity"], for a percentage of the total liabilities due from IL Annuity to the annuity policyholders. In return, ANR received a proportional share of the securities which IL Annuity purchased with the policyholder premiums. The underlying annuity policies were part of a series called VisionMark which allowed policyholders to select among four investment strategies. Various state laws also require that fixed annuity policyholders receive a minimum guaranteed interest rate of 3% to 3.5% per annum. This minimum was paid regardless of the annual management fee of approximately 2.75% which IL Annuity charged all policyholders. Therefore, ANR needed to earn an annual investment return of 6.25% to fund the minimum interest guarantees to policyholders.

Approximately 70% of the premiums on the VisionMark policies held by IL Annuity were invested in convertible bonds; such bonds convert into common stock of the issuing company if the stock price rises above a certain price. The convertible bonds generally paid a lower interest rate than other corporate bonds, but had the potential for higher total returns depending on the performance of the equity markets. Il Annuity assumed 20% of the risk of the Visionmark policies, with Transamerica retaining 16% and ANR assuming 64% of the risk. The decline in the stock market in 1999, the low earnings on investments and the higher than

3

expected surrender rates adversely impacted ANR's financial performance.

Plaintiffs allege, _inter_ _alia_, that ANR made a series of misstatements and omissions during the Class Period regarding the risks of the Transamerica contract, the aforementioned 2.75% management fee, its method of accounting for liabilities for the guaranteed interest payments, the surrender rates and associated expenses, the impact of ANR's initial assumptions on the amortization of capitalized commission costs, and that the financial statements were not prepared in accordance with Generally Accepted Accounting Principles ["GAAP"]. Plaintiffs allege that these false and misleading statements and omissions were made in financial statements and in public filings with the Securities and Exchange Commission ["SEC"], in ANR's Annual Report to Shareholders, and in certain press releases and conferences to financial analysts.

Plaintiffs further allege that the SEC required ANR to restate all of its SEC filings during the Class Period. ANR's financial ratings were sharply downgraded and it ceased writing new business. ANR's status as an on going concern is in question.

## II. Standard of Review

In deciding a motion to dismiss, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. _See_ _Easton_ _v._ _Sundram_, 947 F.2d 1011, 1014-15 (2d Cir. 1991), _cert._ _denied_, 504 U.S. 911 (1992). A complaint should not be dismissed "unless it appears

4

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)(footnote omitted). The issue on a motion to dismiss "is not whether plaintiff will prevail, but whether he is entitled to offer evidence to support his claims." <u>United States v. Yale New Haven Hosp.</u>, 727 F. Supp. 784, 786 (D.Conn.1990)(citation omitted).

For purposes of a motion to dismiss, the court deems a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." <u>Rothman v. Gregor</u>, 220 F.3d 81, 88-89 (2d Cir.2000)(citations omitted).

### III. Discussion

The consolidated amended class action complaint contains two counts. The first alleges that ANR and the Individual Defendants engaged in securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The second count alleges "control person" liability under Section 20(a) of the Exchange Act against the Individual Defendants and XL Capital, LTD. Defendant moves to dismiss the first count on the grounds that plaintiffs have failed to plead scienter with particularity as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), ["PSLRA"], that alleged

5

misstatements and omissions are non-actionable "forward-looking"
statements protected by the safe harbor provisions of the PSLRA,
and that plaintiffs have failed to adequately plead reliance.
Defendant also moves to dismiss the Section 20(a) claim on the
grounds that plaintiffs have failed to plead Burke's culpable
participation in any underlying violations of the securities
laws.

## A. Section 10(b) Claims

Section 10(b) of the Exchange Act forbids the use of "any
manipulative or deceptive" practice in connection with the
purchase or sale of securities. See 15 U.S.C. § 78j(b). As a
claim made pursuant to section 10(b) asserts securities fraud, it
must also comply with the pleading requirements of PSLRA, as well
as the pleading requirements of Rule 9(b) of the Federal Rules of
Civil Procedure. See In re Health Mgmt. Sys., Inc. Sec. Litig.,
No. 97 Civ. 1865, 1998 WL 283286, at *2-3 (S.D.N.Y. June 1,
1998). The PSLRA requires a complaint to "specify each statement
alleged to have been misleading [and] the reason or reasons why
the statement is misleading." See 15 U.S.C. § 78u-4(b)(1). Thus,
a Section 10(b) claim must: "(1) specify the statements that the
plaintiff contends were fraudulent, (2) identify the speaker, (3)
state where and when the statements were made, and (4) explain
why the statements were fraudulent." Stevelman v. Alias Research
Inc., 174 F.3d 79, 84 (2d Cir.1999); see also Novak v. Kasaks,
216 F.3d 300, 306 (2d Cir.2000), cert. denied, 531 U.S. 1012
(2000).

6

The U.S. Court of Appeals for the Second Circuit has found that the PSLRA pleading requirements are essentially a codification of the Second Circuit's interpretation of what is required by Rule 9(b). See Novak, 216 F.3d at 309-10 ("the PSLRA did not change the basic pleading standard for scienter in this circuit").

### 1. Motive and Opportunity

The court first turns to the issue of whether defendant made any materially false statements or omitted any material facts with scienter. A plaintiff may establish the requisite scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." Novak, 216 F.3d at 307. Plaintiffs have alleged that defendant was motivated to perpetuate the fraud in order to maintain ANR's financial ratings and to satisfy conditions on existing contracts, attract new business and post required letters of credit as collateral for its reinsurance agreements. (Am. Compl. ¶ 269). As a Chief Financial Officer of ANR with access to insider information, defendant Burke certainly had the opportunity to commit fraudulent acts. The next issue is whether plaintiffs have sufficiently pled motive.

"Motive is the stimulus that causes a person or entity to act or to fail to act.  Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct." In re

7

_Scholastic Corp. Sec. Litigation_, 252 F.3d 63, 74 (2d Cir.2001),

_cert. denied_, 534 U.S. 1071 (2001). Sufficient motive allegations

entail concrete benefits that a defendant could realize as a

result of one or more of the false statements and wrongful

nondisclosures alleged. Novak, 216 F.3d at 307. Motives that are

generally possessed by most corporate officers and directors will

not suffice. Instead, plaintiffs must assert a concrete and

personal benefit to the individual defendant that will result

from the fraud. Id. Thus, the motive and opportunity elements are

generally met when corporate insiders misrepresent material facts

to keep stock prices high in order to sell their own shares at a

profit. Id at 308. However, the Second Circuit has held that the

desire for the corporation to appear profitable is an

insufficient motive to establish scienter. Id. at 307; see also

Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir.2001); Shields v.

Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir.1994)

(allegation that defendants manipulated stock price in order to

protect executive positions and compensation and prestige derived

therefrom insufficient to support an inference of fraudulent

intent).

Here, the only motives offered by plaintiffs are defendant's

desire to maintain ANR's financial ratings and attract new

business. Defendant Burke asserts that he purchased, but did not

sell, ANR stock and that the absence of sales of ANR stock during

the Class Period are inconsistent with a motive to commit fraud.

(Def.'s Mem. at 16). In keeping with Second Circuit precedent,

8

the court concludes that these allegations of motive to commit fraud are insufficient to give rise to a strong inference of fraudulent intent so as to meet the requirements of the Securities Reform Act for pleading scienter.

### 2. Conscious Misbehavior or Recklessness

Having concluded that plaintiffs' consolidated amended class action complaint fails to sufficiently demonstrate defendant's motive and opportunity to defraud, the court now considers whether plaintiffs have demonstrated strong circumstantial evidence of defendant's conscious misbehavior or recklessness. "[I]t is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." <u>In re Initial Public Offering Sec. Litig.</u>, 241 F.Supp.2d 281, 329 (S.D.N.Y.2003).

Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>In re Carter-Wallace, Inc. Sec. Litig.</u>, 220 F.3d 36, 39 (2d Cir.2000). The Second Circuit has clarified that a strong inference of recklessness or conscious misbehavior may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting

9

that their public statements were not accurate; or (4) failed to
check information they had a duty to monitor. <u>Novak</u>, 216 F.3d at
311.

"[S]ecurities fraud claims typically have sufficed to state
a claim based on recklessness when they have specifically alleged
defendants' knowledge of facts or access to information
contradicting their public statements. Under such circumstances,
defendants knew or, more importantly, should have known that they
were misrepresenting material facts related to the corporation."
<u>Novak</u>, 216 F.3d at 308. However, corporate officials "need not be
clairvoyant" and are only responsible for information reasonably
available to them. <u>Id</u>. at 309. Nor are corporate officials
required to paint "an overly gloomy or cautious picture of
current performance and future prospects," provided that their
public statements are consistent with reasonably available data.
<u>Id.</u>

Defendant Burke argues that plaintiffs' allegations
pertaining to him involve subjective matters of accounting, such
as the timing and setting of reserves, the timing and size of
write-downs and charges to earnings. Defendant maintains that
these decisions "necessarily involve a high degree of management
discretion and judgment," and some of the decisions were made
prior to the time defendant joined ANR. (Def.'s Mem. at 23-24).
Furthermore, defendant claims that plaintiffs have failed to
allege how the accounting method departed from GAAP. (<u>Id</u>. at 25).

In this case, plaintiffs allege generally that the

10

Individual Defendants had access to material adverse non-public information, and that the Individual Defendants knew or recklessly disregarded that adverse facts had not been disclosed to the investing public and that affirmatively false and misleading statements were being made to the public. (Am. Compl. ¶ 28). Plaintiffs also allege that the Individual Defendants were "involved in drafting, producing, reviewing, and/or disseminating [] false and misleading statements and . . . knew or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws." (Am. Compl. ¶ 30). Plaintiffs generally allege that ANR's financial statements were false and misleading because the Individual Defendants improperly accounted for liabilities and deferred costs related to the minimum interest guarantees, the management fees, policy surrender rates and the nature of the Transamerica contract, failed to adjust experience in performing loss recognition testing to determine amortization expenses, and failed to disclose the risks associated with the Transamerica contract.

In their complaint, plaintiffs also allege that on October 25, 2001, ANR issued a press release announcing a third quarter loss of $39.9 million, which was attributed to losses from September 11, losses incurred on a life insurance contract from 1998 and a write-down of $24.7 million of deferred acquisition costs associated with the annuity business, listing defendant

Burke, who had recently been hired as the new Chief Financial Officer, and Doyle as contacts. (Am. Compl. ¶ 145). The next day, ANR held a conference call with analysts to discuss the third quarter results, during which defendant Burke allegedly stated that "the Company believes that there is a low probability of any future write-offs on the contract." (Am. Compl. ¶ 147). Plaintiffs allege that ANR did not reveal its obligations to pay minimum interest guarantees and that ANR represented to analysts that the problems were solely due to high surrender rates. (Am. Compl. ¶ 147). Plaintiffs also allege that defendant's statement about write-offs was false and that the third quarter 2001 write-off was calculated by projecting investments returns of 10%. (Am. Compl. ¶ 154). Plaintiffs also allege that on January 15, 2002, ANR issued a press release announcing a fourth quarter charge to earnings of $33 million, which recognized past losses on the contract due to minimum interest guarantee payments and established a reserve to account for additional liabilities due remaining policyholders for guaranteed interest, listing Burke and Doyle as contacts. (Am. Compl. ¶ 155). Plaintiffs allege that this is the first time that ANR disclosed the existence of minimum interest guarantees and that they affected profitability. (Am. Compl. ¶ 155).

Plaintiffs also allege that certain of the Individual Defendants, including defendant Burke, signed the Form 10-K for 2001, which reported, _inter_ _alia_, $20 million in reserves for future minimum interest payments in addition to $10 million in

extra coverage purchased from XL Capital against future losses
(Am. Compl. ¶ 164); reported Funds Withheld of $1.488 billion, of
which $962 million was allocable to the Transamerica contract,
with a yield of 4.7% totaling $71 million (Am. Compl. ¶ 168); and
did not disclose that the yield on funds associated with
Transamerica was only 3.94% (Am. Compl. ¶ 168).

Plaintiffs allege that the 2001 10-K report was inaccurate
and fraudulent because it did not disclose that the management
fees imposed on policyholders under the Transamerica contract
meant that minimum interest guarantees would cause additional
losses unless the Funds Withheld at Interest performed above
6.25%; the representation that reserves for future losses were
adequate was erroneous because it assumed a 10% return on the
convertible bonds which bore no resemblance to actual
performance; that the write-downs of the deferred amortization
costs were inconsistent with historical experience; and that ANR
did not disclose that the convertible bonds underlying the
Transamerica contract represented 70% of that portfolio; and that
ANR did not segment and separately report its revenues, expenses
and profits for its annuity and life reinsurance businesses. (Am.
Compl. ¶ 172).

After the release of the 10-K report, plaintiffs allege that
Burke and Doyle participated in a conference call with analysts
on April 24, 2002, to discuss first quarter results. (Am. Compl.
¶ 175). Burke and Doyle affirmed that reserves on the
Transamerica contract were reasonable. (Am. Compl. ¶ 176). Burke

also told analysts, "[a]s we discussed before, our largest annuity contract which represents 62% of our annuity assets is expected to break even going forward." (Am. Compl. ¶ 178). Doyle stated that "[o]ur plan for the year should deliver a $1.40 to $1.35 per share." (Am. Compl. ¶ 178). On August 15, 2002, ANR filed its Form 10-Q, stating its second quarter results, which included a $24.8 million write-down. In the press release issued the same day, Doyle stated that "the recent poor performance of the convertible bond market has resulted in an additional charge on our largest annuity contract." (Am. Compl. ¶ 189). In a conference call to analysts the next day, Doyle stated that ANR had provided full and detailed disclosures about Transamerica. Burke added, "[t]he item that has created the most volatility for us is the Transamerica contract, and I think we have provided some fairly good fences for you folks to put a ring around what kind of exposure you have got there. It is our view that the markets are drastically over reactive to it."(Am. Compl. ¶ 197).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 239 n.17 (1988). "[A] duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events." <u>In re Time Warner Inc. Securities Litigation</u>, 9 F.3d 259, 267 (2d Cir.1993), <i>cert. denied</i>, 511 U.S. 1017 (1994). [U]pon choosing to speak, one must speak truthfully about material issues." <u>Caiola v. Citibank N.A.</u>, 295 F. 3d 312, 331 (2d Cir.2002).

14

### 3. Forward Looking Statements

Defendant Burke contends that his statements to analysts about ANR's business conditions were "forward-looking" statements, protected by the PSLRA's safe harbor provisions. (Def.'s Mem. at 30). Under the safe-harbor provisions of the PSLRA, a statement regarding a forward looking statement generally does not give rise to a securities fraud claim if either: (I) it is accompanied by meaningful cautionary language, or (ii) the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading. See 15 U.S.C. § 78u-5(c). However, "it is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." In re Independent Energy Holdings PLC Sec. Litig., 154 F.Supp.2d 741, 757 (S.D.N.Y.2001). It is true that "statements containing simple economic projections, statements of optimism, and other puffery are insufficient" to sustain a claim for securities fraud." Novak, 216 F.3d at 315.

However, "[t]he line between puffery and actionable conduct sometimes is difficult to delineate." Manavazian v. Atec Group, Inc., 160 F.Supp.2d 468, 480 (E.D.N.Y.2001). See also Novak, 216 F.3d at 315 (defendants' statements were actionable where company failed to account properly for millions of dollars of inventory which defendants knew was "nearly worthless"); In re Computer

<u>Assocs. Class Action Secs. Litig.</u>, 75 F.Supp.2d 68, 73
(E.D.N.Y.1999)(defendants' statements were actionable as false
and misleading because they failed "to disclose materially
misleading adverse business trends and accounting practices");
<u>San Leandro Emergency Medical Group Profit Sharing Plan v. Philip</u>
<u>Morris Cos., Inc.</u>, 75 F.3d 801, 811 (2d Cir.1996)(general
optimistic statements constituting inactionable puffery).

In the present case, Burke did more than offer general
optimistic statements about the Company's future performance.
First, plaintiffs allege that on October 25, 2001, ANR issued a
press release announcing a third quarter loss of $39.9 million,
which was attributed to losses from September 11, losses incurred
on a life insurance contract from 1998 and a write-down of $24.7
million of deferred acquisition costs associated with the annuity
business. (Am. Compl. ¶ 145). The next day, ANR held a conference
call with analysts to discuss the third quarter results, during
which defendant Burke allegedly stated that "the Company believes
that there is a low probability of any future write-offs on the
contract." (Am. Compl. ¶ 147). Plaintiffs allege that ANR did not
reveal its obligations to pay minimum interest guarantees and
that ANR represented to analysts that the problems were solely
due to high surrender rates. (Am. Compl. ¶ 147).

While Burke characterizes his statements as "forward-
looking," plaintiffs argue that Burke's positive characterization
of ANR's current and future business conditions were based on
projections of a 10% return that was inconsistent with the bonds'

16

historical performance, rendering those statements misleading.
(Pls.' Opp. at 60). Assuming, as we must at this stage, the
accuracy of the plaintiffs' allegations, the court concludes that
Burke's statement included a representation of present fact.
Thus, the safe harbor provision of the PSLRA does not apply. In
re Independent Energy Holdings PLC Sec. Litig., 154 F.Supp.2d at
757.

Second, after the release of the 2001 10-K report, on April
24, 2002, plaintiffs allege that Burke participated in a
conference call with analysts to discuss first quarter results
and affirmed that reserves on the Transamerica contract were
reasonable. (Am. Compl. ¶¶ 175-76). Plaintiffs contend that the
PSLRA's safe harbor provisions do not apply to reserve
calculations. (Pls.' Opp. at 59). Burke's assertion that the
reserves were reasonable may have been misleading. Statements
regarding loss reserves are not projections, they are directed to
"the then-present state of the Company's financial condition."
See In re Reliance Securities Litigation, 91 F.Supp.2d 706, 721
(D.Del.2000). The court concludes that Burke's statement included
a representation of present fact. Thus, the safe harbor provision
of the PSLRA does not apply. In re Independent Energy Holdings
PLC Sec. Litig., 154 F.Supp.2d at 757.

Therefore, plaintiffs have alleged sufficient facts from
which a reasonable jury could find reckless conduct on the part
of defendant. This is sufficient to meet the pleading standards
for scienter in the Second Circuit. See Novak, 216 F.3d at 308;

17

Rothman, 220 F.3d at 90-91. The court cannot hold plaintiffs to a
standard that would effectively require them, pre-discovery, to
plead evidence. Rule 9(b) proscribes the pleading of "fraud by
hindsight," but neither can plaintiffs be expected to plead fraud
with complete insight. See Press v. Chemical Investment Services
Corp., 166 F.3d 529, 538 (2d Cir.1999)(refusing to interpret the
Reform Act's pleading standard in a manner that "would make
virtually impossible a plaintiff's ability to plead scienter in a
financial transaction involving a corporation, institution, bank
or the like that did not involve specifically greedy comments
from an authorized corporate individual").

    4. Reliance

The court now turns to whether plaintiff has sufficiently
alleged "that the plaintiff's reliance on the defendant's action
caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141,
147 (2d Cir.2003)(citations omitted). To prevail on a Section
10(b) claim a plaintiff must demonstrate that her injuries were
caused by the defendant's material misstatements or omissions.
See Emergent Capital Investment Management, LLC v. Stonepath
Group, Inc., 343 F.3d 189, 196 (2d Cir.2003).

Causation is two-pronged. Plaintiffs must allege both
transaction and loss causation. Suez Equity Investors, L.P. v.
Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir.2001). Burke
argues that plaintiffs have failed to allege loss causation
because his disclosures caused the market price of ANR's stock to
decrease or remain unchanged after his allegedly false and

misleading statements. (Def.'s Mem. at 38-39). Plaintiffs counter that this is a "fraud on the market" case and that there was a "massive stock price drop" once the full extent of the fraud was revealed at the end of the Class Period. (Pls.' Opp. at 56).

The "fraud on the market" theory is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." <u>Basic</u>, 485 U.S. at 241-42 (citation omitted). This theory applies where plaintiffs allege that defendants have "disseminate[d] false information into the market on which a reasonable investor would rely." <u>In re Ames Dept. Stores, Inc., Stock Litig.</u>, 991 F.2d 953, 967 (2d Cir.1993). In such a case, "it is sufficient that [the investor] bases her transactions on the market trends or securities prices that are altered by the fraud." <u>In re Initial Public Offerings Sec. Litig.</u>, 241 F.Supp.2d 281, 375 (S.D.N.Y.2003). The ensuing presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff," because then "the basis for finding that the fraud had been transmitted through market price would be gone." <u>Basic</u>, 485 U.S. at 248.

Loss causation has been compared to "the tort concept of proximate cause." <u>Emergent Capital Investment Mgmt.</u>, 195

19

F.Supp.2d at 559. Courts consider, for example, "whether the
resulting loss was a foreseeable outcome of the fraudulent
statement and [whether] other factors such as intervening causes
and the lapse of time between the fraudulent statement and the
loss [existed]." Id. Here, the allegedly fraudulent statements
portrayed ANR as a viable company while the company was failing,
thereby encouraging investors to purchase stock and creating a
disparity between the transaction price and the true value of the
securities. The alleged accounting violations were ultimately
revealed to the market with the foreseeable consequence that
share price would decline. While a trier of fact might blame
market forces rather than accounting violations for that decline,
the allegations in the Complaint are sufficient to withstand
Burke's motion to dismiss.

## B. Control Person Liability under § 20

To establish a prima facie claim of control person liability
under Section 20(a) of the Exchange Act, a plaintiff must show:
"(1) a primary violation by a controlled person; (2) control of
the primary violator by the defendant; and (3) that the
controlling person was in some meaningful sense a culpable
participant in the primary violation." Boguslavsky v. Kaplan, 159
F.3d 715, 720 (2d Cir.1998) (quoting SEC v. First Jersey
Securities, Inc., 101 F.3d 1450, 1472 (2d Cir.1996), cert.
denied, 522 U.S. 812 (1997)); see also 15 U.S.C. § 78t(a). The
control person liability provisions of Section 20(a) of the
Exchange Act are similar to those of Section 15 of the Securities

Act. Although worded differently, both provisions are generally interpreted the same way. See Wallace v. Buttar, 239 F.Supp.2d 388, 395 n.1 (S.D.N.Y.2003).

However, a split has emerged among the district courts in this circuit as to whether Section 15 claims require that plaintiffs allege the additional element of "culpable participation." Cf. DeMaria v. Andersen, 153 F.Supp.2d 300, 314 (S.D.N.Y.2001)(requiring a showing of culpable participation), with In re Deutsche Telekom AG Sec. Litig., No. 00 Civ. 9475, 2002 WL 244597, at *6-7 (S.D.N.Y. Feb. 20, 2002) (requiring only a showing of control over primary violator); see also Dorchester Investors v. Peak Trends Trust, No. 99 Civ. 4696, 2003 WL 223466, at *3 (S.D.N.Y. Feb. 3, 2003)(discussing cases and concluding that majority of courts have not required a showing of culpable participation). The Second Circuit has yet to pass on this issue.

If plaintiffs have adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled. In re Scholastic Corp., 252 F.3d at 77-78. Control is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." See also First Jersey, 101 F.3d at 1472-73 (adopting this standard for Section 20(a) claim). A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control

person is all that is required. <u>See</u> <u>Swierkiewicz v. Sorema, N.A.</u>,
534 U.S. 506, 512-513 (2002); <u>In re IPO Sec. Litig.</u>, 241
F.Supp.2d at 352.

In the present case, the facts as pleaded support the
reasonable inference that defendant participated in the allegedly
fraudulent representations. Defendant signed multiple disclosures
filed with the SEC that are alleged to have contained actionable
misrepresentations, including Forms 10-K and 10-Q. "The very fact
that a director is required to sign these critical documents
charges the director with power over the documents and represents
to the corporation, its shareholders, and the public that the
corporation's director has performed her role with sufficient
diligence that she is willing and able to stand behind the
information contained in those documents." <u>In re Worldcom, Inc.</u>
<u>Securities Litigation</u>, 294 F.Supp. 392, 420 (S.D.N.Y.2003).
"These approvals through signing sufficiently allege control over
those who have been alleged to have violated Section 10(b), at
least in connection with the misrepresentations and omissions in
those documents." <u>Id</u>.

Plaintiffs' allegations of control are sufficient at the
pleading stage because defendant Burke possessed, directly or
indirectly, the power to direct or cause the direction of the
management and policies of ANR. <u>See</u> <u>Duncan v. Pencer</u>, 94 CIV.
0321, 1996 WL 19043, at *18 (S.D.N.Y. Jan. 18, 1996); <u>Robbins v.</u>
<u>Moore Medical Corp.</u>, 788 F.Supp. 179, 189 (S.D.N.Y.1992)(holding
that allegations that "each individual defendant signed at least

one of the allegedly fraudulent documents" were "sufficient at the pleading stage under § 20(a)").

### IV. Conclusion

Accordingly, for the reasons set forth above, the court **denies** defendant John F. Burke's Motion to Dismiss **(Doc. #73)** the consolidated amended class action complaint.

**SO ORDERED.**

Date: February ⸻, 2004
     Waterbury, Connecticut.


⸻⸻⸻⸻⸻⸻⸻⸻
GERARD L. GOETTEL,
United States District Judge