**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-----------------------------------X
SHERRY SCHNALL, Individually and
On behalf of All Others Similarly
Situated

        Plaintiff,

        -against-

ANNUITY AND LIFE RE (HOLDINGS),LTD.,  **No. 3:02 CV 2133 (GLG)**
XL CAPITAL, LTD., LAWRENCE S. DOYLE,  <u>**OPINION**</u>
FREDERICK S. HAMMER, JOHN F. BURKE,
WILLIAM W. ATKIN, BRIAN O'HARA, AND
MICHAEL O. ESPOSITO JR.

        Defendants.
-----------------------------------X
_____

    Before the court is a motion to dismiss the consolidated amended class action complaint filed by defendants XL Capital, Ltd., Brian O'Hara and Michael P. Esposito, Jr. For the reasons set forth below, the court **denies** defendants' Motion to Dismiss **(Doc. #60)**.

<u>I. Factual History and Procedural Background</u>

    This matter was commenced on December 2, 2002; subsequently, eight other cases were filed against Annuity and Life Re (Holdings), Ltd. ["ANR"], and its officers and directors. On April 3, 2003, the court granted a motion to consolidate all nine actions, with Schnall as the lead case and Communications Workers of America and Midstream Investments, Ltd. as lead plaintiffs. (Doc. #33). On July 11, 2003, plaintiffs filed a consolidated amended class action complaint against defendants, ANR, XL Capital, Ltd., Lawrence S. Doyle ["Doyle"], Frederick S. Hammer

1

["Hammer"], John F. Burke ["Burke"], William W. Atkin ["Atkin"], Brian O'Hara ["O'Hara"], and Michael P. Esposito Jr. ["Esposito"], [collectively the "Individual Defendants"], alleging violations of federal securities laws, which injured purchasers of ANR securities between March 15, 2000 and November 19, 2002 [hereinafter the "Class Period"]. Plaintiffs also allege that ANR's stock price fell from a Class Period high of $36.98 to $2.24 on the last day of the Class Period.

In the consolidated amended class action complaint, plaintiffs allege the following background facts.  ANR is a Bermuda corporation formed in 1997 as a holding company to sell annuity and life reinsurance products. During the Class Period, XL Capital owned between 11% and 12.9% of ANR's common stock. Esposito is Chairman of XL Capital's Board of Directors and was a director of ANR, serving on the Executive and the Finance and Investment Committees during the Class Period. O'Hara is the President and Chief Financial Officer of XL Capital and was a Director of ANR during the Class period.

ANR and its subsidiaries indemnify other insurance companies ("primary insurers" or "ceding companies") against their obligations to their own policyholders in exchange for a reinsurance premium. Many of ANR's client companies are based in the United States and are subject to state regulation. Those regulations require reinsurers to either be qualified by the state or to post collateral in connection with their reinsurance agreements.

2

In 1998, a few months after the initial public offering, ANR executed a contract with Transamerica Occidental Life Insurance ["Transamerica"], a U.S. based insurance and reinsurance company, to provide reinsurance for an approximately $1.6 billion book of annuity policies. Under the contract, ANR indemnified Transamerica and the primary insurer, IL Annuity and Insurance Company ["IL Annuity"], for a percentage of the total liabilities due from IL Annuity to the annuity policyholders. In return, ANR received a proportional share of the securities which IL Annuity purchased with the policyholder premiums. The underlying annuity policies were part of a series called VisionMark which allowed policyholders to select among four investment strategies. Various state laws also require that fixed annuity policyholders receive a minimum guaranteed interest rate of 3% to 3.5% per annum. This minimum was paid regardless of the annual management fee of approximately 2.75% that IL Annuity charged all policyholders. Therefore, ANR needed to earn an annual investment return of 6.25% to fund the minimum interest guarantees to policyholders.

Approximately 70% of the premiums on the VisionMark policies held by IL Annuity were invested in convertible bonds; such bonds convert into common stock of the issuing company if the stock price rises above a certain price. The convertible bonds generally paid a lower interest rate than other corporate bonds, but had the potential for higher total returns depending on the performance of the equity markets. IL Annuity assumed 20% of the risk of the VisionMark policies, with Transamerica retaining 16%

3

and ANR assuming 64% of the risk. The decline in the stock market in 1999, the low earnings on investments and the higher than expected surrender rates adversely impacted ANR's financial performance.

Plaintiffs allege, <u>inter</u> <u>alia</u>, that ANR made a series of misstatements and omissions during the Class Period regarding the risks of the Transamerica contract, the aforementioned 2.75% management fee, its method of accounting for liabilities for the guaranteed interest payments, the surrender rates and associated expenses, the impact of ANR's initial assumptions on the amortization of capitalized commission costs, and that the financial statements were not prepared in accordance with Generally Accepted Accounting Principles ["GAAP"]. Plaintiffs allege that these false and misleading statements and omissions were made in financial statements and in public filings with the Securities and Exchange Commission ["SEC"], in ANR's Annual Report to Shareholders, and in certain press releases and conferences to financial analysts.

Plaintiffs further allege that the SEC required ANR to restate all of its SEC filings during the Class Period. ANR's financial ratings were sharply downgraded and it ceased writing new business. ANR's status as an ongoing concern is in question.

II. Standard of Review

In deciding a motion to dismiss, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. See <u>Easton v. Sundram</u>, 947

4

F.2d 1011, 1014-15 (2d Cir. 1991), *cert. denied*, 504 U.S. 911
(1992).  A complaint should not be dismissed "unless it appears
beyond doubt that the plaintiff can prove no set of facts in
support of his claim which would entitle him to relief." <u>Conley
v. Gibson</u>, 355 U.S. 41, 45-46 (1957)(footnote omitted). The issue
on a motion to dismiss "is not whether plaintiff will prevail,
but whether he is entitled to offer evidence to support his
claims." <u>United States v. Yale New Haven Hosp.</u>, 727 F. Supp.
784, 786 (D. Conn. 1990)(citation omitted).

For purposes of a motion to dismiss, the court deems a
complaint to include "any written instrument attached to it as an
exhibit or any statements or documents incorporated in it by
reference, as well as public disclosure documents required by law
to be, and that have been, filed with the SEC, and documents that
the plaintiffs either possessed or knew about and upon which they
relied in bringing the suit." <u>Rothman v. Gregor</u>, 220 F.3d 81, 88-
89 (2d Cir. 2000)(citations omitted).

### <u>III. Discussion</u>

The consolidated amended class action complaint contains two
counts. The first alleges that ANR and the Individual Defendants
engaged in securities fraud in violation of Section 10(b) of the
Exchange Act and Rule 10b-5 promulgated thereunder. The second
count alleges "control person" liability under Section 20(a) of
the Exchange Act against the Individual Defendants and XL
Capital, LTD. Defendants move to dismiss the first count on the
ground that plaintiffs have failed to plead scienter with

particularity as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), ["PSLRA"]. Defendants also move to dismiss the Section 20(a) claim on the ground that plaintiffs have failed to plead that XL Capital had control over ANR and participated in any underlying violations of the securities laws.

A. Section 10(b) Claims

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice in connection with the purchase or sale of securities. See 15 U.S.C. § 78j(b). As a claim made pursuant to section 10(b) asserts securities fraud, it must also comply with the pleading requirements of PSLRA, as well as the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. See In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286, at *2-3 (S.D.N.Y. June 1, 1998). The PSLRA requires a complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." See 15 U.S.C. § 78u-4(b)(1). Thus, a Section 10(b) claim must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999); see also Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.), cert. denied, 531 U.S. 1012 (2000).

The U.S. Court of Appeals for the Second Circuit has found that the PSLRA pleading requirements are essentially a

codification of the Second Circuit's interpretation of what is required by Rule 9(b). See Novak, 216 F.3d at 309-10 ("the PSLRA did not change the basic pleading standard for scienter in this circuit").

1. Group Pleading Doctrine

In order to state a claim for violation of section 10(b) and the corresponding Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). Esposito and O'Hara maintain that they are not liable under the group pleading doctrine and that plaintiffs have not set forth specific allegations regarding defendants' participation in the day-to-day operations of ANR. (Defs.' Mem. at 10). Defendants also argue that the complaint fails to particularize the nature of their participation in the alleged fraud, that they are not proper defendants and note their status as "outside directors." (Id. at 11). Plaintiffs counter that Esposito and O'Hara signed ANR's fraudulent 10-Ks and, thus, "spoke for § 10(b) purposes." (Pls.' Opp. at 31).

"The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." Elliott Assocs., L.P. v. Covance, Inc., No. 00 CV 4115, 2000 WL 1752848, at *12 (S.D.N.Y.

Nov. 28, 2000). Courts have recognized that "primary liability
under Rule 10b-5 [and § 10(b)] may be imposed `not only on
persons who made fraudulent misrepresentations but also on those
who had knowledge of the fraud and assisted in its
perpetration.'" In re Oxford Health Plans, Inc., 187 F.R.D. 133,
142 (S.D.N.Y. 1999). Thus, a member of upper level management,
such as the CEO or CFO, who had knowledge of the fraud, and
assisted in its perpetration by failing to disclose or correct
the fraud when he had a duty to do so, may be held liable under §
10(b) and Rule 10b-5. Rich v. Maidstone Fin., Inc., No. 98 CV
2569, 2002 WL 31867724, at *8-9 (S.D.N.Y. Dec. 20, 2002).
Although the group pleading doctrine was adopted before the PSLRA
was enacted, district courts in the Second Circuit have concluded
that neither the PSLRA nor the decisions in Central Bank v. First
Interstate Bank, 511 U.S. 164 (1994)(precluding secondary
liability for aiding and abetting a § 10(b) violation), and its
progeny affect the vitality of this doctrine. In re CINAR Corp.
Sec. Litig., 186 F. Supp. 2d 279, 318-19 (E.D.N.Y. 2002).

   "As such, [the group pleading doctrine] is extremely limited
in scope. One such limitation is that it is limited to
group-published documents, such as SEC filings and press
releases." Elliott Assocs., 2000 WL 1752848, at *12. Furthermore,
the doctrine only applies where the officers or directors of the
company "participated in the preparation and dissemination" of
the group published document. Dequlis v. LXR Biotech., Inc., 928
F. Supp. 1301, 1311-12 (S.D.N.Y. 1996)("Consequently, where ...

the defendants are a narrowly defined group of highly ranked
officers or directors who participated in the preparation and
dissemination of a prospectus, plaintiffs are not expected to
bear the burden of having to identify the role of each defendant
in the fraud without the benefit of any discovery."). As the
court noted in In re XOMA Corp. Sec. Litig., No. C-91-2252, 1990
WL 357807, at *6 (N.D. Cal. Dec. 27, 1991), "outside directors,
although almost by definition excluded from the day-to-day
management of a corporation, can fall within the group pleading
presumption when, by virtue of their status or a special
relationship with the corporation, they have access to
information more akin to a corporate insider." See also Sperber
Adams Assocs. v. JEM Mgmt. Assocs. Corp., No. 90 CIV. 7405, 1992
WL 138344, at *5 (S.D.N.Y. June 4, 1992) (outside director who
prepared and distributed offering materials is insider for
purposes of Rule 9(b) particularity inquiry).

     The court disputes Esposito's and O'Hara's characterizations
of themselves as "outsiders" and concludes that the application
of the group pleading doctrine is warranted in this case. First,
in their complaint, plaintiffs allege that in December 1997, XL
Capital created ANR and recruited Lawrence Doyle to be ANR's
President and CEO. (Am. Compl. ¶ 48). In ANR's Form S-1
Registration Statement filed with the SEC and dated December 24,
1997, Doyle is described as having "over 32 years of experience
in the insurance and reinsurance industries and was formerly the
President and Chief Executive Officer of GCR Holdings Limited and

9

its subsidiary Global Capital Reinsurance Limited (together 'GCR') from its formation as a Bermuda reinsurer specializing in catastrophe risk in 1993 until its acquisition by EXEL Limited in 1997, when Mr. Doyle became an Executive Vice President of EXEL." (ANR Form S-1 Registration Statement at 6). Plaintiffs state that defendant XL Capital was formerly known as EXEL. (Pls.' Opp. at 5). The Board of Directors is also described as including Esposito, who has over 30 years of experience in the financial services industry, and that "the extensive insurance and financial services expertise possessed by the Company's directors and President and Chief Executive Officer should provide the Company with a competitive marketing advantage." (Id.)  In Schedule 14A, which defendants attached to their motion to dismiss, Esposito is described as the Co-Chairman of Inter-Atlantic Capital Partners, Inc. since 1998, having previously served as a Vice Chairman of Inter-Atlantic Capital Partners, Inc. from 1994 to 1998. (Defs.' Exh. A at 7). In the Form S-1 Registration Statement filed with the SEC and dated December 24, 1997, Inter-Atlantic is described as a United States corporation with a broker-dealer subsidiary, Inter-Atlantic Securities Corp., which provides investment banking services for insurance companies. The Registration Statement further detailed a five-year financial advisory services contract between ANR and Inter-Atlantic Securities Corp. at the annual rate of $600,000, as well as a $2 million payment to Inter-Atlantic Securities Corp. for financial services provided to ANR in connection with its

10

formation and the initial public offering. (Registration Statement at 42).

Second, plaintiffs claim that Esposito is Chairman of XL Capital's Board of Directors and was a director of ANR, serving on the Executive and the Finance and Investment Committees during the Class Period. (Am. Compl. ¶ 26). O'Hara is the President and Chief Financial Officer of XL Capital and was a Director of ANR during the Class period. (Am. Compl. ¶ 25). During the Class Period, XL Capital owned between 11% and 12.9% of ANR's common stock. (Am. Compl. ¶ 20). Third, the complaint alleges that Esposito and O'Hara signed the Form 10-K for the years 1999, 2000, and 2001. (Am. Compl. ¶¶ 69, 107, 164). Plaintiffs also allege that in XL Capital's 2000 Form 10-K, it states "XL is deemed to have significant influence as the Company has representatives on ALR's board of directors." (Am. Compl. ¶ 296). Therefore, this court concludes that based on the interrelationships between ANR, XL Capital and Inter-Atlantic, XL Capital's stock ownership in ANR, Esposito's and O'Hara's positions with XL Capital, and the fact that Esposito's industry experience was mentioned in ANR's Form S-1 Registration Statement, Esposito and O'Hara are more akin to "insiders" than to "outside" directors. Accordingly, the court finds that plaintiffs' allegations as to Esposito and O'Hara's positions are sufficient to warrant the application of the group pleading doctrine.

2. Motive and Opportunity

11

The court next turns to the issue of whether defendants made any materially false statements or omitted any material facts with scienter. A plaintiff may establish the requisite scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." <u>Novak</u>, 216 F.3d at 307. Plaintiffs have alleged that defendants were motivated to perpetuate the fraud in order to maintain ANR's financial ratings and to satisfy conditions on existing contracts, attract new business and post required letters of credit as collateral for its reinsurance agreements. (Am. Compl. ¶ 269). Given their positions as directors of ANR and their positions at XL Capital, which owned between 11% and 12.9% of ANR's common stock, Esposito and O'Hara certainly had the opportunity to commit fraudulent acts. The next issue is whether plaintiffs have sufficiently pled motive.

"Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct." <u>In re Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63, 74 (2d Cir.), *cert. denied*, 534 U.S. 1071 (2001). Sufficient motive allegations entail concrete benefits that a defendant could realize as a result of one or more of the false statements and wrongful nondisclosures alleged. <u>Novak</u>, 216 F.3d at 307. Motives that are generally possessed by most corporate officers and directors will

12

not suffice. Instead, plaintiffs must assert a concrete and personal benefit to the individual defendant that will result from the fraud. Id. Thus, the motive and opportunity elements are generally met when corporate insiders misrepresent material facts to keep stock prices high in order to sell their own shares at a profit. Id at 308. However, the Second Circuit has held that the desire for the corporation to appear profitable is an insufficient motive to establish scienter. Id. at 307; see also Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994) (allegation that defendants manipulated stock price in order to protect executive positions and compensation and prestige derived therefrom insufficient to support an inference of fraudulent intent).

Here, the only motives offered by plaintiffs are defendants' desire to maintain ANR's financial ratings and attract new business. Esposito and O'Hara assert that they did not sell any ANR stock and that XL Capital purchased additional shares of ANR stock during the Class Period. (Defs.' Mem. at 6). Thus, the absence of sales of ANR stock during the Class Period are inconsistent with a motive to commit fraud. (Id.) In keeping with Second Circuit precedent, the court concludes that these allegations of motive to commit fraud are insufficient to give rise to a strong inference of fraudulent intent so as to meet the requirements of the Securities Reform Act for pleading scienter.

3. Conscious Misbehavior or Recklessness

13

Having concluded that plaintiffs' consolidated amended class action complaint fails to sufficiently demonstrate defendants' motive to defraud, the court now considers whether plaintiffs have demonstrated strong circumstantial evidence of defendants' conscious misbehavior or recklessness. "[I]t is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 329 (S.D.N.Y. 2003).

Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000). The Second Circuit has clarified that a strong inference of recklessness or conscious misbehavior may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. Novak, 216 F.3d at 311.

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged

14

defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Novak, 216 F.3d at 308. However, corporate officials "need not be clairvoyant" and are only responsible for information reasonably available to them. Id. at 309. Nor are corporate officials required to paint "an overly gloomy or cautious picture of current performance and future prospects," provided that their public statements are consistent with reasonably available data. Id.

In this case, plaintiffs allege generally that the Individual Defendants had access to material adverse non-public information, and that the Individual Defendants knew or recklessly disregarded that adverse facts had not been disclosed to the investing public and that affirmatively false and misleading statements were being made to the public. (Am. Compl. ¶ 28). Plaintiffs also allege that the Individual Defendants were "involved in drafting, producing, reviewing, and/or disseminating [] false and misleading statements and . . . knew or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws." (Am. Compl. ¶ 30).

More specifically, plaintiffs allege, inter alia, that the misrepresentations include: failure to timely report increase in

15

liabilities, including amounts due to policyholders as a result of their state guaranteed minimum interest rates (¶¶ 79, 121); failure to recognize expenses for minimum interest payments (¶¶ 87, 117); failure to write down deferred acquisition costs based on historical experience (¶¶ 72, 109); false claims that ANR was not exposed to market risk (¶¶ 71, 112); false representations regarding the source of earnings (¶¶ 75, 112); and the false denials that ANR did not hold derivatives (¶¶ 77, 183). Plaintiffs also argue that the sudden retirement of ANR's Chief Financial officer, William Atkin, (¶ 125) and the statements in the second quarter 10-Q for 2001 that ANR was "conducting a reinsurance audit of a reinsurance client company" (¶ 137) suggest that defendants were aware of facts relating to ANR's contract with Transamerica. (Pls.' Opp. at 38).

In the present case, there is no dispute that misstatements were made, which affected the Company's profits. On March 21, 2003, ANR issued restated financial statements for the fiscal years ended December 21, 2000 and 2001, and quarterly statements for the quarters ended March 31, 2002, June 30, 2002, and September 30, 2002. (Am. Compl. ¶ 214). ANR disclosed that there is doubt about the Company's ability to continue as an on going concern. (Am. Compl. ¶ 217). On April 23, 2003, ANR disclosed that the New York Stock Exchange warning that the stock might be delisted. (Am. Compl. ¶ 218).

There also can be no dispute that Esposito and O'Hara had a duty to exercise a certain level of care when making financial

disclosures. These were not disclosures concerning future
performance. As already discussed, the amended complaint alleges
facts from which one can reasonably infer that the Transamerica
contract represented a significant part of ANR's business. These
facts give rise to a strong inference that Esposito and O'Hara,
who are alleged to have been directors with extensive experience
in the insurance industry, had knowledge that the state minimum
interest guarantees, the required management fees and the
unusually high surrender rates associated with that contract
eliminated a potentially significant source of income for ANR. In
light of the strong inference that defendants had knowledge of
the problems with the Transamerica contract, the court concludes
that plaintiffs have alleged sufficient facts from which a
reasonable jury could find reckless conduct on the part of
defendants. This is sufficient to meet the pleading standards for
scienter in the Second Circuit. See Novak, 216 F.3d at 308;
Rothman, 220 F.3d at 90-91. The court cannot hold plaintiffs to a
standard that would effectively require them, pre-discovery, to
plead evidence. Rule 9(b) proscribes the pleading of "fraud by
hindsight," but neither can plaintiffs be expected to plead fraud
with complete insight. See Press v. Chemical Inv. Servs. Corp.,
166 F.3d 529, 538 (2d Cir. 1999)(refusing to interpret the Reform
Act's pleading standard in a manner that "would make virtually
impossible a plaintiff's ability to plead scienter in a financial
transaction involving a corporation, institution, bank or the
like that did not involve specifically greedy comments from an

17

authorized corporate individual").

B. Control Person Liability under § 20

To establish a prima facie claim of control person liability under Section 20(a) of the Exchange Act, a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied,* 522 U.S. 812 (1997)); see also 15 U.S.C. § 78t(a). The control person liability provisions of Section 20(a) of the Exchange Act are similar to those of Section 15 of the Securities Act. Although worded differently, both provisions are generally interpreted the same way. See Wallace v. Buttar, 239 F. Supp. 2d 388, 395 n.1 (S.D.N.Y. 2003).

However, a split has emerged among the district courts in this circuit as to whether Section 15 claims require that plaintiffs allege the additional element of "culpable participation." *Compare* DeMaria v. Andersen, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001)(requiring a showing of culpable participation), *aff'd*, 318 F.3d 170 (2d Cir. 2003), *with* In re Deutsche Telekom AG Sec. Litig., No. 00 Civ. 9475, 2002 WL 244597, at *6-7 (S.D.N.Y. Feb. 20, 2002) (requiring only a showing of control over primary violator); see also Dorchester

18

Investors v. Peak Trends Trust, No. 99 Civ. 4696, 2003 WL 223466,
at *3 (S.D.N.Y. Feb. 3, 2003)(discussing cases and concluding
that majority of courts have not required a showing of culpable
participation). The Second Circuit has yet to pass on this issue.

If plaintiffs have adequately pleaded a Section 10(b) claim,
the first or primary violation element of a Section 20(a) claim
is sufficiently pled. In re Scholastic Corp., 252 F.3d at 77-78.
Control is defined in 17 C.F.R. § 240.12b-2 as "the power to
direct or cause the direction of the management and policies of a
person, whether through the ownership of voting securities, by
contract, or otherwise." See also First Jersey, 101 F.3d at
1472-73 (adopting this standard for Section 20(a) claim). A
short, plain statement that gives the defendant fair notice of
the claim that the defendant was a control person and the ground
on which it rests its assertion that a defendant was a control
person is all that is required. See Swierkiewicz v. Sorema N.A.,
534 U.S. 506, 512-13 (2002); In re IPO Sec. Litig., 241 F. Supp.
2d at 352.

XL Capital counters that its ownership of 11.1% to 12.9% is
insufficient by itself to infer control, citing In re Deutsche
Telekom AG Sec. Litig., supra, 2002 WL 244597, at *6, as
authority. However, in that case the court noted that stock
ownership by one of the defendants was insufficient by itself to
infer control of Deutsche Telekom, especially given the 43%
ownership share of Deutsche Telekom by the Federal Republic of
Germany. In this present case, no governmental authority owns a

19

substantial amount of the stock which would mitigate control by other major stock holders.

"A review of the precedents leads [us] to conclude that pleading . . . substantial stock ownership, or officer/director status from which control can be directly inferred without more, provides a sufficient basis to show control liability. . . . Director status alone does not establish control person liability." Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp. N.V., 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996)(citation omitted). As discussed earlier in Section III A. 1, this court concluded that based on the interrelationships between ANR, XL Capital and Inter-Atlantic, XL Capital's stock ownership in ANR, Esposito's and O'Hara's positions with XL Capital, Esposito and O'Hara are more akin to "insiders" than to "outside" directors. Accordingly, it may reasonably be inferred that defendant XL Capital was in a position to influence and direct the activities of ANR.

Additionally, the facts as pleaded support the reasonable inference that defendants participated in the allegedly fraudulent representations. Esposito and O'Hara signed multiple disclosures filed with the SEC that are alleged to have contained actionable misrepresentations, including Forms 10-K and 10-Q. "The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind

20

the information contained in those documents." <u>In re Worldcom,</u>
<u>Inc. Sec. Litig.</u>, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003).
"These approvals through signing sufficiently allege control over
those who have been alleged to have violated Section 10(b), at
least in connection with the misrepresentations and omissions in
those documents." <u>Id</u>.

Plaintiffs' allegations of control are sufficient at the
pleading stage because defendants possessed, directly or
indirectly, the power to direct or cause the direction of the
management and policies of ANR. <u>See</u> <u>Duncan v. Pencer</u>, 94 CIV.
0321, 1996 WL 19043, at *18 (S.D.N.Y. Jan. 18, 1996); <u>Robbins v.</u>
<u>Moore Med. Corp.</u>, 788 F. Supp. 179, 189 (S.D.N.Y. 1992)(holding
that allegations that "each individual defendant signed at least
one of the allegedly fraudulent documents" were "sufficient at
the pleading stage under § 20(a)").

<u>IV. Conclusion</u>

Accordingly, for the reasons set forth above, the court
**denies** defendants' Motion to Dismiss **(Doc. #60)** the consolidated
amended class action complaint.

**SO ORDERED.**

Date: March 9, 2004
      Waterbury, Connecticut.


                    _____/s/_____
                    GERARD L. GOETTEL,
                    United States District Judge

21