practices that would give a reasonable auditor pause." *Id*. at 169. The court held that "a theoretical possibility of scienter does not a 'strong inference' make." *Id*. at 169 n.14.

Similarly, plaintiffs' allegation that information was available to "KPMG," which "by virtue of its position as an independent accountant and auditor of ANR, had access to the files and key employees of the Company," Am. Cplt. ¶ 27, is equally insufficient. An auditor's knowledge of its client's alleged fraud "cannot be reasonably inferred from the allegation that [it] had been [the] outside auditor." *Rothman*, 220 F.3d at 98. If that were all that was required under Rule 9(b), an auditor would be strictly liable every time its clients committed fraud, no matter how well disguised or hard to detect, simply because it had access to the company's books and records. *See Queen Uno Ltd. P'ship v. Coeur d'Alene Mines Corp.*, 2 F. Supp. 2d 1345, 1360 (D. Colo. 1998) ("Such a broad based rule would, as other courts have noted, subject any accountant or high-ranking company official to liability for even the most obscure allegation of fraud").

In an apparent effort to overcome this deficiency, the complaint alleges that "KPMG" (though again, not specifically KPMG U.S.) violated GAAP and GAAS.[11] Yet courts have held that allegations as to the misapplications of accounting principles, and even violations of auditing standards, do not satisfy Section 10(b)'s rigorous scienter prerequisite. *See, e.g.*, *Rothman*, 220 F.3d 81. As the Second Circuit explained in *Rothman*:

> Although the Complaint alleged that [the auditor] had violated various GAAP provisions, those allegations, without corresponding fraudulent intent, do not suffice to state a securities fraud claim…. For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in

---

[11] *See, e.g.*, Am. Cplt. ¶¶ 217-256.

> fact, approximate an actual intent to aid in the fraud being
> perpetrated by the audited company.

*Id.* (internal quotation marks and citations omitted); *see also Zucker*, 963 F. Supp. 301 (dismissing complaint against auditor because there were no allegations of fact connecting the accounting firm to the alleged wrongdoing); *Kennilworth Partners L.P.*, 59 F. Supp. 2d 417 (dismissing fraud claims against auditor because plaintiffs failed to provide any link between the GAAS violations and the alleged fraud). Nor is the fact that ANR restated its financial statements enough to allege fraudulent intent. *In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 848 (E.D.N.Y. 2003) (holding that "[a] restatement of financial disclosures, by itself, is not sufficient" to establish scienter); *Stevelman,* 174 F.3d at 84 (holding that "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

Indeed, the allegations here are even more insufficient than those addressed in the above-cited cases, because there is not a single allegation connecting the supposed GAAP and GAAS violations to any alleged fraud either as to the fictitious "KPMG" or, as the PSLRA and Section 10(b) require, as to KPMG U.S. Accordingly, as plaintiffs fail adequately to plead scienter against KPMG U.S., the Section 10(b) claim should be dismissed.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A).

Plaintiffs' separate claim, that KPMG U.S. is liable as a "controlling person" of KPMG Bermuda under Section 20(a) of the Securities and Exchange Act of 1934, is equally deficient, and should also be dismissed pursuant to Rule 12(b)(6). It is nothing more than another attempt to plead an aiding and abetting claim - - firmly rejected by the Supreme Court in *Central Bank*. In any event, plaintiffs' allegations come nowhere close to meeting the plain terms of Section 20(a).

To establish a prima facie claim of control person liability under Section 20(a), a plaintiff must demonstrate (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. *See Schnall I*, 2004 WL 231439, at *8 and *Schnall II*, 2004 WL 367644, at *9; *see also* 15 U.S.C. § 78t(a) (West 2004); *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). In order to establish control of the primary violator, a plaintiff must show "that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey Sec. Inc.*, 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b-2).

Even assuming that plaintiffs had adequately pleaded the first and third elements (which defendants dispute[12]), plaintiffs have not - - and cannot - - plead that KPMG U.S. possessed the requisite control over KPMG Bermuda to establish control person liability as a matter of law.

The recent decision in *In re Asia Pulp & Paper Securities Litigation*, 293 F.2d 391, demonstrates the strictures of this element. In that case, plaintiffs asserted a Section 20(a) control person liability claim against Anderson Worldwide Societe Cooperative ("Anderson Worldwide" or "AWSC") in connection with purportedly fraudulent audits conducted by Arthur Anderson Singapore ("Anderson Singapore"). Although the court found that the first element of Section 20(a) was satisfied -- a primary violation by Anderson Singapore -- the court found plaintiffs' Section 20(a) claim nevertheless deficient as to Anderson Worldwide, despite

---

[12]   *See* KPMG Bermuda's Motion to Dismiss the Complaint (plaintiffs have inadequately pleaded a Section 10(b) claim as to KPMG Bermuda); pages 6-12 *supra* (discussing limited alleged participation of KPMG U.S. in ANR audits).

allegations that Anderson Worldwide set "professional standards and principles" under which the individual offices operated, and Anderson Worldwide's concession that it "coordinates the activities of other distinct legal entities around the world, including [Anderson Singapore]…, that have contracted with AWSC to participate in the Anderson network." *Id.* at 394. The court held that the complaint was "bereft of any allegations that AWSC, pursuant to an agreement or otherwise, was able to *control* or in any way *influence* the particular audits conducted or opinions offered by its individual member firms." *Id* at 396 (emphasis added).

Similarly here, there are no allegations that KPMG U.S. was able generally to control or in any way influence KPMG Bermuda, and there are no allegations that KPMG U.S. exercised control over KPMG Bermuda in the issuance of its audit reports. Nor do plaintiffs plead that KPMG U.S. generally possessed the power "to direct or cause the direction of the management and policies" of KPMG Bermuda. *SEC v. First Jersey Sec. Inc.*, 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b-2).

Rather, plaintiffs conclusorily assert specific instances of purported control, alleging that "Through KPMG USA's domination of the defense of ANR's reporting (and KPMG's earlier audit certifications) to the SEC at least as far back as May 2002, KPMG USA demonstrated its control of the audit positions and public representations made with respect to ANR's financial reporting, including KPMG's failure to timely require correction of ANR's false financial statements KPMG had earlier certified." Am. Cplt. ¶ 264; *see also* Am. Cplt. ¶ 283. Such allegations are insufficient, however, as KPMG U.S. and KPMG Bermuda are separate entities, and one does not control the other, as numerous courts have recognized. *See* pages 13-14, *supra*.

In any event, court have found analogous allegations insufficient to plead Section 20(a) liability. In *In re Lernout & Hauspie Sec. Litig.*, for example, the court rejected plaintiffs' claim that they had adequately pleaded a Section 20(a) claim against KPMG U.S. and KPMG UK as "controlling persons" of KPMG Belgium under Section 20(a). 230 F. Supp. 2d at 175. In so holding, the court stated that plaintiffs made "no specific allegations to bolster their claim that either KPMG UK or KPMG U.S. ha[d] the 'general power' to control KPMG Belgium or L&H. The mere fact that both [KPMG U.K. and KPMG Belgium] substantially participated in conducting audits published under KPMG Belgium's name" did not meet the stringent "control" element of a Section 20(a) claim. *Id.* The court further held that there was "no evidence that KPMG U.S. or KPMG UK ever 'actually exercise[d] control' over KPMG Belgium in the issuance of audit reports." *Id.* at 176 (citation omitted).

In contrast, in *Schnall I* and *Schnall II*, this Court addressed Section 20(a) claims against defendants Frederick S. Hammer and John F. Burke, respectively. *Schnall I*, 2004 WL 231439; *Schnall II*, 2004 WL 367644. In each of those cases, this Court sustained the Section 20(a) claim because the "Defendant signed multiple disclosures filed with the SEC that are alleged to have contained actionable misrepresentations." *Schnall I*, 2004 WL 231439 at *9 and *Schnall II*, 2004 WL 367644 at *10. In so holding, this Court stated

> The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents. *These approvals through signing sufficiently allege control over those who have been alleged to have violated Section 10(b)*, at least in connection with the misrepresentations and omissions in those documents.

*Schnall I*, 2004 WL 231439, at *9 and *Schnall II*, 2004 WL 367644, at *10 (quoting *In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 392, 420 (S.D.N.Y. 2003) (emphasis added)).

- 21 -

The Court also recently found control person liability on the part of defendant XL Capital, Ltd. ("XL Capital") as a result of XL Capital's ownership interests in ANR, as well as the fact that the Chairman of XL Capital's Board of Directors and its President and Chief Financial Officer signed SEC filings. *Schnall v. Annuity and Life Re (Holdings), Ltd.*, No. 3:02 CV 2133 (GLG), at 19-21 (D. Conn. Mar. 9, 2004) (*Schnall III)* (annexed hereto as Exh. G).

Unlike the defendants in *Schnall I, Schnall II and Schnall III*, here KPMG U.S. did not sign the documents upon which plaintiffs purport to sue, and had no ownership interest in KPMG Bermuda. *See* Bicks Aff., Exh. A. And, as discussed above, plaintiffs' conclusory allegations of KPMG U.S.'s "participation" in KPMG Bermuda's audits of ANR's financial statements are simply insufficient to state a Section 20(a) claim as a matter of law. As plaintiffs' allegations claim do not come close to satisfying the requirements of Section 20(a), the Section 20(a) claim should be dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, defendant KPMG LLP (United States) respectfully requests that the claims against it be dismissed.

Dated: March 12, 2004

Respectfully submitted,

WIGGIN AND DANA LLP

By: _____ (hss)

     James H. Bicks (ct 04729)
400 Atlantic Street
Stamford, CT 06901
Tel: (203) 363-7600
Fax: (203) 363-7676

WILLKIE FARR & GALLAGHER LLP
     Kelly M. Hnatt (ct 25374)
     Michelle J. Nadel (ct 25473)
787 Seventh Avenue
New York, New York  10019-6099
Tel: (212) 728-8000
Fax: (212) 728-8111

Attorneys for Defendant KPMG LLP (U.S.)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion to Dismiss of KPMG LLP (U.S.) and

the Memorandum of Law in Support of the Motion to Dismiss of KPMG LLP (U.S.) was sent,

via first class mail, on this 12th day of March, 2004 to:

David Randall Scott, Esq.
Karen M. Leser, Esq.
Erin Green Comite, Esq.
Scott & Scott LLC
108 Norwich Ave.
P.O. Box 192
Colchester, CT 06415

Beth Kaswan, Esq.
Ann M. Lipton, Esq.
Peter E. Seidman, Esq.
Milberg, Weiss, Bershad, Hynes &
Lerach LLP
One Pennsylvania Plaza
New York, NY 10019

Frederick S. Gold, Esq.
Morgan Paul Rueckert, Esq.
Shipman & Goodwin LLP
300 Atlantic St.
Stamford, CT 06901-3522

Elias A. Alexiades, Esq.
215 Church Street, 2nd Floor
New Haven, CT 06510

Karen L. Allison, Esq.
John W. Cannavino. Esq.
Cummings & Lockwood
Four Stamford Plaza
107 Elm St. PO Box 120
Stamford, CT 06904-0120

Lawrence William Andrea, Esq.
57 North Street, Suite 313
Danbury, CT 06810

Gary R. Battistoni, Esq.
Stuart A. Law, Esq.
Edward M. Posner, Esq.
Drinker, Biddle & Reath
One Logan Sq.
18th & Cherry Sts.
Philadelphia, PA 19103-6996

Terence J. Gallagher, III, Esq.
Kenneth W. Ritt, Esq.
James F. Stapleton, Esq.
Day, Berry & Howard
One Canterbury Green
Stamford, CT 06901-2047

John R. Horvack, Jr., Esq.
Carmody & Torrance
50 Leavenworth St., Po Box 1110
Waterbury, CT 06721-1110

Patrick A. Klingman, Esq.
Jeffrey S. Nobel, Esq.
Andrew M. Schatz, Esq.
Schatz & Nobel
330 Main Street
2nd Floor
Hartford, CT 06106-1817

James E. Miller, Esq.
Shepherd Finkelman Miller & Shah
One Lewis St.
Hartford, CT 06103

Peter S. Olson, Esq.
James T. Shearin, Esq.
Pullman & Comley
850 Main St., Po Box 7006
Bridgeport, CT 06601-7006

John J. Robinson, Esq.
McCarter & English
Cityplace I
185 Asylum St.
36th Fl.
Hartford, CT 06103-3495

Thorn Rosenthal, Esq.
Tammy Roy, Esq.
Cahill, Gordon & Reindel
80 Pine St.
New York, NY 10005



Michael S. Sheehy

\16616\1\84300.1

# EXHIBIT A

Slip Copy                                                                                    Page 1
(Cite as: 2004 WL 231439 (D.Conn.))

**H**

Only the Westlaw citation is currently available.


United States District Court,
D. Connecticut.

Sherry SCHNALL, Individually and On behalf of All
Others Similarly Situated
Plaintiff,
v.
ANNUITY AND LIFE RE (HOLDINGS), LTD., XL
Capital, Ltd., Lawrence S. Doyle,
Frederick S. Hammer, John F. Burke, William W.
Atkin, Brian O'Hara, and Michael
O. Esposito Jr. Defendants.

No. 3:02 CV 2133(GLG).

Feb. 4, 2004.

Beth A. Kaswan, Milberg, Weiss, Bershad, Hynes &
Lerach, New York, NY, David Randell Scott, Erin
Green Comite, Karen M. Leser, Scott & Scott,
Colchester, CT, Peter E. Seidman, Milberg, Weiss,
Bershad, Hynes & Lerach, New York, NY, for
Plaintiffs.

Edward M. Posner, Gary R. Battistoni, Drinker,
Biddle & Reath, Philadelphia, PA, James F.
Stapleton, Kenneth W. Ritt, Day, Berry & Howard,
Stamford, CT, Stuart A. Law, Jr., Drinker, Biddle &
Reath, Philadelphia, PA, Terence J. Gallagher, III.,
Day, Berry & Howard, Stamford, CT, John J.
Robinson, McCarter & English-Htfd, Hartford, CT,
John W. Cannavino, Karen L. Allison, Cummings &
Lockwood, Stamford, CT, John R. Horvack, Jr.,
Carmody & Torrance, Waterbury, CT, Lawrence
William Andrea, Danbury, CT, Tammy Roy, Thorn
Rosenthal, Cahill, Gordon & Reindel, New York,
NY, for Defendants.


*OPINION*

GOETTEL, J.

*1 Before this court is defendant Frederick S.
Hammer's motion to dismiss the consolidated
amended class action complaint. For the reasons set
forth below, the court denies defendant's Motion to
Dismiss (Doc. # 68).

*I. Factual History and Procedural Background*

This matter was commenced on December 2, 2002;
subsequently, eight other cases were filed against
Annuity and Life Re (Holdings), Ltd. ["ANR"], and
its officers and directors. On April 3, 2003, the court
granted a motion to consolidate all nine actions, with
Schnall as the lead case and Communications
Workers of America and Midstream Investments,
Ltd. as lead plaintiffs. (Doc. # 33). On July 11, 2003,
plaintiffs filed a consolidated amended class action
complaint against defendants, ANR, XL Capital,
Ltd., Lawrence S. Doyle ["Doyle"], Frederick S.
Hammer ["Hammer"], John F. Burke ["Burke"],
William W. Atkin ["Atkin"], Brian O'Hara
["O'Hara"], and Michael P. Esposito Jr. ["Esposito"],
[collectively the "Individual Defendants"], alleging
violations of federal securities laws, which injured
purchasers of ANR securities between March 15,
2000 and November 19, 2002 [hereinafter the "Class
Period"]. Plaintiffs also allege that ANR's stock price
fell from a Class Period high of $36.98 to $2.24 on
the last day of the Class Period.

In the consolidated amended class action complaint,
plaintiffs allege the following background facts. ANR
is a Bermuda corporation formed in 1997 as a
holding company to sell annuity and life reinsurance
products. Defendant Hammer was the Chairman of
the Board of Directors of ANR, as well as a Director
and sat on the Executive Committee, the Finance and
Investment Committee and the Corporate
Governance Committee during the Class Period.
From approximately September 12, 2002 until the
end of the Class Period, defendant sat on the
Transition Committee of the Board of Directors to
oversee management of ANR.

ANR and its subsidiaries indemnify other insurance
companies ("primary insurers" or "ceding
companies") against their obligations to their own
policyholders in exchange for a reinsurance premium.
Many of ANR's client companies are based in the
United States and are subject to state regulation.
Those regulations require reinsurers to either be
qualified by the state or to post collateral in
connection with their reinsurance agreements.

In 1998, a few months after the initial public
offering, ANR executed a contract with Transamerica
Occidental Life Insurance ["Transamerica"], a U.S.
based insurance and reinsurance company, to provide
reinsurance for an approximately $1.6 billion book of
annuity policies. Under the contract, ANR
indemnified Transamerica and the primary insurer, IL
Annuity and Insurance Company ["IL Annuity"], for
a percentage of the total liabilities due from IL
Annuity to the annuity policyholders. In return, ANR

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

received a proportional share of the securities which IL Annuity purchased with the policyholder premiums. The underlying annuity policies were part of a series called VisionMark which allowed policyholders to select among four investment strategies. Various state laws also require that fixed annuity policyholders receive a minimum guaranteed interest rate of 3% to 3.5% per annum. This minimum was paid regardless of the annual management fee of approximately 2.75% which IL Annuity charged all policyholders. Therefore, ANR needed to earn an annual investment return of 6.25% to fund the minimum interest guarantees to policyholders.

*2 Approximately 70% of the premiums on the VisionMark policies held by IL Annuity were invested in convertible bonds; such bonds convert into common stock of the issuing company if the stock price rises above a certain price. The convertible bonds generally paid a lower interest rate than other corporate bonds, but had the potential for higher total returns depending on the performance of the equity markets. Il Annuity assumed 20% of the risk of the Visionmark policies, with Transamerica retaining 16% and ANR assuming 64% of the risk. The decline in the stock market in 1999, the low earnings on investments and the higher than expected surrender rates adversely impacted ANR's financial performance.

Plaintiffs allege, *inter alia,* that ANR made a series of misstatements and omissions between March 15, 2000, and August 16, 2002, regarding the risks of the Transamerica contract, the aforementioned 2.75% management fee, its method of accounting for liabilities for the guaranteed interest payments, the surrender rates and associated expenses, the impact of ANR's initial assumptions on the amortization of capitalized commission costs, and that the financial statements were not prepared in accordance with Generally Accepted Accounting Principles ["GAAP"]. Plaintiffs allege that these false and misleading statements and omissions were made in financial statements and in public filings with the Securities and Exchange Commission ["SEC"], in ANR's Annual Report to Shareholders, and in certain press releases and conferences to financial analysts.

Plaintiffs further allege that the SEC required ANR to restate all of its SEC filings during the Class Period. ANR's financial ratings were sharply downgraded and it ceased writing new business. ANR's status as an on going concern is in question.

*II. Standard of Review*

In deciding a motion to dismiss, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *See Easton v. Sundram,* 947 F.2d 1011, 1014-15 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). The issue on a motion to dismiss "is not whether the plaintiff will prevail, but whether he is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.,* 727 F.Supp. 784, 786 (D.Conn.1990) (citation omitted).

For purposes of a motion to dismiss, the court deems a complaint to include "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88- 89 (2d Cir.2000) (citations omitted).

*III. Discussion*

*3 The consolidated amended class action complaint contains two counts. The first alleges that ANR and the Individual Defendants engaged in securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The second count alleges "control person" liability under Section 20(a) of the Exchange Act against the Individual Defendants and XL Capital, LTD. Defendant moves to dismiss because of plaintiffs' failure to plead scienter with particularity as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u- 4(b)(2), ["PSLRA"].

*A. Section 10(b) Claims*

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). As a claim made pursuant to section 10(b) asserts securities fraud, it must also comply with the pleading requirements of PSLRA, as well as the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. The PSLRA requires a complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the

statement is misleading." 15 U.S.C. § 78u-4(b)(1); *see In re Health Mgmt. Sys., Inc. Sec. Litig.,* No. 97 Civ. 1865, 1998 WL 283286, at *2 (S.D.N.Y. June 1, 1998), as well as "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Complying with Rule 9(b), a Section 10(b) claim must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999); *see also Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

The U.S. Court of Appeals for the Second Circuit has found that the PSLRA pleading requirements are essentially a codification of the Second Circuit's interpretation of what is required by Rule 9(b). *See Novak,* 216 F.3d at 309-311 ("the PSLRA did not change the basic pleading standard for scienter in this circuit").

1. Group Pleading Doctrine

In order to state a claim for violation of section 10(b) and the corresponding Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000). Defendant maintains that he is not liable under the group pleading doctrine and that plaintiffs have not set forth specific allegations regarding defendant's participation in the day-to-day operations of ANR. (Def.'s Mem. at 13). Defendant also claims that the complaint fails to particularize the nature of his participation in the alleged fraud, that he is not a proper defendant and notes his status as an "outside director." (*Id.*). Plaintiffs counter that defendant signed ANR's fraudulent 10-Ks and, thus, "spoke for § 10(b) purposes." (Pls.' Opp. at 31).

*4 "The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *Elliott Associates, L.P. v. Covance, Inc.,* No. 00 CV 4115, 2000 WL 1752848, at *12 (S.D.N.Y. Nov.28, 2000). Courts have recognized that "primary liability under Rule 10b-5 [and § 10(b) ] may be imposed "not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999). Thus, a member of the upper level management, such as the CEO or CFO, who had knowledge of the fraud, and assisted in its perpetration by failing to disclose or correct the fraud when he had a duty to do so, may be held liable under § 10(b) and Rule 10b-5. *Rich v. Maidstone Fin., Inc.,* No. 98 CV 2569, 2002 WL 31867724, at *8-9 (S.D.N.Y.Dec.20, 2002). Although the group pleading doctrine was adopted before the PSLRA was enacted, district courts in the Second Circuit have concluded that neither the PSLRA nor the decision in *Central Bank v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (precluding secondary liability for aiding and abetting a § 10(b) violation), and its progeny affect its vitality. *In re CINAR Corp. Securities Litigation,* 186 F.Supp.2d 279, 318-19 (E.D.N.Y.2002).

"As such, [the group pleading doctrine] is extremely limited in scope. One such limitation is that it is limited to group-published documents, such as SEC filings and press releases." *Elliott Assocs.,* 2000 WL 1752848, at *12. Furthermore, the doctrine only applies where the officers or directors of the company "participated in the preparation and dissemination" of the group published document. *Degulis v. LXR Biotech., Inc.,* 928 F.Supp. 1301, 1311- 12 (S.D.N.Y.1996) ("Consequently, where ... the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a prospectus, plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery."). As the court noted in *In re XOMA Corp. Securities Litigation,* No. C-91-2252, 1990 WL 357807 (N.D.Cal. Dec. 27, 1991), "outside directors, although almost by definition excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider." *Id.* at *6; *see also Sperber Adams Associates v. JEM Management Associates Corp.,* No. 90 CIV. 7405, 1992 WL 138344 at *5 (S.D.N.Y. June 4, 1992) (outside director who prepared and distributed offering materials is insider for purposes of Rule 9(b) particularity inquiry).

The court disputes defendant Hammer's characterization of himself as an "outsider" and concludes that the application of the group pleading doctrine is warranted in this case. First, the Form S-1 Registration Statement dated December 24, 1997,

which defendant Hammer attached to his motion to dismiss, describes defendant and other ANR officers and directors, as "owners, directors and/or officers of Inter-Atlantic", a United States corporation with a broker-dealer subsidiary which provides investment banking services for insurance companies. (Def.'s Exh. A at 42). The Registration Statement further detailed a five-year financial advisory services contract between ANR and Inter-Atlantic at the annual rate of $600,000, as well as a $2 million payment to Inter-Atlantic for financial services provided to ANR in connection with its formation and the initial public offering. (*Id.*). Furthermore, ANR is a small corporation, which had eleven Bermuda based employees and two U.S. based employees in 1999, thirteen Bermuda based employees and seven U.S. based employees in 2000, and fourteen Bermuda based employees and nine U.S. based employees in 2001. (Am.Compl.¶ 257).

**\*5** Second, plaintiffs claim that defendant was Chairman of the Board of Directors of ANR, sat on the Transition Committee from September 12, 2002 until the end of the Class Period to oversee management of ANR, and served on the Executive Committee, the Finance and Investment Committee and the Corporate Governance Committee during the Class Period. (Am.Compl.¶ ¶ 22, 199). Third, the complaint alleges that defendant signed the Form 10-K for the years 1999, 2000, and 2001. (Am.Compl.¶ ¶ 69, 107, 164). Accordingly, the court finds that plaintiffs' allegations as to defendant Hammer's position are sufficient to warrant the application of the group pleading doctrine.

## 2. Motive and Opportunity

The court next turns to the issue of whether defendant made any materially false statements or omitted any material facts with scienter. A plaintiff may establish the requisite scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak,* 216 F.3d at 307. Plaintiffs have alleged that defendants were motivated to perpetuate the fraud in order to maintain ANR's financial ratings and to satisfy conditions on existing contracts, attract new business and post required letters of credit as collateral for its reinsurance agreements. (Am.Compl.¶ 269). Plaintiffs also claim that the executive careers of the Individual Defendants were "at stake." (Pls.' Opp. at 53). In light of Hammer's ANR board position and position with Inter-Atlantic with access to insider information, defendant

certainly had the opportunity to commit fraudulent acts. The next issue is whether plaintiffs have sufficiently pled motive.

"Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct." *In re Scholastic Corp. Sec. Litigation,* 252 F.3d 63, 74 (2d Cir.2001) *cert. denied,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001). Sufficient motive allegations entail concrete benefits that a defendant could realize as a result of one or more of the false statements and wrongful nondisclosures alleged. *Novak,* 216 F.3d at 307. Motives that are generally possessed by most corporate officers and directors will not suffice. Instead, plaintiffs must assert a concrete and personal benefit to the individual defendant that will result from the fraud. *Id.* Thus, the motive and opportunity elements are generally met when corporate insiders misrepresent material facts to keep stock prices high in order to sell their own shares at a profit. *Id.* However, the Second Circuit has held that the desire for the corporation to appear profitable is an insufficient motive to establish scienter. *Id.; see also Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir.2001); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994) (allegation that defendants manipulated stock price in order to protect executive positions and compensation and prestige derived therefrom insufficient to support an inference of fraudulent intent).

**\*6** Here, the only motives offered by plaintiffs are defendants' desire to maintain ANR's financial ratings and attract new business, and that Hammer's career was at stake. Therefore, in keeping with Second Circuit precedent, the court concludes that these allegations of motive to commit fraud are insufficient to give rise to a strong inference of fraudulent intent so as to meet the requirements of the Securities Reform Act for pleading scienter.

## 3. Conscious Misbehavior or Recklessness

Having concluded that plaintiffs' consolidated amended class action complaint fails to sufficiently demonstrate defendant Hammer's motive and opportunity to defraud, the court now considers whether plaintiffs have demonstrated strong circumstantial evidence of defendant's conscious misbehavior or recklessness. "[I]t is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be

correspondingly greater." *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 329 (S.D.N.Y.2003).

Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000). The Second Circuit has clarified that a strong inference of recklessness or conscious misbehavior may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. *Novak*, 216 F.3d at 311.

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308. However, corporate officials "need not be clairvoyant" and are only responsible for information reasonably available to them. *Novak*, 216 F.3d at 309. Nor are corporate officials required to paint "an overly gloomy or cautious picture of current performance and future prospects," provided that their public statements are consistent with reasonably available data. *Id.*

Here, plaintiffs allege generally that the Individual Defendants had access to material adverse non-public information, and that the Individual Defendants knew or recklessly disregarded that adverse facts had not been disclosed to the investing public and that affirmatively false and misleading statements were being made to the public. (Am.Compl.¶ 28). Plaintiffs also allege that the Individual Defendants were "involved in drafting, producing, reviewing, and/or disseminating [ ] false and misleading statements and ... knew or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws." (Am.Compl.¶ 30). Plaintiffs generally allege that ANR's financial statements were false and misleading because the Individual Defendants improperly accounted for liabilities and deferred costs related to the minimum interest guarantees, the

management fees, policy surrender rates and the nature of the Transamerica contract, failed to adjust experience in performing loss recognition testing to determine amortization expenses, and failed to disclose the risks associated with the Transamerica contract.

*7 In their complaint, plaintiffs allege that on October 25, 2001, ANR issued a press release announcing a third quarter loss of $39.9 million, which was attributed to losses from September 11, losses incurred on a life insurance contract from 1998 and a write-down of $24.7 million of deferred acquisition costs associated with the annuity business. (Am.Compl.¶ 145). The next day, ANR held a conference call with analysts to discuss the third quarter results, during which defendant Burke allegedly stated that "the Company believes that there is a low probability of any future write-offs on the contract." (Am.Compl.¶ 147). Plaintiffs allege that ANR did not reveal its obligations to pay minimum interest guarantees and that ANR represented to analysts that the problems were solely due to high surrender rates. (Am.Compl.¶ 147). Plaintiffs also allege that defendants' statement about write-offs was false and that the third quarter 2001 write-off was calculated by projecting investments returns of 10%. (Am.Compl.¶ 154). Plaintiffs also allege that on January 15, 2002, ANR issued a press release announcing a fourth quarter charge of $33 million, which recognized past losses on the contract due to minimum interest guarantee payments and established a reserve to account for additional liabilities due remaining policyholders for guaranteed interest. (Am.Compl.¶ 155). Plaintiffs allege that this is the first time that ANR disclosed the existence of minimum interest guarantees and that they affected profitability. (Am.Compl.¶ 155).

Plaintiffs also allege that certain of the Individual Defendants, including defendant Hammer, signed the Form 10-K for 2001, which reported, *inter alia,* $20 million in reserves for future minimum interest payments in addition to $10 million in extra coverage purchased from XL Capital against future losses (Am.Compl.¶ 164); revised the section titled "Quantitative and Qualitative Disclosures About Market Risk" (Am.Compl.¶ 165); reported Funds Withheld of $1.488 billion, of which $962 million was allocable to the Transamerica contract, with a yield of 4.7% totaling $71 million (Am. Compl ¶ 168); and did not disclose that the yield on funds associated with Transamerica was only 3.94% (Am. Compl ¶ 168).

Plaintiffs allege that the 2001 10-K report was

inaccurate and fraudulent because it did not disclose that the management fees imposed on policyholders under the Transamerica contract meant that minimum interest guarantees would cause additional losses unless the Funds Withheld at Interest performed above 6.25%; the representation that reserves for future losses were adequate was erroneous because it assumed a 10% return on the convertible bonds which bore no resemblance to actual performance; that the write-downs of the deferred amortization costs were inconsistent with historical experience; and that ANR did not disclose that the convertible bonds underlying the Transamerica contract represented 70% of that portfolio; and that ANR did not segment and separately report its revenues, expenses and profits for its annuity and life insurance businesses. (Am. Compl ¶ 172).

*8 In the present case, there is no dispute that misstatements were made, which affected the Company's profits. On March 21, 2003, ANR issued restated financial statements for the fiscal years ended December 21, 2000 and 2001, and quarterly statements for the quarters ended March 31, 2002, June 30, 2002, and September 30, 2002. (Am. Compl ¶ 214). ANR disclosed that there is doubt about the Company's ability to continue as an on going concern. (Am. Compl ¶ 217). On April 23, 2003, ANR disclosed that the New York Stock Exchange warning that the stock might be delisted. (Am. Compl ¶ 218). There also can be no dispute that defendant Hammer had a duty to exercise a certain level of care when making financial disclosures. These were not disclosures concerning future performance. These were statements about past performance concerning expenses relating to the Transamerica contract, as to which Hammer had knowledge or should have had knowledge. *See Rothman*, 220 F.3d at 90 (finding that plaintiffs had sufficiently alleged scienter based not upon the company's overly optimistic predictions of sales, but rather on its failure to expense royalty advances after poor sales were known).

Accordingly, the court finds that, when the allegations of the amended complaint, which are accepted as true for purposes of this motion, are read in their totality, plaintiffs have alleged sufficient facts from which a reasonable jury could find reckless conduct on the part of defendant Hammer. This is sufficient to meet the pleading standards for scienter in the Second Circuit. *See Novak*, 216 F.3d at 308; *Rothman*, 220 F.3d at 90-91.

*B. Control Person Liability under § 20*

To establish a prima facie claim of control person

liability under Section 20(a) of the Exchange Act, a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. *See* 15 U.S.C. § 78t(a); *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996), *cert. denied*, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997)). The control person liability provisions of Section 20(a) of the Exchange Act are similar to those of Section 15 of the Securities Act. Although worded differently, both provisions are generally interpreted the same way. *See Wallace v. Buttar*, 239 F.Supp.2d 388, 395 n. 1 (S.D.N.Y.2003).

However, a split has emerged among the district courts in this circuit as to whether Section 15 claims require that plaintiffs allege the additional element of "culpable participation." *Cf. DeMaria v. Andersen*, 153 F.Supp.2d 300, 314 (S.D.N.Y.2001) (requiring a showing of culpable participation), *with In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at *6-7 (S.D.N.Y.Feb.20, 2002) (requiring only a showing of control over primary violator); *see also Dorchester Investors v. Peak Trends Trust*, No. 99 Civ. 4696, 2003 WL 223466, at *3 (S.D.N.Y. Feb. 3, 2003) (discussing cases and concluding that majority of courts have not required a showing of culpable participation). The Second Circuit has yet to pass on this issue.

*9 If plaintiffs have adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled. *In re Scholastic Corp.*, 252 F.3d at 77-78. Control is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See also First Jersey*, 101 F.3d at 1472-73 (adopting this standard for Section 20(a) claim). A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *In re IPO Sec. Litig.*, 241 F.Supp.2d at 352.

In the present case, the facts as pleaded support the reasonable inference that defendant participated in the allegedly fraudulent representations. Defendant signed multiple disclosures filed with the SEC that are alleged to have contained actionable

misrepresentations, including Forms 10-K and registration statements. "The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents." *In re Worldcom, Inc. Securities Litigation,* No. 02 CIV 3288(DLC), 2003 WL 21219049, at *24 (S.D.N.Y. May 19, 2003). "These approvals through signing sufficiently allege control over those who have been alleged to have violated Section 10(b), at least in connection with the misrepresentations and omissions in those documents." *Id.* at *25.

### IV. Conclusion

Accordingly, for the reasons set forth above, the court denies defendant Frederick S. Hammer's Motion to Dismiss (Doc. # 68) the consolidated amended class action complaint.
SO ORDERED.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**EXHIBIT B**

**H**

Only the Westlaw citation is currently available.


United States District Court,
D. Connecticut.

Sherry SCHNALL, Individually and On behalf of All
Others Similarly Situated
Plaintiff,
v.
ANNUITY AND LIFE RE (HOLDINGS), LTD., XL
Capital, Ltd., Lawrence S. Doyle,
Frederick S. Hammer, John F. Burke, William W.
Atkin, Brian O'Hara, and Michael
O. Esposito Jr. Defendants.

No. 3:02 CV 2133(GLG).

Feb. 22, 2004.

Beth A. Kaswan, Peter E. Seidman, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, David Randell Scott, Scott & Scott, Colchester, CT, Erin Green Comite, Karen M. Leser, Scott & Scott, Colchester, CT, for Plaintiff.

Edward M. Posner, Gary R. Battistoni, Stuart A. Law, Jr., Drinker, Biddle & Reath, Philadelphia, PA, James F. Stapleton, Kenneth W. Ritt, Terence J. Gallagher, III., Day, Berry & Howard, Stamford, CT, John J. Robinson, McCarter & English, Hartford, CT, John W. Cannavino, Karen L. Allison, Cummings & Lockwood, Stamford, CT, John R. Horvack, Jr., Carmody & Torrance, Waterbury, CT, Lawrence William Andrea, Danbury, CT, Tammy Roy, Thorn Rosenthal, Cahill, Gordon & Reindel, New York, NY, for Defendants.


*OPINION*

GOETTEL, J.

*1 Before the court is defendant John F. Burke's motion to dismiss the consolidated amended class action complaint. For the reasons set forth below, the court denies defendant's Motion to Dismiss (Doc. # 73).

*I. Factual History and Procedural Background*

This matter was commenced on December 2, 2002; subsequently, eight other cases were filed against Annuity and Life Re (Holdings), Ltd. ["ANR"], and its officers and directors. On April 3, 2003, the court granted a motion to consolidate all nine actions, with Schnall as the lead case and Communications Workers of America and Midstream Investments, Ltd. as lead plaintiffs. (Doc. # 33). On July 11, 2003, plaintiffs filed a consolidated amended class action complaint against defendants, ANR, XL Capital, Ltd., Lawrence S. Doyle ["Doyle"], Frederick S. Hammer ["Hammer"], John F. Burke ["Burke"], William W. Atkin ["Atkin"], Brian O'Hara ["O'Hara"], and Michael P. Esposito Jr. ["Esposito"], [collectively the "Individual Defendants"], alleging violations of federal securities laws, which injured purchasers of ANR securities between March 15, 2000 and November 19, 2002 [hereinafter the "Class Period"]. Plaintiffs also allege that ANR's stock price fell from a Class Period high of $36.98 to $2.24 on the last day of the Class Period.

In the consolidated amended class action complaint, plaintiffs allege the following background facts. ANR is a Bermuda corporation formed in 1997 as a holding company to sell annuity and life reinsurance products. Burke was the Chief Financial Officer, Senior Vice President, Corporate Secretary and Treasurer, and Principal Accounting and Financial Officer of ANR from approximately September 17, 2001 until the end of the Class Period.

ANR and its subsidiaries indemnify other insurance companies ("primary insurers" or "ceding companies") against their obligations to their own policyholders in exchange for a reinsurance premium. Many of ANR's client companies are based in the United States and are subject to state regulation. Those regulations require reinsurers to either be qualified by the state or to post collateral in connection with their reinsurance agreements.

In 1998, a few months after the initial public offering, ANR executed a contract with Transamerica Occidental Life Insurance ["Transamerica"], a U.S. based insurance and reinsurance company, to provide reinsurance for an approximately $1.6 billion book of annuity policies. Under the contract, ANR indemnified Transamerica and the primary insurer, IL Annuity and Insurance Company ["IL Annuity"], for a percentage of the total liabilities due from IL Annuity to the annuity policyholders. In return, ANR received a proportional share of the securities which IL Annuity purchased with the policyholder premiums. The underlying annuity policies were part of a series called VisionMark which allowed policyholders to select among four investment strategies. Various state laws also require that fixed annuity policyholders receive a minimum guaranteed

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                          Page 2
(Cite as: 2004 WL 367644 (D.Conn.))

interest rate of 3% to 3.5% per annum. This minimum was paid regardless of the annual management fee of approximately 2.75% which IL Annuity charged all policyholders. Therefore, ANR needed to earn an annual investment return of 6.25% to fund the minimum interest guarantees to policyholders.

*2 Approximately 70% of the premiums on the VisionMark policies held by IL Annuity were invested in convertible bonds; such bonds convert into common stock of the issuing company if the stock price rises above a certain price. The convertible bonds generally paid a lower interest rate than other corporate bonds, but had the potential for higher total returns depending on the performance of the equity markets. Il Annuity assumed 20% of the risk of the Visionmark policies, with Transamerica retaining 16% and ANR assuming 64% of the risk. The decline in the stock market in 1999, the low earnings on investments and the higher than expected surrender rates adversely impacted ANR's financial performance.

Plaintiffs allege, *inter alia,* that ANR made a series of misstatements and omissions during the Class Period regarding the risks of the Transamerica contract, the aforementioned 2.75% management fee, its method of accounting for liabilities for the guaranteed interest payments, the surrender rates and associated expenses, the impact of ANR's initial assumptions on the amortization of capitalized commission costs, and that the financial statements were not prepared in accordance with Generally Accepted Accounting Principles ["GAAP"]. Plaintiffs allege that these false and misleading statements and omissions were made in financial statements and in public filings with the Securities and Exchange Commission ["SEC"], in ANR's Annual Report to Shareholders, and in certain press releases and conferences to financial analysts.

Plaintiffs further allege that the SEC required ANR to restate all of its SEC filings during the Class Period. ANR's financial ratings were sharply downgraded and it ceased writing new business. ANR's status as an on going concern is in question.

### II. Standard of Review

In deciding a motion to dismiss, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *See Easton v. Sundram,* 947 F.2d 1011, 1014-15 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). A

complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). The issue on a motion to dismiss "is not whether plaintiff will prevail, but whether he is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.,* 727 F.Supp. 784, 786 (D.Conn.1990) (citation omitted).

For purposes of a motion to dismiss, the court deems a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (citations omitted).

### III. Discussion

*3 The consolidated amended class action complaint contains two counts. The first alleges that ANR and the Individual Defendants engaged in securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The second count alleges "control person" liability under Section 20(a) of the Exchange Act against the Individual Defendants and XL Capital, LTD. Defendant moves to dismiss the first count on the grounds that plaintiffs have failed to plead scienter with particularity as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), ["PSLRA"], that alleged misstatements and omissions are non-actionable "forward-looking" statements protected by the safe harbor provisions of the PSLRA, and that plaintiffs have failed to adequately plead reliance. Defendant also moves to dismiss the Section 20(a) claim on the grounds that plaintiffs have failed to plead Burke's culpable participation in any underlying violations of the securities laws.

### A. Section 10(b) Claims

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j(b). As a claim made pursuant to section 10(b) asserts securities fraud, it must also comply with the pleading requirements of PSLRA, as well as the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Health Mgmt. Sys., Inc. Sec. Litig.,* No. 97 Civ. 1865, 1998