WL 283286, at *2-3 (S.D.N.Y. June 1, 1998). The PSLRA requires a complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." See 15 U.S.C. § 78u- 4(b)(1). Thus, a Section 10(b) claim must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir.1999); see also Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.2000), cert. denied, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

The U.S. Court of Appeals for the Second Circuit has found that the PSLRA pleading requirements are essentially a codification of the Second Circuit's interpretation of what is required by Rule 9(b). See Novak, 216 F.3d at 309-10 ("the PSLRA did not change the basic pleading standard for scienter in this circuit").

1. Motive and Opportunity

The court first turns to the issue of whether defendant made any materially false statements or omitted any material facts with scienter. A plaintiff may establish the requisite scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." Novak, 216 F.3d at 307. Plaintiffs have alleged that defendant was motivated to perpetuate the fraud in order to maintain ANR's financial ratings and to satisfy conditions on existing contracts, attract new business and post required letters of credit as collateral for its reinsurance agreements. (Am.Compl.¶ 269). As a Chief Financial Officer of ANR with access to insider information, defendant Burke certainly had the opportunity to commit fraudulent acts. The next issue is whether plaintiffs have sufficiently pled motive.

*4 "Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct." In re Scholastic Corp. Sec. Litigation, 252 F.3d 63, 74 (2d Cir.2001), cert. denied, 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001). Sufficient motive allegations entail concrete benefits that a defendant could realize as a result of one or more of the false statements and wrongful nondisclosures alleged. Novak, 216 F.3d at 307. Motives that are generally possessed by most corporate officers and directors will not suffice. Instead, plaintiffs must assert a concrete and personal benefit to the individual defendant that will result from the fraud. Id. Thus, the motive and opportunity elements are generally met when corporate insiders misrepresent material facts to keep stock prices high in order to sell their own shares at a profit. Id at 308. However, the Second Circuit has held that the desire for the corporation to appear profitable is an insufficient motive to establish scienter. Id. at 307; see also Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir.2001); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir.1994) (allegation that defendants manipulated stock price in order to protect executive positions and compensation and prestige derived therefrom insufficient to support an inference of fraudulent intent).

Here, the only motives offered by plaintiffs are defendant's desire to maintain ANR's financial ratings and attract new business. Defendant Burke asserts that he purchased, but did not sell, ANR stock and that the absence of sales of ANR stock during the Class Period are inconsistent with a motive to commit fraud. (Def.'s Mem. at 16). In keeping with Second Circuit precedent, the court concludes that these allegations of motive to commit fraud are insufficient to give rise to a strong inference of fraudulent intent so as to meet the requirements of the Securities Reform Act for pleading scienter.

2. Conscious Misbehavior or Recklessness

Having concluded that plaintiffs' consolidated amended class action complaint fails to sufficiently demonstrate defendant's motive and opportunity to defraud, the court now considers whether plaintiffs have demonstrated strong circumstantial evidence of defendant's conscious misbehavior or recklessness. "[I]t is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." In re Initial Public Offering Sec. Litig., 241 F.Supp.2d 281, 329 (S.D.N.Y.2003).

Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir.2000). The Second Circuit has clarified that a strong inference of recklessness or conscious misbehavior may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal

way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. *Novak, 216 F.3d at 311.*

*5 "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak, 216 F.3d at 308.* However, corporate officials "need not be clairvoyant" and are only responsible for information reasonably available to them. *Id. at 309.* Nor are corporate officials required to paint "an overly gloomy or cautious picture of current performance and future prospects," provided that their public statements are consistent with reasonably available data. *Id.*

Defendant Burke argues that plaintiffs' allegations pertaining to him involve subjective matters of accounting, such as the timing and setting of reserves, the timing and size of write-downs and charges to earnings. Defendant maintains that these decisions "necessarily involve a high degree of management discretion and judgment," and some of the decisions were made prior to the time defendant joined ANR. (Def.'s Mem. at 23-24). Furthermore, defendant claims that plaintiffs have failed to allege how the accounting method departed from GAAP. (*Id.* at 25).

In this case, plaintiffs allege generally that the Individual Defendants had access to material adverse non-public information, and that the Individual Defendants knew or recklessly disregarded that adverse facts had not been disclosed to the investing public and that affirmatively false and misleading statements were being made to the public. (Am.Compl.¶ 28). Plaintiffs also allege that the Individual Defendants were "involved in drafting, producing, reviewing, and/or disseminating [ ] false and misleading statements and ... knew or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws." (Am.Compl.¶ 30). Plaintiffs generally allege that ANR's financial statements were false and misleading because the Individual Defendants improperly accounted for liabilities and deferred costs related to the minimum interest guarantees, the management fees, policy surrender rates and the nature of the Transamerica contract, failed to adjust experience in performing loss recognition testing to determine amortization expenses, and failed to disclose the risks associated with the Transamerica contract.

In their complaint, plaintiffs also allege that on October 25, 2001, ANR issued a press release announcing a third quarter loss of $39.9 million, which was attributed to losses from September 11, losses incurred on a life insurance contract from 1998 and a write-down of $24.7 million of deferred acquisition costs associated with the annuity business, listing defendant Burke, who had recently been hired as the new Chief Financial Officer, and Doyle as contacts. (Am.Compl.¶ 145). The next day, ANR held a conference call with analysts to discuss the third quarter results, during which defendant Burke allegedly stated that "the Company believes that there is a low probability of any future write-offs on the contract." (Am.Compl.¶ 147). Plaintiffs allege that ANR did not reveal its obligations to pay minimum interest guarantees and that ANR represented to analysts that the problems were solely due to high surrender rates. (Am.Compl.¶ 147). Plaintiffs also allege that defendant's statement about write-offs was false and that the third quarter 2001 write-off was calculated by projecting investments returns of 10%. (Am.Compl.¶ 154). Plaintiffs also allege that on January 15, 2002, ANR issued a press release announcing a fourth quarter charge to earnings of $33 million, which recognized past losses on the contract due to minimum interest guarantee payments and established a reserve to account for additional liabilities due remaining policyholders for guaranteed interest, listing Burke and Doyle as contacts. (Am.Compl.¶ 155). Plaintiffs allege that this is the first time that ANR disclosed the existence of minimum interest guarantees and that they affected profitability. (Am.Compl.¶ 155).

*6 Plaintiffs also allege that certain of the Individual Defendants, including defendant Burke, signed the Form 10-K for 2001, which reported, *inter alia,* $20 million in reserves for future minimum interest payments in addition to $10 million in extra coverage purchased from XL Capital against future losses (Am.Compl.¶ 164); reported Funds Withheld of $1.488 billion, of which $962 million was allocable to the Transamerica contract, with a yield of 4.7% totaling $71 million (Am.Compl.¶ 168); and did not disclose that the yield on funds associated with Transamerica was only 3.94% (Am.Compl.¶ 168).

Plaintiffs allege that the 2001 10-K report was inaccurate and fraudulent because it did not disclose

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

that the management fees imposed on policyholders under the Transamerica contract meant that minimum interest guarantees would cause additional losses unless the Funds Withheld at Interest performed above 6.25%; the representation that reserves for future losses were adequate was erroneous because it assumed a 10% return on the convertible bonds which bore no resemblance to actual performance; that the write-downs of the deferred amortization costs were inconsistent with historical experience; and that ANR did not disclose that the convertible bonds underlying the Transamerica contract represented 70% of that portfolio; and that ANR did not segment and separately report its revenues, expenses and profits for its annuity and life reinsurance businesses. (Am.Compl.¶ 172).

After the release of the 10-K report, plaintiffs allege that Burke and Doyle participated in a conference call with analysts on April 24, 2002, to discuss first quarter results. (Am.Compl.¶ 175). Burke and Doyle affirmed that reserves on the Transamerica contract were reasonable. (Am.Compl.¶ 176). Burke also told analysts, "[a]s we discussed before, our largest annuity contract which represents 62% of our annuity assets is expected to break even going forward." (Am.Compl.¶ 178). Doyle stated that "[o]ur plan for the year should deliver a $1.40 to $1.35 per share." (Am.Compl.¶ 178). On August 15, 2002, ANR filed its Form 10-Q, stating its second quarter results, which included a $24.8 million write-down. In the press release issued the same day, Doyle stated that "the recent poor performance of the convertible bond market has resulted in an additional charge on our largest annuity contract." (Am.Compl.¶ 189). In a conference call to analysts the next day, Doyle stated that ANR had provided full and detailed disclosures about Transamerica. Burke added, "[t]he item that has created the most volatility for us is the Transamerica contract, and I think we have provided some fairly good fences for you folks to put a ring around what kind of exposure you have got there. It is our view that the markets are drastically over reactive to it." (Am.Compl.¶ 197).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "[A] duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events." *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 267 (2d Cir.1993), *cert. denied*, 511 U.S. 1017 (1994).[U]pon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank N.A.*, 295 F.3d 312, 331 (2d Cir.2002).

3. Forward Looking Statements

*7 Defendant Burke contends that his statements to analysts about ANR's business conditions were "forward-looking" statements, protected by the PSLRA's safe harbor provisions. (Def.'s Mem. at 30). Under the safe-harbor provisions of the PSLRA, a statement regarding a forward looking statement generally does not give rise to a securities fraud claim if either: (I) it is accompanied by meaningful cautionary language, or (ii) the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading. See 15 U.S.C. § 78u-5(c). However, "it is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re Independent Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 757 (S.D.N.Y.2001). It is true that "statements containing simple economic projections, statements of optimism, and other puffery are insufficient" to sustain a claim for securities fraud." *Novak*, 216 F.3d at 315.

However, "[t]he line between puffery and actionable conduct sometimes is difficult to delineate." *Manavazian v. Atec Group, Inc.*, 160 F.Supp.2d 468, 480 (E.D.N.Y.2001). *See also Novak*, 216 F.3d at 315 (defendants' statements were actionable where company failed to account properly for millions of dollars of inventory which defendants knew was "nearly worthless"); *In re Computer Assocs. Class Action Secs. Litig.*, 75 F.Supp.2d 68, 73 (E.D.N.Y.1999) (defendants' statements were actionable as false and misleading because they failed "to disclose materially misleading adverse business trends and accounting practices"); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir.1996) (general optimistic statements constituting inactionable puffery).

In the present case, Burke did more than offer general optimistic statements about the Company's future performance. First, plaintiffs allege that on October 25, 2001, ANR issued a press release announcing a third quarter loss of $39.9 million, which was attributed to losses from September 11, losses incurred on a life insurance contract from 1998 and a write-down of $24.7 million of deferred acquisition costs associated with the annuity business. (Am.Compl.¶ 145). The next day, ANR held a conference call with analysts to discuss the third quarter results, during which defendant Burke

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

allegedly stated that "the Company believes that there is a low probability of any future write-offs on the contract." (Am.Compl.¶ 147). Plaintiffs allege that ANR did not reveal its obligations to pay minimum interest guarantees and that ANR represented to analysts that the problems were solely due to high surrender rates. (Am.Compl.¶ 147).

While Burke characterizes his statements as "forward-looking," plaintiffs argue that Burke's positive characterization of ANR's current and future business conditions were based on projections of a 10% return that was inconsistent with the bonds' historical performance, rendering those statements misleading. (Pls.' Opp. at 60). Assuming, as we must at this stage, the accuracy of the plaintiffs' allegations, the court concludes that Burke's statement included a representation of present fact. Thus, the safe harbor provision of the PSLRA does not apply. _In re Independent Energy Holdings PLC Sec. Litig._, 154 F.Supp.2d at 757.

*8 Second, after the release of the 2001 10-K report, on April 24, 2002, plaintiffs allege that Burke participated in a conference call with analysts to discuss first quarter results and affirmed that reserves on the Transamerica contract were reasonable. (Am.Compl.¶ ¶ 175-76). Plaintiffs contend that the PSLRA's safe harbor provisions do not apply to reserve calculations. (Pls.' Opp. at 59). Burke's assertion that the reserves were reasonable may have been misleading. Statements regarding loss reserves are not projections, they are directed to "the then-present state of the Company's financial condition." See _In re Reliance Securities Litigation_, 91 F.Supp.2d 706, 721 (D.Del.2000). The court concludes that Burke's statement included a representation of present fact. Thus, the safe harbor provision of the PSLRA does not apply. _In re Independent Energy Holdings PLC Sec. Litig._, 154 F.Supp.2d at 757.

Therefore, plaintiffs have alleged sufficient facts from which a reasonable jury could find reckless conduct on the part of defendant. This is sufficient to meet the pleading standards for scienter in the Second Circuit. See _Novak_, 216 F.3d at 308; _Rothman_, 220 F.3d at 90-91. The court cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence. Rule 9(b) proscribes the pleading of "fraud by hindsight," but neither can plaintiffs be expected to plead fraud with complete insight. See _Press v. Chemical Investment Services Corp._, 166 F.3d 529, 538 (2d Cir.1999) (refusing to interpret the Reform Act's pleading standard in a manner that "would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual").

4. Reliance

The court now turns to whether plaintiff has sufficiently alleged "that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." _Lawrence v. Cohn_, 325 F.3d 141, 147 (2d Cir.2003) (citations omitted). To prevail on a Section 10(b) claim a plaintiff must demonstrate that her injuries were caused by the defendant's material misstatements or omissions. See _Emergent Capital Investment Management, LLC v. Stonepath Group, Inc._, 343 F.3d 189, 196 (2d Cir.2003).

Causation is two-pronged. Plaintiffs must allege both transaction and loss causation. _Suez Equity Investors, L.P. v. Toronto-Dominion Bank_, 250 F.3d 87, 95 (2d Cir.2001). Burke argues that plaintiffs have failed to allege loss causation because his disclosures caused the market price of ANR's stock to decrease or remain unchanged after his allegedly false and misleading statements. (Def.'s Mem. at 38-39). Plaintiffs counter that this is a "fraud on the market" case and that there was a "massive stock price drop" once the full extent of the fraud was revealed at the end of the Class Period. (Pls.' Opp. at 56).

*9 The "fraud on the market" theory is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." _Basic_, 485 U.S. at 241-42 (citation omitted). This theory applies where plaintiffs allege that defendants have "disseminate[d] false information into the market on which a reasonable investor would rely." _In re Ames Dept. Stores, Inc., Stock Litig._, 991 F.2d 953, 967 (2d Cir.1993). In such a case, "it is sufficient that [the investor] bases her transactions on the market trends or securities prices that are altered by the fraud." _In re Initial Public Offerings Sec. Litig._, 241 F.Supp.2d 281, 375 (S.D.N.Y.2003). The ensuing presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff," because then "the basis for finding that the fraud had been transmitted through market price would be gone." _Basic_, 485 U.S. at 248.

Loss causation has been compared to "the tort

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

concept of proximate cause." *Emergent Capital Investment Mgmt.*, 195 F.Supp .2d at 559. Courts consider, for example, "whether the resulting loss was a foreseeable outcome of the fraudulent statement and [whether] other factors such as intervening causes and the lapse of time between the fraudulent statement and the loss [existed]." *Id.* Here, the allegedly fraudulent statements portrayed ANR as a viable company while the company was failing, thereby encouraging investors to purchase stock and creating a disparity between the transaction price and the true value of the securities. The alleged accounting violations were ultimately revealed to the market with the foreseeable consequence that share price would decline. While a trier of fact might blame market forces rather than accounting violations for that decline, the allegations in the Complaint are sufficient to withstand Burke's motion to dismiss.

*B. Control Person Liability under § 20*

To establish a prima facie claim of control person liability under Section 20(a) of the Exchange Act, a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996), cert. denied, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997)); see also 15 U.S.C. § 78t(a). The control person liability provisions of Section 20(a) of the Exchange Act are similar to those of Section 15 of the Securities Act. Although worded differently, both provisions are generally interpreted the same way. See *Wallace v. Buttar*, 239 F.Supp.2d 388, 395 n. 1 (S.D.N.Y.2003).

*10 However, a split has emerged among the district courts in this circuit as to whether Section 15 claims require that plaintiffs allege the additional element of "culpable participation." *Cf. DeMaria v. Andersen*, 153 F.Supp.2d 300, 314 (S.D.N.Y.2001) (requiring a showing of culpable participation), with *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at *6-7 (S.D.N.Y. Feb.20, 2002) (requiring only a showing of control over primary violator); see also *Dorchester Investors v. Peak Trends Trust*, No. 99 Civ. 4696, 2003 WL 223466, at *3 (S.D.N.Y. Feb. 3, 2003) (discussing cases and concluding that majority of courts have not required a showing of culpable participation). The Second Circuit has yet to pass on this issue.

If plaintiffs have adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled. *In re Scholastic Corp.*, 252 F.3d at 77-78. Control is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." See also *First Jersey*, 101 F.3d at 1472-73 (adopting this standard for Section 20(a) claim). A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required. See *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512-513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *In re IPO Sec. Litig.*, 241 F.Supp.2d at 352.

In the present case, the facts as pleaded support the reasonable inference that defendant participated in the allegedly fraudulent representations. Defendant signed multiple disclosures filed with the SEC that are alleged to have contained actionable misrepresentations, including Forms 10-K and 10-Q. "The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents." *In re Worldcom, Inc. Securities Litigation*, 294 F.Supp. 392, 420 (S.D.N.Y.2003). "These approvals through signing sufficiently allege control over those who have been alleged to have violated Section 10(b), at least in connection with the misrepresentations and omissions in those documents." *Id.*

Plaintiffs' allegations of control are sufficient at the pleading stage because defendant Burke possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of ANR. See *Duncan v. Pencer*, 94 CIV. 0321, 1996 WL 19043, at *18 (S.D.N.Y. Jan.18, 1996); *Robbins v. Moore Medical Corp.*, 788 F.Supp. 179, 189 (S.D.N.Y.1992) (holding that allegations that "each individual defendant signed at least one of the allegedly fraudulent documents" were "sufficient at the pleading stage under § 20(a)").

*IV. Conclusion*

*11 Accordingly, for the reasons set forth above, the court denies defendant John F. Burke's Motion to Dismiss (Doc. # 73) the consolidated amended class action complaint.

SO ORDERED.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 367644 (D.Conn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT C

Case 3:02-cv-02133-EBB    Document 122-3    Filed 03/15/2004    Page 8 of 20

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

Page 1

H

United States District Court, S.D. New York.

Lincoln ADAIR, on behalf of himself and all others similarly situated
Plaintiff,
v.
KAYE KOTTS ASSOCIATES, INC.; J.W. Barclay & Co. Inc.; First Cambridge
Securities Corp.; Feldman Radin Feinsod & Co., P.C.; David Kaye; Linda
Kaye; Michael M. Kesner; Susan E. Phillips; Robert M. Rubin; and Lawrence
Cohen, Defendants.

No. 97 CIV. 3375(SS).

March 27, 1998.

I. Stephen Rabin, Allan K. Peckel, Brian Murray, Rabin & Peckel LLP, New York, Counsel for Plaintiffs.

Dan L. Goldwasser, Vedder, Price, Kaufman, Kammholz & Day, New York, Counsel for Defendant Feldman Radin & Co., P.C.

David E. Nachman, Robert S. Frenchman, Solomon, Zauderer, Ellenhorn Frischer & Sharp, New York, Counsel for Defendants Linda Kaye; Michael M. Kesner; Susan E. Phillips; Robert M. Rubin; and Lawrence Cohen.

OPINION AND ORDER

SOTOMAYOR, D.J.

*1 This is a putative class action [FN1] against Kaye Kotts Associates, Inc. ("Kaye Kotts" or the "Company"), its officers, directors and controlling shareholders (collectively, the "individual defendants"), J.W. Barclay & Co. Inc. ("J.W.Barclay") and First National Securities Corp. ("First National") (together, "the Underwriters"), and Feldman Radin Feinsod & Co., P .C. ("Feldman Radin"). [FN2] In this action, plaintiffs allege that the defendants disseminated materially misleading information in the registration statement and prospectus (the "Registration Statement and Prospectus") issued by Kaye Kotts in its initial public offering (the "Offering") on February 22, 1996, in violation of Sections 11, 12(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, 77l(2) and 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendant Feldman Radin now moves for an order pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) dismissing, as against it, plaintiffs' Class Action Complaint (the "Complaint"), and alternatively, for partial summary judgment pursuant to Fed.R.Civ.P. 56 and 15 U.S.C. § 77k(e). The individual defendants, by notice of motion dated August 8, 1997, join in Feldman Radin's motion for summary judgment. For the reasons discussed below, I grant only Feldman Radin's motion to dismiss the Complaint against it. [FN3]

FN1. By Order dated September 23, 1997, the Court granted plaintiff Adair's motion seeking permission to serve as lead plaintiff for the putative class.

FN2. Feldman Radin Feinsod & Co., P.C. became Feldman Radin & Co. in July 1991. Feldman Radin's Mem. in Supp. of Mot. for Summ. J. at 1 n .1 ("FR's Mem."). For purposes of this Opinion, "Feldman Radin" refers to Feldman Radin & Co., P.C., successor to Feldman Radin Feinsod & Co., P.C.

FN3. Because I dismiss the Complaint with respect to Feldman Radin pursuant to Fed.R.Civ.P. 12(b)(6), I do not consider its Rule 9(b) motion.

BACKGROUND

The pertinent facts alleged are as follows. Kaye Kotts is a Delaware corporation based in Sherman Oaks, California that provides tax advice to delinquent taxpayers who face enforcement proceedings by federal and state tax authorities. Cplt. ¶ ¶ 7, 26; Pls.' Mem. in Opp'n to Mot. for Summ. J. at 3 ("Pls.' Mem."). Beginning February 22, 1996, Kaye Kotts offered for sale to the public 1,000,000 shares of common stock at $5 per share and 1,100,00 class A common stock warrants ("warrants") at $0.15 per warrant. [FN4] Cplt. ¶ 2. Prior to the Offering, Kaye Kotts was a closely-held company. Cplt. ¶ 27. Plaintiffs purchased or otherwise acquired Kaye Kotts common stock and

Case 3:02-cv-02133-EBB    Document 122-3    Filed 03/15/2004    Page 9 of 20

Not Reported in F.Supp.                                                                                Page 2
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

warrants between February 22, 1996 and April 15, 1997 (the "Class Period"), pursuant to the Registration Statement and Prospectus. Cplt. ¶¶ 2, 20. Each of the individual defendants are principals of Kaye Kotts, as members of the Company's Board of Directors and/or management. Defendants J.W. Barclay and First National were underwriters for the Offering. Cplt. ¶¶ 16, 17.

> FN4. Each warrant entitled the holder to purchase one share of common stock for $6. Cplt. ¶ 27. The Complaint alleges that the warrants sold for as much as $4 per warrant during the Class Period. Cplt. ¶ 2. As of December 31, 1996, the Company had 2,398,900 shares of stock and 2,575,000 warrants issued and outstanding. Cplt. ¶ 8. The securities are listed and actively traded on the NASDAQ Small Cap Market. Cplt. ¶ 21.

The Prospectus included in the Registration Statement contained audited financial statements for fiscal years 1993 and 1994, and unaudited figures for both the first nine months ended September 30, 1994 and the first nine months ended September 30, 1995. Cplt. ¶¶ 28, 29. The Prospectus did not include the Company's operating results for the final quarter and year ending 1995. Cplt. ¶ 29. Defendant Feldman Radin issued an audit report dated May 4, 1995, certifying the financial statements for fiscal years 1993 and 1994 which were included in the Prospectus. Cplt. ¶ 31; Defs.' Ex. B at F-2. Feldman Radin supplemented its report on August 31 and November 27, 1995. Defs.' Ex. B at F-2. The report revealed that while the Company had sustained losses of $218,392 in 1994, its losses had dropped to $171,248 for the nine months ended September 30, 1995.

*2 In the Winter of 1995, Kaye Kotts took a turn for the worse. Cplt. ¶ 34. On its form 10-K filed April 15, 1997, the Company reported a loss of $224,454 for the final quarter of 1995 alone. Cplt. ¶ 33. Kaye Kotts' stock lost $0.17 per share in the final quarter and $0.14 per share in fiscal 1995. The Company never recovered. By April 15, 1997, the Company's stock sold for $0.625 per share and its warrants for $0.16 per warrant. Cplt. ¶ 35. In July 1997, Kaye Kotts filed for bankruptcy. Pls.' Mem. at 1.

The crux of plaintiffs' claim against defendants is that the financial figures, as revealed in Feldman Radin's audit report and elsewhere in the Prospectus, made the Company look profitable when it was in fact losing money. Plaintiffs allege that defendants knew or should have known of the 1995 results at the time of the Offering and that their failure to disclose these results made the Registration Statement and Prospectus materially misleading. Cplt. ¶¶ 33, 34, 35. [FN5] Plaintiffs also charge that defendants' failure to disclose the final quarter 1995 losses artificially inflated the price of Kaye Kotts' stock during the Class Period, and that plaintiffs incurred damages, because they purchased the shares for more than they were worth. Cplt. ¶¶ 6, 59.

> FN5. Specifically, plaintiffs allege that "[t]he Prospectus set forth that Kaye Kotts, while unprofitable in 1993, had turned the corner, making a profit in 1994 and the first nine months of 1995. This was misleading because the Company had suffered a massive loss in the fourth quarter and full year 1995, which ended *seven weeks before the Offering.*" Cplt. ¶ 32 (emphasis in original). Feldman Radin contends that it could not have committed securities fraud, because such a statement does not appear in its audit report. FR's Mem. at 21. However, reading plaintiffs' allegation broadly, the Court concludes that plaintiffs allege that the financial figures disclosed in the Prospectus suggest that the Company was profitable when in fact it was not. *See* Pl.'s Mem. at 19.

DISCUSSION

I. *Standard of Review*

Feldman Radin moves to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, or alternatively, for summary judgment on plaintiffs' Section 11 claim. The individual defendants join in Feldman Radin's motion for summary judgment. Because the grounds for dismissal asserted by Feldman Radin in its 12(b)(6) motion are inapposite to the individual defendants, the Court discusses the merits of each motion separately.

A. *Motion to Dismiss*

Dismissal under Rule 12(b)(6) is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

Case 3:02-cv-02133-EBB    Document 122-3    Filed 03/15/2004    Page 10 of 20

Not Reported in F.Supp.                                                                                                Page 3
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court's function on a 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." ' *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *cert. denied,*--U.S.--, 117 S.Ct. 50 (1996)). Accordingly, on a motion to dismiss, the Court must accept as true all factual allegations in the Complaint and draw all reasonable inferences in favor of the plaintiff. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). However, the Court may disregard "conclusions of law or unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 ( 2d Cir.1994).

*3 When a complaint is dismissed under Rule 12(b)(6), "the usual practice" is to allow leave to amend. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991). "Although leave to [amend] is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion." *Id.* Such a justifying reason exists if a plaintiff "is unable to allege any fact sufficient to support its claim," *id.,* or where "amendment[] would not serve any purpose." *Kaster v. Modification Systems, Inc.,* 731 F.2d 1014, 1018 (2d Cir.1984). If a plaintiff has "at least colorable grounds for relief, justice does ... require leave to amend." *Id.* (internal quotation omitted). However, where no justifying reason or colorable ground for relief exists, dismissal with prejudice is warranted. *Cortec Indus.,* 949 F.2d at 48.

In reviewing the pleadings on a 12(b)(6) motion, the Court must limit its analysis to the four corners of the complaint and evaluate the legal viability of the allegations contained therein. Fed.R.Civ.P. 12(b)(6); *Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir.1991). However, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim." *Cortec Indus.,* 949 F.2d at 47. Because the Complaint here alleges materially misleading statements made in the Registration Statement and Prospectus issued February 22, 1996, and Feldman Radin has annexed a copy of the Prospectus to its Notice of Motion, the Court considers it in its review of the pleadings.

B. *Summary Judgment*

Summary judgment is permissible only where the parties have been afforded adequate discovery and "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(d). On a motion for summary judgment, "[t]he evidence of the nonmovant is to believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby,* 477 U.S. at 255.

A party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. Only if the movant satisfies that burden does the onus shift to the nonmoving party "to set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 250. This is a "heavy burden" when the motion is made pursuant to 15 U.S.C. § 77k(e). *Ackerman v. Oryx Communications, Inc.,* 810 F.2d 336, 341 (2d Cir.1987).

II. *Liability under Section 11 of the Securities Act*

*4 At issue in plaintiffs' Section 11 claim is whether Feldman Radin was required to update its audit report with financial results it had not certified and whether the individual defendants have proffered sufficient evidence to dismiss plaintiffs' Section 11 claim pursuant to Section 11(e). For the reasons to be discussed, I hold that Fedlman Radin was not required to update its audit report and that the individual defendants have not met their burden under Section 11(e). Accordingly, I grant Feldman Radin's motion to dismiss the Section 11 claim as against it, but deny the individual defendants' motion for summary judgment.

A. *Sections 11(a) and (b)*

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

Page 4

My analysis necessarily begins with the language of Section 11(a). See *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). Section 11(a) provides a cause of action for "any person" who "acquir[ed]" a security in reliance on a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact ... necessary to make the statements therein not misleading," as against, among others,
   (1) every person who signed the registration statement; [FN6]

> FN6. The Complaint alleges that each of the individual defendants signed the Registration Statement. Cplt. ¶ ¶ 9-15. However, the individual defendants have not moved to dismiss plaintiffs' Section 11 claim for failure to state a claim upon which relief may be granted. Thus, the Court does not consider whether plaintiffs sufficiently allege liability on the part of the individual defendants under 15 U.S.C. § 77k(a)(1). However, the Court will consider whether plaintiffs can prove damages against the individual defendants under Section 11, because the individual defendants have joined in Feldman Radin's motion for summary judgment. See discussion *infra* Part II.B.

* * *

(4) *every accountant* ... who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, *with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him* [.]
15 U.S.C. § 77k(a)(4) (emphasis added).

Moreover, Section 11 provides an affirmative defense to any person, other than the issuer, who by "reasonable investigation" had "reasonable ground to believe and did believe at the time such registration statement became effective" that no statement made in connection with a registration statement was materially false or misleading. *Id.*, § 77k(b)(3).

Here, plaintiffs assert a Section 11 claim against Feldman Radin based upon its failure to conduct a "proper and complete S-1 Review" of Kaye Kotts and to update their audit report with the Company's final quarter and year end 1995 financial results. [FN7] See Cplt. ¶ ¶ 31, 42, Pl.'s Mem. at 5. Plaintiffs claim that if Feldman Radin had conducted such a review, it "would have discovered that Kaye Kotts had a material loss for the fourth quarter and full year 1995."

> FN7. An S-1 Review is a review of "events subsequent to the date of a certified balance sheet [appearing in a registration statement]... to ascertain whether any material change has occurred in the company's financial position that should be disclosed to prevent the balance sheet figures from being misleading ." Comment, Barchris: *Due Diligence Refined,* 21 Stan. L. Review 171, 178 n. 16 (1968) (quoting *Escott v. BarChris,* 283 F.Supp. 643, 701 (S.D.N.Y.1968)). Such review includes comparing recent financial statements to earlier ones, reading minutes of stockholders' and directors' meetings, and investigating changes in material contracts, bad debts and newly discovered liabilities. *BarChris,* 283 F.Supp. at 701-03.

Plaintiffs have entirely misconstrued the basis for accountant liability under Section 11. In order to state a claim against an accountant under this provision, the accountant must have prepared or certified a statement in connection with a registration statement that was false or misleading. See *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 n. 13, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Grimm v. Whitney-Fidalgo Seafoods, Inc.,* No. 73 Civ. 1304, 1973 WL 495, at *2-3 (S.D.N.Y. Dec. 4, 1973). In other words, the accountant may only be liable for statements that "purport ... to have been prepared or certified by him." 15 U.S.C. § 77(k)(a)(4). *See also Huddleston,* 459 U.S. at 386 n. 22 (accountants "cannot be reached by a Section 11 action .... with respect to parts of a registration statement which they are not named as having prepared or certified"). [FN8] Plaintiffs do not allege that Feldman Radin, or anyone else, made or caused a misstatement or omission to be made in the audit report. Nor do plaintiffs allege that Feldman Radin prepared or certified any part of the registration statement other than the audit report.

> FN8. Unless, of course, the accountant has signed the registration statement, was a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 3:02-cv-02133-EBB   Document 122-3   Filed 03/15/2004   Page 12 of 20

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

Page 5

director or partner of the issuer, or was about to become a director or partner. *See* 15 U.S.C. § 77k(a). *Cf. Shapiro v. Cantor, 123 F.3d 717, 721 (2d Cir.1997)* ("an accountant shares in an insider's duty to disclose [under Rule 10(b)] if the accountant exchanges his or her role for an insider who vends the company's securities"). Plaintiffs have made no such allegation here.

*5 Rather, plaintiffs suggest that the mere presence of Feldman Radin's report in the Prospectus was misleading, when considered in light of the Company's final 1995 financial results. This argument, however, is unavailing. An accurate report simply does not become misleading because an issuer suffers a material loss subsequent to the period covered by the report. There must exist materially false or misleading information in the report itself. *See, e.g., Ingenito,* 441 F.Supp. at 549. Here, Feldman Radin expressly limited its opinion to "the financial position of Kaye Kotts ... as of December 31, 1994." Because plaintiffs have failed to allege that the certified statements were misleading in and of themselves, they cannot maintain a Section 11 claim against Feldman Radin.

Indeed, by merely alleging that Feldman Radin should have updated its report with the Company's 1995 results, plaintiffs suggest that Section 11(b) is an independent basis for liability under the Securities Act. However, as enacted, Section 11(b) is an affirmative defense to liability under Section 11(a). *A fortiori,* in order for Section 11(b) to apply in any given case, a plaintiff must first allege a violation of Section 11(a). Here, plaintiffs do not assert that Feldman Radin omitted or falsified any material information in the 1993 or 1994 financial statements. Therefore, plaintiffs' sole claim that a subsequent review of the Company would have revealed a material loss for the final quarter and full year 1995 is irrelevant, because plaintiffs have no basis for maintaining a Section 11(a) claim against Feldman Radin. *See, e.g., Robin v. Doctors Officenters Corp., 686 F.Supp. 199, 208 (N.D.Ill.1988)* ("[a]lthough *accountants* are required to take reasonable steps to correct misstatements discovered in previous financial statements," they *need not "disclose events that occur subsequent to the period that they purport to certify* ") (citing *BarChris,* 283 F.Supp. at 684 (S.D.N.Y.1968)) (emphasis added); *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 549 (S.D.N.Y.1977) (purpose of post-audit inquiry is to ensure integrity of certified statements); *Grimm,* 1973 WL 495, at * 2 ("independent accountant's liability is limited to those figures which he certifies .... [j]ust what has been certified [must] be determined [[from]] the four corners of the prospectus ") (emphasis added); *BarChris,* 283 F.Supp. at 701 (purpose of S-1 review "is to prevent ... balance sheet figures" from being false or misleading). *See also United States v. Arthur Young & Co.,* 465 U.S. 805, 811, 104 S.Ct. 1495, 1500, 79 L.Ed.2d 826 (1984) (purpose of audit report is to opine "whether the financial statements, taken as a whole, fairly present the financial position and operations of the corporation for the relevant period"). *Cf. In re Leslie Fay Companies, Inc. Sec. Lit.,* 835 F.Supp. 167, 174-75 (S.D.N.Y.1993) (declining to dismiss complaint against auditor where auditor certified report but failed to discover annual income was 60% of that actually reported); *Ahern v. Gaussoin,* 611 F.Supp. 1465, 1484 (D.Ore.1985) (finding cause of action under Section 11(a) where accountant had certified statement that had become inaccurate by the time that investors had purchased notes).

*6 I decline plaintiffs' invitation to read a duty into Section 11(a) to "update" a certified report beyond the period that the report purports to certify. To do so would contravene the plain language of the statute, which limits the liability of accountants to "statement[s] in a registration statement, report, or valuation, which purport[] to have been prepared or certified by [them]." 15 U.S.C. § 77(k)(a)(4). *See also Grimm,* 1973 WL 495, at * 3 (dismissing Section 11(a) claim against defendant auditor where plaintiff had not alleged that certified financial statements contained material omission or misstatement); *BarChris,* 243 F.Supp. at 684 (declining to hold accountants liable for interim, unaudited financial results). [FN9] *Cf. Ingenito,* 441 F.Supp. at 549 ("accountant may be held liable for ... financial statements which portray an inaccurate picture for the period covered by the report").

> FN9. In *BarChris,* a case which is not, as plaintiffs suggest, "dispositive," a court imposed Section 11 liability on defendant auditor Peat, Marwick because it failed to discover misstatements in its certified audit report. *See* 283 F.Supp. at 682. This Court declines to interpret *BarChris* in such a way that would impose a duty on accountants beyond what is prescribed by Section 11(a). To the extent that dictum in *BarChris* may suggest otherwise, I decline to follow it.

Case 3:02-cv-02133-EBB   Document 122-3   Filed 03/15/2004   Page 13 of 20

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

Page 6

In short, for any post-audit investigation to have been relevant to the instant motion, there must first have existed a basis for liability against Feldman Radin under Section 11(a). The Court has carefully considered the Complaint and has found none. Accordingly, plaintiffs' Section 11 claim is dismissed as against Feldman Radin.

B. *Plaintiffs' Damages under Section 11(e)*

Feldman Radin also urges that plaintiffs' Section 11 claim be dismissed, because plaintiffs can not prove damages under this provision. The individual defendants have joined, and briefed, this motion. Because Feldman Radins' 12(b)(6) motion does not apply to the individual defendants, the Court will consider the defendants' Rule 56 motion.

Section 11(e) provides that damages are not recoverable under Section 11,

> [i]f the defendant proves that any portion or all of the damages represents other than the depreciation in the value of such security resulting from such part of the registration statement, with respect to which liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(e). Defendants assert that because Kaye Kotts disclosed a $176,621 loss for fiscal 1995 in a "Special Financial Report" or "SP-15" filed with the SEC on or about May 17, 1996, and the Company's stock price rose immediately after disclosure, plaintiffs cannot prove damages under Section 11. Indiv. Defs.' Reply Mem. at 3. I disagree.

The presence or absence of price movement immediately after disclosure is not per se dispositive under Section 11(e). FN10 Accord *Beecher v. Able*, 435 F.Supp. 397, 404 (S.D.N.Y.1977) ("Case law [and] commentators ... agree that a stock's 'realistic value' may be something other than market price, where the public is either misinformed or uninformed about important facts relating to the defendant['s] well being."). This is particularly true where it is undisputed that the stock price did in fact decline at some point after the disclosure of the Company's financial results. FN11 Because no expert analysis of the price issue has been provided, the Court cannot discern from the evidence what part, if any, the 1995 information might have had on the stock price. *See, e.g., Westinghouse Elect. Corp. v. '21' Int'l Holdings, Inc.*, 821 F.Supp. 212, 215 (S.D.N.Y.1993) ("while the Court agrees with [[defendants that] the better part of the drop in the market price of its stock cannot be said to have resulted from the alleged misrepresentations, [[[defendants have] not shown that the drop in market price after the [second] announcement ... was not the result of the alleged misrepresentations"); *In re Saxon Sec. Lit.*, No. 83 Civ. 3760, 1985 WL 48177, at *9 (S.D.N.Y. Oct.30, 1985) ("to separate the effect of the fraud from the effect of non-actionable forces .... require[s] expert testimony" where stock price declined upon announcement of company's bankruptcy but had fluctuated periodically prior to announcement). If such analysis were not required, the Court would seldom be in the position to "eliminate that portion of a price decline that [was] the result of forces unrelated to the wrong." *In re Executive Telecard, Ltd. Sec. Lit.*, 979 F.Supp. 1021, 1025 (S.D.N.Y.1997) (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048 (2d Cir.1995), cert. denied,--U.S.--, 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 781 (1996)).

> FN10. Defendants rely exclusively on *Ackerman*, 810 F.2d at 342-43, to support their position. In *Ackerman*, plaintiffs sought damages based upon a depreciation in stock price prior to public disclosure of erroneous information, on the theory that insider trading had deflated the securities' true value. 609 F.Supp. 363, 371 (S.D.N.Y.1984). Defendants had shown that the depreciation in value between the time of disclosure and the time of suit was "zero," and that in fact, the price at the time of suit was twenty-five cents higher than at the time of the offering. 810 F.2d at 342. This is certainly not the case here, where plaintiffs have claimed--and the facts suggest--that Kaye Kotts stock is now "virtually worthless." See Pl.'s Br. at 1. Cf. *Kurzweil v. Philip Morris Companies, Inc.*, No. 94 Civ. 2373, 1997 WL 167043, at *9 (S.D.N.Y. April 9, 1997) (implying that where stock price nearly doubled when lawsuit was pending, defendants could bring successful motion for summary judgment). Moreover, in *Ackerman*, the plaintiffs had been permitted extensive discovery and expert testimony had been submitted on the motion for summary judgment. See 810 F.2d at 343. Here, neither party has submitted expert testimony, and in April 1997, Kaye Kotts' stock sold at $0.25 per

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

Page 7

share, $4.75 less than at the time of the Offering and approximately $3.25 less than at the filing date of the SP-15 report. *See* Def.s' Ex. E; Pls.' Mem. at 1; Cplt. ¶ 2. These cases are therefore distinguishable.

FN11. While the depreciation in value of Kaye Kotts' stock has not been more than a few dollars since the time of the Offering, the Court notes that the price of the stock has dropped approximately 97% from the time of the initial disclosure, and approximately 92% from the time of the second disclosure, to the time of suit. The Court cannot hold as a matter of law that this decrease is insignificant. *See, e.g., United States v. Russo,* 74 F.3d 1383, 1389 (2d Cir.1996) (finding significant 68% drop in stock price from $1.25 to $0.40), *cert. denied,*--U.S.--117 S.Ct. 293 (1996).

*7 Furthermore, it should be noted that in the cases where defendants have successfully established an 11(e) defense on summary judgment, they have not only submitted expert testimony, but have provided and discussed evidence attributing the decline to factors other than their own disclosure of financial results. [FN12] *Eg., In re Fortune Systems Sec. Lit.,* 680 F.Supp. 1360, 1365-68 (N.D.Ca.1987) (attributing price drop to poor management of Offering in addition to showing that stock had outperformed competitors during same period); *Ackerman,* 609 F.Supp. at 371 (finding "many independent factors [[had] contributed to the stock's decline"); *Beecher,* 435 F.Supp. at 407 (drop in value due to economy). *Cf. Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544, 586 (E.D.N.Y.1971) (taking "market decline" into account during valuation); *Fox v. Glickman Corp.,* 253 F.Supp. 1005, 1010 (S.D.N.Y.1966) (same, with respect to "market conditions"). Defendants have not provided the Court with any authority that cannot be distinguished on these grounds. [FN13]

FN12. The Court notes that the record suggests that factors other than the disclosure of the 1995 and 1996 financial results may have contributed to the depreciation in Kaye Kotts' stock price. First, the Prospectus suggests that Kaye Kotts may have lost money in 1995, because it was further expanding its market. *See* Defs.' Ex. B at 5 ("There is no assurance that the Company will successfully market its services outside of California .... It is possible that during its expansion efforts the Company will sustain losses."). Second, a press release states that Kaye Kotts and other tax assistance firms were being investigated by the Internal Revenue Service in 1996. Pls.' Ex. 1. The Court does not consider this evidence, however, because the parties do not discuss, nor even mention, it in their briefs and the Court has no basis in the evidence upon which to evaluate the significance of these events upon the stock price.

FN13. In *Ackerman,* the court dismissed plaintiffs' Section 11 claim on summary judgment, only after defendants had "prove[n] by expert, statistical analysis that the alleged discrepancy had insufficient significance to create a genuine issue of material fact ." 609 F.Supp. at 371. The court suggested that plaintiffs' claim would not have been dismissed based solely upon the submission of stock quotes: "Although defendants failed in their more general attack on the significance of the alleged discrepancy in performance of the ... stock, the court offered them an opportunity to [submit] expert [testimony on that point]." *Id.*

Finally, the Court rejects defendants' attempt to shift their Section 11(e) burden to plaintiffs, by claiming that plaintiffs have failed to show loss causation. Loss causation is not an element of a Section 11 claim. *Lyne v. Arthur Andersen & Co.,* 772 F.Supp. 1064, 1067 (N.D.Ill.1991); *Miller v. New America High Income Fund,* 755 F.Supp. 1099, 1106-09 (D.Mass.1991), *aff'd sub nom. Lucia v. Prospect Street High Income Portfolio, Inc.,* 36 F.3d 170 (1st Cir.1994); *Billet v. Storage Tech. Corp.,* 72 F.R.D. 583, 586 n. 6 (S.D.N.Y.1976); *Emmi v. First Manufacturers Nat'l Bank,* 336 F.Supp. 629, 635 (D.Me.1971). Rather, in enacting Section 11(e), Congress unmistakably made "negative causation" an affirmative defense. *Ackerman,* 810 F.2d at 341. *See also Hayes v. Arthur Young & Co.,* 34 F.3d 1072, Nos. 91-15531, 1994 WL 463493, at *10 (9th Cir.1994) (unpublished table decision) ("while in the § 10(b) context it is the plaintiff who must prove loss causation, in the § 11 context it is the defendant who

Case 3:02-cv-02133-EBB    Document 122-3    Filed 03/15/2004    Page 15 of 20

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,192
(Cite as: 1998 WL 142353 (S.D.N.Y.))

Page 8

has the burden"); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir.1990) (Posner, J.) ("absence of loss causation is an explicit defense"); *Nielsen v. Greenwood*, 849 F.Supp. 1233, 1247 (N.D.Ill.1994) ("[it is] well-settled that loss causation is not a requirement ... under § 11"); *In re Fortune Systems Sec. Lit.*, 680 F.Supp. 1360, 1364 (N.D.Ca.1987) (once plaintiffs allege omission under Section 11, "causation is presumed and the burden is then on defendants to show that 'factors other than' the omissions caused the decline in the value of the stock for which plaintiffs seek to recover"). *Cf. Huddleston*, 459 U.S. at 382 ("Section 11 places a ... minimal burden on a plaintiff."). Thus, the measure of damages is not "an essential element of [plaintiffs'] case" that must be proven by plaintiffs on summary judgment. *See Celotex*, 477 U.S. at 325. Plaintiffs are certainly not required, as defendants suggest, to " 'go beyond the pleadings and by [[their] own affidavits, or by ... [expert] deposition ...' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)). *See also Isquith v. Middle South Indus.*, 847 F.2d 186, 198 (5th Cir.1988) ("We disagree with defendants that [the nonmovant is] require[d] to respond to a motion for summary judgment by proffering its own evidence."). Rather, the burden remains on defendants to prove that other factors caused the decline in price of plaintiffs' stock. *See Ackerman*, 810 F.2d at 341-343.

*8 For plaintiffs' Section 11 claim to be dismissed under Section 11(e) at this stage in the proceedings, defendants must conclusively establish that plaintiffs' damages are de minimus. *Ackerman*, 609 F.Supp. at 371. Based on the evidence submitted, defendants have not met this burden. Accordingly, I decline to dismiss plaintiffs' Section 11 claim as against the individual defendants.

II. *Liability under Section 10(b) and Rule 10b-5*

Plaintiffs also seek to hold the defendants liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5 for failing to disclose the 1995 financial results. Feldman Radin moves to dismiss this claim under Fed.R.Civ.P. 12(b)(6). Because these provisions serve different remedial purposes than does Section 11, *see, e.g., Huddleston*, 459 U.S. at 383-86, I analyze these claims separately.

Section 10(b) makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as necessary or appropriate ... for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, a general anti-fraud provision promulgated under Section 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading ...." 17 C.F.R. § 240.10b-5(2).

To state a claim under Rule 10b-5, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused him injury." *Bloor v. Carro*, 754 F.2d 57, 61 (2d Cir.1985).

As previously stated, plaintiffs allege that Feldman Radin's audit report was misleading, not because it misstated any of the financial results, but rather because it failed to disclose the results for the final quarter and full year 1995. Therefore, the sole basis for plaintiffs' 10(b) and 10b-5 claims is that defendants made a material omission. When a 10(b) claim "is based upon non-disclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 234, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). *See also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir.1992) ("a 'duty to speak' must exist before the disclosure of material facts is required") (internal quotations omitted). Accordingly, as a preliminary matter, to sustain their claims under 10(b) and 10b-5, plaintiffs must allege that Feldman Radin had a duty to disclose Kaye Kotts' final quarter and full year 1995 results.

Plaintiffs cannot meet this burden. Though they are correct that an accountant creates "a special relationship of trust with the public" when it provides certified statements in a prospectus, *Gold v. D.C.L. Inc.*, 399 F.Supp. 1123, 1127 (S.D.N.Y.1973), this duty is narrowly circumscribed. When an accountant certifies financial statements, it "holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable." *Gold*, 399 F.Supp. at 1127. However, the relationship which starts with a review of the issuer's financial statements necessarily ends with the accurate disclosure of those statements on the effective date of the prospectus. "No basis exists in principle or

Not Reported in F.Supp.  
Fed. Sec. L. Rep. P 90,192  
**(Cite as: 1998 WL 142353 (S.D.N.Y.))**

Page 9

authority ... [to] extend[] an auditor's duty to disclose beyond ... [his] representation or certification." *Barker v. Lee County Bank,* No. 79 Civ.2047, 1985 WL 2529, at * 13 (N.D.Ill. Sept.13, 1985), *aff'd*, 797 F.2d 490 (7th Cir.1986). See also *Robin,* 686 F.Supp. at 208 ("no duty to the public to disclose events that occur subsequent to the period that they purport to certify"); *Ingenito,* 441 F.Supp. at 549 (possession of adverse information does not require disclosure where certified figures are accurate when issued).

*9 The duty that plaintiffs would have the Court impose on Feldman Radin is simply too broad. In *IIT v. Cornfeld,* 619 F.2d 909, 927 (2d Cir.1980), the Court restricted an auditor's duty to disclose accurate information under Section 10(b) to those statements it had certified as accurate:

> Accountants do have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements .... However .... [[[defendant Arthur Anderson & Co.] had no independent duty to see to the correction of portions of the prospectus other than the financial statement it prepared.

Even more recently, the Court limited an auditor's duty in connection with information that had not been disclosed anywhere in the offering memorandum. In *Shapiro v. Cantor,* the Court affirmed the dismissal of a 10(b) claim against defendant Touche Ross & Co. for having declined to reveal in its financial projections that " 'investment proceeds were to be placed at the mercy of a person who had been convicted and imprisoned for fraud." ' 123 F.3d at 721 (quoting Pls.' Mem. in Opp'n to Mot. to Dismiss). The Court held that Touche Ross had no duty to disclose such information, because an accountant could not be liable for misrepresentations or omissions which he or she did not certify. *Id.* The Court reasoned that to hold otherwise would impermissibly impose aider and abettor liability under Section 10(b) . [FN14]

---

FN14. In *Central Bank v. First Interstate Bank,"* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court determined that Section 10(b) "does not prohibit aiding and abetting" fraud. *See also Dinsmore v. Squadron,*--F.3d--, No. 97-7011, 1998 WL 49315, at * 6 (2d Cir. Jan.28, 1998) (declining "to imply a cause of action for conspiracy to violate § 10(b) and Rule 10b-5").

Plaintiffs claim that the Prospectus gave the impression that Kaye Kotts had "turned the corner," by suggesting that the Company was "profitable" at the time of the Offering, when in fact it was not. Cplt. ¶ 32. Neither of these statements appear in Feldman Radin's audit report. [FN15] Therefore, in light of *Shapiro,* plaintiffs cannot state a 10(b) or 10b-5 claim against Feldman Radin. *Accord Wright v. Ernst & Young,* No. 97 Civ. 2189, 1997 WL 563782, at *1-3 (S.D.N.Y. Sept.10, 1997) (dismissing complaint on "aider and abettor" grounds where plaintiff alleged that auditor certifying financial statements in prospectus had implicitly "signed off" on later results in company press release); *AUSA Life Ins. Co. v. Dwyer,* 928 F.Supp. 1239, 1256 (S.D.N.Y.1996) (following *Central Bank* to dismiss Section 10(b) claims where audit committee did not make alleged misrepresentations). Accordingly, I dismiss plaintiffs' Section 10(b) and Rule 10b-5 claims with respect to Feldman Radin. [FN16]

---

FN15. As far as the Court can tell, they also do not appear anywhere else in the Prospectus. *See* Defs.' Ex. B.

FN16. Plaintiffs' Section 10(b) and Rule 10b-5 claims may also be dismissed for failure to allege "loss causation." *See First Nationwide,* 27 F.3d at 769; *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1991); *Fisk v. Superannuities, Inc.,* 927 F.Supp. 718, 729 (S.D.N.Y.1996). However, because defendants have not raised this issue, the Court does not consider it.

---

## CONCLUSION

For the foregoing reasons, the Court grants defendant Feldman Radin's Fed.R.Civ.P. 12(b)(6) motion and denies the individual defendants' Rule 56 motion. The Clerk of the Court is directed to enter judgment dismissing the Complaint against Feldman Radin.

SO ORDERED.

1998 WL 142353 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,192

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,192
**(Cite as: 1998 WL 142353 (S.D.N.Y.))**

Page 10

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**EXHIBIT D**

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS in the Chapter 11 Bankruptcy case of Smtk Expedite, Inc., formerly known as Smartalk Teleservices, Inc., Chapter 11 Debtor, on behalf of the Smartalk Teleservices, Inc. bankruptcy estate,
Plaintiff,
v.
DONALDSON, LUFKIN & JENRETTE SECURITIES CORPORATION, Donaldson, Lufkin &
Jenrette, Inc., Global Retail Partners, L.P., DLJ Diversified Partners, L.P.,
DLJ Diversified Partners-A, L.P., GRP Partners, L.P., Global Retail Partners
Funding, Inc., DLJ First ESC, L.P., DLJ ESC-II, L.P., Kenneth A. Viellieu,
Linda Fayne Levinson, Victor Grillo, Jr., Victor Grillo, Sr., Lloyd Lapidus,
Raymond Wysocki, Defendants.

No. 00 Civ. 8688(WHP).

March 6, 2002.

Hal Neier, Friedman Kaplan Seiler & Adelman LLP, New York, New York, for Plaintiff.

Diem-Suong T. Nguyen, Davis Polk & Wardell, New York, New York, Donaldson Lufkin & Jenrette Securities Corp., Donaldson Lufkin & Jenrette, Inc. and Kenneth A. Viellieu, for Defendants.

Arthur K. Steinberg, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, New York, Global Retail Partners, L.P., DLJ Diversified Partners, L.P. DLJ Diversified Partners-A, L.P. GRP Partners, L.P. Global Retail Partners Funding, Inc., DLJ First ESC, L.P., DLJ ESC-II, L.P. and Linda Fayne Levinson, for Defendants.

Arthur H. Aufses III, Kramer Levin Naftalis & Frankel, LLP, New York, New York, Victor Grillo, Jr., Victor Grillo, Sr., Lloyd Lapidus and Raymond Wysocki, for Defendants.

*MEMORANDUM AND ORDER*

PAULEY, J.

*1 This action arises out of the Chapter 11 bankruptcy proceedings of SMTK Expedite, Inc., formerly known as SmarTalk Teleservices, Inc. ("SmarTalk"), and seeks to recover for alleged derelictions attendant to the company's June 1998 acquisition of Worldwide Direct, Inc. ("WWD") in a stock-for-stock merger transaction. Plaintiff, the Official Committee of Unsecured Creditors appointed by the U.S. Trustee for the District of Delaware acting on behalf of the SmarTalk bankruptcy estate (the "Committee"), asserts claims predicated on alleged fraud and breach of fiduciary duty against its financial advisor and investment banker in the merger transaction, Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ Securities Corp."), certain entities and individuals affiliated with DLJ Securities Corp., and four WWD insiders. The defendants fall into three discrete groups: (i) DLJ Securities Corp., its parent company DLJ, Inc., and Kenneth A. Viellieu, an investment banker employed by DLJ Securities Corp. (collectively, the "DLJ Defendants"); (ii) Global Retail Partners, L.P., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., GRP Partners, L.P., Global Retail Partners Funding, Inc., DLJ First ESC, L.P., DLJ ESC-II, L.P. (collectively, the "GRP Entities") and Linda Fayne Levinson, a principal of Global Retail Partners, L.P., (together with the GRP Entities, the "GRP Defendants"); and (iii) Victor Grillo, Jr., Victor Grillo, Sr., Lloyd Lapidus, and Raymond Wysocki, who served either as directors, officers or shareholders of WWD (collectively, the "WWD Defendants"). [FN1]

> FN1. While the amended complaint uses the term "DLJ Defendants" to refer to both the DLJ Defendants and the GRP Defendants, the Committee adopted the nomenclature used by defendants as described in the text for purposes of this motion. The problems spawned by the Committee's group pleading designations are discussed more fully herein.

The first amended complaint ("amended complaint") sets forth ten causes of action: (i) breach of fiduciary duty against DLJ Securities Corp.; (ii) voidable transactions pursuant to California Corporations Code § 310 against the DLJ Defendants and the WWD defendants, except Grillo, Sr.; (iii) voidable transaction pursuant to California Corporations Code § 310 against DLJ Securities Corp. and Viellieu; (iv) professional negligence against DLJ Securities Corp.;

Not Reported in F.Supp.2d
(Cite as: 2002 WL 362794 (S.D.N.Y.))

Page 2

(v) violations of the California Business and Professions Code § 17200 *et seq.* prohibiting unlawful, unfair or fraudulent business practices against all defendants; (vi) fraud against DLJ Securities Corp.; (vii) negligent misrepresentation against DLJ Securities Corp.; (viii) fraud against the WWD defendants; (ix) civil conspiracy against all defendants; and (x) aiding and abetting a breach of fiduciary duty against all defendants except DLJ Securities Corp. In addition, the amended complaint includes a prayer for punitive damages.

By Order dated November 1, 2000, Senior Judge Edward Rafeedie of the U.S. District Court for the Central District of California granted the DLJ Defendants' motion to transfer venue to this District pursuant to 28 U.S.C. § 1406(a) on the basis of a New York forum selection clause. Judge Rafeedie expressly declined to rule on the substantive motions to dismiss filed by defendants, deferring to the transferee court. Presently before this Court are defendants' renewed motions to dismiss the amended complaint pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons detailed below, defendants' motions are granted in part and denied in part.

Factual Background

*2 The following facts are derived from the amended complaint and may be summarized as follows:

SmarTalk, a California corporation, was a provider of prepaid telephone cards and related telecommunications products. (First Amended Complaint ("Am.Compl.") ¶ 19.) In October 1996, SmarTalk conducted an initial public offering with DLJ Securities Corp. as co-managing underwriter. (Am.Compl.¶ 20.) Thereafter, pursuant to an engagement letter dated November 19, 1996, SmarTalk engaged DLJ Securities Corp. to serve as its "exclusive financial advisor" in connection with several potential corporate acquisitions. (Am.Compl.¶ 21.) Erich Spangenberg, the principal DLJ Securities Corp. investment banker who worked on the offering, left the firm in April 1997 to become SmarTalk's chief operating officer and president and later, in February 1998, was elevated to chief executive officer and vice chairman of the board of directors. (Am.Compl.¶ ¶ 22, 24.) Defendant Kenneth Viellieu, another DLJ Securities Corp. investment banker, advised SmarTalk throughout 1997 in connection with a number of commercial transactions (Am.Compl.¶ 23), and was elected a director of SmarTalk at the time Spangenberg became chief executive officer (Am.Compl.¶ 24).

During this same time period, DLJ Securities Corp. also served as the financial advisor to WWD, a cellular phone and wireless services company formed in May 1997 as a result of a corporate spin off from Direct to Retail, Inc. (Am.Compl.¶ ¶ 26-28.) Defendant Victor Grillo, Jr. served as president and chief executive officer of WWD, and was a member of its board of directors and a shareholder. (Am.Compl.¶ 28.) Defendant Lloyd Lapidus served as the company's executive vice president and was a director and a shareholder. (Am.Compl.¶ 28.) Victor Grillo, Sr. was the chairman of WWD's board of directors, and Raymond Wysocki was a director and a shareholder. (Am.Compl.¶ 28.)

In May 1997, DLJ Securities Corp. arranged for WWD to obtain financing through the GRP Entities, a group of Los Angeles-based private equity investment funds whose general partners are subsidiaries of DLJ, Inc. (Am.Comp.¶ ¶ 12, 29-30.) The Committee alleges, on "information and belief," that DLJ Securities Corp. and DLJ, Inc. "operate[d] and control[led] the GRP Entities through (i) control of the moneys available to the GRP Entities for investment purposes and (ii) control of their general partners." (Am.Compl.¶ 30.)

Through a series of agreements executed in July 1997, the GRP Entities purchased substantially all of WWD's outstanding Series A Convertible Redeemable Preferred Stock for $3 million and, in exchange, received the right to appoint two of the five WWD board members and to approve WWD's significant financing and capital investment decisions. (Am.Compl.¶ ¶ 33, 35(a)-(b).) As part of the financing arrangements, DLJ Securities Corp. secured the exclusive right to provide investment banking services to WWD. (Am.Compl.¶ 35(c).) On July 25, 1997, defendant Linda Fayne Levinson, a principal of one of the GRP Entities, Global Retail Partners, L.P., was elected to WWD's board of directors. (Am.Compl.¶ 36.)

*3 From its inception, WWD experienced severe liquidity problems, which persisted despite the influx of cash from the GRP Entities. (*See* Am. Compl. ¶ ¶ 37-38, 43-45.) Consequently, and in only the most general of allegations, the Committee maintains that in order to salvage their investment, defendants devised a scheme to attract SmarTalk as a potential merger partner. (Am.Compl.¶ ¶ 47-51.) Allegedly, through actions taken in board meetings on March 6 and April 28, 1998, DLJ Securities Corp. and the GRP Defendants convinced WWD to commence merger discussions with SmarTalk. (Am.Compl.¶ ¶

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works