Plaintiffs' counsel's extended access to defendant's work papers and its conduct of discovery in the putative class action require the Court to "look more closely at the factual allegations to see if they support the legal conclusions pled". *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir.1996).

Plaintiffs assert that Deloitte falsely issued unqualified opinions regarding the 1991 and 1992 financial statements and the 1992 Restatement, certifying that Deloitte had conducted audits of Cambridge's finances in accordance with Generally Accepted Auditing Standards ("GAAS") and that the financial statements were in compliance with Generally Accepted Accounting Principles ("GAAP"). [FN1] (Id.¶¶ 1, 20, 21, 29.)

> FN1. [The GAAP] are the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants ("AICPA"). These principles establish guidelines for measuring, recording and classifying the transactions of a business entity. [The GAAS] are the standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination.
> *S.E.C. v. Price Waterhouse*, 797 F.Supp. 1217, 1222-23 n. 17 (S.D.N.Y.1992).

Regarding the 1991 statements, the amended complaint alleges that Cambridge's 1991 Form 10-K falsely reported product revenue to be $17,856,167, instead of $14,924,000, and falsely reported a profit of $0.02 per share instead of a loss of $0.03 per share. (*Id.* ¶ 19.) The amended complaint alleges that the 1991 financial statement, included with the 1991 Form 10-K and certified by Deloitte, included four transactions "improperly included as sales, ... for which Cambridge never received any payment whatsoever." (*Id.* ¶ 22.) These transactions included sales of $540,000 to Insermagh, a Tunisian company; $817,000 to Codiapharm, a Swiss company; and $600,000 to Euronet and $975,000 to Croft-Greiner Instruments, Ltd., both British companies. The amended complaint alleges that "no evidence existed, and none was sought" of the ability of any of these companies to pay. (*Id.* ¶ 22.)

According to the amended complaint, the 1992 Form 10-K and 1992 financial statements falsely reported revenue of $38,137,814 instead of $33,956,814, and a loss of $0.52 per share, instead of $0.64 per share (*id.* ¶ 21) by improperly including three sales to two foreign companies, specifically, 700,000 in revenue for a "phony sale" to J. Mitra, an Indian company [FN2] (*id.* ¶ 23(a)), and $204,000 and $612,000 in revenue for "two separate phony sales" to Reagecon, an Irish company [FN3] (*id.* ¶ 23(b)). The amended complaint further alleges that J. Mitra and Reagecon was each a "fly-by-night company, for which no evidence existed, and none was sought, of its ability to pay." (*Id.* ¶ 23.)

> FN2. It is alleged that this sale "was subject to conditions that J. Mitra was incapable of meeting and delivery was never effected", and, further, that Deloitte's branch office in Ireland recommended that this transaction be reversed but a Deloitte partner in the U.S. disregarded this recommendation. (Id. ¶ 23(a).)

> FN3. According to the amended complaint, these sales "were really part of a scheme to circumvent FDA requirements, an illegal purpose of which Deloitte was aware." (*Id.* ¶ 23(b).)

*3 The amended complaint alleges that the 1992 financial statement also improperly included sales transactions with two domestic corporations. Revenue of $2 million was reported for a sale to Virbac, "of distribution rights for a mastitis vaccine product under development, but for which no contract was signed, and no agreement was reached in 1992 pursuant to which Virbac had any obligation to pay Cambridge anything." (*Id.* ¶ 24(a).) The 1992 financial statement was later restated by Cambridge without this transaction, and Deloitte certified the restatement. (*Id.* ¶¶ 26, 27.) The second transaction was $755,000 in revenue for a sale to Ortho, "which Ortho was under no obligation to consummate, by written contract or otherwise, and which in fact, never occurred, and for which Cambridge never received any payment whatsoever." (*Id.* ¶ 24(b).)

Plaintiffs allege that they purchased shares of Cambridge stock during the Class Period at prices inflated by Deloitte's alleged fraud in improperly

certifying these statements and were damaged as a result. (*Id.* ¶ 8.)

## Discussion

A Court must deny a motion to dismiss a claim under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The standards for pleading a § 10(b) claim require compliance with Fed.R.Civ.P. 9(b) ("[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"). Allegations of fraud must specify the fraudulent statement, identify the speaker, time and place of the statement, and explain why it is fraudulent. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995). The complaint must plead facts demonstrating that, in connection with the offering or sale of a security, the defendant (1) "made a false material representation or omitted to disclose material information" and (2) the defendant "act[ed] with scienter." *Acito,* 47 F.3d at 52; *see also In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993), *cert. denied,* 511 U.S. 1017 (1994).

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), which plaintiffs may show by " 'alleging facts to show that the defendants had both the motive and opportunity to commit fraud,' " or " 'alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Acito,* 47 F.3d at 52 (*quoting Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).) While accountants may be found liable of a 10(b) violation, *see Central Bank v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994), it is not enough to show "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more...." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994), *cert. denied,* 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995)(*quoting Malone v. Microdyne Corp.,* 26 F.3d 471, 476 (4th Cir.1994)):

*4 [Scienter] requires more than a misapplication of accounting principles. The [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Id.* at 1426 (*quoting SEC v. Price Waterhouse,* 797 F.Supp. at 1240.)

Plaintiffs have at best set forth allegations of mere negligence, not the fraudulent intent, knowledge or recklessness required for 10b-5 liability.

### 1. Defendant's 1991 Audit

With respect to the audit for 1991, plaintiffs contend that transactions for which Cambridge never received any payment were improperly included as sales, namely, transactions with four foreign companies, Insermagh, Codiapharm, Euronet, and Croft-Greiner Instruments. Except for Codiapharm, these companies are alleged to be new customers. For all of the companies, it is alleged that no evidence existed and none was sought as to their ability to pay receivables, and Cambridge allegedly did not adequately reserve for the high risk of non-payment. [FN4] (Amended Complaint, ¶ 22.)

> FN4. Though the original complaint did allege that the 1991 financials improperly stated the revenue from the Euronet and Croft-Greiner sales, it also included the assertion that "[t]o make it appear as if the Euronet Receivable was paid, Cambridge embarked on a scheme to in effect pay itself for the Euronet Receivable ... Cambridge also engaged in fraudulent purchases to make it appear as if the Croft-Greiner receivable was paid in 1992." (Original Complaint ¶¶ 67, 68.) Paragraph 67 states that payment of the Euronet receivable was received from a Dutch Bank on behalf of Euronet in 1992, and Paragraph 68 states that payment of the Croft-Greiner receivable was received from Croft-Greiner in 1992. As the original complaint does not allege Deloitte had any knowledge about this fraudulent activity, these facts suggest that Deloitte was misled. The amended complaint omits these facts indicating deliberate deceptive activity by Cambridge designed to reflect that payments had been received on those "sales". The inconsistencies between the original complaint and the amended complaint raise

questions about plaintiffs' counsel's awareness of Fed.R.Civ.P. 11(b).

The allegations in Paragraphs 22-25 of the amended complaint relate to the alleged deficiencies in Cambridge's financial statements which are the foundation for plaintiffs' claims that both Deloitte's review of Cambridge's credit control procedures with respect to revenues reflected in Cambridge's financial statements, and its review of Cambridge's uncollectible accounts or bad debt reserve, were so deficient as to demonstrate' a strong inference of intent to deceive or recklessness. [FN5]

> FN5. In Paragraph 4 of the amended complaint, it is alleged that either Deloitte failed to investigate Cambridge's controls on credit to new foreign customers, or Deloitte did investigate and did learn of the lack of such controls but nevertheless failed to devise appropriate audit procedures to determine whether there was a reasonable basis for assuming the collectibility of foreign accounts. In view of plaintiffs' counsel's extended access to defendant's work papers and its conduct of discovery in the putative class action against Cambridge, this pleading in the alternative is rejected as not setting forth "facts" in satisfaction of Rule 9(b). The Court will rely entirely on those "substantive allegations" not pled in the alternative. (Amended Complaint ¶ ¶ 17-50.)

Paragraphs 32-41 of the amended complaint set forth the provisions of GAAS allegedly violated by Deloitte, namely,:
. that, under Auditing Interpretation [FN6] ("AU") § 319, the auditor "needs to understand the internal control structure policies and procedures that increase the likelihood that the financial statements will be prepared in accordance with generally accepted accounting principles" (Amended Complaint ¶ 32 quoting AU § 319.06);

> FN6. Statements on Auditing Standards ("SAS") are issued by the Auditing Standards Board ("the Board"), part of the AICPA, which "recognizes Statements on Auditing Standards as interpretations of generally accepted auditing standards and requires that members be prepared to justify departures from such Statements." (AU Section 100 at 17.) An Auditing Interpretation, issued by a Task Force of the Board, "is not as authoritative as a pronouncement of that Board, but members should be aware that they may have to justify a departure from an interpretation if the quality of their work is questioned." (Id.)

. that, in planning the audit, the auditor should use its understanding of the internal control structure of the entity and previous experience with the entity to plan against the risk of material misstatements (id. ¶ ¶ 33-35 citing AU § § 319.16, 319.19, 319.23);
. that the auditor may assess the level of "control risk" [FN7] at the maximum level because it "believes policies and procedures are unlikely to pertain to an assertion, are unlikely to be effective, or because evaluating their effectiveness would be inefficient (id. ¶ 37 quoting AU § 3.19.29);

> FN7. "Control risk" is "the risk that a material misstatement that could occur in an assertion will not be prevented or detected on a timely basis by the entity's internal control policies or procedures". (Id. ¶ 36 (quoting AU § 319.28).)

. that the assessed level of control risk should be utilized to evaluate the level of "detection risk [FN8]" which is used to "determine the nature, timing, and extent of the auditing procedures to be used to detect material misstatements in the financial statement assertions" (id. ¶ 39 (quoting AU § 319.37)); and,

> FN8. "Detection risk" is defined as "the risk that the auditor will not detect [sic] material misstatement that exists in an assertion." (Id. ¶ 36 (quoting AU § 319.28).)

*5 . that, as the acceptable level of detection risk decreases, "assurance provided from substantive tests should increase. Consequently, the auditor may do one or more of the following": (i) change the nature of the substantive tests, by, for example, directing them to independent parties outside the entity rather than within the entity; (ii) change the timing of the substantive tests, by performing them at year-end rather than at an interim date; or (iii)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

change the extent of the substantive tests, by using a large sample (*id.* 40 (*quoting* AU § 319.38)).

Based on these provisions, plaintiffs allege that by not taking exception to the inclusion of revenue from the new foreign customers, Deloitte violated SAS Nos. 5, 52, 69, which "require financial statements to 'present fairly' the financial position of the company" (*id.* ¶ 41); SAS No. 32, which requires adequacy and fairness of disclosure (*id.*); General Standard No. 2, which requires auditors maintain independent mental attitudes (*id.*); and General Standard No. 3, which mandates that due professional care should be exercised in performing an audit (*id.*).

The allegations set forth in Paragraphs 32-41 are in themselves meaningless statements of auditing standards and principles which can only be assessed in light of the facts confronting the auditor. *See, e.g., Decker v. Massey- Ferguson-Ltd., 681 F.2d 111, 120 (2d Cir.1982)* (generalized statements of accounting violations do not state a fraud claim); *Duncan v. Pencer, 1996 WL 19043 at \*11 (S.D.N.Y., Jan.18, 1996)*(same). Within these paragraphs there are only two factual allegations. The first, concerning Cambridge's internal controls, reads as follows:

> Cambridge's internal control structure did not involve any controls relating to granting credit to new foreign customers, or investigation of the ability to pay what was owed by its foreign customers on a case-by-case basis, and there was no written evidence of any such controls or investigation by Cambridge. Since Cambridge had no internal control procedures relating to granting credit to new foreign customers, Deloitte should have assessed control risk at the maximum level, but did not.

(*Id.* ¶ 38.) The second alleges that:

> [s]ince detection risk was maximum, GAAS required that Deloitte design and implement substantive tests directed towards independent parties. Nevertheless, Deloitte performed no substantive tests relating to the credit- worthiness of new foreign customers or their ability to pay the amounts owed under the "sales." Deloitte did not properly plan the audit in view of the total absence of internal controls with regard to the granting of credit to new foreign customers.

(*Id.* ¶ 40)(emphasis in text).

Plaintiffs' allegation that Cambridge's internal controls were non-existent only as to new foreign customers suggests that Cambridge's credit controls generally were adequate and that the audit of those controls was conducted properly. [FN9] If so, plaintiffs should have disclosed in the amended complaint what audit procedures Deloitte did follow in examining Cambridge's credit control procedures; why such audit procedures were inappropriate or insufficient at the time the audit was being conducted; or why the audit procedures followed should have alerted Deloitte to the absence of Cambridge credit control procedures for new foreign customers. As pled, plaintiffs have not demonstrated Deloitte had knowledge of Cambridge's inadequate controls for new foreign customers.

> FN9. The amended complaint does not allege that Cambridge had no credit control procedures in place for customers in general or all new customers, only for its new foreign customers. (Amended Complaint ¶ 38.) Nor does it state that Deloitte's work papers reflect that Deloitte was aware that Cambridge had no credit control procedures for new foreign customers.

\*6 Plaintiffs' second factual allegation, that Deloitte performed no substantive tests relating to the credit-worthiness' of new foreign customers, is also insufficient to show an intent to deceive or recklessness. An auditor is required to determine what internal controls exist in the audited company. (*See* AU § § 319.16-.22.) Indeed, the auditor's work papers are supposed to document its findings concerning these controls. (*See* AU § 3.26.) The auditor is not, however, required to separately evaluate types of customers absent having information putting it on notice of the advisability of such separate controls. Accordingly, Deloitte's failure to design and implement substantive tests directed toward new foreign customers does not result in a strong inference of fraudulent intent nor raise a strong inference of reckless conduct. [FN10]

> FN10. The amended complaint also alleges that the 1991 financial statements include, as gross revenue, a consignment to Codiapharm as a sale in violation of Financial Accounting Standards Board ("FAS") No. 48, ¶ 6b which states that "[i]f an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be

recognized at time of sale only if *all* " listed conditions are met, including that "[t]he buyer has paid the seller, or the buyer's obligated to pay the seller and the obligation is not contingent on resale of the product." (*See* Amended Complaint ¶ 25(b).) As Codiapharm had no obligation to pay the receivable unless it resold the goods, the inclusion of the Codiapharm transaction allegedly violated this standard. There is, however, no allegation showing that Deloitte was aware, or should have been aware, of the consignment nature of the transaction. Accordingly, there are no facts alleged sufficient to permit a reasonable inference of either knowing or reckless fraud on the part of Deloitte regarding this transaction.

Plaintiffs' allegations regarding the 1991 audit do not assert facts suggesting Deloitte's conduct as auditor was " 'highly unreasonable' and ... 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.) (citation omitted) *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

*2. The 1992 Audit.*

With respect to the financial statements for 1992, the amended complaint states again that Cambridge failed to inquire into new foreign customers' ability to pay their receivables, regarding allegedly improper transactions with J. Mitra, an Indian company, and with Reagecon, an Irish company. (Amended Complaint ¶ 23.) Just as the allegations of Deloitte's failure to inquire into customers' ability to pay in conducting the 1991 audit were insufficient, with respect to the 1992 audit plaintiffs nowhere make reference to Deloitte's work papers or allege facts showing that Deloitte was aware, or should have been aware, at the time of the 1992 audit, that Cambridge did not have any credit control procedures in place with respect to new foreign customers. Accordingly, the assertion that Deloitte failed to design and implement any substantive tests directed towards these new foreign customers cannot be found to constitute a strong inference of intention to deceive, see *Ernst & Ernst*, 425 U.S. at 194, or of a strong inference of recklessness, see *Decker*, 681 F.2d at 120; *Rolf*, 570 F.2d at 47. [FN11]

FN11. Plaintiffs assert that Deloitte's branch office in Ireland recommended that the J. Mitra transaction be reversed but the audit partner in the United States allowed it to stand, thereby inflating Cambridge's revenue for 1992. Plaintiffs' memorandum states the U.S. partner signed off on Cambridge's writing the receivable as bad debt during the 1992 audit. (Plaintiffs' Memorandum In Opposition to Motion to Dismiss, "Pl. Mem." at 7 n. 8.) Thus, although gross revenue may have been inflated, net revenues were not affected by the audit, an assertion alleged in the original complaint (¶ 51) but omitted from the amended complaint (¶ 23(a)). Nowhere in the amended complaint do plaintiffs assert facts showing the determination to include this transaction was evidence of Deloitte's fraudulent intent.

Plaintiffs' assertion that defendant was aware that the Reagecon sales had the illegal purpose of being part of a scheme to circumvent FDA requirements does give rise to an inference of intent to deceive. This allegation does not, however, set forth facts showing which documents or personnel informed Deloitte of the scheme and when that information was obtained by Deloitte. Such facts are required in the complaint to meet the strictures of Rule 9(b). As the Court noted in *The Limited Inc. v. McCrory Corp.*, 683 F.Supp. 387, 394 (S.D.N.Y.1988):

*7 There is no indication of how or when Touche became aware of facts that made the financial statements materially misleading. Touche was not an insider ... and its knowledge cannot be inferred solely from the fact that it was [an] auditor.

There are no allegations that Deloitte was involved in structuring the Reagecon transactions, *cf.*, *In re Kendall Square Research Corp. Sec. Litig.*, 868 F.Supp. 26, 28 (D.Mass.1994) (denying 12(b)(6) motion in securities fraud action against accountant who participated in structuring transactions involved); or that the auditor evinced knowledge of the deficiencies in the corporation's accounting practices by bringing them to the corporation's attention, *cf.*, *In re Leslie Fay Companies Inc.*, 871 F.Supp. 686, 688 (S.D.N.Y.1995); *Ades v. Deloitte & Touche*, 799 F.Supp. 1493, 1500 (S.D.N.Y.1992).

The amended complaint also alleges that two domestic transactions were improperly included in the 1992 financials for which Cambridge did not

receive any payment in 1992, namely, $2 million in revenue for a sale to Virbac and $755,000 in revenue for a sale to Ortho. (Amended Complaint ¶ 24.) In neither of these transactions is it alleged that the customer was not credit-worthy. Rather, the allegation is that there were no agreements reached. [FN12] For these transactions, plaintiffs assert Deloitte failed to meet:

> FN12. Paragraphs 26-31 set forth that the 1992 financials were restated on October 29, 1993 without the $2 million that had been recognized as relating to the sale of distribution rights to Virbac. According to the restatement, the agreement for this transaction had been superseded by a "definitive agreement", and the company expected to recognize the $2 million over several quarters beginning in the fourth quarter of 1993. (Amended Complaint ¶ 26.) Deloitte certified this Restatement. (Id. ¶ 28.) On March 30, 1994, Deloitte withdrew its opinion certifying the 1992 statements and resigned as auditor. (Id. ¶¶ 18; 30.)

(1) Standard of Field Work No. 3, requiring an auditor to review " '[s]ufficient competent evidential matter ... obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis' " for the audit opinion (*quoted in* Amended Complaint ¶ 42);
(2) AU § 326.23 which "requires an auditor to be thorough in its search for evidential matter and unbiased in its evaluation" (*id.*); and
(3) AU §§ 326.15-20, requiring an auditor "to examine evidential matter such as invoices and contracts obtained from independent sources other than its client, if possible" (*id.*).

The only allegations of fact concerning conduct by Deloitte related to these transactions are contained in Paragraph 42 of the amended complaint which states:
  Deloitte did not obtain material from Virbac or Ortho, or if it did, it recklessly ignored it (*id.*); and,

Paragraph 47 which states:
  Deloitte either did not examine the documents concerning the Ortho and Virbac transactions or examined them and did not take exception to recording the revenue from them despite the fact that the documents disclosed that no sale took place and there was no other agreement indicating a sale. In either event, Deloitte was at least reckless. (*Id.* ¶ 47.)

Thus the amended complaint contains no allegations of facts to support the contention that Deloitte failed to obtain an independent confirmation of the sales from Virbac or Ortho. For instance, there is no assertion that Deloitte's work papers do not show independent confirmation was received from either company. [FN13] Instead, plaintiffs once again resort to an alternative factual allegation, that Deloitte obtained material on these transactions but ignored it. Alternative fact pleading is insufficient to satisfy the requirements of Fed.R.Civ.P. 9(b). It is not the equivalent of pleading an allegation of fraud on information and belief, which would be insufficient to satisfy the particularity requirements of Rule 9(b). See *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir.1974). It is inexcusable, however, in light of the fact that plaintiffs' counsel has been in possession of defendant's work papers for three years and has conducted extensive discovery. Because the complaint fails to particularize facts in support of the general allegations, but merely pleads factual conclusions in the alternative, the allegations regarding the domestic transactions do not support a strong inference of intent to deceive or recklessness. [FN14]

> FN13. Indeed, defendant claims in its brief that the work papers do contain confirmation by letter from Virbac's general counsel of the Virbac transaction. (Defendant's Memorandum of Law, "Def. Mem." at 19.) The Court does not rely on this assertion, however, in reaching its decision.

> FN14. In Paragraph 48, plaintiffs again resort to alternative pleading of facts in support of their claim regarding Deloitte's alleged recklessness in investigating Cambridge's credit control procedures for foreign customers. See *supra* note 5. Like the similar alternative statement of facts in Paragraph 4, this allegation is rejected for insufficient particularization. Plaintiffs' counsel's possession of defendant's work papers and its conduct of discovery should have permitted it to offer a more definitive statement of the facts relevant to these allegations.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*8 Paragraphs 43-49 are entitled "Deloitte's Scienter". Paragraph 43 alleges that,

> [i]n the course of the audit process, Deloitte personnel were present at Cambridge corporate headquarters and financial offices and had continual access to and knowledge of Cambridge's private and confidential corporate, financial and business information ... and thus knew the actual financial condition and the business problems that were concealed from the investing public.

This is a conclusory allegation insufficient to support a strong inference of deceit. *See, e.g., O'Brien v. Nat'l Property Analysts Partners,* 719 F.Supp. 222, 228-29 (S.D.N.Y.1989), *aff'd,* 936 F.2d 674 (2d Cir.1991)(mere fact of misstated financial statements does not support inference of auditing fraud); *The Limited Inc.* 683 F.Supp. at 394 (accountant's knowledge cannot be inferred solely from fact it was auditor); *Ross v. Warner,* 480 F.Supp. 268, 272 (S.D.N.Y.1979)("[a]n inference of fraud does not arise from the mere fact that an auditor 'certified' an inaccurate report.").

In Paragraphs 43-45, plaintiffs then list a number of "additional circumstances [that] made the bona fides of these transactions highly questionable" (*Id.* ¶ 45.) These allegations include: that Cambridge's cash flow problems prompted Deloitte to raise with Cambridge the prospect of issuing a "going concern" opinion, "a 'red flag' giving rise to what should have been a heightened level of scrutiny" (*id.* ¶ 43); that the alleged "phony transactions" were markedly larger than Cambridge's other sales for the 1991-1992 period; that virtually all of the foreign customers were first-time customers; that three of the questionable transactions occurred on the last day of a quarter; that Deloitte was aware some of the 1991 transactions had not been completed and so should have scrutinized the 1992 transactions more closely; and that there was no meaningful documentation for the two allegedly phony domestic transactions in 1992. (*Id.* ¶¶ 44, 45.) The only allegation listed here that is tied to an Auditing Standard is that Deloitte knew Cambridge had not received payment for first-time transactions in 1991, and so should have had heightened surveillance regarding the 1992 transactions. (*Id.* ¶ 45(d)(*citing* AU § 319.19).) This allegation does not set forth, however, facts showing for which of the 1991 "sales" Deloitte knew payment had not been received by the time of the 1992 audit, and when and how Deloitte had received such knowledge; [FN15] such inadequate particularization is insufficient to constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Acito,* 47 F.3d at 52. Regarding the other listed "circumstances", without more factual allegations as to how such knowledge implicates Deloitte's auditing responsibilities, the mere listing of them does not raise Deloitte's duty to scrutinize the financial statements. Additionally, as an auditor is not required to make an examination of every record in the company's possession, *see, e.g.,* AU § 350.07 ("the basic concept of sampling is well-established in auditing practice"), these circumstances would not necessarily become apparent in a properly performed audit, and thus do not constitute allegations of fact showing Deloitte's notice and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness.

> FN15. The original complaint states that in 1992 Cambridge accepted certain receipts for the Euronet and the Croft-Greiner transactions.

*Conclusion*

*9 For the reasons stated above, defendant's motion is granted and plaintiffs' amended complaint is dismissed with prejudice. [FN16] Plaintiffs have already amended their complaint once and have had access to Deloitte's working papers for over three years, so they have been given sufficient opportunity to submit a properly pled complaint. Given their failure to do so, the amended complaint is dismissed with prejudice and without leave to replead. This case is hereby closed.

> FN16. As the amended complaint is dismissed on 12(b)(6) and 9(b) grounds regarding the allegations of scienter and fraud, the Court need not rule on defendant's other arguments, that this complaint does not adequately plead loss causation or that the alleged fraud was performed "in connection with" the sale of securities.

IT IS SO ORDERED.

1997 WL 151330, 1997 WL 151330 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,456

END OF DOCUMENT

**EXHIBIT F**

C

United States District Court, S.D. New York.

In re SOTHEBY'S HOLDINGS, INC. Securities Litigation

No. 00 Civ. 1041(DLC).

Aug. 31, 2000.

Sherrie R. Savett, Gary E. Cantor, Berger & Montague, P.C., Philadelphia, PA, for Plaintiffs' Lead Counsel.

Daniel W. Krasner, Fred Taylor Isquith, Michael Jaffe, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, for Plaintiffs' Local Counsel.

Greg A. Danilow, Timothy E. Hoeffner, Jonathan Margolis, Timothy A. Greensfelder, Weil, Gotshal & Manges LLP, New York, NY, for Defendants Sotheby's Holdings Inc., Sotheby's Inc., William S. Sheridan, Joseph A. Domonkos, Patricia A. Carberry, and Cyndee L., Grillo.

Scott W. Muller, Gregory G. Ballard, Davis Polk & Wardwell, New York, NY, for Defendant A. Alfred Taubman.

John S. Siffert, Lisa A. Baroni, Lankler Siffert & Wohl LLP, New York, NY, for Defendant Diana D. Brooks.

OPINION and ORDER

COTE, J.

*1 In this securities fraud class action, plaintiffs--all persons and entities who purchased Sotheby's Class A common stock ("common stock") from February 11, 1997 to February 21, 2000 ("the Class Period")-- allege that defendants, Sotheby's Holdings, Inc., its subsidiary, Sotheby's Inc. (individually and collectively "Sotheby's"), and certain of Sotheby's present and former executive officers and directors ("the Individual Defendants"), misrepresented material facts in their public statements, reports to shareholders and SEC filings relating to the existence of competition in the industry and the source and growth of Sotheby's commission rates, auction sales, revenue and earnings. Specifically, plaintiffs allege that the public statements made by the defendants were false and misleading in that they failed to disclose that Sotheby's commission revenues and, therefore, a material portion of its profit margins and net income, were derived from an illegal antitrust conspiracy. Plaintiffs assert that the defendants' actions violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder. All defendants have submitted motions to dismiss the complaint in its entirety. For the reasons discussed below, the motions of defendants Williams S. Sheridan ("Sheridan"), Joseph A. Domonkos ("Domonkos"), Patricia A. Carberry ("Carberry"), and Cyndee L. Grillo ("Grillo") (collectively, the "Financial Officer Defendants") and of defendant Sotheby's, Inc. are granted; the motions of defendant Sotheby's Holdings, Inc. and of defendants A. Alfred Taubman ("Taubman") and Diana D. Brooks ("Brooks") are denied.

BACKGROUND

*The Parties*

The Consolidated Amended Class Action Complaint ("Complaint") alleges the following facts. Defendant Sotheby's Holdings, Inc. primarily serves as a holding company and parent company of defendant Sotheby's, Inc. During the Class Period, Sotheby's, Inc. conducted auctions in the United States through its auction house located in New York, New York. Sotheby's is one of the world's largest auctioneers of fine arts, antiques and collectibles. Its aggregate auction sales in 1998 and 1999, were approximately $1.940 billion and $2.259 billion, respectively.

Defendant Taubman was Chairman of the Board of Directors of Sotheby's Holdings, Inc. between 1983 and approximately February 21, 2000. Between 1983 and the present, Taubman controlled more than 60% of the voting stock of Sotheby's Holdings, Inc. and owned and still owns in excess of 22% of its equity. Taubman signed Sotheby's annual reports filed with the SEC for fiscal years 1996 and 1997. [FN1] Taubman resigned his position as Chairman on February 20, 2000, soon after government investigations into Sotheby's business practices became public.

FN1. While the Complaint does not include the allegation that Taubman signed the 1996 Annual Report, the plaintiffs rely on it in their opposition to the motions. These annual reports are quoted in the Complaint at some length and therefore incorporated by reference. *See San Leandro Emergency*

*Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 809 (2d Cir.1996).

Defendant Brooks was the President and Chief Executive Officer of Sotheby's Holdings, Inc. and Sotheby's, Inc. between April 1994 and approximately February 21, 2000. Brooks signed Sotheby's annual reports filed with the SEC for fiscal years 1997 and 1998. Brooks also resigned soon after the government investigations were made public.

*2 Defendants Sheridan, Domonkos, Carberry and Grillo served in various capacities as financial officers at Sotheby's at relevant times during the Class Period. They signed Sotheby's quarterly and/or annual reports during their employment.

*The Price-Fixing Agreement*

Christie's International PLC ("Christie's") is one of the world's largest auction houses. Together with Sotheby's, the two auction houses control an estimated 95% of the $4 billion worldwide auction market. Sotheby's and Christie's generally function as agents accepting property on consignment from their clients ("Auction Items"), selling the Items at auction in return for a "seller's commission," based on the auction sale's price, and a "buyer's premium," a predetermined percentage fee.

Prior to the early 1980s, Sotheby's and Christie's only charged a commission to the seller of Auction Items. In the early 1980s, Christie's began requiring that all buyers pay a premium of 10% on Auction Items. Approximately two years later, Sotheby's instituted a premium fee of 10% for all buyers. Prior to entering into the commission-fixing scheme alleged in the complaint, Sotheby's and Christie's competed with each other in aggressive price-cutting.

In the early 1990s, as the art market went into recession and revenues at Sotheby's and Christie's dropped, the two auction houses competed for major consignments by reducing the official 10% seller commissions to zero, effectively wiping out profits. Thereafter, Sotheby's and Christie's agreed to fix the prices of their auction services in the United States. They agreed to increase the buyer's premium, and in March and April, 1995, the two houses instituted identical changes to their seller's commission policy, changing from a flat commission to a variable one based on the value or selling price of Auction Items. The complaint describes further evidence of collusion in the form of shared preferred customer lists that identified clients that were spared from paying the new fees.

*The Government Investigation*

In the Spring of 1997, the United States Department of Justice ("DOJ") launched an antitrust investigation into collusive and price-fixing practices between Sotheby's and Christie's and empaneled a grand jury. Subpoenas were issued in the Spring of 1997 to Sotheby's, Christie's and others that called for documents going back to January 1, 1992. According to an article in the *New York Times* dated February 1, 2000, the Government required Sotheby's to provide the names of officials or employees who had "direct or indirect responsibility, including management-oversight responsibility, for setting, recommending or negotiating consignors' commissions and/or buyers' premiums." In late January and during February 2000, Christie's disclosed that the Antitrust Division of the DOJ had granted Christie's "conditional amnesty" under the Antitrust Division's Corporate Leniency Policy. Under this policy, the corporation or individual is admitted into the program only if it reports "illegal activity" and "reports the wrongdoing with candor and completeness."

*The Misleading Statements*

*3 The Complaint alleges that Sotheby's publicly touted the positive impact of the new commission structure and increased auction sales as the sources of improved revenues, when the real cause of the increased profits was the illegal collusion. The Complaint also alleges that Sotheby's issued statements misrepresenting the level of competition in the auction market. To support these allegations, plaintiffs point to specific statements, including language in Sotheby's 1996, 1997 and 1998 Annual Reports. Sotheby's stock rose from $14 a share in 1995, to a high of $47 in 1999. Never during that time did Sotheby's disclose any arrangement or agreement with Christie's to fix premium and commission charges.

### DISCUSSION

This Court may grant a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond reasonable doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." ' *Cohen v. Koenig*, 25 F .3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Koenig*, 355 U.S. 41, 45-46 (1957)). In considering the motion, the court must take "as true the facts alleged

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 91,059  
(Cite as: 2000 WL 1234601 (S.D.N.Y.))

Page 3

in the complaint and draw[ ] all reasonable inferences in the plaintiff's favor." *Jackson Nat'l Life Ins. v. Merrill Lynch & Co.* 32 F.3d 697, 699-700 (2d Cir.1994). The court can dismiss the claim only if, assuming all the facts alleged to be true, plaintiffs still fail to plead the basic elements of a cause of action.

I. Primary Violations of Section 10(b)

Section 10(b) of the Exchange Act provides that:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999). Rule 10b-5 requires the following for a plaintiff to maintain a misrepresentation claim:
> "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury ."

*Id.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir.1993)) (brackets in original). Securities fraud claims are subject to the requirements of Rule 9(b), Fed.R.Civ.P., which provides that "[i]n all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." *See Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000).

A. Duty to Disclose

*4 All of the defendants contend that the complaint is defective because the plaintiffs allege no circumstances giving rise to a duty under the securities laws to disclose the alleged collusive conduct with Christie's. Plaintiffs respond that Sotheby's made a number of false or misleading affirmative statements in public filings and in press releases--as to the level of competition in the industry and the reasons for Sotheby's growth in revenues and earnings--that triggered the requirement to disclose the illegal conduct.

The Complaint alleges misrepresentations with sufficient particularity to withstand a motion to dismiss. Specifically, the Complaint alleges that defendants' statements in Sotheby's Annual Reports on Form 10-K that there was "intense" competition with its "primary auction competitor," Christie's, and that the amount of commission proposed by auction houses was a factor in the decision made by a seller of Auction Items, were false and misleading because the price-fixing agreement between Sotheby's and Christie's had eliminated price competition between the two houses. [FN2] A jury could conclude that these statements could have led reasonable investors to believe that Sotheby's and Christie's were competing with each other in the usual manner, that is, through price.

> FN2. For example, Sotheby's 1997 Form 10-K stated that:
> Competition in the international art market is intense. A fundamental challenge facing the auctioneer or dealer is to obtain high quality and valuable property for sale. The Company's primary auction competitor is Christie's.
> ...
> A complex array of factors may influence the seller's decision. These factors include ... the amount of commission proposed by dealers or auction houses to sell a work on consignment.

Defendants rely on a series of cases holding that there is no general duty under SEC regulations for a corporation to disclose uncharged illegal conduct. *See, e.g., Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 27 (1st Cir.1987); *United States v. Matthews*, 787 F.2d 38, 49 (2d Cir.1986); *United States v. Crop Growers Corp.*, 954 F.Supp. 335, 347 (D.D.C.1997). These cases reflect the principle that " 'so long as uncharged criminal conduct is not required to be disclosed by any rule lawfully promulgated by the SEC, nondisclosure of such conduct cannot be the basis of a criminal prosection." ' *Crop Growers*, 954 F.Supp. at 346 (quoting *Matthews*, 787 F.2d at 49).

Generally, "an omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *Time Warner,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

9 F.3d at 267; see also Basic Inc. v. Levinson, 485 U.S. 224, 239 n. 17 (1988). "A duty to disclose arises whenever secret information renders prior public statements materially misleading." Time Warner, 9 F.3d at 268. A statement is materially misleading if "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." ' Id. at 267-68 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 499 (1976)). Thus, "[w]hen a corporation does make a disclosure-- whether it be voluntary or required--there is a duty to make it complete and accurate." Roeder, 814 F.2d at 26. This duty to disclose exists even where the omitted information relates to allegedly illegal conduct. See In re Par Pharm., Inc. Sec. Litig., 733 F.Supp. 668, 675 (S.D.N.Y.1990) ("The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose."); Ballan v. Wilfred Am. Ed. Corp., 720 F.Supp. 241, 249 (E.D.N.Y.1989) ("The fact that a defendant's act may be a crime does not justify its concealment."). [FN3]

   FN3. Given the conclusion that the statements regarding competition give rise to a duty to disclose, the Court need not reach the issues of (1) whether Sotheby's statements regarding the reasons for its growth in revenues and earnings, including the impact of its commission schedule, or (2) the more tenuous theory that statements that it was cooperating with the DOJ investigation, also triggered a duty to disclose the alleged price- fixing agreement.

B. Sotheby's, Inc.

*5 Sotheby's, Inc., argues that because the plaintiffs do not allege that any of the misleading statements were made by Sotheby's, Inc. and because no aiding and abetting liability exists under Section 10(b), see Central Bank v. First Interstate Bank, 511 U.S. 164, 177-78 (1994), the claim against Sotheby's, Inc. must be dismissed. For primary liability to attach to a defendant, the misrepresentation must "be attributed to that specific actor." Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir.1998). A misrepresentation may be attributed to a corporate defendant if it was made by or on behalf of the corporation. See Time Warner, 9 F.3d at 265 (Rule 9(b) requires plaintiff to identify the corporate insider in its pleadings to allege corporate liability based on press reports attributed to anonymous corporate insiders); United States v. Jacques Dessange, Inc., 103 F.Supp.2d 701, 705-06 (S.D.N.Y.2000) (DLC) (holding that corporation may be criminally liable for actions of a supervisory employee where the employee's actions "were for the benefit of and authorized by the company") (quoting United States v. Paccione, 949 F.2d 1183, 1200 (2d Cir.1991)).

A primary violator of Section 10(b) is any actor who " 'participated in the fraudulent scheme." ' SEC v. U.S. Environmental, Inc., 155 F.3d 107, 112 (2d Cir.1998) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1471 (2d Cir.1996)). A finding that the defendant communicated the misrepresentation directly to the plaintiff is not necessary. See Wright, 152 F.3d at 175; In re Kidder Peabody Sec. Litig., 10 F.Supp.2d 398, 407 (S.D.N.Y.1998). If a plaintiff "can show that defendants were the *original and knowing source* of a misrepresentation and that defendants knew or should have known that [that] misrepresentation would be communicated to investors, primary liability should attach." 10 F.Supp.2d at 407 (emphasis added); see also U.S. Environmental, 155 F.3d at 112 (distinguishing cases where liability did not attach because defendant who was the source of the misrepresentation had no legal duty to disclose or prevent a fraudulent act).

The Complaint does not specifically allege that Sotheby's, Inc. made any false or misleading statements. Instead, the statements alleged to be actionable are identified as having been made by "Sotheby's"--which is defined to include both the parent and subsidiary--or by an individual who was an officer of both companies. An examination of the Annual Reports, which are incorporated through the references made to them in the Complaint, see supra n. 1, indicate that they were filed by and on behalf of Sotheby's Holdings, Inc. The press reports quoted in the Complaint do not identify the corporate speaker as someone from Sotheby's, Inc. When there is an identification, it is to Sotheby's Holdings, Inc. Regarding Sotheby's, Inc., the Complaint alleges only that it is a subsidiary of Sotheby's Holdings, Inc., which is its parent and holding company, and that Sotheby's, Inc. conducts auctions. There are no allegations that Sotheby's, Inc. was the original and knowing source of any misleading statements.

*6 Plaintiffs argue that from the Complaint's allegations, it is reasonable to infer that "the financial information and statements on competition in the auction business ... were endorsed by, the

subsidiary." Such an inference is inappropriate, especially in light of the heightened pleading requirements for securities fraud claims. Furthermore, even were the Court to make this inference, absent additional allegations that any information transmitted to Sotheby's Holdings, Inc. by Sotheby's, Inc. was itself false and misleading and that its source knew it to be such, plaintiffs would still fail to state a claim against Sotheby's, Inc. *See Kidder, 10 F.Supp.2d at 407.* Because plaintiffs fail to allege any act or omission on the part of Sotheby's, Inc. sufficient to subject it to liability under Section 10(b), the complaint as to Sotheby's, Inc. is dismissed.

C. The Individual Defendants

The Individual Defendants contend that plaintiffs have not sufficiently pled the elements of a Section 10(b) claim to link the Individual Defendants to the alleged fraud. To satisfy the requirements of Rule 9(b), Fed.R.Civ.P., in pleading a fraud claim, a complaint must " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ' *Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir.1995) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)); see also Novak, 216 F.3d at 306.* In pleading a securities fraud violation, a complaint must allege that a defendant acted with scienter. *See Novak, 216 F.3d at 306* (collecting cases). When pleading scienter, "with respect to each act or omission" alleged to violate the securities laws, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Second Circuit has held that to satisfy this scienter requirement, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rothman v. Gregor, No. 00-7005, 2000 WL 959484, at \*7 (2d Cir. July 11, 2000); see also In re Carter-Wallace Sec. Litig., 220 F.3d 36,--(2d Cir.2000).*

A plaintiff may sufficiently plead conscious misbehavior through allegations of deliberate illegal conduct. *See Novak, 216 F.3d at 308.* To plead recklessness, a plaintiff must allege facts showing conduct that was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman, 2000 WL 959484, at \*8* (quotation omitted). Recklessness has been sufficiently pled where there are specific allegations that a defendant knew of facts or had access to information contradicting his public statements, or where he failed to review information that he had a duty to monitor, or where he ignored obvious signs of fraud. *See Novak, 216 F.3d at 308.* "Where plaintiffs contend [a] defendant[ ] had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id. at 309.*

*7 To plead facts supporting a strong inference of the requisite scienter by showing motive and opportunity, a plaintiff must allege facts showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," and "the means and likely prospect of achieving the concrete benefits by the means alleged." *Press, 988 F.Supp. at 390 (quoting Shields, 25 F.3d at 1129).* General allegations of motive "possessed by virtually all corporate insiders" are insufficient to raise a strong inference of fraudulent intent. *Novak, 216 F.3d at 307.*

In its recent decision in *Novak v. Kasaks, 216 F.3d 300,* after summarizing prior case law, the Second Circuit explained that a complaint pleads facts sufficient to raise a "strong inference" of fraudulent intent where it sufficiently alleges that a defendant:

(1) benefitted in a concrete and personal way from the purported fraud ...; (2) engaged in deliberately illegal behavior ...; (3) knew facts or had access to information suggesting that [her] public statements were not accurate ...; or (4) failed to check information [she] had a duty to monitor.

*Id.* at 311.

1. The Financial Officer Defendants

The plaintiffs argue that they have alleged facts sufficient to raise a strong inference of recklessness on the part of the Financial Officer Defendants. There are no allegations of the scienter of the Financial Officer Defendants apart from conclusory allegations regarding the Individual Defendants as a group. For example, the Complaint alleges that the Individual Defendants were "aware that the statements being made by Sotheby's" were misleading, that they "knew or were grossly reckless in not recognizing that the disclosures in public filings with the SEC ... were blatantly false," and that "their executive and/or directorial positions provided them with access to internal corporate documents and information ... and

allowed them to have conversations and meetings with other corporate officers and employees." The Complaint does not allege that any of the Financial Officer Defendants possessed any specific knowledge of the alleged illegal conduct, does not allege the existence of any specific documents or other information contradicting their public statements that were available to the Financial Officer Defendants, and does not allege facts demonstrating that the Financial Officer Defendants failed to review or check information that they had a duty to monitor or that they ignored obvious signs of fraud, *see Novak, 216 F.3d at 308.*

Apparently conceding these failings, the plaintiffs argue that those such as the Financial Officer Defendants who are in senior positions of a corporation are presumed to be "knowledgeable about significant practices at their company." It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter. *See Novak, 216 F.3d at 309; In re Health Management Sys. Inc. Sec. Litig.,* No. 97 Civ. 1865(HB), *1998 WL 283286,* at *6 (S.D.N.Y. June 1, 1998); *In re WRT Energy Sec. Litig.,* No. 96 Civ. 3210(JFK), NO. 96 Civ. 3611(JFK), *1997 WL 576023,* at *14 (S.D.N.Y. Sept. 15, 1997); *Duncan v. Pencer,* No. 94 Civ. 0321(LHP), *1996 WL 19043,* at *14 (S.D.N.Y. Jan. 18, 1996). The facts demonstrating the requisite scienter must be pleaded with particularity, thus, in attempting to establish scienter by showing recklessness or conscious misbehavior,

> *8 conclusory allegations--that Defendants "knew but concealed" some things, or "knew or were reckless in not knowing" other things--do not satisfy the requirements of Rule 9(b).... [S]uch allegations are "so broad and conclusory as to be meaningless."

*Shields,* 25 F.3d at 1129 (quoting *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 119-20 (2d Cir.1982)). Because the allegations of the Complaint do not raise a strong inference of fraudulent intent on the part of the Financial Officer Defendants, Count I of the Complaint must be dismissed as to them.

2. Taubman and Brooks

The Complaint does, however, allege facts sufficient to raise a strong inference that Taubman and Brooks acted with fraudulent intent. The Complaint alleges that both Taubman and Brooks were directly involved in arranging the illegal price-fixing agreement, and that each of them signed 10-Ks that, in light of the illegal agreement, they knew were false or misleading. Allegations that defendants had actual knowledge that their statements were false or misleading are sufficient to plead scienter. *See Novak,* 216 F.3d at 308.

II. Section 20(a) of the Exchange Act

In Count II of the Complaint plaintiffs assert a claim of secondary liability against the Individual Defendants under Section 20(a) of the Exchange Act. The Individual Defendants contend that they are not control persons within the meaning of Section 20(a). To establish a prima facie case of liability under Section 20(a), a plaintiff must show:

> (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation.

*Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)). Control over a primary violator may be established by showing that "the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." ' *First Jersey,* 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b-2). Actual control over the wrongdoer and the transactions in question is necessary for control person liability. *See In re Blech Sec. Litig.,* 961 F.Supp. 569, 586-87 (S.D.N.Y.1997). Thus, officer or director status alone does not constitute control. *See Livent,* 78 F.Supp.2d at 221 (collecting cases).

1. Financial Officer Defendants

As discussed above, the Complaint contains no detailed allegations regarding the state of mind of the Financial Officer Defendants in making the alleged misstatements. For this same reason, the Section 20(a) claim against the Financial Officer Defendants must be dismissed for failure to allege culpable participation in the fraud. *See Livent,* 78 F.Supp.2d at 222 (dismissing Section 20(a) claims where plaintiffs did not adequately allege scienter element of Section 10(b) claim against those defendants).

2. Taubman and Brooks

*9 The Complaint does state a claim for control person liability against Taubman and Brooks.

## CONCLUSION

For the reasons stated, the motions of Sotheby's, Inc. and the Financial Officer Defendants are granted and the claims against them are dismissed without prejudice; the motions of Sotheby's Holdings, Inc. and of Taubman and Brooks are denied. The plaintiffs having requested leave to amend to cure any deficiencies in their pleading, any amended complaint shall be filed by September 15, 2000.

SO ORDERED:

2000 WL 1234601 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,059

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works