# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHERRY SCHNALL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANNUITY AND LIFE RE (HOLDINGS), LTD., XL CAPITAL, LTD., LAWRENCE S. DOYLE, FREDERICK S. HAMMER, JOHN F. BURKE, WILLIAM W. ATKIN, BRIAN O'HARA, AND MICHAEL P. ESPOSITO, JR.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 02 CV 2133 (GLG)<br><br>April 28, 2004 |

## LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION TO THE MOTIONS TO DISMISS FILED BY DEFENDANTS KPMG LLP (UNITED STATES) AND KPMG IN BERMUDA

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

I.    BACKGROUND FACTS ..............................................................................4

II.   KPMG'S FALSE AND MISLEADING STATEMENTS.................................8

      A.    Failure to Fully Account for Obligations to Policyholders.....................8

      B.    Failure to Recognize Expenses for Minimum Interest Payments...........9

      C.    Failure to Write-Down Deferred Acquisition Costs ...........................10

      D.    Additional Ways in Which ANR Obscured its True Financial Position ..............12

      E.    Failure to Investigate Red Flags .....................................................13

III.  THE HISTORY OF ANR'S FALSE AND MISLEADING FINANCIAL
      REPORTING .........................................................................................14

ARGUMENT ...................................................................................................19

I.    THE COMPLAINT PROPERLY PLEADS FALSITY ....................................19

      A.    Rule 12(b)(6) and the Elements of a §10(b) Claim...........................19

      B.    KPMG's Certifications of ANR's Financial Statements Were False ..................20

            1.    ANR's Financial Statements Did Not Fairly Present the Financial
                  Condition and Earnings of the Company........................................20

            2.    ANR Misstated its Financial Statements by Failing to Recognize
                  Liabilities to Policyholders Imposed by State Law ...................22

            3.    GAAS Required KPMG to Collect and Review Critical Audit
                  Evidence..................................................................................23

            4.    Falsely Reported Profits and Delayed Disclosure of Losses ..................25

            5.    ANR's Baseless Projected Returns Rendered its Statements False
                  and Misleading.........................................................................26

            6.    Additional False Statements ......................................................28

i

II.    THE AUDIT OPINIONS ARE ATTRIBUTABLE TO KPMG USA..............................30

    A.    KPMG USA Issued the False Audit Opinions........................................................30

    B.    KPMG USA is Liable as a Joint Venturer with KPMG Bermuda.........................33

    C.    KPMG USA Participated in a "Scheme to Defraud"............................................34

III.    THE COMPLAINT PROPERLY ALLEGES SCIENTER ...............................................35

    A.    KPMG Was Aware of the Undisclosed Facts Rendering ANR's Financial
        Statements False and Misleading............................................................................36

    B.    GAAP and GAAS Violations of the Type and Magnitude Alleged
        Contribute to the Inference of Scienter..................................................................38

        1.    The Obviousness of the Fraud Suggests Scienter......................................39

        2.    KPMG's Failure to Collect Critical Audit Evidence Creates an
              Inference of Scienter..................................................................................41

        3.    Multiple Restatements and Unrealistic Projections Demonstrates
              Scienter .......................................................................................................42

        4.    Additional Red Flags Demonstrate Scienter..............................................43

        5.    ANR's "Disclosures" Do Not Negate the Inference of Scienter ...............44

IV.    KPMG IS RESPONSIBLE FOR THE FALSE STATEMENTS CONTAINED IN
    ANR'S QUARTERLY FILINGS .....................................................................................46

V.    KPMG USA IS A CONTROLLING PERSON OF KPMG BERMUDA .........................48

VI.    CONCLUSION..................................................................................................................50

# TABLE OF AUTHORITIES

## CASES

Page

*AT&T v. Winback & Conserve Program*,
42 F.3d 1421 (3d Cir. 1994)..................................................................................33

*In re Adaptive Broadband Sec. Litig.*,
2002 U.S. Dist. LEXIS 5887 (N.D. Cal. Apr. 2, 2002) ...............................................42, 44

*Ades v. Deloitte & Touche*,
799 F. Supp. 1493 (S.D.N.Y. 1992)..........................................................................43

*Arnlund v. Deloitte & Touche LLP*,
199 F. Supp. 2d 461 (E.D. Va. 2002) .....................................................................35, 40

*In re Asia Pulp & Paper Sec. Litig.*,
293 F. Supp. 2d 391 (S.D.N.Y. 2003).....................................................................49, 50

*Associated Randall Bank v. Griffin, Kubik Stephens & Thompson*,
3 F.3d 208 (7th Cir. 1993) ..................................................................................45

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).........................................................................................19

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)................................................................................22

*Carley Capital Group v. Deloitte & Touche LLP*,
27 F. Supp. 2d 1324 (N.D. Ga. 1998) ....................................................................38, 41

*Central Bank, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994).......................................................................................30, 31

*Chambers v. Time Warner*,
282 F.3d 147 (2d Cir. 2002)..................................................................................26

*In re Colonial P'ship Litig.*,
896 F. Supp. 250 (D. Conn. 1995) ............................................................................36

*Conley v. Gibson*,
355 U.S. 41 (1957)...........................................................................................19

*Cromer Finance Ltd. v. Berger*,
245 F. Supp. 2d 552 (S.D.N.Y. 2003)..........................................................................33

*Danis v. USN Comm.,*
    73 F. Supp. 2d 923 (N.D. Ill. 1999) ........................................................................38, 39

*In re Enron Corp. Secs. Litig. ,*
    235 F. Supp. 2d 549 (S.D. Tex.  2002) ....................................................................34, 35

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995) ........................................................................................25

*In re First Merch. Acceptance Corp. Sec. Litig.,*
    1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998) ................................................39

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,*
    270 F.3d 645 (8th Cir. 2001) ..................................................................................25, 43

*Foman v. Davis,*
    371 U.S. 178 (1962)........................................................................................................50

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000)....................................................................................20, 26

*In re Global Crossing Ltd. Sec. Litig.,*
    2004 U.S. Dist. LEXIS 5040 (S.D.N.Y. Mar. 23, 2004) ........................................ *passim*

*In re Health Mgmt. Sec. Litig,*
    970 F. Supp. 192 (E.D.N.Y. 1997) ..............................................................36, 39, 43, 44

*Helwig v. Vencor Inc.,*
    251 F.3d 540 (6th Cir. 2001) ......................................................................27, 40, 43, 44

*In re Homestore.com Sec. Litig.,*
    252 F. Supp. 2d 1018 (C.D. Cal. 2003) ........................................................................43

*In re IKON Office Solutions,*
    66 F. Supp. 2d 622 (E.D. Pa. 1999) ........................................................................39, 40

*In re Initial Pub. Offering Sec. Litig.,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................................22

*Jacobs v. Coopers & Lybrand, LLP,*
    1999 U.S. Dist. LEXIS 2102 (S.D.N.Y. Feb. 26, 1999)................................................36

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir. 1991)..........................................................................................10

*LC Capital Partners, LP v. Frontier Ins. Group,*
    318 F.3d 148 (2d Cir. 2003)..................................................................28, 42

*In re Lernout & Haupsie Sec. Litig.,*
    230 F. Supp. 2d 152 (D. Mass. 2002) ..............................................31, 32, 33, 50

*In re McKesson HBOC Inc. Sec. Litig.,*
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...........................................................44

*In re Mercator Software,*
    161 F. Supp. 2d 143 (D. Conn. 2001) .............................................................44

*In re MicroStrategy,*
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...............................................36, 39, 42, 43

*New England Health Care Employees Pension Fund v. Ernst & Young LLP,*
    336 F.3d 495 (6th Cir. 2003) .......................................................................41

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000)................................................................ *passim*

*In re Oxford Health Plans,*
    51 F. Supp. 2d 290 (S.D.N.Y. 1999)..............................................35, 39, 43, 44

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,*
    142 F. Supp. 2d 589 (D.N.J. 2001) ................................................................42

*Rehm v. Eagle Fin. Corp.,*
    954 F. Supp. 1246 (N.D. Ill. 1997) ...........................................................28, 42

*In re Rent-Way Sec. Litig.,*
    209 F. Supp. 2d 493 (W.D. Pa. 2002)..................................................... *passim*

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000).................................................................1, 26, 37

*SEC v. Caserta,*
    75 F. Supp. 2d 79 (E.D.N.Y. 1999) ...............................................................22

*SEC v. U.S. Envtl, Inc.,*
    155 F.3d 107 (2d Cir. 1998).......................................................................34

*Schnall v. Annuity & Life Re (Holdings),*
    2004 U.S. Dist. LEXIS 4643 (D. Conn. Mar. 9, 2004)........................................49

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001)..................................................................... *passim*

*Shaw v. Digital Equip. Corp.,*
    82 F.3d 1194 (1st Cir. 1996)...........................................................40

*Sound Video Unlimited v. Video Shack,*
    700 F. Supp. 127 (S.D.N.Y. 1988)...................................................34

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001)..........................................................33, 49

*In re Sunbeam Sec. Litig.,*
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) .................................36, 39, 44

*In re The Leslie Fay Co. Inc. Sec. Litig.,*
    835 F. Supp. 167 (S.D.N.Y. 1993).............................38, 39, 41, 43

*United States v. Simon,*
    425 F.2d 796 (2d Cir. 1969)............................................................23

*In re Vivendi Univ. S.A. Sec. Litig.,*
    2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003)................22, 23, 31, 47

*Wafra Leasing Corp. 1999 A-1 v. Prime Capital Corp.,*
    247 F. Supp. 2d 987 (N.D. Ill. 2002) .............................................32

*Weissman v. Seiyu,*
    2000 U.S. Dist. LEXIS 509 (S.D.N.Y. Jan. 14, 2000) .....................33

*In re Worldcom Inc. Sec. Litig.,*
    2003 U.S. Dist. LEXIS 10863 (S.D.N.Y. June 24, 2003) .................42

*Wright v. Ernst & Young LLP,*
    152 F.3d 169 (2d Cir. 1998)................................................30, 32, 39, 47

## OTHER AUTHORITIES

15 U.S.C. § 78u-4 .................................................................................20

15 U.S.C. § 78t.....................................................................................49

15 U.S.C. § 78j.....................................................................................19

17 C.F.R. § 210.10-01...................................................................15, 19, 47

17 C.F.R. §240.10b-5 ................................................................................................34

17 C.F.R. §229.305 ...................................................................................................29

Fed. R. Civ. P. 9 .......................................................................................................37

Fed. R. Civ. P. 12 .......................................................................................................9

Fed. R. Civ. P. 15 .....................................................................................................50

Lead Plaintiffs, Communication Workers of America and Midstream Investments, Ltd,

submit this single brief in response to the separate Motions to Dismiss the First Amended Class

Action Complaint ("Complaint") filed by KPMG in Bermuda ("KPMG Bermuda") and KPMG

LLP (U.S.) ("KPMG USA") (together, "KPMG").

## PRELIMINARY STATEMENT

This case arises out of KPMG's materially false and misleading statements concerning

the financial performance of Annuity & Life Re (Holdings) ("ANR").  KPMG served as ANR's

independent auditor from the Company's inception until this past month, when ANR announced

that KPMG had resigned. Pltfs Exh. B.[1]  In that capacity, KPMG certified that ANR's financial

statements "present[ed] fairly, in all material respects, the financial position of the Company

[and] the results of [] operations and cash flows," ¶¶78, 116, 168, that the statements complied

with United States Generally Accepted Accounting Principles ("GAAP"), and that KPMG's

audit had been conducted in accordance with Generally Accepted Auditing Standards ("GAAS").

In fact, ANR had reported tens of millions of dollars in income on a massive annuity reinsurance

contract that was actually generating *losses*.  ANR concealed these losses from investors with a

series of blatantly improper accounting practices, including ANR's failure to recognize liabilities

for obligations it was required to pay to policyholders under state law and ANR's use of baseless

and wildly optimistic projections as to the future returns on its investments.  When ANR finally

disclosed the full extent of its losses to the market at the end of the Class Period, its share price

plunged to $2.24 from a Class Period high of $36.98, and the Company admitted that it might no

longer be able to continue as a going concern.  ANR was ultimately forced to restate virtually all

---

[1] This Court may take judicial notice of documents that are required to be filed with the SEC.
*See Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000).

of its Class Period financial statements and, in fact, even *after* the Class Period, continues to issue restatements due to its faulty accounting on the Transamerica contract.

As ANR's auditor, KPMG was required to evaluate the significant estimates used by ANR in its accounting and to assure that ANR's financial statements were free of "material misstatements." The Complaint alleges a complete breakdown in the accounting for a contract that required ANR to assume $1.6 billion in liabilities. As KPMG has admitted, it failed even to collect basic data necessary to evaluate the profitability of the contract and to determine ANR's actual expenses. KPMG did not require ANR to account for its known, guaranteed liabilities to policyholders, and did not require ANR to use realistic projections, based on ANR's own actual experience, to estimate its future investment returns. KPMG also ignored other significant GAAP violations and "red flags," including ANR's false representation to the market that its assets were free from market risk, ANR's false claim not to hold a particularly risky type of security known as an "embedded derivative," and ANR's false representation that its income was dependent on interest rate spreads (rather than, as was the case, appreciation in the equity markets). All three of these false statements were contained in ANR's SEC filings during the Class Period, which included KPMG's certification, and all have been repudiated by ANR.

Under the guise of arguing that Plaintiffs have not properly pled KPMG's "scienter," KPMG actually argues that ANR's financial statements were not *false*, because Plaintiffs have not identified any GAAP violations. Rather than address the fundamental accounting violations pled, KPMG instead attempts to rewrite the Complaint to shift the issue to one involving technical industry-specific subtleties involving the characterizations of different types of insurance policies, and new SEC guidelines for quantifying the effects of embedded derivatives. In so doing, KPMG attempts to persuade the Court that ANR's financial statements reflected

nothing more than good-faith judgments in an area of extreme uncertainty.  This Court has

already rejected similar arguments in the context of the earlier motions to dismiss, and it should

do so again here.  It should take no reference to complicated accounting pronouncements for it to

be immediately obvious that a corporation may not simply ignore known, quantifiable liabilities

that are imposed by state law.  Any reasonable auditor would know that if a corporation's

investment returns do not come close to meeting guaranteed liabilities, that corporation must

report *losses* rather than *profits*.  And any reasonable auditor would know that for a contract

involving $1.6 billion in liabilities -- representing between 45% and 97% of ANR's reported

liabilities to policyholders during the Class Period -- it is absolutely necessary to collect basic

information about expenses and contract performance in order to conduct a reasonable audit.

KPMG USA argues that because the audit opinions were issued under the name of

KPMG's office in Bermuda, it cannot be held liable as a primary violator of the securities laws

or as a controlling person of its affiliate.  Plaintiffs have alleged specific facts showing that

KPMG USA's own personnel served as part of the ANR audit team, particularly with respect to

the evaluation of the accounting for the Transamerica contract, that KPMG USA was responsible

for final decisions regarding ANR's compliance with United States GAAP, that KPMG USA

defended ANR's financial reporting before the SEC, and that KPMG USA controlled KPMG

Bermuda's decision making as to whether to withdraw its earlier certifications of ANR's financial

statements.  Plaintiffs have alleged that KPMG Bermuda had been permitted to practice before

the SEC as a result of its affiliation with KPMG USA.  Indeed, the audit opinions themselves are

simply signed "KPMG," with no further qualification except for the use of a Bermuda address.

Under such circumstances, KPMG USA (as well as KPMG Bermuda) "issued" the fraudulent

audit opinions or may otherwise have the audit opinions attributed to it on agency grounds.

3

## STATEMENT OF FACTS

### I.     BACKGROUND FACTS

KPMG is a worldwide firm of certified public accountants and auditors.  Because of the legal requirements of various countries, KPMG is organized in a series of local partnerships and/or corporations.  The different local firms may act separately or together in conducting audits of and issuing audit opinions for its various audit clients.  ¶5.  The Department of Professional Practice ("DPP") of KPMG USA often becomes involved in the audits of KPMG conducted throughout the world when those audits involve technical accounting compliance issues related to audits required by the United States securities laws, or where audit clients' accounting practices are questioned by the Securities and Exchange Commission ("SEC").  Local KPMG audit offices defer to audit positions and authority of the DPP.  ¶6.

This lawsuit involves KPMG's audits of ANR, a Bermuda-based reinsurance company.  KPMG's Bermuda office and its United States office worked jointly to examine ANR's financial statements and to make recommendations regarding ANR's reporting of its financial condition and earnings. ¶¶257-260.  KPMG USA examined those aspects of ANR's reporting that form the basis of this lawsuit.  KPMG's certifications of ANR's financial statements contained the signature "KPMG," with no qualifying language.  The address listed below the signature was that of KPMG Bermuda. ANR told investors that its auditor was simply "KPMG." ¶28.

As a reinsurer, ANR is in the business of providing insurance to other insurance companies, known as "cedents." ¶40.  ANR reinsures primary insurers directly, and also reinsures other reinsurers ("retrocessional" insurance).  ANR reinsures two products: annuities and life insurance. ¶2.  In September 1998, ANR retrocessionally insured Transamerica Occidental Life Insurance ("Transamerica"), which itself resinsured IL Annuity & Life's ("IL Annuity") "VisionMark" annuity policies.  ¶¶48, 55.

VisionMark policyholders were told that they would be paid annuities based upon the market performance of certain investments. However, if the investments did poorly, the policyholders were guaranteed a minimum interest rate, ranging between 3% and 3.5% annually, pursuant to state law. These minimum annual returns were due regardless of any portfolio management fees IL Annuity otherwise charged and collected from policyholders. ¶55.

IL Annuity invested 70% of the premiums earned on the VisionMark policies in convertible bonds. ¶60. Convertible bonds are corporate bonds that, at a stated price, can be "converted" into the common stock of the issuing company. If the market price of the issuers' stock appreciates above the conversion price, the bonds' value increases. In exchange for this conversion feature, the bonds pay a lower interest rate than ordinary bonds. ¶58. As ANR admitted at the end of the Class Period, "While convertible bonds would typically be expected to produce lower investment [i.e., interest] income than other fixed income securities, convertible bonds provide the potential for higher total returns through the underlying equity component . . ." ¶58. Because convertible bonds constituted 70% of the assets supporting the VisionMark policies, VisionMark profitability depended in large part on equity market performance. ¶61.

ANR's contract with Transamerica, and Transamerica's contract with IL Annuity, were "modified coinsurance" arrangements. In this structure, the ceding insurer retains ownership and control over the assets supporting the policies, but allocates a portion of those assets to the reinsurer. ¶41. The reinsurer then reports its allocable share of these investments as an asset on its own balance sheet called "Funds Withheld at Interest." ¶44. By reinsuring the VisionMark business through a "modified coinsurance" arrangement, ANR assumed the lion's share of the risk that the returns on the investments (e.g., convertible bonds) might be inadequate to cover obligations to VisionMark policyholders, while allowing IL Annuity to retain control over which

particular investments were purchased. ¶¶42, 60. Transamerica provided ANR with monthly information about investment performance and changes in policyholder account status. ¶202.

The Transamerica contract represented between 61% and 95% of ANR's reported "Funds Withheld at Interest" asset during the Class Period, and was responsible for between 45% and 97% of ANR's assumed liabilities to annuity policyholders. ¶61. At the end of 1999, the portion of the Funds Withheld at Interest asset associated with Transamerica totaled $1.51 billion, and the portion of ANR's reported liabilities to policyholders associated with Transamerica totaled a staggering $1.6 billion. ¶8. Additionally, as is typical in modified coinsurance structures, ANR assumed some of the *costs* associated with the policies that it reinsured – specifically, costs associated with brokers' commissions on those policies. As is required under GAAP, ANR deferred its recognition of these costs, and instead listed them as an asset on its balance sheet called "deferred acquisition costs," or DAC. ¶44. These costs were to be amortized over the life of the reinsurance contract, using a schedule based upon ANR's projected lifetime profits on the contract. ¶44. In 1999, of the $203 million total deferred acquisition costs ANR reported on its balance sheet, $201.5 million was allocable to Transamerica. ¶61.

The risks associated with this contract were enormous. Merely to meet policyholder obligations, the Funds underlying the contract needed to earn enough to cover both the guaranteed minimum interest to policyholders, and to pay IL Annuity's management fees. Because these fees were 2.75% during the Class Period, ANR would only be able to meet obligations to policyholders if the Funds earned 6.25% (2.75 plus 3.5). ¶55.

Beginning in mid-1999, and continuing through the Class Period, ANR's experience on its Transamerica contract was far worse than it had anticipated when the contract was first

signed.  These losses were not fully disclosed to investors until the end of the Class Period because of ANR's false financial reporting, endorsed and certified by KPMG.

As described above, the profitability of the contract depended on ANR's ability to earn income on the investment assets underlying the Funds Withheld sufficient to meet minimum interest guarantees to policyholders and to meet its own costs, including over $200 million in "deferred" costs that were to be amortized over the life of the contract.  However, the Funds never performed at the required rate, ¶56; ANR Answer ¶¶55, 65, 73, 83.  In fact, both before and during the Class Period, the Funds only performed above 6.25% in a *single quarter* — and even that performance was only possible because IL Annuity undertook an extraordinary liquidation of its investments. ¶106.

ANR's dire situation was aggravated by another factor: the extraordinarily high numbers of VisionMark policyholders who chose to prematurely cash out their policies and obtain their cash surrender value payments rather than wait until the annuity periods ran their course.  In mid-1999, VisionMark policyholders began surrendering their policies at rates well in excess of those ANR had projected when it had priced the contract.  ¶79(c).  By the end of 2001, even though ANR had projected surrender rates of 4%, VisionMark surrenders had actually reached a staggering 26%.  ¶66; ANR Answer ¶67.  When policyholders surrendered their policies and received cash, the overall base of ANR's investment assets used to fund policyholder obligations was depleted, so that even if the equity markets rebounded in the future there would be lower total gains on the investment assets to make up for past deficiencies.  ¶39.  Policyholder surrenders also imposed an immediate payment obligation on ANR, and, because the policyholders were guaranteed investment returns that were higher than those ANR had earned, ANR was forced to fund the excess payments out of its own income from other sources. These

two factors – low investment returns coupled with high surrenders – guaranteed that the Transamerica contract was in a loss position from which it would never recover.

## II.    KPMG'S FALSE AND MISLEADING STATEMENTS

Each of ANR's annual filings on Form 10-K included a certification from KPMG representing that, "In our opinion, the consolidated financial statements [of ANR] present fairly, in all material respects, the financial position of the Company and its subsidiaries . . . and the results of their operations and cash flows. . . in conformity with United States generally accepted accounting principles." ¶¶78, 116, 168.   KPMG reached this conclusion, it said, by "conduct[ing] our audits in accordance with United States generally accepted auditing standards," "obtain[ing] reasonable assurance" that ANR's financial statements were "free of material misstatement," "examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements," and "assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation." ¶¶78, 116, 168.  Each of ANR's quarterly filings on Form 10-Q incorporated the annual 10-Ks by reference, *e.g.* ¶¶83, 90, 96, and, as required by federal regulation, KPMG reviewed each of ANR's quarterly filings. ¶215.  Despite KPMG's representations, ANR's financial statements were not presented "fairly," nor did they comply with GAAP, and the audits severely deviated from GAAS.

### A.    Failure to Fully Account for Obligations to Policyholders

Because the Funds consistently performed so poorly, ANR experienced stunning losses. Nonetheless, ANR actually reported *net income* on the Transamerica contract for half the Class Period. ¶¶79, 85, 91, 97, 111, 124, 136; ANR Answer ¶63.  ANR accomplished this by failing to account for the minimum guaranteed interest rates of 3.5% when reporting its liabilities. Although ANR was required to report its liabilities to policyholders, these state-mandated

obligations did not appear in ANR's financial statements *at all*, ¶221; ANR Answer ¶241.  In this manner, ANR under-reported its expenses, and over-reported its overall earnings.   Indeed, ANR did not even acknowledge its liabilities imposed by state laws as a "contingent" liability.  ¶221; ANR Answer ¶241.   KPMG – which claimed to have "assess[ed] the accounting principles used" by ANR, ¶¶78, 116, 168 – was indisputedly *aware* that ANR was not reserving for minimum interest guarantees, but nonetheless signed off on its financial statements.

### B.    Failure to Recognize Expenses for Minimum Interest Payments

ANR should have been regularly reserving for amounts due to policyholders based upon the higher of: (1) the rates guaranteed by state law or (2) the annuity policy's crediting provisions.  ANR did not do so; instead, it credited based on the annuity policy crediting provision without considering minimum amounts due.  ANR then exacerbated this reporting deficiency when policyholders surrendered their policies for their cash surrender value.  Whenever a policyholder surrendered his policy, ANR (through Transamerica, and through IL Annuity) paid the policyholder the cash he was due.  Because ANR had not accrued for amounts due policyholders under state minimum interest laws, the amount paid to the policyholder often exceeded the amount of ANR's recorded liabilities (or reserve) for that policyholder.  Thus, when making the payout, ANR should have closed out the policyholder's account balance and recognized an expense for the shortfall.  Instead, ANR simply reduced its reported liabilities by the *full amount* it paid the policyholder.  By doing so, ANR under-reported and misstated the remaining balance of its liabilities to other policyholders.  And, again, ANR under-reported its expenses, and thereby over-reported its earnings.  *E.g.*, ¶¶86, 91, 97, 101, 103; ANR Answer ¶¶87, 96, 100, 117, 128, 139.   Correction of this blatant accounting error was one of the reasons for ANR's massive restatement for 2000 and 2001.  ¶195.

In fact, despite the extraordinarily high surrender rates on the Transamerica contract, not to mention the unexpectedly low returns on the Funds underlying the contract, neither ANR nor KPMG even collected basic information from Transamerica that would allow them to determine expenses in connection with its minimum interest guarantee payments. ¶65.[2] Because ANR was lacking such basic information, it was not only unable to properly account for minimum interest payouts to policyholders, but KPMG suffered from a limitation on the scope of its audit that left it unable even to begin its review in accordance with GAAS. An auditor may not issue an unqualified audit opinion if it has not obtained sufficient competent evidential matter to perform necessary audit procedures. ¶242. Instead of refusing to issue an opinion or, at minimum, issuing an opinion disclosing that KPMG was operating under "scope limitation," as GAAS requires, ¶242, KPMG falsely represented that it had "examin[ed], on a test basis, evidence supporting the amounts and disclosures in the financial statements." ¶¶78, 116, 168.

## C.    Failure to Write-Down Deferred Acquisition Costs

When ANR first entered into the agreement with Transamerica, ANR determined the rate at which it would amortize its deferred costs based upon its projected profits over the life of the

---

[2] KPMG Bermuda improperly attempts to induce this Court to decide disputed issues of fact on this issue. KPMG Bermuda asserts that ANR was thwarted by Transamerica in its attempts to obtain information on minimum interest payments. KPMG Bermuda at 6. This self-serving account, from ANR's Amended 2001 10-K, cannot be taken as true on motion to dismiss. Although a court may judicially notice SEC filings, it may not assume their truth. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Moreover, even if true, KPMG would not be absolved of its responsibility to obtain critical evidence before issuing an audit opinion; indeed, even by making the argument, KPMG admits the facts necessary to demonstrate its liability, for KPMG repeatedly stated that it had "examin[ed], on a test basis, evidence supporting the amounts and disclosures in the financial statements." ¶¶78, 116, 168. Additionally, KPMG Bermuda, relying on ANR's SEC filings, claims that ANR regularly reviewed the DAC amortization schedule based on "historical" experience. KPMG Bermuda at 16-17. In fact, this is one of the statements that the Complaint alleged was *false* and actionable. ¶169.

contract.  Such an amortization schedule would, in the ordinary case, allow ANR to slowly offset earnings with these deferred costs, while still earning a profit on the contract.  However, because the rate at which these costs are recognized depends upon projected future profits, GAAP required that ANR periodically reevaluate its projections in light of actual experience, and to make as-needed adjustments to the amortization schedule.  If at any time it appeared that the contract would not be sufficiently profitable to offset the deferred costs, ANR was required to "write-off" the DAC and recognize those costs as an immediate and unrecoverable expense.  ¶44.

ANR claimed to regularly review its amortization schedule as GAAP requires, including conducting "loss recognition testing" to determine whether its deferred costs would be offset by profits on the contract. ¶¶71, 105.  Only at the end of the Class Period, however, did ANR disclose that it was recognizing additional DAC write-downs as a result of having "initiate[d] a review of the recoverability of the deferred acquisition costs" in the third quarter of 2001. ¶199.  As such, KPMG also failed to timely conduct the review it was required to do under GAAS. ¶¶243-256.  Based upon the monthly reports by Transamerica that showed poor performance on the Funds Withheld coupled with startlingly high policyholder surrenders, it was obvious to ANR and to KPMG that ANR could not continue to use the original, now-stale estimates to assume that the deferred costs could be recovered.  Given the size of the Transamerica contract, KPMG's failure to evaluate ANR's ability to recover its deferred costs, and to make appropriate adjustments for ANR's actual experience, amounted to no audit at all. ¶246.  Indeed, by failing to collect information about actual policyholder payments for amounts due under state law, as both ANR and KPMG knew, they were missing the critical data needed to reevaluate the DAC amortization schedule as GAAP and GAAS require.

Even after ANR reviewed its amortization schedule and acknowledged (and expensed) a portion of its deferred costs as unrecoverable, ANR avoided recognizing the full extent of the losses by using baseless and wildly optimistic assumptions about future investment returns in determining the size of its write-down and expense. Specifically, even though the corporate bonds and other investments had consistently yielded returns far *below* 6.25%, ANR adjusted its DAC amortization based upon projections that in the following year convertible bonds would magically yield *10% returns*. ¶¶150, 169. KPMG, which claimed to have "assess[ed] . . .significant estimates," ¶168, and which was required to actuarially test ANR's accounting, ¶¶251-252, fully knew that ANR had misstated its earnings with this manipulation.

### D. Additional Ways in Which ANR Obscured its True Financial Position

*First*, ANR repeatedly declared that it did not hold a risky type of security known as an embedded derivative. ¶¶76, 84, 90, 96, 115, 123. In fact, at the end of the Class Period, ANR admitted that it *did* hold embedded derivatives within the Funds supporting the Transamerica contract. ¶179.

*Second*, despite the GAAP requirement that different business segments be reported separately to permit investors to gain a complete understanding of the entity's financial condition and earnings, ¶¶225-237, ANR did not separately report its annuity and life reinsurance segments until April 2002, ¶171. ANR's failure to report the operating segments separately permitted ANR to obscure adverse facts regarding its annuity segment, ¶237.

*Third*, despite requirements of federal regulations and GAAP that the characteristics of securities held by the disclosing entity be broken out and reported separately, ¶¶238-239, ANR did not disclose the details of the holdings in the Funds underlying its annuity segment until the end of the Class Period, ¶200, thus allowing ANR to obscure the deterioration in its holdings.

### E.    Failure to Investigate Red Flags

KPMG failed to investigate numerous "red flags" signaling that ANR's financial statements were false and misleading, despite the GAAS requirement that particular attention be paid to financial statements with a high risk of misstatement.  ¶243.  KPMG certified ANR's financial statements (and the explanatory notes accompanying them) despite certain extraordinary false and misleading statements and omissions concerning the nature of its business, and the associated risks.  ANR bizarrely represented to investors that its Funds Withheld were *not* subject to market risks, ¶¶71, 75-76, 112, despite the fact that – as ANR was forced to admit – the Funds were heavily dependent on stock price movements due to the concentration of convertible bonds.  ¶¶59, 165.  Equally surprising, ANR assured investors that the profitability of the annuity product line "depends on earning a targeted spread between the interest rate earned on the supporting asset base and the interest rate credited to the underlying annuity liability." ¶74; *see also* ¶¶108, 165.  In fact, the profitability of the annuity line did *not* depend on interest rates, but instead depended on stock price movements due to ANR's heavy concentration in convertible bonds – a fact that ANR was ultimately forced to admit.  ¶58. Additionally, KPMG ignored:

- That despite the poor performance of the Funds Withheld in every other quarter, returns suddenly spiked in the fourth quarter of 2000, just in time for ANR's 2000 annual SEC filing, ¶117;

- That the CFO suddenly retired in the middle of 2001 under highly suspicious circumstances, ¶¶120-121; and

- That the SEC, through its inquiry into ANR's accounting in 2002, identified deficiencies that, at minimum, should have prompted KPMG to further investigate ANR's reporting and to withdraw its earlier certifications, ¶249(d).

### III.    THE HISTORY OF ANR'S FALSE AND MISLEADING FINANCIAL REPORTING

On March 15, 2000, the first day of the Class Period, ANR filed its Report on Form 10-K for 1999, which included financial statements certified by KPMG. ¶¶68, 78.  Although ANR consistently incurred losses on the Transamerica contract because the Funds Withheld at Interest did not earn enough to break even after accounting for minimum interest guarantees, ¶72, and surrender rates had accelerated far beyond what ANR had predicted when the contract was first signed,  ¶79(c), ANR reported net *income* on the contract.  ANR also actively concealed the adverse performance by reporting its income from surrender fees — an ominous indicator of surrender rates — as "other income," without disclosing its source. ¶73.  ANR did not even disclose the rate of return on the Funds Withheld; instead, it merely noted the size of the aggregate Funds and, separately, the income they earned, leaving it to investors to fit the pieces together.  This omission was striking in light of ANR's ready disclosure of the better return on its directly-held investments.  As the 1999 10-K stated, "The average yield rate earned on . . . the invested assets, *excluding Funds Withheld*, was 6.29% for the year." ¶72 n.2 (emphasis added).

Thus, the financial statements certified by KPMG within the 1999 10-K contained the false statements described above: (a) ANR misstated and underreported its liabilities; (b) misstated and underreported its policyholder expenses; (c) failed to expense its unrecoverable deferred costs; and, as a result, (d) misstated and overreported profits.  ¶¶79-80.   The presentation of earnings was also inadequate under GAAP for failure to segregate ANR's earnings and losses by life insurance and annuity segments, ¶235-237, and for failure to disclose ANR's method for revenue and expense recognition.  ¶¶218, 220.  The presentation of the Funds Withheld was inadequate under GAAP because it failed to disclose the nature and amounts of the convertible bonds and other investments. ¶¶238-241. These latter deficiencies were particularly

material in light of the other false statements contained in the Form 10-K that minimized the risks associated with ANR's financial performance, *e.g.*, (a) the false claim that profitability depended on interest spreads rather than the equity markets; (b) the false denial of the existence of market risk on the Funds; and (c) the false denial that ANR held embedded derivatives. ¶¶70, 74-75, 76. Despite these flaws, KPMG represented that ANR's financial statements "present[ed] fairly, in all material respects, the financial position of the Company [and] the results of [] operations and cash flows," ¶78, that the statements complied with GAAP, and that KPMG's audit had been conducted in accordance with GAAS.

In its quarterly filings on Form 10-Q in 2000, ANR continued in the same manner, claiming profits on the contract despite its failure to earn enough to break even. ¶¶85, 91, 97. These quarterly filings were reviewed by KPMG as required by Rule 10-01(d) of Regulation S-X. ¶215; 17 CFR § 210.10-01. Each quarterly filing incorporated by reference ANR's fraudulent 1999 10-K. ¶¶83, 90, 96. KPMG took no steps to withdraw its false audit opinion as required by GAAS. ¶215.

In March 2001, ANR issued its 2000 10-K, repeating the same false financial information from its earlier statements, ¶111, and offering the extraordinary representation that in accounting for its policyholder liabilities, ANR recognized an expense for any "benefit claims incurred in the period in excess of related clients' account balances and interest credited to clients' account balances." ¶112. In fact, ANR did not even collect the information it needed to recognize excess claims as expense. ¶65.

ANR's 2000 10-K indicated that the Funds had earned a return of 7.6%, ¶108, despite the fact that in the first three quarters of 2000, ANR's Funds had performed at rates well below 6.25%. ¶¶ 82, 90, 96. This startling turnaround was caused by a sudden, massive, one-time

15

liquidation of appreciated assets performed by IL Annuity at the end of the year. ¶106. IL Annuity's gimmick to boost the annual return of the Funds resulted in a return of 14.6% for the fourth quarter,[3] almost three times the rate of return for the rest of the year. These stark quarterly fluctuations were apparent to KPMG, which reviewed ANR's quarterly financial statements. ¶215. Nonetheless, ignoring the aberrational quality of these fourth quarter results, KPMG certified ANR's 2000 10-K. ¶116.

In the first half of 2001, despite continued abysmal performance of the investments in the Funds and skyrocketing surrenders, ANR reported income on the Transamerica contract in its quarterly filings, ¶¶124, 136, reviewed by KPMG, ¶215. Despite mounting evidence that the earnings ANR had earlier reported had been fictional, KPMG took no steps to investigate or withdraw its prior audit opinions as required by GAAS. ¶215. At the end of 2001, however, ANR slowly disclosed the truth to investors. First, in October, ANR finally announced that it would write down $24.7 million of the deferred costs associated with "our annuity business," although it assured investors that future write-downs would be unlikely, ¶¶140-142. Three months later, ANR announced an additional $33 million in losses on the Transamerica contract, entirely wiping out its earlier reported profits. ¶151. As would later be revealed, however, the calculations for both write-offs had been predicated on projections that the Company would, beginning the following year, achieve a 10% return on the convertible bonds underlying the Transamerica contract, ¶169, far in excess of the returns that had thus far been earned.

---

[3] The reported carrying values of investment assets did not include unrealized gains or losses. By selectively choosing to liquidate certain appreciated investments, IL Annuity "realized" and recognized the gains, which was then passed through to ANR's reporting.

In March 2002, ANR filed its 2001 10-K and informed investors that it was pursuing arbitration claims against the "cedent" whose contract had caused the losses.[4]  For the first time, ANR confessed that its annuity segment was "market and interest rate sensitive," and that minimum interest guarantee payments could cause losses if the assets failed to perform. ¶160.  But, rather than admit its dependence on the equity markets, ANR reiterated its false claim that profitability on the annuity segment was dependent on interest rate spreads.  ¶165.  The 10-K contained KPMG's certification, including KPMG's representation that it had "assess[ed] . . . significant estimates made by management," ¶168, which necessarily included estimates about future investment returns, the sufficiency of ANR's write-downs, and reserves for policyholder liabilities.  Still, KPMG took no steps to withdraw its earlier false audit opinions.

During a conference call with investors the next month, ANR President and CEO Lawrence Doyle stated that because of 3% to 3.5% minimum guarantees, ANR needed to make at least 5.5% to earn a profit —  ignoring the fact that actually, ANR needed to earn in excess of 6.25% because of the 2.75% fees charged by IL Annuity. ¶172.  At this time, the SEC began an inquiry into ANR's financial reporting. ¶261.

As was inevitable given ANR's unsupported projected returns, ANR announced a *third* write-down of deferred costs in July and August 2002, this time for $24 million.  ANR finally disclosed the unrealistic assumptions it had used earlier, and announced that to compensate for its earlier 10% projected returns, it was now projecting *zero* return for the remainder of the year. ¶184.  Nonetheless, despite the pending SEC review and the third write-down in nine months, KPMG took no steps to withdraw its earlier, false audit opinions.  In its August 2002 10-Q filed

---

[4] KPMG Bermuda falsely states that ANR disclosed from the beginning that the contract involved Transamerica and IL Annuity.  KPMG Bermuda at 6. In fact, these facts were not

with the SEC, ANR announced that it would be restating its financial results as far back as 2001 in part due to its earlier accounting on the Transamerica contract. ¶183. Unlike earlier 10-Qs, which were reviewed by KPMG, this 10-Q announced that because an SEC review was still pending, it could not be certified by the Company's accountants. ¶183. Nonetheless, KPMG did nothing to prevent the market from continuing to rely on its earlier-issued false audit opinions.

On November 19, 2002, the last day of the Class Period, ANR finally disclosed the last piece of the puzzle — the management fees imposed by IL Annuity that had made this contract a losing proposition from the beginning.[5] ANR also announced that it would restate its financial results back through all of 2000 due to two years' failure to account for minimum interest guarantee payments, and for its failure to properly write-down its deferred costs. ¶201. ANR admitted that despite its earlier denials, it did, in fact, hold embedded derivatives in its Transamerica contract, ¶204, and disclosed that the convertible bond holdings now had a market value that was $46 million *less* than the value at which they were reported on ANR's financial statements. ¶200. Finally, ANR disclosed that its financial viability was in jeopardy. ¶205.

In March 2003, ANR filed an amended 10-K for 2000 and 2001, and amended 10-Qs for the first three quarters of 2002, thus restating virtually all of its Class Period financial statements. The new 10-K contained numerous charts explaining ANR's myriad restatements, write-downs, and reclassifications, and reiterated ANR's doubts about its ability to continue as a going concern. ¶209-211. On July 2, 2003, ANR filed an amended 10-K to correct its 2002 10-K. ANR warned that the SEC might still require additional restatements. ¶214.

---

disclosed until very late in the end of the Class Period. *E.g.*, ¶¶140, 159, 178.

[5] At this time, ANR claimed the management fee was only 2.5%; later, ANR would disclose that the fee was 2.75%. ¶204.

That prediction has now come true.  On March 15, 2004, ANR announced yet *another* restatement on the Transamerica contract.  Pltf. Exh. A.  This new restatement reduced ANR's previously reported income of $33,000 for the quarter to a net *loss* of nearly $4 million.[6]

## ARGUMENT

### I.    THE COMPLAINT PROPERLY PLEADS FALSITY

#### A.    Rule 12(b)(6) and the Elements of a §10(b) Claim

To state a claim under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), a plaintiff must allege: (1) a misrepresentation or omission of material fact; (2) in connection with the purchase or sale of a security; (3) made with scienter; (4) that the plaintiff relied upon; (5) causing damages.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 230-232 (1988).  A court may only dismiss a complaint pursuant to Rule 12(b)(6) if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In assessing the Complaint, the court must accept the facts alleged as true and draw all reasonable inferences in plaintiffs' favor.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that the Complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  This statutory requirement did not

---

[6] After this restatement, ANR announced that KPMG had withdrawn as auditor, even though "there have been no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the subject matter of the disagreement in connection with its report on the Company's consolidated financial statements for such periods."  Pltfs. Exh. B.  The announcement disclosed KPMG's recommendation that ANR keep "only one set of records" for the Transamerica contract, which should be "reconciled to the reports received from Transamerica each quarter." *Id.*

change the pre-existing standard for pleading scienter in the Second Circuit. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000). Under the Second Circuit's standards, a "strong inference" of fraud may be established by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." ); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (quotations omitted).

### B.    KPMG's Certifications of ANR's Financial Statements Were False

KPMG represented that ANR's financial statements fairly presented the financial condition and results of operations (or earnings) of the Company, that the statements complied with GAAP, and that its own audits complied with GAAS. These statements were false.

### 1.    ANR's Financial Statements Did Not Fairly Present the Financial Condition and Earnings of the Company

The Complaint alleges a complete breakdown in the financial accounting for a $1.6 billion contract that constituted between 45% and 97% of ANR's liabilities to policyholders during the Class Period. ANR's financial statements suffered from the following flaws:

- Due to poor investment returns, high surrender rates, and liabilities imposed under state law, losses were being incurred on the contracts – instead of reporting these losses, ANR falsely reported *profits* on the contract until halfway through the Class Period, ¶¶79, 85, 91, 97, 111, 124, 136;

- ANR failed to account for obligations due to policyholders under state law, or the associated expenses for these obligations, ¶64;

- ANR improperly accounted for minimum interest payments actually made to surrendering policyholders, resulting in understated expenses and liabilities, ¶65;

- There was no disclosure of the nature or amount of the underlying assets in the Funds, allowing ANR to conceal their deterioration in value, and to falsely represent: (1) that profitability was dependent on *interest rates*, rather than highly volatile *equity* markets; (2) that it did *not* hold embedded derivatives; (3) that there were *no* market risks associated with the Funds, *e.g.* ¶79; and

- ANR did not disclose its methods for recognizing revenue, and accruing and estimating expenses incurred on the Transamerica contract, leaving investors in the dark as to ANR's method for reporting income or loss, ¶¶218, 220.

ANR, by its multiple restatements, conceded that its original financial statements were false.[7] After three write-downs in nine months, ANR announced in July 2002 that it would restate its finances back through 2001 to correct accounting for embedded derivatives. ¶179. One month later, ANR announced that the restatement would also alter the Transamerica accounting. ¶183. Three months later, ANR announced that it would restate its Transamerica accounting back through 2000. ¶195. In April 2003, ANR filed its 2002 10-K, only to restate it three months later, while warning investors that further restatements might follow. ¶220. The latest Transamerica restatement was filed 6 weeks ago. Pltfs. Exh. A. KPMG did not voice disapproval for any of these restatements.

Despite these admissions that ANR's accounting for the Transamerica contract was false, KPMG Bermuda seeks to have this Court find, as a matter of law, that ANR's financial statements complied with GAAP, and that in so approving these statements, KPMG complied with GAAS. KPMG Bermuda includes most of these "falsity" challenges within the "scienter" portion of its brief, because, it argues, the lack of accounting violations necessarily means a lack of scienter. To make these arguments, KPMG Bermuda rewrites and then disputes Plaintiffs' claims. But "[p]laintiffs are the master of their complaint and neither this Court nor the defendant have the right to redraft the complaint to include new claims." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332 (S.D.N.Y. 2003).

---

[7] Indeed, Accounting Principles Board ("APB") Opinion No. 20 states that *errors* in accounting are distinguishable from mere changes to accounting *estimates* – and only the former merit a restatement. APB Op. No. 20 ¶¶13, 31.

### 2. ANR Misstated its Financial Statements by Failing to Recognize Liabilities to Policyholders Imposed by State Law

It should take no recitation of complicated accounting standards for it to be evident that if a corporation fails to accrue for liabilities it is *required* to pay by state law, the corporation's financial statements will not "present fairly, in all material respects, the financial position of the Company . . . and the results of their operations and cash flows" (as KPMG's opinion certifying ANR's financial statements provided, ¶¶78, 116, 168). Indeed, failure to report known, guaranteed obligations violates the basic tenets of GAAP, that financial reporting should be relevant and reliable, complete, should present an accurate picture of the enterprise's financial condition, and should include all material items. ¶219.

KPMG Bermuda nonetheless declares that ANR's failure to accrue for these liabilities *at all* – or even to disclose their existence to investors as a contingent liability -- was proper, and argues that Plaintiffs have misinterpreted the relevant insurance industry accounting rules. Compliance with GAAP is a factual question that is inappropriate for resolution on motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997); *SEC v. Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999). Because, for the reasons above, Plaintiffs "have pled enough to provide a reasonable basis to infer that [ANR] indeed materially overstated its revenue" (or, in this case, profits) through improper accounting, falsity is properly alleged. *In re Vivendi Univ. S.A. Sec. Litig.*, 2003 U.S. Dist. LEXIS 19431, at *55 (S.D.N.Y. Nov. 3, 2003).

Even if KPMG's paragraph-by-paragraph analysis of a particular accounting standard known as FAS 97 could be considered at this stage of litigation, its flaws are clear. Although various insurance accounting provisions may provide alternative ways to reflect increased policyholder obligations (e.g., by increasing expenses through DAC write-offs or by creating policyholder reserves), *none* embrace the accounting theory espoused by KPMG – *i.e.*, that

22

amounts currently due to policyholders (as the "cash surrender value" imposed by state law) can simply be ignored by hoping that, in the future, the performance of the company's investments will magically improve and render the state-imposed obligations moot. There are no estimates or matters of "judgment" involved in calculating what ANR currently owed – it simply did not perform the calculations.

Unsurprisingly, this common-sense notion – that ANR was required to account for its known liabilities – has been codified as a fundamental accounting standard known as SFAS 5, with general application across industries. SFAS 5 requires that the reporting entity recognize a loss when a liability has been incurred and its amount can be determined. ¶221. Similar requirements are imposed by FASB Interpretation No. 14. ¶222. Although KPMG Bermuda argues that Plaintiffs have misinterpreted FAS 97, KPMG Bermuda at 18-20, nowhere does KPMG Bermuda challenge these *other* GAAP provisions cited in the Complaint, which are basic to GAAP. ANR has admitted that it simply did not account for, or disclose, these guaranteed obligations *at all* – even as "contingent" liabilities. ANR Answer ¶241.[8] At bottom, then, Plaintiffs have alleged facts that, if true, demonstrate that ANR misstated its income through improper accounting. *See Vivendi*, 2003 U.S. Dist. LEXIS 19431, at *55.

### 3. GAAS Required KPMG to Collect and Review Critical Audit Evidence

GAAS forbids an auditor from issuing an unqualified audit opinion if the auditor is unable to obtain sufficient evidential matter to perform audit procedures. ¶242(a). As ANR

---

[8] Even if ANR's financial statements complied with GAAP – which they did not –financial statements that technically comply with GAAP requirements may still be misleading and actionable under the securities laws. *See In re Global Crossing Ltd. Sec. Litig.*, 2004 U.S. Dist. LEXIS 5040, at *56 (S.D.N.Y. Mar. 23, 2004); *see also United States v. Simon*, 425 F.2d 796, 805-806 (2d Cir. 1969) (compliance with GAAP is not a defense to knowing misrepresentation or knowing involvement in a fraudulent scheme).

admitted, it did not obtain from Transamerica sufficient information for it to determine the amounts of its payments for minimum interest guarantees to the surrendering policyholders. ¶202.  Such information was critical both to enable ANR to accurately report its expenses and liabilities, and also to permit ANR to create accurate projections of the overall profitability of the Transamerica contract so that it could determine whether, and to what extent, its deferred costs could not be offset by profits.  ¶242. KPMG certified ANR's financial statements knowing that it lacked this critical data, and despite its own representation to investors that it had "examin[ed], on a test basis, evidence supporting the amounts and disclosures in the financial statements." ¶¶78, 116, 168.  KPMG's certification of ANR's financial statements without any qualification for the "scope limitation" on its audit was false.

KPMG Bermuda contends that there was nothing improper about its failure to collect information about ANR's minimum interest guarantee payments, because, in KPMG Bermuda's words, "[a]ssuming arguendo that there was some risk that surrender rates would be much higher than anticipated and that investment performance would be much lower, plaintiffs have alleged no facts showing that the risk of these events occurring was significant." KPMG Bermuda at 15. This argument is unfathomable.  Plaintiffs have alleged not only that the risk was significant, but that it *actually occurred*.  Starting in mid-1999, surrender rates shot to virtually unmanageable levels, ¶66; ANR Answer ¶67, and the Funds only performed at an acceptable rate in a single quarter during the entire Class Period (and then only due to a one-time liquidation of investments).  These facts were reported to ANR each month by Transamerica.  Even if failure to collect basic evidence of ANR's liabilities would have been acceptable under other circumstances – which it was not – the risk of misstatement was overwhelming once the high

surrender rates and low returns manifested themselves nine months *before* the Class Period.  The SEC, too, found the failure to collect such evidence extraordinary.  ¶65.

### 4.  Falsely Reported Profits and Delayed Disclosure of Losses

Until October 2001, ANR reported profits on the Transamerica contract every quarter and every year, despite adverse experience with high surrender rates and low investment returns.  ANR's delay in reporting losses rendered its financial statements (certified by KPMG) false.

KPMG Bermuda insists that the timing of a write-off is a matter of professional judgment, and that no GAAP violation can be established by the fact that a write-off occurred later rather than earlier.  KPMG Bermuda at 12.  This Court has already rejected similar arguments made by the other defendants, *see* Docket Entries 112, 117, and 119, and KPMG Bermuda offers no reason why the outcome should be any different now.  As Plaintiffs argued in their original briefing, the Second Circuit has explicitly held that a large write-off gives rise to an inference that the corporate financial reports were inflated prior to that time.  *Scholastic*, 252 F.3d at 73; *see also Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995).  Although such decisions involve professional judgment, like any other accounting judgment, there is a range of reasonableness outside of which they may not stray.  *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001)  ("Undoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness will surely be the focus of any trial of this case.").  Here, KPMG's certification of ANR's financial statements despite ANR's adverse experience was far outside the bounds of permissible judgment, and was therefore false and misleading.

**5.    ANR's Baseless Projected Returns Rendered its Statements**
**False and Misleading**

Even after ANR announced losses on the Transamerica contract, it avoided disclosing the

full extent of the damage by repeatedly projecting unprecedented convertible bond returns of

10%.  The manipulation of its projections to minimize losses violated rendered its financial

statements false and misleading -- which, by its own admission, KPMG knew, since it

"assess[ed] . . . significant estimates made by management," ¶¶78, 116, 168.  As this Court has

already held, *see* Docket Entry # 117, the fact that "professional judgment" is exercised in

preparing estimates does not insulate them from claims for securities fraud.  *See Novak*, 216 F.3d

at 312 (rejecting argument that defendants' failure to take write-downs "supported nothing more

than an inference that the managers of AnnTaylor disagreed over matters of business judgment").

In this instance, the decision to use projected 10% returns that bore no resemblance to the actual

performance of the investment portfolio is precisely the sort of unreasonable judgment that

renders statements false and misleading.

KPMG Bermuda asks this Court to take judicial notice of historical bond prices as part of

its argument that a 10% projected return was not unreasonable.  KPMG Bermuda at 14 n.9.  Such

notice is manifestly improper on a motion to dismiss.  Although the Second Circuit permits

courts to take notice of documents integral to the complaint, *Chambers v. Time Warner*, 282 F.3d

147, 153 (2d Cir. 2002), documents that are required to be filed and are actually filed with the

SEC, *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000), and well-publicized stock prices,

*Ganino*, 228 F.3d at 166 n.8, KPMG Bermuda cites no authority for the proposition that a nine-

year index is judicially noticeable.  KPMG Bermuda does not explain what the index is, how it is

constructed, or why its factual accuracy should be accepted by this Court.

Moreover, KPMG Bermuda's argument – that ANR's projected returns were reasonable because two year old bond data showed higher performance – ignores the reality that ANR faced. KPMG Bermuda faults the Complaint for failure to allege "any comparable performance data that KPMG Bermuda supposedly disregarded" when ANR adopted the 10% projections. KPMG Bermuda at 14. On the contrary, Plaintiffs *have* alleged comparable performance data – the *actual experience* that ANR had experienced with the bonds for *two years* prior to its decision to use 10% projections. Such "performance data" is facially more relevant than KPMG Bermuda's Index, especially as KPMG Bermuda has offered no reason to believe that ANR's holdings were in any way similar to the Index as a whole.[9] In the years since ANR signed the contract with Transamerica, its bonds had performed at singularly poor rates, nowhere near approaching the 1990's rates of KPMG's Index. ANR was not permitted to disregard its own actual experience and use two-year-old data from a different set of securities when calculating its losses. *See Helwig v. Vencor Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc) (fraud may be inferred from "disregard of the most current factual information before making statements"). On KPMG's motion to dismiss, the 10% projected return must be seen as baseless – particularly when ANR itself promised that DAC amortization was based on "historical" experience. ¶¶71, 105, 163.

Additionally, it can hardly be supposed that the 10% projections were reasonable when they were used repeatedly during the Class Period, only to be revoked, and then employed *yet again*. ANR used the 10% projections in October 2001, and, when its investments failed to perform at that rate, announced additional write-downs in January 2002. Nonetheless, it chose

---

[9] In fact, ANR revealed at the end of the Class Period that the bonds' value had drastically deteriorated from even their carrying value on ANR's books, ¶200, demonstrating that projected returns of 10% were particularly unrealistic. ANR was able to conceal this deterioration by its failure to disclose the contents of the Funds, thus violating GAAP requirements. ¶¶238-241.

the same 10% projections in January 2002, only to announce another write-down in July 2002 when its investments again failed to meet those projections.  Repeated write-downs in a short space of time are another hallmark of fraud. *Cf. LC Capital Partners, LP v. Frontier Ins. Group*, 318 F.3d 148, 155 (2d Cir. 2003) (rapid series of charges raises sufficient inference of fraud to trigger statute of limitations); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (fraud inferred from repeated enlargement of reserves).

### 6.    Additional False Statements

*First*, KPMG endorsed ANR's repeated representation that it did not hold embedded derivatives. *E.g.*, ¶¶76, 115.  In fact, as ANR admitted at the end of the Class Period, it did hold embedded derivatives in the Funds Withheld at Interest due to the convertible bonds underlying the Transamerica contract.  ¶204.[10]

In an attempt to reframe this case as one involving complex and novel interpretations of accounting literature, KPMG Bermuda irrelevantly discusses an accounting standard known as FAS 133 to argue that these statements were not false.  Because of a grandfather clause, FAS 133, which deals with methods for valuing embedded derivatives, did not apply to the Transamerica contract during the Class Period, and Plaintiffs do not allege that it did.  Instead, Plaintiffs allege that ANR committed fraud by denying that it held embedded derivatives *at all*. *E.g.*,¶79(g).   KPMG Bermuda does not dispute that the definition of an embedded derivative was well-settled prior to the beginning of the Class Period; thus, there can be no doubt that when ANR claimed it did not *have* embedded derivatives, these statements were just untrue, especially in light of its later admission that it *did* hold embedded derivatives, ¶204.

---

[10] The heavy concentration of convertible bonds was not revealed until August 2002, ¶184.

*Second*, GAAP requires that business "segments" be reported separately to facilitate investor comprehension.  KPMG Bermuda concedes that a business segment is defined by reference to how results are reviewed and analyzed by corporate officials.  KPMG Bermuda at 22.  Doyle admitted that he reviewed the life and annuity segments separately.  ¶171.  Thus, ANR violated GAAP by reporting the life and annuity segments together.

KPMG Bermuda argues that although Doyle admitted that he reviewed results on a segmented basis in 2002, no inference can be drawn that he did so prior to that time.  To the contrary, as is clear from ANR's 10-Ks, the life and annuity segments received different accounting treatment and operated on distinct economic models.  *E.g.*, KPMG Bermuda Exh. 6 (contrasting two lines); Exh. 7 (discussing different accounting policies).  Thus, they must necessarily have been reviewed separately.

*Third*, ANR violated accounting standard FAS 115 and 17 C.F.R. §229.305 with respect to the Funds Withheld.  Both require that a corporation disclose the categories of investments it holds, and to compare the carrying value of the investments to the investments' actual market value.  ¶238.  ANR only complied when required to do so by the SEC, thus disguising its convertible bond holdings and their deterioration in value.  ¶¶200, 262.

KPMG Bermuda argues that FAS 115 did not apply to the Funds Withheld, because FAS 115 applies only to directly held investments, and not to "receivables."  In KPMG Bermuda's view, because the Funds were structured as a "receivable" owed to ANR by Transamerica (and to Transamerica by IL Annuity), no disclosure was necessary.

KPMG Bermuda's argument invites fraud.  ANR explained in its Amended 2001 10-K that, economically, it absorbed all of the benefits – and bore all of the risks – inherent in ownership of the investments underlying the Funds.  KPMG Bermuda Exh. 8 at 3.  Though ANR

29

classified the Funds as a "receivable," in fact, there were none of the credit risks (i.e., risks that IL Annuity or Transamerica could not pay) that are ordinarily associated with a receivable. KPMG Bermuda Exh. 8 at 13-14.   In other words, ANR's classification of the Funds as a "receivable" rather than an "investment" was nothing but an accounting formality to avoid full disclosure to investors – hence the SEC's requirement that ANR restate its financial statements and comply with FAS 115.  ANR's failure to apply FAS 115 was therefore improper, and KPMG's blessing of the arrangement violated both GAAP and GAAS.  ANR's failure in this regard was all the more damaging to investors because, while concealing the true nature of the Funds and their deterioration in value, ANR affirmatively lied about the Funds to investors by representing that: (1) there were no market risks inherent in the Funds; (2) ANR did not hold embedded derivatives; and (3) ANR's earnings on the Funds were dependent on interest rate spreads (rather than appreciation in the equity markets).

## II.    THE AUDIT OPINIONS ARE ATTRIBUTABLE TO KPMG USA

### A.    KPMG USA Issued the False Audit Opinions

KPMG USA argues that, under *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998), it is not responsible for KPMG Bermuda's audits.  *Wright* has no application to this case.

In *Wright*, the Second Circuit interpreted the scope of liability under the federal securities laws in the wake of the Supreme Court's decision in *Central Bank, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which eliminated aiding-and-abetting liability under §10(b).  In *Wright*, statements contained in a corporate press release were not attributable to an outside auditor who was alleged to have reviewed them because the release had been disseminated "without a whisper" of the auditor's involvement.  *Id.* at 176.  The Second Circuit concluded that, under these circumstances, there was "no basis" for the plaintiff's claim that the auditor "had endorsed the accuracy" of the press release.  *Id.* at 175.

30

*Wright* has been refined in the context of statements by related entities. When *related* or *affiliated* entities work together to issue false statements, *both* will be held liable for them, even if the statement was only formally attached to one. *Scholastic*, 252 F.3d at 75-76. In *Scholastic*, a corporate vice president was responsible for false statements issued under the corporate name because he was involved in "drafting, producing, reviewing and/or disseminating" them. *Id.*; *see also Vivendi*, 2003 U.S. Dist. LEXIS 19431, at *92-*96 (CFO is liable for corporate financial reports not specifically attributed to him).

The same principle holds for affiliated auditors operating under a common name. In *In re Global Crossing Ltd. Sec. Litig.*, 2004 U.S. Dist. LEXIS 5040, at *56 (S.D.N.Y. Mar. 23, 2004), after exhaustive analysis of *Central Bank* and *Wright*, the court concluded that "absolving an auditor who prepares, edits, and drafts a fraudulent financial statement knowing it will be publicly disseminated simply because [it was signed by another, affiliated auditor] would stretch *Central Bank*'s holding too far." *Global Crossing*, 2004 U.S. Dist. LEXIS 5040, at *30 (alteration in original). Here, the Complaint alleges that KPMG USA and KPMG Bermuda worked jointly to prepare ANR's financial statements and complete the audits, ¶¶257-265; and they worked under the name "KPMG" without any qualification, ¶28. Nothing in *Wright* requires that KPMG USA be absolved of responsibility for the false statements merely because the address of KPMG in Bermuda appears in the signature block beneath the name "KPMG."

KPMG USA directs the court's attention to *In re Lernout & Haupsie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002), which was extensively discussed and relied upon in *Global Crossing*. *Lernout* supports Plaintiffs' position. *Lernout* involved a suit against KPMG USA, KPMG UK, KPMG Belgium, and KPMG Singapore, and, because different facts were alleged against each, the court considered the claims against each separately. *See Lernout*, 230 F. Supp.

31

2d at 163-169, 171. KPMG Belgium had issued the audit opinions, and the other KPMG

affiliates were alleged to have participated to a greater or lesser extent. After analyzing both

*Central Bank* and *Wright*, *see id.* at 160-163, the *Lernout* court held that an auditor would be

liable for a false statement if it played a "substantial role" in conducting audits, and the audits

were ultimately issued under the name of an affiliated office working under a common

trademark. 230 F. Supp. 2d at 168. Just as in *Global Crossing*, the court stated that to absolve

the auditor of responsibility under such circumstances would "stretch *Central Bank*'s holding too

far." *Id.* The court went on to conclude that, based on the facts alleged, the plaintiffs had shown

that KPMG UK *had* played such a role, *id.*, but that KPMG Singapore had not, *see id.* at 171.

Here, the Complaint alleges far more involvement by KPMG USA than was rejected in

*Lernout* against KPMG Singapore. KPMG USA partner James Butler was part of the KPMG

audit team, ¶261, KPMG USA audited ANR's U.S. subsidiaries, ¶29, KPMG USA instructed

ANR in its DAC amortization and loss recognition testing, ¶¶259-260, and KPMG USA

represented KPMG during the SEC investigation of the ANR audits, ¶¶261, 264.[11] KPMG USA

controlled KPMG Bermuda's audits through its DPP, and controlled KPMG's decision not to

withdraw KPMG's audit opinions, ¶264 (despite KPMG's duty to withdraw false certifications

to prevent further reliance by the investing public, *see Wright*, 152 F.3d at 177; *Wafra Leasing

Corp. 1999 A-1 v. Prime Capital Corp.*, 247 F. Supp. 2d 987, 996 (N.D. Ill. 2002)). The audits

were attributed to KPMG generally, with no qualifying language, ¶28, and at the beginning of

the Class Period, KPMG's marketing materials described KPMG as a single "international public

---

[11] Indeed, XL Capital, Michael Esposito, and Brian O'Hara have filed cross-claims against
KPMG USA regarding its audits of ANR. ANR, Doyle, John Burke, and Frederick Hammer
have each asserted the affirmative defense of reliance on "KPMG" (with no qualification) that
ANR's financial statements – including its quarterly reports – complied with GAAP.

accounting and consulting firm." ¶5.  Finally, it was the participation of KPMG USA in the U.S.

American Institute of Certified Public Accountants ("AICPA") SEC Practice Section that

allowed KPMG Bermuda, without additional qualification, to audit the financial statements of

public companies. ¶25.  KPMG USA's involvement was "substantial enough that s/he may be

deemed to have made the statement," *Global Crossing*, 2004 U.S. Dist. LEXIS 5040, at *29, and

that justifies holding it liable as a primary violator for statements issued under the trademark

"KPMG." *See id.*; *Lernout*, 230 F. Supp. 2d at 168.

### B.    KPMG USA is Liable as a Joint Venturer with KPMG Bermuda

KPMG USA is liable as a joint venturer with KPMG Bermuda with respect to the ANR

audit engagement.  *Central Bank* did not eliminate traditional agency liability.  *See Suez Equity

Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-101 (2d Cir. 2001); *accord AT&T v.

Winback & Conserve Program*, 42 F.3d 1421, 1430-1431 (3d Cir. 1994).  Joint venturers are

each agents of the other, and liable for acts taken in furtherance of the joint venture. *See

Weissman v. Seiyu*, 2000 U.S. Dist. LEXIS 509, at *20 (S.D.N.Y. Jan. 14, 2000).

One auditor may be liable for the acts of an affiliate where the two have established an

agency relationship.  In *Cromer Finance Ltd. v. Berger*, 245 F. Supp. 2d 552 (S.D.N.Y. 2003),

Judge Cote held that plaintiffs had submitted sufficient evidence to create an issue of fact as to

whether the Bermuda branch of Deloitte & Touche had acted as an agent of the international

Deloitte branch.  *See id.* at 562.  Judge Cote thus allowed claims to proceed against the

international entity based upon false audit opinions issued by Deloitte Bermuda.  *See id.*

In New York, a joint venture "has been variously defined as an association to carry out a

single business enterprise for profit; a common enterprise for mutual benefit; [and] a

combination of property, efforts, skill and judgment in a common undertaking.  Common indicia

of a joint venture are: (1) the intent of the parties to form a joint enterprise; (2) joint control and

management of the business; (3) a sharing of profits and losses; and (4) a combination of property, skill or knowledge." *Sound Video Unlimited v. Video Shack*, 700 F. Supp. 127, 139 (S.D.N.Y. 1988) (quotations omitted). Here, the Complaint alleges that KPMG Bermuda and KPMG USA combined their skills and resources to jointly audit ANR's financial statements. ¶¶29, 257-265. For Rule 8 purposes, the Complaint adequately alleges that KPMG USA jointly ventured with KPMG Bermuda to conduct the ANR audits.

     **C.    KPMG USA Participated in a "Scheme to Defraud"**

*Wright* addresses the scope of liability under Rule 10b-5(b), but even if KPMG USA did not "speak" under *Wright*, it is still subject to primary liability under Rule 10b-5(a) and Rule 10b-5(c), which forbid the use of a "any device, scheme or artifice to defraud," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit" in connection with the purchase or sale of a security. 17 C.F.R. §240.10b-5(a), (c). To state a claim under subsections (a) or (c), the plaintiff must allege that the defendant "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." *Global Crossing*, 2004 U.S. Dist. LEXIS 5040, at *40. "[A] cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a scheme, even absent a fraudulent statement by the defendant." *Id.* at *37-*38; *see also SEC v. U.S. Envtl, Inc.*, 155 F.3d 107 (2d Cir. 1998); *In re Enron Corp. Secs. Litig.*, 235 F. Supp. 2d 549, 577 (S.D. Tex. 2002). In *Global Crossing*, the court held an outside auditor liable under subsections (a) and (c) for developing accounting structures used to create false financial statements. *See id.* at *40-*44.

KPMG USA played a major role in the audits of ANR, particularly with respect to the accounting for the Transamerica contract. Much of the false actuarial work may be attributed to Richard Browne, the actuary in KPMG USA's Chicago office. ¶¶246, 259-260. KPMG USA

"issued" the clean audit opinion jointly with KPMG Bermuda.  Taken singly or in combination, these are "manipulative or deceptive acts" taken "in furtherance of a scheme to defraud."

## III.    THE COMPLAINT PROPERLY ALLEGES SCIENTER

Recklessness is pled where plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308. "[A]llegations of recklessness [are also] sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Id.*  In the case of an outside auditor, the Complaint must raise the inference that the "accounting practices were so deficient that the audit amounted to no audit at all, or [to] an egregious refusal to see the obvious, or to investigate the doubtful."  *In re Oxford Health Plans*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999).  Allegations of recklessness are considered in their entirety.  *See Rent-Way*, 209 F. Supp. 2d at 511; *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 484-485 (E.D. Va. 2002).

KPMG argues that Plaintiffs have not pled scienter because Plaintiffs have not adequately pled the existence of false statements (via GAAP and GAAS violations).  As discussed above, this is simply not true.  Widespread GAAP violations, spanning a prolonged period of time, coupled with auditors who are alleged to have access to financial data and who have long-term relationships with their audit clients, give rise to an inference of scienter.  *See In re Health Mgmt. Sec. Litig*, 970 F. Supp. 192, 202-203 (E.D.N.Y. 1997); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1345-1346 (S.D. Fla. 1999); *MicroStrategy*, 115 F. Supp. 2d at 652-653.  That is precisely the situation here.

A.    **KPMG Was Aware of the Undisclosed Facts Rendering ANR's Financial Statements False and Misleading**

Recklessness is pled where plaintiffs "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. This Court has, on three separate occasions, concluded that scienter was properly pled where Plaintiffs showed knowledge of the false or undisclosed facts alleged here. Because KPMG had knowledge of the facts and omissions alleged, scienter is properly pled against KPMG. *See In re Colonial P'ship Litig.*, 896 F. Supp. 250, 257 (D. Conn. 1995) (because allegations properly pled scienter against corporation, same allegations plead scienter against outside auditor).

By its own admission, KPMG examined "evidence supporting the amounts and disclosures in the financial statements," and "assess[ed] the accounting principles and significant estimates made by management." ¶¶78, 116, 168. As part of any audit, KPMG was required to test ANR's policyholder reserves and significant estimates, ¶251, and to test ANR's assumptions about its ability to recover its deferred costs on the Transamerica contract, ¶246. KPMG USA used its own actuary to evaluate ANR's assumptions about the recoverability of its deferred costs, and to instruct ANR as to how to amortize those costs. ¶246. These procedures were of critical importance because of the sheer size of the Transamerica contract – representing 83% of ANR's assets and 97% of its liabilities at the end of 1999. ¶21. *See Rent-Way*, 209 F. Supp. 2d at 507 (auditor required to investigate "second largest category of expenses"); *Jacobs v. Coopers & Lybrand, LLP*, 1999 U.S. Dist. LEXIS 2102, at *16 (S.D.N.Y. Feb. 26, 1999) (auditor required to scrutinize item representing 32% of company's assets). Under such circumstances, there can be no doubt that KPMG was fully aware of the accounting practices employed by ANR. Indeed, KPMG Bermuda does not even dispute that Plaintiffs have properly pled that it

36

was aware of these accounting practices. Thus, Plaintiffs have shown "knowledge of facts or access to information contradicting [] public statements." *Novak*, 216 F.3d at 308.

KPMG Bermuda contends that Plaintiffs must meet a "particularly high hurdle" to plead scienter against an outside auditor. KPMG Bermuda at 9. Although in *Rothman*, a claim against an auditor was dismissed despite an inference of scienter against the corporation itself, in that instance, the court reasoned that different standards for auditors and "insiders" was appropriate because auditors might not be aware of all of the facts available to insiders. *See* 220 F.3d at 98. Here, by contrast, the issue does not arise: the infirmities in ANR's accounting are so fundamental that they could not be missed by an auditor conducting any audit at all.

Indeed, even as KPMG Bermuda argues that its awareness of various facts does not add up to an inference of scienter, KPMG Bermuda entirely *ignores* many of Plaintiffs' critical allegations from which KPMG's knowledge is necessarily imputed. Nowhere does KPMG Bermuda even address the Complaint's allegations that it was aware of the low investment returns on the convertible bonds and other investments reported each month by Transamerica, the high surrender rates, ANR's obligations to policyholders under state law, ANR's false representations to be free from market risk, ANR's claim to have earned profits even as its income from the bonds did not cover its state-imposed liabilities, the suspicious retirement of Atkin, or Doyle's false claim that ANR needed only a 5.5% return to earn a profit.

KPMG USA argues that the Complaint is deficient for failing to allege its role in the fraud and its scienter with sufficient particularity under Rule 9(b) and the PSLRA. Plaintiffs have specifically alleged the key role of numerous KPMG USA personnel in the audits, including a KPMG USA partner (James Butler) who served as one of the auditors, and a KPMG USA actuary who addressed the amortization of the deferred costs on the Transamerica contract.

37

As at least 4 members of the DPP of KPMG USA reviewed the SEC's comments challenging the accounting for the Transamerica contract and assumed control over the decision whether to withdraw earlier audit opinions, KPMG USA undeniably "knew" the facts that rendered its opinions misleading.  Scienter is pled against KPMG USA for the same reason it is pled against KPMG Bermuda – KPMG USA's participation in the audit of the accounting for the Transamerica contract gave it the same access to information, and thus, the same degree of recklessness.  Such particularity was sufficient to plead scienter against the corporate insiders, and therefore should be sufficient against KPMG USA.  *See Carley Capital Group v. Deloitte & Touche LLP*, 27 F. Supp. 2d 1324, 1340 (N.D. Ga. 1998) (scienter inferred in part because "the allegations in the Amended Complaint [against auditor] are at least as specific and particular" as those in the action against the corporation that survived a motion to dismiss).  Moreover, it is not necessary for Plaintiffs, pre-discovery, to plead additional facts that are uniquely within the control of the auditor.  *See Danis v. USN Comm.*, 73 F. Supp. 2d 923, 942 n.11 (N.D. Ill. 1999); *In re The Leslie Fay Co. Inc. Sec. Litig.*, 835 F. Supp. 167, 174 (S.D.N.Y. 1993).

### B.    GAAP and GAAS Violations of the Type and Magnitude Alleged Contribute to the Inference of Scienter

Numerous courts have recognized that GAAP violations may themselves be evidence of scienter against outside auditors when considered in conjunction with surrounding circumstances.  As the court explained in *MicroStrategy*, "[W]hile it is true that it cannot be *strongly* inferred from bare allegations of a GAAP violation or a restatement of financials that a defendant acted recklessly . . . it is not true that nothing can be inferred from those facts at all or that specific attributes of a GAAP violation may give rise to a stronger, or weaker, inference of scienter."  115 F. Supp. 2d at 635; *see also Oxford Health Plans*, 51 F. Supp. 2d at 295 (allegations of "magnitude of the misstatements, the specific GAAP and GAAS violations, and

the 'red flags' together support an inference" of scienter (quoting *In re First Merch. Acceptance Corp. Sec. Litig.*, 1998 U.S. Dist. LEXIS 17760, at *32-33 (N.D. Ill. Nov. 2, 1998)); *Health Management*, 970 F. Supp. at 203; *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 511 (W.D. Pa. 2002); *Danis*, 73 F. Supp. 2d at 941-942. Allegations of GAAP and GAAS violations carry significant weight when plaintiffs specifically allege *how* the standards were violated, *see, e.g.*, *Leslie Fay*, 835 F. Supp. at 175 n.3; *Rent-Way*, 209 F. Supp. 2d at 507; *Sunbeam*, 89 F. Supp. 2d at 1345-1346; *In re IKON Office Solutions*, 66 F. Supp. 2d 622, 633 (E.D. Pa. 1999), as has been done here.

### 1.    The Obviousness of the Fraud Suggests Scienter

Plaintiffs have alleged violations of the most basic and simple accounting principles: (1) ANR should have, but did not, account for liabilities to policyholders imposed by state law, and (2) ANR should have, but did not, report losses on a contract that failed to earn investment returns sufficient to offset costs. KPMG's certification of ANR's financial statements – and its refusal to withdraw its audit opinions despite mounting evidence of their falsity and a continuing duty to do so, *see Wright*, 152 F.3d at 177 – gives rise to an inference of scienter. *See In re MicroStrategy*, 115 F. Supp. 2d 620, 652 (E.D. Va. 2000) (it is "common sense" that "the less complex the rules violated" the stronger an inference of recklessness).

Additionally, pursuant to federal regulation, KPMG reviewed and approved ANR's quarterly financial statements as well as its year-end financial statements. ¶215. KPMG Bermuda disputes that it can be deemed to have made a "statement" within the meaning of §10(b) in the quarterly reports (an argument refuted below), but, even if KPMG is not liable for these statements, its approval of them supports an inference of scienter. As described in the Complaint, the only reason that the Funds underlying the Transamerica contract performed sufficiently for ANR to meet the 6.25% threshold for the year 2000 was because of a sudden

spike in fourth quarter returns.  (ANR did not meet the 6.25% threshold in 1999, a fact which did

not stop KPMG from certifying ANR's financial statements, ¶79).  Nonetheless, with KPMG's

approval, ANR reported income in *each* of the three quarterly reports *preceding* that sudden

spike in 2000, and continued to report income in its first two quarterly reports of 2001.  Thus, it

may be fairly inferred that KPMG knew, or was reckless in not knowing, that the Transamerica

investment returns were being manipulated and obscured.

Scienter may also be inferred from the suspicious timing and size of the losses ANR

reported.  Just as *falsity* may be inferred from the timing and size of a write-down, so too can

*knowledge*.  *See Scholastic*, 252 F.3d at 77 (large write-offs "undermine[], at the pleading stage,

the argument that defendants were unaware of the [problems] until shortly before [announcing

the charges]"); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) ("we need not

turn a blind eye to the obvious: the proximity of the date of the allegedly fraudulent statements . .

. [to] the date on which disclosure was eventually made"); *Helwig*, 251 F.3d at 552 (inference of

scienter from "closeness in time of an allegedly fraudulent statement . . . and the later disclosure

of inconsistent information").  These inferences arise against outside auditors just as they do

against corporate "insiders."  *See Arnlund*, 199 F. Supp. 2d at 483 ("brief lapse of time between

the unqualified audit opinion and . . . total financial devastation" supports inference of scienter);

*IKON*, 66 F. Supp. 2d at 632.

The timing of ANR's write-downs suggests scienter because after reporting income on

the Transamerica contract for more than a year, ANR suddenly switched gears and wrote down

all of the profits it had thus far earned – even though neither the terms of the contract, nor ANR's

experience, had changed.  As one market analyst put it:

> This strikes us as a sudden and dramatic shift in the accounting for this business.
> The company has been booking a significant level of profits, rather than losses. . .

40

. We're somewhat perplexed about how lapse [surrender] assumptions could
change so significantly in a short period of time, particularly since management
now indicates that it has been concerned about poor persistency for two years.

¶148; *see Scholastic*, 252 F.3d at 76 (scienter inferred because of "[t]he sharp criticism from

industry analysts" after true facts were revealed).

The sheer size of the write-downs also gives rise to an inference of scienter, even against

outside auditors. *See, e.g.*, *New England Health Care Employees Pension Fund v. Ernst &*

*Young LLP*, 336 F.3d 495, 501 (6th Cir. 2003) (large-scale mistakes "strongly suggest" fraud);

*Leslie*, 835 F. Supp. at 175 (small errors might not be detected by auditor but "tidal waves of

accounting fraud" give rise to an inference of scienter); *Carley Capital Group*, 27 F. Supp. 2d at

1339; *Rent-Way*, 209 F. Supp. 2d at 506 (citing cases). All of the profits reported on the

Transamerica contract were wiped out by the end of 2001; by the end of the Class Period, ANR

warned that it might not be able to continue as a going concern. ¶211. It is simply implausible

that KPMG could have approved ANR's reports of income for the first half of the Class Period

without having acted recklessly.[12]

### 2. KPMG's Failure to Collect Critical Audit Evidence Creates an Inference of Scienter

GAAS requires that auditors pay special attention to transactions that are laden with risk,

¶¶243-244, and this contract, which made up the lion's share of ANR's business and represented

$1.6 billion in liabilities, was particularly risky. KPMG's failure to obtain evidence regarding

---

[12] KPMG argues that the "magnitude" here was insufficient to suggest scienter because the actual
amounts that ANR paid out in minimum interest guarantees were a small percentage of its
overall income. KPMG Bermuda at 10 n.5. The argument misses the point. These "small"
actual payments to those who surrendered their policies were a huge red flag that ANR's
liabilities on the remaining policies were outpacing ANR's returns on the Funds Withheld
invested assets – which is precisely why ANR was forced to take such massive write-downs on
the Transamerica contract once it acknowledged these payments, ¶202, and why KPMG's failure
to obtain information on these payments was so egregious.

the payments ANR actually made in excess of its credited values for minimum interest

guarantees was therefore a violation of GAAS. Failure to collect critical audit evidence

contributes to the inference of scienter. *See, e.g.*, *In re Worldcom Inc. Sec. Litig.*, 2003 U.S.

Dist. LEXIS 10863, at *11,*22 (S.D.N.Y. June 24, 2003); *Rent-Way*, 209 F. Supp. 2d at 507; *P.

Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 606-608 (D.N.J. 2001).

Moreover, by failing to obtain critical evidence, KPMG "failed to check information [it] had a

duty to monitor," which also creates a strong inference of fraud. *Novak*, 216 F.3d at 311.

### 3. Multiple Restatements and Unrealistic Projections Demonstrates Scienter

Restatements, like GAAP violations, may give rise to an inference of scienter –

particularly where, as here, there are *multiple* restatements in short succession. *See In re

Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *42 (N.D. Cal. Apr. 2, 2002);

*cf. LC Capital*, 318 F.3d at 155 (series of charges raises inference of fraud); *Rehm*, 954 F. Supp.

at 1256 (scienter inferred from repeated enlargement of reserves). ANR restated almost every

Class Period financial statement, and has continued to issue restatements even *after* the Class

Period. ¶214; Pltfs Exh. A. These circumstances permit the court to draw the obvious inference

that "fraud or recklessness was afoot." *MicroStrategy*, 115 F. Supp. 2d at 636-637.

Scienter may also be inferred from the 10% projected returns on ANR's convertible

bonds used to calculate (and minimize) reported losses. *See Scholastic*, 252 F.3d at 77 (scienter

pled where defendants "failed to adjust revenues" in light of historical experience); *Green Tree*,

270 F.3d at 662 (recklessness pled when plaintiffs allege that defendants knew that actual

financial performance differed from projected performance). More egregiously, ANR *repeatedly*

used the *same* projection, even after the projection was shown to be false, thus resulting in

additional losses. Each of these projections was subject to KPMG certification, or was reviewed

by KPMG before it was publicly released.  ¶215.  ANR's (and KPMG's) failure to use the recent

and representative experience on ANR's actual investment portfolio is a classic hallmark of

scienter.  *See Helwig*, 251 F.3d at 552 (scienter inferred from "disregard of the most current

factual information before making statements").

### 4.    Additional Red Flags Demonstrate Scienter

Scienter is pled when a complaint alleges "in your face facts" that "cry out, how could

KPMG not have known that the financial statements were false."  *Oxford Health*, 51 F. Supp. 2d

at 294; *Health Mgmt.*, 970 F. Supp. at 203 ("red flags should have caused [outside auditor] to

investigate further"); *Ades v. Deloitte & Touche*, 799 F. Supp. 1493, 1500-1501(S.D.N.Y. 1992).

(recklessness pled when auditor failed to investigate facts suggesting problems in accounting).

Many red flags identified in the Complaint are the sort that courts repeatedly single out as

creating a duty on the part of an auditor to investigate – and an inference of recklessness if it

does not.  For instance, auditors have a duty to be suspicious when financial results spike at the

end of a reporting period, just in time for inclusion in corporate financial statements. *See*

*MicroStrategy*, 115 F. Supp. 2d at 654; *In re Homestore.com Sec. Litig.*, 252 F. Supp. 2d 1018,

1044 (C.D. Cal. 2003); *Leslie Fay*, 835 F. Supp. at 175; *Ades*, 799 F. Supp. at 1500.  Here,

KPMG certified ANR's financial statements in 2000 – and continued to review and approve the

10-Qs in 2001, ¶215 – despite the highly aberrant fourth quarter 2000 returns on the Funds.

Similarly, a common hallmark of fraud is a reshuffling of corporate personnel.  *See, e.g.*,

*Adaptive Broadband*, 2002 U.S. Dist. LEXIS 5887, at *43; *In re McKesson HBOC Inc. Sec.*

*Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000);  *Sunbeam*, 89 F. Supp. 2d at 1338; *In re*

*Mercator Software*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001).  Here, KPMG, along with

everyone at ANR, must have been aware of serious problems in the accounting for the

Transamerica contract at the time of the sudden and bizarre resignation of ANR's CFO, William

43

Atkin.  ¶¶120-121.  Nonetheless, KPMG did not withdraw its prior certifications of ANR's financial statements and continued to endorse its reporting.

Additionally, ANR's choice to report its finances in such a way to as to disguise its performance problems served as a red flag to KPMG.  ANR not only failed to report by segment, thus disguising the performance of the annuity line, but also deliberately obscured the true yield on the Funds Withheld investments, ¶72 n.2.  ANR also concealed the significance of its high levels of income from surrender charges paid by policyholders cashing in their policies by innocuously labeling these amounts as "other income." *E.g.*, ¶73.  Scienter may be inferred when defendants "disclos[e] accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication." *Helwig*, 251 F.3d at 552.

Finally, the SEC investigation – which began as early as April 2002, ¶261-- served as a red flag to KPMG that it needed to investigate ANR's earlier reporting and withdraw its prior certifications.  *See Health Mgmt.*, 970 F. Supp. at 203 (auditor ignored "red flag" of SEC inquiry); *Oxford Health*, 51 F. Supp. 2d at 295 (regulatory investigations are red flags).

### 5.    ANR's "Disclosures" Do Not Negate the Inference of Scienter

KPMG Bermuda contends that ANR "disclosed" many of the facts relating to its accounting and, it says, these "disclosures" negate any inference of an intent to defraud.  The disclosures identified by KPMG Bermuda are either wholly inadequate to alert investors to the fraud, or are themselves not disclosures at all, but materially misleading statements.

KPMG Bermuda contends that ANR properly disclosed the sources of its income when it told investors that its annuity product line depended on ANR's ability to earn a "targeted spread between the interest rate earned on the underlying supporting asset base and the interest credited to the underlying annuity liability." KPMG Bermuda at 16.  KPMG Bermuda thus ignores the allegations in the Complaint, which make it quite clear that, by investing in convertible bonds,

ANR was *not* depending on interest rate spreads at all, but appreciation in the *equity* markets. ANR admitted as much at the end of the Class Period, ¶¶58-59. *Cf. Associated Randall Bank v. Griffin, Kubik Stephens & Thompson*, 3 F.3d 208, 211 (7th Cir. 1993) (it is material to an investor whether it is investing in bonds or in equity investments).

KPMG Bermuda points out that ANR warned that results may differ from projections, and that it might change its estimates in light of historical experience, and argues that these warnings acted as some kind of "disclosure" of the risks associated with an investment in ANR. KPMG Bermuda at 16-17. To the contrary, Plaintiffs allege that these statements were themselves misleading, because ANR was not, in fact, reevaluating the contract in light of historical experience. ANR admitted that it only "initiated a review of the recoverability of the deferred acquisition costs" in the third quarter of 2001, ¶199, and used projected returns that were *not* consonant with ANR's historical experience.

KPMG Bermuda next argues that because ANR's 1999 10-K – but not its 2000 10-K – disclosed a few facts about the annuity line, there is no inference of an intent to deceive. KPMG Bermuda observes that the 1999 10-K disclosed that the assets "included fixed income and convertible fixed income securities," and that the annuity policies contained minimum interest guarantees. KPMG Bermuda at 20. The obvious point is that these disclosures *disappeared* from the 2000 10-K, even though there had been no change in the terms of the Transamerica contract or the nature of the Funds underlying it. In fact, ANR only admitted to the existence of minimum interest guarantees in the 2001 10-K because its losses had reached the point where they could no longer be ignored. Even in the 2001 10-K (after ANR had written-down all of the profits formerly reported on the Transamerica contract) ANR still did not disclose its heavy reliance on convertible bonds. ¶169. That ANR included these (minimal) details in its 1999 10-

K, but then eliminated them from later 10-Ks, strongly suggests that ANR (and KPMG) were *intentionally* concealing the risks from investors.

Even in the 1999 10-K, ANR neutralized the impact of its disclosures with false representations minimizing the risks. Even though ANR disclosed the existence of minimum interest guarantees, ANR falsely implied that the Funds' lack of "market risk" would somehow mitigate the effect of such guarantees. ¶70. Similarly, ANR disclosed the existence of "convertible fixed income securities" within the Funds in its 1999 10-K, but this disclosure could hardly serve as a warning to investors when ANR simultaneously stated that the Funds were not exposed to market risk, ¶70, and promised that it did *not* hold embedded derivatives, ¶76.

Finally, KPMG Bermuda cannot seriously contend that any inference of scienter is negated by ANR's warning that its assumptions might turn out to be incorrect. KPMG Bermuda at 16-17, 21. Such a vague and generalized warning would not even protect forward-looking statements which are subject to safe harbor protection under the PSLRA, *see, e.g.*, *Vivendi*, 2003 U.S. Dist. LEXIS 19431, at * 83, and thus they can hardly be sufficient to negate an inference of scienter with respect to unprotected statements of historical fact.

## IV.    KPMG IS RESPONSIBLE FOR THE FALSE STATEMENTS CONTAINED IN ANR'S QUARTERLY FILINGS

Although ANR's quarterly filings did not contain new certifications from KPMG, KPMG may still be held responsible for the false statements contained therein because of its public role in reviewing and assisting in the preparation of those statements.

In *Wright*, the Second Circuit explained that an auditor would be liable for false statements contained in a client's financial statements if the auditor both made a false statement, and if the public was aware of the auditor's involvement. *See* 152 F.3d at 175. In that case, the Second Circuit refused to hold an auditor liable for the false statements contained in a corporate

46

press release that the auditor had reviewed, because the press release was disseminated "without a whisper" of the auditor's involvement. *Id.* at 176. The Court was concerned that if the speaker were not connected to the false statement in any manner prior to the "investment decision," there could be no showing that the public had "relied" on the statement. *See id.* at 175.

Here, notice to the market of KPMG's involvement was provided by federal law and public familiarity with the relationship between ANR and KPMG. Two years after *Wright*, the SEC promulgated Rule 10-01(d) of Regulation S-X. This new regulation, which took effect on the first day of the Class Period and was published in the Federal Register, *see* 64 Fed. Register 73,389 (Dec. 30, 1999), requires that all quarterly financial results be reviewed by the corporation's independent auditors. 17 CFR § 210.10-01. Thus, KPMG reviewed ANR's quarterly filings pursuant to the regulation.[13] This federal requirement is one that the investing public (including market analysts who followed ANR's performance) may be presumed to be aware for pleading purposes.[14] With this new regulation in place, the public was both aware of the outside auditor's involvement, and relied upon that involvement prior to making the investment decision. So, however true it may have been that the investing public did not know of the auditor's involvement in the *Wright* press release (and therefore could not have relied upon the auditor's review), the federal law requirement of the auditor's participation in approving quarterly reports gives rise to an inference that the investing public relied on KPMG's approval of ANR's false quarterly financial reports when making its investment decisions.

---

[13] In fact, ANR has asserted as an affirmative defense that it relied on KPMG's reviews of its quarterly financial statements to determine that the statements complied with GAAP. ANR Seventh Affirmative Defense.

[14] Indeed, if the public were unaware of the requirement, it would have been unnecessary for ANR to publicly announce that it did *not* have such approval when it filed its quarterly report in August 2002. ¶183.

*Global Crossing* applied similar reasoning to impose liability on an auditor for a corporation's quarterly filings.   In that case, after an extensive discussion of *Wright*, the court concluded that because the investing public was aware of the auditor's relationship with the client, those investors "could easily have relied on the accounting firm's involvement in making any public financial reports, even where a particular statement was not publicly attributed to it." 2004 U.S. Dist LEXIS 5040, at *33.  That fact, coupled with allegations that the auditor assisted in the preparation of false financial reports, led the court to conclude that the auditor could be held liable for false statements contained in the corporation's quarterly financial reports.  *Id.* at *34.  Because both KPMG Bermuda and KPMG USA performed the review of the accounting for the Transamerica contract (and helped ANR develop methods for amortizing its deferred costs), and because the quarterly filings incorporated by reference ANR's fraudulent 10-Ks certified by KPMG, the quarterly filings may fairly be attributed to both KPMG units.

## V.    KPMG USA IS A CONTROLLING PERSON OF KPMG BERMUDA

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), imposes liability for "controlling persons" and is a "separate inquiry from that of primary liability and provides an alternative basis of liability."  *Suez Equity Investors*, 250 F.3d at 101.  The complaint must allege the existence of a primary violation, control of the primary violator by the defendant, and, according to some decisions, culpable participation in the fraud.  *See* Docket Entry # 119 at 19.  The complaint need only supply a "short, plain statement that gives the defendant fair notice of the claim." *Id*.

Plaintiffs have pled a primary violation of §10(b) by KPMG Bermuda, for the reasons set forth above.  Plaintiffs have additionally pled KPMG USA's control over and culpable participation in KPMG Bermuda's handling of the ANR audits, its issuance of "clean" opinions, and its consent to the filing of the opinions with the SEC in the United States.

48

KPMG USA's DPP oversees compliance with SEC requirements, ¶6, and KPMG USA used its membership in the AICPA Practice Section to obtain permission for KPMG Bermuda to audit the financial statements of public companies. ¶25. KPMG USA was involved in the audits of ANR (and particularly its accounting for the Transamerica contract) prior to the Class Period, ¶259, and KPMG USA controlled the defense of ANR's reporting before the SEC, ¶¶261-264. The Complaint thus "support[s] the reasonable inference" of culpable participation, and creates the inference that "defendants possessed, directly or indirectly, the power to direct or cause the direction" of KPMG Bermuda. *Schnall v. Annuity & Life Re (Holdings)*, 2004 U.S. Dist. LEXIS 4643, *30-31 (D. Conn. Mar. 9, 2004).

KPMG USA observes that in both *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391 (S.D.N.Y. 2003), and *Lernout*, courts rejected allegations that a member of accounting firm had any control over an affiliated member. However, in both cases, the plaintiffs failed to plead *any* particular facts to demonstrate control by one entity over the other. In *Asia Pulp & Paper*, the court rejected plaintiffs' attempts to plead control based solely on general information such as firm marketing materials, explaining that, "the Amended Complaint is bereft of any allegations that AWSC, pursuant to an agreement or otherwise, was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms." 293 F. Supp. 2d at 396. In *Lernout*, there were similarly no allegations showing the authority of one member firm over another, *see* 230 F. Supp. 2d at 176.[15] Here, Plaintiffs have alleged

---

[15] Despite KPMG USA's argument that the complaint in *Lernout* was "analogous" to the one here, KPMG USA at 10, there are critical differences. There is no indication that the *Lernout* plaintiffs made any allegations that the U.S. affiliate assumed the responsibility and control for reviewing and approving opinions as in compliance with U.S. GAAP and U.S. law before filing with U.S. regulators. Here, as a result of KPMG USA's participation in the AICPA Practice Section, KPMG Bermuda automatically qualified to conduct and issue opinions that were

specific facts demonstrating the relationship of control between KPMG USA and KPMG Bermuda, particularly with respect to opinions publicly filed in the U.S.  Plaintiffs have named the individuals who were involved with, and exercised control over, KPMG Bermuda's audits, and have described the particular division within KPMG USA that mounted the defense before U.S. regulators of ANR's financial reporting and of the "KPMG" audit opinions.

## VI.    CONCLUSION

For the reasons given above, this Court should deny the motions to dismiss.  However, should this Court grant Defendants' motions in whole or in part, Plaintiffs respectfully request that this Court grant leave to amend pursuant to Rule 15(a).  Leave to amend should be "freely given."  Fed. R. Civ. P. 15(a); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

Dated:   April 28, 2004

**SCOTT + SCOTT, LLC**

_____/s/_____
David R. Scott (Juris No. 16080)
Erin Green Comite (Juris No. 24886)
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone:     (860) 537-3818
Facsimile:      (860) 537-4432

---

accepted for SEC filing.  More importantly, here KPMG USA is alleged to have actively exercised its supervisory role over opinions publicly filed in the US, both through the participation of audit partner James Butler, and by the oversight and control of several DPP members. ¶¶6, 261.

**MILBERG WEISS BERSHAD HYNES
 & LERACH LLP**
Beth Kaswan (Ct 21415)
Ann M. Lipton (Ct 25358)
One Pennsylvania Plaza
New York, NY  10119
Telephone:     (212) 594-5300
Facsimile:     (212) 868-1229

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2004, I caused a true and correct copy of

LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION TO THE MOTIONS TO DISMISS

FILED BY DEFENDANTS KPMG LLP (UNITED STATES) AND KPMG IN BERMUDA to

be served by postage prepaid, first class U.S. mail on counsel of record listed on the attached

Service List.


/s/_____
David R. Scott

**Annuity and Life Re (Holdings), Ltd. Service List**

**Attorneys for Plaintiffs**

Andrew M. Schatz
Jeffrey S. Nobel
Patrick A. Klingman
SCHATZ & NOBEL
330 Main Street
Hartford, CT 06106-1817

James E. Miller
SHEPHERD FINKELMAN MILLER &
SHAH, LLC
One Lewis Street
Hartford, CT 06103

Attorney Elias A. Alexiades
ATTORNEY ELIAS A. ALEXIADES
215 Church Street
New Haven, CT 06525

Beth Kaswan
Ann Lipton
MILBERG WEISS BERSHAD HYNES
  & LERACH
One Pennsylvania Plaza
New York, NY 10119

Marc Edelson
HOFFMAN & EDELSON
45 West Court St.
Doylestown, PA  18901

**Attorneys for Defendants**
(Also served via Facsimile)

Gary R. Battistoni
DRINKER BIDDLE & REATH
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
215-988-2700
215-988-2757 (fax)

John W. Cannavino
Karen L. Allison
CUMMINGS & LOCKWOOD, LLC
Four Stamford Plaza
107 Elm Street
Stamford, CT 06902
203-327-1700
203-351-4535 (fax)

James F. Stapleton
Kenneth W. Ritt
Terence J. Gallagher
DAY, BERRY & HOWARD, LLP
One Caterbury Green
Stamford, CT 06901
203-977-7300
203-977-7301 (fax)

Thorn Rosenthal
Tammy Roy
CAHILL GORDON & REINDEL, LLP
80 Pine Street
New York, NY 10005-1702
212-701-3000
212-269-5400 (fax)

Lawrence W. Andrea
LAW OFFICES OF
  LAWRENCE W. ANDREA
57 North Street, Suite 313
Danbury, CT 06810
860-927-3372
860-927-3375 (fax)

James T. Shearin
Peter Olson
PULLMAN & COMLEY, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT  06601-7006
203-330-2000
203-576-8888 (fax)

James K. Robertson, Jr.
John R. Horvack, Jr.
CARMODY & TORRANCE
50 Leavenworth Street
P. O. Box 1110
Waterbury, CT 06721-1110
203-573-1200
203-575-2600

Francis S. Chlapowski
Randi B. Pincus
MORGAN LEWIS & BOCKIUS, LLP
101 Park Avenue, 44th Floor
New York, NY 10178
212-309-6000
212-309-6001 (fax)

John J. Robinson
McCARTER & ENGLISH, LLP
One Financial Plaza
755 Main Street, 18th Floor
Hartford, CT 06103
860-275-6700
860-724-3397 (fax)

R. Nicholas Gimbel
McCARTER & ENGLISH, LLP
Mellon Bank Center
1735 Market Street, Suite 700
Philadelphia, PA 19103
215-979-3800
215-979-3899 (fax)

James H. Bicks
WIGGIN & DANA
400 Atlantic St., 7th Fl.
PO Box 110325
Stamford, CT 06911-0325
203-363-7600
203-363-7676 (fax)

Kelly M. Hnatt
Joseph T. Baio
Michelle J. Nadel
WILKIE, FARR & GALLAGHER
787 Seventh Ave.
New York, NY 10019-6099
212-728-8000
212-728-8111 (fax)

Frederick S. Gold
Morgan Paul Rueckert
SHIPMAN & GOODWIN
300 Atlantic St.
Stamford, CT 06901-3522
203-324-8100
203-324-8199 (fax)

Michael J. Malone
Paul A. Straus
Lisa Albert
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
212-556-2100
212-556-2222 (fax)