UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHERRY SCHNALL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANNUITY AND LIFE RE (HOLDINGS), LTD., XL CAPITAL, LTD., LAWRENCE S. DOYLE, FREDERICK S. HAMMER, JOHN F. BURKE, WILLIAM W. ATKIN, BRIAN O'HARA, AND MICHAEL P. ESPOSITO, JR.,<br><br>Defendants. | Civil Action No 03 CV 2133 (EBB)<br><br>JUNE 11, 2004 |

**LEAD PLAINTIFFS' MEMORANDUM IN FURTHER OPPOSITION TO THE
MOTIONS TO DISMISS FILED BY
DEFENDANTS KPMG BERMUDA AND KPMG USA**

On May 25, 2004, Defendants KPMG Bermuda and KPMG USA submitted Reply Memoranda of Law in further support of their motions to dismiss the Complaint filed in this action. Lead Plaintiffs respectfully submit this Memorandum in Further Opposition to the Motions to Dismiss to respond to certain arguments raised for the first time in those Reply Memoranda.[1]

**I.    KPMG Bermuda**

    **A.    KPMG Endorsed ANR's False Denial that it Held Embedded Derivatives**

As explained in the Complaint, embedded derivatives are "essentially assets whose value are dependent upon the fluctuating values of other, related assets." ¶76(g). Convertible bonds "contain embedded derivatives because the bonds' value depends, in part, on the fluctuating

---

[1] This Surreply does not address all arguments made by KPMG Bermuda and KPMG USA in their Reply Memoranda, and Plaintiffs' failure to comment on all arguments is not a concession of their validity. For instance,

DOCS\204281v1                                    1

market price of the stock of the issuing company (to which the bond is convertible at a fixed conversion price)." *Id.* Because the assets supporting ANR's Transamerica contract were 70% convertible bonds, ¶¶57-58, ANR made a false statement – blessed by KPMG – when it denied that it held embedded derivatives, *e.g.*, ¶79(g).

In its Motion to Dismiss, KPMG Bermuda recast Plaintiffs' allegations on this relatively simple point. Instead of addressing the allegation head on, KPMG Bermuda instead made reference to an accounting standard known as FAS 133, which deals with the accounting treatment of embedded derivatives. FAS 133 was modified after the Class Period, and KPMG Bermuda interpreted the Complaint to allege that ANR's financial statements were false for failing to apply the newly modified version. KPMG Bermuda then pointed out that ANR could hardly have been expected to apply an accounting standard that did not exist when its financial statements were filed. Plaintiffs responded to this argument in their opposition brief, explaining that ANR's false statement was to deny that it held embedded derivatives at all – nowhere does the Complaint allege that ANR's financial statements were false for failure to apply the modifications to FAS 133 when actually valuing its Transamerica convertible bonds.

In its Reply Memorandum, KPMG Bermuda has once again rewritten the Complaint and then offered a rebuttal to its own "straw man" argument. KPMG Bermuda now reinterprets the Complaint to allege that it was the modified coinsurance structure itself – rather than ANR's convertible bond holdings – that created an embedded derivative. KPMG Bermuda then argues that when FAS 133 was modified, this was the first time that "modified coinsurance agreements [were] deemed to contain embedded derivatives." KPMG Bermuda Reply at 4. Because modified coinsurance arrangements – which is the type of contract ANR had with Transamerica

---

contrary to KPMG Bermuda's repeated contentions, KPMG Bermuda Reply at 7-10, silence in this Memorandum or in Plaintiffs' earlier Memorandum does not mean that Plaintiffs have "retreated" from an allegation.

– were not deemed to inherently contain embedded derivatives before April 2003, KPMG Bermuda argues, the Complaint once again is flawed because it accuses KPMG of failing to apply an accounting standard that did not exist at the time the financial statements were filed.

However, the Complaint does not allege that ANR held embedded derivatives merely by virtue of the fact that it had a modified coinsurance arrangement with Transamerica. If, for example, ANR had had the exact same modified coinsurance arrangement with Transamerica but instead had held garden-variety stocks in the Funds Withheld, there would have been no false statement. Rather, the Complaint alleges that ANR was exposed to embedded derivatives because the Funds were heavily invested in *convertible bonds*. That convertible bonds were understood to be embedded derivatives well before the start of the Class Period is indisputable; indeed, in the June 1998 Accounting Standards, FAS 133 defined embedded derivatives as follows:

> Contracts that do not in their entirety meet the definition of a derivative instrument . . . such as bonds, insurance policies, and leases, may contain "embedded" derivative instruments – implicit or explicit terms that affect some or all of the cash flows or the value of other exchanges required by the contract in a manner similar to a derivative instrument. The effect of embedding a derivative instrument in another type of contract . . . is that some or all of the cash flows or other exchanges that otherwise would be required by the contract . . . will be modified based on one or more underlyings

FAS 133, ¶12 (Pltf. Exh. C). This precisely describes a convertible bond; the definition existed well before the start of the Class Period in March 2000, and KPMG Bermuda made a false statement of material fact when it certified ANR's financial statements as compliant with GAAP despite the fact that ANR falsely denied holding embedded derivatives.

**B.     AICPA Statement of Position 03-1 Does Not Alter the Analysis**

In their Complaint, Plaintiffs alleged the facially obvious proposition that because policyholders were guaranteed a 3.5% annual return on their policies, ANR was required to

account for these liabilities. In its Reply Brief, KPMG Bermuda cites for the first time American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 03-1, and claims that according to this statement, ANR was not required to record these guaranteed liabilities because ANR was not required to take into account the fact that a policyholder might surrender his policy rather than wait until annuitization. KPMG Bermuda Reply at 9. SOP 03-1 is inapposite because it was first adopted after the Class Period. Had it been in effect, however, the paragraphs of the SOP that KPMG neglected to submit in the excerpted version of its exhibit explicitly approve the allegations in the Complaint.

AICPA SOP 03-1 was first adopted in July 2003, to take effect December 15, 2003. The Statement explicitly requires precisely the kind of accounting treatment alleged in the Complaint. For instance, the Statement says:

> For contracts that have features that may result in more than one potential account balance (for example, a contract that provides a return based on a contractually referenced pool of real estate assets owned by the insurance enterprise but also provides for minimum investment return guarantees), the accrued balance should be based on the ***highest contractually determinable balance*** that will be available in cash or its equivalent at contract maturity. . . .

AICPA SOP 03-1 ¶22 (Pltf. Exh. D) (emphasis added). This is precisely what Plaintiffs alleged: that ANR, knowing it was required to pay 3.5% minimum interest to policyholders, was required to account for those liabilities in its financial statements. rather than simply record liabilities based on the (lower) investment performance of the investments in the Funds Withheld. ¶64. Notably, the accounting treatment required in the above-quoted paragraph explicitly applies to two different kinds of contracts: "investment contracts" as defined under FAS 97 ¶15, and "universal life-type contracts" as defined under FAS 97 ¶17(a). *See* AICPA SOP 03-1 ¶19. This is an important point because in its Motion to Dismiss, KPMG Bermuda argued that "investment contracts" and "universal life-type" contracts should receive different accounting treatment, and

that the allegations in the Complaint were flawed for failing to recognize the different treatment. *See* KPMG Bermuda Memorandum of Law in Support of Motion to Dismiss at 19.[2]

AICPA SOP 03-1 repeats the importance of recognizing liabilities for guaranteed minimum interest payments at ¶11, which reads: ***"[a]ny liabilities related to minimum guarantees*** and insurance benefit liabilities under the contracts ***in excess of the fair value of separate account assets*** representing contract holder funds ***should be recognized*** as general account liabilities." AICPA SOP 03-1 ¶11 (emphasis added).

The portion of SOP 03-1 submitted and quoted by KPMG Bermuda is irrelevant here. At the end of the SOP, the drafters included an Appendix setting forth their reasoning for adopting the various accounting standards. At A-23, quoted by KPMG Bermuda, the Appendix states "FASB Statement No. 97 is a long-duration contract model that does not assume policyholders will surrender at the balance sheet date. . . ."[3] However, this paragraph is *not* referring to liabilities that are guaranteed by state law and accrue annually. This paragraph is referring to the fact that sometimes when a policyholder surrenders his policy, he is charged a fee that *would not exist* but for the premature surrender. The Appendix explains that the insurance enterprise need not assume a premature termination of the policy when calculating liabilities. Guaranteed liabilities, such as the 3.5% interest owed to ANR's policyholders, are a completely different matter, for they accrue and are owed to the policyholder *regardless* of whether the policyholder surrenders his policy or awaits annuitization.

This discussion, of course, epitomizes why the question of compliance with GAAP is a factual one that should not be decided at this stage of litigation. *In re Burlington Coat Factory*

---

[2] FAS 97 is attached as Exhibit 12 to the Declaration of Paul A. Strauss dated March 10, 2004.
[3] Of course, by relying on this standard, KPMG Bermuda implicitly admits that – just as Plaintiffs alleged – FAS 97 is the accounting standard ANR should have followed when accounting for its Transamerica contract. *See* Plaintiffs' Opposition Brief at 22-23.

*Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997). At this stage, it is enough for the Complaint to allege that the accounting treatment violated GAAP, and it is enough that Plaintiffs have set forth the extremely commonsense proposition that KPMG acted recklessly when it allowed ANR to simply ignore guaranteed, immutable liabilities imposed by state law. Thus, KPMG Bermuda's argument should be rejected, and its motion to dismiss denied.

## II.   KPMG USA

In their Complaint, Plaintiffs set forth several facts demonstrating that KPMG USA acted as a controlling person of KPMG Bermuda. ¶¶5-6, 25, 28, 29, 257-265. Among these facts included the allegation that KPMG Bermuda was permitted to practice before the SEC because of its affiliation with KPMG USA, which itself is a member of the AICPA SEC Practice Section. As a member of that group, KPMG USA has agreed to ensure that its foreign affiliates adhere to certain standards when they practice before the SEC. ¶25. This fact, in conjunction with the additional facts set forth in the Complaint, demonstrates that KPMG USA was a controlling person of KPMG Bermuda for the purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

KPMG USA responds to this point for the first time in its Reply. In Footnote 11, KPMG USA cites to the AICPA SEC Practice Manual, Appendix K. This Manual is, of course, drafted by the accountants in the AICPA SEC Practice Section itself, presumably with an eye towards insulating its members from securities fraud liability in connection with their oversight of foreign audit affiliates' conduct; as such, it lacks the force of federal rule or regulation in interpreting the legal standard of "control" under the federal securities laws. KPMG USA uses the Manual to factually dispute the Plaintiffs' allegations, stating that the Manual "nowhere indicates, as

plaintiffs claim, that KPMG U.S. somehow 'qualified' KPMG Bermuda to audit SEC registrants." KPMG USA Reply at 13 n.11.

Although the Court should declined to engage KPMG USA's factual challenge to the allegations in the Complaint regarding KPMG Bermuda's qualifications to practice before the SEC, in fact, as described in the Staff Outline of the SEC Division of Corporation Finance, Pltf. Exh. E, a foreign accounting firm may qualify to audit financial statements of foreign issuers filed with the SEC either through its affiliation with a United States member of the AICPA SEC Practice Section, or by meeting other criteria, including demonstrating knowledge and experience in applying United States GAAP and GAAS, SEC financial rules, etc.[4] *See* Pltf. Exh. E at 20.

KPMG USA also points out a single partial sentence from the Manual that says that international firms "usually do not control" foreign affiliates, and relies on this fragment to dispute Plaintiffs' allegations under §20(a). Significantly, however, the Manual explicitly requires KPMG USA to oversee the conduct of KPMG Bermuda, particularly with respect to its SEC filings. According to the Manual, KPMG USA was required to appoint a United States auditor as the "filing reviewer." KPMG USA Exh. F. at .01(a). That reviewer must read the audited financial statement to ensure compliance with United States regulatory standards, discuss the financial statement with the foreign affiliate, and inspect the policies and procedures of the foreign affiliate. *Id.* This oversight role, taken in conjunction with the additional allegations in the Complaint regarding the degree to which KPMG USA insinuated itself in the KPMG Bermuda audit, are sufficient to establish that KPMG USA "possessed, directly or indirectly, the

---

[4] These standards were in place during the ANR audits. In late 2003, however, the SEC Practice Section discontinued its activities. The standards with respect to U.S. firms' responsibilities for the audits of foreign affiliates were retained by the Public Company Accounting Oversight Board. *See* Pltf. Exh. F at 16.

power to direct or cause the direction" of KPMG Bermuda. *Schnall v. Annuity & Life Re (Holdings)*, 2004 U.S. Dist. LEXIS 4643, *30-31 (D. Conn. Mar. 9, 2004).

KPMG USA also argues that "as a matter of law" it has already been decided that, for all times and all circumstances, no matter what facts might exist, it must be deemed to have no control over its foreign affiliates. KPMG USA Reply Br. at 13-14. In fact, in the ongoing action of *Securities & Exchange Commission v. KPMG LLP et al.*, No. 03 CV 0671 (DLC) (S.D.N.Y. filed Jan. 29, 2003), the SEC recently filed a motion for an evidentiary ruling on the question of whether foreign affiliated firms of KPMG USA acted as KPMG USA's agent in connection with the audits of Xerox Corporation. *See* Pltf. Exh. G. The SEC argued to Judge Cote that under KPMG's standards of practice, KPMG's audits are conducted in a "strict hierarchical structure" that renders foreign affiliates the agents of KPMG USA. *Id.* The request for a ruling was ultimately withdrawn when KPMG USA and the SEC entered into a stipulation agreeing that KPMG USA would not raise hearsay objections to the statements of foreign affiliates. *See id.*. These documents show that the question whether the foreign affiliates of KPMG USA may be deemed to be agents or joint actors of KPMG USA is a factual one, not a legal one, and that the SEC, at least, considers that KPMG's corporate structure is susceptible to an agency analysis. Plaintiffs submit that they have alleged sufficient facts in the Complaint to show, at this stage of the litigation, that KPMG USA and KPMG Bermuda acted jointly to conduct the ANR audits and KPMG USA may therefore be deemed responsible for the KPMG opinions included in ANR's financial statements.

Dated: June 11, 2004

           **SCOTT + SCOTT, LLC**

           */s/ Erin Green Comite*
           David R. Scott (Juris No. 16080)
           Erin Green Comite (Juris No. 24886)
           108 Norwich Avenue
           P.O. Box 192
           Colchester, CT 06415
           Telephone:   (860) 537-3818
           Facsimile:    (860) 537-4432

           **MILBERG WEISS BERSHAD**
            **& SCHULMAN LLP**
           Beth Kaswan (Ct 21415)
           Ann M. Lipton (Ct 25358)
           One Pennsylvania Plaza
           New York, NY 10119
           Telephone:   (212) 594-5300
           Facsimile:    (212) 868-1229

**Of Counsel**
Marc Edelson
HOFFMAN & EDELSON
45 West Court St.
Doylestown, PA 18901

DOCS\204281v1                     9