COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

rebuttable presumption that a contract has significant mortality risk where the additional insurance benefit would vary significantly in response to capital markets volatility. If the mortality or morbidity risk is other than nominal and the fees assessed or insurance benefits are not fixed and guaranteed, the contract should be classified as an FASB Statement No. 97 universal life-type contract by the insurance enterprise. If the fees assessed on a contract and insurance benefits provided by the contract are fixed and guaranteed or if the contract is short duration, the contract should be classified under FASB Statement No. 60, as amended.

.25    The determination of significance of mortality or morbidity risk should be based on a comparison of the present value of expected excess payments to be made under insurance benefit features (that is, insurance benefit amounts and related incremental claim adjustment expenses in excess of the account balance, herein referred to as the "excess payments") with the present value of all amounts expected to be assessed against the contract holder (revenue). For contracts that include investment margin fn 14(16) in their estimated gross profits, fn 15(17) the investment margin should be included with any other assessments for purposes of determining significance. In performing the analysis, an insurance enterprise should consider both frequency and severity under a full range of scenarios that considers the volatility inherent in the assumptions, rather than making a best estimate using one set of assumptions. For example, if the annuity contract is a variable annuity contract, the insurance enterprise should consider a range of fund return scenarios. When considering a range of scenarios, the insurance enterprise should consider historical investment returns, the volatility of those returns, and expected future returns, as applicable.

### Accounting for a FASB Statement No. 97 Universal Life-Type Contract With Death or Other Insurance Benefit Features

.26    For a contract determined to meet the definition of an insurance contract as described in paragraphs .24 and .25, if the amounts assessed against the contract holder each period for the insurance benefit feature are assessed in a manner that is expected to result in profits in earlier years and losses in subsequent years from the insurance benefit function, a liability should be established in addition to the account balance to recognize the portion of such assessments that compensates the insurance enterprise for benefits to be provided in future periods. Insurance coverage encompasses the concepts of amounts at risk and the relative probability of mortality and morbidity events. The amount of the additional liability should be determined based on the ratio (benefit ratio) of (a) the present value of total expected excess payments over the life of the contract, divided by (b) the present value of total expected assessments over the life of the contract. The benefit ratio may

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

exceed 100 percent, resulting in a liability that exceeds cumulative assessments. Total expected assessments are the aggregate of all charges, including those for administration, mortality, expense, and surrender, regardless of how characterized. For contracts in which

the assets are reported in the general account and that include investment margin in their estimated gross profits, the investment margin should be included with any other assessments for purposes of determining total expected assessments. The insurance enterprise should calculate the present value of total expected excess payments and total assessments and investment margins, as applicable, based on expected experience. Expected experience should be based on a range of scenarios rather than a single set of best estimate assumptions. In calculating the additional liability for the insurance benefit feature, assumptions used, such as the interest rate, discount rate, lapse rate, and mortality, should be consistent with assumptions used in estimating gross profits for purposes of amortizing capitalized acquisition costs. For contracts in which assessments are collected over a period significantly shorter than the period for which the contract is subject to mortality and morbidity risks, the assessment would be considered a front-end fee under FASB Statement No. 97 and accounted for under paragraph 20 of that Statement. The amounts recognized in income should be considered assessments for purposes of this paragraph.

.27    The insurance enterprise should regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised. In making such revised estimates, both the present value of total excess payments and the present value of total expected assessments and investment margins, should be calculated as of the balance sheet date using historical experience from the issue date to the balance sheet date and estimated experience thereafter.

.28    The additional liability at the balance sheet date should be equal to:

a.    The current benefit ratio multiplied by the cumulative assessments fn 16(18)

b.    Less the cumulative excess payments (including amounts reflected in claims payable liabilities)

c.    Plus accreted interest

However, in no event should the additional liability balance be less than zero. The change in the additional liability should be recognized as a component of benefit expense in the statement of operations.

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

.29    The estimated gross profits used for the amortization of deferred acquisition costs should be adjusted to reflect the recognition of the liability in accordance with paragraph .28 of this SOP.

## Accounting for Reinsurance and Other Similar Contracts

.30    If a reinsurer assumes the insurance benefit feature, the reinsurer should assess the significance of mortality and morbidity risk within the reinsurance contract according to the guidance in paragraphs .24 and .25 of this SOP, regardless of whether there is an account balance. The reinsurer should determine the classification of the reinsurance contract as an investment contract or as an insurance contract at the inception of the reinsurance contract. For reinsurance contracts, the mortality or morbidity risk could be deemed other than nominal even if the original issuer did not determine mortality or morbidity to be other than nominal. There is a rebuttable presumption that a contract has significant mortality risk where the additional insurance benefit would vary significantly in response to capital markets volatility. Similarly, the issuer of a contract that provides only an insurance benefit feature that wraps fn 17(19) a noninsurance contract, for example, a guaranteed minimum death benefit related to a mutual fund balance, should evaluate its contract in the same manner. A reinsurer or issuer of the insurance benefit features of a contract should calculate a liability for the portion of premiums collected each period that represents compensation to the insurance enterprise for benefits that are assessed in a manner that is expected to result in current profits and future losses from the insurance benefit function. That liability should be calculated using the methodology described in paragraphs .26 through .28 of this SOP. For example, a reinsurance contract that assumes only the risk related to the MGDB feature for a fee that varies with the account balance rather than with the insurance coverage provided would be a FASB Statement No. 97 universal life-type contract and the contract should be accounted for in accordance with paragraphs .26 through .28 of this SOP.

## Accounting for Contracts That Provide Annuitization Benefits

.31    Contracts may provide for potential benefits in addition to the account balance that are payable only upon annuitization, such as annuity purchase guarantees, GMIBs and two-tier annuities. Insurance enterprises should determine whether such contract features should be accounted for under the provisions of FASB Statement No. 133. fn 18(20) If the contract feature is not accounted for under the provisions of FASB Statement No. 133, an additional liability for the contract feature should be established if the present value of expected annuitization payments at the expected annuitization date exceeds the expected account balance at the expected annuitization date. The amount of the additional

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

liability should be determined based on the ratio (benefit ratio) of (*a*) the present value of expected annuitization payments to be made and related incremental claim adjustment expenses, discounted at estimated investment yields expected to be earned during the **annuitization phase** of the contract, minus the expected accrued account balance at the expected annuitization date (the "excess payments"), divided by (*b*) the present value of total expected assessments during the accumulation phase of the contract. Total expected assessments are the aggregate of all charges, including those for administration, mortality, expense, and surrender, regardless of how characterized. For contracts whose assets are reported in the general account and that include investment margin in their estimated gross profits, the investment margin should be included with any other assessments for purposes of determining total expected assessments. The insurance enterprise should calculate the present value of total expected excess payments and total assessments and investment margins, as applicable, based on expected experience. Expected experience should be based on a range of scenarios that considers the volatility inherent in the assumptions rather than a single set of best estimate assumptions. In calculating the additional liability for the additional benefit feature, assumptions used, such as the interest rate, discount rate, lapse rate, and mortality, should be consistent with assumptions used in estimating gross profits for purposes of amortizing capitalized acquisition costs. When determining expected excess payments, the expected annuitization rate is one of the assumptions that needs to be estimated.

.32    The insurance enterprise should regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised. In making such revised estimates, both the present value of total excess payments and the present value of total expected assessments or investment margins should be calculated as of the balance sheet date using historical experience from the issue date to the balance sheet date and estimated experience thereafter.

.33    The additional liability at the balance sheet date should be equal to

  *a.*    The current benefit ratio multiplied by the cumulative assessments

  *b.*    Plus accreted interest

  *c.*    Less, at time of annuitization, the cumulative excess payments determined at annuitization

However, in no event should the additional liability balance be less than zero. The change in the additional liability should be recognized as a component of benefit expense in the statement of operations. "Cumulative excess payments determined at annuitization"

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

represent the amount that should be deducted at the actual date of annuitization. That amount should be calculated as the present value of expected annuity payments and related claim adjustment expenses discounted at expected investment yields minus the accrued account balance at the actual annuitization date. On the date of annuitization, the additional liability related to the cumulative excess benefits will be zero and the amount deducted will be used in the calculation of the liability for the payout annuity.

.34  The estimated gross profits used for the amortization of deferred acquisition costs should be adjusted to reflect the recognition of the liability determined in accordance with paragraph .32 of this SOP. Capitalized acquisition costs should continue to be amortized over the present value of estimated gross profits (as adjusted above) over the expected life of the book of contracts. For purposes of amortization of deferred acquisition costs, the life of the book of contracts excludes the annuitization phase.

.35  A reinsurer may agree to reinsure all or a portion of the additional benefits described in paragraph .31 of this SOP. Both the ceding company and the reinsurer should determine whether such a reinsurance contract should be accounted for under the provisions of FASB Statement No. 133. For example, unlike many of the direct contracts that contain GMIB benefits, contracts to reinsure GMIB benefits often meet the definition of a derivative under FASB Statement No. 133. If the reinsurance contract should not be accounted for under the provisions of FASB Statement No. 133, the guidance in paragraphs .31 through 34 of this SOP should be followed.

## Sales Inducements to Contract Holders

.36  Sales inducements provided to the contract holder, whether for investment or universal life-type contracts, should be recognized as part of the liability for policy benefits over the period in which the contract must remain in force for the contract holder to qualify for the inducement or at the crediting date, if earlier, in accordance with paragraph 20 of this SOP. No adjustments should be made to reduce the liability related to the sales inducements for anticipated surrender charges, persistency, or early withdrawal contractual features.

.37  Sales inducements that (*a*) are recognized as part of the liability under paragraph .36 of this SOP, (*b*) are explicitly identified in the contract at inception, and (*c*) meet the criteria in the following sentence should be deferred and amortized using the same methodology and assumptions used to amortize capitalized acquisition costs. The insurance enterprise should demonstrate that such amounts are (*a*) incremental to amounts the enterprise credits on similar contracts without sales inducements and (*b*) higher than the contract's

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

expected ongoing crediting rates for periods after the inducement, as applicable; that is, the crediting rate excluding the inducement should be consistent with assumptions used in estimated gross profits, contract illustrations, and interest-crediting strategies. Due to the nature of day-one and persistency bonuses, the criteria in the preceding sentence are generally met. The deferred amount should be recognized on the statement of financial position as an asset, and amortization should be recognized as a component of benefit expense. The annuitization phase is viewed as a separate contract under FASB Statement No. 97, and should not be combined with the accumulation phase for amortization of deferred sales inducements.

## Disclosures

.38     The following information should be disclosed in the financial statements of the insurance enterprise:

a.     The general nature of the contracts reported in separate accounts, including the extent and terms of minimum guarantees.

b.     The basis of presentation for separate account assets and liabilities and related separate account activity.

c.     A description of the liability valuation methods and assumptions used in estimating the liabilities for additional insurance benefits and minimum guarantees.

d.     Disclosures should include the following amounts related to minimum guarantees:

(1)     The separate account liability balances subject to various types of benefits (for example, guaranteed minimum death benefit, guaranteed minimum income benefit, guaranteed minimum accumulation benefit). Disclosures within these categories of benefits for the types of guarantees provided may also be appropriate (for example, return of net deposits, return of net deposits accrued at a stated rate, return of highest anniversary value).

(2)     The amount of liability reported for additional insurance benefits, annuitization benefits and other minimum guarantees, by type of benefit, for the most recent balance sheet date and the incurred and paid amounts for all periods presented.

(3)     For contracts for which an additional liability is disclosed in d(2) above, **net amount at risk** and weighted average attained age of contract holders.

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

    *e.*      The aggregate fair value of assets, by major investment asset category, supporting separate accounts with additional insurance benefits and minimum investment return guarantees as of each date for which a statement of financial position is presented.

    *f.*      The amount of gains and losses recognized on assets transferred to separate accounts for the periods presented.

**.39**    An insurance enterprise should disclose its accounting policy for sales inducements, including the nature of the costs deferred and the method of amortizing those costs. The amount of costs deferred and amortized for each of the periods presented and the unamortized balance as of each balance sheet date also should be disclosed.

## Effective Date and Transition

**.40**    The provisions of this SOP are effective for financial statements for fiscal years beginning after December 15, 2003, with earlier adoption encouraged. Restatement of previously issued annual financial statements or reclassification between separate account and general account balances is not permitted. Initial application of this SOP should be as of the beginning of an entity's fiscal year (that is, if the SOP is adopted prior to the effective date and during an interim period, all prior interim periods should be restated). Disclosure of the pro forma effects of retroactive application (discussed in paragraph 21 of Accounting Principles Board (APB) Opinion No. 20, *Accounting Changes*) or the pro forma effect on the year of adoption is not required.

**.41**    At the date of initial application:

    *a.*      For assets that no longer qualify for separate account treatment:

        (1)    Debt or equity securities previously classified as separate account assets but valued in accordance with FASB Statement No. 115 should maintain their designations as held-to-maturity, available-for-sale, or trading upon reclassification to the general account.

        (2)    The provisions of FASB Statement No. 115 should be adopted for any debt or equity securities previously recognized at fair value in accordance with paragraph 54 of FASB Statement No. 60, as amended. Any adjustment for FASB Statement No. 115 designation resulting from initial adoption should be reported in a manner similar to the cumulative effect of a change in accounting principle in accordance with the provisions of APB

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

Opinion No. 20 and paragraph 25 of FASB Statement No. 115:

(a) If designated as held-to-maturity, the adjustment should be reported through income.

(b) If designated as available-for-sale, the adjustment should be reported in income, with a corresponding cumulative effect adjustment for the unrealized holding gains and losses reported in other comprehensive income.

(c) If designated as trading, there should be no adjustment.

(3) Any revaluation adjustments related to assets that are not subject to FASB Statement No. 115 should be reported in a manner similar to the cumulative effect of a change in accounting principle in accordance with the provisions of APB Opinion No. 20.

b. The guidance in *a* above should be applied in accounting for an insurance enterprise's proportionate interest in the separate account assets regardless of whether the interest was previously reported in the separate account or the general account. If the insurance enterprise considered its portion of separate account units to be equity securities under FASB Statement No. 115, the guidance in *a*(1) or (3) above should be applied as appropriate.

c. To the extent a debt or equity security subject to FASB Statement No. 115 and previously classified as available-for-sale is part of a contractually referenced pool of assets in which total return will be accrued to the account balance in accordance with paragraph .21 of this SOP), and a transition adjustment for the liability valuation is reported in accordance with *e* below, that security may be reclassified to trading with the revaluation adjustment recognized as a cumulative effect similar to the liability transition adjustment.

d. For contracts that are in force on the date of initial application of this SOP, the determination of significance of mortality and morbidity risk resulting from insurance benefit features, in accordance with paragraphs .24 through .25 of this SOP, should be performed as of the date of initial application of this SOP using both actual results from inception of the contract through the date of initial application and expected future results thereafter.

e. Any adjustment in contract holder liabilities from adopting this SOP should be reported in a manner similar to the cumulative effect of a change in accounting principle in accordance with the provisions of APB Opinion No. 20, through

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

income or, for amounts previously accrued under Emerging Issues Task Force (EITF) Topic No. D-41, *Adjustments in Assets and Liabilities for Holding Gains and Losses as Related to the Implementation of FASB Statement No. 115*, accumulated other comprehensive income.

   *f.*    If the adoption of this SOP results in changes in estimated gross profits, any adjustments to unamortized deferred acquisition costs or present value of future profits fn 19(21) should be reported in a manner similar to the cumulative effect of a change in accounting principle in accordance with the provisions of APB Opinion No. 20, through income or, for amounts previously accrued under EITF Topic No. D-41, accumulated other comprehensive income.

.42    This SOP should be applied prospectively with respect to the deferral of sales inducements meeting the criteria in paragraph .37 of this SOP. Sales inducements deferred subsequent to the initial application of this SOP on policies in force at that date should be accounted for in accordance with paragraph .37 of this SOP. Costs recognized for sales inducements prior to initial application of this SOP other than for those referred to in paragraph .43 of this SOP, whether capitalized or not, should not be adjusted to the amounts that would have been deferred had this SOP been in effect when those costs were incurred. Costs capitalized for sales inducements prior to initial application of this SOP that were previously reported with unamortized deferred acquisition costs should be reported separately.

.43    Insurance enterprises that were previously amortizing sales inducements using the same methodology and assumptions used for amortizing deferred acquisition costs (the approach required by the guidance in this SOP) should continue using that approach and should consider the entire life of the contracts. Any cumulative adjustment to unamortized sales inducements resulting from changes in estimated gross profits, made as a result of the initial adoption of this SOP, should be reported in a manner similar to the cumulative effect of a change in accounting principle in accordance with the provisions of APB Opinion No. 20, through net income or, for amounts previously accrued under EITF Topic No. D-41, accumulated other comprehensive income. However, if an insurance enterprise had been amortizing sales inducements using a methodology or assumptions other than those used for amortizing deferred acquisition costs, the amortization of deferred sales inducements after implementation of this SOP should consider only estimated gross profits or interest, as applicable, depending on the amortization methodology, from the date of initial application forward.

> **The provisions of this Statement need not be applied to immaterial items.**

Revised December 2003

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

# Appendix A

# Basis for Conclusions

.44

A-1.    This section discusses considerations that were deemed significant by the Accounting Standards Executive Committee (AcSEC) in reaching the conclusions in this Statement of Position (SOP). In July 2002, AcSEC issued for public comment an exposure draft of a proposed SOP, *Accounting and Reporting by Insurance Enterprises for Certain Nontraditional Long-Duration Contracts and for Separate Accounts.* During the 90-day comment period, 20 comment letters were received by AcSEC.

## Separate Account Presentation

A-2.    Existing authoritative accounting guidance for separate accounts is limited to paragraphs 53 and 54 of Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards No. 60, *Accounting and Reporting by Insurance Enterprises,* and was written when contracts underlying the separate accounts generally were either fixed (having guaranteed returns) or variable (wherein the performance of the assets was the sole determinant of the return to the contract holder).

53.    Separate accounts represent assets and liabilities that are maintained by an insurance enterprise for purposes of funding fixed-benefit or variable annuity contracts, pension plans, and similar activities. The contract holder generally assumes the investment risk, and the insurance enterprise receives a fee for investment management, certain administrative expenses, and mortality and expense risks assumed.

54.    Investments in separate accounts shall be reported at market except for separate account contracts with guaranteed investment returns. For those separate accounts, the related assets shall be reported in accordance with paragraphs 45–51. Separate account assets and liabilities ordinarily shall be reported as summary totals in the financial statements of the insurance enterprise.

Paragraphs 45 through 51 of Financial Accounting Standards Board (FASB) Statement No. 60, *Accounting and Reporting by Insurance Enterprises,* provide guidance for valuing assets of the insurance enterprise's general account (for example, FASB Statement No. 115, *Accounting for Certain Investments in Debt and Equity Securities,* for securities, and FASB Statement No. 114, *Accounting by Creditors for Impairment of a*

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

*Loan,* for mortgage loans), which for the remainder of this discussion will be referred to as "general account assets."

**A-3.**    Paragraph 54 of FASB Statement No. 60 has not been applied consistently in practice in terms of *valuing* assets maintained in separate accounts that have been determined to require valuation as general account assets, and in classifying the assets in the insurer's statement of financial position. It is unclear whether the phrase "reported in accordance with paragraphs 45–51," as used in paragraph 54 of FASB Statement No. 60, refers only to valuation or whether it refers to statement of financial position single line presentation as well. Paragraph 54 of FASB Statement No. 60 states, "Separate account assets and liabilities ordinarily shall be reported as summary totals in the financial statements of the insurance enterprise." Because separate account liabilities are classified consistent with the related asset classification, the issue of classification also affects separate account liabilities.

**A-4.**    Although FASB Statement No. 60, as amended, requires separate account assets and liabilities to be reported in the financial statements of the insurance enterprise, AcSEC considered whether that guidance is consistent with recent standards addressing both asset and liability recognition and derecognition, such as FASB Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.* AcSEC also considered potential analogies to similar trust fund and mutual fund products offered by the financial services industry. AcSEC noted that, unlike a financial institution trust fund account or mutual fund, the assets of the separate account are legally owned by the insurance enterprise. Additionally, a separate account is not a separate legal entity under general corporate statutes. As noted in the AICPA Audit and Accounting Guide *Life and Health Insurance Entities,* "a separate account is a legally restricted fund that is segregated from the life insurance entity. State insurance laws provide that assets in separate accounts may be invested without regard to restrictions covering general investments of life insurance entities. Separate account assets are generally not available to cover liabilities except those of the separate account."

**A-5.**    Thus, separate account assets may be isolated from the general creditors of the insurance enterprise, but not from the insurance enterprise itself, which still legally owns the assets. In a variable annuity or similar arrangement, there is no relinquishment of ownership of assets but rather the execution of a contract pursuant to which the insurance enterprise agrees to pass through the separate account investment results to the contract holder. Furthermore, the contract executed between the contract holder and the insurance enterprise creates an obligation of the insurance enterprise that is not defeased by the segregation of funds in the separate account. Based on the above, AcSEC concluded that separate account assets and separate account liabilities should be reported in the statement of financial position of the insurance enterprise that owns the assets and

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

is contractually obligated to settle the liabilities.

A-6.     AcSEC considered whether it should ask FASB to reconsider the separate account asset and liability reporting requirements of FASB Statement No. 60, as amended, in light of AcSEC's conclusion in the SOP 00-3, *Accounting by Insurance Enterprises for Demutualizations and Formations of Mutual Insurance Holding Companies and for Certain Long-Duration Participating Contracts,* that closed block assets, liabilities, and related statement of operations activity should be displayed with the remainder of an insurance enterprise's assets, liabilities, and statement of operations activity. AcSEC concluded that separate account structures differ in several significant respects from closed block structures: closed blocks do not legally insulate the assets supporting contract liabilities, closed block contract holders do not direct the investment of supporting assets, and individual closed block contract holders do not receive the direct pass-through of investment performance.

A-7.     Collectively, the unique features of separate account arrangements warrant presentation distinct from an insurance enterprise's other assets and liabilities. AcSEC concluded that summary account totals in the statement of financial condition and the offsetting of investment performance and corresponding amounts credited to the contract holder provide the most meaningful presentation to the users of the financial statements for contracts meeting the four criteria specified in paragraph .11 of this SOP. In addition, that presentation allows financial statement users to more readily analyze investment returns of insurance enterprises by excluding amounts that are legally insulated from the general account and not available to shareholders.

A-8.     Separate accounts often are used in conjunction with nontraditional products that have both fixed and variable features. For example, variable annuity and variable life contracts frequently offer fixed rate investment options (typically through the insurer's general account) and may provide contractually guaranteed benefits that are paid upon the death of the contract holder (minimum guaranteed death benefits) or at a specified date in the accumulation phase of the contract (guaranteed minimum accumulation benefits). Those products have made it difficult to determine whether the criterion in paragraph 53 of FASB Statement No. 60, that "the contract holder generally assumes the investment risk," has been met and thus whether assets and liabilities associated with such separate account arrangements should be classified as general account, separate account, or some combination of both. In addition, fixed contracts in which the insurance enterprise guarantees investment return or otherwise bears the investment risk may be offered through separate accounts, for example, as a means to provide additional credit protection to the contract holder.

A-9.     AcSEC believes that the emergence of new products has created a need for

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

criteria to be developed for evaluating separate account arrangements and applying the guidance in paragraphs 53 and 54 of FASB Statement No. 60. AcSEC concluded that a defining characteristic of separate accounts is their designation as such by appropriate regulatory bodies. AcSEC also believes that legal insulation of separate account assets, such that to the extent of contract holder liabilities, the assets would not be available to the general creditors and shareholders of the insurance enterprise in the event of insolvency, is a unique aspect of separate account assets. AcSEC also concluded that a defining characteristic of separate accounts is that the contract holder dictates the allocation of deposits among investment alternatives and receives the pass-through of investment performance (that is, the contract holder receives the investment reward). In the case of certain group contracts, this feature may take the form of the contract holder's establishment of specific investment guidelines and objectives. AcSEC also noted that an implicit ceiling could exist through the use of certain sliding-scale performance-based fees, thereby not meeting the criteria in paragraph .11*d* of this SOP.

**A-10.**  AcSEC considered whether only the assets and liabilities associated with the pure pass-through contracts offered through separate account arrangements, such as traditional variable annuities and other variable contracts that have neither guaranteed minimum death benefits nor accumulation guarantees, should be presented as single line items in the statement of financial condition of an insurance enterprise. That treatment would require that the insurer not include in the separate account summary totals the assets and liabilities related to a contract if the insurance enterprise bore *any* investment risk related to that contract. That view was rejected because the contract holder, rather than the insurance enterprise, controls the investments and is entitled to all the rewards of owning the assets underlying variable contracts. AcSEC concluded that separate account presentation for the portion of the separate account arrangement meeting the four criteria specified in paragraph .11 of this SOP is appropriate. Guarantees on such contracts provided by the insurance enterprise are viewed as incremental contract benefits that may require recognition of any additional liability in the general account of the insurance enterprise.

**A-11.**  Several respondents to the exposure draft expressed a view that the definition and proposed reporting of separate account arrangements in paragraph .11 of this SOP do not recognize the unique nature of certain non-U.S. products where legal insulation may not be achieved. AcSEC believes that the criteria for separate account treatment should be applied consistently to U.S. and non-U.S. products and that changes to the definition to permit classification of certain non-U.S. products as separate accounts would inappropriately expand the use of separate account presentation to certain U.S. products. AcSEC reaffirmed that legal insulation is a key criterion for summary total presentation and statement of operations separate account treatment.

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**Accounting for an Insurance Enterprise's Interest in a Separate Account**

**A-12.**   When a separate account is established, the insurance enterprise may transfer non-contract-holder-related funds, commonly referred to as seed money, from its general account to the separate account to support the initial or ongoing operations of the separate account. Such transfers give the insurance enterprise an ownership interest in the separate account. The insurance enterprise's interest may also include undistributed earnings on the seed money and contract charges that have not been transferred to the general account.

**A-13.**   AcSEC recognized that there was diversity in practice regarding the classification and measurement of an insurance enterprise's proportionate interest in a separate account. Some insurance enterprises classified such amounts in the separate account caption along with separate account assets attributable to contract holders. Other insurance enterprises reclassified such amounts to general account assets. In terms of measurement, some insurance enterprises marked separate account assets to market through income, including the insurance enterprise's proportionate interest, while others accounted for the insurance enterprise's proportionate interest as general account assets. Some insurance enterprises viewed the separate account as if it were a separate legal entity, and thus considered their portion of "separate account units" to be equity securities. Other insurance enterprises looked through the separate account arrangement and viewed their investment as a proportionate interest in the underlying mutual funds, debt and equity securities, mortgage loans, real estate, or other assets in which the separate account arrangement was invested.

**A-14.**   AcSEC concluded that an insurance enterprise's proportionate interest in the assets of a separate account does not qualify for separate account treatment, as it does not represent contract holder funds. Consequently, the assets underlying the insurance enterprise's proportionate interest should be classified and measured as general account assets in accordance with paragraphs 45 through 51 of FASB Statement No. 60, as amended.

**A-15.**   AcSEC noted that a separate account is not a distinct legal entity under general corporate statutes, but rather an accounting entity created by and under the control of the insurance enterprise that owns 100 percent of the assets. The insurance enterprise's proportionate interest in the separate account typically would be available to general creditors in the event of the insurance enterprise's insolvency. AcSEC concluded that an insurance enterprise's proportionate interest in a separate account should not be viewed as an investment in "equity securities" of the separate account. Instead, AcSEC concluded that the insurance enterprise should "look through" to the underlying investments held in the separate account for purposes of classification and measurement as general account

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

assets. In reaching that conclusion, AcSEC believed that assets should not be accounted for differently depending on whether an insurance enterprise has an interest in those assets through the general account or through the separate account (for example, fair value versus historical cost for real estate).

A-16.  Many respondents to the exposure draft commented on the complex and burdensome task of maintaining detailed records of daily percentage ownership of bonds or stocks or other investments as required under the SOP. While AcSEC continued to believe that the guidance noted in paragraph .11 is appropriate, AcSEC considered these comments and decided to permit an insurance enterprise to account for its investment in a separate account as an investment in equity securities under FASB Statement No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, when the insurance enterprise's proportionate interest represents less than 20 percent of the separate account and the underlying separate account investments are securities under Statement No. 115 or paragraph 46 of FASB Statement No. 60, as amended by FASB Statement No. 115, or cash and cash equivalents. AcSEC acknowledged that there should not be a difference between the aggregate fair value of the individual securities and a proportionate share of the fair value of the aggregate investments in the separate account. Therefore, in these limited situations, the cost appeared to outweigh the commensurate benefit of applying the proposed guidance.

A-17.  AcSEC also acknowledged that under this alternative an insurance enterprise should perform an impairment test on the value of the interest in the separate account (or individual subaccounts, as applicable). AcSEC believes it would not be appropriate to allow this alternative for circumstances where the underlying separate account investments are other than securities under FASB Statement No. 115 or paragraph 46 of FASB Statement No. 60, as amended by FASB Statement No. 115, or cash and cash equivalents, such as mortgage loans or real estate, as the alternate method would result in different bases of accounting. AcSEC concluded that to apply the alternate method the underlying separate account investment related to the insurance company's proportionate interest should be classified as trading with changes flowing through the income statement, as classification as available for sale would defer the recognition of investment income.

A-18.  Contract holders may have the right to continue to make deposits and direct transfers of their account balances, and new contract holders are permitted to invest in the various separate account arrangements. In those cases, the insurance enterprise is effectively holding for sale its proportionate interest in the separate account assets if those separate account arrangements would meet the criteria in paragraph .11 of this SOP. Consequently, the insurance enterprise should recognize an impairment loss on its proportionate interest in the assets of a separate account arrangement meeting the criteria

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

in paragraph .11 in a situation where the current fair value of the insurance enterprise's proportionate interest in the separate account assets is less than its carrying amount.

## Transfers to Separate Accounts

A-19.   AcSEC concluded that transfers of assets to separate accounts should be recognized at fair value to the extent of third-party contract holders' interests in the separate account if the separate account arrangement meets the criteria in paragraph .11 of this SOP, with any resulting gains or losses recognized immediately in earnings of the insurance enterprise. Gain or loss recognition is appropriate in such cases because the contract holders are unrelated third parties to whom subsequent risks and rewards of ownership of a portion of the asset have been transferred, and the assets will subsequently be carried at fair value with changes reported in earnings (offset by changes in contract holder liabilities). Furthermore, although the insurance enterprise holds legal title to assets in separate account arrangements, the contract holders will be entitled to receive the investment performance of the assets after the transfer. This treatment is consistent with the presentation of separate account assets as summary totals in the statement of financial position, because the risks and rewards of ownership of the assets reside with the contract holders rather than the insurance enterprise that has legal ownership of the assets. If the insurance enterprise guarantees the asset's value or minimum rate of return or commits to repurchase the asset, the risks of ownership have not been transferred, and no gain should be recognized. However, loss recognition is still appropriate as noted in paragraph A-18 of this SOP. AcSEC concluded that in the limited circumstances where the alternate method, as described in paragraph .18 of this SOP, is applied, 100 percent of any gain on transfers of assets to separate accounts should be recognized as the underlying investments are designated as trading. AcSEC had already concluded that all losses were required to be recognized for transfers of assets to separate accounts.

A-20.   For separate account arrangements for which the insurance enterprise is actively marketing units and hold real estate, AcSEC concluded that, in cases in which the held for sale criteria for real estate are not met, the impairment test should be performed solely using cash flows from ultimate disposition. Cash flows related to the use of the asset during the period preceding ultimate disposition should be zero because the enterprise does not have control over the dilution of its interest.

## Valuation of Liabilities

A-21.   *Account balance.* Paragraph 17(a) of FASB Statement No. 97, *Accounting and Reporting by Insurance Enterprises for Certain Long-Duration Contracts and for Realized Gains and Losses from the Sale of Investments,* does not explicitly define "the balance that accrues to the benefit of policyholders at the date of the financial

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

statements," which is commonly referred to as the "account balance," FASB Statement No. 97, paragraph 18, provides that the account balance is an amount that should not be reduced for "amounts that may be assessed against policyholders in future periods, including surrender charges...."

A-22.  AcSEC also noted that FASB Statement No. 97 defines contract holder balance indirectly through the following:

> Premium payments are credited to the policyholder balance, against which amounts are assessed for contract services and to which amounts are credited as income. The policyholder balance provides a base upon which interest accrues to the policyholder and, when compared with the death benefit amount, fixes the insurer's net amount at risk. [*paragraph 45*]

> ...the balance that accrues to the benefit of individual policyholders represents the minimum measure of an insurance enterprise's liability.... For many universal life-type contracts, this amount takes the form of an account balance that, absent future action by the policyholder, will continue to fund operation of the contract until exhausted or reduced to a contract minimum. The insurer has a present obligation, arising from past transactions, to continue to maintain the contract and provide mortality protection as long as an adequate account balance exists. Other universal life-type contracts do not have an explicit policyholder account but do have a policyholder balance to which interest is accrued at a variable rate. In either case, future events and transactions will change the amount of the enterprise's obligation as policyholders make additional premium deposits and realize contract benefits. The present obligation, however, is fixed by the amount that has accrued to the benefit of the policyholder. [*paragraph 53*]

Recent product innovation and the lack of explicit guidance has led to diversity in the application of the definition of account balance. AcSEC therefore believes that interpretive guidance is needed for determining the balance that accrues to the benefit of the policyholder at the date of the financial statements.

A-23.  AcSEC concluded that all surrender charges or credits should be ignored in measuring the policyholder liability because, as noted in FASB Statement No. 97, paragraphs 18 and 53, the liability should be measured assuming no future action by the policyholder. FASB Statement No. 97 is a long-duration contract model that does not assume policyholders will surrender at the balance sheet date but rather amortizes deferred acquisition costs over the expected life of the contract. Additionally, the FASB Statement No. 60, as amended, and FASB Statement No. 97 accounting models do not require that the contract holder liability, net of unamortized acquisition costs, equal or exceed the cash surrender value of the contract. AcSEC considered whether the presence

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

of an additional amount due on surrender but not due upon maturity, such as a market value annuity adjustment, should result in the recognition of an additional liability. AcSEC concluded that recording an additional liability for surrender adjustments prior to the contract holder's elected surrender would be inconsistent with the long-duration model.

**A-24.**  AcSEC concluded that, in accordance with FASB Statement No. 97, it is appropriate to accrue to the amount that the contract holder could receive in cash or its equivalent, before reduction for future fees and charges, at the earlier of the date that the rate credited to the contract is reset or contractual maturity. That conclusion is consistent with the long-duration model, which does not permit the anticipation of surrenders and also with the accounting for debt instruments, under which interest is accrued to maturity using the interest method. Accrual of interest at an effective interest rate is consistent with existing accounting for debt instruments with fixed nonlevel interest payments. A delay in crediting to the contract holder account balance an amount that is to be credited in the future should not prevent the accrual of the amount ratably over the period the contract holder earns the amount.

**A-25.**  AcSEC believes that a contract in which the amount due at maturity is based on a referenced pool of assets is similar to indexed debt, which prior to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities,* was accounted for in accordance with Emerging Issues Task Force (EITF) Issue No. 86-28, *Accounting Implications of Indexed Debt Instruments*. EITF Issue No. 86-28 provides the following accounting guidance:

> ... as the applicable index increases such that the issuer would be required to pay the investor a contingent payment at maturity, the issuer should recognize a liability for the amount that the contingent payment exceeds the amount, if any, originally attributed to the contingent payment feature. The liability for the contingent payment feature should be based on the applicable index value at the balance sheet date and should not anticipate any future changes in the index value. When no proceeds are originally allocated to the contingent payment, the additional liability resulting from the fluctuating index value should be accounted for as an adjustment of the carrying amount of the debt obligation.

Therefore, AcSEC concluded that, to the extent such contracts are not accounted for under the provisions of FASB Statement No. 133, the balance that accrues to the benefit of the contract holder should be based on the fair value of the referenced pool of assets because the change in the fair value of the referenced pool of assets represents the change in the account balance. To the extent the amount credited does not equal the change in fair value of the referenced pool of assets, an adjustment as described in paragraph .20e of

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

this SOP would be required. Many respondents to the exposure draft commented that this guidance would result in misleading volatility and a mismatch in the financial statements when the referenced assets are not also recorded at fair value. AcSEC reaffirmed the liability model in this SOP and noted that changing the valuation of investments was not within the scope of this project.

## Contracts With Death or Other Insurance Benefit Features

**A-26.** *Determination of applicable accounting standard.* AcSEC decided the FASB Statement No. 97 universal life model should apply to insurance benefit features only if (*a*) the fees assessed or the benefits provided are not fixed and guaranteed, and (*b*) the mortality and morbidity risks are other than nominal. Those contracts having insurance benefit features where the fees assessed and the benefits provided are fixed and guaranteed should be accounted for under FASB Statement No. 60, as amended. Those insurance benefit features that do not pass the test of significance result in the contracts being classified as investment-type contracts under FASB Statement No. 97, and no additional liability for insurance benefits should be provided, other than a claim liability resulting from the occurrence of the insurance event.

**A-27.** *Determining the significance of mortality and morbidity risk.* AcSEC considered how the test of significance of mortality and morbidity risk should be applied to contracts with insurance benefit features. The significance test contained in paragraph 8 of FASB Statement No. 97 is based on the present value of the expected life contingent payments relative to the present value of all expected payments. AcSEC considered whether that test should be modified for insurance benefit features offered with annuity contracts. The test was written for payout annuities for which the entire deposit may be subject to mortality risk. For accumulation-phase annuity contracts containing insurance benefit features, the contract has a deposit element, which under all circumstances the contract holder will receive, and a mortality and morbidity element for payments in excess of the deposit element. AcSEC decided that because the timing and nature of benefit payments are different between payout annuities and an accumulation-phase annuity with an minimum guaranteed death benefit (MGDB) or other insurance benefit feature, the measurement of the significance of the mortality related payments needed to be modified. AcSEC believes a better method to determine significance for these contracts is to compare the present value of expected insurance benefit excess payments with the fee revenue or spreads the insurance enterprise will collect for accepting that and other risks.

**A-28.** AcSEC considered whether the test of significance should be performed only at the inception of the contract or throughout the life of the contract. It was noted that performing the test throughout the life of the contract could result in situations where

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

contracts would switch from one accounting model to another and potentially back again as the estimate of expected benefit costs changed. AcSEC decided to require the test of significance to be performed only at the inception of the contract or reinsurance contract, noting that it is consistent with current practice for applying the test for classifying payout annuities under FASB Statement No. 97. Similarly, the comparison of the timing of expected assessments and related benefits for determining whether the amounts assessed against the contract holder each period for the insurance benefit feature are assessed in a manner that is expected to result in profits in earlier years and losses in subsequent years from the insurance benefit function would occur at inception only, as well. As discussed in the transition section of this SOP, an exception is made for contracts in force at the date of transition for which the test of significance would be performed as of transition.

A-29.  For certain contracts with insurance benefit features, such as MGDBs offered with variable annuities, the expected benefit costs or the expected revenue vary with market elements such as interest rates or the performance of an underlying pool of equities. AcSEC considered whether to require expected benefit costs and expected revenue to be determined based on a single set of assumptions or a range of results. AcSEC decided that the test of significance should be based on models that use more than a single set of assumptions, because that approach would better reflect the effect of market elements on both expected benefit costs and expected revenue. This approach is consistent with FASB Statement of Financial Accounting Concepts No. 7, *Using Cash Flow Information and Present Value in Accounting Measurements,* which concludes that expected values are more useful for present value calculations, and is further supported by FASB Statement No. 113, *Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts,* which states that when evaluating the possibility of the reinsurer incurring a loss, reasonably possible scenarios should be considered. Because the test of significance requires consideration of a range of scenarios and the market is inherently volatile, AcSEC concluded that there is a rebuttable presumption that a contract with an insurance benefit that varies significantly in response to capital market volatility has significant mortality risk.

A-30.  *Establishment of an additional liability.* AcSEC considered whether, under the universal life model of FASB Statement No. 97, a separate liability in addition to the account balance should be recognized. AcSEC noted that FASB Statement No. 97, paragraph 17, states:

The liability for policy benefits for universal life-type contracts shall be equal to the sum of:

a.      The balance that accrues to the benefit of policyholders at the date of the financial statements

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

b.    Any amounts that have been assessed to compensate the insurer for services to be performed over future periods (paragraph 20)

c.    Any amounts previously assessed against policyholders that are refundable on termination of the contract

d.    Any probable loss (premium deficiency) as described in paragraphs 35–37 of Statement No. 60. [*Footnote omitted*]

**A-31.**   AcSEC noted that the universal life model under FASB Statement No. 97 requires additional liabilities for revenue assessed for services to be performed in future periods and any probable future loss (premium deficiency). In studying the attributes of contracts with insurance benefit features, AcSEC observed that, in some contracts, periodic charges are not assessed in proportion to the risk associated with these benefit features. For example, charges may be assessed for a ratchet MGDB offered with variable annuities based on a percentage of the account balance. In such an MGDB design, as the account balance and assessments increase, the likelihood of a death benefit payment in excess of the account balance decreases. AcSEC noted that FASB Statement No. 97, paragraph 61, states, "An amount assessed might be considered unearned, for example, if it is assessed only in certain contract periods or in a manner that is expected to result in current profits and future losses from a specific contract function." AcSEC concluded that, for contracts where amounts are assessed in a manner that is expected to result in current profits and future losses from the insurance benefit function, a liability should be established in addition to the account balance. This conclusion is also appropriate when considering the reinsurer that assumes, under a long-duration contract, the MGDB risk for a level basis point charge but does not assume the account balance. Without this conclusion, the reinsurer would be recognizing revenue without the related expected benefit cost.

**A-32.**   AcSEC also considered, but rejected, the view that an additional liability for expected losses on insurance benefit payments would only be established if all the margins of the product combined to create a premium deficiency. The premium deficiency concept would in most cases result in no additional liability being established and all amounts assessed during the period being recognized in income even for assessments that are clearly not proportionate to the risk borne by the insurance enterprise for the period. AcSEC rejected that view because such disproportionate assessments are made in part to compensate the insurance enterprise for the risk it assumes in future periods.

**A-33.**   In calculating the liability for the insurance benefit feature, AcSEC decided it is appropriate to use assumptions, such as the interest rate, lapse rate, and

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

mortality, consistent with those used in estimated gross profits and consequently the amortization of deferred acquisition costs. This approach is supported by paragraph 20 of FASB Statement No. 97.

A-34.  Due to multiple contractual designs, some of which may include no explicit fee for the insurance benefit feature, AcSEC concluded that the liability in addition to the account balance should be based on total assessments, including investment spread, to eliminate different design features receiving different accounting treatment. This approach implicitly assumes that the assessment each period for the insurance benefit feature is a level amount of the total basis point charge. AcSEC noted that this approach is relatively easy to apply for all contracts even if there is not a separate explicit charge in the contract for the insurance benefit feature. If there is a separate explicit charge for the insurance benefit feature, AcSEC believes it is appropriate to determine the liability using total assessments because it will result in more consistent application of the methodology. In situations where expenses included in estimated gross profits are proportionate to assessments, AcSEC understands that the use of estimated gross profits instead of assessments for purposes of determining the benefit ratio may produce consistent results.

A-35.  The additional liability is in substance an FASB Statement No. 60 policyholder benefit liability, but with the unlocking of assumptions each period as required under FASB Statement No. 97 to recognize the variability of the insurance benefit payments and contract assessments. That is, the FASB Statement No. 60 policy benefits liability is calculated as the present value of future expected benefits and related expenses minus the present value of future net premiums. In substance, the FASB Statement No. 60 approach is a type of unearned revenue model, although the policyholder benefit liability does not include a profit margin, in that it provides for the addition to the policyholder benefit reserve each period of a constant percentage of gross premium. AcSEC considered whether the additional liability should be reflected as unearned premium. The concept of unearned revenue includes an element of profit margin, other than in an FASB Statement No. 60 policyholder benefit liability. Allocation of profit to specific contract features such as an MGDB would require allocation of costs across all product features. Such analysis would require further actuarial modeling of costs for other product features considering a range of assumptions, which would add substantial effort to the determination of the MGDB liability. Such analysis to ascertain a profit margin for each benefit feature reconciling to the total profit margin for the contract introduces further subjectivity into the liability determination. The additional liability required in this SOP is based on the relationship of total expected benefits and related expenses to total expected revenue and thus is consistent with the FASB Statement No. 60 policyholder benefit liability with the unlocking of assumptions each period to be consistent with FASB Statement No. 97. Therefore AcSEC concluded that, because profit

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

margin was not being considered in the calculation, the best presentation of the liability would be as a policyholder benefit liability.

A-36.   *Statement of operations presentation.* AcSEC considered whether changes in the liability for insurance benefit features offered with annuity contracts should be reflected in the statement of operations as an increase or decrease in revenue or expense. AcSEC concluded for the reasons mentioned in paragraph A-35 of this SOP that the change in the liability should be reported as a benefit expense consistent with changes in policyholder benefit liabilities under FASB Statement No. 60.

A-37.   *Accounting for contracts that provide only death or other insurance benefit features.* FASB Statement No. 113, paragraph 12, requires that, for long duration contracts, the reinsurance contract subjects the reinsurer to the "reasonable possibility that the reinsurer may realize significant loss from assuming insurance risk as that concept is contemplated in FASB Statement Nos. 60 and 97." Therefore, AcSEC concluded that the reinsurer should follow the same guidance as a direct writer when testing for significance of mortality and morbidity risk and when accounting for the insurance benefit feature.

## Accounting for Contracts That Provide Annuitization Benefits

A-38.   Certain variable annuities provide a guaranteed minimum amount available to annuitize after a specified period in addition to a guaranteed minimum annuity interest rate. Other contracts may provide a lower-tier crediting rate during the accumulation phase and a higher rate that is available only upon annuitization. There was diversity in practice with regard to the accounting for these and other annuitization options.

A-39.   The conclusion in the exposure draft of the proposed SOP was that no liability should be recognized during the accumulation phase of a contract for the potential effect of annuitization options. This view was based on AcSEC's initial interpretation of FASB Statement No. 97, paragraph 7, which states in part that "a contract provision that allows the holder of a long-duration contract to purchase an annuity at a guaranteed price on settlement of the contract does not entail a mortality risk until the right to purchase is executed. If purchased, the annuity is a new contract to be evaluated on its own terms." AcSEC had initially concluded that those words precluded accounting recognition of an annuitization option before the option is exercised. However, after further discussion, AcSEC concluded that the language in paragraph 7 could be interpreted to apply only to testing for the presence of mortality risk, and not to preclude recognition of a liability. Supporters of this latter view note that FASB Statement No. 97 states in paragraph 40 that "the risk that the guaranteed price of an annuity may prove to be unfavorable to the guaranteeing enterprise when the annuity is purchased is a price risk

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

not unlike a guaranteed price of any commodity and does not create a *mortality risk* [*emphasis added*]." Supporters of accruing an additional liability believe that, although that guidance prohibits accounting for the contract as if the payout phase were elected and mortality risk existed, it acknowledges the existence of price risk inherent in the annuitization option, thereby allowing for the recognition of the effect of significant annuitization options in the accumulation phase.

A-40.    A majority of respondents to the exposure draft of the proposed SOP noted that the exposure draft's initial conclusion to not accrue the costs related to annuitization options would, in many instances, result in an accounting treatment that does not appropriately reflect the economics of the product. Some noted that the financial statement result could be recognition of earnings during the accumulation phase followed by losses during the annuitization phase of the contract. Respondents noted that establishing a liability for these features would be consistent with fundamental generally accepted accounting principles concepts, including the definition of a liability, unearned income, and loss recognition. AcSEC redeliberated the issue and ultimately concluded that the guidance in paragraph 7 of FASB Statement No. 97 should, therefore, be interpreted to require the recognition of a liability related to any such options that are other than nominal, reversing the conclusion reached in the exposure draft of the proposed SOP. AcSEC members believe that recording a liability during the accumulation phase of a contract for expected annuitization benefits would better reflect the economics of the contract. Some amount of revenue or fees was explicitly, or in some cases implicitly, being charged for this additional contract feature; therefore, the cost of providing the potential future benefits should also be recognized in the accumulation phase. Such additional benefits can be clearly and materially favorable to the contract holder and thus represent a loss contingency that is both probable and reasonably estimable. The obligation to provide a service/benefit under an annuitization guarantee also meets the definition of a liability under FASB Concepts Statement No. 6, *Elements of Financial Statements*.

A-41.    AcSEC noted that annuitization benefits are similar in many respects to MGDBs in that they provide an additional benefit beyond the account balance. For example, both the MGDB and guaranteed minimum income benefit (GMIB) features represent a minimum guaranteed amount on a variable account balance, with the principal difference being that one is promised upon death, the other upon annuitization. Based on this similarity to MGDB, AcSEC concluded that the MGDB model should be used to accrue an additional liability for GMIB if, at the expected annuitization date, the present value of expected annuitization payments exceeds the expected accrued account balance. In addition, AcSEC noted that if an insurance enterprise has reinsured the GMIB risk, in many instances the reinsurance contract results in a derivative recognized as an asset on the statement of financial condition. If the GMIB liability was not recognized,

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

stockholders' equity would be increased, when in fact that asset is substantially offset by an unrecorded liability. However, AcSEC observed that the GMIB liability recognized under the guidance in this SOP will not be measured at fair value and therefore would not necessarily offset the reinsurance asset.

**A-42.** In reaching a conclusion relative to accounting for annuitization option benefits, AcSEC considered several alternative models, including the loan commitment and written option models. AcSEC's consideration of those models is discussed in the following paragraphs of this SOP.

**A-43.** *Consideration of the loan commitment model.* AcSEC considered an analogy between annuitization options provided to contract holders and loan commitments offered to borrowers, the accounting for which is prescribed by FASB Statement No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases,* which effectively defers revenue recognition until the economic sacrifice has occurred. FASB Statement No. 91 states in paragraph 8 that "fees received for a commitment to originate or purchase a loan or group of loans shall be deferred and, if the commitment is exercised, recognized over the life of the loan as an adjustment of yield…." Under this analogy, all fees related to an annuitization option should be deferred until the contract holder selects an annuity option; the fees would then be recognized over the payout phase of the annuity or, if annuitization was not elected, recognized in income at the date the contract is surrendered.

**A-44.** AcSEC believes that problems would arise in applying the loan commitment model to annuity contracts. First, it would be difficult to reasonably determine which fees should be deferred within a fee-based product as the fees related to the annuitization guarantee often are not stated explicitly, or even if stated explicitly, may have been priced on an integrated basis with other revenue components within the contract rather than on a stand-alone basis. Also, it is unclear how to apply this model to products where the insurance enterprise derives its income from investment spreads and thus the contracts have no explicit fee of any kind to defer.

**A-45.** In addition, AcSEC noted that there are differences between annuitization options and loan commitments. Annuitization options are of a long-term nature (for example, the contract holder may have until age 65, 80, or 90 to annuitize), whereas a loan commitment is generally for a much shorter period. Also, in deciding whether or not to annuitize, there are additional economic factors that contract holders must consider, such as alternative investment options, cash flow considerations, their tax situations, and needs of beneficiaries. Those factors are not relevant to the process of taking a loan, as the commitment is entered into with the intent to borrow and the principal decision is