COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

whether the loan terms are competitive. In view of the significant practical implications and many differences between annuitization options and loan commitments, AcSEC decided to reject the FASB Statement No. 91 approach in accounting for annuitization and similar elective benefits.

A-46. *Consideration of the written option model.* AcSEC also considered whether elective benefit options should be accounted for as written options by recording the fair value of the options both at inception and throughout the accumulation phase of the contract, with changes in fair value recognized in income. Supporters of this view believe that similar to the conclusion reached by AcSEC as noted in paragraph A-37 of this SOP, the guidance in paragraph 7 of FASB Statement No. 97 should be interpreted to require the recognition of a liability related to any such options.

A-47. AcSEC also noted that under FASB Statement No. 133, reinsurance of a GMIB option typically would be accounted for as a derivative contract by both the direct writer of the deferred annuity contract with the GMIB feature (ceding company) and the reinsurer, as such reinsurance contracts are typically net settled. Also, although the FASB concluded that certain annuitization options such as GMIBs offered in direct annuity contracts typically are not net settled and therefore fall outside the scope of FASB Statement No. 133, some argue that there are other written options that fall outside the scope of FASB Statement No. 133 that nevertheless are required to be fair valued. For example, EITF Issue No. 99-2, *Accounting for Weather Derivatives*, requires fair value for certain written options even though they fall outside the scope of FASB Statement No. 133. However, those are examples of contracts falling outside of the scope of Statement No. 133 that represent written options in their entirety and not a component embedded in a contract.

A-48. It was also noted that following the approach of valuing all elective options at fair value would be a change in practice and would require insurance enterprises to determine the fair value of every available annuitization option. Traditional annuity purchase options may have little value, but it would be necessary to continuously determine their value. AcSEC also discussed the issues of the lack of a ready market to determine the fair value of the annuity options because each contract's features are unique by product as well as by insurance enterprise, and of the difficulty involved in splitting apart an integrated fee-based contract to determine applicable fees representing the implicit option premium received, adding to the practical problems of applying this approach.

## Sales Inducements to Contract Holders

A-49. Sales inducements to contract holders typically can be characterized as one

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

of the following types: immediate, persistency, and enhanced crediting rate. The actual structure of the inducement can take many forms. Economically, recovery of the costs associated with sales inducements is predicated on a future income stream of items such as fees charged against the assets, investment margins, surrender charges, cost of insurance charges, or reduction of other cost components. In some cases, insurance enterprises may accept lower margins on the product. Sales inducements may be part of an arrangement whereby the sales agent is willing to accept lower commissions, which may offset some or all of the associated cost. In some cases, inducement programs may be initiated to prevent recognition of more dramatic losses if the insurance enterprise is unable to retain contract holders (for example, the insurance enterprise may be required to sell investments at a loss to fund contract surrenders).

A-50. *Consideration of the debt model.* Asset accumulation products accounted for under FASB Statement No. 97 as investment products or universal life-type contracts are viewed as financial instruments. The insurance enterprise has a contractual obligation to deliver cash and the customer has a contractual right to receive cash. Paragraph 15 of FASB Statement No. 97 requires that investment contracts issued by an insurance enterprise be accounted for in a manner consistent with the accounting for interest-bearing instruments.

A-51. AcSEC believes instruments issued by financial institutions should be accounted for consistently, as noted in FASB Statement No. 97, paragraph 39: "While many investment contracts are issued primarily by insurance enterprises, the Board believes that similar financial instruments should be accorded similar treatment regardless of the nature of the issuing enterprise." In connection with an immediate inducement, cash is given to the insurance company in exchange for a promise to pay back an amount in excess of the cash received. Persistency and enhanced inducements are also analogous to nonlevel interest on fixed income securities. FASB Statement No. 91 requires that fees or costs be recognized as yield adjustments over the life of the contract by the interest method of recognition for nonlevel interest. AcSEC concluded that sales inducements meeting the criteria in paragraph .37 of this SOP should result in an effective yield being recognized over the expected life of the contract, rather than expensing the persistency and enhanced interest rate inducements as amounts are credited to the contract holder. This treatment will result in recognition of the sales inducement as it is accrued or when it is credited to the account balance, whichever is earlier.

A-52. *Consideration of sales inducements as deferred acquisition costs.* AcSEC considered the arguments in favor of accounting for sales inducements as a deferred acquisition cost. Insurance companies price the products based on total cash inflows and outflows. Some argued that the form of the transaction that splits these outflows between agent and the customer should be of no consequence, and the substance of the transaction

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

is that certain outflows are paid to induce the customer to acquire the product. AcSEC concluded that sales inducements do not meet the definition of a deferrable acquisition cost because they are benefits paid to contract holders, not payments to third parties.

A-53. *Criteria for capitalization.* AcSEC considered the criteria for determining when a sales inducement is in excess of normal crediting rates that would warrant capitalization. AcSEC believed it was necessary for an insurance enterprise to explicitly demonstrate that such amounts are (*a*) incremental to amounts the enterprise credits on similar contracts without sales inducements, and (*b*) higher than the contract's expected ongoing crediting rates for periods after the inducement; that is, the crediting rate excluding the inducement should be consistent with assumptions used in estimated gross profits, contract illustrations, and interest crediting strategies. These criteria are necessary to prevent capitalization of interest crediting amounts that are current period benefit expenses.

A-54. AcSEC believes that in determining whether an enhanced crediting rate is incremental to amounts the enterprise credits on similar contracts, an insurance enterprise should compare the enhanced crediting rate with the current rate offered on a similar product sold without a sales inducement, if available. In cases where a similar product is not actively marketed and sold without the enhanced crediting rate, AcSEC believes the enterprise should demonstrate that the enhanced crediting rate is incremental to the effective crediting rate on the enterprise's other product(s) that have common characteristics and substance. For example, variable annuities may offer a fixed return over a six-month period until the funds are transferred into equity funds (dollar cost averaging options). The fixed return is often in excess of the interest rate credited on other variable annuity general account fixed income investment alternatives of similar duration that are actively marketed and sold by the enterprise. The excess interest rate would meet the criterion in paragraph .37 of this SOP of "incremental to amounts the enterprise credits on similar contracts without sales inducements."

A-55. Normally day-one and persistency bonuses would meet the criteria in paragraph .37 of this SOP, because crediting occurs on a specific date and thus the bonus would be incremental to other similar contracts with a different anniversary.

A-56. *Consideration of expensing sales inducements in the period credited.* AcSEC also considered and rejected the view that benefits payable to contract holders should be charged to benefit expense in the period credited to the contract holder consistent with other benefit payments. Under this method, AcSEC noted that sales inducements would be recorded as a liability to the customer at the time they meet the definition of a liability, with an immediate charge to expense as a benefit cost.

A-57. AcSEC recognized the long-duration nature of the contracts as defined in

Revised December 2003                                     42

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

FASB Statements No. 60 and No. 97 and was concerned that expensing sales inducements in the period credited could lead to different accounting for contracts that are economically similar. AcSEC noted that contract wording could easily be changed to obtain different accounting treatments. For example, contracts with identical economic benefits to the contract holder could be designed, one with an immediate bonus with a surrender charge expiring after five years and one with a persistency bonus credited at the end of five years. Expensing sales inducements in the period credited would result in very different accounting results even though the contracts were identical economically and would result in loss at inception on the contract that offered an immediate sales inducement. Another contract with a persistency bonus would give the contract holder the same cash in the future and not have a loss at inception. Based on those concerns, AcSEC rejected the concept of expensing sales inducements in the period credited and concluded to expense sales inducements over the period that the long-duration contract is in force.

A-58. *Amortization of deferred sales inducements.* For contracts accounted for under FASB Statement No. 97, the asset arising from sales inducements should be amortized using methodology and assumptions consistent with those used for deferred acquisition costs under FASB Statement No. 97, which is effectively the expected life of the accumulation phase of the contract. Because FASB Statement No. 97 requires that the annuitization phase be viewed as a separate contract, the annuitization phase should not be combined with the accumulation phase. AICPA Practice Bulletin No. 8, *Application of FASB Statement No. 97, Accounting and Reporting by Insurance Enterprises for Certain Long-Duration Contracts and for Realized Gains and Losses from the Sale of Investments, to Insurance Enterprises*, states:

> The amortization method described in FASB Statement No. 97 for universal life-type contracts should be used for investment contracts that include significant surrender charges or that yield significant revenue from sources other than the investment of contract holders' funds. This method matches amortization of deferred policy acquisition costs (DPAC) with the recognition of gross profits. Otherwise, DPAC on investment contracts should be amortized using an accounting method that recognizes acquisition and interest costs as expenses at a constant rate applied to net policy liabilities and that is consistent with the interest method under FASB Statement No. 91, *Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans and Initial Direct Costs of Leases* (interest method).

This guidance is provided for the amortization of deferred acquisition costs, which in this context is similar to debt issuance costs.

A-59. AcSEC considered, but rejected, the view that a qualifying sales

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

inducement should be amortized over the shorter of the expected life of the contract or the period during which the sales inducement is effectively operating to incent persistency. As the recovery of sales inducements is through future income streams [such as fees charged against the assets, investment margins, cost of insurance charges, reduction of other cost components (such as commissions), or surrender charges] during the expected contract life, AcSEC concluded that qualifying sales inducements should be amortized over the expected life of the contract. In addition, amortization of deferred sales inducements will include an expected lapse assumption that is updated each period.

**Disclosures**

A-60.  AcSEC concluded that it is important to provide details of the investments of variable separate accounts with guarantees because this provides information on a significant asset for many insurance enterprises. In addition, the nature of the guarantee is affected by the nature of the investments in the separate account. Some respondents to the exposure draft recommended that gains and losses on assets transferred to a separate account also should be disclosed. AcSEC agreed that this would be useful information to readers of financial statements, and, therefore, required differentiation of gains and losses that were generated from the insurance enterprise's general account investments.

A-61.  Several respondents to the exposure draft of the proposed SOP suggested that the required disclosures should also include the significant assumptions used to estimate liabilities for additional insurance benefits and minimum guarantees. AcSEC agreed that this information would help improve transparency and comparability of financial statements, and concluded that the significant assumptions should be required disclosures. AcSEC concluded that the detail and amount of the separate account liability balances subject to various types of guarantees would be useful information to readers of financial statements and promote comparability. AcSEC also concluded that it is important to disclose the net amount at risk by type of guarantee because this provides readers of financial statements with the maximum amounts the insurance enterprise is at risk for guaranteeing.

A-62.  AcSEC discussed including sensitivity analysis related to significant assumptions used for liability balances related to minimum guarantees, and concluded that this information would be more appropriate in the management discussion and analysis section of an enterprise's public reporting.

**Effective Date and Transition**

A-63.  AcSEC concluded that this SOP should be initially applied at the beginning of the fiscal year that begins after December 15, 2003, which should permit

Revised December 2003                                    44

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

companies sufficient time to implement this SOP. AcSEC also concluded that it should allow companies the option of early adoption.

A-64. AcSEC concluded that the effect of initially adopting this SOP should be reported as a cumulative effect of a change in accounting principle (in accordance with the provisions of Accounting Principles Board (APB) Opinion No. 20, *Accounting Changes*) and that restatement of prior annual financial statements should be prohibited. AcSEC recognizes the benefits of comparable financial statements but believes that due to significant judgment and the possible use of hindsight in applying this SOP, and the significance of the efforts and costs likely to be incurred, retroactive restatement or pro forma disclosures in the year of adoption should not be required.

A-65. AcSEC considered allowing entities the choice, for certain provisions of this SOP, to reclassify previously reported financial statements provided there was no valuation basis adjustment affecting earnings, while prohibiting reclassification when the valuation provisions of this SOP would affect earnings. AcSEC concluded that the provisions of this SOP are not fundamentally different from the FASB Statement No. 97 model and that allowing entities the option of applying certain provisions and not others would result in inconsistent recognition of liabilities, revenue, and acquisition costs. AcSEC concluded that allowing restatement in certain circumstances and not allowing restatement in other circumstances is not appropriate. Therefore, AcSEC decided not to permit restatement.

A-66. AcSEC concluded that securities subject to FASB Statement No. 115 previously carried at fair value that are reclassified to the general account may be designated as held-to-maturity for debt securities, available-for-sale for debt and equity securities, or trading for debt and equity securities. AcSEC believed that prior to implementation of this SOP the assets were being accounted for under separate account valuation basis and, after reclassification to the general account per the guidance of this SOP, they are to be valued under general account guidance. Accordingly, AcSEC concluded this designation is similar to an enterprise initially adopting FASB Statement No. 115 for those securities. The guidance provided by AcSEC is consistent with that provided in FASB Statement No. 115 for its initial adoption.

A-67. AcSEC also concluded that debt or equity securities subject to FASB Statement No. 115, previously classified as part of a separate account but valued in accordance with paragraphs 45 through 51 of FASB Statement No. 60, as amended, should maintain the original designation as held-to-maturity, available-for-sale, or trading. That designation previously was made in accordance with FASB Statement No. 115 when the security was purchased and classified as a separate account asset. Although under this SOP the securities are now classified as part of the general account, the

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

insurance enterprise has already assessed its intent under FASB Statement No. 115, which is not changed.

A-68. Any revaluation adjustment for the securities described in paragraph A-66 of this SOP should be reported in a manner similar to the cumulative effect of a change in accounting principle through net income or accumulated other comprehensive income, as appropriate. In its deliberations, AcSEC considered both the transfer and transition guidance provided in FASB Statement No. 115, paragraphs 15 and 25, related to reclassifications among categories. AcSEC believes that the transition requirements of FASB Statement No. 115 are consistent with AcSEC's decision not to permit restatement resulting from adoption of this SOP.

A-69. AcSEC concluded that, for debt or equity securities subject to FASB Statement No. 115 and classified as available-for-sale that are part of a contractually referenced pool of assets where a total return will be accrued to the account balance liability, and a transition adjustment for the liability valuation is reported in accordance with paragraph .41e, the related debt or equity securities may be reclassified to trading upon initial adoption of the SOP. In this case, AcSEC believes the combined effect of the asset and liability transition adjustments should be reported in a manner similar to the cumulative effect of a change in accounting principle. An enterprise may not have designated a security as available-for-sale when it purchased the security if it had known a contract holder liability designed to mimic the return would be recorded based on the referenced asset in the statement of operations. In addition AcSEC noted that FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities,* provides for similar transition treatment because the guidance for hedge accounting significantly changed. AcSEC also made the analogy to the transition guidance in EITF Issue No. 97-14, *Accounting for Deferred Compensation Arrangements Where Amounts Earned Are Held in a Rabbi Trust and Invested.*

A-70. The insurance enterprise's accounting policies with regard to assets other than those subject to FASB Statement No. 115 should be consistently applied upon reclassification of assets from separate accounts to the general account at the date of initial adoption of the SOP. AcSEC concluded that any revaluation adjustments related to assets other than those subject to FASB Statement No. 115 should be reported in a manner similar to the cumulative effect of a change in accounting principle.

A-71. AcSEC concluded that, because this SOP may change the way an insurance enterprise applies the mortality and morbidity significance test and that the results of that test may change the required liability valuation model, insurance enterprises should perform a new determination of significance of mortality and morbidity risk resulting from the insurance benefit features of the contract for purposes of

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

contract classification at the date of initial adoption of this SOP. AcSEC considered requiring this determination to be made as of original contract issuance, but rejected that approach because it would not be practicable to obtain and document a range of reasonably possible cash flow outcomes as of those inception dates without the inappropriate use of hindsight. In addition to the burden of performing the test without original information, it would be difficult to verify the appropriateness of the outcomes. AcSEC also considered requiring the determination only for new contracts, but was concerned that would cause inconsistencies in the accounting for similar contracts of an enterprise for many years due to the long-duration nature of such contracts.

A-72. AcSEC considered whether to require restatement of contract holder liabilities as a result of adoption of this SOP, but concluded that restatement is not necessary and may not be possible to reconstruct. AcSEC concluded that any adjustment to contract holder liabilities from adoption of this SOP should be reported in a manner similar to the cumulative effect of a change in accounting principle in accordance with the provisions of APB Opinion No. 20, through net income or, for amounts previously reported under EITF Topic No. D-41, accumulated other comprehensive income.

A-73. AcSEC, in discussing sales inducements, recognized that some insurance enterprises charged those costs to expense as incurred. AcSEC believes that the costs of developing the information that would be necessary to determine the costs that would be capitalized if this SOP were applied retroactively would exceed the benefits retroactive application might offer and that such retroactive determination should not be made. AcSEC believes this treatment is consistent with transition rules of other accounting guidance, such as SOP 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use.*

A-74. AcSEC further concluded that the unamortized capitalized sales inducement balance at transition should not be adjusted, but the balance should be subject to the amortization provisions of this SOP on a prospective basis. Prospective treatment and prohibition on restating sales inducements capitalized is consistent with AcSEC's conclusions on restatement of previously expensed inducements. Identification and amortization of previously capitalized costs in accordance with the provisions of this SOP should result in an acceptable level of comparability and understandability.

# Appendix B

# Illustration for Presentation of an Insurance Enterprise's Interest in a Separate Account

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

.45

**B-1.** The following example illustrates the presentation in the financial statements of an insurance enterprise's proportionate interest in separate accounts:

> An insurance enterprise has a separate account that consists of two subaccounts, Subaccount ABC and Subaccount XYZ. The insurance enterprise has a 10 percent interest in Subaccount XYZ, determined based on the fair value of Subaccount XYZ's investments. Subaccount XYZ has debt securities, mutual fund investments, mortgage loans, and real estate. Subaccount XYZ carries its investments at fair value; if the general account held these investments, they would be accounted for at amortized cost or fair value, depending on the applicable literature. Accounting for equity investments, including mutual funds, would depend on percentage ownership. If Subaccount XYZ owns more than 50 percent of the outstanding shares of a mutual fund, the accounting and classification of the items included in the column titled "Separate Account at General Account Value" would reflect consolidating the mutual fund into Subaccount XYZ. That is, if the mutual fund held debt and equity securities, those amounts would be included in the debt and equity securities lines of the table below.

The assets of Subaccount XYZ are composed of the following:

| Investment | Separate Account at Fair Value | Separate Account at General Account Value *fn 1(22)* | Insurer's Interest | Proportionate Interest |
|---|---|---|---|---|
| Debt securities | 400 | 400 | 10% | 40 |
| Equity securities | 300 | 300 | 10% | 30 |
| Mortgage loans | 250 | 200 | 10% | 20 |
| Real estate | 130 | 100 | 10% | 10 |
| Total assets | $1,080 | $1,000 | 10% | $100 |

Balances presented in the insurer's statement of financial condition would reflect:

Assets:

    Debt securities *fn 2(23)*      40

    Equity securities *fn 2(24), fn 3(25)*      30

    Mortgage loans      20

Revised December 2003

48

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

|  |  |
|---|---:|
| Real estate | 10 |
| Total investments | 100 |
| Separate account—Assets | $972 *fn 4(26)* |
| Liabilities: Separate account—Liabilities | $972 |

The applicable disclosures for the insurer's proportionate interest in these specific assets would be included within the applicable disclosures for the general account invested assets.

The XYZ separate account's balances for net investment income and gains and losses:

|  | XYZ Separate Account Total | Insurer's Interest | Apportioned Values | General A Classific |
|---|---:|---:|---:|---|
| Net investment income (NII) | 65 | 10% | 6.5 | Rever |
| Realized gains and losses | 20 | 10% | 2.0 | Rever |
| Unrealized gains and losses: |  |  |  |  |
| Debt securities | 8 | 10% | 0.8 | Revenue or 5(2 |
| Equity securities | 25 | 10% | 2.5 | Revenue or 5(2. |
| Mortgage loans | 5 | 10% | 0.5 | Not recogn 6(2! |
| Real estate | 2 | 10% | 0.2 | Not recogn 6(3. |
| Total NII and gains and losses | $125 |  | 12.5 |  |

Assume in the second year:

- Insurer interest is lowered to 5 percent on the last day of the first quarter.
- At the time of dilution:
  - Separate account at fair value was $ 1,090.
  - Separate account at general account value was $ 1,007.

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

- Fair value of each investment increases 1 percent

End of first quarter:

| Investment | Separate Account at Fair Value | Separate Account at General Account Value | Insurer Interest | Proportionate Interest After Dilution |
|---|---|---|---|---|
| Debt securities | 404 | 404 | 5% | 20 |
| Equity securities | 303 | 303 | 5% | 15 |
| Mortgage loans | 252 | 200 | 5% | 10 |
| Real estate | 131 | 100 | 5% | 5 |
| Total assets | $1,090 | $1,007 | | 50 |

Balances presented in the insurer's statement of financial condition would reflect:

| | | |
|---|---|---|
| Assets: | Debt securities | 20 |
| | Equity securities | 15 |
| | Mortgage loans | 10 |
| | Real estate | 5 |
| | Total investments | 50 |
| | Separate account—Assets | $1,036 *fn 7 (31)* |

The XYZ separate account's balances for net investment income and gains and losses for the quarter:

| | XYZ Separate Account Total | Insurer's Interest | Apportioned Values |
|---|---|---|---|
| Net investment income | 16.3 | 10% | 1.6 |
| Unrealized gains and losses: | | | |
| Debt securities | 4.0 | 10% | 0.4 |
| Equity securities | 3.0 | 10% | 0.3 |
| Mortgage loans | 2.5 | 10% | 0.3 |

Revised December 2003                                50

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

| | | | |
|---|---|---|---|
| Real estate | 1.2 | 10% | 0.1 |
| Total NII and gains and losses | $27 | | 2.7 |

The seed money change for the quarter would be accounted for as follows:

| | |
|---|---|
| Amount due to proportionate interest in revenue | 2.1 |
| Gain recognition on dilution of interest | 4.2 fn |
| | 8(32) |

# Appendix C

# Sample Disclosures

.46

      C-1.   This appendix provides an illustration of the financial statement disclosure requirements relating to paragraph .38 of this Statement of Position (SOP). Entities are not required to display the disclosure information contained herein in the specific manner illustrated. Alternative ways of disclosing the information are permissible provided that the disclosure requirements of this SOP, as described in paragraph 38, are met, such as showing account balances of contracts with guarantees by type of benefit.

      The company issues variable contracts through its separate accounts for which investment income and investment gains and losses accrue directly to, and investment risk is borne by, the contract holder (traditional variable annuities). The company also issues variable annuity and life contracts through separate accounts where the company contractually guarantees to the contract holder (variable contracts with guarantees) either (*a*) return of no less than total deposits made to the contract less any partial withdrawals, (*b*) total deposits made to the contract less any partial withdrawals plus a minimum return, or (*c*) the highest contract value on a specified anniversary date minus any withdrawals following the contract anniversary. These guarantees include benefits that are payable in the event of death, annuitization, or at specified dates during the accumulation period. During 20X1 and 20X2 there were no gains or losses on transfers of assets from the general account to the separate account.

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

The assets supporting the variable portion of both traditional variable annuities and variable contracts with guarantees are carried at fair value and reported as summary total separate account assets with an equivalent summary total reported for liabilities. Amounts assessed against the contract holders for mortality, administrative, and other services are included in revenue and changes in liabilities for minimum guarantees are included in policyholder benefits in the Statement of Operations. Separate account net investment income, net investment gains and losses, and the related liability changes are offset within the same line item in the Statement of Operations.

At December 31, 20X1 and 20X2, the company had the following variable contracts with guarantees. (Note that the company's variable contracts with guarantees may offer more than one type of guarantee in each contract; therefore, the amounts listed are not mutually exclusive.) For guarantees of amounts in the event of death, the net amount at risk is defined as the current guaranteed minimum death benefit in excess of the current account balance at the balance sheet date. For guarantees of amounts at annuitization, the net amount at risk is defined as the present value of the minimum guaranteed annuity payments available to the contract holder determined in accordance with the terms of the contract in excess of the current account balance. For guarantees of accumulation balances, the net amount at risk is defined as the guaranteed minimum accumulation balance minus the current account balance.

|  | December 31 | |
|---|---|---|
|  | _20X1_ | _20X2_ |
| **Return of Net Deposits** | | |
| _In the event of death_ | | |
|     Account value | $xxx | $xxx |
|     Net amount at risk | $xxx | $xxx |
|     Average attained age of contract holders | xx | xx |
| _At annuitization_ | | |
|     Account value | $xxx | $xxx |
|     Net amount at risk | $xxx | $xxx |
|     Weighted average period remaining until expected annuitization | xx | xx |
| _Accumulation at specified date_ | | |
|     Account value | $xxx | $xxx |
|     Net amount at risk | $xxx | $xxx |
| **Return of Net Deposits Plus a Minimum Return** | | |
| _In the event of death_ | | |
|     Account value | $xxx | $xxx |
|     Net amount at risk | $xxx | $xxx |

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

|  | December 31 | |
|---|---|---|
|  | 20X1 | 20X2 |
| Average attained age of contract holders | xx | xx |
| Range of guaranteed minimum return rates | x-x% | x-x% |
| *At annuitization* | | |
| Account value | $xxx | $xxx |
| Net amount at risk | $xxx | $xxx |
| Weighted average period remaining until expected annuitization | xx | xx |
| Range of guaranteed minimum return rates | x-x% | x-x% |
| *Accumulation at specified date* | | |
| Account value | $xxx | $xxx |
| Net amount at risk | $xxx | $xxx |
| Range of guaranteed minimum return rates | x-x% | x-x% |

**Highest Specified Anniversary Account Value Minus Withdrawals Post Anniversary**

| | | |
|---|---|---|
| *In the event of death* | | |
| Account value | $xxx | $xxx |
| Net amount at risk | $xxx | $xxx |
| Average attained age of contract holders | xx | xx |
| *At annuitization* | | |
| Account value | $xxx | $xxx |
| Net amount at risk | $xxx | $xxx |
| Weighted average period remaining until expected annuitization | xx | xx |
| *Accumulation at specified date* | | |
| Account value | $xxx | $xxx |
| Net amount at risk | $xxx | $xxx |

Account balances of contracts with guarantees were invested in variable separate accounts as follows:

| *Asset Type* | December 31, 20X1 | December 31, 20X2 |
|---|---|---|
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ | $ |
| Obligations of states of the United States and political subdivisions of the states | | |
| Corporate debt securities: | | |
| —Investment grade | | |
| —Noninvestment grade | | |
| Foreign debt securities | | |
| Mortgage-backed securities | | |

Revised December 2003                                      53

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

    Equity securities (including mutual funds) fn 1(33)

    Real estate

    Mortgage loans

    Derivative financial instruments

    Cash and cash equivalents

        Total     $ X,XXX,XXX     $ X,XXX,XXX

The following summarizes the liabilities for guarantees on variable contracts reflected in the general account:

| | Minimum Guaranteed Death Benefit (MGDB) | Guaranteed Minimum Accumulation Benefit (GMAB) | Guaranteed Minimum Income Benefit (GMIB) | Totals |
|---|---|---|---|---|
| Balance at January 1 | $ X,XXX,XXX | $ X,XXX,XXX | $ X,XXX,XXX | $ X,XXX,XXX |
| Incurred guarantee benefits fn 2(34) | X,XXX,XXX | X,XXX,XXX | X,XXX,XXX | $ X,XXX,XXX |
| Paid guarantee benefits | X,XXX,XXX | X,XXX,XXX | X,XXX,XXX | $ X,XXX,XXX |
| Balance at December 31, 20X2 | $ X,XXX,XXX | $ X,XXX,XXX | $ X,XXX,XXX | $ X,XXX,XXX |

The MGDB liability is determined each period end by estimating the expected value of death benefits in excess of the projected account balance and recognizing the excess ratably over the accumulation period based on total expected assessments. The Company regularly evaluates estimates used and adjusts the additional liability balance, with a related charge or credit to benefit expense if actual experience or other evidence suggests that earlier assumptions should be revised. [*Include discussion of change in estimate if material.*]

The following assumptions and methodology were used to determine the MGDB liability at December 31, 20X2:

- Data used was 1,000 stochastically generated investment performance scenarios.
- Mean investment performance assumption was XX.
- Volatility assumption was XX.
- Mortality was assumed to be 90 percent of the Annuity 2000 table.
- Lapse rates vary by contract type and duration and range from 1 percent to

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

- 20 percent, with an average of 3 percent.
- Discount rate was XX%.

Guaranteed minimum accumulation benefits are considered to be derivatives under Financial Accounting Standards Board Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities*, and are recognized at fair value through earnings.

The guaranteed minimum income benefit (GMIB) liability is determined each period end by estimating the expected value of the annuitization benefits in excess of the projected account balance at the date of annuitization and recognizing the excess ratably over the accumulation period based on total expected assessments. The Company regularly evaluates estimates used and adjusts the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised. [*Include discussion of change in estimate if material.*] The assumptions used for calculating the GMIB liability at December 31, 20X2, are consistent with those used for calculating the MGDB liability. In addition, the calculation of the GMIB liability assumes X percent of the potential annuitizations that would be beneficial to the contract holder will be elected.

# Appendix D

# Application of Statement of Position—Product and Product Feature Examples

.47

### Market Value Annuity

**D-1.** A market value annuity (MVA) provides for a return of principal plus a fixed rate of return if held to maturity (referred to herein as book value), or, alternatively, a "market adjusted value" if surrendered prior to maturity. The product is also sometimes referred to as a "market value adjusted annuity" or "modified guaranteed annuity." The product typically provides for a single premium that may be invested for a specified term, with typical terms of 1 to 10 years. A fixed interest rate is specified in the contract based upon the term selected. The contract contains surrender values that are based upon a market value adjustment formula if held for shorter periods. The formula typically is based on current crediting rates being offered for new MVA purchases with terms equal to the remaining term to maturity. The market value adjustment may be positive or

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

negative, depending on crediting rates at surrender.

**D-2.** Because the insurance enterprise provides a fixed return for a specified period, market value adjusted annuities written through a separate account do not meet the criteria in paragraph .11*d* of this Statement of Position (SOP). Under paragraph .11*d* of this SOP, all investment performance, net of contract fees, must be required to be passed through to the contract holder to qualify for separate account treatment. Therefore, the assets and liabilities related to market value adjusted annuities should be accounted for and reported as general account assets and liabilities.

**D-3.** Under the model, described in paragraphs .20 through .23 of this SOP, the liability to be held for market value adjusted annuities is the accrued account balance using the contractually specified rate. The market value adjusted amount generally is available at surrender only and is not available at contract maturity; therefore, the market value adjustment is considered a surrender charge or credit.

## Two-Tier Annuity

**D-4.** A two-tier annuity has two crediting rates applied to funds deposited into the contract. One rate is used to calculate the account balance if the contract holder elects to surrender the contract for cash, and is referred to as the "lower tier." A second rate, typically higher, is used to calculate the account balance, but only if the contract holder elects to annuitize the contract, and is referred to as the "upper tier."

**D-5.** This SOP requires that the accrued account balance during the accumulation phase be calculated using the lower-tier rate because the account balance accumulated at the lower tier is the amount that would be available in cash at maturity if the contract holder elects not to annuitize the contract. An additional liability determined in accordance with paragraphs .31 through .33 of this SOP should be recognized during the accumulation phase for the annuitization benefit in excess of the accrued account balance. When there is an additional liability for the annuitization benefit and a contract holder elects to annuitize, the present value of annuitization payments, including related incremental claims adjustment expenses, discounted at expected investment yields would represent the single premium used to "purchase" the annuitization benefit.

## Variable Annuity With Guaranteed Minimum Accumulation Benefit

**D-6.** Some deferred annuities provide a minimum accumulation benefit or a guaranteed account value floor that is available to the contract holder in cash. These benefits are often referred to as guaranteed minimum accumulation benefits, or GMABs.

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

D-7. *Example:* Contract holder deposits $100,000 in a deferred variable annuity that provides for a GMAB that guarantees that at a specified anniversary date (for example, five years), the contract holder's account balance will be the greater of (*a*) the account value, as determined by the separate account assets, or (*b*) deposits less partial withdrawals accumulated at 3 percent interest compounded annually. At the specified anniversary date the contract holder's account balance has declined to $80,000 due to stock market declines. The guaranteed minimum value of the $100,000 deposit compounded annually at 3 percent interest is $115,930. The contract holder's account balance will be increased to the greater amount, resulting in an account balance of $115,930. Financial Accounting Standards Board (FASB) Derivative Implementation Issue B8, *Identification of the Host Contract in a Nontraditional Variable Annuity Contract,* specifies that a GMAB is an embedded derivative subject to the requirements of FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities.* The remaining part of the hybrid contract should be accounted for separately.

**Variable Annuity With Guaranteed Minimum Income Benefit**

D-8. Some deferred variable annuities guarantee that, regardless of separate account investment performance, the contract holder will be able to annuitize after a specified date and receive a defined minimum periodic benefit. These benefits are available only if the contract holder elects to annuitize and are often referred to as guaranteed minimum income benefits, or GMIBs.

D-9. *Example:* A contract holder deposits $100,000 in a deferred variable annuity that provides a GMIB. The GMIB contract specifies that if the contract holder elects to annuitize, the amount available to annuitize will be the higher of the then account balance or the sum of deposits less withdrawals. The contract holder directs the deposit to equity-based funds within the separate account. At the date that the contract holder chooses to annuitize, the account balance has declined to $80,000 due to stock market declines. The contract holder elects a 20-year period-certain fixed payout annuity, payable monthly in arrears. Using the $100,000 guaranteed minimum account value at the date of annuitization and a guaranteed 3 percent crediting rate, the fixed monthly periodic annuity payment is $554.

D-10. During the accumulation phase, if the GMIB feature is not accounted for under the provisions of FASB Statement No. 133, an additional liability should be established if the present value of expected annuitization payments at the annuitization date exceeds the expected account balance at the expected annuitization date. That additional liability should be determined in accordance with paragraphs .31 through .33 of this SOP. When there is an additional liability for the annuitization benefit and a

Revised December 2003    57

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

contract holder elects to annuitize, the present value of annuitization payments, including related claims adjustment expenses, discounted at expected investment yields would represent the single premium used to "purchase" the annuitization benefit.

**D-11.** FASB Derivative Implementation Issue B25, *Deferred Variable Annuity Contracts with Payment Alternatives at the End of the Accumulation Period,* specifies that a GMIB does not meet the definition of an embedded derivative if it cannot be net settled. If the GMIB can be net settled, the guarantee is an embedded derivative in the accumulation period and should be accounted for under FASB Statement No. 133.

**Variable Annuity and Life Insurance**

**D-12.** Variable annuity and variable life insurance contracts provide the contract holder with a number of investment alternatives. Many of those investment alternatives will be separate account funds, such as equity, aggressive equity, high-grade corporate bond, mortgage loan, real estate and similar funds, that satisfy the criteria contained in paragraph .11 of this SOP. Other investment alternatives could include guaranteed investment and market value adjusted separate accounts as well as a general account fixed interest rate option.

**D-13.** *Example:* The contract holder deposits $100,000 in a deferred variable annuity that has no front-end load. The contract holder directs the allocation of the deposit to the following: aggressive growth equity fund, $25,000; high-yield corporate bond fund, $25,000; five-year guaranteed interest separate account, $25,000; and general account, $25,000.

**D-14.** Assets representing the contract holder's funds in the aggressive growth equity fund and high-yield corporate bond fund separate accounts satisfy all the criteria of paragraph .11 of this Statement of Position (SOP). The allocation to the guaranteed interest separate account does not satisfy the criterion in paragraph .11*d* of this SOP. Therefore, assets representing the contract holder's funds in the guaranteed interest separate account will be presented in the insurance enterprise's financial statements integrated with general account assets and liabilities. This reporting is appropriate even in those instances where the separate account arrangements with those contracts have been approved by regulatory authorities as separate account contracts. These contracts are often referred to as spread products, where the insurer bears the investment risk and its profits are derived primarily from the excess of investment performance over net amounts credited to the contract holder. Amounts related to this contract that are directed to the general account option will, of course, be shown within general account balances.

COPYRIGHT © 2003, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

## Group Participating Pension Contracts

**D-15.** Some FASB Statement No. 97, *Accounting and Reporting by Insurance Enterprises for Certain Long-Duration Contracts and for Realized Gains and Losses from the Sale of Investments,* contracts between insurance enterprises and pension plans have account balance crediting provisions that give the contract holder the total return based on a referenced pool of assets over the life of the contract either through crediting rates or termination adjustments. The ongoing crediting to the account balance may be based on statutory, cash basis, or book value returns. The contracts may not have a maturity date but specify that upon surrender any remaining return on the referenced pool of assets on the termination date not yet credited will be a termination adjustment. The referenced pool of assets may include mortgage loans, real estate, and equity and debt securities.

**D-16.** This SOP requires that, for contracts not accounted for under the provisions of FASB Statement No. 133, the liability for the contract holder account balance be based on the fair value of the referenced pool of assets without regard to the accounting under generally accepted accounting principles for the assets in the referenced pool of assets, with any change in the liability recognized through earnings.

## Sales Inducements to Contract Holders

**D-17.** Sales inducements to contract holders typically can be characterized as one of the following types: immediate bonuses, persistency bonuses, and enhanced crediting rate bonuses.

**D-18.** In the case of the immediate bonus, the insurance company is obligated to credit to the contract holder's account the sales inducement as a result of signing the contract. The contract holder account balance is increased for the full amount of the immediate bonus on the date that the bonus is contractually granted. If the criteria in paragraph .37 of this SOP are met, an asset should be established for the same amount. Even if a company were to impose a prepayment penalty designed to recover the sales inducement, paragraph 18 of FASB Statement No. 97 specifies that amounts assessed against policyholders in future periods cannot be considered in determining the liability for policy benefits. The prepayment penalty for the sales inducement would be treated no differently than any other surrender charge.

**D-19.** A persistency bonus is credited to the contract holder account balance at the end of a specified period if the contract remains in force at that date. The amount that will be credited in accordance with the terms of the contract should be accrued as a component of the contract holder account balance ratably over the vesting period. If the

Revised December 2003                               59