**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

In re ELAN CORPORATION          :

SECURITIES LITIGATION          :

-------------------------------------------------x

This Document Relates to:          :

    All Actions          :

-------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
RICHARD M. BERMAN**

02 Civ. 865 (RMB)(FM)

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

        This putative class action arises out of more than thirty securities class

actions which have been consolidated before Your Honor. The plaintiffs ("Plaintiffs")

are persons who acquired shares of Elan Corporation ("Elan"), an Irish pharmaceutical

company, either in the open market or as the result of a merger. The defendants are Elan;

four of its executives, Donal L. Geaney ("Geaney"), Thomas G. Lynch ("Lynch"), Shane

M. Cooke ("Cooke"), and William F. Daniel ("Daniel") (collectively, the "Individual

Defendants" and, together with Elan, the "Elan Defendants"); and Elan's outside auditor,

KPMG, Chartered Accountants ("KPMG-Ireland"), and a related United States entity,

KPMG LLP ("KPMG-US") (together, the "KPMG Defendants"). (See Docket No. 37).

On January 24, 2003, after the appointment of lead plaintiffs and lead counsel, the

Plaintiffs filed an 85-page consolidated complaint ("Complaint" or "Compl.") alleging

violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, as amended

("Securities Act"), and Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of

1934, as amended ("Exchange Act"), as well as several rules promulgated thereunder.

(Docket No. 45). The Elan and KPMG Defendants have now moved to dismiss the

Complaint, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure,

and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.

§ 78-u4(b), for failure to state a claim or plead with the requisite particularity. (Docket

Nos. 54, 56, 60). For the reasons set forth below, I recommend that these motions be

granted in part and denied in part. Additionally, except where otherwise noted, the

Plaintiffs should be given leave to replead within thirty days.[1]

---

[1]    The Plaintiffs have filed two cross-motions. First, the Plaintiffs seek to strike
from the record several exhibits proffered by the Elan and KPMG-Ireland Defendants, (see Decl.
of Jaculin Aaron, Esq., dated Mar. 25, 2003 ("Aaron Decl."), Exs. 5-10; Aff. of Michael R.
Young, Esq., sworn to on Mar. 25, 2003, Exs. 8, 11-12), in an effort to show (a) that the
Securities and Exchange Commission ("SEC" or "Commission") undertook a "lengthy and
detailed review" of Elan's accounting practices in 1999, but took issue only with its accounting
for two of Elan's joint ventures; and (b) that market analysts understood some of the facts that
the Plaintiffs allege were concealed. (See Docket No. 67). Because those exhibits plainly raise
matters not appropriate for consideration at this pre-discovery stage, I have not considered them,
thereby rendering the Plaintiffs' motion moot.

       The Plaintiffs' second cross-motion (Docket No. 80) asks the Court to take
judicial notice of Elan's 2002 Annual Report and Form 20-F, in which Elan restated its earnings
for 2001, reducing its reported income by $73 million and its cash flow from investments by
more than $500 million. In their opposition papers, the Elan Defendants concede that "the
request for judicial notice is not objectionable," although they assert that the Plaintiffs'
"suggestion that this document supports a finding of scienter is." (Elan Defs.' Mem. of L. in
Opp. to Pls.' Mot. for Judicial Notice at 1). Inasmuch as the exhibit is a proper subject of
judicial notice, this motion should be granted.

(continued...)

2

## II.    Background

### A.    Relevant Facts

For present purposes, the following facts alleged in the Complaint must be taken as true.

#### 1.    Parties

Elan is an Irish pharmaceutical company, with headquarters in New York and San Diego, that specializes in the discovery, development, and marketing of therapeutic products and services in the areas of neurology, pain management, and auto-immune diseases. (Compl. ¶ 13). Elan's securities are traded on the Irish Stock Exchange as common stock, and on the New York Stock Exchange as American Depository Receipts ("ADRs").[2] (Id. ¶ 13(f)).

Defendant Geaney served as Chief Executive Officer and Chairman of Elan until July 2002, when he was fired due to the financial improprieties alleged in the Complaint. (Id. ¶ 14). Defendant Cooke was an officer of Elan and served as its Chief Financial Officer from July 5, 2001, through July 2002, when he met the same fate as

---

[1] (...continued)
    The Plaintiffs also have submitted a letter-request to lift the automatic stay of discovery imposed by the PSLRA. That application is addressed in a separate Discovery Order bearing today's date.

[2]    An ADR is a receipt issued by a U.S. depositary bank "which represents shares of a foreign corporation held by the bank." (See http://www.nyse.com/glossary/1042235995800.html) (last visited May 11, 2004). ADRs are quoted in dollars and trade in the same manner as the shares of a domestic corporation. (Id.).

3

Geaney. (Id. ¶ 15). Defendant Lynch was an officer and director of Elan and served as
its Chief Financial Officer prior to July 5, 2001. (Id. ¶ 16). Defendant Daniel was an
officer of Elan who signed its filings with the SEC. (Id. ¶ 17).

 Defendant KPMG-Ireland is an accounting firm based in the United
Kingdom with offices in Dublin. (Id. ¶ 19). KPMG-Ireland certified Elan's Financial
Statements for the years 1999 through 2001 as conforming to Generally Accepted
Accounting Principles ("GAAP") both in the United States and Ireland. (Id.). Defendant
KPMG-US is an accounting firm based in the United States with its principal offices in
New York. (Id. ¶ 20). KPMG-US is alleged to have audited Elan's financial statements
and to have provided opinions to KPMG-Ireland regarding Elan's compliance with U.S.
GAAP. (Id.).

 The Plaintiff Class consists of all persons who purchased Elan ADRs
between February 7, 2000, and July 1, 2002 (the "Class Period"). (Id. ¶ 226). The
Plaintiff Class contains two subclasses consisting of: (a) all persons who acquired Elan
ADRs as a result of Elan's merger with the Liposome Corporation ("Liposome")
(hereinafter, "Liposome Subclass"), and (b) all persons who acquired Elan ADRs as a
result of Elan's merger with Dura Pharmaceuticals, Inc. ("Dura") (hereinafter, "Dura
Subclass"). (Id.).

4

2.    Alleged Securities Law Violations

The Plaintiffs contend that the Elan Defendants engaged in various improper practices during the Class Period which materially inflated Elan's reported financial results. The Plaintiffs further contend that the KPMG Defendants improperly certified Elan's inflated financial statements.

The common feature of many of Elan's alleged accounting schemes was "round tripping," a process by which Elan provided third parties with funding that was later returned to Elan. (Id. ¶ 26). At the same time that Elan booked its payments to the third parties as either capital investments or loans, it also recorded the returning funds as revenue. (Id.). Elan allegedly inflated its financial results through four different round-tripping schemes involving (a) joint business ventures ("JBVs"), (b) a product rationalization program, (c) risk sharing arrangements, and (d) special purpose entities. Elan also allegedly engaged in a scheme to generate tax-free compensation for its executives.

a.    Joint Business Venture Scheme

From 1998 through mid-2001, Elan entered into more than fifty JBVs with other firms ("Business Partners"). (Id. ¶¶ 31, 35). Although Elan touted the JBVs as vehicles to spread the risks associated with the development of new products, they actually were created to enable Elan to report substantial sales income.

5

In a typical transaction, Elan would fund the JBV by making direct and indirect contributions, which the JBV, in turn, used to purchase a license from Elan for its medical technology. As a result of this round tripping of funds, the JBV typically would be "penniless" following the purchase of the license. (<u>See</u> <u>id.</u> ¶¶ 34-35). Thereafter, however, from time to time Elan would inject operating funds into the JBV. (<u>See</u> <u>id.</u> ¶ 35). Elan also had the right to appoint one of the JBV's directors whose attendance was required for there to be a quorum at a JBV board meeting. (<u>Id.</u> ¶ 40(b)).

Under the equity method of accounting, a company that exercises "significant influence" over another entity must include a proportionate share of the gains or losses of that entity in its own financial results to conform to GAAP. (<u>See</u> <u>id.</u> ¶ 39). Pursuant to GAAP, there is a presumption that a company exerts the requisite degree of influence over another entity when it owns twenty percent or more of the voting stock of that entity. (<u>Id.</u>). Although Elan sought to avoid that presumption by purchasing only 19.9 percent of the securities issued by the JBVs, the company nevertheless exerted "significant influence" over the JBVs because it had "veto power" over the actions taken by the JBV boards. (<u>Id.</u> ¶¶ 40, 40(b)).

According to the Plaintiffs, Elan therefore should have used equity accounting principles to record the results of its JBV investments. Instead, Elan included all of the money that it received from the JBVs for the sale of licenses in its reported revenues and net income. In doing so, Elan failed to include its proportionate share of the

6

losses sustained by the JBVs or to exclude its proportionate share of the amounts that the JBVs spent to purchase the licenses. (Id. ¶ 38). These practices violated GAAP. (See id. ¶ 39).

The JBVs also enabled Elan to remove certain research and development costs from its profit and loss statements. (Id. ¶ 45). Under GAAP, such costs ordinarily must be expensed as incurred. (Id.) Because Elan had many products under development, this would have had an adverse impact on its earnings. (Id.) Through the use of the JBVs Elan was able to shift many of these costs to other entities. (Id. ¶¶ 45-46).

In 2000, the SEC issued Staff Accounting Bulletin 101 ("SAB 101"), which required that license fees be amortized rather than being recognized up front. (Id. ¶ 47). As a result, Elan took a noncash charge of $344 million "for the cumulative effect of this accounting change" relating to revenue recognized in periods up to December 31, 1999. (Pls.' Mot. for Judicial Notice, Ex. A (2002 Annual Report and Form 20-F) at 150).

### b.   Product Rationalization Program

In an effort to mitigate the consequences of SAB 101, Elan developed a Product Rationalization Program, pursuant to which it began selling to other companies the royalty and distribution rights for certain products for periods of as long as ten years. (Id. ¶ 48). These purchases were made with funds that Elan provided to the purchasers. (Id.). Elan failed to disclose its role in the financing of these transactions. In addition,

7

Elan improperly accounted for the transactions by (i) classifying them as ordinary sales, when, in fact, they were sales of assets which should have been reported after net earnings as "non-recurring" or "other" income, and (ii) recognizing the earnings resulting from these "sales" during the year in which they were received, rather than allocating them over the term of the contracts. (Id. ¶¶ 48, 54-55).

### c.   Risk Sharing Arrangement

Under its "Risk Sharing Arrangement," Elan "sold" to third parties the future royalty rights to certain products that it had under development, in return for substantial payments to reimburse Elan for its research and development costs related to those products. (Id. ¶ 60). Elan accounted for the payments as "sales" revenues even though they reflected the reimbursement of costs that Elan had incurred. (Id. ¶ 61).

One such risk sharing arrangement involved the sale of Elan's royalty rights for five key products to Pharma Marketing, Inc. ("Pharma"), a Bermuda-based entity. (Id. ¶ 60). During the Class Period, Elan continuously emphasized the importance of these drug products to its business plan, without disclosing (i) the risk sharing arrangement, (ii) that much of the revenue it was reporting as income actually related to the sale of Elan's royalty rights or the reimbursement of its research and development and costs, or (iii) that as part of the arrangement, Elan had given up a significant portion of its future royalty revenues. (Id. ¶ 62). According to the Plaintiffs, the fact that Elan had to inject $60 million into Pharma when it ran out of cash only eighteen months after the initial sale is

8

further evidence of the sham nature of the original Pharma transaction. (Id. ¶ 64). Elan recorded this expenditure of cash on its books as "being for an 'intangible asset,' and made no disclosure of the additional funding to investors." (Id.). Elan's justification for this accounting treatment was that the payment allegedly was made to reacquire the royalty rights to Myobloc, one of the five drugs whose future royalty streams had been conveyed to Pharma. (Id.). The Plaintiffs contend that this was a sham because Elan (i) paid substantially more for the repurchase than it initially had received for the Myobloc rights and (ii) also conveyed a sixth product to Pharma as a swap for Myobloc.[3] (Id.).

          d.    Special Purpose Entities Scheme

Elan also entered into transactions with three special purpose entities, known as Elan Pharmaceutical Investments, Ltd. ("EPIL"), EPIL II, and EPIL III, in order to remove substantial amounts of debt from its balance sheet and create the illusion of profits. (Id. ¶¶ 66-67). As part of this scheme, Elan conveyed the securities it had received from the JBVs and its Business Partners and sold them to the EPILs. (Id. ¶ 67). The sales amounts exceeded Elan's "book value" of the securities, thereby enabling Elan to record extraordinary gains of approximately $40 million in both 2000 and 2001. (Id.). The EPILs had no incentive to bargain for a lower price for the securities because Elan had guaranteed all of the debt issued by the EPILs. (Id.).

---

[3]     In December 2001, Elan entered into a second risk-sharing arrangement with a Bermuda-based entity known as Autoimmune Research and Development, Ltd. (Id. ¶ 65).

9

Elan allegedly violated GAAP in connection with these transactions both by
recognizing gains from its transactions with the EPILs and by failing to consolidate the
EPILs' substantial losses in its own financial reports as required by U.S. GAAP. (Id.
¶ 68). Pursuant to GAAP, financial statements must disclose material related-party
transactions. (Id. ¶ 68). The Plaintiffs contend that the transactions with the EPILs
should have been treated in this fashion because Elan exercised significant control over
the JBVs, the securities of which were the sole assets of the EPILs. (Id. ¶ 69). Instead,
Elan failed to disclose the liquidity problems that the EPILs were experiencing until after
the close of the Class Period. (Id. ¶ 70).

### e.    Executive Compensation Scheme

Finally, the Plaintiffs contend that Elan failed to disclose certain
compensation that the Individual Defendants and other Elan executives received through
an entity known as "Monksland" that the executives owned. (Id. ¶ 72). Over the years,
Elan paid "royalties" to Monksland, which redistributed the funds to its "shareholders" in
the form of undisclosed – and untaxed – income. In total, Elan paid more than $20
million to its executives through this mechanism, including $3 million in 2001 alone. (Id.
¶ 73).

### 3.    False and Misleading Statements

As a result of these accounting practices and schemes, Elan's financial
reports during the Class Period overstated the company's revenues and earnings and

10

failed to disclose material adverse information. The Plaintiffs estimate Elan's net profit

to have been inflated by a total of $648.8 million, consisting of $266.7 million

attributable to the JBV scheme, $215.8 million attributable to the product rationalization

program, $86.6 million attributable to the risk sharing arrangement scheme, and $79.7

million attributable to the EPIL scheme. (Id. ¶¶ 74-205).

        4.    Merger Acquisitions

        The Plaintiffs contend that the misstatements by the Elan and KPMG

Defendants enabled Elan to make two acquisitions during the Class Period using its

inflated stock. (Id. ¶¶ 79, 81).

        The first acquisition involved Liposome. On March 6, 2000, Elan

announced that it had agreed to acquire Liposome in a stock-for-stock transaction, valued

at approximately $575 million, pursuant to which Liposome shareholders were to receive

0.385 of an Elan ADR for each share of Liposome that they owned. (Id. ¶ 81). In

connection with the proposed merger, Elan issued a Form F-4 Registration Statement

("Liposome Registration Statement") and a Proxy Prospectus (together, the "Liposome

Merger Offering Materials"), that incorporated, among other things, Elan's financial

results for the last nine months of 1999. (Id. ¶ 82). The merger was approved by the

Liposome shareholders and, thereafter, was completed on May 12, 2000. (Id. ¶ 85).

        The second acquisition involved Dura. On September 11, 2000, Elan

announced a proposed stock-for-stock merger, valued at approximately $1.8 billion,

11

pursuant to which Dura shareholders were to receive 0.6175 of an Elan ADR for each

share of Dura common stock that they owned. (Id. ¶ 112). As required by the SEC, Elan

filed a Form F-4 Registration Statement ("Dura Registration Statement") along with a

Proxy Prospectus (together, the "Dura Merger Offering Materials"). (Id. ¶ 113). These

filings incorporated Elan's Annual Report for 1999, as well its quarterly reports for the

periods ending March 31 and June 30, 2000. (Id.). The Dura merger was completed on

November 9, 2000. (Id. ¶ 116).

###         5.    Claims for Relief

Counts I through IV of the Complaint allege violations of the Securities

Act. In Count I, the Liposome and Dura Subclasses claim that the Elan Defendants (other

than Cooke) violated Section 11 of the Act by making false or misleading statements in

the Liposome and Dura Registration Statements. (Id. ¶¶ 232-40). In Count II, the Dura

Subclass alleges that the KPMG Defendants violated Section 11 in connection with

Elan's financial statements for Fiscal Year 2000, which were incorporated by reference

into the Dura Registration Statement. (Id. ¶¶ 241-50). Count III alleges that the Elan

Defendants (other than Cooke) violated Section 12(a)(2) of the Securities Act by

soliciting members of the Liposome and Dura Subclasses to acquire Elan ADRs through

the use of false and misleading statements in the proxies/prospectuses issued in

connection with the Liposome and Dura mergers. (Id. ¶¶ 251-60). Count IV seeks to

hold each of the Individual Defendants liable under Section 15 of the Securities Act for

12

Elan's false and misleading statements in the Liposome and Dura Registration Statements and prospectuses. (Id. ¶¶ 261-63).

Counts V through VII allege violations of the Exchange Act. In Count V, the Elan Defendants are alleged to have violated Section 14(a) of the Act, and Rule 14a-9 promulgated thereunder, by soliciting proxies from members of the Dura and Liposome Subclasses by means of a proxy/prospectus which was materially false and misleading. (Id. ¶¶ 264-67). Count VI alleges that all of the defendants violated Section 10(b) of the Act, and Rule 10b-5 promulgated thereunder, by engaging in a scheme to inflate the revenues, assets, net income, and net income per share of Elan. (Id. 268-79). Finally, Count VII alleges that the Individual Defendants also are liable under Section 20(a) for the violations alleged in Count VI. (Id. ¶¶ 280-84).

III.    Standard of Review

The Elan and KPMG Defendants have moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA.

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle." In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003) (Berman, J.) (quoting Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999)). In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all factual allegations made in the complaint and

13

draw all reasonable inferences in favor of the plaintiff. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995). The Court may grant the motion only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In deciding a motion to dismiss, the Court may deem a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (internal citations omitted).

Rule 9(b) requires that allegations of fraud, including securities fraud, be stated with particularity. Under Rule 9(b), "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). Nevertheless, an allegation of fraud must specify: (1) those statements the plaintiff thinks were fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes the statements fraudulent. Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995).

Finally, the PSLRA is applicable to the Plaintiffs' Exchange Act claims. See 15 U.S.C. § 78u-4(a)(1). PSLRA requires that in any action brought by a private

14

plaintiff under the Exchange Act the complaint must specify each statement alleged to

have been misleading and why the statement is misleading. Id. § 78u-4(b)(1).

Additionally, if an allegation regarding a statement or omission is made on information

and belief, the complaint must state with particularity the facts on which that belief is

formed. Id. While the Exchange Act requires a defendant to have acted with a particular

state of mind before a private plaintiff may recover money damages, the PSLRA further

requires the complaint to "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind." Id. §78u-4(b)(2). As Judge

Martin noted:

> The "strong inference" requirement has been held to mean
> that plaintiffs are entitled to only the "most plausible of
> competing inferences." In re: Champion, 145 F. Supp. 2d
> 871, 877 (E.D. Mich. 2001) (citing Helwig v. Vencor, 251
> F.3d 540, 553 (6th Cir. 2001), cert. denied, 536 U.S. 935
> (2002)). However, plaintiffs must plead with particularity
> only sufficient facts to support their beliefs, and not every fact
> necessary to prove their claim. Novak v. Kasaks, 216 F.3d
> 300, 313-14 (2d Cir.), cert. denied, 531 U.S. 1012 (2000).

Bond Opportunity Fund v. Unilab Corp., No. 99 11074 (JSM), 2003 WL 21058251, at *3

(S.D.N.Y. May 9, 2003).

15

IV.    Discussion

    A.    <u>Securities Act</u>

        1.    <u>Section 11 Claims</u>

        Pursuant to Section 11 of the Securities Act, every person who signs a

registration statement or who was a director (or person performing similar functions) or

partner of the issuer at the time the registration statement was filed, and every accountant

who has with his consent been named as having prepared or certified any report or

valuation which is used in connection with the registration statement shall be liable to the

extent that "any part of the registration statement, when such part became effective,

contained an untrue statement of a material fact or omitted to state a material fact required

to be stated therein or necessary to make the statements therein not misleading."  15

U.S.C. § 77k(a).  Accountants, however, are liable only with respect to their own

statements.  <u>Id.</u> § 77k(a)(4).

        As the Supreme Court noted in <u>Herman & MacLean v. Huddleston</u>, 459

U.S. 375, 381-82 (1983):

> Th[is] section was designed to assure compliance with the
> disclosure provisions of the [Securities] Act by imposing a
> stringent standard of liability on the parties who play a direct
> role in a registered offering.  If a plaintiff purchased a security
> issued pursuant to a registration statement, he need only show
> a material misstatement or omission to establish his <u>prima
> facie</u> case.

16

A Section 11 violation is established when "material facts have been omitted or presented in such a way as to obscure or distort their significance." I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 761 (2d Cir. 1991) (citation, internal quotation marks, and alterations omitted). "[M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968).

Until recently, the Second Circuit had not resolved whether a claim under Sections 11 or 12(a)(2) of the Securities Act was required to meet the particularity requirements of Rule 9(b). Moreover, the district courts in the Circuit were divided as to the applicability of the rule to such claims. Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). Earlier this year, the Second Circuit finally reached this question, stating that "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." Id. In that case, as here, the plaintiffs asserted in their complaint that their Section 11 claims did not "sound in fraud," but the court found that language suggesting that the registration statements were "inaccurate and misleading" and contained "untrue statements of material facts" was "classically associated with fraud." Id. at 171-72. Notwithstanding the Plaintiffs' fraud disclaimer, the Section 11 claims in this case are peppered with similar words. (See

17

Compl. ¶¶ 234, 241). Accordingly, as in <u>Rombach</u>, those claims must meet the pleading requirements of Rule 9(b).

a.     Elan Defendants

The first statements that the Plaintiffs allege violated Section 11 relate to the JBVs. The Elan Defendants (other than Cooke) are alleged to have incorporated into the Liposome and Dura Merger Offering Materials financial results for the JBVs which were false and misleading because they did not employ equity accounting principles and failed to make adequate disclosure regarding the round tripping of the JBVs' revenues.

The Accounting Principles Board ("APB" or "Board") is one of three successors to the American Institute of Certified Public Accounts authorized to promulgate GAAP standards. <u>Ganino v. Citizens Util. Co.</u>, 228 F.3d 154, 159 n.4 (2d Cir. 2000). In 1971, in APB Opinion 18, the Board concluded that "the equity [accounting] method best enables investors in corporate joint ventures to reflect the underlying nature of their investment in those ventures." (Aaron Decl. Ex. 23 (APB Op. 18) ¶ 16). The Board therefore indicated that an investor whose voting stock gives it the ability to exercise "significant influence" over an investee should use the equity method to account for its investment. (<u>Id.</u> ¶ 17). Under equity accounting, an investor recognizes its share of the investee's earning and losses after the acquisition date. (<u>Id.</u> ¶ 6(b)).

Recognizing that the "substantial influence" test would often prove difficult to apply, the Board concluded that

18

> an investment (direct or indirect) of 20% or more of the
> voting stock of the investee should lead to a presumption that
> in the absence of evidence to the contrary an investor has the
> ability to exercise significant influence over an investee.
> Conversely, an investment of less than 20% of the voting
> stock . . . should lead to a presumption that an investor does
> not have the ability to exercise significant influence unless
> such ability can be demonstrated.

(Id. ¶ 17) (emphasis added).

In this case, from the face of the Complaint, it might appear that Elan was

seeking to skirt APB Opinion 18 by limiting its ownership of stock in each JBV to 19.9

percent. However, Elan's ownership interest in those JBVs consisted of nonvoting stock.

The Plaintiffs consequently are not entitled to a presumption under APB Opinion 18 that

Elan's accounting treatment of its JBV investments in its registration statements was

materially misleading simply because Elan failed to employ equity accounting. Similarly,

although Elan's contractual arrangement with each JBV evidently gave it the right both to

appoint a director whose attendance was necessary for a quorum and to approve the

venture's "business plan," the Plaintiffs have not set forth any basis on which a finder of

fact could reasonably conclude that the failure to use equity accounting because of these

aspects of Elan's interest in the JBVs constituted fraud. In that regard, it is, of course,

settled law that a mere violation of GAAP, standing alone, does not suffice to state a

securities fraud claim. Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) (citing

Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999)).

19

Quite apart from the accounting method employed, the Plaintiffs allege that the Liposome and Dura Registration Statements failed to make adequate disclosure of the round tripping of JBV revenues. The Liposome Registration Statement incorporated by reference Elan's Annual Report for 1998, as amended by its Form 20-F/A1.[4] (See Aaron Decl. Ex. 21 at 68). The Dura registration statement similarly incorporated by reference Elan's Annual Report for 1999, on Form 20-F. (Id. Ex. 22 at 80).

Both of the annual reports incorporated by reference into the Registration Statements detailed information about the amounts that Elan invested in the JBVs and its Business Partners, as well as the license fees that Elan received from the JBVs. For example, the 1999 report shows that Elan invested $30 million in ISIS Pharmaceuticals, Inc., a genomics-based drug discovery and development company, receiving, in return, a $15 million license fee to develop oral oligonucleotide delivery technologies and commercialize certain "antisense" targets. (See id. Ex. 3 at 11). Similar details concerning the amounts invested and the license fees received are furnished for more than one dozen additional JBVs. (Id. at 11-12). The annual report also discloses that many of the agreements governing the JBVs provide for Elan to conduct research and

---

[4]    Foreign issuers submit their annual reports to the SEC on a Form 20-F. See 1 Harold S. Bloomenthal, Securities Law Handbook, ("Handbook") § 3:17:40 (2004). The A1 suffix regarding the 1998 report indicates that Elan had amended its original Form 20-F for 1998. (Aaron Decl. Ex. 21 at 68). Unlike domestic corporations, foreign issuers are not required to file quarterly reports on Form 10-Q, but must file on Form 6K information which is made available to stockholders pursuant to foreign law or stock exchange regulations, or otherwise distributed to stockholders. Handbook § 22:11.

development at the JBV's request, for which Elan may recover its expenses at a

predetermined rate. (Id. at 11). Elan further disclosed that the majority of its Business

Partners would likely require additional funding before or during 2001, and that the JBVs

would have to fund their research and development through their own cash resources,

"which may have arisen in part from Elan's original investment," additional funding from

public and private capital markets, or additional infusions of cash by Elan. (Id. at 13).

There consequently is no basis for the Plaintiffs' contention that Elan failed to disclose its

partial round tripping of funds.

     The Plaintiffs also assert that Elan failed to disclose that the JBVs were

penniless after they paid Elan their licensing fees. (See Compl. ¶ 35). The Plaintiffs base

this allegation on Elan's annual report for Fiscal Year 2001, which states that the JBVs

typically have no funds after paying the initial licensing fees to Elan. (Pl.'s Mem. of L. in

Opp. to Elan Defs.' Mot. at 14; see Aaron Decl. Ex. 1 at 13). While this disclosure was

not made in prior years, the JBVs were start up operations created by Elan and its

Business Partners. The Plaintiffs have not set forth any reason why an investor would

believe that the JBVs, at their inception, would have substantial amounts of cash on hand.

In any event, in its Form 20-F annual reports for prior years, Elan did disclose the

amounts that it had invested in its Business Partners and JBVs and the amount of the

license fees that it received.[5]  (Aaron Decl. Exs. 2 at 109, 3 at 11-12) The Plaintiffs have

---

[5]    In its Form 20-F for 2000, Elan did not break out these amounts by JBV.

                                     (continued...)

21

not shown, as they must, that Elan's disclosures in 1999 and 2000 regarding the finances

of the JBVs were so misleading or incomplete that they were fraudulent.

The next branch of the Plaintiffs' Section 11 claim relates to EPIL I.  The

Complaint alleges that the Liposome Merger Offering Materials "failed to account for or

disclose the losses sustained by EPIL I." (Compl. ¶ 83).  The Complaint further alleges

that the Dura Merger Offering Materials were misleading because the Elan financial

results for the second quarter of 2000 included an illusory gain of $39.2 million in

connection with EPIL I which Elan achieved by inflating the book value of the securities

that it had conveyed to that entity.  (Id. ¶ 114(c)).  In their opposition papers, however,

rather than setting forth a basis for these contentions, the Plaintiffs focus on EPILs II and

III.  The only facts that they muster with respect to EPIL I are that it "needed to be

restructured in January 2001"; that many of the securities it held were not publicly traded,

"making their valuation entirely arbitrary"; and that, because Elan had guaranteed that the

EPIL investors would not lose their investments, there was little incentive for them to

secure accurate appraisals of the securities underlying their investments.  (Pls.' Mem. of

L. in Opp. to Elan Defs.' Mot. at 7-8).  However, none of these factual allegations, even if

established, suggests that Elan's disclosures in the Liposome and Dura Registration

Statements related to EPIL I were untrue or omitted relevant facts at the time that the

---

[5](...continued)
Nevertheless, Elan reported the aggregate amounts that it had invested in the JBVs and its
Business Partners and the total amount of license revenue it received. (Aaron Decl. Ex. 2 at
109).

22

statements became effective.  Accordingly, the Plaintiffs allegations with respect to EPIL
I fail to state a Section 11 fraud claim.[6]

The Plaintiffs next allege that the Dura Registration Statement was
materially misleading because it highlighted the development of several new drug
products, but failed to disclose (i) that Elan had sold the royalty rights to these products to
Pharma in June 2000 and (ii) that certain "revenues" received from Pharma actually
constituted reimbursements for research and development costs that Elan had incurred.
(See Compl. ¶¶ 29, 60-64, 114(d)).[7]

In their motion papers, the Elan Defendants argue that no disclosure
regarding the Pharma risk sharing arrangement was required in 2000 when the Dura
registration became effective because (i) by 2001 only one of the five products which
were the subject of the royalty rights transfer "had reached a stage at which any royalties
even became due," and (ii) the $5.6 million in royalties attributable to that product
(Zanaflax) was not material in light of Elan's $1.7 billion in revenues that year. (Elan
Mem. of L. at 29 (citing Aaron Decl. Ex. 1 (Elan 2001 Form 20-F) at 42, 68, 106)).

---

[6]      In their papers opposing KPMG-Ireland's motion to dismiss, the Plaintiffs also
note that Elan's FY 2000 Annual Report did not disclose the profits of EPIL I in a separate "line
item or footnote." (Pls. Mem. of L. in Opp. to KPMG-Ireland's Mot. at 8).  The Plaintiffs have
not set forth any reason why such an accounting treatment was necessary.

[7]      Because the Pharma transaction took place after the Liposome merger was
completed, this aspect of the Plaintiffs' Section 11 claim relates solely to the Dura Merger
Offering Materials.

23

To accept this argument, the Court would first have to infer from the disclosures for 2001 that Zanaflax had generated no royalties during 2000 and that none of the other products whose royalty rights were assigned had been approved for distribution by then. While that is likely correct, a court may not engage in such fact finding at this preliminary stage.

More importantly, even if the direct financial consequences of the Pharma risk sharing arrangement were not material to Elan's financial situation in 2000, this alone is not dispositive of the materiality issue. The question instead is whether the alleged omissions in the Dura Registration Statement would have misled a reasonable investor. Here, the Complaint alleges that the five products that were the subject of the arrangement with Pharma were key to Elan's business plan, and that the written risk sharing agreements required Elan to pay Pharma ever increasing royalties, "averaging 24% by the mid-point of the agreements." (Compl. ¶¶ 60-63). At this preliminary stage, the Court cannot say, as a matter of law, that the failure to identify the specific products subject to risk sharing would not have been material to a reasonable investor.

Another element of the risk sharing arrangement was that, subject to certain limitations, Pharma would make regular payments to Elan corresponding to the amounts that Elan expended to develop and commercialize the five products. (See id. ¶ 114(d)). As the Elan Defendants correctly observe, by incorporating its 1999 Form 20-F into the Dura Registration Statement, Elan disclosed that its revenues consisted of, inter alia, "(i)

24

product sales derived from pharmaceutical products . . . and (iv) research revenues for performing research and development activities on behalf of pharmaceutical industry clients." (Aaron Decl. Ex. 3 at 25). Elan further disclosed that its product sales included "revenue arising from product co-promotion and similar activities." (Id.). These generic descriptions of its revenue sources did not disclose, however, that Elan was treating the reimbursements that it received from Pharma as revenues. Indeed, Pharma was not even named in the disclosures incorporated by reference into the Dura Registration Statement.

The failure to disclose this information in the Dura Merger Offering Materials, or the documents incorporated by reference therein, might give rise to a Section 11 claim based on negligent misrepresentations. In this case, however, the allegations in Count I of the Complaint concerning Pharma sound in fraud. Accordingly, it is incumbent upon the Plaintiffs to plead the circumstances allegedly constituting the fraud with particularity. Whatever the merits of the Plaintiffs' Section 11 claim regarding Pharma might be were it couched as a negligence claim, the Plaintiffs plainly have not adequately alleged that Elan engaged in fraud in connection with Pharma. Accordingly, this aspect of the Plaintiffs' Section 11 claim against the Elan Defendants must be dismissed.

The last aspect of the Plaintiffs' Section 11 claim against the Elan Defendants (other than Cooke) relates to the Monksland tax savings "scheme." (Compl. ¶¶ 84, 206-07). The Plaintiffs allege that money was channeled to the Individual

25

Defendants and other senior Elan executives "in a manner designed to evade income taxes in Ireland." (Id. ¶ 72). The Plaintiffs also allege that this diversion of funds was material and undisclosed. (Id. ¶¶ 72-73). Finally, in their opposition papers, the Plaintiffs contend that the Monksland arrangement constituted a "bonus plan" which had to be disclosed pursuant to SEC regulations. (Pls.' Mem. of L. in Opp. to Elan Defs.' Mot. at 15).

Despite the use of such value-laden terms as "scheme" and "evade," the Plaintiffs have not alleged in their Complaint that the tax-free payments to the Individual Defendants and others violated any laws. In fact, they apparently base their contentions regarding the Monksland tax-free compensation arrangement on an article which appeared in the Sunday Independent, an Irish newspaper, on August 4, 2002. (See Compl. ¶¶ 206-07). That article stated that "[t]he tax-free dividends paid under the device are likely to cause further concern over Elan's aggressive accounting practices, although the scheme is permissible through a Revenue loophole and was authorised in the mid-Eighties." (Aaron Decl. Ex. 20) (emphasis added). In the absence of any allegation that the scheme was unlawful, the mere decision to use it to ease the tax burden of certain Elan executives is no more objectionable than the use of Section 401-K plans for corporate employees seeking to defer taxes in the United States. Consequently, as presently pleaded, this aspect of the Plaintiffs' Section 11 claim against the Elan Defendants does not give rise to any inference of fraud.

26

More troubling is the allegation that the compensation paid to the Elan executives through Monksland remained undisclosed until 2002. (See Compl. ¶¶ 84, 206-07). In their opposing papers, the Elan Defendants claim that this contention on the part of the Plaintiffs is flat wrong. (Elan Defs.' Mem. of L. at 19 & n.12). From the face of Elan's financial statements, which list only the aggregate compensation paid to Elan's senior officers, it is impossible to tell whether the Monksland compensation was disclosed. On the other hand, as noted above, the Plaintiffs bear the burden of pleading fraud with particularity. In the absence of any explanation for the Plaintiffs' belief that the tax-free compensation was undisclosed, the Plaintiffs clearly have not met that burden. The Irish newspaper article is silent as to the accounting treatment of the Monksland royalty payments and therefore cannot suffice to bridge this pleading gap.

Finally, the Plaintiffs' allegation that the Monksland payments amounted to an executive "bonus plan" does not appear anywhere in their Complaint. While the Plaintiffs should be given leave to amend their existing allegations, the Complaint cannot be amended by means of statements made in opposition to a motion to dismiss. See Disabled in Action of Metro New York v. Trump Int'l Hotel & Tower, No. 01 Civ. 5518 (MBM), 2003 WL 1751785, at *13 (S.D.N.Y. Apr. 2, 2003).

b.    KPMG Defendants

In Count II of the Complaint, the Plaintiffs seek to hold the KPMG Defendants liable to the members of the Dura Subclass under Section 11 on the basis of

27

the Dura Registration Statement. (Compl. ¶¶ 241-50). That registration statement

incorporated by reference Elan's annual report for 1999 on Form 20-F, which included

Elan's consolidated financial statements for the years 1998 and 1999. (See Aaron Decl.

Ex. 22). In those financial statements, KPMG-Ireland opined (without qualification) that

Elan's financial statements conformed to U.S. GAAP. (Id. Ex. 3 at 44).

KPMG-US's name is nowhere to be found in the Dura Registration

Statement or the financial statements section of the Elan annual report.  Accordingly,

KPMG-US seeks dismissal of the Plaintiffs' Section 11 claim because KPMG-US never

authorized the making of any statement on its behalf and was not identified as the firm

that prepared the Elan financial statement in the Form 20-F which was incorporated by

reference into the Dura registration statement. (See KPMG-US Mem. of L. at 19-20).

The Plaintiffs' rejoinder is that at this early stage the Court must "accept the

factual allegations of the complaint as true and must draw all reasonable inferences in

[their] favor." (Pls.' Mem. of L. in Opp. to KPMG-US Mot. at 16). While this general

precept is, of course, correct, it is equally well settled that the Court need not accept any

averments of a complaint which are contradicted by documents incorporated by reference

therein. In re Bristol-Myers Squibb Sec. Litig., 02 Civ. 2251 (LAP), 2004 WL 72046, at

*2 (S.D.N.Y. April 1, 2004).  Accordingly, because KPMG-US's name is not mentioned

in the Dura Registration Statement, or any of the documents incorporated by reference,

the Plaintiffs' Section 11 claim against that firm must be dismissed with prejudice. See

28

Herman & MacLean v. Huddleston, 459 U.S. 375, 382 n.13 (1983) ("A Section 11 claim

can be brought only against the issuer, its directors or partners, underwriters, and

accountants who are named as having prepared or certified the registration statement.");

Adair v. Kaye Kotts Assocs., Inc., No. 97 Civ. 3375 (SS), 1998 WL 142353, at *4

(S.D.N.Y. March 27, 1998) ("In order to state a claim against an accountant under

[Section 11], the accountant must have prepared or certified a statement that was false or

misleading.").

      On the other hand, KPMG-Ireland was Elan's independent auditor and it

did certify the financial statements incorporated by reference into the Dura registration

statement. The firm is alleged to have violated Section 11 by making false and

misleading statements and failing to disclose other facts necessary to make its statements

not misleading. (Compl. ¶¶ 241-45). More specifically, the Dura Subclass alleges that

the financial statements prepared by KPMG-Ireland failed to account properly for the

JBVs, inaccurately reported an "illusory" $39.2 million gain "fabricated" from the EPIL I

transaction, failed to disclose the conveyance to Pharma of the royalty rights for five key

Elan products, and improperly recorded as "revenues" monies received from Pharma

which in fact were reimbursements of Elan's research and development costs. (Id. ¶ 241

(incorporating by reference ¶¶ 112-16)).

      Turning to the first of these allegations, the Plaintiffs contend that KPMG-

Ireland failed to disclose the "round trip" nature of Elan's JBV revenues and earnings and

29

also misled investors by not using equity accounting, which would have required Elan to exclude 19.9 percent of its JBV revenues from, and include 19.9 percent of the JBV losses in, its own results. (Id. ¶¶ 114(a)-(b)).

As noted earlier, Elan's annual financial report for 1999, of which the KPMG-Ireland statement was a part, disclosed with respect to each of the JBVs the amounts that Elan invested and the license fees that it received. The report also disclosed that in the aggregate "Elan invested approximately $285.0 million" in the JBVs and their parent companies in 1999, receiving "gross license revenues of $193.6 million" in return. (Aaron Decl. Ex. 3 at 11-12). While the report did not expressly note that the JBVs were paying for their licenses with Elan funds, it did state that Elan expected that most of its Business Partners ("strategic collaborators") would require additional funding in or before 2001. (Id. at 13). The report also indicated that the JBVs could fund their research and development from "existing cash resources, which may have arisen in part from Elan's initial investment," could look for funding in the capital markets, or could seek additional funding from Elan or, with Elan's consent, from its JBV partner. (Id.). Given these disclosures, there does not seem to be any basis on which a finder of fact could reasonably conclude that the Dura Subclass was misled as to the attributes of Elan's JBV program.

Turning to the equity accounting issue, the Plaintiffs contend that "'[f]raud is not an element in Section 11'" and that a showing of scienter is also unnecessary. (Pls.'

30

Mem. of L. in Opp. to KPMG-Ireland Mot. at 13-14). The Second Circuit's recent

decision in Rombach, which was issued after the parties briefed the issues in this case,

has substantially changed the pleading terrain. See Rombach, 355 F.3d at 171.

Accordingly, because the Plaintiffs' present Section 11 claim against KPMG-Ireland

sounds in fraud, it is insufficient to allege simply that the accounting treatment that Elan

employed did not conform to GAAP. This aspect of Count II consequently must be

dismissed.

The remaining allegations in Count II of the Complaint relating to EPIL I

and Pharma are substantially the same as those set forth in Count I. Accordingly, because

Count II sounds in fraud, it fails to state a claim for relief with respect to Pharma or the

valuation of EPIL I for the reasons previously set forth.

2.    Section 12(a)(2)

Section 12(a)(2) of the Securities Act imposes liability on "any person who

offers or sells a security . . . by means of a prospectus or oral communication, which

includes an untrue statement of a material fact or omits to state a material fact necessary

in order to make the statements, in light of the circumstances under which they were

made, not misleading . . . ." 15 U.S.C. § 77l(a)(2). To prevail on a Section 12(a)(2)

claim, the purchaser of the securities must make a showing that the prospectus or

communication was "intended or perceived as instrumental in effecting the sale."

Jackson v. Oppenheim, 533 F.2d 826, 830 n.8 (2d Cir. 1976). Additionally, while a

31

plaintiff may bring a Section 12(a)(2) claim on the basis of an issuer's negligence, where the claim sounds in fraud, it must be pleaded with particularity. Rombach, 355 F.3d at 171. Proof of actual reliance is not required; rather, a plaintiff need only show "some causal connection between the alleged communication and the sale, even if not decisive." Metromedia Co. v. Fugazy, 983 F.2d 350, 361 (2d Cir. 1992) (citation and internal quotation marks omitted).

Count III of the Complaint alleges that the Elan Defendants (other than Cooke) violated Section 12(a)(2) by making false and misleading statements in the proxies/prospectuses issued in connection with the Liposome and Dura mergers. (Compl. ¶¶ 251-56). The Liposome and Dura Subclasses incorporate into this claim by reference the entire catalog of alleged misconduct discussed previously and, once again, disclaim any reliance on a fraud theory, stating that "[t]his claim does not sound in fraud, and neither fraud nor scienter is an element of this claim." (Id. ¶ 251 (incorporating ¶¶ 81-85, 112-16)). Notwithstanding this disclaimer, elsewhere in Count III, the Plaintiffs have used the sort of language that triggered a finding in Rombach that the claim sounded in fraud, stating that the proxies/prospectuses "contained untrue statements of material facts," "omitted other facts necessary to make the statements not misleading," and "concealed and failed to disclose material facts." (Id. ¶ 255) (emphasis added). Given these allegations, Count III of the Complaint cannot be construed as merely a negligence claim and therefore must meet the particularity requirement of Rule 9(b). When the claim

32

is evaluated in that manner, it, too, fails to meet the pleading requirements of the rule.

Count III of the Complaint therefore also should be dismissed.

### 3.    Section 15

Section 15 of the Securities Act provides that:

> Every person who, by or through stock ownership, agency, or
> otherwise, or who, pursuant to or in connection with an
> agreement or understanding with one or more other persons
> by or through stock ownership, agency, or otherwise, controls
> any person liable under [Sections 11 or 12 of the Securities
> Act], shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom
> such controlled person is liable, unless the controlling person
> had no knowledge of or reasonable ground to believe in the
> existence of the facts by reason of which the liability of the
> controlled person is alleged to exist.

15 U.S.C. § 77o. Thus, to establish a prima facie Section 15 claim, a plaintiff need only

establish (a) that a defendant has control of a person upon whom liability may be

imposed, and (b) that the person controlled by the defendant committed a violation of

Sections 11 or 12(a)(2).[8] See In re Independent Energy Holdings PLC Sec. Litig., 154 F.

Supp. 2d 741, 769-70 (S.D.N.Y. 2001).

Count IV of the Complaint alleges that "[e]ach of th[e] Individual

Defendants, by virtue of their executive and/or directorial positions and stock ownership

---

[8]    A few courts in this Circuit have also required a third element, "culpable
participation," but most do not. See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281,
352 n.82 (S.D.N.Y. 2003) (citing Dorchester Investors v. Peak Trends Trust, No. 99 Civ. 4696
(LMM), 2003 WL 223466, at *3 (S.D.N.Y. Feb. 3, 2003) (collecting cases)).

33

had and exercised the power to control the representatives and actions of Elan." (Compl.

¶¶ 261-63). Additionally, this count incorporates by reference paragraphs 81 through 85

and 112 through 116 of the Complaint, which relate to the Dura and Liposome mergers.

(Id. ¶ 261). Because these allegations meet the limited pleading requirements of Rule

8(a) of the Federal Rules of Civil Procedure, see Swierkiewicz v. Sorema, N.A., 534 U.S.

506, 512 (2002), the individual defendants may properly be held liable for misstatements

in Elan's prospectuses and registration statements, but only to the extent that Elan itself is

potentially liable. Consequently, because Counts I through III of the Complaint are

subject to dismissal for failure to state a claim, Count IV does not entitle the Liposome

and Dura Subclasses to any additional relief.

      B.    <u>Exchange Act</u>

          1.    <u>Section 14(a)</u>

          Count V of the Complaint alleges that the Elan Defendants violated Section

14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, by soliciting proxies

for the Liposome and Dura mergers through the use of false and misleading statements in

the proxies/prospectuses. (Compl. ¶¶ 264-67). Those false and misleading statements,

detailed in paragraphs 81 through 85 and 112 through 116 of the Complaint, are

incorporated by reference in Count V. (Id. ¶ 264).

          Section 14(a) makes it unlawful to solicit any proxy "in contravention of

such rules and regulations as the Commission may prescribe as necessary or appropriate

34