in the public interest or for the protection of investors." 15 U.S.C. § 78n(a). Rule 14a-9,

in turn, prohibits proxy solicitation "by means of any proxy statement . . . containing any

statement which, at the time and in the light of the circumstances under which it is made,

is false or misleading with respect to any material fact, or which omits to state any

material fact necessary in order to make the statements therein not false or misleading."

17 C.F.R. § 240.14a-9(a). The elements of a claim under Section 14(a) and Rule 14a-9

are therefore:

> ([a]) that the proxy materials contain a false or misleading
> statement of a material fact or omit to state a material fact
> necessary in order to make the statement made not false or
> misleading; ([b]) that the misstatement or omission of a
> material fact was the result of knowing, reckless or negligent
> conduct; and ([c]) that the proxy solicitation was an essential
> link in effecting the proposed corporate action.

Vides v. Amelio, 265 F. Supp. 2d 273, 276 (S.D.N.Y. 2003) (citing Halpern v.

Armstrong, 491 F. Supp. 365, 378 (S.D.N.Y. 1980)). "In the context of a proxy

statement, a fact is material if there is a substantial likelihood that a reasonable

shareholder would consider it important in deciding how to vote." Resnik v. Swartz, 303

F.3d 147, 151 (2d Cir. 2002) (citations and internal quotation marks omitted). "[T]here

must be a substantial likelihood that the disclosure of the omitted fact would have been

viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449

(1976). "It is not sufficient to allege that the investor might have considered the

35

misrepresentation or omission important. On the other hand, it is not necessary to assert

that the investor would have acted differently if an accurate disclosure was made."

Ganino, 228 F.3d at 162.

Although the Plaintiffs have not hesitated to accuse the Elan Defendants of

wrongdoing throughout their Complaint, their Section 14(a)/Rule 14a-9 claim expressly

excludes any allegations of scienter, stating that "[n]one of the paragraphs regarding

defendants' scienter are incorporated [t]herein." (Compl. ¶ 264). The difficulty is that,

following this exclusion, neither the paragraphs of this specific claim, (id. ¶¶ 264-67), nor

those that are incorporated by reference, (id. ¶¶ 81-85, 112-16), say anything at all about

the Elan Defendants' mental state. Accordingly, pursuant to the PSLRA, Count V of the

Complaint must be dismissed for failing to set forth any facts giving rise to a strong

inference that the defendants acted at least negligently in misrepresenting or failing to set

forth the material facts in the Dura and Liposome proxy materials.

2.    Section 10(b) and Rule 10b-5

Count VI of the Complaint alleges that all of the defendants violated

Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, by engaging in a course

of conduct intended to induce the members of the Class to purchase Elan ADRs at prices

which were artificially inflated as a consequence of the defendants false and misleading

statements of material fact. (Id. ¶¶ 268-79). This count relies upon each of the alleged

schemes considered in relation to the prior counts of the Complaint. This claim differs

36

from the prior counts of the Complaint in that it incorporates by reference (for the first

time) all of the preceding paragraphs of the Complaint, including the Product

Rationalization Program that allegedly came into existence after SAB 101 precluded Elan

from recognizing all of the income from a JBV license in the year that the license was

issued. (Id. ¶¶ 47-59, 268).

   Section 10(b) is a "catchall provision" which entitles a plaintiff to recover

damages for manipulative practices undertaken by defendants acting in bad faith. See

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 205-06 (1976). The statute provides, in

relevant part, that:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce or of the mails, or of any facility of any national
> securities exchange --
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale
> of any security registered on a national securities exchange or
> any security not so registered . . . any manipulative or
> deceptive device or contrivance in contravention of such rules
> and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, the parallel regulation, states:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any national
> securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

37

(b) To make any untrue statement of a material fact necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which
operates or would operate as a fraud or deceit upon any
person, in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b-5.

To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff

must allege that "the defendant, in connection with the purchase or sale of securities,

made a materially false statement or omitted a material fact, with scienter, and that the

plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino, 228

F.3d at 161; accord Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87,

95 (2d Cir. 2001). A plaintiff alleging that a defendant engaged in securities fraud in

violation of these provisions must satisfy the pleading requirements of both Rule 9(b) and

PSLRA. In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001). In this

case, because the Elan and KPMG Defendants do not question the causation element of

the claim, my Report and Recommendation focuses on whether the Plaintiffs have

adequately pleaded a material misstatement or omission and that the defendants acted

with the requisite mental state.

a.    Statements and omissions

At the pleading stage, a plaintiff satisfies the materiality requirement of

Section 10(b) and Rule 10b-5 by "alleging a statement or omission that a reasonable

38

investor would have considered significant in making investment decisions." <u>Ganino</u>,

228 F.3d at 161. For each such statement or omission, a court must determine whether

"defendants' representations or omissions, considered together and in context, would

affect the total mix of information and thereby mislead a reasonable investor regarding

the nature of the securities offered." <u>Halperin v. eBanker USA.com, Inc.</u>, 295 F.3d 352,

357 (2d Cir. 2002) (citing <u>McMahan & Co. v. Wherehouse Entm't, Inc.</u>, 900 F.2d 576,

579 (2d Cir. 1990)); <u>see also</u> <u>Basic v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (the

materiality requirement for Section 10(b) and Rule 10b-5 violations is met when there is a

"substantial likelihood" that the statement or the disclosure of an omitted fact "would

have been viewed by the reasonable investor as having significantly altered the 'total mix'

of information made available") (quoting <u>TSC Indus.</u>, 426 U.S. at 449).

      While "[i]t is not sufficient to allege that the investor might have considered

the misrepresentation or omission important" when considering statements or omissions,

"it is not necessary to assert that the investor would have acted differently if an accurate

disclosure was made." <u>Ganino</u>, 228 F.3d at 162. Materiality is a mixed question of law

and fact. <u>Id.</u> A complaint fails to state a claim only if "<u>no reasonable investor</u> could have

been misled about the nature of the risk when he invested." <u>Halperin</u>, 295 F.3d at 359

(emphasis in original); <u>see also</u> <u>Ganino</u>, 228 F.3d at 162 ("a complaint may not properly

be dismissed . . . on the ground that the alleged misstatements or omissions are not

material unless they are so obviously unimportant to a reasonable investor that reasonable

39

minds could not differ on the question of their importance") (quoting <u>Goldman v. Belden</u>, 754 F.2d 1059, 1067 (2d Cir. 1985)).

In their Complaint, the Plaintiffs seek to rely on each of the schemes previously discussed as the source of material misrepresentations or omissions giving rise to liability under Section 10(b) and Rule 10b-5. With respect to three of these alleged bases for liability – concerning the JBVs, EPIL I and Monksland – the Plaintiffs have not adequately alleged a materially false statement or omission for the reasons previously set forth. On the other hand, the alleged failure to make adequate disclosure concerning Pharma is potentially material and is alleged with sufficient specificity.

Because Count VI of the Complaint incorporates <u>all</u> of the prior paragraphs of the Complaint, (Compl. ¶ 268), it adds several allegations concerning the EPILs which were not part of any of the prior claims for relief. First, Count VI alleges with respect to the EPILs that Elan violated U.S. GAAP by not including the losses incurred by these entities in its own financial results. (<u>See id.</u> (incorporating ¶¶ 68-69 by reference)). Ironically, although Elan and its auditors concluded that the EPILs should be separately reported under U.S. GAAP, they also determined that Irish GAAP mandated consolidation. Accordingly, Elan reported the EPIL financial results on both a consolidated and an unconsolidated basis in its Annual Reports on Form 20-F for 1999 and 2000. (<u>See</u> Aaron Decl. Exs. 2 at 110, 113, 4 at 71-72).

40

Thus, while the performance results of the EPILs may not have been incorporated into Elan's financial results for purposes of U.S. GAAP, they were plainly disclosed to investors who took the time to read the entire report. The Plaintiffs consequently have not alleged a materially false statement or omission of material fact with respect to this aspect of Elan's disclosures concerning the EPILs.

Second, the Plaintiffs allege as part of Count VI that Elan extended the payment period for the EPIL I notes in March 2001 by conveying all of them to EPIL III in exchange for $350 million in EPIL III notes guaranteed by Elan. (Compl. ¶ 143). The Plaintiffs further allege that this restructuring of EPIL I was not disclosed during the Class Period, and that it would have been a "red flag" for investors had it been disclosed. (Id. ¶ 144). The difficulty with this branch of the Plaintiffs' 10(b)/10b-5 claim is that no facts have been set forth to support the allegation that EPIL I was in extremis at the time that the payment terms were restructured.

The Plaintiffs further contend that Elan created a fictitious $40.5 million capital gain by transferring the JBV securities to EPIL III at prices above book value. (Id. ¶ 141). Unfortunately, here again, the Complaint fails to set forth any facts to support the Plaintiffs' supposition that the securities were not appropriately valued at the time of the transfer.[9]

---

[9]    The Plaintiffs note that when a portion of the EPIL I debt transferred to EPIL III became due in July 2002, EPIL III was unable to make payment. (Id. ¶ 145). This, however, does not establish that the securities were overvalued at an earlier time.

41

The other alleged scheme incorporated by reference into Count VI of the Complaint relates to the Product Rationalization Program. According to Elan's Annual Report on Form 20-F for 2001, Elan disposed of certain product lines pursuant to this program through outright sales or distribution and royalty arrangements. (Aaron Decl. Ex. 1 at 35). The Report contains a table listing each product that was rationalized, the company that acquired the product or rights, and the net revenues received. (Id.). The Report also contains a narrative description of each of the transactions. (Id. at 35-37).

In the Complaint, the Plaintiffs allege that the advent of SAB 101 – which required Elan to spread the revenues received from the JBVs over the life of the license – "substantially impaired" Elan's ability to inflate its JBV earnings. (Compl. ¶¶ 47-48). According to the Plaintiffs, Elan thereafter developed the Product Rationalization Program, pursuant to which it "sold" to third parties the royalty and distribution rights to certain products for periods as long as ten years. (Id. ¶ 48). The Complaint alleges that this was yet another form of undisclosed round tripping because "many of these transactions were financed entirely by Elan's investments in, and loans to, the purchasers." (Id. ¶¶ 48, 52-54). The Complaint further alleges that Elan engaged in deceptive accounting by treating the revenue received through such transactions as "ordinary sales," rather than reporting it "after net earnings" as "non-recurring" or "other" income, and by failing to spread the revenues received over the term of the contracts. (Id. ¶ 49) (emphasis in original). Finally, the Complaint alleges that the impact of these

42

transactions was material because they accounted for 31 percent of Elan's net profit for

the year. (Id. ¶ 50).

In their opposition papers, the Elan Defendants contend that the Plaintiffs

are mistaken insofar as they characterize the product rationalization transactions as the

granting of licenses. (Elan Defs.' Reply Mem. of L. at 9-11). Citing Elan's annual report

for 2001, the Elan Defendants contend that all but one of the transactions involved an

outright sale, even though Elan retained a royalty right as part of most such sales. (Id. at

10 (citing Aaron Decl. Ex. 1 at 35-37)). The Elan Defendants also maintain that SAB 101

did not require Elan to spread the revenues received as a result of the product

rationalizations over time. (Id.). Finally, the Elan Defendants assert that as a foreign

issuer, Elan had no duty to make disclosures concerning the Product Rationalization

Program until its Form 20-F for 2001 was due because it was not required to file interim

reports. (Id. at 11).

At the outset, the Plaintiffs have not adequately pleaded facts which would

warrant the conclusion that the product rationalization transactions involved licenses. In

the 2001 Form 20-F, Elan characterizes the transactions as "outright sales" or

"distribution and royalty arrangements." (Aaron Decl. Ex. 1 at 35). The Plaintiffs have

not set forth any basis for their apparent belief that the outright sales were actually

licenses. Moreover, the Plaintiffs have not indicated why the "distribution and royalty"

arrangements should be considered licenses for which Elan improperly accounted.

43

Indeed, in the one product rationalization clearly described in Elan's annual report as involving a "distribution and option agreement," which related to a product known as "Permax," Elan disclosed that Amarin, a United Kingdom public limited company, had agreed to market and distribute Permax in the United States, receiving in exchange an option to acquire rights to the product line from Elan.[10] (Id. at 36). In terms of its accounting treatment of this arrangement, Elan's Form 20-F stated that

> Elan recorded consideration of $45.0 million under the terms of the amended distribution and option agreement and retained a royalty right of 3.5% on net sales of Permax by Amarin from 1 January 2002 through the date on which Amarin exercises or terminates its option to acquire Permax. In 2001, Elan also recorded a net amount of $6.2 million from Amarin for distribution fees and royalties on sales of Permax. After reducing the carrying value of the Permax intangible and equity accounting, Elan recorded net revenue from Amarin of $16.9 million in 2001,which includes the distribution revenue. Amarin's option to purchase Permax was exercisable between September 2001 and May 2002 for an exercise price of $37.5 million, payable $7.5 million on exercise of the option and $2.5 million in quarterly installments thereafter, and a royalty of between 7% and 10% on future net sales of Permax by Amarin. The royalty on future net sales may be reduced by up to $8.0 million if Permax revenues in 2003 and 2004 are less than $26.0 million and $16.0 million, respectively. If Permax revenues in 2003 and 2004 are greater than $26.0 million and $16.0 million, respectively, Amarin will make additional royalty payments to Elan of up to $8.0 million. Amarin exercised its option to purchase Permax in March 2002 and paid Elan the first installment of the exercise price of $7.5 million.

---

[10] A subsequent amendment to the agreement gave Amarin an exclusive Permax distributorship until August 2002. (Id. at 36).

44

> In connection with the amended distribution and option
> agreement, Elan provided a loan of $45.0 million to Amarin.
> The loan bears interest at a rate equal to the London Interbank
> Offered Rate ("LIBOR") plus a margin of 2%. The loan
> matures on 28 September 2002. At 31 December 2001, Elan
> held approximately 7% of the outstanding ordinary shares of
> Amarin and also held preferred shares convertible into an
> additional 34% of Amarin's equity on a fully diluted basis. In
> March 2002, Elan converted a portion of the Amarin
> preferred shares into Amarin ordinary shares. Following this
> conversion, Elan owned approximately 27% of Amarin's
> outstanding ordinary shares.

(Id. at 36-37) (emphasis added).

To the extent that the Permax product rationalization involved the round

tripping of revenues, the salient financial aspects of the transaction were disclosed.

Additionally, although Elan evidently recorded the distribution revenue during the period

it was received, it appears that the company employed equity accounting for at least

certain aspects of its dealings with Amarin. Finally, Elan's disclosures apparently

indicated that the company would record any future royalty income derived from Permax

or its other rationalized product lines as it was received. (See id. at 35) ("Elan may

receive future revenues from Entex, Midrin, Mysoline, Nasorel, Nasalide, and Permax in

the form of royalties or option payments."). In the absence of any allegation that Elan had

a duty to provide continuing services to its product rationalization counterparties, the

Plaintiffs have not adequately pleaded any reasons why Elan's accounting treatment of

these transactions was generally improper.

There is one narrow respect in which the Complaint does allege that Elan's disclosures regarding the Product Rationalization Program were inadequate. In their motion papers, the Elan Defendants make the point that foreign issuers do not have quarterly disclosure duties and need not file interim reports for material events. (See Elan Defs.' Mem. of L. at 14 n.7). Nevertheless, as they themselves concede, the securities laws require Elan to disclose in a Form 6-K material information which it makes public or is required to make public in Ireland, or which it distributes or is required to distribute to its securities holders. (See id. (citing 17 C.F.R. §§ 240.13a-11(b), 240.13a-13(b)(2), 240.13a-16)).

In a press release issued on April 23, 2001, Elan indicated that its "[o]perating income in the first quarter of 2001 increased 94% to $116.2 million compared to 59.8 million in 2000, reflecting strong revenue growth, the improved gross margin on product revenue and lower research and development expenses." (Compl. ¶¶ 146-47) (emphasis deleted). That disclosure arguably gave rise to a duty to make a further timely disclosure regarding the extent to which those increases were attributable to one-time events or funded by Elan itself. Although Elan notes that its Form 20-F for 1999 stated that Elan recorded its sales of inventory and related product rights as product revenues, (see Elan Defs.' Reply Mem. of L. at 11 (citing Aaron Decl. Ex. 3 at 25)), the Court cannot say as a matter of law that this disclosure was adequate to alert investors

prior to the filing of Elan's 2001 Form 20-F that Elan's quarterly revenues included the proceeds of substantial sales of product lines and the round tripping of funds.

In sum, Plaintiffs have adequately pleaded that the defendants made a material misstatement or omission of fact in relation to the Pharma and Product Rationalization schemes.

### b.  Scienter

To prevail in an action brought under Section 10(b) or Rule 10b-5, a plaintiff must allege that the defendants acted with "an intent to deceive, manipulate or defraud." Ganino, 228 F.3d at 168 (quoting Hochfelder, 425 U.S. at 193 n.12).  Under the PSLRA, with respect to each act or omission alleged to have violated the Exchange Act, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  In this Circuit, this requirement is satisfied by alleging either (a) "facts to show that defendants had both motive and opportunity to commit fraud," or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito, 47 F.3d at 52. Accord Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000) (indicating that the PSLRA "did not change the basic pleading standard for scienter in this [C]ircuit").

47

i.     Motive and opportunity

To establish motive, a plaintiff must allege "concrete benefits that could be

realized by one or more false statements and wrongful nondisclosures alleged." Novak,

216 F.3d at 307 (quoting Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1130 (2d Cir.

1994)). To establish opportunity, the plaintiff must allege that the defendants had the

"means and likely prospect of achieving concrete benefits by the means alleged." Id.

Motives that are "generally possessed by most corporate directors and officers do not

suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual

defendants resulting from the fraud." Kalnit, 264 F.3d at 139. Among the motives that

are insufficient to meet this test are a desire for the corporation to appear profitable or to

keep the stock price high to increase officer compensation. Id.; see also San Leandro

Emergency Med. Group Profit Sharing Plan v. Phillip Morris, 75 F.3d 801, 814 (2d Cir.

1996) (corporation's desire to maintain a high credit rating is not a sufficient motive).

In this case, the Plaintiffs allege that the Elan Defendants "were motivated

to participate in the fraud to raise the price of Elan's ADRs and thereby provide currency

to acquire other pharmaceuticals in an effort to build a global empire." (Compl. ¶ 212).

They further suggest that the Individual Defendants were "direct beneficiaries" of the

Monksland royalty scheme. (Id. ¶ 211). Finally, they allege that Geaney's "fraudulent

mind-set" is evidenced by his continued insistence that Elan had made "full and fair

48

disclosure" even after financial analysts began to question Elan's bookkeeping practices in 2002. (Id. ¶ 213).

In Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000), the Second Circuit noted that while "virtually every company may have the desire to maintain a high bond or credit rating, . . . not every company has the desire to use its stock to acquire another company." Accordingly, the Plaintiffs may rely on the Elan Defendants' desire to complete the Liposome and Dura mergers as the requisite motive, but only to the extent that the allegedly fraudulent conduct preceded the merger. As the Elan Defendants evidently concede, (see Elan Defs.' Mem. of L. at 34 n.18), the Dura merger was completed after the Pharma sale. Consequently, the Plaintiffs' allegation that the Elan Defendants engaged in fraud in order to increase their ability to acquire other companies adequately pleads motive and opportunity with respect to alleged material misstatements and omissions concerning Pharma made in connection with the Dura merger.

In their Complaint, the Plaintiffs allege that the Product Rationalization Program was developed in response to SAB 101, which sounded the death knell for Elan's JBV accounting. That accounting bulletin, however, first became effective in 2001, by which time both the Dura and the Liposome mergers had been completed. It follows that a desire to complete a corporate merger using fraudulently-inflated Elan ADRs could not have provided the motive to engage in any fraud with regard to the Product Rationalization Program, which first came into existence after the mergers took

49

place. Inasmuch as no other specific motive is ascribed to the Elan or KPMG
Defendants, the Plaintiffs have not adequately alleged scienter on the basis of motive and
opportunity in relation to the purported Product Rationalization fraud.

   In a section of the Complaint captioned "Scienter of the Individual
Defendants and Elan," the Plaintiffs also allege that the Individual Defendants
participated in the Monksland scheme to enhance their incomes. (Compl. ¶ 211). As
noted earlier, however, the Plaintiffs have failed to allege adequately that the Monksland
scheme was improper in any respect. Insofar as the payments through Monksland served
as a legal tax avoidance mechanism for the Individual Defendants, their involvement in it
fails, as a matter of law, to furnish a motive for them to have defrauded investors through
either the Pharma or Product Rationalization schemes. See, e.g., Kalnit, 264 F.3d at 140
("As we made clear in Acito[,43 F.3d at 54], an allegation that defendants were motivated
by a desire to maintain or increase executive compensation is insufficient because such a
desire can be imputed to all corporate officers.").

   Finally, the fact that Geaney may have denied any wrongdoing in 2002,
after the relevant facts became known, does not establish that he had a motive to act in a
fraudulent manner at an earlier time, nor does it constitute a motive not generally
attributable to all corporate officers. Indeed, if the mere denial of a class action plaintiff's
accusations were sufficient to establish a defendant's scienter, the requirement of

50

pleading the requisite mental state with particularity would frequently become a mere formality.

### ii.   Conscious misbehavior or recklessness

A plaintiff may also satisfy the pleading standard by alleging facts showing conduct on the part of the defendant which was "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 142 (quoting Honeyman v. Hoyt (In re Carter-Wallace Sec. Litig.), 220 F.3d 36, 39 (2d Cir. 2000)).  This requirement is satisfied when a plaintiff has "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements . . . [and] defendants knew, or more importantly, should have known that they were misrepresenting material facts related to the corporation." Id. (quoting Novak, 216 F.3d at 308).

Because the Plaintiffs have adequately alleged motive with respect to the Pharma risk sharing arrangement, it is not necessary to consider whether any of the Elan Defendants' conduct in relation to Pharma meets the alternative method by which scienter may be established.  Turning to the Product Rationalization Program, it is undisputed that the Elan Defendants did not disclose any details of the program during 2001, despite Elan's issuance of an optimistic press release concerning its first quarter income.  The Plaintiffs further allege that the Product Rationalization Program had a material effect on

51

Elan's revenues, accounting for 31 percent of its reported net profit that year. (Compl.

¶ 50). In these circumstances, the Court cannot say as a matter of law that the Elan

Defendants' failure to make timely disclosure regarding the details of its Product

Rationalization Program was not, at a minimum, reckless.

Accordingly, the Plaintiffs have adequately alleged scienter on the part of

the Elan Defendants with respect to both the Pharma risk sharing arrangement and the

Product Rationalization Program.

c.    KPMG Defendants

In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, 511

U.S. 164, 191 (1994), the Supreme Court held that a private plaintiff may not bring an

action under Section 10(b) against a defendant on the theory that the defendant aided and

abetted a primary violator. Predictably, plaintiffs responded to Central Bank by seeking

to charge lawyers, accountants and others as primary, rather than as secondary, violators.

Cf. Bart Schwartz and Jonathan Friedman, Aiding and Abetting Liability and Enron, N.Y.

Law Journal, Jan. 23, 2003, at 5, col. 1. Courts have reached varying conclusions

regarding the level of involvement that a plaintiff must show to name an indirect

participant in a securities fraud as a primary violator. Some courts deem it sufficient that

the defendant had "substantial participation" in the steps leading to the publication of the

allegedly fraudulent statements. See, e.g., Howard v. Everex Sys., Inc., 228 F.3d 1057,

1061 n.5 (9th Cir. 2000); In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F.

52

Supp. 2d 549, 583-93 (S.D. Tex. 2002).  Other courts, including the Second Circuit, have

adopted a "bright line" test.  See, e.g., Wright v. Ernst & Young LLP, 152 F.3d 169, 175

(2d Cir. 1998).  Under the latter formulation, a defendant must actually make a false or

misleading statement in order to be held liable under Section 10(b).  Id.  The defendant

itself need not have communicated the statement to investors so long as it knew or had

reason to know that its representation would be communicated to investors and the

statement is attributed to the defendant.  Id. (citing Shapiro v. Cantor, 123 F.3d 717, 720

(2d Cir. 1997)).  "Anything short of such conduct is merely aiding and abetting and no

matter how substantial that aid may be, it is not enough to trigger liability."  Id. (quoting

Shapiro, 123 F.3d at 720).

        Although the Second Circuit adheres to the "bright line" rule, it also has

stated that the definition of a primary violator is broad enough to include anyone "who

participated in the fraudulent scheme" or other activities proscribed by the securities laws.

SEC v. U.S. Environmental, Inc., 155 F.3d 107, 111 (2d Cir. 1998) (quoting SEC v. First

Jersey Sec., Inc., 101 F.3d 1450, 1471 (2d Cir. 1996)); see In re Scholastic Corp., 252

F.3d at 75-76 (vice president for finance and investor relations who was allegedly

involved in drafting and disseminating false and misleading statements may be liable as a

primary violator even though the statements were not specifically attributed to him); see

also 17 C.F.R. §§ 240.10b-5(a), (c) (making it unlawful to employ "any device, scheme or

artifice to defraud" or to "engage in any act, practice, or course of business which

53

operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security"); <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153 (1972) (noting that subsections (a) and (c) of Rule 10b-5 do not require a plaintiff to allege that the defendant made a false or misleading statement or omission).

In <u>In re Global Crossing, Ltd. Sec. Litig.</u>, No. 02 Civ. 910 (GEL), 2004 WL 763890, at *7-*8 (S.D.N.Y. March 23, 2004), Judge Lynch recently sought to reconcile some of the case law under Section 10(b). Judge Lynch found the decision in <u>In re Lernout & Hauspie Sec. Litig.</u>, 230 F. Supp. 152 (D. Mass. 2002), particularly persuasive. In that case, the corporation's principal auditor was KPMG Belgium, but it was assisted by other KPMG affiliates that did not sign the audit reports. The Court held that the auditor's Singapore affiliate could not be held liable under Section 10(b) where its role was limited to communicating its "clean" audit opinion to the Belgian affiliate responsible for issuing the public company's audit reports. <u>Lernout & Hauspie</u>, 230 F. Supp. 2d at 171. On the other hand, because the role of the United States affiliate had been widely made known in the company's annual reports, the court found that "it was appropriate to infer that . . . investors reasonably attributed the statements contained in the quarterly and annual reports to [the United States affiliate]." <u>Id.</u> at 166-67. Judge Lynch concluded that

> the rule espoused in <u>Lernout & Hauspie</u> is that a plaintiff may state a claim for primary liability under section 10(b) for a false statement (or omission), even where the statement is not publicly attributed to the defendant, where the defendant's

54

> participation is substantial enough that s/he may be deemed to
> have <u>made</u> the statement, and where investors are sufficiently
> aware of defendant's participation that they may be found to
> have <u>relied</u> on it as if the statement had been attributed to the
> defendant.

<u>In re Global Crossing</u>, 2004 WL 763890, at *8 (emphasis in original).

Here, the Plaintiffs allege that KPMG-Ireland's representation that Elan's

financial statements for 1999 and 2000 conformed to U.S. GAAP constituted an

"implicit" representation that KPMG-US agreed. (Compl. ¶ 273). The Plaintiffs further

allege that analysts in the United States in turn relied upon that implied representation in

making their recommendations regarding Elan ADRs. (<u>Id.</u>). Under the bright line rule

applicable in this Circuit, these allegations are insufficient to establish KPMG-US's

involvement because Elan's disclosures are utterly silent as to any role that KPMG-US

may have played in the Elan audits. <u>See</u> <u>Wright</u>, 152 F.3d at 176 (defendant accounting

firm not liable under Section 10(b) where corporate press release contained unaudited

financial statement "without a whisper" of firm's involvement); <u>see also</u> <u>Ziemba v.</u>

<u>Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1205 (11th Cir. 2001) (for an accounting or law firm

to be "primarily" liable under Section 10(b) and Rule 10b-5, "the alleged misstatement or

omission must have been publicly attributed to the defendant"). Indeed, even if this Court

were to conclude that <u>Lernout & Hauspie</u> correctly states the applicable law, the Section

10(b) and Rule 10b-5 claim against KPMG-US would have to be dismissed because there

55

is no suggestion in the Complaint that KPMG-US's role in the audit process, rather than
being surmised by investors, was in fact disclosed to them in some fashion by Elan.

The Plaintiffs further contend that KPMG-US should be held liable for
Elan's fraudulently misleading statements because KPMG-US may be deemed to have
"directly or indirectly issued such statements, or participated in their issuance under the
group pleading doctrine." (Compl. ¶ 274). The "group pleading doctrine" permits
plaintiffs to "rely on a presumption that statements in prospectuses, registration
statements, annual reports, press releases or other group-published information, are the
collective work of those individuals with direct involvement in the everyday business of
the company." In re Vivendi Universal, S.A., Sec. Litig., No. 02 Civ. 5571 (HB), 2003
WL 22489764, at *25 (S.D.N.Y. Nov. 3, 2003) (quoting Polar Int'l Brokerage Corp. v.
Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000)). Here, however, the Complaint does
not allege that KPMG had the requisite level of involvement with Elan. It follows that
KMPG-US cannot be held liable under the group pleading doctrine pursuant to Section
10(b) or Rule 10b-5 on the theory that it was a direct participant in fraudulent
misrepresentations or omissions made by Elan. See Goldin Assocs., LLC v. Donaldson,
Lufkin & Jenrette Sec. Corp., No. 00 Civ. 8688 (WHP), 2003 WL 22218643 (S.D.N.Y.
Sept. 25, 2003) (group pleading doctrine is limited in scope and does not extend to "every
outside contributor" to a document published by a group); Degulis v. LXR
Biotechnology, Inc., 928 F. Supp. 1301, 1311-12 (S.D.N.Y. 1996) (group pleading

56

doctrine only applies where the officers or directors of the company participated in preparation and dissemination of the group-published document).

      3.    Section 20(a)

In their final claim for relief, the Plaintiffs allege that the Individual Defendants are liable as control persons for the Section 10(b) violations pursuant to Section 20(a) of the Exchange Act. (Compl. ¶¶ 280-84). Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Controlling person liability under Section 20(a) is "a form of secondary liability, under which a plaintiff may allege a primary [Section] 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud." Suez Equity Investors, L.P., v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001) (citing First Jersey, 101 F.3d at 1472).

To state a claim under Section 20(a), a plaintiff must allege at least two elements: (a) a primary violation by a controlled person and (b) direct or indirect control of the primary violator by the defendant. Control may be established by showing that the defendant possessed, either directly or indirectly, "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of

57

voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2; see In re Worldcom,

Inc. Sec. Litig., 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003) (noting that the court in First

Jersey adopted the definition of control in 17 C.F.R. § 12b-2 as the standard for a Section

20(a) claim).

    Courts disagree as to whether a Section 20(a) claim also requires a showing

of scienter. See In re Initial Pub. Offering, 241 F. Supp. 2d at 392-93 & n.179 (observing

that six circuits have held that there is no scienter requirement, two have held that there is

such a requirement, and the Second Circuit "has yet to definitively answer this question");

Neubauer v. Eva-Health USA, Inc., 158 F.R.D. 281, 284 (S.D.N.Y. 1994) (collecting

cases). In this Circuit, the courts are divided as to whether a securities plaintiff must at

least allege that "that the controlling person was in some meaningful sense a culpable

participant in the primary violation." Bouguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.

1998) (quoting First Jersey, 101 F.3d at 1472). Some judges have concluded that this

state of mind requirement is a necessary element of the claim, that it necessitates

compliance with the PSLRA, and that a plaintiff must therefore "plead with particularity

facts giving rise to a strong inference that the controlling person knew or should have

known that the primary violator, over whom that person had control, was engaging in

fraudulent conduct." Burstyn v. Worldwide Xceed Group, Inc., 01 Civ. 1125 (GEL),

2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002) (noting that the "debate continues"

even though recent Second Circuit opinions such as Ganino and Boguslavsky "appear to

58

treat culpable participation as an element of the prima facie case . . . since the pleading

standard of Section 20(a) was not at stake in any of those cases and the split was not

explicitly addressed") (citation and internal quotation marks omitted); see also In re Loral

Space & Communications Ltd. Sec. Litig., No. 01 Civ. 4388 (JGK), 2004 WL 376442, at

*19 (S.D.N.Y. Feb. 27, 2004) (adopting culpable participation requirement). Other

judges have opined that "Section 20(a) requires the plaintiff to allege only control, not

scienter or culpable conduct." Duncan v. Pencer, 94 Civ. 321 (LAP), 1996 WL 19043, at

*17 (S.D.N.Y. Jan. 18, 1996) (collecting cases and noting that Judge Pollack has adopted

this view); Food and Allied Serv. Trades Dep't, AFL-CIO v. Millfield Trading Co., 841

F. Supp. 1386, 1390 (S.D.N.Y. 1994) (Sand, J.) ("We agree . . . that all that is required to

make out a prima facie case of controlling person liability at the pleading stage is an

allegation of control status."). Your Honor has previously weighed in on this issue,

siding with those judges who have concluded that a particularized showing of culpable

participation is necessary. See In re Solv-Ex Corp. Sec. Litig., 210 F. Supp. 2d 276, 284

(S.D.N.Y. 2000). Accordingly, I have assumed for purposes of this Report and

Recommendation that culpable participation is a necessary element of a Section 20(a)

claim.

      The Complaint adequately alleges that each of the Individual Defendants

was an Elan control person during at least some of the Class Period. (See Compl. ¶¶ 209-

14). Nevertheless, the Complaint does not set forth a particularized showing of culpable

participation on the part of any of the Individual Defendants. Perhaps the closest that the

Plaintiffs come to meeting this requirement is their allegation that in 2002, after financial

analysts began to question Elan's disclosures, "Geaney continued to insist that there had

been 'full and fair disclosure.'" (Id. ¶ 213). As noted earlier, if a denial of wrongdoing

could serve as the factual predicate for a showing of scienter (or culpable participation),

this element of a securities law claim would become a mere formality in any action in

which the individual defendants (or control persons) did not concede liability. While the

exact boundaries of what must be alleged may be unclear under existing Second Circuit

law, Geaney's mere denial of wrongdoing plainly is not enough to meet the Plaintiffs'

pleading burden under Section 20(a) if a plaintiff must make a particularized showing of

culpable participation. Count VI of the Complaint therefore fails to state a claim against

any of the Individual Defendants.

V.   Conclusion

          For the reasons set forth above, the defendants' motion to dismiss should be

granted in part and denied in part. The Plaintiffs' cross-motion to strike certain exhibits

proffered by the Elan and KPMG-Ireland Defendants is rendered moot, because I have

not considered those exhibits, which raise matters not appropriate for consideration at this

pre-discovery stage. Finally, the Plaintiffs' cross-motion asking the Court to take judicial

notice of Elan's 2002 Annual Report and Form 20-F should be granted.

60

## V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this

Report and Recommendation, they must, within ten (10) days from today, make them in

writing, file them with the Clerk of the Court, and send copies to the chambers of the

Honorable Richard M. Berman, at the United States Courthouse, 40 Centre Street, New

York, New York 10007, and to the chambers of the undersigned, at the United States

Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).  Any requests for an

extension of time for filing objections must be directed to Judge Berman.  Any failure to

file timely objections will result in a waiver of those objections for purposes of appeal.

See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(e), 72(b).


Dated:      New York, New York
            May 18, 2004


                                        FRANK MAAS
                                  United States Magistrate Judge



Copies to:

Hon. Richard M. Berman
United States District Judge



61

**Via Facsimile**

Travis E. Downs, III, Esq.
Lerach Coughlin Stoia Robbins LLP
401 B Street, Suite 1700
San Diego, California 92101
Fax:   (619) 231-7423

Marc I. Gross, Esq.
Pomerantz Haudek Block Grossman & Gross, LLP
100 Park Avenue
New York, New York 10017
Fax:   (212) 661-8665

Stuart J. Baskin, Esq.
Jaculin Aaron, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Fax:   (212) 848-7179

Michael R. Young, Esq.
Wilkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Fax:   (212) 728 -8111

Cheryl Justice, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071
Fax:   (213) 229-6470

62