**Exhibit B**

LEXSEE 2004 U.S.DIST. LEXIS 5040

## In re GLOBAL CROSSING, LTD. SECURITIES LITIGATION

### 02 Civ. 910 (GEL)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2004 U.S. Dist. LEXIS 5040; Fed. Sec. L. Rep. (CCH) P92,717*

**March 23, 2004, Decided**
**March 23, 2004, Filed**

**SUBSEQUENT HISTORY:** Later proceeding at *Nachom v. Citigroup, Inc. (In re Global Crossing, Ltd. Secs. Litig.), 2004 U.S. Dist. LEXIS 5323 (S.D.N.Y., Mar. 26, 2004)*

**PRIOR HISTORY:** *In re Global Crossing, Ltd. Sec. Litig., 2003 U.S. Dist. LEXIS 22930 (S.D.N.Y., Dec. 18, 2003)*

**DISPOSITION:** [*1] Defendant Fagan, individual Andersen Defendants dismissed from Counts I and XIX of the Complaint. Count XX of the Complaint dismissed against Andersen. Andersen's motions to dismiss the Complaint denied in every other respect, and plaintiffs' motion to lift the stay of discovery as to Andersen granted.

## CASE SUMMARY:

**PROCEDURAL POSTURE:** In addition to suing corporate defendants, plaintiff investors also sued defendant outside auditor, several of its officers, board members, and employees under § § 11 and 15 of the Securities Act of 1933, *15 U.S.C.S. § § 77k*, 77o, and § § 10(b), 14, and 20(a) of the Exchange Act of 1934, *15 U.S.C.S. § § 78j*(b), 78n, 78t-l(a), as well as S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*. The auditor and its related individual defendants moved to dismiss.

**OVERVIEW:** The consolidated class action arose from alleged accounting improprieties that artificially inflated stock price at the corporation. Plaintiffs alleged that insiders sold over $ 1.5 billion in artificially inflated stock while in possession of material, non-public

information and the auditor defendants reaped hundreds of millions of dollars in fees and profits. However, the corporation and its purported multi-billion dollar revenues and strong, substantial cash flow were a complete sham. Inter alia, the court held that the auditor's reports were included in the corporation's registration statements and annual reports, and were widely available to shareholders. Investors could easily have relied on the auditor's involvement in making any public financial reports, even where a statement was not publicly attributed to it. Moreover, the auditor's aggressive marketing of novel accounting strategies raised an inference that sophisticated investors would have known of its role in creating the reporting practices behind the corporation's false statements. There was a reasonable inference that the auditor was a "maker" of the statements and the investors viewed it as such.

**OUTCOME:** All except one of the auditor-related individual defendants were dismissed from counts I and XIX of the Complaint. Count XX, which addressed inclusion of the auditor's report in the corporations' subsidiary's registration statement, was dismissed as against the auditor. The auditor's motions to dismiss were denied in every other respect, and the investors' motion to lift a stay of discovery as to the auditor was granted.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] On a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the court must accept as true the facts alleged in

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 3 of 15

Page 2

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

the complaint, and may grant the motion only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. When adjudicating motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] When deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court may consider documents attached to the complaint as exhibits or incorporated in it by reference. In addition to facts alleged in the complaint, the court may take judicial notice of public disclosure documents filed with the Securities and Exchange Commission.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] On a motion to dismiss for failure to state a claim, all reasonable inferences are to be drawn in the plaintiffs' favor, which often makes it difficult to resolve certain questions as a matter of law.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN4] Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), protects investors by making it unlawful to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. *15 U.S.C.S. § 78j*(b).

*Securities Law > Bases for Liability > Deceptive Devices*
[HN5] See *17 C.F.R. § 240.10b-5*.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN6] The purpose of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry. To better achieve this end, the Securities Exchange Act is to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.

*Securities Law > Bases for Liability > Deceptive DevicesSecurities Law > Bases for Liability > Misleading Statements*
[HN7] The majority of securities fraud claims under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), are brought pursuant to S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5(b)*, for false or misleading statements or omissions. In order for a claim under this provision to survive a motion to dismiss, a plaintiff must allege that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff. A statement or omission is material if it would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN8] S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5(a)* and (c), prohibit the use of any device, scheme, or artifice to defraud or the participation in any act, practice, or course of business that would perpetrate fraud on investors. While claims brought under S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5(b)*, require plaintiffs to allege a false or misleading statement (or omission), the first and third subparagraphs of Rule 10b-5 are not so restricted. Rather, in order for such a claim to survive a motion to dismiss, plaintiffs must allege that (1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading RequirementsSecurities Law > Bases for Liability > Deceptive DevicesSecurities Law > Bases for Liability > Private Securities Litigation*
[HN9] In a securities fraud case, the pleading standard is stiffened by the requirements that plaintiffs plead the element of scienter, defined as a mental state embracing intent to deceive, manipulate, or defraud, which is a necessary element of any claim brought under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b). The burden of pleading scienter is intensified by the requirement of *Fed. R. Civ. P. 9(b)* that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. *Fed. R. Civ. P. 9(b)*. Although Rule 9(b) allows the pleading party to aver scienter generally, the United States Court of Appeals for the Second Circuit warns that the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind must not be

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 4 of 15

Page 3

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

mistaken for a license to base claims of fraud on speculation and conclusory allegations. Rather, plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. This requirement is further reinforced by the Private Securities Litigation Reform Act, which requires plaintiffs to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *15 U.S.C.S. § 78u-4*(b)(2).

### Securities Law > Bases for Liability > Private Securities Litigation

[HN10] The Private Securities Litigation Reform Act (PSLRA) raises the nationwide pleading standard in securities cases. However, since the United States Court of Appeals for the Second Circuit already required heightened pleading, the PSLRA merely adopts the Circuit's "strong inference" standard.

### Securities Law > Bases for Liability > Private Securities Litigation

[HN11] The Private Securities Litigation Reform Act requires that where material misstatements or omissions are alleged, plaintiffs must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. *15 U.S.C.S. § 78u-4*(b)(1). In cases where it is not a statement or omission that is alleged, but rather, a fraudulent scheme to affect the price of stocks, it is sufficient to specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.

### Securities Law > Bases for Liability > Deceptive Devices

[HN12] Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*, assuming all of the requirements for primary liability under Rule 10b-5 are met. In any complex securities fraud there are likely to be multiple violators. Nonetheless, the requirement of a primary violation is a precondition for liability. To allow otherwise would circumvent a necessary element of every § 10(b)of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), claim by subjecting defendants to liability without any showing that the plaintiff relied upon the aider and abettor's statements or actions. Interpreting this mandate, the United States Court of Appeals for the Second Circuit has clarified that in cases brought under S.E.C.

Rule 10b-5, *17 C.F.R. § 240.10b-5(b)*, defendants can only be held liable for statements that are publicly attributed to them. Thus, in order for a defendant to be held liable for a claim brought under Rule 10b-5, a plaintiff must allege that that defendant made a false or misleading statement or omission that was attributed to him or her, or that s/he participated in a fraudulent scheme or other activity proscribed by the securities laws.

### Securities Law > Bases for Liability > Deceptive Devices

[HN13] The United States Court of Appeals for the Second Circuit has held that although each participant in a group may be liable for his or her own primary securities violation, there is no separate cause of action for conspiracy to violate S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*.

### Securities Law > Bases for Liability > Deceptive Devices

[HN14] The requirement that a plaintiff must plead a primary violation of the securities laws is distinct from the requirement of pleading scienter. As the United States Court of Appeals for the Second Circuit has explained, whether a defendant was a primary violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind when he performed them.

### Securities Law > Bases for Liability > Deceptive Devices

[HN15] In the Second Circuit, a defendant may be held liable for fraudulent statements under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), where a plaintiff alleges sufficient facts that demonstrate that a defendant was personally responsible for making those statements, even if he or she is not identified as the speaker. However, while Scholastic might indicate some relaxation of Wright's requirement, it does not provide any guidance as to when a statement not attributed to a defendant might cross the line into a primary violation.

### Securities Law > Bases for Liability > Deceptive Devices

[HN16] Fairly read, the rule the court ultimately adopted in Lernout & Hauspie comports with its own characterization of Second Circuit law, that for primary liability to attach for fraudulent statements by a secondary actor under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), the public must be able to attribute a misleading statement (at least indirectly) to the secondary actor at the time it is issued. The rule espoused in the case thus emphasizes constructive, rather than actual, attribution -- a concept

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 5 of 15

Page 4

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

consistent with the United States Court of Appeals for the Second Circuit's emphasis on reliance.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN17] Allegations that an auditor helped create financial documents, alone, have been held insufficient to sustain § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)* liability.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN18] It is apparent from the language of S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*, and the caselaw interpreting it that a cause of action exists under *17 C.F.R. § 240.10b-5(a)* and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant. In the wake of Central Bank, courts have not been reluctant to find fraud allegations sufficient under these subsections, provided that the other requirements for establishing a primary violation have been met. Claims for engaging in a fraudulent scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct elements.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN19] All that is required in order to state a claim for a primary violation under S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5(a)* or (c), is an allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance.

*Securities Law > Bases for Liability > Liability for Fraud*
[HN20] Market manipulation is defined as the illegal practice of raising or lowering a security's price by creating the appearance of active trading.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN21] S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5(a)* and (c), encompass much more than illegal trading activity: they encompass the use of any device, scheme or artifice, or any act, practice, or course of business used to perpetrate a fraud on investors. *17 C.F.R. § 240.10b-5(a)*, (c). As demonstrated by the cases cited above, courts including this country's highest court have held that a cause of action lies for claims that involve allegations of manipulative schemes used in connection with securities markets. If the behavior alleged does not make out a claim for engaging in any act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person, then it is hard to imagine what would.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN22] The use of the term "manipulative" in § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, itself connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities. Plaintiffs allege precisely such manipulative conduct, with precisely such a result. Schemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within both the language of § 10(b) and its broad purpose, to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded. Provided that the other elements of a § 10(b) claim are met, nothing in the language of § 10(b) or S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*, or in the case law interpreting them shields a party from liability for its direct participation in such a scheme.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN23] S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5(a)* and (c) may only be used to state a claim against a company's accountant for the underlying deceptive devices or frauds themselves, and not as a short cut to circumvent Central Bank's limitations on liability for a secondary actor's involvement in making misleading statements. In other words, although Andersen may be held liable for the underlying fraudulent scheme to inflate the price of the company's stocks, it may only be held liable for specific false statements to the extent that it can be said to have made those statements under Rule 10b-5(b).

*Securities Law > Bases for Liability > Deceptive DevicesSecurities Law > Bases for Liability > Misleading Statements*
[HN24] Fair presentation is the touchstone for determining the adequacy of disclosure in financial statements. While adherence to generally accepted accounting principles is a tool to help achieve that end, it is not necessarily a guarantee of fairness.

*Securities Law > Bases for Liability > Misleading Statements*
[HN25] Under both Generally Accepted Accounting Principles and the securities laws, business entities and their accountants are required to provide whatever additional information would be necessary to make the

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 6 of 15

Page 5

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

statements in their financial reports fair and accurate, and not misleading. *17 C.F.R. § 240.10b-5(b).*

*Securities Law > Bases for Liability > Deceptive DevicesSecurities Law > Bases for Liability > Misleading Statements*
[HN26] In the context of a securities fraud action, a statement or omission is material if it would be viewed by the reasonable investor as having significantly altered the total mix of information available. Materiality is generally a mixed question of law and fact, and only if no reasonable juror could determine that the statement or omission would have assumed actual significance in the deliberations of the reasonable investor should materiality be determined as a matter of law.

*Securities Law > Bases for Liability > Liability for FraudSecurities Law > Bases for Liability > Private Securities Litigation*
[HN27] In recognition that there will rarely be direct evidence of intent to defraud, the United States Court of Appeals for the Second Circuit has held that a plaintiff may establish the requisite "strong inference" of scienter either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

*Securities Law > Bases for Liability > Liability for FraudSecurities Law > Bases for Liability > Private Securities Litigation*
[HN28] In the context of a securities fraud action, just as technical compliance with Generally Accepted Accounting Principles does not negate the potential of a statement or omission to mislead investors, neither does public reporting or marketing of a particular body of accounting practices necessarily negate an intent to defraud investors.

*Securities Law > Bases for Liability > Liability for FraudSecurities Law > Bases for Liability > Private Securities Litigation*
[HN29] Courts have been especially ready to find motive pleading adequate to survive *Fed. R. Civ. P. 12(b)(6)* motions in securities fraud cases where the auditing company plays a dual role with respect to the client. In such cases, an auditor may take on a vested interest in the performance and profitability of its client, and consequently weaken its ability to rely on its reputation

in countering as irrational allegations that it participated in a client's fraud.

*Securities Law > Bases for Liability > Liability for FraudSecurities Law > Bases for Liability > Private Securities Litigation*
[HN30] Securities fraud plaintiffs can plead scienter by showing strong circumstantial evidence of conscious misbehavior or recklessness. Allegations of recklessness generally are sufficient when plaintiffs have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements or have alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud. However, in the case of non-fiduciary accountants, not every oversight is a sufficient basis for a claim. Violations of Generally Accepted Accounting Principles standing alone, are insufficient to state a securities fraud claim; plaintiffs must link such allegations with fraudulent intent. Indeed, for non-fiduciary accountants, the standard for pleading scienter by recklessness appears to be heightened. For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

*Securities Law > Bases for Liability > Liability for FraudSecurities Law > Bases for Liability > Private Securities Litigation*
[HN31] In a securities fraud action, liability for recklessness does not include "fraud by hindsight," meaning that defendants cannot be held liable for failing to anticipate future events and make disclosures earlier than they did.

*Securities Law > Bases for Liability > Liability for FraudSecurities Law > Bases for Liability > Private Securities Litigation*
[HN32] In a securities fraud action, the scope of the fraud alleged may appropriately be considered in determining whether scienter has been adequately pled.

*Securities Law > Bases for Liability > Civil LiabilitySecurities Law > Bases for Liability > Misleading Statements*
[HN33] Section 11 of the Securities Act of 1933, *15 U.S.C.S. § 77k,* imposes civil liability on persons preparing materially misleading registration statements. To state a claim under § 11, an injured plaintiff must allege only that a defendant made or participated in making a "material misstatement or omission" in a

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

registration statement for a security the plaintiff acquired; liability for such misstatements extends to, among others, underwriters of securities and to every person who signed the registration statement or who consented to be named as having prepared or certified a report or valuation which is used in connection with the registration statement. *15 U.S.C.S. § 77k*(1), (4). No intent to defraud need be alleged under § 11.

***Securities Law > Bases for Liability > Civil LiabilitySecurities Law > Bases for Liability > Misleading Statements***
[HN34] *15 U.S.C.S. § 77k* extends liability to any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement. *15 U.S.C.S. § 77k*. The definitions that accompany the statute, in turn, specifically include corporations in the definition of the term "person. " *15 U.S.C.S. § 77b*(2).

***Securities Law > Bases for Liability > Civil LiabilitySecurities Law > Bases for Liability > Deceptive DevicesSecurities Law > Bases for Liability > Misleading Statements***
[HN35] The same standard for materiality applies to both § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), claims and § 11 of the Securities Act, *15 U.S.C.S. § 77k*, claims.

***Securities Law > Bases for Liability > Controlling Persons Liability***
[HN36] See *15 U.S.C.S. § 78t*(a).

***Securities Law > Bases for Liability > Controlling Persons Liability***
[HN37] The provisions of § 15 of the Securities Act of 1933, *15 U.S.C.S. § 77o*, are essentially parallel, providing control person liability for claims brought under § § 11 and 12 of the Securities Act, *15 U.S.C.S. § § 77k* and 77l, and its terms are interpreted in the same manner as those of § 20(a) of the Securities Act of 1933, *15 U.S.C.S. § 78t* (a). *15 U.S.C.S. § 77o*. Each provision provides a separate basis for liability, apart from the underlying claim of primary liability.

***Securities Law > Bases for Liability > Controlling Persons Liability***
[HN38] In order to state a claim under § 20(a) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78t*(a) and § 15 of the Securities Act of 1933, *15 U.S.C.S. § 77o*, plaintiffs must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator. Section 20(a) contains the additional requirement that plaintiff allege culpable participation in

some meaningful sense by the controlling person in the fraud. Since culpable participation is an element, the Private Securities Litigation Reform Act's heightened pleading requirements apply, and plaintiffs must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct. Determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability.

***Securities Law > Bases for Liability > Controlling Persons Liability***
[HN39] Despite recent decisions within the Second Circuit arguing that no showing of culpable participation is necessary for a prima facie § 20(a) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78t*(a) claim, the United States District Court for the Southern District of New York adheres to its prior position that the plaintiff must allege culpable participation.

***Securities Law > Bases for Liability > Private Securities Litigation***
[HN40] The Private Securities Litigation Reform Act provides that all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party. *15 U.S.C.S. § 78u-4*(b)(3)(B).

**COUNSEL:** Jay W. Eisenhofer, Sidney S. Liebesman, Michael J. Barry, Lauren E. Wagner, and Marlon Q. Paz, Grant & Eisenhofer, P.A., Wilmington, DE, for Lead Plaintiffs Public Employees Retirement System of Ohio and State Teachers Retirement System of Ohio.

Peter Fleming Jr., Eliot Lauer, Jacques Semmelman, Jonathan Harris, Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, NY, for Defendants Arthur Andersen LLP and the Individual Andersen Defendants.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINIONBY:** GERARD E. LYNCH

**OPINION:**

OPINION AND ORDER

GERARD E. LYNCH, District Judge:

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 8 of 15

Page 7

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

This consolidated class action arises from alleged accounting improprieties at the telecommunications firm Global Crossing, Ltd. ("GC"), during the period between February 1, 1999, and January 28, 2002, the "class period," that artificially inflated the company's stock price. According to the Consolidated [*2] Class Action Complaint, "during the Class Period, insiders sold over $ 1.5 billion in artificially inflated Global Crossing stock while in possession of material, non-public information and the outside advisor defendants reaped hundreds of millions of dollars in fees and profits. But the Company and its purported multi-billion dollar revenues and strong, substantial cash flow were a complete sham." (Compl. P 1.) In addition to suing GC, its individual directors and officers, and numerous financial institutions, n1 plaintiffs have named as defendants Arthur Andersen LLP ("Andersen"), n2 GC's outside auditor, as well as several of its officers, board members, and employees ("the individual Andersen defendants"). n3 Plaintiffs later amended their Complaint to assert claims against a GC subsidiary, Asia Global Crossing, Ltd. ("AGC"), and against Andersen in its role as AGC's outside auditor. n4 Plaintiffs assert these claims under sections 11 and 15 of the Securities Act of 1933, *15 U.S.C. § § 77k, 77o*, and sections 10(b), 14, and 20(a) of the Exchange Act of 1934, *15 U.S.C. § § 78j(b), 78n, 78t*, as well as *Rule 10b-5* promulgated thereunder [*3] by the Securities Exchange Commission ("SEC"), *17 C.F.R. § 240.10b-5*.

n1 Plaintiffs have also named as defendants various financial institutions that served as analysts, underwrote GC's stock offerings, or provided other investment banking services during the class period. Several Counts of the Complaint relating to these defendants were dismissed by this Court's opinion and order dated December 18, 2003. *In re Global Crossing Sec. Litig., 2003 U.S. Dist. LEXIS 22930, 02 Civ. 910 (GEL), 2003 WL 22999478 (S.D.N.Y., Dec. 22, 2003).* Motions to dismiss by defendants Solomon Smith Barney and Canadian Imperial Bank of Commerce are currently pending, as are several additional motions to dismiss filed in response to the claims related to Asia Global Crossing in the Amended Complaint. These motions will be dealt with in a later opinion.

n2 In their original Complaint, plaintiffs named as a defendant Andersen Worldwide S.C., the umbrella company that is "comprised of member firms, including Arthur Andersen LLP, Arthur Andersen & Co., and the individual and collective partners of the member firms." (Compl. P 61.) The Amended Complaint added another Andersen affiliate, Arthur Andersen Asahi & Co. (Am. Compl. P 73.) Plaintiffs refer to these entities collectively throughout the Complaint as "Andersen." (Id. P 82.) However, the motions to dismiss were brought only by Arthur Andersen LLP and the individual Andersen defendants. The issue of liability on the part of the other named affiliates is therefore not before the Court. [*4]

n3 The individual Andersen defendants are Mark Fagan, Joseph F. Berardino, Thomas L. Elliott, Anthony J. Amoruso, Scott Taub, Benjamin Neuhausen, Carl E. Bass, Amy Ripepi, John Stewart, Dorsey L. Baskin Jr., Michael Crooch, Rick Peterson, Thomas Hoey and Donald L. Weeks. Plaintiffs have dropped from the Amended Complaint Edmund Jenkins, Ken Rigelsford, Robert Hodgkinson, Ros Lindsey, Isobel Sharp, and Hazel Powling, who had originally been named as defendants.

n4 Plaintiffs' 1088-paragraph Amended Consolidated Complaint was filed on August 11, 2003. The Amended Complaint left virtually unchanged the allegations in the original Complaint with respect to GC; it merely added claims related to AGC which accrued during a second class period encompassing October 6, 2000 and November 17, 2002. All further references to the "Complaint" are therefore to the Amended Complaint, as are all further parenthetical citations, unless otherwise noted.

On April 4, 2003, Andersen and the individual Andersen defendants moved to dismiss all claims asserted against them in the original Complaint; on October 10, 2003, they [*5] further moved to dismiss all claims relating to AGC. Because both motions implicate similar legal issues, they will be decided together. For the reasons set forth below, Andersen's motions will be granted in part and denied in part.

BACKGROUND

The facts underlying the Complaint in this case were briefly set forth in this Court's December 18 Opinion, but will be outlined in more detail here. The claims against Andersen in particular center around allegedly fraudulent misstatements of GC's and AGC's assets, obligations, and cash revenues, arising from the manner in which the two companies accounted for certain transactions involving "indefeasible rights of use" ("IRUs"). In its role as independent auditor for both GC and AGC ("the Companies"), Andersen is alleged to have perpetrated a

Case 3:02-cv-02133-EBB   Document 167-4   Filed 08/18/2004   Page 9 of 15

Page 8

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

fraud on investors by dictating incorrect and misleading accounting systems for these transactions and by structuring them so as to inflate the Companies' reported earnings, in violation of Generally Accepted Accounting Practices ("GAAP") and Generally Accepted Accounting Standards ("GAAS"). n5

> n5 The Complaint defines GAAP as "those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time." (P 147.) GAAP are "established by the American Institute of Certified Public Accountants (the 'AICPA') ... and through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board ('the FASB')." (Id.) GAAS are those "standards of conduct for auditors in performing and reporting on audit engagements." (P 719.)

[*6]

An IRU is the "right to use a specified capacity, or bandwidth, over a designated communications cable owned by a telecommunications company for a set period of time." (P 150.) Income from IRU transactions represented a large portion of the Companies' revenues during the class periods and therefore played a substantial role in determining the market value of their shares. Plaintiffs claim that the Companies, in order to meet performance expectations and thereby boost the value of their securities, (1) reported as immediate cash revenue income that should have been booked over the 25-year term of each IRU, while amortizing the related costs over the entire term; and (2) similarly reported income from unneeded reciprocal "swaps" with other carriers of such capacity, notwithstanding that, where cash actually changed hands, it was "round-tripped" in the return half of the swap, thereby yielding no actual revenue. They further assert that the Companies overstated the value of their assets by failing to mark down the value of the IRUs received in the swaps, which had been booked at or above their "fair market value," even as the market price for capacity plummeted due to the glut on the [*7] market. (P 718.)

Exchanges of capacity were common in the telecommunications industry from its inception. However, "until the late 1990s ... telecom companies did not treat these exchanges as sales and usually did not record revenue from the trades." (P 210.) GC alone among these companies booked immediate revenue from these sales. (P 211.) Plaintiffs allege that the practice of

booking IRU revenue up front violated Financial Accounting Standards Board ("FASB") Statement No. 13, which restricts the circumstances under which a company may report as immediate revenue the total lease payments due under a multiyear lease agreement. Indeed, effective July 1, 1999, the FASB issued "FASB Interpretation No. 43" ("FIN 43"), a clarification of FASB 13 that clearly prevented GC from continuing to book the IRU payments as immediate cash income. Following the issuance of FIN 43, GC changed its accounting to come into compliance with its requirements, although AGC continued to book revenue for leases of subsea (as opposed to terrestrial) cable as immediate revenue until mid-2000. (P 157.)

Following the issuance of FIN 43, GC announced that compliance with its terms "would not have a material impact [*8] on the Company's financial position or results of operations." (P 220 (quoting unattributed source).) But plaintiffs allege that compliance with FIN 43 would, in fact, have been devastating had GC not found a new source of illusory revenue: reciprocal "swap" transactions with other telecommunications companies. According to the Complaint, Joseph Perrone, a senior partner in Andersen's media and communications practice, devised a "roadmap" whereby telecom companies, and GC in particular, could structure trades of capacity to create the appearance of revenue, with the purpose of avoiding the strictures of GAAP. (PP 216-224.) In particular, the transactions were structured to circumvent Accounting Principles Board Opinion No. 29 ("APB 29"), "Accounting for Nonmonetary Transactions," which specifies that no revenue or expense should be recorded for transactions that involve an exchange of like assets. Andersen's scheme, which was embodied in a document that came to be known as the "White Paper," advised that telecom clients could book revenue from IRU sales between companies if the transactions had separate contracts and separate cash settlements, and if the contracts were at least sixty [*9] days apart. (P 217.) Thereafter, the Companies followed these guidelines to structure their exchanges of capacity such that they could book revenue from the transactions.

When revenue from IRU sales could no longer be reported immediately as cash revenue under GAAP, GC claimed that its own measures of revenue, styled by GC as "pro forma disclosures," "Earnings Before Interest, Taxes, Depreciation, and Amortization" ("EBIDTA"), and "Adjusted EBIDTA," were better measures of its financial health than financial statements according to GAAP. These financial statements, which were publicly disseminated to investors, reported as immediate revenue what they termed the "cash portion" of "deferred revenue": in effect, these disclosures allowed GC to

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 10 of 15

Page 9

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

further circumvent the requirements of FIN 43 and APB 29, and to continue to represent as immediate revenue the up-front payments they received for IRU sales. Additionally, AGC created the terms "Proportionate Cash Revenue" and "Proportionate Adjusted EBITDA," which purportedly reflected "the sum of our ownership percentage" of cash revenue and adjusted EBITDA of various GC affiliates with whom ACG participated in joint ventures. (PP 240, 241.) [*10] The Companies' tactics succeeded, plaintiffs claim, in inflating the value of their stock, resulting in steep losses for shareholders in 2002 when the house of cards collapsed and the Companies inevitably went bankrupt.

Plaintiffs allege that Andersen, as independent auditor for both GC and AGC, played a central role in devising and implementing the accounting schemes in question. According to the Complaint, Andersen "created a web of interrelated transactions between [its] clients that had no economic substance but which were used to fool investors into believing that the industry and these companies were growing much faster than the reality." (P 146.) In addition to issuing clean audit opinions on the Companies' annual 10-K reports filed with the SEC, Andersen allegedly also had direct knowledge of the Companies' unaudited pro forma reports (P 732(h)), and was responsible through defendants Perrone and, later, Mark Fagan, Andersen's senior partner in charge of the GC account after Perrone was hired by GC, for overseeing all of GC's public statements (P 77.) Plaintiffs accordingly seek to hold Andersen liable under *section 10(b)* and *Rule 10b-5* for the financial statements it audited [*11] for GC in 1998, 1999, and 2000, and for AGC in 2000, claiming that they included materially false or misleading information in their treatment of IRUs and swap transactions. They also seek to hold Andersen liable for GC's and AGC's unaudited press releases and "pro forma" disclosures, which included falsely optimistic statements of income and misleading statements of "EBIDTA." (Counts I, XIX.) As a corollary to the allegations of false and misleading statements in plaintiffs' *section 10(b)* claims, they further assert that Andersen is liable under *section 11* for including the allegedly misleading audited financial statements in registration statements filed in connection with various stock offerings (Counts VIII-XIV, XX), and under *section 14* for consenting to the inclusion of the false audited financial statements in a proxy statement issued in connection with GC's merger with Frontier Corporation ("Frontier") in 1999 (Count II). Finally, they assert claims under *sections 20(a)* and *15* against Andersen as an entity, as well as against the individual Andersen defendants, for controlling the persons who engaged in these illegal activities. (Counts IV, XVI).

DISCUSSION

[HN1] On a motion [*12] to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins., 32 F.3d 697, 699-700 (2d Cir. 1994)*, and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir. 1998)* (citations omitted); see also *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)* (when adjudicating motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (citations omitted)). [HN2] When deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)* ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or [*13] documents incorporated in it by reference."). In addition to facts alleged in the complaint, the Court may take judicial notice of public disclosure documents filed with the SEC. *Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)*. [HN3] All reasonable inferences are to be drawn in the plaintiffs' favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Indep. Energy Holdings PLC, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001)*.

I. *Section 10(b)* Claims

A. Legal Standard

[HN4] *Section 10(b)* protects investors by making it unlawful "to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b)*. Pursuant to SEC *Rule 10b-5*, it is unlawful:

> [HN5] (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order [*14] to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 11 of 15

Page 10

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

17 C.F.R. § 240.10b-5. [HN6] The purpose of *section 10(b)* was "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 31 L. Ed. 2d 741, 92 S. Ct. 1456 (1972)*, citing *SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 11 L. Ed. 2d 237, 84 S. Ct. 275 (1963)*. To better achieve this end, the *Exchange Act* is "to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." Id.

[HN7] The majority of securities fraud claims under *section 10(b)* are brought pursuant to *Rule 10b-5(b)* for false or misleading statements or omissions. In order for a claim under this provision to survive a motion to dismiss, a plaintiff must allege that the defendant, "in connection [*15] with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)*. A statement or omission is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)*.

Plaintiffs here bring their claims not only under *Rule 10b-5(b)*, but also under the more general provisions of [HN8] *Rule 10b-5(a) and (c)*, which prohibit the use of "any device, scheme, or artifice to defraud" or the participation "in any act, practice, or course of business" that would perpetrate fraud on investors. While claims brought under *Rule 10b-5(b)* require plaintiffs to allege a false or misleading statement (or omission), "the first and third subparagraphs [of *Rule 10b-5*] are not so restricted." *Affiliated Ute, 406 U.S. at 153*. Rather, in order for such a claim to survive a motion to dismiss, plaintiffs [*16] must allege that "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." *In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003)*, citing *In re Blech Sec. Litig. 961 F. Supp. 569, 582 (S.D.N.Y. 1997)*; see also *SEC. v. Zanford, 535 U.S. 813, 824-25, 153 L. Ed 2d 1, 122 S. Ct. 1899 (2002)* (holding that broker's actions in establishing phony escrow accounts and using the proceeds for his own purposes was an unlawful scheme "in connection with the purchase or sale of securities" within the meaning of *§ 10(b)*, where his "fraudulent intent deprived the [plaintiffs] of the benefit of the sale").

Finally, [HN9] the pleading standard is stiffened by the requirements that plaintiffs plead the element of scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud," which is a necessary element of any claim brought under *section 10(b)*. *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 213-14, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)*. [*17] The burden of pleading scienter is intensified by the requirement of *Rule 9(b)* that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. Although *Rule 9(b)* allows the pleading party to aver scienter generally, the Second Circuit warns that "the relaxation of *Rule 9(b)*'s specificity requirement regarding condition of mind [must not be mistaken] for a license to base claims of fraud on speculation and conclusory allegations." *Chill v. General Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996)* (citations omitted). Rather, plaintiffs must allege facts that "give rise to a *strong inference of fraudulent intent.*" Id. (citations omitted; emphasis in original). This requirement is further reinforced by the Private Securities Litigation Reform Act ("PSLRA"), which requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*. n6

> n6 Passed by Congress in 1995, [HN10] the PSLRA "raised the nationwide pleading standard" in securities cases. *Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000)*. However, since the Second Circuit already required heightened pleading, the PSLRA merely "adopted [the Circuit's] 'strong inference' standard." *Id. at 311.*

[*18]

In addition, [HN11] the PSLRA requires that where material misstatements or omissions are alleged, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*. In cases where it is not a statement or omission that is alleged, but rather, a fraudulent scheme to affect the price of stocks, it is sufficient to specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." n7 *Blech, 961 F. Supp. at 580* (internal citation omitted).

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 12 of 15

Page 11

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

n7 The requirement of *15 U.S.C.A. § 78u-4(b)(1)* obviously does not apply to claims brought under *Rule 10b-5(a)* or *(c)*, as such claims do not rely on allegations of material misstatements or omissions. See *Initial Public Offering, 241 F. Supp. 2d at 385 n.100*.

[*19]

B. Primary Liability versus Aiding and Abetting n8

n8 This section addresses whether plaintiffs have sufficiently pled a primary violation of *section 10(b)* by Andersen LLP. The question of whether plaintiffs have pled a primary violation by the individual Andersen defendants will be discussed *infra*, Part III.B.

Andersen's chief argument is that plaintiffs' claims run afoul of the Supreme Court's mandate in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 128 L. Ed. 2d 119, 114 S. Ct. 1439 (1994)*, which held that there is no private cause of action against mere aiders and abettors of *section 10(b)* violations. Andersen argues that plaintiffs' allegations amount to nothing more than a claim that it aided and abetted the Companies' violations, and that such a claim is prohibited under Central Bank and the Second Circuit's case law interpreting it.

At the outset, the Supreme Court's ruling in *Central Bank* does not amount to a categorical prohibition on claims against [*20] secondary actors such as accountants. To the contrary, the Court explicitly emphasized that secondary actors such as accountants and lawyers may still be held liable where they commit a primary violation of securities laws:

[HN12] Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under *Rule 10b-5* are met ... In any complex securities fraud ... there are likely to be multiple violators.

*Central Bank, 511 U.S. at 191* (emphasis in original). Nonetheless, the requirement of a primary violation is a precondition for liability: to allow otherwise, the Court held, would circumvent a necessary element of every

*section 10(b)* claim by subjecting defendants to liability "without any showing that the plaintiff relied upon the aider and abettor's statements or actions." *Id. at 180*. Interpreting this mandate, the Second Circuit has clarified that in cases brought under *Rule 10b-5(b)*, defendants can only [*21] be held liable for statements that are publicly attributed to them. See *Wright v. Ernst & Young, LLP, 152 F.3d 169 (2d Cir. 1998)*. n9 Thus, in order for a defendant to be held liable for a claim brought under *Rule 10b-5*, a plaintiff must allege that that defendant made a false or misleading statement or omission that was attributed to him or her, or that s/he "participated in [a] fraudulent scheme or other activity proscribed by the securities laws." *SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998)* (citations omitted). n10

n9 Similarly, [HN13] the Second Circuit has held that although each participant in a group may be liable for his or her own primary violation, there is no separate cause of action for conspiracy to violate *Rule 10b-5*. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837 (2d Cir. 1998)*.

n10 [HN14] The requirement that a plaintiff must plead a primary violation of the securities laws is distinct from the requirement of pleading scienter. As the Second Circuit has explained, "whether [a defendant] was a primary violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind when he performed them." *U.S. Envtl., Inc. 155 F.3d at 111*.

[*22]

1. *Andersen's Liability for False Statements in GC's and AGC's Unaudited Financial Statements*

The crux of Andersen's argument is that it is shielded from liability under Central Bank and Wright because its only publicly attributed statements were the Companies' audited financial reports, and these were not materially false or misleading. Andersen does not dispute that it is responsible for the statements in its audit reports on GC's annual 10-Ks for 1998, 1999, and 2000 and on AGC's 10-K for 2000. But most of the allegedly misleading "swap" transactions occurred in FY 2001, a year for which Anderson did not audit the financials of either GC or AGC. The bulk of plaintiffs' Complaint concerns public statements regarding these swaps that were issued in various press releases, unaudited quarterly statements, and "pro forma" financials. Leaving aside, for the moment, the materiality and falsehood of the *audited* statements (see Part I.C. *infra*), the issue is thus

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 13 of 15

Page 12

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

whether Andersen can be held liable for GC's and AGC's other unaudited public statements and disclosures. n11 Andersen argues that it cannot be because these statements were made not by Andersen, but by [*23] AGC or GC, and were never publicly attributed to Andersen. According to Andersen, claims that it reviewed and approved these statements, or assisted the Companies in making them, would amount to nothing more than impermissible aiding and abetting claims. Plaintiffs respond that Andersen played so central a role in the creation and perpetration of the allegedly false accounting schemes, and its role as auditor was so well-known to investors, that it should be subject to liability as a primary violator for these statements under Central Bank.

> n11 The allegedly false statements made by GC and AGC are listed in the Complaint at paragraphs 389-572 and 573-629, respectively.

The Second Circuit's initial interpretation of Central Bank appeared to be clear that in order for liability to attach to a defendant, the misrepresentation had to be "attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision." *Wright, 152 F.3d at 175*. This seemed [*24] to leave little doubt that the rule limiting liability to a defendant's own publicly attributed statements was absolute. Indeed, Wright explicitly rejected liability on the part of an auditor for statements made by a public company on a theory that the defendant accounting firm had "reviewed and approved" the allegedly false and misleading statements. However, in a recent decision, the Second Circuit upheld a ruling that a company vice president could be liable for misstatements not specifically attributed to him, where he "was primarily responsible" for communications with investors and analysts and was "involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements." *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75-76 (2d Cir. 2001)*. Plaintiffs thus appear to be correct that, [HN15] in this Circuit, "[a] defendant *may be* held liable for fraudulent statements under *Section 10(b)* where a plaintiff alleges sufficient facts that demonstrate that a defendant was personally responsible for making those statements, even if he or she is not identified as the speaker." (P. Opp. GC 24-25, emphasis added.) However, Scholastic [*25] did not explicitly overrule Wright -- in fact, it failed to cite either Wright or Central Bank-- and it gave scant explanation of its holding. See *252 F.3d at 75-76*. While Scholastic might indicate some relaxation of Wright's requirement, then, it does not provide any guidance as to when a statement not attributed to a defendant might cross the line into a primary violation. n12

> n12 The other case plaintiffs cite that has purportedly assigned primary liability to a secondary actor for false or misleading statements or omissions not attributed to it is *In re Enron Corp. Secs., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 583 (S.D. Texas, 2002)*. That case is strikingly similar to the present case in its facts, allegations, and most notoriously, parties -- the facts surrounding Enron's collapse and its subsequent bankruptcy, and Andersen's alleged role therein, need not be rehearsed here. But in that case, because the Fifth Circuit has not yet ruled on the issue, the district court was not bound, as it is here, by controlling precedent requiring public attribution.

[*26]

Some district courts, in this Circuit and others, have allowed claims to survive the pleading stage even where the defendant was not alleged to have actually made the allegedly false statement. See, e.g., *In re Vivendi Univ. S.A. Sec. Litig., 2003 U.S. Dist. LEXIS 19431, 02 Civ. 5571 (HB), 2003 WL 22489764, at *25 (S.D.N.Y. Nov. 3, 2003)* (refusing to dismiss claim against CFO for public statements made by company but not specifically attributed to him); *In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 166-67 (D. Mass. 2002)* (refusing to dismiss claims against auditor where auditor's role was widely disseminated to the public and it was "appropriate to infer that ... investors reasonably attributed the statements" to the auditor); *In re Livent, Inc. Noteholders Sec. Litig., 174 F. Supp. 2d 144 (S.D.N.Y. 2001)* (holding broker potentially liable for "structuring and keeping secret the misrepresented [relationship]" between the underwriter and the company). However, as Andersen correctly points out, in many if not most of these cases, either the defendant was a corporate insider, rather than a secondary actor, or the complaint alleged that s/he had actually [*27] made a false or misleading statement or omission, thus stating a claim for a primary violation. For example, in Scholastic and Vivendi, defendants were both CFOs of the respective defendant companies. n13 In Livent, the defendant underwriter had also served as a broker and had solicited and executed sales of company's stock. *174 F. Supp. 2d at 154-55*.

> n13 *Phillips v. Kidder, Peabody & Co., 933 F. Supp. 303 (S.D.N.Y. 1996)*, also cited by plaintiffs, held that an underwriter could be held liable for "actively participating in formulating

Case 3:02-cv-02133-EBB    Document 167-4    Filed 08/18/2004    Page 14 of 15

Page 13

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

the language of the prospectus." *Id. at 316.* However, that case was decided before *Wright.*

Among the cases cited above, the district court decision in *Lernout & Hauspie, 230 F. Supp. 2d 152,* provides the most support for plaintiffs' position. In that case, plaintiffs sued various corporate affiliates of Lernout & Hauspie's outside auditor, KPMG, for having overseen and prepared unaudited financial reports [*28] submitted to shareholders. The court allowed certain claims to survive a motion to dismiss on grounds that plaintiffs had alleged that the KPMG affiliate had actually "made" the false statements through its active role in preparing them. With respect to the public attribution rule, the court distinguished *Wright,* noting that the necessary element of reliance had not been sufficiently pled in that case because the statements in question had specifically noted that the reports were unaudited, and because it had been made "without a whisper of [the defendant's] involvement." *Id. at 162,* citing *Wright, 152 F.3d at 175-76* (alteration in original). Applying that principle, the court held that the plaintiffs had failed to state a claim against KPMG's Singapore based affiliate where it had not directly participated in issuing any of the reports in question, but rather, had communicated its "clean" audit opinion to its Belgian affiliate responsible for issuing Lernout & Hauspie's audit reports. *Id. at 171.* By contrast, the involvement of KPMG's United States affiliate had been widely disseminated to investors in annual reports. Thus, [*29] even if the statements themselves were not publicly attributed to KPMG U.S., it was "appropriate to infer that ... investors reasonably attributed the statements" to KPMG U.S. *Id. at 166-67.* Put another way, the rule espoused in Lernout & Hauspie is that a plaintiff may state a claim for primary liability under *section 10(b)* for a false statement (or omission), even where the statement is not publicly attributed to the defendant, where the defendant's participation is substantial enough that s/he may be deemed to have *made* the statement, and where investors are sufficiently aware of defendant's participation that they may be found to have *relied* on it as if the statement had been attributed to the defendant.

Although *Lernout & Hauspie* is not controlling here, its reasoning is persuasive. Its analysis reconciles the Second Circuit's ruling in Scholastic with the focus on reliance that was central to its holding in Wright. n14 It also comports with the broad preventative purpose of the Exchange Act. A strict requirement of public attribution would allow those primarily responsible for making false statements to avoid liability by remaining anonymous, and [*30] thus "would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws." *In re Enron Corp. Secs.,*

*Derivative & ERISA Litig., 235 F. Supp. 2d 549, 587 (S.D. Tex. 2003)* (adopting SEC position). As the Massachusetts district court noted in Lernout & Hauspie, "absolving an auditor who prepares, edits, and drafts a fraudulent financial statement knowing it will be publicly disseminated simply because [it was signed by another, affiliated auditor] would stretch Central Bank's holding too far." *230 F. Supp. 2d at 168.*

> N14 Andersen argues that the court in Lernout & Hauspie "expressly stated that it was not following Second Circuit law requiring that the alleged misstatement be attributed to the defendant." (D. Reply. Mem. AGC 11.) But the opinion states no such thing, expressly or otherwise. On the contrary, [HN16] fairly read, the rule the court ultimately adopted comports with its own characterization of Second Circuit law, "that for primary liability to attach, the public must be *able to attribute* a misleading statement (*at least indirectly*) to the secondary actor at the time it is issued." *230 F. Supp. 2d at 161* (emphasis added), citing *Wright, 152 F.3d at 175.* The rule espoused in the case thus emphasizes constructive, rather than actual, attribution -- a concept consistent with the Second Circuit's emphasis on reliance.

[*31]

Under this standard, plaintiffs' allegations against Andersen with respect to its role in the fraudulent statements made by Global Crossing are sufficient to survive a motion to dismiss, but fail to meet that threshold with respect to its role in the statements made by *Asia* Global Crossing. Plaintiffs' most general allegations about Andersen's role in preparing the Companies' financial statements are insufficient to establish a primary violation. Plaintiffs have alleged that Andersen not only "reviewed [and] approved" GC's financial statements, but also that it "prepared and directed the production of financial statements, reports, and releases" issued by the Companies. (PP 73-74.) However, the Complaint never specifies which of the Companies' public statements Andersen "prepared and directed" and which it merely "reviewed and approved." This blanket allegation is vague and conclusory, and, without more, would not sustain a claim for primary liability under *section 10(b).* Similarly, as regards the unaudited "pro forma" financial reports, plaintiffs allege that "Andersen was instrumental in helping Global Crossing and Asia Global Crossing create these 'pro forma' numbers." (PP242.) [*32] But [HN17] allegations that an auditor "help[ed] create" financial documents, alone, have been held insufficient to sustain

*10(b)* liability. See *Vosgerichian v. Commodore Int'l, 862 F. Supp. 1371, 1378 (E.D. Pa. 1994)* (dismissing as claims of aiding and abetting allegations that the audited company "consulted with Andersen" and that Andersen "advised or concurred with" the company's accounting practices); *In re Kendall Square Research Corp. Sec. Litig., 868 F. Supp. 26, 28 (D. Mass. 1994)* ("Because [defendant] did not actually engage in the reporting of the financial statements ... but merely reviewed and approved them, the statements are not attributable to [defendant] and thus [defendant] cannot be found liable for making a material misstatement.").

Plaintiffs' specific allegations regarding Andersen's role in GC's statements, however, are more fully developed. The Complaint alleges that Andersen served as "the primary accomplice in perpetuating the fraud that ultimately caused the downfall of the Company." (P 712.) It points to testimony of former GC executives before Congress that Andersen "reviewed *every* public filing, earnings release, [*33] and quarterly financial report released by [GC]." (Id. P 714, emphasis in original.) It also alleges that Fagan "materially assisted in the preparation of all public financial disclosures, including public filings, statements to the press and investing public, earnings releases, and press releases relating to financial issues of GC." (Id. P 78.) Allegations that Andersen "prepared, directed or controlled," "helped create" or "materially assisted in" preparing false statements issued by Global Crossing place its involvement well beyond the realm of "aiding and abetting" liability precluded by Central Bank.

With respect to the issue of attribution, it is undisputed, as a matter of public record, that Andersen's audit reports were included in all of GC's registration statements and annual reports from 1998 to 2000, and that they were widely available to shareholders during the class period. Andersen's role as GC's auditor was thus well known to investors, who could easily have relied on the accounting firm's involvement in making any public financial reports, even where a particular statement was not publicly attributed to it. Moreover, Andersen's aggressive marketing of [*34] the novel accounting strategies promoted in the White Paper, which allegedly "became a 'must read' in the telecom industry" (P 225), raises an inference that sophisticated investors would have known of Andersen's role in creating the reporting practices behind GC's false statements. These allegations are sufficient to raise a reasonable inference not only that Andersen was one of the "makers" of the statements, but also that investors viewed it as such.

However, where the rest of the Amended Complaint carefully adds AGC to most of its allegations, the Complaint significantly lacks any specific allegations that Andersen made or participated in making any of AGC's public statements or unaudited financials. (See (PP 573- 629.) While the Complaint states that "Andersen ... audited Global Crossing's and *Asia Global Crossing's* materially false and misleading financial statements," it states only that "Andersen reviewed, prepared, directed, and controlled all public financial disclosures ... relating to financial issues of *Global Crossing* made by the *Company* during the class period," and asserts no parallel claim with respect to AGC. (P 77.) Similarly, plaintiffs' claims [*35] with respect to Fagan relate entirely to his participation in the false statements made by GC, not AGC (P 78), and the Complaint fails to raise any comparable allegation with respect to the involvement any other individual Andersen defendant at AGC. Thus, although plaintiffs do assert that "Andersen was instrumental in *helping* Global Crossing and Asia Global Crossing create the[] 'pro forma' numbers" (P 242, emphasis added), this allegation, without more, cannot transcend the category of aiding and abetting.

The allegations related to Asia Global Crossing thus do not meet the standard for liability under *Rule 10b-5(b)*. Andersen can be held liable only for the statements it is alleged to have *made,* which in the case of AGC, is solely the audited financial statement for FY 2000. However, the allegations related to GC, taken together, are sufficient to satisfy the Second Circuit's requirements of primary participation and reliance; Andersen may thus be liable for any statement it is shown to have made and that investors attributed to it. Establishing the actual extent of Andersen's participation in making the statements will, of course, await summary judgment or trial, but [*36] drawing all inferences in favor of the plaintiff, the allegations against Andersen with respect to GC's unaudited statements are sufficient to survive a motion to dismiss.

2. *Andersen's Liability for Participation in a Fraudulent Scheme*

In addition to liability for its statements in the Companies' financial reports, plaintiffs posit an alternative theory of liability for Andersen's role in the fraud alleged: *subsections (a)* and *(c) of Rule 10b-5*, which allow liability to be assigned based on the use of a manipulative or deceptive device or participation in a scheme to defraud. *17 C.F.R. § 240.10b-5(a), (c)*. Plaintiffs argue that Andersen should be liable for the fraud perpetrated by GC and AGC, even in the years for which it did not issue audits, because it essentially *created* the accounting schemes used to inflate the Companies' financials at the outset.

On these grounds Andersen raises few defenses on the merits; n15 rather, it attempts to discredit plaintiffs' theory by characterizing it as "a thinly disguised ...