Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 1 of 13

Page 15
2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

aiding and abetting claim" and an impermissible attempt to circumvent the Second Circuit's public attribution requirement. (D. [*37] Reply Mem. AGC 12-14.) But in attempting to reduce plaintiffs' arguments to a mere theory of "fraudulent statement by another name," Andersen itself conflates the distinct elements of a claim for false statements under *subsection (b) of Rule 10b-5* with those of a claim for engaging in a fraudulent scheme under *subsections (a)* or *(c)*. *17 C.F.R. § 240.10b-5*.

> n15 In fact, Andersen only raises arguments related to the fraudulent scheme allegations in its reply brief on the AGC motion to dismiss, having failed to address these grounds at all in either its motion to dismiss the claims against GC in the original Complaint or in its accompanying reply. Nonetheless, for the sake of judicial economy, the Court will accept its arguments as pertaining to both motions.

[HN18] It is apparent from *Rule 10b-5*'s language and the caselaw interpreting it that a cause of action exists under *subsections (a)* and *(c)* for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement [*38] by the defendant. See *Affiliated Ute, 406 U.S. at 152-53*; *SEC v. Zanford, 535 U.S. at 820* ("Neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."). In the wake of Central Bank, courts have not been reluctant to find fraud allegations sufficient under these subsections, provided that the other requirements for establishing a primary violation have been met. See, e.g., *Zanford, 535 U.S. at 825* (holding that broker's actions in establishing phony escrow accounts and using the proceeds for his own purposes was an unlawful scheme in connection with securities sales within the meaning of *section 10(b)*) n16; *U.S. Envtl., Inc. 155 F.3d at 112* (holding trader could be liable for executing manipulative stock trades at his employer's direction); *SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1471-2 (2d Cir. 1996)* (affirming district court finding that CEO was liable for having "orchestrated" a scheme among branch offices to defraud customers into paying prices that included excessive markups). Claims [*39] for engaging in a fraudulent scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct elements.

> n16 As Andersen correctly notes, Zanford concerned no alleged misstatements or omissions, and the defendant's role as a primary violator was not at issue. (See D. Reply. GC 16; D. Reply AGC 12.) Plaintiffs cite Zanford to support their argument that even in the absence of a fraudulent statement, Andersen may be liable for its participation in a fraudulent scheme under *subsections (a)* and *(c)*. Andersen's attempt to argue that Zanford fails to support a theory of aiding and abetting is thus both misleading and irrelevant.

Andersen attempts to lump plaintiffs' fraudulent scheme claims together with their fraudulent misstatement claims, and asserts that plaintiffs have failed to allege that Andersen did anything more than aid and abet a violation by GC and AGC. But plaintiffs' allegations against Andersen go far beyond mere aiding and abetting. [HN19] All that is required [*40] in order to state a claim for a primary violation under *Rule 10b-5(a)* or *(c)* is an allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance. See *Enron Corp., 235 F. Supp. 2d 249*. Postponing for the moment, once again, the questions of scienter and reliance, plaintiffs have clearly alleged here that Andersen "committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud." The Complaint asserts that Andersen masterminded the misleading accounting for IRUs and the subsequent sham swap transactions used to circumvent GAAP and inflate the Companies' revenues, that it actively participated in structuring each swap, that it was intimately involved in all of GC's and AGC's accounting functions, and that it directly participated in the creation of the misleading "pro forma" numbers that concealed these practices from investors. Andersen's allegedly central role in these schemes, as their chief architect and executor, leaves no doubt as to its potential liability as a primary violator under *section 10(b)*.

Andersen's sole substantive argument [*41] on this front is that because plaintiffs have failed to allege "market manipulation" they have failed to state a claim for a fraudulent scheme under *subsections (a)* or *(c)*. [HN20] Market manipulation is defined as "the illegal practice of raising or lowering a security's price by creating the appearance of active trading." Blacks Law Dictionary (7th ed. 1999). Andersen argues that because plaintiffs failed to allege "tie-in agreements, wash sales, matched orders or rigged prices," they have failed to state such a claim. (D. Reply Mem. AGC 13-14, citing *Initial Public Offering, 241 F. Supp. 2d at 387*, citing in turn *Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476-77, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977))*. It is true that plaintiffs fail to assert a market manipulation claim, as those claims are technically understood -- they have

Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 2 of 13

Page 16

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

alleged no illegal *trading* activity that would artificially cause stock prices to rise. But [HN21] *subsections (a) and (c)* encompass much more than illegal trading activity: they encompass the use of *"any* device, scheme or artifice," or *"any* act, practice, or course of business" used to perpetrate a fraud on investors. *17 C.F.R. § 240.10b-5(a)* [*42] *, (c)*. As demonstrated by the cases cited above, courts including this country's highest court have held that a cause of action lies for claims that involve allegations of manipulative schemes used in connection with securities markets. If the behavior alleged does not make out a claim for engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," then it is hard to imagine what would.

[HN22] The use of the term "manipulative" in *section 10(b)* itself "connotes intentional or willful conduct designed to deceive or defraud investors by controlling *or artificially affecting* the price of securities." *Ernst & Ernst, 425 U.S. at 199* (emphasis added). Plaintiffs allege precisely such manipulative conduct, with precisely such a result. Schemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within both the language of *section 10(b)* and its broad purpose, to "prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value [*43] of the securities traded." *Sullivan & Long, Inc. v. Scattered Corp., 47 F.3d 857, 861 (7th Cir. 1995)* (Posner, C.J.). Provided that the other elements of a *section 10(b)* claim are met, nothing in the language of *section 10(b)* or *Rule 10b-5* or in the case law interpreting them shields Andersen from liability for its direct participation in such a scheme.

The imposition of liability on Andersen for the schemes underlying the Companies' misleading accounting practices results in the survival of plaintiffs' *section 10(b)* claims springing from practices that are not reflected in the audited financial reports. This means that Andersen may be liable for deceiving investors not only about its accounting for IRU sales, but also about swaps, which make up the bulk of the Complaint. Unlike the theory discussed in Part I.B.1., *supra,* this theory also applies to Andersen's involvement in the alleged manipulation of AGC's stock price. n17

----

n17 One coda is in order: the plaintiffs seek to hold Andersen liable for the pro forma statements and press releases issued by the Companies under *subsections (a)* and *(c)*, as well as under *Rule 10b-5(b)*. [HN23] *Subsections (a) and (c)* may only be used to state a claim against Andersen for the underlying deceptive devices or frauds themselves, and not as "a short cut to circumvent Central Bank's limitations on liability for a secondary actor's involvement in [making misleading statements]." *Lernout & Hauspie, 230 F. Supp. 2d at 175*. In other words, although Andersen may be held liable for the underlying fraudulent scheme to inflate the price of the Companies' stocks, it may only be held liable for specific false statements to the extent that it can be said to have made those statements under *Rule 10b-5(b)*.

In light of the holding above that the Complaint has failed to allege that Andersen made any fraudulent statements with respect to AGC, it may not be held liable for any of the individual unaudited *statements* made by AGC under *Rule 10b-5(b)*, although it may be held liable for the fraudulent *scheme* behind them. The practical result is that the claims against Andersen for its role in the fraud perpetrated by AGC that are related to swaps survive.

[*44]

C. Materiality and Falsehood

Because of Andersen's reliance on its threshold argument is that it cannot be liable for any statements issued by GC or AGC that it did not audit, it focuses its materiality, falsehood, and scienter arguments almost solely upon the financial statements it audited for GC in 1998-2000 and for AGC in 2000. With respect to these statements, Andersen's chief argument is that the accounting practices it created, marketed, and implemented were permissible under GAAP, and that they were therefore not "false or misleading." However, it also adds that to they extent that these statements may have been false or misleading, they were not *materially* so. Neither argument has merit at this stage in the litigation.

1. *Accounting for IRU Sales*

Andersen's central argument is that its method of accounting for IRU sales -- treating them as long-term leases of equipment and recognizing the revenue up front, in what is called "sales-type accounting" -- was permissible under the applicable accounting standards in effect at the time. In particular, Andersen points to FASB 13, which appeared to allow sales-type accounting for long-term leases of equipment where, [*45] among other factors, the lease was for 75% of the useful life of the asset and the benefits and risks of ownership had passed to the lessee. It was not until July of 1999 that FIN 43 was issued, clarifying that in order for sales-type accounting to apply in such cases, title to the asset must

Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 3 of 13

Page 17
2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

actually pass to the lessee. This clarification made it impossible for the Companies to continue accounting for IRUs as sales-type leases, because title to the underlying land did *not* pass at the end of the lease term. Following the issuance of FIN 43, GC and AGC therefore reclassified revenue from the bulk of their IRU sales as "operating leases." Operating leases require "service-type accounting," causing revenue to be prorated over the lifetime of the lease.

Andersen argues, in effect, that it cannot be held liable for accounting practices only later declared unacceptable, and that plaintiffs are impermissibly "pleading fraud by hindsight." See *Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)* (noting that defendants cannot be liable for failing to anticipate future events). Because FIN 43 was explicitly prospective in application, Andersen argues, the Companies' use of [*46] sales-type accounting for IRUs prior to its issuance was in compliance with GAAP as it existed at the time, and Andersen's certification that GC's and AGC's financials complied with GAAP was therefore not false or misleading. It claims, therefore, that its treatment of IRUs as sales-type leases was within "the range of reasonable alternatives that management can use." *Ganino, 228 F.3d at 160,* citing *In re Burlington Coat Factory, 114 F.3d 1410, 1421 n.10 (3d Cir. 1997).*

But plaintiffs have pled far more than fraud by hindsight. Whether or not the Companies violated specific provisions of GAAP, plaintiffs have asserted that the practice of booking revenue immediately while booking expenses over the life of the lease was fundamentally misleading to investors and in violation of numerous overarching accounting principles, even prior to the issuance of FIN 43. (See P 718.) It is not necessary to list here each of these multiple provisions plaintiffs allege were violated, because the principal rules cited are sufficient to survive a motion to dismiss.

First, plaintiffs argue that booking revenue from IRU sales up front, while amortizing the associated [*47] expenses, violated the fundamental principle of accounting that requires expenses and revenues associated with an asset to be "matched" -- that is, booked during the same accounting period, see Statement of Financial Accounting Concepts No. 6 -- as well as other principles of transparency and accuracy in reporting. (See P 718.) Second, plaintiffs assert in their amended Complaint that such leases should have been treated as contracts for real estate, rather than contracts for equipment, because the assets involved in an IRU lease, *i.e.* the fiber optic cable, are "integral to the underlying land." (PP 151-154.) This categorization would have subjected such leases to the requirements of FASB 66, which governs real-estate transactions as opposed to leases of equipment. FASB 66 would not allow revenue from such a lease to be booked under sales-type accounting unless title to the underlying land had passed (which is in effect what FIN 43 ultimately specified). Third, they assert that almost from its inception, GC was an outlier in the industry in its treatment of IRUs, and that its accounting practices were "the subject of increasing controversy" in the accounting and financial [*48] industries. (PP 204-205.) They argue that to the extent that there was any uncertainty in the proper treatment of IRUs prior to the issuance of FIN 43, Andersen *created* that uncertainty through its overly aggressive accounting practices.

Although the question of whether GAAP has been violated might appear to be a legal determination, the element of what is "generally accepted" makes this difficult to decide as a matter of law. As the Supreme Court has observed,

> GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be. Far from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time. GAAP changes and, even at any one point, is often indeterminate. The determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles.

*Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 101, 131 L. Ed. 2d 106, 115 S. Ct. 1232 (1995)* (internal citations and alterations omitted). Whether or not the Companies' practice of accounting for IRUs was ever acceptable [*49] under the applicable provisions of GAAP cannot be determined in advance of the development of the record. Eventual evidence on industry practice or expert testimony are likely to shed light on this question, but at the current procedural phase, the plaintiffs' assertion that they were *not* generally accepted must be taken as true.

Even should Andersen prove that these accounting practices were in technical compliance with certain individual GAAP provisions, however, this would not necessarily insulate it from liability. This is because, unlike other regulatory systems, GAAP's ultimate goals of fairness and accuracy in reporting require more than mere technical compliance. Federal tax law serves as a useful point of comparison. Under our tax system, although a loose overarching justification exists -- to protect the public fisc -- there is also an element of arbitrariness in the way the system is implemented, and

Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 4 of 13

Page 18

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

in how its numerous components fit together. This arbitrariness is a function of many confluent forces, such as political realities, competing economic theories, and the power of various interest groups. The end result, though, is that where a loophole or shelter exists, [*50] the public is entitled to take advantage of it until Congress takes action to correct it; technical conformity to the code is all that is required, and indeed, such loopholes and shelters are central to the practice of many an accountant and tax lawyer.

GAAP, by contrast, when viewed as a whole, provides no loopholes or shelters. It has a single unified purpose, one that it shares with *section 10(b) of the 1934 Exchange Act*: to increase investor confidence by ensuring transparency and accuracy in financial reporting. See Statement of Financial Accounting Concepts Nos. 1 (Objectives of Financial Reporting by Business Enterprises), 2 (Qualitative Characteristics of Accounting Information). Plaintiffs allege that the Companies' accounting for IRUs amounted to a violation not only of FIN 43, but also of basic overarching principles of accounting aimed at meeting this goal. n18 [HN24] "Fair presentation is the touchstone for determining the adequacy of disclosure in financial statements. While adherence to generally accepted accounting principles is a tool to help achieve that end, it is not necessarily a guarantee of fairness." *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 378 F. Supp. 112, 121-122 (S.D.N.Y. 1974)* [*51] (citing Theodore Sonde, The Responsibility of Professionals under the Federal Securities Laws, 68 Nw. U. L. Rev. 1, 3 (1973)), *aff'd in part and rev'd in part on other grounds by 540 F.2d 27 (2d Cir. 1976)*. Even assuming, therefore, that the Companies' accounting for IRUs was arguably consistent with the terms of certain specific accounting standards, this would not insulate them or their accountants as a matter of law from liability under the securities laws, because [HN25] under both GAAP and the securities laws, business entities and their accountants are required to provide whatever additional information would be necessary to make the statements in their financial reports fair and accurate, and not misleading. Id; *17 C.F.R. § 240.10b-5(b)*; see also *17 C.F.R. § 230.408* (requiring that "in addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading").

n18 For example, Statement of Financial Accounting Concepts ("Concepts") 6 specifically requires that the costs associated with the generation of revenues should be matched with and set off against revenues as they are recognized. More generally, Concepts 1, 2, and 5 require that a company's financial disclosures should accurately and completely disclose sufficient information to enable potential investors, creditors and other users of financial statements to meaningfully evaluate the cash flows of the reporting enterprise, see Concepts No. 1; that they should be reliable, transparent, truthful, and accurately reflect the financial performance of the company, see Concepts No. 2; and that revenue recognized by a corporation in its financial statements should accurately reflect the business operations of the company, see Concepts No. 5. (P 718; P. Opp. GC 5.)

[*52]

The same reasoning holds true for plaintiffs' allegations regarding AGC's accounting for subsea capacity. Plaintiffs allege that AGC's persistence in booking revenue from subsea IRUs up front, for a full year after GC ceased so doing in response to FIN 43, amounted to an ongoing violation of GAAP. Andersen argues that AGC's accounting treatment was correct under FIN 43 and FASB 66, since leases on the ocean bed "did not implicate questions of title." (D. Mem. AGC 12.) This distinction, again, misses the point. Plaintiffs allege that the accounting for IRUs was misleading from the start: it is the practice of booking revenues up front while amortizing the costs that is alleged to have misled investors. The technical distinction between capacity on underlying terrestrial land, which could be sold, or on underlying ocean bed, which could not, makes little difference to the outcome of the analysis.

Plaintiffs allege facts that would permit a reasonable factfinder to infer that the methods of accounting utilized by Andersen in certifying the Companies' financial statements constituted an utter "sham" -- "a house of cards built on the illusion of revenue" fostered by "blatant abuses of [*53] applicable accounting rules." (P. Opp. GC 1.) It may be that, when all the evidence is heard, a factfinder will conclude that it was reasonable for Andersen and GC to treat as immediate "revenue" payments due to be received over a twenty-five year period, while conveniently deferring to future years the costs that would be associated with those projected receipts. But plaintiffs' claim that such apparently deceptive practices violated elementary, long-established accounting principles, even before the FASB issued FIN 43 to reject Andersen's aggressive efforts to report revenue when there was none, is easily sufficient to survive a motion to dismiss. Plaintiffs have thus raised allegations sufficient to call into question not only the

Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 5 of 13

Page 19

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

Companies' compliance with specific GAAP provisions governing IRUs, but also the truth and accuracy of their financial statements overall. n19

> n19 Finally, for the sake of completeness, it should be noted that the materiality of defendants' accounting treatment for IRU sales is not in dispute. Nor could it be. Plaintiffs allege that revenue from IRU sales represented 98.8% and 48.8% of GC's entire revenue for 1998 and 1999, respectively, and 90% of AGC's revenue in 2000. Had the Companies accounted properly for these sales, "[GC's] reported revenue for 1998 and 1999 would have been $ 7.3 million and $ 28.2 million, far less then the $ 418 million and $ 728 million the Company reported to shareholders. [AGC's] reported revenue for 2000 would have been approximately $ 5.5 million, far less than the $ 138 million [AGC] reported to shareholders." (P 158.) Defendants could therefore raise no credible argument regarding the materiality of these representations.

[*54]

2. *Accounting for Swaps*

In contrast with Andersen's arguments defending the Companies' accounting for IRU sales, Andersen makes only a weak attempt to justify the Companies' accounting for swap transactions. Its principal argument is that its treatment of swaps, like its accounting for IRUs, was "within the range of reasonable alternatives available to management." (D. Mem. GC 27, citing *Ganino* 228 F.3d at 154.) Andersen's only other argument is that the bulk of the swaps alleged occurred *after* Andersen ceased performing audits for GC and AGC, that is, in 2001; what swaps *did* occur in 2000 were immaterial "as a matter of law" because in the case of GC, plaintiffs failed to allege that they amounted to a significant amount of GAAP revenue for that year or because, and in the case of AGC, plaintiffs failed to allege that *GAAP* revenue (as opposed to cash revenue) was misstated at all.

In light of the discussion in Part I.C.1. above, Andersen's first argument can be disposed of fairly quickly. Plaintiffs argue that the Companies' accounting for swaps violated Accounting Principles Board Opinion No. 29, which specifies that while the seller of an asset [*55] may generally record revenue based on the fair market value of the asset received or given up, no revenue may be recognized in exchanges of assets of like kind. Andersen argues that following the issuance of FIN 43, GC considered the capacity swapped to be a service, rather than an asset, since FIN 43 mandated "service-type accounting"; therefore the stricture on revenue recognition for like-kind *assets* did not apply. (D. Mem. 26.)

As plaintiffs correctly point out, the issue of whether an IRU should be classified as a service or an asset is a red herring. The gravamen of plaintiffs' Complaint is that these exchanges were essentially unnecessary mirror-image transactions created with the specific intention of inflating the Companies' revenues and deceiving investors into thinking the company was financially sound when it was, in fact, in increasingly perilous straits. Plaintiffs have alleged voluminous facts, including internal correspondence among former employees, analysts' reports, and congressional testimony, indicating that these transactions had no business purpose, but rather, were structured with the specific goal of increasing quarterly revenue and meeting "the street's [*56] expectations." (PP 361, 363.) In addition, they have alleged that the transactions were specifically structured, at Andersen's direction, to avoid the strictures of APB 29 that would preclude the Companies from booking the revenue at all. Statements conforming to specific GAAP rules may be misleading or false where "the purpose and effect of structuring [the transaction] was to avoid the Equity Accounting method under GAAP." *In re Jiffy Lube Sec. Litig.*, 772 F. Supp. 258, 265 (D. Md. 1991). The issue of whether the underlying exchange involved "services" or "assets," and the technical compliance with APB 29, is therefore irrelevant in light of GAAP's goals of fairness and accuracy in reporting. At a minimum, the facts alleged are sufficient, if proven, to establish that the transactions in question were designed from the outset to mislead investors.

With respect to GC, Andersen's only other argument is that because GC reported over $ 3.7 billion in revenue in 2000, and because by that time it had begun pro-rating revenue from IRU sales, its reported FY 2000 revenue of $ 20 million from reciprocal transactions was immaterial as a matter of law. (D. Reply GC 11.) [*57] It is true that this amount is relatively small compared with the company's total revenue. However, it is not so small as to be considered *per se* immaterial. [HN26] A statement or omission is material if it would "be viewed by the reasonable investor as having significantly altered the total mix of information available." *TSC Industries*, 426 U.S. at 449; *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267-68 (2d Cir. 1993) (applying TSC Industries). Materiality is generally a mixed question of law and fact, *First Jersey*, 101 F.3d at 1466, and "only if no reasonable juror could determine that the [statement or omission] would have assumed actual significance in the deliberations of the reasonable investor" should materiality be determined as a matter of law. *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538

Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 6 of 13

Page 20

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

*(2d Cir. 1999)* (citations and alterations omitted). The allegation of a $ 20 million overstatement of revenue hardly falls into this category, especially coupled with the allegation that the entire body of GC's financial reports, both audited and unaudited, were also inflated. Plaintiffs have therefore [*58] sufficiently alleged that Andersen made material misstatements regarding swaps in GC's audited financial statements.

Andersen's arguments with respect to AGC's accounting for swaps, however, are more persuasive. Andersen points out that although the Complaint identifies specific swaps that AGC entered into during FY 2000, it alleges only that "cash revenue" and not "GAAP revenue" was overstated in the company's financial reports. All other alleged misstatements with respect to AGC's accounting for swaps occurred in the context of unaudited pro forma reports and press releases. Because plaintiffs have failed to allege a primary violation by Andersen in connection with AGC's unaudited statements, it cannot be held liable for these statements under *Rule 10b-5(b)*. With respect to AGC, then, Andersen is correct that plaintiffs have failed to allege any material misstatement in its audit report on AGC's FY 2000 financial statements regarding swaps. However, this distinction is somewhat academic in light of the determination above that Andersen may be held liable for its participation for the scheme underlying those statements under *Rule 10b-5(a) and (c)*.

### 3. *Failure to Write Down Assets* [*59]

Plaintiffs raise the additional charge that the Companies' failure to write down the value of network capacity to reflect declines in the market value of that capacity violated FASB 121, "Accounting for the Impairment of Long-Lived Assets," which requires an annual evaluation of the market value of long-lived assets carried on a corporation's books, and appropriate adjustments to the book value in accordance with market value. Andersen raises objections to plaintiffs' pleading only with respect to AGC's alleged violations on this front. Specifically, it argues that plaintiffs' allegations are insufficiently detailed because they fail to specify, *inter alia*,

> . Whether the assets in question were carried on Asia Global's books at cost, depreciated cost, or fair market value at the time of transfer;
> . The sum of the expected future cash flows ... from these assets as of December 31, 2000 ...
> . The actual fair market value of these assets as of December 31, 2000 ...
> . Whether the sum of the expected future cash flows was *less* than the carrying amount of these assets ...
> . Whether the alleged fair market value of these assets on December 31, 2000 was less than the carrying [*60] amount of these assets ...
> . What the impact of the specified impairment would have been on Asia Global's balance sheet, and whether such impact would have been material.

(D. Mem. AGC 16.)

Although some of this information would have been helpful, plaintiffs' allegations are nonetheless sufficient. Plaintiffs have alleged that at the time AGC issued its offering materials, "price declines were anticipated over the next several years due primarily to increased competition, technology advances, and strategic alliances," that "[AGC] knew or was reckless in not knowing that there was a capacity glut as well as competition from impending new technologies that were displacing its business, and that, as a result, there would be no increase in demand for [AGC's] products and services," and that "[AGC] would have to sell 90% of its available capacity just to cover its cable construction costs." (Id. PP 577, 576.) As to whether the overstated financials were material, plaintiffs have alleged that AGC knew or should have known that due to the decrease in value of capacity, "there was no viable future for the business." (Id. P 577.) Plaintiffs [*61] have adequately alleged a factual basis for the conclusion that an adjustment for the impairment in the value of AGC's capacity was warranted, and that the facts requiring the adjustment were known to AGC. To require them to plead more would be unnecessary; to require them to plead at the level of specificity demanded by Andersen would be absurd.

In sum, Plaintiffs have sufficiently alleged that the statements in both GC's and AGC's audited financial statements were materially false or misleading with respect to their accounting for IRUs and their failure to mark down depreciated assets. Moreover, as determined above, Andersen may be liable for its statements on GC's financial reports related to swaps, as well as for any unaudited statements regarding swaps that plaintiffs can prove Andersen made and that were attributed to Andersen. Plaintiffs have thus adequately pled that Andersen made statements in its audited reports that were materially false or misleading for purposes of stating a claim under *section 10(b)*.

Finally, since these audited statements were materially false and misleading, it follows that the accounting schemes behind them also meet this standard.

Case 3:02-cv-02133-EBB    Document 167-5    Filed 08/18/2004    Page 7 of 13

Page 21

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

Andersen may thus [*62] also be held liable under the fraudulent scheme theory described above for the schemes underlying the false and misleading statements issued by both GC and AGC during the class period.

D. Scienter

Andersen next argues that plaintiffs have failed to plead facts giving rise to a strong inference of scienter, as required by *Rule 9(b)* and the PSLRA. [HN27] In recognition that there will rarely be direct evidence of intent to defraud, the Second Circuit has held that a plaintiff may establish the requisite "strong inference" of scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak, 216 F.3d at 307*, quoting *Acito v. IMCERA Group, 47 F.3d 47, 52 (2d Cir. 1995)*. "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." Id., quoting *Shields v. Citytrust Bankcorp, 25 F.3d 1124, 1130 (2d Cir. 1994)*. [*63] Before reaching the question of whether plaintiffs have pled scienter through either of these means, though, Andersen advances two threshold arguments regarding plaintiffs' pleadings.

First, Andersen argues that because plaintiffs have failed to allege the scienter of any individual Andersen employee, the scienter of Andersen as a corporate entity cannot be inferred. Andersen's argument is not that scienter cannot be imputed to the entities through their agents. Rather, it argues that plaintiffs have failed to allege, even in a conclusory fashion, scienter on the part of any individual employee named as a defendant. This argument is somewhat baffling, given that plaintiffs devote over thirty paragraphs to pleading Andersen's scienter. The Complaint, which refers to the Andersen defendants collectively as "Andersen," specifically alleges that Andersen acted with scienter, and does so through specific allegations as to the individual defendants' roles in perpetrating the fraud. For example, plaintiffs allege that Perrone and Fagan controlled and directed the audits of the Companies' materially false and misleading financial statements during the respective class periods (P 77), that [*64] Perrone, while still at Andersen, authored the "White Paper" that "specifically counseled GC" on how to circumvent GAAP by structuring reciprocal exchanges of capacity with other telecommunications companies (PP 145-146, 213-224, 713-733), and that Fagan, who took over for Perrone when he was hired to work directly for GC, personally reviewed and materially assisted in the preparation of all public financial disclosures made by GC from at least May 2000 until the end of the class period. (P77.) To hold that such pleadings fail to plead scienter adequately because they fail to state that "defendant X acted with scienter" -- when such a conclusory statement, standing on its own, would be deemed insufficient as a matter of law absent specific supporting facts -- would elevate form over substance. Whether these individuals actually acted with the requisite scienter remains an issue of fact to be decided at a later stage of the litigation, *Press, 166 F.3d at 538*, but as a matter of pleading, plaintiffs have sufficiently alleged scienter on the part of individual Andersen employees Perrone and Fagan to sustain a claim under *section 10(b)*. Cf. id. ("To require more in [*65] pleading of motive ... would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual.").

Second, Andersen argues that plaintiffs' own allegations negate any inference of scienter. Its first supporting argument, that it could not have had intent to defraud investors because its accounting for IRUs and swaps was permissible under GAAP, amounts to a rehash of the same argument rejected above. See *supra* Part I.C. Andersen further argues, however, that its accounting treatment could not have been false or misleading because the Companies fully disclosed their accounting practices in all public financial filings, and because Andersen actively marketed its "White Paper" to other accounting firms. But [HN28] just as technical compliance with GAAP does not negate the potential of a statement or omission to mislead investors, neither does public reporting or marketing of a particular body of accounting practices necessarily negate an intent to defraud investors. Indeed, plaintiffs allege that these schemes were [*66] misleading precisely because they gave the appearance of compliance for reporting purposes. n20 Plaintiffs' pleadings are more than adequate to withstand defendants' challenges on these fronts.

---

n20 Andersen also argues that plaintiffs' "concession" that GC failed to reveal to Andersen the "whistleblower letter" negates an inference of scienter. (D. Mem. GC 31.) This argument is irrelevant in light of the numerous other red flags plaintiffs allege Andersen ignored, and in light of plaintiffs' assertion that Andersen already knew of the practices identified in the whistleblower letter.

---

1. *Motive and Opportunity*

Case 3:02-cv-02133-EBB    Document 167-5    Filed 08/18/2004    Page 8 of 13

Page 22

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

Pointing out that pleading motive and opportunity requires more then the mere motive of "generalized economic interests," Andersen argues that plaintiffs have failed to allege that the Andersen defendants were motivated by anything other than the entirely permissible desire to receive fees. Far from having a motive to commit fraud, Andersen argues, the individual defendants had no motive to "risk [their] [*67] career[s] and reputation[s] in a purported effort to defraud Global Crossing's shareholders." n21 (D. Mem. GC 32.) Defendants are correct that "motives possessed by virtually all corporate insiders" do not suffice to indicate scienter; rather, plaintiffs must allege "that defendants benefitted in some concrete and personal way" by, for example, selling shares while stock prices were artificially high. *Novak, 216 F.3d at 307-308*. However, the Complaint adequately sets forth a motive distinct from mere profit, namely, Andersen's desire to build its consulting practice. The Complaint alleges that the desire to increase its non-audit practice led Andersen to abandon its obligations as an independent auditor, and by pushing its auditing clients to adopt risky and misleading accounting practices, to participate actively in the Companies' schemes to defraud investors. (PP 703-706.)

n21 Defendants do not argue that Andersen lacked opportunity to commit fraud.

[HN29] Courts have been especially ready to [*68] find motive pleading adequate to survive *12(b)(6)* motions in cases where the auditing company plays a dual role with respect to the client. See, e.g., *In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 335 (S.D.N.Y. 2002)*; *In re MicroStrategy Inc. Secs. Litig, 115 F. Supp. 2d 620, 654-56 (E.D. Va. 2000)*; *Carley Capital Group v. Deloitte & Touche, LLP, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998)*. In such cases, an auditor may take on "a vested interest in the performance and profitability" of its client, and consequently "weaken[] its ability to rely on its reputation in countering as 'irrational' allegations that it participated in a client's fraud." *In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 655 (E.D. Va. 2000)*.

As in those cases, the motive alleged by plaintiffs here is sufficiently concrete to survive a motion to dismiss. Andersen's consulting work for the Companies is alleged to have generated almost $ 12 million, nearly six times what it received in auditing fees. (P 711.) Moreover, Andersen's marketing strategies themselves raise an inference that it was motivated by more than the [*69] usual desire of an auditor to please clients. Specifically, plaintiffs point to Andersen's aggressive marketing of its White Paper, and to advertising materials touting the company's ability to "help[] clients find new ways to create manage and measure value in the rapidly changing global economy." (P 706.) Andersen's strategy to emphasize its "creative" means of finding revenues to boost growth may also be understood as a tacit indication of the firm's willingness to support dubious financial claims. Indeed, plaintiffs allege that these "'new' measures of 'value,' [were] ultimately revealed as a sham, as client after client of the auditing firm has restated its earnings, admitting that the 'business models' they adopted, and which were created, managed and approved by Andersen, produced fundamentally misleading financial results." (P 707.) Notwithstanding the severity of the violations alleged, then, it is quite possible to conclude, as the Texas district court did in Enron, that Andersen "turned a blind eye to the many red flags and continued to issue 'clean' audit opinions in order to generate big fees and increase the compensation of Arthur Andersen partners." *235 F. Supp. 2d at 679*. [*70] Plaintiffs have adequately pled a motive that benefitted Andersen in a "concrete and personalized way." *Novak, 216 F.3d at 307-08*.

### 2. *Conscious Misbehavior or Recklessness*

Alternatively, [HN30] plaintiffs can plead scienter by showing strong circumstantial evidence of conscious misbehavior or recklessness. Allegations of recklessness generally are sufficient when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" or have "alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." *Novak, 216 F.3d at 308*. However, in the case of non-fiduciary accountants, not every oversight is a sufficient basis for a claim. Violations of GAAP "standing alone, are insufficient to state a securities fraud claim"; plaintiffs must link such allegations with fraudulent intent. Id. Indeed, for non-fiduciary accountants, the standard for pleading scienter by recklessness appears to be heightened: "for recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness [*71] must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)* (citations omitted). Finally, [HN31] liability for recklessness does not include "fraud by hindsight," meaning that defendants cannot be held liable for failing to anticipate future events and make disclosures earlier than they did. *Novak, 216 F.3d at 309*.

Andersen's argument that plaintiffs fail to meet this heightened standard for demonstrating recklessness

Case 3:02-cv-02133-EBB    Document 167-5    Filed 08/18/2004    Page 9 of 13

Page 23

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

borders on frivolous. Far from relying solely on allegations of GAAP violations or allegations of mere negligence, plaintiffs devote over thirty paragraphs of the Complaint to allegations that Andersen was well aware that the Companies' books were misleading, and that it played an active role in creating the schemes used to inflate the Companies' revenue. (PP 701-733.) Specifically, plaintiffs allege, *inter alia,* that (a) Andersen, through Perrone, designed and executed the illegal swap deals (P 713); (b) Perrone and Fagan were [*72] regularly present at GC's corporate headquarters and had access to and knowledge of the company's private books and records which contained information clearly contradicting its public statements (P 714); (c) the Andersen Professional Standards Group ("PSG") had been alerted to these same questionable practices by an auditor assigned to Qwest, another client, who had questioned their propriety, and that the auditor's concerns had been "quashed" (P 716); and (d) that Andersen ignored numerous red flags, and was aware of and itself perpetrated numerous GAAP and GAAS violations in connection with both the GC and the AGC accounts (PP 717-730). In addition, the Andersen White Paper all but bragged of the firm's willingness to take aggressive accounting positions that a factfinder could easily conclude were consciously reckless of traditional standards of accuracy.

In short, plaintiffs have alleged a fraud of a magnitude only rarely seen -- at least until recent years. In such cases, [HN32] the scope of the fraud alleged may appropriately be considered in determining whether scienter has been adequately pled. See *In re Livent, Inc. Sec. Litig., 148 F. Supp. 2d 331, 367-68 (S.D.N.Y. 2001)*; [*73] see also *Scholastic, 252 F.3d at 73* (size of post-class period special charge supports inference of knowledge); *Rothman, 220 F.3d at 92* (size of write-off supports claim of fraudulent intent). As Judge Cote has held in a similar case in this Circuit, also involving Arthur Andersen, "although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of [the client's] fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference that Andersen was reckless in not knowing that its audit opinions materially misrepresented [the company's] financial state." *In re Worldcom. Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 10863, No. 02 Civ. 3288, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003).* In the present case, plaintiffs' allegations against Andersen amount to, at best, "an extreme departure from the standards of ordinary care," and at worst, "an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman, 220 F.3d at 98*; see also *Complete Mgmt., 153 F. Supp. at 334* [*74] ("If Andersen were conducting any kind of audit at all, they would have seen the potential problems."). Andersen's motion to dismiss on grounds that plaintiffs have failed to plead scienter thus fails.

In sum, because plaintiffs have raised allegations of primary liability against Andersen that satisfy all the elements of a *section 10(b)* claim, Andersen's motion to dismiss plaintiffs' claims against it in Counts I and XIX will be denied.

II. *Section 11* Claims

A. Legal Standard

[HN33] *Section 11* imposes civil liability on persons preparing materially misleading registration statements. To state a claim under *section 11*, an injured plaintiff must allege only that a defendant made or participated in making a "material misstatement or omission" in a registration statement for a security the plaintiff acquired; liability for such misstatements extends to, among others, underwriters of securities and to "every person who signed the registration statement" or who consented to be "named as having prepared or certified [a] report or valuation which is used in connection with the registration statement." *15 U.S.C. § 77k(a)(1), (4)*. No intent to defraud need be [*75] alleged under *section 11*. *Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983)*.

B. Defenses

Plaintiffs seek to hold defendants liable under *section 11* for the audited financial statements included in the Companies' various registration statements containing Andersen's clean audit opinion. Andersen's first argument in response to these claims, which it raises only with respect to GC, is that because plaintiffs have failed to allege that any of the individual defendants named in Counts VIII and IX of the Complaint were personally "named" as having prepared or certified any of the audited financial statements included in the registration statements, these claims are "invalid as a matter of law." The Court is unaware of any authority supporting Andersen's position. n22 [HN34] The statute extends liability to "any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement." *15 U.S.C. § 77k*. The definitions that accompany the statute, in turn, specifically include corporations in the definition of the term "person. [*76] " See *15 U.S.C. § 77b(2)*. The Companies' registration statements contain their annual reports, which included clean audit opinions on the company's financials signed by "Andersen & Co." (See Fleming Aff. E's. D-F.) Andersen itself can thus be held

Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 10 of 13

Page 24

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

liable, even without any individual defendant being named.

> n22 The sole authority defendant cites in support of its assertion is a footnote in the Supreme Court case *Herman & MacLean v. Huddleston, 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983)*, stating in dicta that "accountants are liable under § 11 only for those matters which purport to have been prepared or certified by them." *Id. at 381 n.11*. The Court's statement of the law is indisputably correct. However, the Court's point was not that Herman & MacLean, the corporate entity, could not be held liable for statements that it was named as having certified, but rather, that "it did not 'expertise' at least some of the materials that were the subject of the lawsuit ... which, if true, could preclude a § 11 remedy with respect to these materials." Even were the Court's statement binding precedent, then, it would not follow that Andersen itself could not be liable for its own statements in connection with GC's registration because none of the named individual defendants were identified as having certified them.

[*77]

Andersen argues correctly that *section 11* liability is limited to such statements as the registration statement names Andersen as having prepared or certified, and that it cannot be liable for any misleading statements in GC's pro forma reports. See *Herman & MacLean v. Huddleston, 459 U.S. at 382 n. 11*. However, Andersen's conclusion that the statements for which Andersen *was* named were not false or misleading fails for the same reasons outlined [HN35] above. The same standard for materiality applies to both *section 10(b)* claims and *section 11* claims. See *Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 731 (2d Cir. 1987)*. Plaintiffs have sufficiently alleged that Andersen's audited financials for 1998-2000 were materially false or misleading. Plaintiffs' claims based on the inclusion of Andersen's audited financial statements in the GC registration statements (Counts VIII-XIV) therefore survive.

However, with respect to plaintiffs' *section 11* claims regarding AGC, Andersen's claim that plaintiffs have failed to plead falsity prevails. The only statements made by Andersen that was contained in AGC's registration statement were the reports on its [*78] audited financials for 1998-1999, during which time AGC reported no GAAP income. Although the registration statement contained financials for the six-month period ending June 30, 2000, those financials were not audited. Because Andersen cannot be held liable for reports it was not named as having certified or prepared, plaintiffs' *section 11* claims related to the inclusion of Andersen's reports in the AGC registration statement (Count XX) must therefore be dismissed. n23

> n23 Because plaintiffs' *section 11* claims based on the AGC registration statement are dismissed on these grounds, the Court need not reach Andersen's second argument that these claims are barred by the statute of limitations. (D. Mem. AGC 19-22.)

### III. Sections 15 and 20(a)

#### A. Legal Standard

*Section 20(a) of the Exchange Act* provides for control person liability for underlying securities law violations. The relevant provision states that:

> [HN36] every person who, directly or indirectly, controls any person liable under any provision [*79] of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a)*. [HN37] The provisions of *section 15 of the Securities Act* are essentially parallel, providing control person liability for claims brought under *sections 11 and 12*, and its terms are interpreted in the same manner as those of *section 20(a)*. *15 U.S.C. § 77o; Initial Public Offering, 241 F. Supp. 2d at 393*. Each provision provides a separate basis for liability, apart from the underlying claim of primary liability.

[HN38] In order to state a claim under *section 20(a)* and *section 15*, plaintiffs must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator. See *Burstyn v. Worldwide Xceed Group, Inc.,2002 U.S. Dist. LEXIS 18555, No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002)* (citations [*80] omitted). *Section 20(a)* contains the additional requirement that plaintiff allege culpable participation "in some meaningful sense" by the controlling person in the fraud. n24 Id. Since culpable participation is an element, the PSLRA's heightened pleading requirements apply, and

Case 3:02-cv-02133-EBB   Document 167-5   Filed 08/18/2004   Page 11 of 13

Page 25

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

"plaintiffs must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." Id. (citation omitted). "Determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." *Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).*

> n24 The district courts in this Circuit have divided as to the prima facie requirements of a *section 20(a)* claim, or more specifically as to whether plaintiffs must plead culpable participation. See *Burstyn, 2002 U.S. Dist. LEXIS 18555, 2002 WL 31191741, at *7* (describing the intra-circuit split and holding that plaintiffs must plead culpable participation). [HN39] Despite recent decisions within this Circuit arguing that no showing of culpable participation is necessary, see e.g., *Initial Public Offering, 241 F. Supp. 2d at 396 (Scheindlin, J.)* (reversing former position in *Independent Energy Holdings, 154 F. Supp. 2d at 771*); *In re Worldcom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 414-16 (S.D.N.Y. 1994)* (Cote, J.), the Court here adheres to its prior position that the plaintiff must allege culpable participation.

[*81]

B. Primary Liability of Individual Defendants and Plaintiffs' Control Person Claims

1. *Fagan and Others Under his Direction*

Andersen argues that plaintiffs' control person claims related to GC must be dismissed for failure to allege a primary violation by any individual Andersen defendant. n25 As demonstrated by the facts discussed above, plaintiffs clearly state a claim under *section 10(b)* and *Rule 10b-5* for Andersen's primary participation in a fraudulent scheme with respect to the accounting for IRU sales and swaps through the participation of Perrone (while he was still employed at Andersen) and Fagan, as well as other employees reporting to them. See *supra* Part I. Andersen's argument is therefore without merit.

> n25 Plaintiffs bring no for control person liability related to AGC.

Based on Fagan's central role in creating and perpetrating a scheme intended to defraud investors, Plaintiffs have asserted a claim for a primary violation against Fagan. n26 In addition, plaintiffs have adequately [*82] alleged facts giving rise to a strong inference that Fagan, as the Andersen partner in charge of the GC account, controlled others at Andersen who committed primary violations at his direction. The Complaint alleges that Fagan, as one of the chief architects of the fraud, acted with full knowledge and in furtherance of its goals of creating illusory revenue and deceiving investors. The entire scheme, as well as the false financial statements associated with it, were executed by Andersen employees under Fagan's supervision. Plaintiffs therefore meet the requirements of alleging a primary violation, control by Fagan, and culpable participation.

> n26 Perrone is not named as a defendant in his capacity as an officer at Andersen, but rather, in his role as a director of GC, which he became in May 2000. (P 51.) Thus, although his acts while at Andersen are relevant to establishing a primary violation by an Andersen employee, his own liability as a primary violator or control person is not at issue on these motions.

[*83]

2. *Berardino and Eliott*

While the Complaint is replete with facts indicating Fagan's primary participation in the alleged scheme to defraud, it fails to state a claim for primary liability under *section 10(b)* against individual defendants Joseph Berardino and Thomas Elliot, Andersen's managing partner for its assurance and business advisory practice (and later CEO) and the head of Andersen's U.S. business consulting practice, respectively. Although the Complaint states in a conclusory manner that each "participated in the scheme, plan, and common course of conduct" it describes, it fails to provide any factual support for this allegation; in fact, outside of the initial paragraphs in which these two defendants are identified, the Complaint never mentions them again. Thus, the plaintiffs' *section 10(b)* claims for primary liability against Berardino and Elliot must be dismissed.

But even where plaintiffs' claims are insufficient to establish primary liability against these defendants, they may be sufficient to state a claim for control person liability. Plaintiffs allege that Elliott and Berardino each "directed, controlled, and established Andersen's conduct ... and thus participated [*84] in the [fraudulent] scheme alleged." (PP 77-80.) As the heads of Andersen's assurance business advisory practice and its business consulting practice, respectively, Berardino and Elliott certainly occupied the highest levels of the corporate hierarchy, and would have directly overseen Perrone, and later, Fagan. Plaintiffs have also alleged facts supporting

Case 3:02-cv-02133-EBB  Document 167-5  Filed 08/18/2004  Page 12 of 13

Page 26

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

an inference of these defendants' culpable participation. The Complaint cites, in considerable detail, a host of internal correspondence and documents demonstrating widespread internal knowledge of the schemes plaintiffs allege, which spanned from the bottom of the company to its top reaches. It would simply be implausible to argue in the face of the evidence presented that Berardino and Elliott did not know of and in some sense culpably participate in the fraudulent schemes alleged.

However, plaintiffs have failed to allege a single fact, outside of these defendants' positions, indicating that either exercised actual control over the primary violators -- indeed, as mentioned above, the Complaint fails to mention them again outside of the initial paragraphs of the Complaint in which they are first identified. In light of the probability [*85] of culpable participation, it is thus a close call on the issue of control as between the conclusory nature of the pleadings and the presumption of control that follows from these defendants' extremely high ranks within the company. Under these circumstances, the Court is prepared to leave the decidedly fact-based determination of control to a later phase in the litigation, and to allow plaintiffs' control person claims against these defendants to proceed. See *In re Executive Telecard, Ltd. Sec. Litig., 913 F. Supp. 280, 286 (S.D.N.Y. 1996)*; *Degulis v. LXR Biotechnology, Inc., 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996)*.

### 3. Andersen PSG

The same holds true for plaintiffs' control person claims against the members of the Andersen Professional Standards Group ("PSG"). n27 The Complaint alleges only that the PSG was aware of the misleading accounting schemes, and that it stifled the dissent of a junior auditor working on another account who questioned their propriety. (P 716). This is insufficient to state a claim for a primary violation against the PSG members. However, plaintiffs'control person claims aimed at the PSG are more fully developed. The [*86] Complaint alleges that the PSG "gave advice on complex questions for [GC's] audit teams" and "was consulted by Andersen's [GC] audit team during the class period with respect to the same accounting issues underlying [the Complaint]." (P 81.) Moreover, the Complaint alleges that the PSG was actually aware of the fraudulent accounting schemes, and, indeed, that it was responsible for ensuring that they were applied consistently; the Complaint even alleges that the PSG actively "quashed" the dissent of a junior auditor who questioned their propriety in the context of related frauds perpetrated at another company. (P 716). These factual allegations are considerably more specific than those lodged against Berardino or Elliott, and are sufficient to satisfy the requirements of pleading actual control and culpable participation by the Andersen PSG.

n27 The individual defendants named as members of the PSG are Anthony J. Amoruso, Scott Taub, Benjamin Neuhausen, Carl E. Bass, Amy Ripepi, John Stewart, Dorsey L. Baskin Jr., Michael Crooch, Rick Peterson, Thomas Hoey and Donald L. Weeks.

[*87]

Thus, although the underlying *section 10(b)* claims against Berardino, Elliott, and the PSG members must be dismissed, plaintiffs adequately state claims against Fagan as a primary violator (Counts I, XIX), and against all of the individual Andersen defendants for control person liability under *section 20(a)* (Count IV). Because the more stringent requirements of *20(a)* are met, plaintiffs' *section 15* claims (Count XVI) are also sufficient. The claims against the individual Andersen defendants in Counts IV and XVI, and against Fagan in Counts I and XIX thus survive.

### IV. Section 14(a) Claims

Andersen also moves to dismiss plaintiffs' claims against Andersen brought under *Section 14(a) of the Securities Act*, which imposes liability on defendants that "permit the use of [their] name" in a proxy solicitation that violates SEC regulations. *15 U.S.C. § 78n(a)*. The Court need not consider Andersen's arguments on this matter, because plaintiffs' sole claim under *section 14(a)* (Count II) was dismissed as time-barred by this Court's Opinion and Order dated December 18, 2003. *In re Global Crossing Sec. Litig.,2003 U.S. Dist. LEXIS 22930, 02 Civ. 910 (GEL), 2003 WL 22999478, at *4 (S.D.N.Y., Dec. 22, 2003)* [*88] .

### V. Plaintiffs' Motion to Lift Stay of Discovery

During the pendency of Andersen's motions to dismiss, plaintiffs in turn brought a motion to lift the automatic stay of discovery against Andersen imposed under the PSLRA. [HN40] The PSLRA provides that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." *15 U.S.C. § 78u-4(b)(3)(B)*. Plaintiffs request that the stay be lifted in order to conduct discovery on the issue of successor liability, in the wake of the bankruptcy of Andersen LLP under the exception for preservation of evidence and prevention of undue prejudice.

Case 3:02-cv-02133-EBB    Document 167-5    Filed 08/18/2004    Page 13 of 13

Page 27

2004 U.S. Dist. LEXIS 5040, *; Fed. Sec. L. Rep. (CCH) P92,717

The statute does not specify how the stay is to be applied in cases involving multiple defendants bringing multiple motions to dismiss. As one court has noted, the statute could either mean that "no discovery may proceed against any party to an action until all motions by all parties are resolved [or] that all discovery against a party must be stayed during [*89] the pendency of any motion to dismiss filed by that party." *In re Lernout & Hauspie Sec. Litig., 214 F. Supp. 2d 100 (D. Mass. 2002)*. In the present case, this could mean that the stay would either automatically remain in place pending resolution of the balance of the multiple motions to dismiss brought by other defendants, or, at the other extreme, that the resolution of the motions above would moot plaintiffs' motion by eliminating the necessity for the stay altogether.

The Court need not resolve this ambiguity. Assuming, for the sake of argument, that the stay applies pending the resolution of literally "any motion" to dismiss, this mandate is not absolute, as the exceptions for undue prejudice and preservation of evidence leave sufficient flexibility to address situations involving multiple defendants bringing multiple motions on an individualized basis, depending on the specific facts in each case. In this case, the disposition above resolves the issues raised in Andersen's motions to dismiss almost entirely in favor of plaintiffs and allows the majority of their claims against Andersen to proceed. Although motions to dismiss by other defendants remain pending [*90] in this case, they present distinct factual allegations and legal issues. In addition, plaintiffs have raised compelling evidence that further delay of discovery on the issue of successor liability could hamper their ability in the long term to achieve the relief they seek, citing "the need to locate and identify Andersen's successors, determine if plaintiffs can assert valid claims against such successors and ensure that evidence is being preserved." (See P. Mem. Supp. Mot. To Lift Stay as to Def. Arthur Andersen 1.) There is no reason under the statute's language or its purpose to countenance further delay by preventing discovery from proceeding as to Andersen, against whom this case is now clearly going forward. Given the concerns raised in a situation where the entity being sued is winding down, resumption of discovery is desirable in order to prevent undue prejudice and preserve evidence. The stay will accordingly be lifted. n28

n28 The court in *Lernout & Hauspie, 214 F. Supp. 2d 100*, reached a similar result. Considering as a matter of first impression the precise question of whether the resolution of a motion to dismiss against a particular defendant permits the PSLRA automatic stay to be lifted against that defendant, the court found the statute ambiguous on its face. The court then turned to the question of Congressional purpose, noting the provision's stated goals of deterring meritless litigation and preventing plaintiffs from engaging in "fishing expeditions" intended to force settlement. These concerns, the court held, were not implicated in a case in which the merits of a plaintiff's claims against the defendant against whom discovery was being sought had been decided in the plaintiff's favor, and in which the motions pending by other defendants presented distinct legal and factual issues. *Id. at 106*.

[*91]

CONCLUSION

With the exception of defendant Fagan, the individual Andersen defendants are dismissed from Counts I and XIX of the Complaint. Count XX of the Complaint is dismissed as against Andersen. Andersen's motions to dismiss the Complaint are denied in every other respect, and plaintiffs' motion to lift the stay of discovery as to Andersen is granted. The parties are requested to submit a proposed discovery schedule to the Court by Wednesday, April 7, 2004.

SO ORDERED.

Dated: March 23, 2004.

GERARD E. LYNCH

United States District Judge