**Exhibit E**

Westlaw.

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

Page 1

H

United States District Court,
S.D. New York.

SCONE INVESTMENTS, L.P., and Stanley Cohen,
Plaintiffs,
v.
AMERICAN THIRD MARKET CORP., Israel
Englander, Rosehouse Ltd., Christopher
Carajohn, Richard Prichard-Jones, Tellerstock, Inc.,
Thomas N. Telegades.

**No. 97 CIV. 3802 (SAS).**

April 28, 1998.

Jerome M. Leitner, Leitner & Getz, LLP, New York,
New York for plaintiffs.

Lisa Klein Wager, Morgan, Lewis & Bockius LLP,
New York, New York, for defendant Standard Bank
(Jersey) Limited.

Steven M. Kaplan, Loselle, Greenawalt, Kaplan,
Blair & Adler, New York, New York, for defendant
Tellerstock, Inc.

Allan S. Sexter, Sexter & Warmflash, New York,
New York for defendants American Third Market
Corp. and Israel A. Englander.

*OPINION AND ORDER*

SCHEINDLIN, U.S.D.J.:

**\*1** Plaintiffs Scone Investments, L.P. ("Scone") and
Stanley Cohen, ("Cohen") bring this action against
all defendants, alleging (1) violations of Section
10(b) of the Securities and Exchange Act of 1934
(the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule
10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-
5; (2) common law fraud; and (3) negligence and
bad faith. Defendant Standard Bank Investment
Corporation (Jersey) Ltd. ("Standard Bank" or the
"Bank") moves to dismiss these claims pursuant to
Fed.R.Civ.P. 9(b) and 12(b)(6). For the reasons
stated below, Standard Bank's motion is granted in its
entirety.

I. Factual Background

A. *The Parties*

Plaintiff Scone is a limited partnership organized
under the laws of Delaware, with offices in New
York. Complaint at ¶ 1. Plaintiff Cohen is the
general partner of Scone. *Id.* at ¶ 2. Defendant
Christopher Carajohn ("Carajohn") was the principal
equity holder, and defendant Richard Prichard-Jones
was an officer or director of defendant Rosehouse
Ltd. ("Rosehouse"), a Bermudian corporation that
traded securities of U.S. corporations (collectively,
"Rosehouse defendants"). *Id.* at ¶¶ 5-7. Defendant
Thomas N. Telegades was an officer, director and/or
principal shareholder of defendant Tellerstock, Inc., a
Delaware corporation engaged in trading securities of
U.S. companies (collectively, "Tellerstock
defendants"). *Id.* at ¶¶ 8-9. Finally, Peter C. Tosto
was an officer, director and/or principal shareholder
of defendant Investor Relations, Inc., a Utah
company that traded securities of U.S. companies
(collectively, "Investor Relations defendants").

B. *The Alleged Manipulative Scheme*

This action concerns a scheme to manipulate the
market prices of certain publicly issued securities and
the misrepresentations which allegedly induced
plaintiffs to purchase large quantities of these
securities. The Complaint sets forth the following
account of the defendants' roles in the scheme and
their involvement in the misrepresentations. For
purposes of this motion, these facts are assumed to be
true.

The genesis of the scheme was an agreement by the
Rosehouse defendants to purchase thinly traded
"penny stocks" from the Tellerstock and the Investor
Relations defendants, to hold the securities for a
limited period, and to resell those securities to the
Tellerstock and Investor Relations defendants for a
minimum guaranteed price or "floor." *Id.* at ¶ 18.
The Rosehouse defendants agreed to rebate the
Tellerstock and Investor Relations defendants 20
percent of any profits on the resales beyond the
guaranteed price floor. *Id.* at ¶ 18. As compensation
for making these purchases and resales, the
Rosehouse defendants were to receive substantial
monetary sums from the Tellerstock and Investor
Relations defendants. *Id.* The purpose of the scheme
was to artificially inflate the price of the designated

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

Page 2

securities by creating the appearance of demand in the market.

### 1. The Rosehouse Defendants' Purchase of MKTB Securities

**\*2** At an unspecified time, the Rosehouse defendants obtained a $5 million credit line from Standard Bank. *Id.* at ¶ 20. The credit line included a covenant which prohibited the investment of more than 50 percent of the loan in any one security without Standard Bank's consent. *Id.* On August 1, 1995, Standard Bank also extended to the Rosehouse defendants a $2 million mortgage on Carajohn's home located in Bridgehampton, New York. *Id.*

In February 1996, the Tellerstock and Investor Relations defendants agreed to sell to the Rosehouse defendants 4.8 million shares of an over-the-counter stock, Market Basket Enterprises, Inc. ("MKTB") at a price of $.875 per share, with an understanding that the Tellerstock and Investor Relations defendants would repurchase these shares at a guaranteed minimum price of $1.125. *Id.* at ¶ 21. Rosehouse requested that Standard Bank waive the application of the 50 percent covenant so that it could purchase the 4.8 million shares. *Id.* at ¶ 22. Standard Bank agreed to this waiver and increased Rosehouse's credit line from $5 million to $6.3 million. *Id.* On February 22 and 27, and March 11, 1996, Rosehouse purchased the 4.8 million shares of MKTB using the credit line extended by Standard Bank. *Id.* On May 17, 1996, the Rosehouse defendants received $250,000 from the Tellerstock and Investor Relations defendants in consideration for having purchased the MKTB securities. *Id.* at 23.

Between April 3 and May 3, 1996, the Tellerstock and Investor Relations defendants arranged to repurchase 850,000 of the MKTB shares at prices from $1.09 and $1.12 per share, and paid the Rosehouse defendants the balance of the guaranteed $1.125 per share on these purchases. *Id.* at ¶ 24. Approximately four million shares of MKTB remained in Rosehouse's inventory.

### 2. Carajohn's Relationship With Plaintiffs

In February 1996, Cohen authorized Carajohn to execute certain securities transactions both for his own account and for Scone's account, on a non-discretionary and approval basis. *Id.* at ¶ 26. Carajohn's authority over plaintiffs' accounts was restricted to the purchase of new issues of securities for prompt resale. *Id.* Authorization for each of

Carajohn's trades for plaintiffs' accounts was to be confirmed by Cohen upon the transfer of the securities into plaintiffs' accounts. *Id.*

### 3. Plaintiffs' Purchase of BNN Shares

On May 24 and May 29, 1996, Carajohn purchased for plaintiffs' accounts 920,000 shares of BNN Corp. ("BNN") at $4 per share from the Tellerstock and Investor Relations defendants. *Id.* at ¶ 33. When Cohen learned of these purchases, he contacted Carajohn for an explanation of the unauthorized transaction. *Id.* at ¶ 34. In response to Cohen's inquiry, Carajohn represented that the purchases were "stopped out,"--i.e., that he had already found purchasers who had agreed to purchase the securities from plaintiffs, and the shares would be liquidated promptly at a profit of $.25 per share. *Id.*

**\*3** In reliance on this representation of a guaranteed profit, Cohen authorized the purchase of the 920,000 BNN shares at $4 per share. *Id.* at ¶ 37. Following the transfer of these shares to plaintiffs' accounts, the Investor Relations and Tellerstock defendants paid $97,000 to the Rosehouse defendants. *Id.* at ¶ 38. Between May 31 and July 2, 1996, 375,000 shares of plaintiffs' BNN shares were sold at a profit to plaintiffs of over $500,000. *Id.* at ¶ 33. However, after July 2, 1996, plaintiffs were unable to sell any of their remaining 595,000 BNN shares for an amount approximating the $4 purchase price. *Id.* at ¶ 41. In December 1996, plaintiffs liquidated substantially all of their remaining position in BNN at prices which resulted in a net loss of over $1 million. *Id.*

### C. Plaintiffs' Purchase of MKTB Securities

Plaintiffs further allege that in mid-June 1996, Standard Bank became concerned that due to the extended inability or unwillingness of Tellerstock and Investor Relations to repurchase the four million shares of MKTB that remained in the Rosehouse defendants' inventory, Rosehouse would be unable to repay the outstanding credit line of $4 million. *Id.* at ¶ 42. On June 18, 1996, Standard Bank transmitted correspondence to the Rosehouse defendants which threatened to eliminate any further advances pursuant to the credit line unless they satisfactorily reduced the outstanding credit balance through immediate sales of their MKTB inventory. *Id.* at ¶ 43.

That same day, two directors of Standard Bank allegedly met with the Rosehouse, Tellerstock, and Investor Relations defendants concerning the

Not Reported in F.Supp.                                                          Page 3
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

liquidation of the Rosehouse defendants' position in MKTB. *Id.* at ¶ 43. Shortly thereafter, Standard Bank "released" 1.5 million shares of MKTB from the Rosehouse defendants' inventory for transfer and sale to plaintiffs' accounts. *Id.* at ¶ 53(f).

On June 21, 1996, the Rosehouse defendants transferred 1.5 million shares of its MKTB inventory to the account of Cohen, at a cost of $1.125 per share. *Id.* at ¶ 44. The $1.8 million proceeds of this transaction were immediately credited to Standard Bank, thus reducing the amount of its outstanding loan to the Rosehouse defendants. *Id.* On June 21 and June 28, 1996, the Tellerstock and Investor Relations defendants paid $129,000 to the Rosehouse defendants in consideration of the sale of the 1.5 million MKTB shares. *Id.* at ¶ 45.

Between June 21 and June 27, 1996, Cohen learned of the transfer of the 1.5 million MKTB shares to his account, and refused to accept the trade. *Id.* at ¶ 46. On June 27, 1996, Carajohn contacted Cohen and represented that he should accept the trade because "Carajohn already had the entire 1.5 million shares sold, at a profit, that [Cohen] had to accept the trade before delivery to those purchasers could be effectuated, and that those shares need only be held by plaintiff Cohen for approximately one week." *Id.* at ¶ 47. In fact, no investors were committed to purchasing the 1.5 million MKTB shares. *Id.* at ¶¶ 48, 49. In reliance on Carajohn's misrepresentation, Cohen authorized the transfer of the MKTB securities to his account. *Id.* at ¶ 50. Cohen was unable to sell any shares of MKTB for an amount approximating the purchase price of $1.125 per share and, following his purchase of the shares, the market price of MKTB stock collapsed. *Id.* at ¶ 51. Cohen liquidated his position in MKTB in December 1996 at a price of $.04 per share, resulting in a net loss exceeding $1.5 million. *Id.*

*4 Plaintiffs now seek to recover the loss of over $2.5 million which they allegedly suffered as a result of the precipitous decline in price of the BNN and MKTB securities.

II. Standard of Review

A. *Standard of Review Under Rule 12(b)(6)*

In considering a 12(b)(6) motion to dismiss, a district court must limit itself to "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 661 (2d Cir.1996) (internal quotations omitted). A court deciding such a motion must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). Furthermore, a 12(b)(6) motion to dismiss cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, because "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). However, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

B. *Standard of Review under Rule 9(b)*

Rule 9(b) requires that in all allegations of fraud, including actions under § 10(b) and Rule 10b-5, the circumstances constituting the fraud must be stated with particularity. [FN1] *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994). The pleading must be sufficiently particular to serve the three goals of Rule 9(b): (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Egidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

Courts are especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants. Each defendant is "entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged." *In re Blech Sec. Litig.,* 928 F.Supp. 1279, 1293 (S.D.N.Y.1996) (*Blech I* ) (quotations omitted) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 584 (S.D.N.Y.1995)); *accord DiVitterio,* 822 F.2d at 1247. To this end, a complaint may not rely upon blanket references to the acts of all of the defendants without identifying the nature of each defendant's participation in the fraud.

III. Claims Under § 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person "to use or employ, in connection with

Not Reported in F.Supp.                                                        Page 4
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe." 15 U.S.C. § 78j(b). Promulgated pursuant to § 10(b), Rule 10b-5 prohibits any artifice to defraud or any act that operates or would operate as a fraud or deceit in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5. In order to establish liability under § 10(b) and Rule 10b-5, a plaintiff must aver that (1) in connection with the purchase or sale of a security, (2) defendant made a material misrepresentation (or omission) or committed a fraudulent act, (3) with scienter, (4) upon which plaintiff relied, (5) causing injury to plaintiff. See _Royal American Managers, Inc. v. IRC Holding Corp._, 885 F.2d 1011, 1015 (2d Cir.1989); _Bloor v. Carro, Spanbock, Londin, Rodman & Fass,_ 754 F.2d 57, 61 (2d Cir.1985).

A. _Market Manipulation_

*5 One class of conduct prohibited by § 10(b) and Rule 10b-5 is market manipulation, which involves "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting the market activity." _Santa Fe Indus., Inc. v. Green,_ 430 U.S. 462, 476 (1977); _see also Ernst & Ernst v. Hochfelder,_ 425 U.S. 185, 197-98 (1976). The purpose of many market manipulation schemes is to drive up the price of securities by creating the impression that they are in demand by investors who are making independent assessments of the securities' value. _See, e.g., In re Blech Sec. Litig.,_ 961 F.Supp. 569, 582 (S.D.N.Y.1997) (_Blech II_ ) (defendant supplied money and/or securities to other participants in scheme to pay for securities which it arranged for them to purchase in sham transactions designed to inflate securities' price); _Cowen & Co. v. Merriam,_ 745 F.Supp. 925 (S.D.N.Y.1990) (defendant purchased certain security for wife's account to create the appearance of demand for the stock when price was generally declining). The schemers typically own large quantities of the manipulated security which they expect to sell after the price has been artificially inflated. Such schemes strike at an essential purpose of the federal securities laws--"the assurance of free and open securities markets in which prices are fixed by the interaction of supply and demand, uninfluenced by manipulative activities that would cause prices to be inflated or depressed artificially." _SEC v. Kimmes,_ 799 F.Supp. 852, 858-59 (N.D.Ill.1992).

The Rosehouse defendants' alleged purchase of securities from the Tellerstock and Investor Relations defendants pursuant to an agreement that the shares would be resold at a guaranteed profit, so as to inflate the securities' price, is precisely the sort of manipulative conduct against which § 10(b) and Rule 10b-5 are directed. However, to state a claim for market manipulation, a plaintiff must do more than merely allege the existence of a manipulative scheme.

1. _Recovery Under the Fraud on the Market Theory_

To succeed on a claim under § 10(b) or Rule 10b-5, a plaintiff must allege reliance on the purported misrepresentation or fraudulent act. _Basic, Inc. v. Levinson,_ 485 U.S. 224, 243 (1988). In certain contexts, reliance may be proved under a fraud on the market theory, which the Supreme Court explained as follows:

> The theory is based on a hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock is no less significant than in a case of direct reliance on misrepresentation.

_Id._ at 241-42. The fraud on the market theory is especially applicable in the market manipulation context. Market manipulation schemes which are intended to distort the price of a security, if successful, necessarily defraud investors who purchase the security in reliance on the market's integrity. Absent the fraud on the market theory, the parties injured by such manipulative schemes could not plead the necessary element of reliance. _Cf._ _Blech II,_ 961 F.Supp. at 582 (S.D.N.Y.1997) (to state a claim for market manipulation, plaintiff must plead reliance on the integrity of a market for securities).

2. _Fraud on the Market Theory Applied_

*6 In their memorandum of law, plaintiffs contend that their pleadings satisfy § 10(b)'s reliance element under, _inter alia,_ the fraud on the market theory. Plaintiffs' Memorandum of Law in Opposition to Standard Bank's Motion to Dismiss at n. 21. However, the Complaint does not aver--even generally-- that plaintiffs relied on the integrity of the market in deciding to purchase either the BNN or the MKTB securities. In fact, plaintiff's averments are

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

flatly inconsistent with such reliance. According to the Complaint, Cohen was initially unwilling to accept either the May 24 and May 29, 1996 transfers of BNN securities or the June 21, 1996 transfer of the MKTB shares. Complaint at ¶ ¶ 34, 46. Only after Carajohn assured Cohen that there were investors committed to buying the securities at a higher price-- thus guaranteeing plaintiffs a profit--did he consent to the purchases. *Id.* at ¶ ¶ 34, 47-50. The Complaint specifically avers that plaintiffs' authorized the transactions in reliance on Carajohn's assurance of a profit. *Id.* at ¶ ¶ 37, 47-50.

Accordingly, the Complaint not only fails to allege that plaintiffs relied on the integrity of the market in authorizing the purchase of the BNN and MKTB securities, but it also avers facts which are facially inconsistent with the fraud on the market theory of reliance. Plaintiffs have therefore failed to adequately state a claim for market manipulation. Nevertheless, because the Complaint expressly alleges reliance on Carajohn's misrepresentation, the question arises whether Standard Bank may be liable under § 10(b) and Rule 10b- 5 on a misrepresentation theory. [FN2]

B. *Misrepresentation Theory*

1. *Liability of Participants in a Scheme to Defraud*

Plaintiffs' pleadings repeatedly allege that all the defendants were engaged in a scheme to manipulate market prices of various securities and to defraud investors in these securities. Even assuming, *arguendo,* that plaintiffs have properly pleaded Standard Bank's involvement in such a scheme, the Bank is not necessarily liable for Carajohn's misrepresentation.

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994), the Court held that there is no civil cause of action for aiding and abetting a violation of § 10(b) or Rule 10b-5. Applying the reasoning of *Central Bank,* the Second Circuit recently held that conspiracy allegations cannot sustain a private cause of action under § 10(b). *Dinsmore v. Squadron, Ellenoff, Plesent, Scheinfeld & Sorkin,* 135 F.3d 837, 842-43 (2d Cir.1998). *Dinsmore* involved claims against a law firm that had represented a corporation engaged in a classic Ponzi scheme. The court held that though plaintiff had alleged that the law firm and corporation were engaged in a conspiracy to violate 10(b) and Rule 10b-5, the law firm could be liable for only its own misrepresentations, not those of the corporation.

"Where the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which other parties have committed a primary violation." *Id.* at 843. Rather, a plaintiff alleging a violation of § 10(b) and Rule 10b-5 must make out a claim for primary liability against each defendant individually, including a showing that plaintiff relied on each defendant's allegedly fraudulent conduct. *See Central Bank,* 511 U.S. at 191; *Dinsmore,* 135 F.3d at 843.

**\*7** Thus, *Dinsmore* dictates that Standard Bank is not liable for Carajohn's misrepresentation simply because it is alleged to have been a participant with Carajohn and others in a conspiracy or scheme to defraud. *See also In re Silicon Graphics Inc. Sec. Litig.,* 970 F.Supp. 746, 762 (N.D.Cal.1997) (rejecting "scheme" allegations as a "thinly disguised attempt to avoid the impact of the *Central Bank* decision"). The relevant question is whether Standard Bank's individual conduct constitutes a primary violation of § 10(b) and Rule 10b-5 under a misrepresentation theory of liability.

2. *Determining Primary Liability*
   a) *Misrepresentation Concerning the MKTB Securities*
   i) *General Averments Regarding Standard Bank's Conduct*

In the Complaint, Standard Bank is most often mentioned in averments which impermissibly lump together the conduct of all the defendants. With respect to the Bank's involvement in Carajohn's misrepresentation about the MKTB securities, the Complaint states:

> On or about June 27, 1996, Carajohn, at the direction, and with the knowledge, consent and approval, and for the benefit, of Rosehouse, Prichard- Jones, Tellerstock, Investor Relations, Telegades, Tosto, ATM, Englander and Standard Bank, pursuant to the foregoing market manipulation scheme between and among defendants, and in order to obtain approval from plaintiff Cohen for confirmation of the MKTB trade, made representations and statements of material fact to plaintiff Cohen by telephone....

Complaint at § 47. This shotgun pleading contravenes Rule 9(b)'s policy of safeguarding the reputation of individual defendants "from the stain of allegations leveled with particularity against other parties." *Blech II,* 961 F.Supp. at 581 (citing *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y.1993)). Accordingly, those

Not Reported in F.Supp.                                                                                    Page 6
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

paragraphs which merely lump Standard Bank with its co-defendants, add nothing to my consideration of the Bank's motion to dismiss.

Plaintiffs' only non-conclusory allegations concerning Standard Bank's individual role in the sale of MKTB securities are (1) that the Bank financed the Rosehouse defendants' purchase of the MKTB securities, (2) that the Bank pressured the Rosehouse defendants to liquidate the MKTB securities to pay down their credit line, and (3) that the Bank "released" the 1.5 million shares of MKTB from the Rosehouse defendants' inventory.

ii) *Directing the Liquidation of MKTB Securities*

With regard to the Bank's alleged direction that the Rosehouse defendants liquidate their inventory of MKTB securities, plaintiffs aver that (1) on or about June 18, 1996, the Bank threatened the Rosehouse defendants that it would eliminate any further advances on the credit line unless satisfactory reduction of the outstanding balance were effectuated through immediate sales of the Rosehouse defendants' MKTB inventory; (2) at approximately the same time, two directors of Standard Bank met with the Tellerstock, Investor Relations, and Rosehouse defendants to discuss the liquidation of Rosehouse's MKTB position. Complaint at ¶ 43.

**\*8** Thus, the Bank is alleged to have directed that the MKTB securities be sold, not that the sale be effectuated by way of fraudulent misrepresentation. The Bank's liquidation demand is a far cry from the "intimate" "hands-on involvement" and participation in "key decisions" about the details of the sale which would render it a primary violator. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1460-61 (2d Cir.1996). Accordingly, the Bank's demand that the Rosehouse defendants liquidate their inventory of MKTB securities does not, in and of itself, violate § 10(b) or Rule 10b-5.

iii) *Financing Rosehouse's Purchase of and of the MKTB Securities and the "Release" of the Securities from Rosehouse's Inventory*

With respect to the financing of Rosehouse's purchase of the MKTB securities, the complaint alleges that (1) in August 1995, the Bank extended a $2 million mortgage to the Rosehouse defendants, (2) that sometime prior to February 1996, the Bank provided the Rosehouse defendants with a $5 million credit line which restricted the borrowers from investing more than 50 percent in any single security; and (3) that in February 1996, the Bank waived the 50 percent covenant and increased the credit line to

$6.3 million. Complaint at ¶¶ 20, 53. The only other acts that plaintiffs attribute to the Bank was its "release" of the 1.5 million shares of MKTB from the Rosehouse defendants' inventory. *Id.* at ¶ 53.

Taken together, this conduct is insufficient to render Standard Bank primarily liable for Carajohn's misrepresentation. Primary liability does not attach when the alleged fraudulent conduct is no more than the performance of a routine market function. *See Ross v. Bolton,* 904 F.2d 819, 820-21 (2d Cir.1990) (no primary or secondary liability for normal conduct of clearing broker that extends loans on margin); *Blech I,* 928 F.Supp. at 1295 (performing routine function of clearing transactions does not create primary liability, even with knowledge that transactions violate 10b-5). Here, the Bank's financing of the Rosehouse defendants' purchase of the MKTB securities and the release of its shares for trading amounts to nothing more than the routine functioning of a lending institution.

### a. *The Blech Exception*

In *Blech II,* the court recognized an exception to the general rule that the traditional conduct of market participants does not create primary liability. *Blech II* involved an investment bank which was allegedly concerned that a broker-dealer with a margin account at the bank would soon be unable to pay off its debt. To eliminate its exposure to risk, the bank demanded that the broker-dealer sell certain securities and repay the margin debt. In response to this demand, the broker-dealer sold the securities in transactions which constituted market manipulation. The sales were "executed" by the bank, which not only cleared the transactions but also provided the purchaser with financing. In holding that the bank was liable for market manipulation as a primary violator, the court reasoned that the bank had not only initiated the sale of the securities but had also participated in the fraudulent transaction itself. Thus, under the approach of the court in *Blech II,* an investment bank that both (1) *directs* that securities be sold and (2) *participates* in the sale of the securities (even in its traditional market role as a clearing agent), may be primarily liable under a market manipulation theory where the sales were "sham" transactions aimed at inflating or maintaining the artificially high price of the securities sold.

**\*9** As in *Blech II,* the instant action concerns a bank which directed that its debtor sell certain securities to reduce the risk of default. However, in *Blech II,* the defendant bank directly engaged in the fraudulent

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                          Page 7
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

conduct at issue (i.e., market manipulation) by executing "sham" transactions. In contrast, Standard Bank is alleged only to have participated indirectly in the sale of the MKTB securities--by releasing the shares from the Rosehouse defendants' inventory. Moreover, the Complaint provides no basis from which to infer that Standard Bank participated in any respect in the specific fraudulent conduct at issue here--Carajohn's misrepresentation. The approach followed in *Blech II* is therefore inapplicable to the case at bar.

### iv) *Overview of the MKTB Misrepresentation*

While Standard Bank's acts of (1) financing the Rosehouse defendants' purchase of the MKTB securities, (2) directing that the inventory be liquidated, and (3) releasing these shares from the inventory, facilitated--and even precipitated--Carajohn's misrepresentation, such conduct does not amount to a primary violation. A contrary result would impose liability for conduct on which the plaintiffs did not rely, thus reviving the aiding and abetting and conspiracy liability that *Central Bank* and *Dinsmore* expressly disavowed. *Cf. Primavera Familienstiftung v. Askin*, 95 Civ. 8905, 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996) (though brokers created, supplied, and financed the purchase of a speculative class of risky securities by investment funds which resold securities in fraudulent transactions, brokers' conduct did not amount to a primary violation of 10b-5). For these reasons, Standard Bank cannot be liable for the losses which plaintiffs allegedly suffered as a consequence of Carajohn's misrepresentations concerning the MKTB securities.

### b) *Misrepresentation Concerning the BNN Securities*

Any assertion that Standard Bank is liable for Carajohn's fraudulent misrepresentation concerning the BNN securities is unavailing. Neither the buyers (plaintiffs) nor the sellers (the Investor Relations and Tellerstock defendants) are alleged to have received any financing from Standard Bank, nor is the Bank alleged to have initiated the sale. There is simply no suggestion that the Bank was involved--even indirectly--in that transaction. Thus, Standard Bank cannot be liable as a primary violator for Carajohn's misrepresentation concerning the BNN shares.

### 3. *Summary of the § 10(b) and Rule 10b-5 Claims*

Because plaintiffs do not allege that they relied on the integrity of the market in deciding to purchase either the MKTB or BNN securities, they cannot

recover against Standard Bank under a market manipulation theory. Plaintiffs also fail to state a claim for primary liability against Standard Bank under a misrepresentation theory. Accordingly, Standard Bank's motion to dismiss plaintiffs' § 10(b) and Rule 10b-5 claims is granted.

### IV. Common Law Fraud

**\*10** The requirements of common law fraud are (1) false representation of a material fact; (2) intent to defraud; (3) reasonable reliance on the representation; and (4) damage caused by such reliance. *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1 F.3d 138, 140 (2d Cir.1993). In a common law fraud action alleging market manipulation, the reliance element may be satisfied by averment that the plaintiff relied on the integrity of the market. *Blech II*, 961 F.Supp. at 587 (citing *Minpeco, S.A. v. Hunt*, 718 F.Supp. 168, 176 (S.D.N.Y.1989)); *Schultz v. Commercial Programming Unlimited, Inc.*, 91 Civ. 7924, 1992 WL 396434, at \* 3 (S.D.N.Y. Dec. 23, 1992). Thus the elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b-5. *See Pits, Ltd. v. American Express Bank, Int'l*, 911 F.Supp. 710, 719 (S.D.N.Y.1996).

As explained above, the only misrepresentations alleged in the Complaint are Carajohn's statements concerning the resale of the MKTB and BNN securities. Plaintiffs' argument that Carajohn acted as the Bank's agent in making these misrepresentations is untenable, for the complaint lacks any allegation suggesting the existence of an agency relationship between the two defendants. Furthermore, because plaintiffs have not alleged that the purchases were authorized in reliance on the integrity of the market for BNN or MKTB securities, they have failed to state a fraud claim sounding in market manipulation. Plaintiffs' common law fraud claim against Standard Bank is dismissed.

### V. Negligence and Bad Faith

Finally, plaintiffs assert a claim for negligence and bad faith against Standard Bank for failing to ascertain the accuracy of Carajohn's representations concerning the MKTB and BNN securities. To state a claim for negligence, a plaintiff must allege that defendant owed her a cognizable duty of care, that the defendant breached that duty, and that the plaintiff was injured as a proximate result of the breach. *See Donohue v. Copiague Union Free School Dist.*, 407 N.Y.S.2d 874, 877 (2d Dep't), *aff'd,*

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

Page 8

418 N.Y.S.2d 375 (1978). A defendant who owes plaintiff no duty cannot be liable for negligence, even if defendant is negligent. *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F.Supp. 693, 713 (S.D.N.Y.1996) (citing *Livingston v. Gribetz*, 549 F.Supp. 238, 242 (S.D.N.Y.1982)). Similarly, a claim for bad faith depends on the existence of a duty owed by defendant to plaintiff. *Cf. Scavo v. Allstate Ins. Co.*, 657 N.Y.S.2d 193, 193 (2d Dep't 1997). Because plaintiffs have not averred that Standard Bank owed them any duty, the claims for negligence and bad faith against the Bank are dismissed.

VI. Leave to Amend

Fed.R.Civ.P. 15(a) provides that the court should grant leave to amend "freely ... when justice so requires." The Second Circuit has noted that "[w]hen a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.' ... Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground." *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir.1991) (quotations omitted) (quoting *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir.1990)). Where the possibility exists that the defect can be cured, leave to amend at least once should normally be granted unless doing so would prejudice the defendant. *See Oliver Schools*, 930 F.2d at 253.

*11 It is possible that plaintiffs could plead facts which might cure the defects in their pleadings. For example, they may be able to plead non- conclusory allegations concerning Standard Bank's participation in Carajohn's misrepresentation. Additionally, Standard Bank has not argued that it would be prejudiced by the Court's granting leave to amend at this early stage of the litigation. Standard Bank's motion to dismiss is granted with leave to amend. [FN3]

VI. Conclusion

For the aforementioned reasons, plaintiffs' claims against Standard Bank asserting (1) violations of § 10(b) and Rule 10b-5; (2) common law fraud; and (3) negligence and bad faith are dismissed with leave to amend. Any amended complaint must be served and filed no later than June 1, 1998.

SO ORDERED.

Shira A. Scheindlin U.S.D.J.

FN1. The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This provision, which has engendered spirited disagreement among the district courts of this Circuit, *compare In re Baesa Sec. Litig.*, 928 F.Supp. 238 (S.D.N.Y.1997) (following PSLRA, "motive and opportunity" is no longer sufficient to plead a strong inference of scienter), with *In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192 (E.D.N.Y.1997) ("motive and opportunity" remains sufficient to plead a strong inference of scienter under PSLRA), is not an issue in this motion.

FN2. By repeatedly alleging that Standard Bank failed to disclose certain material information, plaintiffs appear also to advance their § 10(b) claim under a theory of omission. However, a duty to disclose arises only when one party has information that the other party is entitled to know because of a fiduciary or similar relationship of trust and confidence between them. *Chiarella v. United States*, 445 U.S. 222, 230 (1980). Because plaintiffs do not allege that any fiduciary-type relationship existed between themselves and the Bank, plaintiffs cannot recover under a theory of omission.

FN3. PSLRA requires that "upon final adjudication" of certain causes of actions, including those arising under § 10(b), the court must determine whether the parties and their attorneys complied with Fed.R.Civ.P. 11(b). 15 U.S.C. § 78u-4(c)(1); *see Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.*, 97 Civ. 6601, 1997 WL 769378 (S.D.N.Y. Dec. 12, 1997). As dismissal with leave to amend does not constitute a final adjudication of an action, *cf. Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 650 (2d Cir.1987), I need not make such a determination at this time.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 90,207
**(Cite as: 1998 WL 205338 (S.D.N.Y.))**

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works