## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHERRY SCHNALL, Individually and On Behalf of All Others Similarly Situated, ) ) ) **Plaintiffs,** ) ) **v.** ) ) ANNUITY AND LIFE RE (HOLDINGS), LTD., XL CAPITAL, LTD., LAWRENCE S. DOYLE, FREDERICK S. HAMMER, JOHN F. BURKE, WILLIAM W. ATKIN, BRIAN O'HARA, AND MICHAEL P. ESPOSITO, JR., ) ) ) ) ) ) ) **Defendants.** ) | Civil Action No 02 CV 2133 (EBB)  JANUARY 14, 2005 |

## JOINT DECLARATION OF CO-LEAD COUNSEL IN SUPPORT OF PROPOSED CLASS ACTION SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS AND PETITION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

Pursuant to 28 U.S.C. §1746, David R. Scott and Beth Kaswan hereby declare under penalty of perjury that the following is true to the best of their knowledge and belief:

## INTRODUCTION

1.      Our firms, Scott + Scott, LLC and Milberg Weiss Bershad & Schulman LLP, are co-lead counsel for the Class as defined below.  Our firms have participated actively in all aspects of the litigation, and we are each familiar with the facts set forth in this declaration.  We jointly submit this declaration in support of (i) the proposed settlement of a portion of this litigation consisting of $16.5 million in cash ("Settlement"), including the plan of allocation of the proceeds of the Settlement; (ii) certification of the Class for settlement purposes; and (iii) the application of Plaintiffs' counsel for an award of attorneys' fees and reimbursement of litigation expenses to be paid from the Settlement Funds.  The settlement agreement also includes a cooperation agreement by the Defendants settling this litigation against the remaining, non-settling Defendants, KPMG in Bermuda and KPMG LLP USA (collectively "KPMG").

2.      The proposed Settlement represents an extraordinary recovery for the Class. Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs in this action (the "Action") respectfully request that this Court grant final approval of the Settlement with Defendant Annuity and Life Re (Holdings) Ltd. ("ANR"), Defendant XL Capital, Ltd. ("XL Capital") and Individual Defendants Lawrence S. Doyle, Frederick S. Hammer, John F. Burke, William W. Atkin, Brian O'Hara and Michael P. Esposito, Jr. (collectively, the "Settling Defendants").  The Settlement partially resolves a lawsuit over whether ANR misled investors about the problems and risks associated with its largest annuity reinsurance contract and about its earnings on that contract.  Plaintiffs allege that ANR failed to properly reserve for policyholder liabilities – and thus failed to disclose that its earnings on its dedicated investments did not cover those liabilities, or its costs.

3.      As further described below, Plaintiffs ability to collect a substantial judgment in this case is significantly imperiled by the precarious financial condition of ANR.  The Settlement amount far exceeds the maximum recoverable amount of ANR's $10 million directors and officers ("D&O") insurance policy, which is first subject to payment of the litigation expenses to defend this case.  Because of the complex and technical issues requiring expert support, the defense costs should this case proceed to trial could easily have exhausted the D&O policy.  Moreover, because of the settlement offset provisions of the PSLRA, 15 U.S.C. §78u-4(f)(7), Plaintiffs risked obtaining any recovery from XL Capital (who was sued only as a control person under Sec. 20(a), 15 U.S.C. §78t(a)) if it was not included within the current settlement.

4.      The Settlement was entered into after extensive motion practice, informal discovery, retention of and consultation with a series of actuarial, accounting and economic experts to evaluate liability and damages issues and mediation with a retired U.S.D.C. judge, the

Hon. Nicholas Politan, who recommended the proposed settlement terms.  There remained

serious risks on the merits and to establishing damages in prosecuting the action further,

including establishing:

- What actuarial standards and Generally Accepted Accounting Principles ("GAAP") were applicable to this case;

- That Defendants misstated their financial statements in violation of these actuarial standards and GAAP;

- That each of the Defendants sued under §10b and Rule 10b-5 acted with scienter;

- That the alleged false statements caused Plaintiffs' losses; and

- The amount of damage to the class.

Each of these issues were vigorously disputed.  For their claims against XL Capital, Plaintiffs

would also have had to establish control person liability.  Many of these issues would have been

the subject of a "battle of experts" – plus the uncertainties, expense and delay of post-trial

motions and likely appeals.  Under these circumstances, the $16.5 million recovery for the Class

represents an outstanding result and should be approved by the Court.

     5.     This declaration also addresses Plaintiffs' proposed Plan of Allocation.  The Plan

of Allocation, which is set forth fully in the Notice of Pendency of Class Action and Proposed

Settlement With Certain Defendants, Motion For Attorneys' Fees and Settlement Fairness

Hearing (the "Notice") that has been mailed to members of the Class, provides for the

distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability

and damages.  As this is a reasonable and rational distribution, the Court should approve the

proposed Plan of Allocation.

     6.     We submit this declaration in support of certification of the Class for settlement

purposes.  In its October 6, 2004 Amended Order, this Court preliminarily certified the Class, as

defined below, for settlement purposes. Because the Class adequately satisfies all the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance of common issues and superiority, the Court should confirm its certification of the Class.

7.    Finally, we submit this declaration in support of the application by Plaintiffs' counsel for an award of attorneys' fees in the amount of 33 1/3% of the Settlement Funds and reimbursement of $194,855.37 in litigation expenses, including $3,150 of expenses personally expended by Lead Plaintiff Midstream Investments Ltd. investigating the claims and consulting with Bermuda counsel. Plaintiffs' counsel worked on an entirely contingent fee basis for nearly two years. Counsel shouldered the risk of committing significant resources to the litigation, notwithstanding the uncertainty as to whether the litigation would succeed. Counsel's efforts have produced an enormously beneficial result for the Class. As discussed below, the requested fee falls within the parameters recognized as appropriate in federal securities class actions such as this, regardless of whether the proposed fee is evaluated as a percentage of the amount recovered through counsel's efforts or as a multiple of counsel's lodestar.

8.    For the reasons discussed below, we respectfully submit that the Settlement is outstanding and worthy of immediate approval, that the proposed Class should be certified for settlement purposes, that the proposed Plan of Allocation is equitable and just, and that the requested fee should be awarded, with expenses. The relevant law supporting the approval of the Settlement and requested fee is set forth in the accompanying Memorandum of Law in Support of Final Approval Of Proposed Class Action Settlement, Certification Of Settlement Class And Petition For Award Of Attorneys' Fees And Reimbursement Of Expenses.

## FACTUAL BACKGROUND OF THE LITIGATION

9.      Lead Plaintiffs Communication Workers of America and Midstream Investments,

Ltd. ("Plaintiffs") maintain this class action on behalf of all persons and entities who purchased

shares of ANR securities between March 15, 2000 and November 19, 2002 inclusive (the "Class

Period"), and who were damaged thereby (the "Class").[1]

**B.      Background Of ANR's Business And The Transamerica Contract**

10.      As a reinsurer, ANR provides insurance to other insurance companies, known as

"cedents." ANR reinsures primary insurers directly, and also sells "retrocessional" insurance,

which is reinsurance of another reinsurer.  ¶¶40-45.  ANR specializes in providing reinsurance

for two kinds of products: annuities, which are an investment vehicle typically offered by

insurance companies, and life insurance. ¶¶2, 40.  For annuities providing or "guaranteeing"

minimum fixed rates of interest to policyholders (the types of policies involved here), the

primary insurer earns its profit by investing the premiums paid by the policyholder in such a way

as to earn investment returns that exceed the ultimate payout to the policyholder.  When the

primary insurer buys reinsurance, the reinsurer then assumes part of the risk that investment

returns will not be sufficient to fund the guaranteed payouts.

11.      This lawsuit revolves around a particular annuity reinsurance contract signed by

ANR in September 1998,  ¶¶50-51, whereby ANR agreed to provide retrocessional insurance to

---

[1] Excluded from the Class are the Settling Defendants, the officers and directors of ANR and XL
Capital at all relevant times, members of their immediate families and their legal representatives,
heirs, successors or assigns, and entity in which Defendants have or had a controlling interest.
For purposes of this Settlement, the term "controlling interest" shall include any interest of 10%
or more of the common stock of any entity.  Also excluded from the Class are any putative Class
Members who exclude themselves by filing a request for exclusion in accordance with the
requirements set forth in the Notice.  Only one person, who filed a late notice, chose to exclude
himself.

a company called Transamerica Occidental Life Insurance ("Transamerica"), which itself had agreed to provide reinsurance to a primary insurer known as IL Annuity & Life ("IL Annuity"). ANR's annuity reinsurance contracts, including its contract with Transamerica, and Transamerica's contract with IL Annuity, were "modified coinsurance" arrangements. In a "modified coinsurance" structure, the primary insurer uses policyholder premiums to purchase investment assets that support the policies, and retains possession and control over these assets, but allocates a portion of those assets and their returns to the reinsurer. ¶44. The reinsurer then lists its allocable share of these investments as an asset on its own balance sheet, called "Funds Withheld at Interest," and claims its share of the investment returns as income. ¶47. For this transaction, Transamerica reinsured 80% of the annuity block of business issued by IL Annuity, and ANR reinsured 80% of Transamerica's share. Thus, in total, ANR assumed 64% of this block of business. ¶62.

12.     The underlying annuity policies that were sold by IL Annuity were part of a series called VisionMark. ¶57. Under the VisionMark annuity policies, for an up-front premium payment, policyholders could choose to "link" his or her policy to the performance of certain types of securities, and the performance of those securities would determine the ultimate interest rate earned by the policyholder earned. However, the Visionmark contracts provided that even after the policyholders were charged administrative fees, they would still never earn less than a guaranteed "fixed" minimum rate, set by state law at 3% to 3.5% annually. So, if the investments did well, the policyholders would share in the benefits. However, if the investments did poorly, the policyholders were still entitled, at surrender or when the policy annuitized, to their guaranteed minimum interest rate, calculated on a cumulative basis for the years that the policyholder's annuity policy had remained outstanding.

13.    As it turned out, nearly 70% of VisionMark annuity policyholders chose to "link" their policies to the performance of convertible bonds and, as a result, IL Annuity chose to invest 70% of policyholders' premiums paid on the policies in convertible bonds. ¶60.  Thus, pursuant to ANR's reinsurance contract with Transamerica, ANR acquired a 64% share of the earnings from, and assumed 64% of the total investment risks associated with, this convertible bond portfolio, even though the portfolio itself was managed by others.  Transamerica provided ANR with information about the performance of the investments and changes in policyholder account status, including policy surrenders, on a monthly basis.  ¶261.  During the Class Period, the Transamerica contract represented a massive share of ANR's business, accounting for between 61% and 95% of ANR's reported "Funds Withheld at Interest" asset, and, at the end of 1999, representing reported liabilities to policyholders of $1.6 billion.  ¶55.

14.    Additionally, as is typical in modified coinsurance structures, ANR assumed some of the *costs* associated with the policies that it reinsured – specifically, costs associated with brokers' commissions on those policies.  Rather than immediately reporting an expense for these costs at the time it entered its reinsurance contract with Transamerica, ANR deferred its recognition of these costs, and instead listed them as an asset on its balance sheet called "deferred acquisition costs," or DAC.  ¶47.  To accord with GAAP, these costs were to be amortized over the life of ANR's reinsurance contract, based upon a schedule of ANR's projected lifetime profits on the contract.  Thus, as ANR earned revenues on the contract each quarter, a portion of those revenues would be offset by an expense to recognize a portion of the deferred costs as an expense in that reporting period.  The amount of costs that would be recognized in each period was based upon ANR's preset schedule.

15.    At the inception of the reinsurance contract, ANR set the amortization rate at which deferred costs would be recognized as expenses. The rate was created using a variety of factors regarding ANR's performance projections for the contract, including future earnings assumptions (which were dependent on investment performance) and surrender rates. ¶47. Under GAAP, ANR was required to regularly review whether the earnings assumptions and other "pricing" factors it had used to set the amortization pattern should be changed based on its actual experience under the contract, and to modulate the speed of this amortization and the recognition of expense based on the updated assumptions. If, based upon the revisions to the pricing factors, it appeared that the projected lifetime earnings on the contract would not be sufficient to cover the remaining deferred costs, ANR was required to recognize the unrecoverable costs as an immediate expense. ¶47. The process of determining whether the deferred costs will be offset by projected profits is called "loss recognition testing," and ANR asserted in its financial statements that it performed such tests every quarter. ¶¶47, 72, 109.

C.    **The Transamerica Contract Is In A Loss Position Almost From Its Inception**

16.    As explained above, because policyholders were guaranteed returns of 3.5% regardless of any fees otherwise charged for the administration of their policies (except for surrender fees), the assets supporting the policies needed to perform at a rate well above 3.5% to permit ANR to recover the deferred acquisition costs, and its own operating costs, plus earn a profit. ¶¶56-57. And, as ANR would reveal at the end of the Class Period, because policyholders were charged administrative fees as high as 2.75% per year, the assets needed to perform at rates above 6.25% to cover the 3.5% guaranteed interest. However, during the Class Period, the Funds only performed above 6.25% in a *single quarter* — and even that performance was only possible because IL Annuity undertook an extraordinary liquidation of its investments.

¶110.  Plaintiffs have alleged that, because the Funds consistently performed so poorly, ANR experienced stunning losses which should have reported on its financial statements on an on-going basis.

17.     ANR's dire situation was aggravated by another factor —the extraordinarily high numbers of VisionMark policyholders who were choosing to prematurely cash out their policies and obtain their cash surrender value payments rather than wait until the annuity periods ran their course.  ¶67.  Beginning in mid-1999, VisionMark policyholders began surrendering their policies at alarming rates, well in excess of those ANR had projected when it had priced the contract.  When policyholders surrendered their policies and received cash, the overall base of ANR's investment assets used to fund policyholder obligations was depleted, so that even if the equity markets rebounded in the future there would be lower total gains on the Transamerica contract's investment assets to make up for past deficiencies.  ¶41.  Policyholder surrenders also imposed an immediate payment obligation on ANR, and, because the policyholders were guaranteed interest higher than the convertible bond investments had earned, ANR was forced to fund the excess payments out of its own income from other sources.  ¶42.   Plaintiffs alleged that these two factors – low investment returns coupled with high surrenders – guaranteed that the Transamerica contract was in a loss position from which it would never recover.

**D.     ANR's Failure To Timely Report Its Losses**

18.     Plaintiffs alleged that rather than report that the Transamerica reinsurance contract was generating policyholder obligations in excess of its investment earnings, ANR issued a series of false financial statements that reported *net income* on the Transamerica contract until the third quarter of 2001.  ¶¶63, 79, 128, 139.  Plaintiffs alleged that, even then, ANR failed to report the full extent of its losses.  ¶¶144, 153-154.

19.     In each of its financial statements, ANR reported the total amount of its purported liabilities to policyholders.  In every reporting period, ANR credited the policyholders, and thus increased its liabilities (and reported expense), based only upon the performance of the assets underlying the policies, less administrative charges, without regard to the 3-3.5% minimum guaranteed interest rate in the policies and required by state law.  Because investment performance of the convertible bonds was far below the minimum guaranteed interest, this practice ensured that ANR's reported liabilities and policyholder expenses were far too low, thus allowing ANR to report higher profits than it had actually earned.  Defendants dispute that GAAP required ANR to immediately recognize policyholder minimum guaranteed interest rate obligations, *see, e.g.*, ANR Answer at ¶239, and KPMG in Bermuda has made a similar argument in its memoranda in support of its pending motion to dismiss, *see, e.g.*, Memorandum of Law of Defendant KPMG Bermuda in Support of its Motion to Dismiss the First Amended Class Action Complaint, at 18-20 ("KPMG Bermuda Mem.").

20.     Moreover, when policyholders surrendered their policies and were paid their cash surrender values which included interest at the minimum guaranteed rate, ANR still failed to recognize any expense for these minimum amounts due to policyholders and which ANR had actually paid out.  ¶66.  ANR restated its financial statements to recognize these costs. ¶202.

21.     Plaintiffs alleged that, even after ANR began to acknowledge the losses inherent in the Transamerica contract, ANR continued to misstate the *extent* of the losses by using unrealistic projections for the future performance of its assets.  So, when ANR announced a $24.7 million loss in October 2001, it avoided an even larger write-down by projecting that in the coming year, the convertible bonds in the Funds Withheld at Interest would yield 10% returns, which Plaintiffs alleged was wholly unfounded.  As a result, ANR was forced to report a second

write-down of $33 million in January 2002 to acknowledge minimum interest payments it had already made and to set up a "reserve" for future payments, ¶155, and then a *third* write-down of $24 million in July 2002 when the bonds failed to perform at the unrealistic projected rate. ¶181. In its pending motion to dismiss, KPMG Bermuda contends that 10% returns were consistent with the long-term performance of a particular bond index, *see* KPMG Bermuda Mem. At 14 n.9; if the case against ANR and other Settling Defendants were to go forward to a consolidated trial with KPMG, presumably, this is a defense on which the Settling Defendants would rely, as well. The Settling Defendants have also contended that the use of the 10% projection was not so unreasonable as to demonstrate scienter.

22.     Plaintiffs also alleged that, in addition to its fraudulent financial reporting, ANR consistently misled investors with several false descriptions of the nature of its business in its SEC filings. These alleged falsehoods are detailed more fully in the Complaint, but among them, ANR inexplicably assured investors that the Funds Withheld at Interest were "not directly exposed to market risk," ¶71, despite the fact that the profitability of the massive Transamerica contract was heavily dependent on the market performance of the convertible bonds held within the Funds (and particularly the issuers' stock to which the bonds could be converted). Plaintiffs also alleged that ANR did not conduct "loss recognition" testing based on its actual experience to determine whether its deferred costs were recoverable, ¶¶72, 109, 167, an allegation that Defendants dispute, *see, e.g.*, ANR Answer ¶79(f). Defendants have also argued that in preparing their financial statements and SEC filings they relied heavily on KPMG's expertise and guidance. *See, e.g.*, John F. Burke's Memorandum of Law in Support of His Motion to Dismiss the Consolidated Amended Class Action Complaint, at 22 n.11; ANR Answer ¶¶303-305; XL Capital, O'Hara, and Esposito Answer ¶¶246, 247, 255.

23.     Documents produced by ANR in the course of informal discovery reflected that no fewer than four members of KPMG's Department of Professional Practice, as well as two of its engagement partners, repeatedly appeared before the SEC to defend ANR's accounting, before ANR ultimately determined to restate its financial reports.

24.     On November 19, 2002, ANR issued an 8-K that disclosed the problems it had been experiencing on the Transamerica contract, as well as much of the faulty accounting that it had been employing up until that time.  The Company announced that due to its inaccurate accounting, it would be required to restate all of its financial statements for 2000 and 2001, and admitted that it had not conducted loss recognition testing until the third quarter of 2001. Finally, the Company disclosed that it might soon be forced to stop writing new business.  Upon this announcement, ANR's stock price tumbled to $2.24.  In March 2003, ANR filed an amended 10-K for 2000 and 2001, and amended 10-Qs for the first three quarters of 2002, thus restating virtually all of its Class Period financial statements.  The new 10-K warned investors that there was a significant risk that ANR would be unable to continue as a going concern.  On July 2, 2003, ANR filed another amended 10-K, this time to correct the 10-K filed for 2002.  Even then, ANR warned that more financial restatements might still occur, because the Company could "provide no assurance as to whether [the SEC] will require us to make any further changes to the financial, pro forma or other information and data included in this report or in other periodic reports we have filed with the SEC." ¶220.

25.     The Complaint alleges that ANR, and its officers and directors, acted knowingly and/or recklessly in issuing ANR's false financial statements, because the errors were so fundamental, and the contract was such a huge portion of ANR's business.

**E.     XL Capital's Liability As A Control Person**

26.     Additionally, the Complaint alleges that XL Capital, an 11% shareholder of ANR, is liable as a controlling person under Section 20(a) of the Exchange Act for ANR's fraud. Plaintiffs did not sue XL Capital under §10b and Rule 10b-5 of the Exchange Act.  Judge Goettel, in his decision of March 9, 2004, agreed that Plaintiffs had adequately alleged that "XL Capital was in a position to influence and direct the activities of ANR." *Schnall v. Annuity & Life Re (Holdings) Ltd.*, 02 CV 2133 (GLG), 2004 U.S. Dist. LEXIS 4643, at *29-*30.  XL Capital is a Cayman Islands corporation with its principal place of business in Bermuda.  ANR was formed by XL and many of its top management were current or former officers of XL Capital or its subsidiaries.  Two of ANR's directors were, in fact, XL Capital's President and CEO (Defendant O'Hara), and its Chairman of the Board of Directors (Defendant Esposito).  In 1999, ANR paid a consulting firm, Inter-Atlantic Securities Corporation, $2.7 million for help with its business.  That firm had as its principals two XL Capital officials who also sat on ANR's Board: Esposito, and Robert M. Lichten, a director of one of XL Capital's subsidiaries.  Defendant Hammer was also an Inter-Atlantic principal.  XL Capital (as well as Esposito and Hammer) have adamantly denied that they exercised control over ANR, pointing out that no control can be inferred from XL Capital's status as a minority shareholder with minority representation on its Board of Directors..

27.     Unlike ANR, XL Capital financial statements reflect that it could withstand a substantial judgment in this case.  Because, however, of the PSLRA's offset provisions, if Plaintiffs settle with ANR without also settling with XL Capital, Plaintiffs face the prospect of having their claims against XL Capital severely reduced or extinguished.

## PROCEDURAL HISTORY OF THE LITIGATION

**A.     Filing of Complaints, Motions to Dismiss and Answers**

28.     After investigation of public filings with the SEC and consultation with experts,

beginning on December 4, 2002, nine class actions alleging violations of federal securities laws –

*Schnall v. Annuity and Life Re (Holdings), Ltd., et al.*, Civil Action No. 02-CV-2133 (GLG);

*Feldbaum v. Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 02-CV-2223 (GLG);

*Nadoff v. Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 02-CV-2224 (GLG);

*Bernard v. Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 03-CV-0043 (DJS);

*Madsen v. Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 02-CV-2269 (GLG);

*Bird v. Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 02-CV-2210 (RNC); *Hertzl*

*v. Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 02-CV-2211 (GLG); *Huff v.*

*Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 03-CV-0022 (SRU); and *Lassoff v.*

*Annuity and Life Re (Holdings), Ltd., et al*., Civil Action No. 03-CV-0211 (SRU) – were filed in

this Court and subsequently were consolidated under the above caption, and are hereinafter

referred to as the "Action."

29.     On February 3, 2003, four movants, including two large institutional investors --

the General Retirement System of the City of Detroit ("Detroit") and Local Union 338

Retirement Fund Board of Trustees, moved for appointment as lead plaintiff pursuant to the

PSLRA, 15 U.S.C. § 78u-4(a)(3).  The battle for lead plaintiff was hard fought with Detroit and

the other movants, but on April 3, 2003, the Court appointed Communications Workers of

America and Midstream Investments Ltd. as the lead plaintiffs and appointed their counsel, Scott

+ Scott, LLC and Milberg Weiss Bershad Hynes & Lerach LLP (now Milberg Weiss Bershad &

Schulman LLP), as co-lead counsel, finding under the PSLRA that lead plaintiffs suffered the

largest loss of all the movants.  On April 17, 2003, however, Detroit challenged lead plaintiffs'

appointment, filing a motion for reconsideration.  After extensive briefing, the Court denied the

motion for reconsideration, confirming lead plaintiffs' appointment on May 29, 2003.

30.     Plaintiffs filed the Consolidated Amended Class Action Complaint for Violations

of Federal Securities Laws on July 11, 2003 (the "Complaint"), which generally alleges, as

described in detail above, that Defendants issued false and misleading press releases and other

statements regarding ANR's earnings and financial condition during the Class Period – March

15, 2000 through November 19, 2002 – in a scheme to artificially inflate the value of ANR's

securities.

31.     The Complaint further alleges that Plaintiffs and other members of the Class

purchased ANR common stock during the Class Period at prices artificially inflated as a result of

Defendants' dissemination of materially false and misleading statements regarding ANR in

violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5

promulgated thereunder.

32.     On September 17, 2003, Plaintiffs filed a motion and supporting briefing for

partial relief from the PSLRA's discovery stay, on the ground that ANR might soon file for

bankruptcy and thus, under Bermuda law, render its documents inaccessible to Plaintiffs.

Ultimately, ANR agreed to provide documents to Plaintiffs voluntarily, as described more fully

below.

33.     On September 20, 2003, ANR filed its answer to the Complaint, denying any

liability to Plaintiffs and the Class.

34.     On October 3, 2003, Individual Defendants Burke, Hammer and Atkin each filed

a separate motion to dismiss the Complaint.  In addition, XL Capital and Individual Defendants

O'Hara and Esposito (the "XL Capital Defendants") together filed a motion to dismiss on October 3, 2003.

35.     On October 23, 2003, the Plaintiffs filed a related action, Civil Action No. 03-CV-1826, (the "KPMG Action") with a separate complaint against KPMG in Bermuda ("KPMG Bermuda") and KPMG LLP USA ("KPMG USA") (collectively, "KPMG"), alleging that they had violated the securities laws through their conduct as ANR's auditor.  (Plaintiffs also initially named KPMG United Kingdom in its KPMG complaint but upon further investigation removed it as a Defendant in filing an amended KPMG complaint.)  On January 6, 2004, the Court granted Plaintiffs' motion to consolidate the KPMG Action with the Action, without prejudice to Defendants' rights to request a separate trial at a later and more appropriate phase of the litigation.  This Settlement with the Settling Defendants does not settle any claims against KPMG or its partners, principals, employees, agents and affiliates, none of whom or which shall be released from any claims of the Plaintiffs or the Class under this Settlement.

36.     On October 24, 2003, Individual Defendant Doyle filed his answer to the Complaint, denying any liability to Plaintiffs and the Class.

37.     Plaintiffs sought and received permission from the Court to file a consolidated response to the motions to dismiss filed by Burke, by Hammer and by the XL Capital Defendants.  As Atkin's motion to dismiss was the only one to make substantially different arguments for dismissal, Plaintiffs filed a separate response to Atkin's motion to dismiss.  On November 19, 2003, Plaintiffs filed these opposition papers to the motions to dismiss.

38.     Atkin filed his reply to Plaintiffs' opposition on December 4, 2003.  On December 13, 2003, the Court denied Atkin's motion to dismiss without prejudice.  *See Schnall v. Annuity & Life Re (Holdings)*, 02 CV 2133, 2003 U.S. Dist. LEXIS 23258 (D. Conn. Dec. 13,

2003).  On January 26, 2004, Atkin filed a renewed motion to dismiss.  On March 16, 2004, Plaintiffs filed their opposition to Atkin's renewed motion to dismiss.  Atkin filed his response on April 1, 2004.  On April 15, 2004, Plaintiffs sought and received permission from the Court to file a surreply to Atkin's renewed motion to dismiss.  On April 19, 2004, Atkin filed a reply to the surreply.

39.     The XL Capital Defendants filed their reply to Plaintiffs' opposition on December 18, 2003.  On March 9, 2004, the Court denied the XL Capital Defendants' motion to dismiss . On April 8, 2004, the XL Capital Defendants filed their answer and cross-claim against KPMG. XL Capital alleged that the XL Capital Defendants were entitled to contribution from KPMG for any judgment against the XL Capital Defendants.

40.     Individual Defendant Hammer filed his reply to Plaintiffs' opposition on December 22, 2003.  On February 4, 2004, the Court denied Hammer's motion to dismiss.  On February 24, 2004, Hammer filed his answer to the Complaint, denying any liability to Plaintiffs and the Class.

41.     Individual Defendant Burke filed his reply to Plaintiffs' opposition to December 22, 2003.  On February 26, 2004, the Court denied Burke's motion to dismiss.  On April 8, 2004, Burke filed his answer to the Complaint, denying any liability to Plaintiffs and the Class.

42.     In three separate opinions, Judge Goettel denied Defendants' motions in their entirety.  *See Schnall v. Annuity & Life Re (Holdings)*, 02 CV 2133 (GLG), 2004 U.S. Dist. LEXIS 1601 (D. Conn. Feb. 4, 2004) ("*Schnall I*"); *Schnall v. Annuity & Life Re (Holdings)*, 02 CV 2133 (GLG), 2004 U.S. Dist. LEXIS 2859 (D. Conn. Feb. 22, 2004) ("*Schnall II*");  *Schnall v. Annuity & Life Re (Holdings)*, 02 CV 2133 (GLG), 2004 U.S. Dist. LEXIS 4643 (D. Conn. Mar. 9, 2004) ("*Schnall III*").  Judge Goettel stated that given the nature of the falsehoods,

Defendants' knowledge of the industry, and the size of the Transamerica contract, there was a strong inference that the Defendants acted knowingly or recklessly when they approved ANR's financial statements. *See Schnall I*, 2004 U.S. Dist. LEXIS 1601, at *22-*23; *Schnall II*, 2004 U.S. Dist. LEXIS 2859, at *25; *Schnall III*, 2004 U.S. Dist. LEXIS 4643, at *25. Judge Goettel rejected the claims of Hammer, Esposito, and O'Hara that, as outside directors, they could not be held responsible for the contents of ANR's financial statements. Instead, Judge Goettel highlighted the industry expertise of these Defendants and the interrelationships between themselves, ANR, XL Capital, and Inter-Atlantic. *See Schnall I*, 2004 U.S. Dist. LEXIS 1601, at *12-13; *Schnall III*, 2004 U.S. Dist. LEXIS 4643, at *15-*18.

43.    In response to the claim by XL Capital that it had not exercised control over ANR sufficient to subject it to 20(a) liability, Judge Goettel concluded, "based on the interrelationships" between the companies involved in this case, "Esposito and O'Hara are more akin to 'insiders' than to 'outside' directors. Accordingly, it may reasonably be inferred that Defendant XL Capital was in a position to influence and direct the activities of ANR." *Schnall III*, 2004 U.S. Dist. LEXIS 4643, at *29-*30.

**B.    Investigation of the Claims**

44.    Following their appointment on April 3, 2003, Plaintiffs conducted an extensive investigation, without benefit of formal discovery under the Federal Rules.

45.    Plaintiffs examined all of ANR's publicly-filed financial statements and analyst conference calls. Plaintiffs also examined analyst reports discussing ANR, the nature of its business, and its finances. Similar documents were studied for XL Capital, IL Annuity, Indianapolis Life Insurance Company (IL Annuity's parent corporation), and AmerUs Group (which acquired Indianapolis Life during the Class Period).

46.    Plaintiffs contacted insurance regulators in several states to obtain information about ANR's domestic reinsurance companies, IL Annuity, and Indianapolis Life.  Among other things, through these records Plaintiffs learned details about IL Annuity's investment portfolio and its disposition of that portfolio.  This information was then compared to ANR's reported income from its Funds Withheld at Interest.

47.    To assist with their analysis of these documents, Plaintiffs enlisted the aid of a forensic accountant, a consulting actuary, and an expert in insurance liabilities.  These experts researched the prevailing actuarial and accounting standards and practices during the class period, reviewed documents and filings obtained by Plaintiffs and consulted with Plaintiffs, via their counsel, in several conferences.

48.    Plaintiffs also consulted with a Bermuda attorney regarding Bermuda law and its effect on this action, including on the assets that would be available to the Class if ANR were to wind up its affairs and the effect of such a proceeding on Plaintiffs' continued access to ANR's records.

49.    In connection with settlement discussions after the Complaint was filed, ANR informally produced over 45,000 documents to Plaintiffs related to an arbitration proceeding it had instituted against Transamerica (which was ultimately resolved in Transamerica's favor), as well as certain documents concerning its communications with KPMG and with the SEC.  These documents included the arbitration testimony of key ANR executives and Defendants in this action, extensive charts of ANR's actuarial calculations on the Transamerica contract, descriptions of ANR's experiences on that contract, ANR's correspondence with Transamerica regarding the contract, and multiple drafts of ANR's SEC filings.  These documents were reviewed both by Plaintiffs and their actuarial expert.

50.    Prior to reviewing these documents, Plaintiffs negotiated a confidentiality order with ANR for the Court's approval.

51.    These documents yielded additional facts and evidence supporting Plaintiffs' claims that throughout the Class Period ANR knowingly and recklessly misstated earnings and failed to disclose the full extent of its losses on the Transamerica contract, although the documents do also show a close collaboration with KPMG in performing the actuarial computations and justifying the results to the SEC.

**C.    Settlement Negotiations**

52.    In or about October 2003, ANR's counsel initiated settlement discussions for this Action.  From the beginning, the financial problems of ANR and its need to quickly resolve this litigation in order to rehabilitate itself with its creditors has lent an urgency to the negotiations.

(a)    On December 15, 2003, Plaintiffs' counsel met with ANR's counsel in New York City to discuss resolution of the case.  As a condition to further negotiations, Plaintiffs' counsel required that ANR informally produce documents that would permit the evaluation of Plaintiffs' claims against ANR, XL Capital, the Individual Defendants and also KPMG (because of the potential effect of the settlement offset provisions of the PSLRA on remaining claims of non-settling Defendants).  An important aspect of the negotiations and settlement was and is the settling Defendants' agreement to cooperate in the continuing prosecution of this lawsuit.  This is particularly important given the difficulty of obtaining enforceable process over the settling Defendants and their records under the laws of Bermuda.  As such, a key term of the settlement provides:

> The Settling Defendants will provide reasonable cooperation to Plaintiffs' Co-Lead Counsel for the Class' remaining claims in this Action against KPMG.  Reasonable cooperation shall include the production of documents and the voluntary appearance for interview, deposition, and/or trial, on reasonable notice.

53.    During settlement negotiations, Plaintiffs consulted with a damages expert, who opined regarding the damages sustained by the class.  Counsel held numerous conferences with this expert, reviewing the Complaint, determining the methodology to be used in calculating damages and selecting key dates for which the stock price movements were considered to be statistically relevant and related to Plaintiffs' allegations of fraud, and which were used to calculate damages.

54.    Substantive settlement negotiations continued only after Defendants informally produced the 45,000 documents described above, and after their review by Lead Counsel and their experts.  While ANR and its counsel always sought a speedy resolution of this case, serious negotiations with the D&O insurer and XL Capital only began after the Honorable Nicholas Politan, a former U.S.D.C. judge in New Jersey, agreed to serve as a mediator for this Action. Plaintiffs and each of the settling Defendants provided comprehensive mediation statements to Judge Politan who then presided over a day-long mediation.  The settlement negotiations themselves were hard fought and conducted at arm's length between experienced and skilled attorneys with the able mediation expertise of Judge Politan.  The final settlement result was adopted with the strong urging of Judge Politan, who oversaw the signing of an agreement in principle at the conclusion of the mediation.  Throughout the mediation, the key factor driving the resolution was the interest of all the settling parties to avoid the further wasting of the D&O policy and to preserve the ability of ANR to contribute to the settlement and continue its rehabilitation.

**D.    Preliminary Approval Of Settlement And Mailing And Publication Of Notice Of Settlement**

55.    On October 6, 2004, the Court entered an Amended Order that preliminarily approved the Settlement and directed that Plaintiffs' counsel cause the mailing of the Notice and

the Proof of Claim and Release form to all potential Class Members identifiable with reasonable effort. The Court's Amended Order also directed Plaintiffs' counsel to cause the Summary Notice to be published in the international editions of the *Wall Street Journal* and the *Financial Times*, which counsel did on October 26, 2004.

56.     Submitted herewith is the Affidavit of Barbara Heald, the Claims Administrator, which attests that Notices have been mailed to 16,700 potential Class Members. *See* Exhibit 1. Also submitted herewith is the Affidavit of Beth Kaswan of Milberg Weiss, which attests that the Summary Notice was published on October 26, 2004, as directed by the Court. *See* Exhibit 2.

57.     The Notice informed Class Members of the terms of the Settlement, the proposed Plan of Allocation of the settlement proceeds and that Plaintiffs' counsel would apply for an award of attorneys' fees of up to 33 1/3% of the Settlement Fund and reimbursement of litigation expenses. *See* Exhibit 1.A.

58.     The Notice also provided that any objections to the Settlement, the proposed Plan of Allocation or the application for attorneys' fees and reimbursement of expenses had to be filed with the Court by December 27, 2004. Requests to be excluded from the class were also required to be served on The Garden City Group by that date. To date, no objections have been docketed with the Court, and only one class member, Andrew S. Lerner, excluded himself from the class.

## TERMS OF THE SETTLEMENT

59.     In full and complete settlement of the claims that have or could have been asserted against the Settling Defendants in this Action, and subject to the terms and conditions of the settlement agreement, the Settling Defendants have paid into escrow on behalf of Plaintiffs and the Class the cash sum of $16.5 million, which has been earning interest for the benefit of the Class (the "Gross Settlement Fund").

60.     In addition, as described above, the Settling Defendants have agreed to provide reasonable cooperation to Plaintiffs' Co-Lead Counsel for the Class' remaining claims in this Action against KPMG.

61.     The Gross Settlement Fund, less all taxes, approved costs, fees and expenses (the "Net Settlement Fund") shall be distributed as described in the proposed Plan of Allocation discussed below, to members of the Class who submit timely proofs of claim in order to participate in the Settlement.

62.     Upon the Court's approval of the Settlement, Plaintiffs and members of the Class will release and shall be enjoined from prosecuting the Settling Defendants for all claims that were or could have been asserted in this Action.

## THE PLAN OF ALLOCATION

63.     The proposed Plan of Allocation contained in the Notice mailed to the members of the Class provides for the distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability and damages as calculated by Plaintiffs' damages consultant, Bjorn Steinholt, an economic consultant with Financial Markets Analysis. *See* Exhibit 1.A. An allocation formula only need have a reasonable and rational basis, particularly if recommended by experienced and competent class counsel. Accordingly, Plaintiffs' counsel respectfully

submit that this Plan of Allocation is reasonable and rational and should be approved by the Court.

64.    The Claims Administrator will determine each "Authorized Claimant's" *pro rata* share of the Net Settlement Fund based on his or her "Recognized Claim" from transactions during the Class Period.   Transactions resulting in a gain are not included in the calculation of a Recognized Claim.

65.    For purposes of the Settlement, "Recognized Claims" will be calculated as follows:

(a)    For shares of ANR common stock purchased during the Class Period and still owned as of the close of trading on November 19, 2002, "Recognized Claim" shall be the Plaintiffs' Contention of Alleged Inflation ("PCAI") per share on the date of purchase as shown on Schedule 1 of the Settlement Notice ("Schedule 1") for the date of purchase.  *See* Exhibit 1.A.

(b)    For shares of ANR common stock purchased during the Class Period and sold at a loss on or before the close of trading on November 19, 2002, "Recognized Claim" shall be the **lesser of (x)** the Purchase Price Paid less the Sale Proceeds received; or **(y)** the PCAI per share on the date of purchase (as shown on Schedule 1 for the date of purchase), less the PCAI per share on the date of sale (as shown on Schedule 1 for the date of sale).

(c)    To the extent a Claimant had a gain from his, her or its overall transactions in ANR common stock during the Class Period, the value of the Recognized Claim will be zero. To the extent that a Claimant suffered an overall loss on his, her or its overall transactions in ANR common stock during the Class Period, but that loss was less than the Recognized Claim calculated above, then the Recognized Claim shall be limited to the amount of the actual loss.

66.     Based on calculations of Plaintiffs' damages consultant, Plaintiffs' Co-Lead Counsel prepared the Plan of Allocation and the "Recognized Claim" formulae in such a way as to fairly allocate the recovery among Class members in accordance with Plaintiffs' theories of damages in the Action.  Thus, as set forth in detail in the Plan of Allocation, with respect to common stock purchases, a Claimant's Recognized Claim is based upon Plaintiffs' contention of the estimated artificial inflation in the price paid for shares of ANR common stock.  This estimated inflation is the excess amount that Class members allegedly paid, over fair market value, for their stock.  To the extent that a Class member sold the common stock at a still inflated price, the Recognized Claim is reduced under the Plan of Allocation.  The alleged amount of artificial inflation for ANR common stock and for each day during the Class Period is set forth in Exhibit 1.A.  The formulae and the inflation table takes into account the limitations on damages imposed under the PSLRA.

67.     Under the Plan of Allocation, checks will be distributed to Authorized Claimants after the Court has finally approved the Settlement and after all claims have been processed.  If any funds remain in the Net Settlement Fund one (1) year after the checks are distributed, the balance will first be re-distributed to qualifying Class Members who have cashed their checks and who would receive at least $10.00 from such redistribution, after payment of any unpaid fees or expenses related to such redistribution.  If any funds remain after redistribution, they  will be contributed to non-sectarian, not-for-profit, 501(c)(3) organizations designated by Plaintiffs' Co-Lead Counsel.

68.     Accordingly, Plaintiffs' counsel submit that the proposed Plan of Allocation has a reasonable and rational basis and should be approved by the Court.

## CLASS CERTIFICATION

69.     The Court's October 6, 2004, Amended Order preliminarily certified the Class for settlement purposes and approved the procedures for notifying the Class about the Settlement as well as the content of the notice materials.  For the reasons set forth below, the Court should confirm its prior conclusions.

**A.     Notice To The Class Was Adequate**

(1)     Adequacy Of The Notice

70.     Conformity with the requirements of Rule 23(c)(2) fulfills the due process mandate. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Thus, for opt-out class actions like this one, due process and the Federal Rules require individual notice only to "all class members whose names and addresses may be ascertained through reasonable effort." *Id*.; *accord* Fed. R. Civ. P. 23(c)(2)(B); *In re NASDAQ Market-Makers Antitrust Litig*., 94 Civ. 3996 (RWS), 1999 WL 395407, at *2 n.3 (S.D.N.Y.  June 15, 1999) (no requirement to notify each and every class member individually).

71.     The Garden City Group, Inc. ("Garden City"), the Claims Administrator for the Settlement, administered the mailing of individual notice by first-class mail to all reasonably locatable Class Members at their last-known addresses. Garden City contacted ANR's transfer agent and requested the most recent addresses for all ANR shareholders of record.  *See* Exhibit 1, ¶¶3-6.]  As of January 13, 2005, Garden City had mailed a total of 16,700 packets of individual notice materials.  *Id*.

72.     In addition to the mailing of individual notice to 16,700 individuals or entities, Beth Kaswan arranged for publication of the Summary Notice Of Pendency Of Class Action, Proposed Partial Settlement And Settlement Hearing ("Summary Notice") in the international editions of the *Wall Street Journal* and *Financial Times* on October 26, 2004.  *See* Exhibit 2.

73.     These procedures collectively satisfy Rule 23(c)(2)(B)'s requirement that individual notice be sent to all potential Class members identifiable through reasonable effort. *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig*., 302 F. Supp. 2d 180, 185-86 (S.D.N.Y. 2003) (due process satisfied by mailing approximately 30,000 notice packets to all reasonably identifiable persons who purchased securities during class period and by publishing summary notice in The New York Times ); *see also, e.g., In re "Agent Orange" Prod. Liab. Litig*., 818 F.2d 145, 167-69 (2d Cir. 1987) (approving letter notice to reasonably identifiable class members, supplemented by "various forms of substitute notice," including publication in various media); *In re Prudential Sec. Inc. Ltd. P'ships Litig*., 164 F.R.D. 362, 368 (S.D.N.Y. 1996) (approving individual notice to class members "whose address could reasonably be located" and summary notice published twice in national editions of the Wall Street Journal, New York Times, and U.S.A. Today ), *aff'd mem*., MDL No. 1005, 107 F.3d 3, 1996 WL 739258 (2d Cir. Dec. 27, 1996).

(2)     Content of the Notice

74.     The content of the notice – whether mailed directly to class members or communicated by publication – also satisfied Rule 23, due-process norms, and the PSLRA.  Rule 23(c)(2)(B) specifies certain information that a class notice in a Rule 23(b)(3) action must contain, including (i) the nature of the case, the class definition, and the claims, issues, or defenses in the action, (ii) class members' right to exclude themselves from the class, (iii) the binding effect of a class judgment on all class members who do not request exclusion, and (iv) class members' right to object to the partial settlement and appear through counsel. The PSLRA contains additional requirements applicable to the securities action. 15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7). The notice must contain:

27

A.   Statement of recovery – the amount of the settlement determined in the aggregate and on an average per share basis;

B.   Statement of potential outcome of case – the amount of damages per share recoverable if Plaintiffs were to prevail on every claim. If the parties are unable to agree on damages, a statement concerning the issues on which the parties disagree;

C.   Statement of attorneys' fees – statement of fees and costs to be applied for in the aggregate and on a per share basis;

D.   Identification of lawyers' representatives – the name, telephone number, and address of counsel available to answer questions; and

E.   Reasons for settlement – a brief statement explaining the reasons why the parties are proposing the settlement.

*In re Indep. Energy Holdings*, 302 F. Supp. 2d at 184. The notice also must include a cover page summarizing the required information. 15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7)(A). The notice provided to the Class in this case satisfies all the foregoing requirements.  *See* Exhibit 1.A.  The notice clearly informed the Class of the relevant aspects of the Action and the partial settlement, including:

A.   The nature of the case, a statement of the parties' respective claims and defenses, the background of the settlement, and how the settlement funds will be allocated if the settlement is approved;

B.   Class members' right to exclude themselves from the securities settlement class, to object to any aspect of the settlement, and to appear at the fairness hearing--and the processes and deadlines for doing so; and

    C.   The binding effect of any judgment on all persons who do not exclude themselves from a class, and the impact on class members if the settlement is approved.

Consistent with the PSLRA's requirements, the notice also:

    A.   set out the amount of the settlement and the aggregate recovery per share, and provided the Plan of Allocation;

    B.   stated that the parties disagree on the amount of damages to which class members would be entitled, and the nature of that disagreement;

    C.   stated the amount of attorneys' fees and costs sought;

    D.   provided the name, address, and telephone number of lead counsel for the various classes; and

    E.   explained why the parties have proposed a settlement, including the risk that depletion and potential unavailability of insurance funds could defeat Plaintiffs' ability to collect any judgment.

75.    In addition, the notice provided a toll-free telephone number to call for more information. The Summary Notice – published on October 26, 2004 – also contained information required by Rule 23, the PSLRA, and due process, and provided a toll-free number and website for Class Members to call for the full individual notice.

76.    Thus, these notices provided sufficient information for the Class to understand the proposed partial settlement and their options. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y.1997) (settlement notice adequate where "level of detail apprises the class members of the salient terms of the settlement and affords them a reasonable opportunity to present any objections."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F.

Supp. 2d at 184 (approving notice where information required by PSLRA was found partly in individual notice and partly in summary notice).

77.    Accordingly, the Court should find the form and substance of the notice disseminated to the Class proper and adequate.

**B.    Certification Of The Settlement Class Is Proper**

(1)    Numerosity, Commonality and Typicality

78.    The Class meets the numerosity, commonality and typicality standards.  The numerosity requirement is met when "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The Second Circuit presumes that the numerosity requirement is met when the number of class members exceeds 40.  *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Smellie v. Mount Sinai Hosp.*, 03 Civ. 0805 (LTS) (DFE), 2004 U.S. Dist. LEXIS 24006, at *11 (S.D.N.Y. Nov. 29, 2004).  Throughout the Class Period, ANR had between 25,499,999 and 26,106,328 shares of common stock outstanding, and based on ANR's transfer records 16,700 notices were sent to potential members of the Class who purchased ANR common stock during the Class Period.  Thus, the numerosity requirement is satisfied.  *See, e.g.*, *In re Global Crossing Sec. and ERISA Litig.*, 02 MD 1472 (GEL), 2004 U.S. Dist. LEXIS 23946, at *48 (S.D.N.Y. Nov. 24, 2004).

79.    In addition, there are substantial questions of law and fact common to all members of the Class, including whether Defendants made misrepresentations and omissions during the Class Period, whether the alleged misrepresentations and omissions during the Class Period were material, and whether Defendants acted with the requisite scienter.  Securities fraud cases generally meet Rule 23(a)(2)'s commonality requirement. *See In re Oxford Health Plans, Inc., Sec. Litig.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000) ("Where the facts as alleged show that

Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met").

80.     Further, the Plaintiffs' claims are typical of the claims of other members of the Class because they purchased ANR securities during the period of alleged price inflation and thus have alleged damages similar to other members of the Class.  Typicality exists where the "claims of representative plaintiffs arise from [the] same course of conduct that gives rise to claims of the other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives."  *Oxford Health Plans*, 191 F.R.D. at 375. Indeed, when "the same [alleged] unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). Here, the Plaintiffs' and the Class Members' claims arise from the same alleged course of conduct and are based on the same legal theories.

(2)     Adequacy of Representation

81.     Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court must evaluate adequacy of representation by considering (i) whether the class representatives' claims conflict with those of the class and (ii) whether class counsel is qualified, experienced, and generally able to conduct the litigation. *Oxford Health Plans*, 191 F.R.D. at 376. Both standards are met here.

82.     There is no conflict between the class representatives and the other class members. All share the common goal of maximizing recovery.  Plaintiffs are members of the Class who suffered the same type of injury as the other members of the Class (*i.e*., economic

damages) and are represented by preeminent securities class action lawyers.  Further, Plaintiffs retained counsel with extensive experience in complex securities class-action proceedings in this Court and in other federal courts throughout the United States.  Additionally, the manner in which the settlement was negotiated satisfies any concerns that unnamed class members have been inadequately represented.  Thus, the interests of all members of the Class were represented adequately by Plaintiffs and their counsel.

(3)    Predominance of Common Issues And Superiority

83.    Certification of a class under Rule 23(b)(3) requires that common issues predominate over individual issues and that the class action mechanism is superior to the other methods of adjudicating the controversy.  Both of these requirements are satisfied.

84.    The predominance inquiry focuses on the existence of common issues.  As the Supreme Court recognized in *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997), "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  *Id.* at 625.  In this case, the issues of materiality, causation and scienter are common to all the members of the Class and clearly predominate over any individual issues. Further, resolution of this case through a class action is far superior to litigating thousands of individual claims where the expense for a single investor pursuing a separate action could exceed the individual's loss.  *Phillips Petroleum v. Shutts*, 472 U.S. 797, 809 (1985).

**EVALUATION OF THE PROPOSED SETTLEMENT**

85.    Co-Lead Counsel respectfully submit that the substantive terms of the Settlement and the method used to arrive at the Settlement, as well as the proposed Plan of Allocation are fair, reasonable and adequate and should be approved by the Court.

86.    The factors in this Circuit to be considered in evaluating the Settlement are: (i) the complexity, expense and likely duration of the litigation; (ii) the reaction of the class to the

settlement; (iii) the stage of the proceedings and the amount of discovery completed; (iv) the

risks of establishing liability; (v) the risks of establishing damages; (vi) the risk of maintaining

the class action through trial; (vii) the ability of the defendants to withstand a greater judgment;

(viii) the range of reasonableness of the settlement funds in light of the best possible recovery;

and (ix) the range of reasonableness of the settlement funds to a possible recovery in light of all

the attendant risks of litigation. When assessed in light of the applicable criteria, the Settlement

is fair, reasonable and adequate and should be granted final approval.

**A.    The Risks Of Continued Litigation**

87.    Plaintiffs still had to overcome likely motions for summary judgment. Moreover,

trial of this case would have proven to be complex, expensive and time-consuming. There were

significant risks in proceeding with a trial of Plaintiffs' claims, requiring complex, fact-intensive

analyses of such issues as accounting treatment of a retrocessional annuity insurance contract for

universal-life type and investment-type policies, accounting treatment for convertible bonds,

actuarial standards for projecting expected profits associated with such a contract, the accuracy

and materiality of many different financial statements, and the conduct and state of mind of each

of the Individual Defendants.

88.    For instance, Plaintiffs had to show that ANR's accounting treatment of the

Transamerica contract was not a product of reasonable choices among accounting alternatives.

Defendants contend that most of their accounting for the Transamerica contract was proper;

because "GAAP does not prescribe a fixed set of rules, but rather represent the range of

reasonable alternatives that management can use," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154,

159 n.4 (2d Cir. 2000), Plaintiffs faced significant risks in attempting to establish that

Defendants' accounting was imporper. KPMG in Bermuda in its memorandum in support of its

motion to dismiss the complaint has argued strenuously for the application of different actuarial standards and accounting principles. *See* KPMG Bermuda Mem. at 18-20; Reply Memorandum of Law of Defendant KPMG Bermuda in Support of its Motion to Dismiss the First Amended Class Action Complaint, at 8-9.

89.     Plaintiffs also had to show that ANR's publicly-announced projected future results were not sheltered by the special legal protections for issuers who make predictions of future corporate performance, including the PSLRA's "safe harbor" for forward-looking statements, 15 U.S.C. §78u-5, and the judicially-created "bespeaks caution" doctrine, *see Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

90.     Plaintiffs also had the heavy burden of persuading a jury that ANR's misstated financial results were fraudulently rather than merely erroneously issued. Defendants argued that they were unaware of any overstatement of ANR's earnings and that therefore that no fraud had occurred. Defendants also claimed that any flaws in their accounting were the result of reasonable reliance on their auditor, KPMG. Documents produced by ANR reflect that ANR collaborated with KPMG in reaching its actuarial conclusions and consulted with them in reporting their financial results. The jury could find that argument persuasive, particularly because KPMG held itself out to be the expert in this area and in order to understand Plaintiffs' claims, the jury would have to consider complex testimony concerning actuarial standards of practice and calculations. Plaintiffs also bore the burden of demonstrating that those Defendants who served as ANR's outside directors were sufficiently involved with the Company so as to have been aware of any flaws in ANR's actuarial assumptions and accounting.

91.     Plaintiffs had to demonstrate that XL Capital exercised sufficient control over ANR to qualify as a "controlling person" under the securities laws, notwithstanding the fact that

XL Capital only owned approximately 11% of ANR's stock during the Class Period. A jury could easily conclude that such a small ownership interest was not sufficient to confer on XL Capital the power to influence ANR's accounting. Moreover, cases in this Circuit have reached differing results with respect to Plaintiffs' obligation to produce proof of "culpability" on the part of a control person.

92.     Plaintiffs would also have to demonstrate that the Class's losses were caused by its fraudulent accounting for the Transamerica contract, rather than other issues in ANR's accounting for which its restatements issued, its business or in the market generally. Because ANR experienced other problems during the Class Period beyond its difficulties with the Transamerica contract, Plaintiffs risks in this regard were significant.

93.     The issue of damages would also likely be vigorously disputed. Thus, there was considerable uncertainty as to what damages Plaintiffs might have been able to recover in the event of a successful trial. Even if a judgment were obtained, post-judgment appeals would have significantly delayed any recovery and collecting any judgment for United States statutory violations against ANR's assets in other countries, including Bermuda, likely would have been difficult and added to that delay. Many countries recognize only judgments for common law violations and will not give effect to those entered on statutory grounds that do not comport with their own policies.

94.     The risks to establishing the Settling Defendants' liability in this Action were also heightened by the fact that ANR is a foreign company. Thus, many of the records supporting Plaintiffs' claims were located abroad and may have been difficult to obtain, particularly if winding up proceedings were filed against ANR in Bermuda. Moreover, virtually all potential witnesses with knowledge as to ANR's operations, as well as many of the named Defendants, are

foreigners or live abroad and are beyond the subpoena power of the Court. While the Settling

Defendants would have been able to call live witnesses in support of their position, Plaintiffs

would have been forced to rely primarily on videotaped deposition testimony of Defendants and

third parties, provided that there was a mechanism to obtain depositions under the foreign laws

where they resided.

**B.     The Complexity, Expense And Likely Duration Of The Litigation**

95.     As the preceding paragraphs have shown, this Action is replete with complexity

both in establishing liability and in proving damages.  Plaintiffs would have to prove that the

market was deceived by the misstated financial statements; that ANR violated the relevant

accounting standards; that ANR's revenues and expenses were fraudulently misstated and not

just a product of corporate mismanagement, erroneous business judgment, or good faith

misapplication of relevant accounting standards; and that XL Capital exercised sufficient control

over ANR to constitute a "controlling person" within the meaning of the securities laws.

Additionally, the jury's verdict with respect to damages would depend on its reaction to the

complex testimony of experts, a reaction which at best is uncertain.

96.     Moreover, whatever the outcome of any eventual trial, inevitably appeals would

have been taken to the Second Circuit and perhaps even to the U.S. Supreme Court.  All of the

foregoing would have delayed, for years, the ability of the Class to recover.  Settlement at this

juncture results in a substantial and tangible present recovery, without the attendant risk of delay

of continued litigation through the class certification, summary judgment, trial and post-trial

proceedings.

97.     Delay was a factor strongly considered by Plaintiffs' counsel in negotiating the

proposed Settlement.  Because of its financial distress, ANR is relying on its D&O carrier,

Chubb, which issued ANR a $10 million D&O insurance policy, to fund most of its share of the Settlement. If the litigation proceeds, ANR attorneys' fees, expert expenses, and other litigation costs are likely to exhaust most, if not all, of the D&O insurance proceeds, and, without resolution of this litigation, ANR is unlikely to rehabilitate itself with its other creditors, so that a litigated judgment against ANR would be unlikely to be fully collectible, if it was collectible at all. Moreover, delay in recovery would increase Plaintiffs' counsel's time and expenses thereby reducing the availability of class funds.

98.    As a practical matter the D&O insurer was unwilling to put up any insurance proceeds without a release of all the officers and directors covered by the policy. The settlement bar provisions of the PSLRA also made it imperative that, were Plaintiffs to settle with ANR to avoid draining ANR's funds in litigation, Plaintiffs also settle with the other Defendants. The PSLRA provides that if one party settles, any judgment against remaining parties to the litigation will be reduced by the greater of (1) the amount that corresponds to the percentage of responsibility of the settling party, (2) or the amount paid by the settling party. 15 U.S.C. §78u-4(f)(7). Because XL Capital was sued only as a control person, and its liability was derivative of ANR's, had Plaintiffs settled with ANR, but not XL Capital, there was a great risk that the ANR settlement would extinguish the claims against XL Capital, or that the judgment would be substantially reduced if the jury concluded that XL Capital bore only slight responsibility for the damages to the Class. This result differs from the effect of the settlement on KPMG who is alleged to be a joint tortfeasor with ANR for its liability under §10 and 10(b)(5). For KPMG, under the PSLRA, should a judgment against it be ultimately entered, KPMG's judgment would be reduced only by the larger of the settlement payment or the settling Defendants' percentage of responsibility. *Id.*

**C.    Reaction Of The Class To The Settlement**

99.    Notice of the proposed Settlement, in substantially the form approved by the Court, was mailed to 16,700 Class Members by January 13, 2005, and summary notice was published in the international editions of the *Wall Street Journal* and the *Financial Times* on October 26, 2004.  Class Members had until December 27, 2004 to object to the Settlement.  To date, even though 16,700 notices have been mailed to members of the Class, not one Class Member has filed an objection to the Settlement, and only one class member excluded himself from the class.  The absence of any objections from any of the large number of potential Class Members who received notice in this case is further grounds for finding that the Settlement is fair, reasonable and adequate and should be approved by the Court.

**D.    Stage Of The Proceedings And The Amount Of Discovery Completed**

100.    As described above, this Action was settled only after Co-Lead Counsel had conducted extensive investigation into the Class's potential claims, thoroughly researched the applicable law of the Class's claims and Defendants' defenses, prepared and filed a detailed 296-paragraph Complaint specifying Defendants' alleged violations of federal securities laws, successfully opposed Defendants' motions to dismiss, worked with expert accounting, actuarial and damage consultants, engaged in informal discovery with ANR, analyzed the risks of continued litigation in light of the poor financial condition of ANR and the resulting collectability issues, and engaged in extensive settlement negotiations with defense counsel. Therefore, Plaintiffs and Co-Lead Counsel had sufficient information to permit them to carefully consider the adequacy of the Settlement.

**E.    The Ability Of The Defendants To Withstand Greater Judgments**

101.    ANR's financial condition was precarious throughout the litigation.  Just after achieving a settlement agreement in principle, on July 27, 2004, ANR announced that the New York Stock Exchange (the "NYSE") would suspend trading in ANR's common shares prior to the NYSE's opening on Friday July 30, 2004.  ANR further announced in its August 5, 2004 Form 8-K filing with the SEC that the NYSE applied to the SEC to delist ANR's common shares.  Even in its last quarterly Form 10Q filed in November 2004, ANR reported a third quarter 2004 net loss exceeding $3 million and an accumulated deficit of over $235 million. ANR also made the following disclosures in its Management's Discussion & Analysis ("MD&A"):

> Our company has encountered significant difficulties the last three years. In addition to reporting significant operating losses for those years, we have reduced our operations significantly through the novation, termination and recapture of many of our life and annuity reinsurance agreements.  We plan to continue to receive premiums and pay claims under our remaining reinsurance treaties; however, we are not currently underwriting any new treaties or accepting any new business from our existing treaties.  In addition, we continue to use substantial amounts of cash to fund our operations, primarily due to the significant cash outlays required under our annuity reinsurance agreement with Transamerica Occidental Life Insurance Company ("Transamerica").  If we are not able to reduce our operating expenses and negotiate the recapture or termination of our agreement with Transamerica, our cash position will continue to deteriorate.
>
> A large portion of our cash and investments is posted as collateral and therefore cannot be used to fund our operations.  We are required to post collateral for the statutory reserves ceded to us by U.S. based insurers and reinsurers.  During 2002, 2003, and a portion of 2004, we did not have sufficient available cash and investments to post colleratal, but were able to negotiate the recapture or termination of most of our reinsurance agreements during 2003.

102.    While no one can predict whether a much larger judgment entered several years from now would be collectible, the inability of Defendants to withstand a greater judgment was a significant consideration relied upon by Plaintiffs' counsel in determining to settle this case.  The

overriding consideration driving the settlement negotiations was the possibility that without a quick resolution of this litigation ANR might not be able to rehabilitate itself and contribute in any meaningful way to a recovery by the Class. Moreover, the largest practical and available source of recovery for the Class in the near future was ANR's D&O insurance policy. Given that the insurance policy was a "wasting" asset that would be used to pay the defense costs, it was clear that even if Plaintiffs were ultimately able to establish Settling Defendants' liability at trial and even if the jury accepted Plaintiffs' damage analyses, by that point the insurance policy, would in all likelihood have been substantially reduced or exhausted. Because the Defendants on Plaintiffs' fraud claims likely could not withstand a greater judgment, if one were achieved at trial, this factor strongly supports approval of the Settlement.

**F.    The Range of Reasonableness of the Settlement Funds in Light of the Best Possible Recovery and Litigation Risks**

103.    In analyzing these last factors, the issue for the Court is not whether the Settlement represents the "best possible recovery," but how the Settlement relates to the strengths and weaknesses of the case. Given the history and posture of this case, as well as the litigation risks discussed above, the Settlement provides an extraordinary recovery.

## CLASS CERTIFICATION

104.    By way of its October 6, 2004 Amended Order, this Court preliminarily certified the Class for settlement purposes. The Second Circuit has acknowledged the propriety of certifying a class solely for settlement purposes. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). In *Amchem*, the Supreme Court also held that such certification is appropriate. *See* 521 U.S. at 619-22. For class certification, even if only for settlement purposes, the requirements of Rule 23(a) (numerosity, commonality, typicality, adequacy of representation) and, as applicable to this Action, 23(b)(3) (predominance of common issues and superiority)

must be met.  Co-Lead Counsel respectfully submit that all Rule 23 requirements are met and

that the Court should confirm its preliminary certification of the Class for settlement purposes.

## THE FEE PETITION

A.    **The Requested Fee is Reasonable Under Both The Percentage And
      Lodestar/Multiplier Methods**

105.    In the notice to the class for the settlement, Plaintiffs' counsel advised that they

may request up to a fee of 33 1/3% of the Settlement.  This percentage is merited in light of the

extraordinary result obtained in this highly complex case that was negotiated under very

sensitive and difficult circumstances.  As set forth in the memorandum of law submitted in

support of Plaintiffs' counsel's fee application, the Second Circuit has held that this simple and

direct method of computing fees, which is supported by the PSLRA,[2] is available to this Court in

awarding fees in common fund cases.  However, if the Court elects also to consider the

lodestar/multiplier method in awarding counsel's fees, the appropriate information is presented

herein and also supports the full fee award.

106.    The cumulative lodestar for the services performed by all of the plaintiffs' firms

in this action is $1,862,701.25.  The requested fee, amounting to $5,499,450.00, represents a

multiple of approximately 2.95 times the lodestar, well within the norm for this type of case.

The Compendium of Plaintiffs' Counsel's Affidavits In Support Of An Award Of Attorneys'

Fees and Reimbursement of Expenses ("Compendium"), which is being filed contemporaneously

with this declaration, contains individual affidavits, affirmations or declarations for each of the

firms that worked on this case, or the complaints consolidated into this case, setting forth the

---

[2] The PSLRA, 15 U.S.C. § 78-u4(a)(6), provides:  "Total attorneys' fees and expenses awarded
by the court to counsel for the plaintiff class shall not exceed *a reasonable percentage* of the
amount of any damages and prejudgment interest actually paid to the class."  (emphasis added.)

names of the lawyers of each firm who worked on the litigation, the normal hourly rates

currently chargeable by each lawyer, the lodestar value of the time expended by attorneys and

paralegals and the disbursements and the background and experience of the petitioning firms.

107.    Pursuant to the Court's Order, all objections to the application for fees and

reimbursement of expenses had to be served and filed no later than December 27, 2004.  To date,

there has been no objection concerning the fee award.

**B.    The Results Obtained From Counsel's Efforts And The Quality Of The Work
Performed**

108.    Our firms, which acted as co-lead counsel for Plaintiffs and the Class, have great

experience in complex federal civil litigation, particularly the litigation of securities and other

class actions, and have achieved significant acclaim for their work, as set forth in the exhibits

accompanying the fee affidavits in the Compendium.  Our experience in the field allowed us to

identify the complex issues involved in this case and to formulate strategies to prosecute it

effectively.  Our reputations as attorneys able and unafraid to carry a meritorious case through to

trial gave us strong leverage in the settlement negotiations with Defendants.  We also did not

hesitate to retain (and fund the expenses) of actuarial, insurance accounting and economic

experts to prepare the complaint and evaluate the technical evidence in this case.

109.    The settlement terms already have been described in detail.  The Settlement is an

outstanding benefit to the Class, given the tenuous financial position of ANR.  As detailed above,

there is no guarantee that Plaintiffs would have succeeded in convincing a jury that ANR's

financial results were materially and fraudulently misstated or that damages were what Plaintiffs

claimed them to be.

110.    As shown in the accompanying memorandum of law, determination of a fair fee

must include consideration of the contingent nature of counsel's retainer and of the extent of the

difficulties and uncertainties which were overcome in obtaining the Settlement.  Here, counsel agreed to prosecute this case on an entirely contingent fee basis.  We received no retaining fees from our clients.  Counsel knew from the outset that they might expend many millions of dollars worth of attorneys' time and out-of-pocket expenditures in pursuing this action on behalf of the Class, yet receive no compensation whatsoever if the action ultimately proved unsuccessful.  In addition, contingent fee litigation also carries the risk that, even if successful, the Class might receive an amount smaller than needed to provide a fully compensatory fee to counsel.  Professionals in the firms representing the Class collectively expended over 5,473 hours with no assurance of success.  Counsel also was unassisted by any government investigation or prosecution in reaching the Settlement, and, as described above, was able to achieve the excellent results for the Class only through meticulous and painstaking review of detailed and arcane financial materials.

111.    This declaration and the memoranda in support of the proposed Settlement and the fee application describe the substantial risks of litigation.  Those same difficulties also constituted risks that counsel might never be paid for their efforts.

**C.      Risks Of Contingent-Fee Litigation Generally**

112.    There are numerous cases where Plaintiffs' counsel in contingent fee cases such as this, after expenditures of thousands of hours and significant out-of-pocket expenditures, have received no compensation whatsoever.  Often the Plaintiffs' counsel who take on the most difficult cases and are among the most diligent members of the Plaintiffs' bar are the most at risk.  The fact that Defendants and their counsel know that the leading members of the Plaintiffs' bar are actually able to, and will, go to trial gives rise to meaningful settlements such as this.

The losses suffered by Plaintiffs' counsel in other actions where insubstantial settlement offers

are rejected, and Plaintiffs' counsel ultimately receive little or no fee, should not be ignored.

113.    Plaintiffs' counsel know from personal experience that despite the most vigorous

and competent of efforts, attorneys' success in contingent litigation, such as this, is never

assured.

114.    For instance, one of the co-lead counsel, Milberg Weiss, lost a large securities

fraud class action in *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997), when the

Court of Appeals reversed a jury verdict of $81 million against an accounting firm after a 19-day

trial in Jacksonville, Florida.  The Court of Appeals reversed on loss causation grounds and

entered judgment for the defendant.  Other such cases lost on or after trial include *In re Health

Management, Inc. Sec. Litig*., No. 96-CV-889 (ADS)(E.D.N.Y. 1999)(jury verdict for auditor in

securities case); *In re Biogen Sec. Litig*., No. 94-12177-PBS (D. Mass 1999)(jury verdict for

defendants); *Bentley v. Legent Corp*., 849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom*, *Herman

v. Legent Corp*., 50 F.3d 6 (4th Cir. 1995)(directed verdict in favor of defendants after plaintiffs'

presentation of its case to the jury); *Randol v. Thomas*, 772 F.2d 244 (6th Cir. 1985)(summary

judgment and jury verdict in favor of defendants in action challenging Marathon/U.S. Steel

merger); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987)(directed verdict for defendants after

five years of litigation; affirmed on appeal); *Krinsk v. Fund Asset Mgmt., Inc*., 715 F. Supp. 472

(S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989)(verdict for defendants after trial).

115.    An example of how risky, and indeed difficult, this type of litigation is, also is

exemplified by the history of *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990).  In that

case, after 11 years of litigation, a jury verdict in plaintiffs' favor and a First Circuit decision

sustaining the plaintiffs' cause of action, the plaintiffs' case was dismissed in an en banc decision and the plaintiffs recovered nothing.

116.    Many other cases are lost on summary judgment after thousands of hours have been invested in successfully opposing the motions to dismiss and pursuing discovery. *E.g.*, *Freedman v. Value Health, Inc.*, 34 Fed. Appx. 408 (2d Cir. 2002)(affirming district court's decision granting defendants' motion for summary judgment); *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997)(same); *Searls v. Glasser*, No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994), *aff'd*, 64 F.3d 1061 (7th Cir. 1995)(same); *In re Clorox Co. Secs. Litig.*, 238 F. Supp. 2d 1139 (N.D. Cal. 2002)(granting summary judgment in favor in of defendants); *In re Convergent Techs. Sec. Litig.*, 721 F. Supp. 1133 (N.D. Cal. 1988)(summary judgment against plaintiffs following five years of litigation), *aff'd*, No. 90-15156, 1991 U.S. App. LEXIS 19733 (9th Cir. Aug. 27, 1991), *amended*, 948 F.2d 507 (9th Cir. 1991).

117.    The risks of contingent litigation also are highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after a great deal of time and effort have been expended on the case.  For example, when the United States Supreme Court eliminated a causes of action for aiding and abetting under Section 10(b) of the Securities Exchange Act of 1994, *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), many courts then dismissed long pending cases that otherwise stated a proper cause of action at the time they were brought.

118.    Clearly, there is no truth to the argument that a large fee is guaranteed by virtue of the commencement of a class action.  It takes hard diligent work by skilled counsel to develop facts and theories which either will persuade defendants to enter into serious settlement negotiations, or alternatively, will succeed at trial.

119.    Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

120.    Lawsuits such as those described above are exceedingly expensive to successfully litigate.  Outsiders often focus on the gross fee awarded, but ignore the fact that those fees are used to fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal, state and local authorities, and when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee awarded appears.  The market rate for contingent fees in these kinds of cases is commonly 33 1/3% and is often as high as 40%.

121.    In understanding the general risks of contingent litigation, it is also necessary to analyze the economics of running a law office.  It is generally accepted that a law office's overhead is well in excess of 50% of its gross billing fees.  This amount is necessary to cover such expenses as rent, associate, clerical and staff salaries, insurance and telephones, among other things, which expenses must be paid whether or not a fee ultimately is awarded.  In order to meet the developing standards of the PSLRA, Milberg Weiss also funds a large investigative and forensic accounting staff.

122.    Another factor is the contingent fee attorney's loss of the use of fees earned, but unpaid, during the course of litigation.  Lawyers representing paying clients receive their fees regularly and immediately.  Those fees are then available to them for investment, which in turn creates additional revenues for them over time.  A contingent fee lawyer loses the use of that money.

123.    Plaintiffs' counsel have the option available to them of devoting more time to cases where they would be paid by clients on an hourly basis.  For example, over the last several

years, Milberg Weiss has represented IBM, CBS, Inc., the Federal Deposit Insurance Corp. and

the City of San Jose, among others, and Scott + Scott has represented companies such as Collins

& Aikman, Gliatech, Inc., and Global Wire Group, and each of these clients paid the firms'

standard hourly rates.  The time devoted to a contingent fee case like this one could otherwise be

spent on behalf of clients who would guarantee a steady stream of income, thereby depriving

persons such as members of the Class of any meaningful opportunity to seek redress for their

losses.

124.    Courts have repeatedly held that it is in the public interest to have experienced

and able counsel enforce the securities laws and regulations.  The SEC, a vital but understaffed

government agency, does not have the budget or staffing to ensure complete enforcement of the

securities laws.  If this important public policy is to be carried out, the courts should award fees

which will adequately compensate Plaintiffs' counsel, taking into account the enormous risks

undertaken with a clear view of the economics of the situation.

**D.    Standing And Expertise Of Plaintiffs' Counsel**

125.    The expertise and experience of counsel is another important factor in setting a

fair fee.  The expertise and experience of Plaintiffs' counsel is set forth in the Compendium at

Exhibits A and B.  Plaintiffs' counsel are experienced and skilled practitioners in the securities

litigation field, responsible for numerous settlements as well as legal decisions that enable

litigation such as this to be successfully prosecuted.

**E.    Standing And Caliber Of Opposition Counsel**

126.    The quality of the work performed by counsel for the Plaintiffs in attaining the

Settlement also may be evaluated, in part, in light of the quality of the opposition.  For this case

defense counsel were both numerous and highly skilled.  Counsel for Defendants – Day, Berry &

Howard LLP and Drinker Biddle & Reath LLP on behalf of Defendant ANR, the law firms of

Cahill Gordon & Reindel LLP and The Law Offices of Thomas W. Andrea, Esq. on behalf of the

XL Capital Defendants, the law firm of Cummings & Lockwood LLC on behalf of Defendant

Lawrence S. Doyle, the law firms of Day, Berry & Howard LLP, Drinker Biddle & Reath LLP

and McCarter & English, LLP on behalf of Defendant Frederick S. Hammer, the Law firms of

Carmody & Torrance LLP, Morgan, Lewis & Bockius LLP, Day, Berry & Howard LLP, and

Drinker Biddle & Reath LLP on behalf of Defendant John F. Burke, and the law firm of Pullman

& Comley, LLC on behalf of Defendants William W. Atkin – are highly regarded and

experienced in defending actions such as these, and senior litigation partners headed teams from

each of these firms in vigorously defending against this action.  Plaintiffs' counsel were thus

confronted with formidable opposition.

127.    In resisting Defendants' motions to dismiss, Plaintiffs faced several volumes of

legal memoranda, declarations and exhibits.  The caliber of the legal work performed by the

defense attorneys was superior.  In the face of formidable opposition, Plaintiffs' counsel were

able to develop their case sufficiently to press Defendants into a substantial settlement in this

action.  The Settlement clearly reflects Defendants' awareness of class counsel's ability and

readiness to continue prosecuting this case if a fair settlement could not be achieved.

**F.    Plaintiffs' Counsel Should Be Reimbursed For The Expenses They Have Incurred**

128.    The reimbursement of expenses to counsel who create a common fund is

appropriate.  Plaintiffs' counsel have incurred unreimbursed expenses in the amount of

$194,855.37 for which they seek reimbursement.  A breakdown of the aggregate expenses

incurred by category is contained in the Compendium.  Much of this amount was expended for

Plaintiffs' experts.  These expenditures were critical to Plaintiffs' success in achieving the proposed Settlement.

129.    Lead Plaintiff Midstream Investments also seeks reimbursement of $3,150 in litigation expenses, including expenses related to investigating the claims and consulting with Bermuda counsel.

130.    In view of the complex nature of these actions, the expenses incurred by Plaintiffs' counsel are reasonable and necessary and were reasonably related to the pursuit of the interests of the Class.  Accordingly, Plaintiffs' counsel should be reimbursed for their expenses incurred in connection with this action.

## CONCLUSION

131.    In view of the substantial cash benefit conferred on the Class, the risks of this litigation, the significant effort of counsel, the quality of the work performed, the contingent nature of the fee, the complexity of the case, and the standing of Plaintiffs' counsel at the Bar, it is respectfully submitted that the Settlement of $16.5 million should be approved as fair, reasonable and adequate; that the Class be certified for purposes of settlement only; that the Plan of Allocation be approved; and that a fee in the amount of 33 1/3% of the Gross Settlement Fund, after expenses, should be awarded to counsel, together with reimbursement of litigation expenses in the amount of $194,855.37, with the award of attorneys' fees to be allocated among Plaintiffs' counsel in a fashion which, the opinion of Plaintiffs' co-lead counsel, fairly compensates Plaintiffs' counsel for their respective contributions in the prosecution of the action.

Dated:   January 14, 2005

Respectfully submitted,

**SCOTT + SCOTT, LLC**

_____
David R. Scott (ct16080)
Erin Green Comite (ct24886)
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone:     (860) 537-3818
Facsimile:     (860) 537-4432


**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**

_____
Beth Kaswan (ct21415)
Ann M. Lipton (ct25358)
One Pennsylvania Plaza
New York, NY  10119

Telephone:     (212) 594-5300
Facsimile:     (212) 868-1229

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th of January, 2005, I caused a true and correct copy of the

foregoing Joint Declaration Of Co-Lead Counsel In Support Of Proposed Class Action

Settlement, Certification Of Settlement Class And Petition For Award Of Attorneys' Fees And

Reimbursement Of Expenses to be served by first-class, postage prepaid U.S. mail on counsel of

record listed on the attached Service List.


_____
David R. Scott

**Annuity and Life Re (Holdings), Ltd. Service List**

**Attorneys for Plaintiffs**

Andrew M. Schatz
SCHATZ & NOBEL
One Corporate Center
20 Church Street, Suit 1700
Hartford, CT 06106

James E. Miller
SHEPHERD FINKELMAN MILLER &
SHAH, LLC
65 Main Street
Chester, CT  06412

Attorney Elias A. Alexiades
ATTORNEY ELIAS A. ALEXIADES
215 Church Street
New Haven, CT 06525

Beth Kaswan
MILBERG WEISS BERSHAD
 & SCHULMAN LLP
One Pennsylvania Plaza
New York, NY 10119

Marc Edelson
HOFFMAN & EDELSON
45 West Court St.
Doylestown, PA  18901

Deborah R. Gross
LAW OFFICES OF BERNARD M.
GROSS, P.C.
1515 Locust Street, Suite 200
Philadelphia, PA  19102

Arnold Levin
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106

S. Gene Cauley
J. Allen Carney
CAULEY BOWMAN CARNEY &
WILLIAMS, P.C.
P. O. Box 25438
Little Rock, AR  72221-5438

Ann M. Caldwell
CALDWEL LAW OFFICE, LLC
141 Pelham Road, Suite 300
Philadelphia, PA  19119

Curt Trinko
LAW OFFICES OF CURTIS V. TRINKO
16 West 46th Street, 7th Floor
New York, NY  10036

Donald B. Lewis
LAW OFFICES OF DONALD B. LEWIS
5 Cynwyd Road
Bala Cynwyd, PA  19004

Felix Fox
KAPLAN FOX KILSHEIMER, LLP
805 Third Avenue, 22nd Floor
New York, NY  10022

Eugene Friedman
FRIEDMAN & WOLF
1500 Broadway
New York, NY  10036

Douglas McKeige
BERNSTEIN LITOWITZ BERGER &
GROSSMAN LLP
1285 Avenue of the Americas
New York, NY  10019

Joseph Weiss
WEISS &LURIE
551 Fifth Avenue, Suite 1600
New York, NY  10176

**Attorneys for Defendants**

Gary R. Battistoni
DRINKER BIDDLE & REATH
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996

John W. Cannavino
CUMMINGS & LOCKWOOD, LLC
Four Stamford Plaza
107 Elm Street
Stamford, CT 06902

James F. Stapleton
Terence J. Gallagher
DAY, BERRY & HOWARD, LLP
One Caterbury Green
Stamford, CT 06901

Thorn Rosenthal
CAHILL GORDON & REINDEL, LLP
80 Pine Street
New York, NY 10005-1702

Lawrence W. Andrea
LAW OFFICES OF
  LAWRENCE W. ANDREA
57 North Street, Suite 313
Danbury, CT 06810

James T. Shearin
PULLMAN & COMLEY, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT  06601-7006

Michael J. Malone
KING & SPAULDING
1185 Avenue of the Americas
New York, NY  10036-4003

John R. Horvack, Jr.
CARMODY & TORRANCE
50 Leavenworth Street
P. O. Box 1110
Waterbury, CT 06721-1110

Francis S. Chlapowski
Randi B. Pincus
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue, 44th Floor
New York, NY 10178

John J. Robinson
McCarter & English, LLP
One Financial Plaza
755 Main Street, 18th Floor
Hartford, CT 06103

R. Nicholas Gimbel
MCCARTER & ENGLISH, LLP
Mellon Bank Center
1735 Market Street, Suite 700
Philadelphia, PA 19103
James H. Bicks
WIGGIN & DANA
400 Atlantic St., 7th Fl.
PO Box 110325
Stamford, CT 06911-0325
203-363-7600

Kelly M. Hnatt
Joseph T. Baio
WILLKIE, FARR & GALLAGHER
787 Seventh Ave.
New York, NY 10019-6099
212-728-8000

Frederick S. Gold
Morgan Paul Rueckert
SHIPMAN & GOODWIN
300 Atlantic St.
Stamford, CT 06901-3522
203-324-8100