akin to 'insiders' than to 'outside' directors. Accordingly, it may reasonably be inferred that Defendant XL Capital was in a position to influence and direct the activities of ANR." *Schnall III*, 2004 U.S. Dist. LEXIS 4643, at *29-*30.

On February 24, 2004, Hammer filed his answer to the Complaint, denying any liability to Lead Plaintiffs and the Class. On April 8, 2004, the XL Capital Defendants filed their answer and cross-claim against KPMG. XL Capital alleged that the XL Capital Defendants were entitled to contribution from KPMG for any judgment against the XL Capital Defendants. On April 8, 2004, Burke filed his answer to the Complaint, denying any liability to Lead Plaintiffs and the Class.

### C.   **Investigation of the Claims**

Following their appointment on April 3, 2003, Lead Plaintiffs conducted an extensive investigation, without benefit of formal discovery under the Federal Rules.

Lead Plaintiffs examined all of ANR's publicly-filed financial statements and analyst conference calls. Lead Plaintiffs also examined hundreds of analyst reports discussing ANR, the nature of its business, and its finances. Similar documents were studied for XL Capital, IL Annuity, Indianapolis Life Insurance Company (IL Annuity's parent corporation), and AmerUs Group (which acquired Indianapolis Life during the Class Period).

Lead Plaintiffs contacted insurance regulators in several states to obtain information about ANR's domestic reinsurance companies, IL Annuity, and Indianapolis Life. Among other things, through these records Lead Plaintiffs learned details about IL Annuity's investment portfolio and its disposition of that portfolio. This information was then compared to ANR's reported income from its Funds Withheld at Interest.

To assist with their analysis of these documents, Lead Plaintiffs enlisted the aid of a forensic accountant, a consulting actuary, and an expert in insurance liabilities. These experts

11

researched the prevailing actuarial and accounting standards and practices during the class period, reviewed documents and filings obtained by Plaintiffs and consulted with Lead Plaintiffs, via their counsel, in several conferences.

Lead Plaintiffs also consulted with a Bermuda attorney regarding Bermuda law and its affect on this action, including on the assets that would be available to the Class if ANR were ultimately to be subjected to a winding up proceeding and its affect on access to ANR's records.

In connection with settlement discussions after the Complaint was filed, ANR informally produced over 45,000 documents to Plaintiffs related to an arbitration proceeding it had instituted against Transamerica (which was ultimately resolved in Transamerica's favor), as well as certain documents concerning its communications with KPMG and with the SEC. These documents included the arbitration testimony of key ANR executives and Defendants in this action, extensive charts of ANR's actuarial calculations on the Transamerica contract, descriptions of ANR's experiences on that contract, ANR's correspondence with Transamerica regarding the contract, and multiple drafts of ANR's SEC filings. These documents were reviewed both by Lead Plaintiffs and their experts.

These documents yielded additional facts and evidence supporting Plaintiffs' claims that throughout the Class Period ANR knowingly and recklessly falsely reported earnings and failed to disclose the full extent of its losses on the Transamerica contract, although the documents do also show a close collaboration with KPMG in performing the actuarial computations and justifying the results to the SEC.

# SUMMARY OF THE SETTLEMENT

### D. The Settlement

The Settling Defendants have agreed to pay $16.5 million[4] in full settlement of Plaintiffs' claims. The settlement fund, less any attorneys' fees and expenses and notice, administrative and tax expenses (the "Net ANR Settlement Fund") will be distributed among those Class members who have not requested exclusion from the Class and who submit a timely and valid Proof of Claim under the procedures set forth in the Settlement Notice. The Settlement partially resolves the lawsuit concerning whether ANR misled investors about the problems and risks associated with its largest annuity reinsurance contract as well as about its future earnings by failing to accrue its liabilities accurately and concealing the fact that the contract was generating large losses. The lawsuit will continue with respect to claims asserted against KPMG.

### E. Plaintiffs' Recovery Under The Settlement and Plan of Allocation

The claims administrator will determine each "Authorized Claimant's" *pro rata* share of the Net Settlement Fund based on his or her "Recognized Claim" from transactions during the Class Period. *See* Joint Decl., Ex. 1.A. Transactions resulting in a gain are not included in the calculation of a Recognized Claim.

For purposes of the Settlement, "Recognized Claims" will be calculated as follows:

> For shares of ANR common stock purchased during the Class Period and still owned as of the close of trading on November 19, 2002, "Recognized Claim" shall be the Plaintiffs' Contention of Alleged Inflation ("PCAI") per share on the date of purchase as shown on Schedule 1 of the Settlement Notice ("Schedule 1") for the date of purchase.

> For shares of ANR common stock purchased during the Class Period and sold at a loss on or before the close of trading on November 19, 2002,

---

[4] Originally, the parties agreed that ANR could opt to pay its portion of the Settlement either all in cash or with $2.5 million of the settlement payable in ANR common stock. ANR, however, has opted to pay the full settlement in cash.

"Recognized Claim" shall be the **lesser of (x)** the Purchase Price Paid less the Sale Proceeds received; or **(y)** the PCAI per share on the date of purchase (as shown on Schedule 1 for the date of purchase), less the PCAI per share on the date of sale (as shown on Schedule 1 for the date of sale).

To the extent a Claimant had a gain from his, her or its overall transactions in ANR common stock during the Class Period, the value of the Recognized Claim will be zero. To the extent that a Claimant suffered an overall loss on his, her or its overall transactions in ANR common stock during the Class Period, but that loss was less than the Recognized Claim calculated above, then the Recognized Claim shall be limited to the amount of the actual loss.

Plaintiffs' Co-Lead Counsel prepared the Plan of Allocation and the "Recognized Claim" formulae in such a way as to fairly allocate the recovery among Class members in accordance with Plaintiffs' theories of damages in the Action. Thus, as set forth in detail in the Plan of Allocation, with respect to common stock purchases, a Claimant's Recognized Claim is based upon Plaintiffs' contention of the estimated artificial inflation in the price paid for shares of ANR common stock as calculated by Plaintiffs' damages expert. This estimated inflation is the excess amount that Class members allegedly paid, over fair market value, for their stock. To the extent that a Class member sold the common stock at a still inflated price, the Recognized Claim is reduced under the Plan of Allocation. The alleged amount of artificial inflation for ANR common stock and for each day during the Class Period is set forth in Schedule 1. *See* Joint Decl., Ex. 1.A. Schedule 1, providing a table of the alleged artificial inflation per share, is the product of Plaintiffs' damages consultant, Bjorn Steinholt. The formulae and the inflation table takes into account the limitations on damages imposed under the PSLRA.

Under the Plan of Allocation, checks will be distributed to Authorized Claimants after the Court has finally approved the Settlement and after all claims have been processed. If any funds remain in the Net Settlement Fund one (1) year after the checks are distributed, the balance will

14

first be re-distributed to qualifying Class Members who have cashed their checks and who would receive at least $10.00 from such redistribution, after payment of any unpaid fees or expenses related to such redistribution. Any funds remaining after redistribution will be contributed to non-sectarian, not-for-profit, 501(c)(3) organizations designated by Plaintiffs' Co-Lead Counsel.

## CLASS NOTICE AND CERTIFICATION

The Court's October 6, 2004, Amended Order preliminarily certified the Class for settlement purposes and approved the procedures for notifying the Class about the Settlement as well as the content of the notice materials. For the reasons set forth below, the Court should confirm its prior conclusions.

### A.  Notice To The Class Was Adequate

#### 1.  Adequacy Of The Notice

Federal Rule of Civil Procedure 23(c) describes the notice to class members when a court certifies a class. In contrast, Rule 23(e) describes the notice to class members when a court is asked to approve a class-action settlement. Where, as here, the parties seek simultaneously to certify a settlement class and to settle a class action, the elements of Rule 23(c) notice (for class certification) are combined with the elements of Rule 23(e) notice (for settlement or dismissal). *See, e.g., In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977).

Conformity with the requirements of Rule 23(c)(2) fulfills the due process mandate. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Thus, for opt-out class actions like this one, due process and the Federal Rules require individual notice only to "all class members whose names and addresses may be ascertained through reasonable effort." *Id.*; *accord* Fed. R. Civ. P. 23(c)(2)(B); *In re NASDAQ Market-Makers Antitrust Litig.*, 94 Civ. 3996 (RWS), 1999 WL 395407, at *2 n.3 (S.D.N.Y. June 15, 1999) (no requirement to notify each and every class member individually).

15

The Garden City Group, Inc. ("Garden City"), the Claims Administrator for the Settlement, administered the mailing of individual notice by first-class mail to all reasonably locatable Class Members at their last-known addresses. Garden City contacted ANR's transfer agent and requested the most recent addresses for all ANR shareholders of record. *See* Joint Decl., Ex. 1, ¶¶3-6.] As of January 13, 2005, Garden City had mailed a total of 16,700 packets of individual notice materials. *Id.*

In addition to the mailing of individual notice to 16,700 individuals or entities, Beth Kaswan arranged for publication of the Summary Notice Of Pendency Of Class Action, Proposed Partial Settlement And Settlement Hearing ("Summary Notice") in the international editions of the *Wall Street Journal* and the *Financial Times* on October 26, 2004. *See* Joint Decl., Ex. 2.

These procedures collectively satisfy Rule 23(c)(2)(B)'s requirement that individual notice be sent to all potential Class members identifiable through reasonable effort. *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 185-86 (S.D.N.Y. 2003) (due process satisfied by mailing approximately 30,000 notice packets to all reasonably identifiable persons who purchased securities during class period and by publishing summary notice in The New York Times ); *see also, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 168-69 (2d Cir. 1987) (approving letter notice to reasonably identifiable class members, supplemented by "various forms of substitute notice," including publication in various media); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996) (approving individual notice to class members "whose address could reasonably be located" and summary notice published twice in national editions of the Wall Street Journal, New York Times, and U.S.A. Today ), *aff'd mem*., MDL No. 1005, 107 F.3d 3, 1996 WL 739258 (2d Cir. Dec. 27, 1996).

2.  Content of the Notice

The content of the notice -- whether mailed directly to class members or communicated by publication -- also satisfied Rule 23, due-process norms, and the PSLRA. Rule 23(c)(2)(B) specifies certain information that a class notice in a Rule 23(b)(3) action must contain, including (i) the nature of the case, the class definition, and the claims, issues, or defenses in the action, (ii) class members' right to exclude themselves from the class, (iii) the binding effect of a class judgment on all class members who do not request exclusion, and (iv) class members' right to object to the partial settlement and appear through counsel. The PSLRA contains additional requirements applicable to the securities action. 15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7). The notice must contain:

> (A)  Statement of recovery -- the amount of the settlement determined in the aggregate and on an average per share basis;
>
> (B)  Statement of potential outcome of case -- the amount of damages per share recoverable if Plaintiffs were to prevail on every claim. If the parties are unable to agree on damages, a statement concerning the issues on which the parties disagree;
>
> (C)  Statement of attorneys' fees -- statement of fees and costs to be applied for in the aggregate and on a per share basis;
>
> (D)  Identification of lawyers' representatives -- the name, telephone number, and address of counsel available to answer questions; and
>
> (E)  Reasons for settlement -- a brief statement explaining the reasons why the parties are proposing the settlement.

*Indep. Energy Holdings*, 302 F. Supp. 2d at 184. The notice also must include a cover page summarizing the required information. 15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7)(A). The notice provided to the Class in this case satisfies all the foregoing requirements. *See* Joint Decl., Ex. 1.A. The notice clearly informed the Class of the relevant aspects of the Action and the partial settlement, including:

17

- The nature of the case, a statement of the parties' respective claims and defenses, the background of the settlement, and how the settlement funds will be allocated if the settlement is approved;

- Class members' right to exclude themselves from the securities settlement class, to object to any aspect of the settlement, and to appear at the fairness hearing--and the processes and deadlines for doing so; and

- The binding effect of any judgment on all persons who do not exclude themselves from a class, and the impact on class members if the settlement is approved.

Consistent with the PSLRA's requirements, the notice also:

- set out the amount of the settlement and the aggregate recovery per share, and provided the Plan of Allocation;

- stated that the parties disagree on the amount of damages to which class members would be entitled, and summarized the bases for that disagreement;

- stated the amount of attorneys' fees and costs sought;

- provided the name, address, and telephone number of lead counsel for the various classes; and

- explained why the parties have proposed a settlement, including the risk that depletion and potential unavailability of insurance funds could defeat Plaintiffs' ability to collect any judgment.

In addition, the notice provided a toll-free telephone number to call for more information. The Summary Notice – published on October 26, 2004 – also contained information required by

18

Rule 23, the PSLRA, and due process, and provided a toll-free number and website for Class Members to call for the full individual notice.

Thus, these notices provided sufficient information for the Class to understand the proposed partial settlement and their options. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y.1997) *aff'd*, 117 F.3d 721 (2d Cir. 1997) (settlement notice adequate where "level of detail apprises the class members of the salient terms of the settlement and affords them a reasonable opportunity to present any objections."); *Indep. Energy Holdings*, 302 F. Supp. 2d at 184 (approving notice where information required by PSLRA was found partly in individual notice and partly in summary notice).

Accordingly, the Court should find the form and substance of the notice disseminated to the Class proper and adequate.

**B.     Certification Of The Settlement Class Is Proper**

The Second Circuit has acknowledged the propriety of certifying a class solely for settlement purposes. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). In *Amchem Prods. v. Windsor*, 521 U.S. 591, 619-22 (1997), the Supreme Court also held that such certification is appropriate. In so doing, the Supreme Court held that a class seeking to be certified for purposes of effectuating a settlement must satisfy the applicable requirements of Rule 23, *i.e.*, numerosity, commonality, typicality, adequacy of representation, predominance of common issues and superiority. The Second Circuit has instructed district courts to interpret these Rule 23's requirements liberally. *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990). As explained below, the Class satisfies each of these requirements, and the Court should affirm its preliminary certification of the Class for settlement purposes.

19

1.  <u>Numerosity, Commonality and Typicality</u>

The Class meets the numerosity, commonality and typicality standards. The numerosity requirement is met when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Second Circuit presumes that the numerosity requirement is met when the number of class members exceeds 40. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Smellie v. Mount Sinai Hosp.*, 03 Civ. 0805 (LTS) (DFE), 2004 U.S. Dist. LEXIS 24006, at *11 (S.D.N.Y. Nov. 29, 2004). Throughout the Class Period, ANR had between 25,499,999 and 26,106,328 shares of common stock outstanding, ¶35, and based on ANR's transfer records 16,700 notices were sent to potential members of the Class who purchased ANR common stock during the Class Period. Thus, the numerosity requirement is satisfied. *See, e.g., In re Global Crossing Sec. and ERISA Litig.*, 02 MD 1472 (GEL), 2004 U.S. Dist. LEXIS 23946, at *48 (S.D.N.Y. Nov. 24, 2004).

In addition, there are substantial questions of law and fact common to all members of the Class, including whether Defendants made misrepresentations and omissions during the Class Period, whether the alleged misrepresentations and omissions during the Class Period were material, and whether Defendants acted with the requisite scienter. Securities fraud cases generally meet Rule 23(a)(2)'s commonality requirement. *See In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000) ("Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met").

Further, the Lead Plaintiffs' claims are typical of the claims of other members of the Class because they purchased ANR securities during the period of alleged price inflation and thus have alleged damages similar to other members of the Class. Typicality exists where the "claims of representative plaintiffs arise from the same course of conduct that gives rise to claims

20

of the other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives." *Oxford Health Plans*, 191 F.R.D. at 375. Indeed, when "the same [alleged] unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). Here, the Lead Plaintiffs' and the Class Members' claims arise from the same alleged course of conduct and are based on the same legal theories.

2.  Adequacy of Representation

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court must evaluate adequacy of representation by considering (i) whether the class representatives' claims conflict with those of the class and (ii) whether class counsel is qualified, experienced, and generally able to conduct the litigation. *In re Oxford Health Plans, Inc.*, 191 F.R.D. at 376. Both standards are met here.

There is no conflict between the class representatives and the other class members. All share the common goal of maximizing recovery. Lead Plaintiffs are members of the Class who suffered the same type of injury as the other members of the Class (*i.e.*, economic damages) and are represented by preeminent securities class action lawyers. Further, Lead Plaintiffs retained counsel with extensive experience in complex securities class-action proceedings in this Court and in other federal courts throughout the United States. Additionally, the manner in which the settlement was negotiated satisfies any concerns that unnamed class members have been inadequately represented. Thus, the interests of all members of the Class were represented adequately by Lead Plaintiffs and their counsel.

3. <u>Predominance of Common Issues And Superiority</u>

Certification of a class under Rule 23(b)(3) requires that common issues predominate over individual issues and that the class action mechanism is superior to the other methods of adjudicating the controversy. Both of these requirements are satisfied.

The predominance inquiry focuses on the existence of common issues. As the Supreme Court recognized in *Amchem*, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." 521 U.S. at 625. In this case, the issues of materiality, causation and scienter are common to all the members of the Class and clearly predominate over any individual issues. Further, resolution of this case through a class action is far superior to litigating thousands of individual claims where the expense for a single investor pursuing a separate action could exceed the individual's loss. *Phillips Petroleum v. Shutts*, 472 U.S. 797, 809 (1985).

## THE PROPOSED SETTLEMENT SHOULD BE GRANTED FINAL APPROVAL

The substantive terms of the Settlement and the method used to arrive at the Settlement, as well as the proposed Plan of Allocation are fair, reasonable and adequate and should be approved by the Court.[5]

**A.** <u>The Proposed Settlement Is Fair, Reasonable and Adequate</u>

In determining whether final approval should be given to a class action settlement, the Court must determine whether a proposed settlement, taken as a whole, is fair, reasonable and adequate. *In re Iomega Sec. Litig.*, Civ Nos. B-86-257 (JAC), B-86-273 (JAC), 1987 WL 43391, at *9 (D. Conn. Oct. 1, 1987); *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1368 (2d Cir.

---

[5] The factors supporting final approval of the Settlement and the Plan of Allocation are only summarized herein. Plaintiffs respectfully refer the Court to the Joint Declaration for a detailed discussion of the litigation risks and other factors supporting final approval of the Settlement and Plan of Allocation.

22

1991); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 360 (S.D.N.Y. 2002). A proposed class action settlement enjoys a strong presumption that it is fair, reasonable, and adequate if, as here, it was the product of arm's length negotiations conducted by capable counsel experienced in class action litigation arising under the federal securities laws, and if it occurred after meaningful discovery. *See, e.g., PaineWebber*, 171 F.R.D. at 124; *New York & Maryland v. Nintendo of Am., Inc.*, 775 F. Supp. 676, 680-81 (S.D.N.Y. 1991); *Chatelain v. Prudential-Bache Secs., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992) ("A strong initial presumption of fairness attaches to the proposed settlement when it is shown to be the result of this type of a negotiating process and when the number of objectors is small."); *see also Manual for Complex Litigation, Fourth § 21.612* (2004) ("Extended litigation between or among adversaries might bolster confidence that the settlement negotiations were at arm's length."). Indeed, "absent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel." *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993) (citation omitted). In making this determination, the Court compares "the terms of the compromise with the likely rewards of litigation." *Iomega*, 1987 WL 43391, at *9; *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 740 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *see also Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) ("[t]he court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable") (citations omitted).

The Court must ascertain sufficient facts about the settlement in order to render "an intelligent and objective opinion" about the likelihood of success if a claim is litigated, but in doing so, the Court cannot conduct a trial on the settlement's merits. *See Weinberger v.*

23

*Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (citations omitted); *Grinnell*, 495 F.2d at 462 ("[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case"); *Paine Webber*, 171 F.R.D. at 124 (approval of a settlement is within the Court's discretion).

The factors in this Circuit to be considered in evaluating the Settlement are:

1. the complexity, expense and likely duration of the litigation;

2. the reaction of the class to the settlement;

3. the stage of the proceedings and the amount of discovery completed;

4. the risks of establishing liability;

5. the risks of establishing damages;

6. the risk of maintaining the class action through trial;

7. the ability of the Defendants to withstand a greater judgment;

8. the range of reasonableness of the settlement funds in light of the best possible recovery; and

9. the range of reasonableness of the settlement funds to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463; *Iomega*, 1987 WL 43391, at *9; *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003). When assessed in light of the applicable criteria, the Settlement is fair, reasonable and adequate and should be granted final approval.

1. <u>The complexity, expense and likely duration of the litigation</u>

As described in more detail below describing the risks of establishing liability, this Action is replete with complexity both in establishing liability and in proving damages. Plaintiffs would have to prove that ANR violated the relevant accounting standards; that ANR's revenues and expenses were fraudulently misstated and not just a product of corporate mismanagement, erroneous business judgment, or good faith misapplication of relevant accounting standards; that the market was deceived by the misstated financial statements and that the false statements caused Plaintiffs' losses. To impose liability against XL Capital, Plaintiffs would also need to establish that XL Capital exercised sufficient control over ANR to constitute a "controlling person" within the meaning of the securities laws. Additionally, the jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction which at best is uncertain.

Moreover, whatever the outcome of any eventual trial, inevitably appeals would have been taken to the Second Circuit and perhaps even to the U.S. Supreme Court. All of the foregoing would have delayed, for years, the ability of the Class to recover. Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk of delay of continued litigation through the class certification, summary judgment, trial and post-trial proceedings.

Delay was a factor strongly considered by Plaintiffs' counsel in negotiating the proposed Settlement. Because of its financial distress, ANR is relying on its D&O carrier, Chubb, which issued ANR a $10 million D&O insurance policy, to fund most of its share of the Settlement. If the litigation proceeds, ANR attorneys' fees, expert expenses, and other litigation costs are likely to exhaust most, if not all, of the D&O insurance proceeds, and, without resolution of this litigation, ANR is unlikely to rehabilitate itself with its other creditors, so that a litigated

25

judgment against ANR would be unlikely to be fully collectible, if it was collectible at all. Moreover, delay in recovery would increase Plaintiffs' counsel's time and expenses thereby reducing the availability of class funds.

As a practical matter the D&O insurer was unwilling to put up any insurance proceeds without a release of all the officers and directors covered by the policy. The settlement bar provisions of the PSLRA also made it imperative that, were Plaintiffs to settle with ANR to avoid draining ANR's funds in litigation, Plaintiffs also settle with all the other Settling Defendants, including XL Capital. The PSLRA provides that if one party settles, any judgment against remaining parties to the litigation will be reduced by the greater of (1) the amount that corresponds to the percentage of responsibility of the settling party, (2) or the amount paid by the settling party. 15 U.S.C. §78u-4(f)(7). Because XL Capital was sued only as a control person, and it liability was derivative of ANR's, had Plaintiffs settled with ANR, but not XL Capital, there was a risk that the ANR settlement would extinguish the claims against XL Capital. This result differs from the effect of the settlement on KPMG who is alleged to be a joint tortfeasor with ANR for its liability under §10 and 10(b)(5). For KPMG, under the PSLRA, should a judgment against it be ultimately entered, KPMG's judgment would be reduced only by the larger of the settlement payment or the settling Defendants' percentage of responsibility. *Id.*

2.   The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement is often the most significant factor to be weighed in considering its adequacy. *See Maley*, 186 F. Supp. 2d at 362; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001); *Global Crossing*, 2004 WL 2724076, at *21. The fact that no objections to the Settlement have been made as of this date is evidence of the fairness of the Settlement. *PaineWebber*, 171 F.R.D. at 126.

As of January 13, 2005, 16,700 Settlement Notices were sent to Class Members or their nominees. To date, no objections to the Settlement have been received. The deadline for submitting objections is December 27, 2004. The favorable reaction of the Class is further evidence that the Settlement is fair, reasonable and adequate.

3.  The Stage of Proceedings and the Amount of Discovery Completed

The original complaints were filed in December, 2002. Since that time, the Court denied each motion to dismiss, Plaintiffs conducted informal discovery and reviewed documents produced by ANR, and the parties participated in mediation to resolve this litigation.

The stage of proceedings and the amount of discovery completed at the time of settlement is relevant to "the parties' knowledge of the strengths and weaknesses of the various claims in the case, and consequently affects the determination of the settlement's fairness." *PaineWebber*, 171 F.R.D. at 126. To approve a proposed settlement "the Court need not find that the parties have engaged in extensive discovery." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (citing *Plummer v. Chem. Bank*, 608 F.2d 654 (2d Cir. 1982)). "Formal discovery is not a prerequisite." *Global Crossing*, 2004 WL 2724076, at *22 (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981)). "Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make ... an appraisal' of the Settlement." *Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 176; *accord Global Crossing*, 2004 WL 2724076, at *22.

Here, there is no doubt that at this stage of these proceedings, the parties have gained a thorough understanding of their own strengths and weaknesses. Prior to executing the Stipulation, Co-Lead Counsel investigated the events and transactions alleged in the Action, reviewed and analyzed the extensive deposition and trial testimony given in the ANR arbitration proceeding with Transamerica, as well as tens of thousands of documents produced by ANR, and

27

retained and consulted with expert witnesses in damages, forensic accounting and actuarial practices. This adds credibility to Co-Lead Counsel's assessment that the Settlement is fair. *PaineWebber*, 171 F.R.D. at 126 ("Class Counsel has had sufficient information to act intelligently on behalf of the class") (internal quotations and citations omitted); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 WL 31663577, at *15 (S.D.N.Y. Nov. 26, 2002) ("[g]iven the stage of this case and the extensive discovery conducted. . . Plaintiffs' counsel is well-positioned to assess the fairness of the proposed settlement"); *Global Crossing*, 2004 WL 2724076, at *22 (where plaintiffs obtained documents from the company through informal discovery during settlement negotiations, the court determined that "Plaintiffs' counsel appear to have scrutinized the facts of the Actions from the earliest stages of the litigation and developed an informed basis from which to negotiate a reasonable compromise"). Accordingly, this factor also supports approval of the Settlement.

4. Risks of Establishing Liability

As the preceding paragraphs have shown, this Action is replete with complexity both in establishing liability and in proving damages, and litigation could potentially have dragged on for years. Plaintiffs still had to overcome likely motions for summary judgment and demonstrate that the putative class could be certified for litigation purposes. Moreover, trial of this case would have proven to be complex, expensive and time-consuming. There were enormous risks in proceeding with a trial of Plaintiffs' claims, requiring complex, fact-intensive analyses of such issues as accounting treatment of a retrocessional annuity insurance contract for universal-life type and investment-type policies, accounting treatment for convertible bonds, actuarial standards for projecting expected profits associated with such a contract, the accuracy and materiality of many different financial statements, and the conduct and state of mind of each of the Individual Defendants.

28

For instance, Plaintiffs had to show that ANR's accounting treatment of the Transamerica contract was not a product of reasonable choices among accounting alternatives. Defendants contend that most of their accounting for the Transamerica contract was proper; because "GAAP does not prescribe a fixed set of rules, but rather represent the range of reasonable alternatives that management can use," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000), Plaintiffs faced significant risks in establishing at trial that Defendants' accounting was false (although parts of it were the subject of multiple restatements). KPMG in Bermuda in its memorandum in support of its motion to dismiss the complaint against it has argued strenuously for the application of different actuarial standards and accounting principles. *See* Memorandum of Law of Defendant KPMG Bermuda in Support of its Motion to Dismiss the First Amended Class Action Complaint at 18-20; Reply Memorandum of Law of Defendant KPMG Bermuda in Support of its Motion to Dismiss the First Amended Class Action Complaint, at 8-9. As the claims against ANR were consolidated with those against KPMG, Plaintiffs would likely have faced this defense at trial with respect to all Defendants.

Plaintiffs also had to show that ANR's publicly-announced projected future results were not sheltered by the special legal protections for issuers who make predictions of future corporate performance, including the PSLRA's "safe harbor" for forward-looking statements, 15 U.S.C. §78u-5, and the judicially-created "bespeaks caution" doctrine, *see Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Plaintiffs also had the heavy burden of persuading a jury that ANR's misstated financial results were fraudulently rather than merely erroneously issued. Defendants argued that they were unaware of any overstatement of ANR's revenues and that therefore that no fraud had occurred. Defendants also claimed that any flaws in their accounting were the result of

29