reasonable reliance on their auditor, KPMG. Documents produced by ANR reflect that ANR collaborated with KPMG in reaching its actuarial conclusions and consulted with them in reporting their financial results. The jury could find that argument persuasive, particularly because KPMG held itself out to be the expert in this area and in order to understand Plaintiffs' claims, the jury would have to consider complex testimony concerning actuarial standards of practice and calculations. Plaintiffs also bore the burden of demonstrating that those Defendants who served as ANR's outside directors were sufficiently involved with the Company so as to have been aware of any flaws in ANR's actuarial assumptions and accounting.

Plaintiffs had to demonstrate that XL Capital exercised sufficient control over ANR to qualify as a "controlling person" under the securities laws, notwithstanding the fact that XL Capital only owned approximately 11% of ANR's stock during the Class Period. A jury could easily conclude that such a small ownership interest was not sufficient to confer on XL Capital the power to influence ANR's accounting. Moreover, cases in this Circuit have reached differing results with respect to Plaintiffs' obligation to provide proof of "culpability" on the part of a control person.

Plaintiffs would also have to demonstrate that the Class's losses were caused by its fraudulent accounting for the Transamerica contract, rather than other issues in ANR's accounting for which its restatements issued, its business or in the market generally. Because ANR experienced other problems during the Class Period beyond its difficulties with the Transamerica contract, Plaintiffs risks in this regard were significant.

The issue of damages would also likely be vigorously disputed. Thus, there was considerable uncertainty as to what damages Plaintiffs might have been able to recover in the event of a successful trial. Even if a judgment were obtained, post-judgment appeals would have

30

significantly delayed any recovery and collecting any judgment for United States statutory violations against ANR's assets in other countries, including Bermuda, likely would have been difficult and added to that delay. Many countries recognize only judgments for common law violations and will not give effect to those entered on statutory grounds that do not comport with their own policies.

The risks to establishing the Settling Defendants' liability in this Action were also exacerbated by the fact that ANR is a foreign company. Thus, many of the records supporting Plaintiffs' claims were located abroad and may have been difficult to obtain, particularly if winding up proceedings were filed against ANR in Bermuda. Moreover, virtually all potential witnesses with knowledge as to ANR's operations, as well as many of the named Defendants, are foreigners or live abroad and are beyond the subpoena power of the Court. While the Settling Defendants would have been able to call live witnesses in support of their position, Plaintiffs would have been forced to rely primarily on videotaped deposition testimony of Defendants and third parties, provided that there was a mechanism to obtain depositions under the foreign laws where they resided.

5. The Risks of Establishing Damages

Plaintiffs also confronted significant obstacles in demonstrating damages. "Calculation of damages is a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's 'true' value absent the alleged fraud." *Global Crossing*, 2004 WL 2724076, at *23 (citations and internal quotations omitted). The jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction which at best is uncertain. *See Lloyd's*, 2002 WL 31663577, at *21 ("The determination of damages. . . is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is

31

highly unpredictable."); *Maley*, 186 F. Supp. 2d at 365 (same); *Warner*, 618 F. Supp. at 744-45 ("[i]n this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions").

The risk of establishing damages and the amount thereof also supports approval of the Settlement.

    6.    Risks of Maintaining Class Action Through Trial

No class has been certified in the Action. Were these cases not to settle, Defendants might contest class certification on various grounds, thereby creating appreciable risk to the class members' potential for recovery. *See, e.g., In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2002 WL 31720381, at *1 (S.D.N.Y. Dec.4, 2002). And even if Plaintiffs could obtain class certification, there could be a risk of decertification at a later stage. *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476-77 (S.D.N.Y. 1998) (decertification can occur if management problems arise during litigation; decertification or reversal of certification would deprive class of any recovery). Accordingly, this factor also supports approving the Settlement.

    7.    The Ability of Defendants to Withstand a Greater Judgment

ANR's financial condition was precarious at the outset of the litigation and remained so at the time of Settlement. In March 2003, ANR filed with the SEC an amended Form 10-K for 2000 and 2001, and amended Form 10-Qs for the first three quarters of 2002, thus restating virtually all of its Class Period financial statements. The new Form 10-K contained numerous charts and tables explaining ANR's myriad restatements, write-downs, and reclassifications. Finally, the Form 10-K disclosed that ANR's ability to continue as a going concern was seriously in jeopardy. On July 2, 2003, ANR filed another amended Form 10-K, this time to correct the

Form 10-K filed for 2002. Even then, ANR warned that more financial restatements might still occur, because the Company could "provide no assurance as to whether [the SEC] will require us to make any further changes to the financial, pro forma or other information and data included in this report or in other periodic reports we have filed with the SEC." Thus, with the delay of taking this case to trial, bankruptcy was not outside the realm of possibility for ANR. Moreover, on July 27, 2004, ANR announced that the NYSE would suspend trading in ANR's common shares prior to the NYSE's opening on Friday July 30, 2004. ANR further announced in its August 5, 2004 Form 8-K filing with the SEC that the NYSE applied to the SEC to delist ANR's common shares, explaining that the

> NYSE's action was taken in view of the fact we had again fallen below the NYSE's continued listing standards, as the average closing price of our common shares had been less than $1.00 over a consecutive 30-trading-day period. We were previously below this standard from April through October 2003. Our common shares are now being traded over the counter under the symbol ANNRF.pk. If we are unable to list our common shares for trading on any other national exchange or automated quotation system, it will adversely affect the public market for and liquidity of our common shares, and may adversely affect any capital raising or other strategic transactions we may choose to pursue in the future.

While no one can predict whether a much larger judgment entered several years from now would be collectible, the inability of Defendants to withstand a greater judgment was a significant consideration relied upon by Plaintiffs' counsel in determining to settle this case. *See Iomega*, 1987 WL 43391, at *10. The overriding consideration driving the settlement negotiations was the possibility that ANR might not be able to contribute in any meaningful way to a recovery by the Class in the near future, particularly if it was unable to put this case behind it. The largest practical available source of recovery for the Class was ANR's D&O insurance policy. Given that the insurance policy was a "wasting" asset that would be used to pay the defense costs, it was clear that even if Plaintiffs were able to establish Settling Defendants' liability at trial and even if the jury accepted Plaintiffs' damage analyses, by that point the

33

insurance policy, would in all likelihood have been substantially reduced or exhausted. As suggested by the court in *Global Crossing*, "without the proposed settlement, class members might well receive far less than the settlement would provide to them, even if they could prevail on their claims." *Global Crossing*, 2004 WL 2724076, at *24 (citing *Teachers' Retirement Sys. of Loisiana. v. A.C.L.N., Ltd.*, No. 01 Civ. 11814 (MP), 2004 WL 1087261, at *4 (S.D.N.Y. May 14, 2004) (likely depletion of D & O insurance supports settlement approval); *Maley*, 186 F. Supp. 2d at 365 (approving settlement where insurance "would be significantly depleted by defense costs"). Because Defendants on Plaintiffs' fraud claims likely could not withstand a greater judgment, if one were achieved at trial, this factor strongly supports approval of the Settlement.

### 8.  The Range of Reasonableness of the Settlement Funds in Light of the Best Possible Recovery and Litigation Risks

The last two substantive factors courts consider are the range of reasonableness of the settlement funds in light of (i) the best possible recovery and (ii) litigation risks. In analyzing these last factors, the issue for the Court is not whether the Settlement represents the "best possible recovery," but how the Settlement relates to the strengths and weaknesses of the case. The Court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462.

Given the history and posture of this case, as well as the litigation risks discussed above, the Settlement provides an extraordinary recovery. In fact, the Settlement amount far exceeds the maximum recoverable amount of ANR's D&O insurance policy. According to the court in *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E. D. Pa.2001) since 1995, class action settlements have typically recovered "between 5.5% and 6.2% of the class members'

estimated losses". A settlement can be approved even when it amounts to only a small percentage of the recovery sought. *In re Michael Milken & Assocs.*, 150 F.R.D. 57, 64-65 (S.D.N.Y. 1993); *In re Gulf Oil Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 590-91 (S.D.N.Y.1992); *Grinnell*, 495 F.2d at 455 n. 2 ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."). Even if Plaintiffs obtained, after long and costly litigation, a dramatically larger judgment, there is a significant issue as to whether such a judgment could be collected.

> In cases like these actions--where the risks and costs of litigation are great, where little if any additional recovery might be gained through litigation, and where the remaining insurance could be depleted or lost entirely, thereby potentially reducing the recovery available through litigation--the amount of "potential damages" does not preclude approval of a lesser settlement amount. The prompt, guaranteed payment of the settlement money increases the settlement's value in comparison to "some speculative payment of a hypothetically larger amount years down the road." *Teachers' Retirement Sys.*, 2004 WL 1087261, at *5.

*Global Crossing*, 2004 WL 2724076, at *25.

In view of the foregoing, and in light of all the risks, the Settlement represents an outstanding recovery for the Class.

**B.    The Settlement Negotiations Were Procedurally Fair**

In assessing whether a settlement is fair, reasonable and adequate, courts often examine the "negotiating process by which the settlement was reached" to determine whether the settlement was the result of "arms-length negotiations" between counsel with "the experience and ability . . . necessary to effective representation of the class's interests." *Weinberger*, 698 F.2d at 74; *In re Sterling Foster & Co. Sec. Litig.*, 238 F. Supp. 2d 480, 484 (E.D.N.Y. 2002) ("[a] strong presumption of fairness attaches to proposed settlements that have been negotiated at arms-length").

35

Collusion is not an issue with respect to this Settlement. As explained in the Joint Declaration, the parties fought hard over the course of the litigation, conducted informal discovery, filed numerous motions and prepared for mediation. The settlement negotiations themselves were hard-fought and conducted at arm's length between experienced and skilled attorneys with the able mediation expertise of Judge Politan. Qualified and experienced counsel for both sides, who are intimately familiar with all facets of this case, recommend final approval of the Settlement. The Settlement is therefore clearly entitled to a presumption of fairness based on the negotiations.

## THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE AND ADEQUATE

A Plan of Allocation is fair, reasonable and adequate as long as it has a "reasonable, rational basis." *Maley*, 186 F. Supp. 2d at 367. Because it is impossible in a large class to calculate each member's claim with mathematical precision, courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *PaineWebber*, 171 F.R.D. at 133.

Here, the Plan of Allocation provides for the distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability and damages. "Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim." *American Bank Note*, 127 F. Supp. 2d at 429. An allocation formula only need have a reasonable and rational basis, particularly if recommended by experienced and competent class counsel. *Id.* at 429-30. Counsel's conclusion that the Plan of Allocation is fair and reasonable is therefore entitled to great weight. *Id.* at 430 (approving allocation plan and according counsel's opinion

36

"considerable weight" because there were "lengthy negotiations" among lead counsel and "detailed assessments of the strengths and weaknesses of the claims asserted, the applicable damages, and the likelihood of recovery").

For these reasons, the Plan of Allocation is fair, reasonable and adequate and should be approved.

## PETITION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

Simultaneously with seeking final approval of the Settlement negotiated in this case, Plaintiffs' counsel also respectfully submit this memorandum of law in support of their petition for an award of attorneys' fees in the amount of one-third (33-1/3%) of the Gross Settlement Fund, a modest 2.95 multiple of Plaintiffs' counsel's lodestar, and reimbursement of their out-of-pocket litigation expenses in the amount of $194,855.37, including approximately $3,150 for the costs and expenses of Lead Plaintiff Midstream Investments Ltd. directly relating to their representation of the Class.

The Settlement obtained in this case – consisting of $16.5 million in cash -- is extraordinary. This exceptional result is due solely to the tenacious and skillful efforts of Plaintiffs' counsel, who prosecuted this case for two years on a contingent basis. Defendants mounted an arduous defense. In the face of this vigorous opposition, Plaintiffs' counsel constructed a compelling case and refused substantial settlement overtures that they deemed inadequate. Plaintiffs' counsel's skill and diligence in prosecuting this action, and their willingness to take this case to mediation and trial and perhaps risk their significant investment of lodestar and out-of-pocket expenses rather than accept a settlement offer they deemed inadequate, merits the requested fee in this case. Even higher percentages have been awarded in numerous cases that were far less risky involving Defendants with the ability to withstand a far greater judgment.

37

The Class does not appear to disagree. In accordance with this Court's October 6, 2004, Amended Order, copies of the Settlement Notice were mailed to 16,700 potential Class Members, and a Summary Notice was published in the international editions of the *Wall Street Journal* and the *Financial Times*.[6] The Settlement Notice described the litigation and the proposed Settlement, as well as Plaintiffs' counsel's intent to request an award of fees of up to one-third (33-1/3%) of the Gross Settlement Fund and reimbursement of their expenses in an approximate amount of $250,000, including $10,000 for the costs and expenses of Lead Plaintiffs directly relating to their representation of the Class. The Settlement Notice also informed Class Members of their right to object to this application. The deadline for filing an objection has passed, and no Class Members have objected. The overwhelming positive response from Class Members, including numerous sophisticated financial institutions who received notice in this case, is further grounds for finding that the requested fee award is reasonable and appropriate.

### A. Plaintiffs' Counsel Should Be Awarded Fees as a Percentage of the Common Fund Created as a Result of the Settlement

Courts have long recognized that when, as in this case, a party maintains a suit that results in the creation of a fund for the benefit of a class, the costs of the litigation, including an award of reasonable attorneys' fees, should be recovered from the fund created by the litigation. *Boening Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970). This "equitable" or "common fund" doctrine established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527 (1882), spreads the cost of the litigation, including attorneys' fees, among the fund's beneficiaries.

---

[6] *See* Joint Decl, Ex. 1, Heald Aff. ¶7.; Joint Decl., Ex. 2, Kaswan Aff. ¶2.

Courts traditionally have used two methods to calculate attorneys' fees in common fund cases: (i) the percentage method, which awards attorneys' fees as a percentage of the common fund created for the benefit of the class; and (ii) the lodestar/multiplier approach, which multiplies the number of hours expended by counsel by the hourly rate normally charged for similar work by attorneys of comparable skill and experience, and enhances the resulting lodestar figure by an appropriate multiplier to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999); *Maley*, 186 F. Supp. 2d at 369-70.

Although the Second Circuit has held that both the percentage and lodestar/multiplier methods are available to district courts in awarding attorneys' fees in common fund cases, *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000), the clear trend among district courts in this Circuit is to use the percentage method rather than the "cumbersome, enervating, and often surrealistic process"[7] of evaluating fee petitions under the lodestar/multiplier approach. *See In re Fine Host Corp. Sec. Litig.*, No. MDL 1241, 3:97-CV-2619, 2000 WL 33116538, at *4 (D. Conn. Nov. 8, 2000) ("The court finds it appropriate to apply the percentage method in this case while remaining cognizant of the policy considerations favoring the lodestar calculation and using the lodestar documentation "as a 'cross check' on the reasonableness of the requested percentage."); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) (noting trend in favor of the percentage method); *Maley*, 186 F. Supp. 2d at 370 ("[T]here is a strong consensus – both in this Circuit and across the country – in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery.").[8] As the Court

---

[7] Third Circuit Task Force on Court Awarded Attorneys' Fees, 108 F.R.D. 237, 258 (1985).
[8] *See also In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663, at *73 (S.D.N.Y. Nov. 26, 2002) ("This Court has previously found that the percentage approach is appropriate in a class action

39

observed in *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 165, 170 (S.D.N.Y. 1989):

> Experience...has finally taught us that convoluted judicial efforts to evaluate the lodestar, and see to it that the lodestar hours were reasonable and necessary, and that the case was not overmanned or the time overbooked, are extremely difficult to say the least, and unrewarding. Such efforts produce much judicial paper shuffling, in many cases with no real assurance that an accurate or fair result has been achieved.
>
> * * *
>
> [Lodestar] computations, no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo. They do not guarantee a more fair result or a more expeditious disposition of litigation.[9]

In addition to its relative simplicity, the percentage method has been favored because it "directly aligns the interests of the class and its counsel[,] . . . provides a powerful incentive for the efficient prosecution and early resolution of litigation,"[10] and most closely approximates the manner in which private litigants compensate their attorneys in the marketplace contingency fee model.[11] Further, application of the percentage approach in securities class actions is supported by the PSLRA, which provides that "[t]otal attorneys' fees and expenses awarded by the court to

---

common fund context."); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999) ("Courts increasingly have come to recognize the shortcomings of the lodestar/multiplier method as a universal rule for compensation."); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 484 (S.D.N.Y. 1998) ("there is strong support for the percentage approach from district courts in this Circuit"); *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 215 (S.D.N.Y. 1992) ("[t]his Court declines to apply the lodestar method, and instead favors the use of the straight percentage of recovery method"); *In re RJR Nabisco Inc. Sec. Litig.*, No. 88 Civ. 7905, 1992 WL 210138, at *6 (S.D.N.Y. Aug. 24, 1992) ("the award of the percentage fee in common fund cases...is consistent with the better and increasingly prevailing view in such cases"); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992) ("in cases such as this, where counsel have helped create a fund to be shared by numerous plaintiffs, courts have tended increasingly to award fees based on a percentage of the fund rather than on the lodestar calculation of time multiplied by an hourly rate.") (citations omitted).

[9] The *Union Carbide* court is not alone in its criticisms of the lodestar/multiplier approach. In *Goldberger*, the Second Circuit observed that "experience with the lodestar method proved vexing." and noted that "the primary source of dissatisfaction was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed view of the line-item fee audits." 209 F.3d at 48.

[10] *In re Lloyd's Am. Trust Fund*, 2002 U.S. Dist. LEXIS 22663, at *73.

[11] *See Strougo*, 258 F. Supp. 2d at 261 ("the percentage method is consistent with and, indeed, is intended to mirror, practice in the private marketplace"); *In re Sumitomo*, 74 F. Supp. 2d at 397 (noting that the percentage approach is "uniquely the formula that mimics the compensation system actually used by individual clients to compensate their attorneys."); *In re RJR Nabisco*, 1992 WL 210138, at *7 ("What should govern such awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases.").

counsel for the plaintiff class shall not exceed *a **reasonable percentage*** of the amount of any damages and prejudgment interest actually paid to the class...." *See* 15 U.S.C. § 78u-4(a)(6) (emphasis added).

No matter which method is chosen – percentage or lodestar/multiplier – the fees awarded in common fund cases must be "reasonable" under the circumstances. *Goldberger*, 209 F.3d at 47; *In re Fine Host*, 2000 WL 33116538, at *4. "What constitutes a reasonable fee is properly committed to the sound discretion of the district court, ... and will not be overturned absent an abuse of discretion, such as mistake of law or a clearly erroneous factual finding." *Goldberger*, 209 F.3d at 47;[12] *In re Fine Host*, 2000 WL 33116538, at *4. The Second Circuit has instructed that in exercising their discretion:

> [D]istrict courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation...., (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50, *quoting Union Carbide*, 742 F. Supp. at 163; *In re Fine Host*, 2000 WL 33116538, at *4. As the *Union Carbide* court has observed, in applying these criteria, "a Court essentially makes no more than a qualitative assessment of a fair legal fee under all the circumstances of the case." *Union Carbide*, 724 F. Supp. at 166.

---

[12] The Second Circuit has held that the already deferential "abuse of discretion" standard of review "takes on special significance when reviewing fee decisions," *Goldberger*, 209 F.3d at 47 (acknowledging that "[t]he district court, which is intimately familiar with the nuances of the case, is in a far better position to make [such] decisions than is an appellate court, which must work from a cold record.") *See also In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992) (per curiam).

B.  **The Requested Fee is Fair and Reasonable as a Percentage of the Fund Created for the Benefit of Class Members and Consistent with Fee Awards in Comparable Cases**

Irrespective of the method employed, the requested fee in this case is consistent with fee awards in comparable cases. There are scores of recent common fund cases in which district courts in the Second Circuit have awarded fees totaling as much as 33 1/3% of the settlement fund. *See, e.g., In re Netease.com, Inc. Sec. Litig.*, No. 01-CV-9405 (RO), slip op. at 3 (S.D.N.Y. May 16, 2003); *RMED Int'l, Inc v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239 (S.D.N.Y. May 15, 2003); *Strougo*, 258 F. Supp. 2d at 262; *Maley*, 186 F. Supp. 2d at 370; *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2002 U.S. Dist. LEXIS 23170, at *5 (S.D.N.Y. Dec. 4, 2002); *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145, slip op. at 2 (S.D.N.Y. Dec. 10, 2001); *Newman v. Caribiner Int'l Inc.*, No. 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001); *Saddle Rock Partners, Ltd. v. Hiatt*, No. 96 Civ. 9474 (SHS) (S.D.N.Y. Apr. 12, 2001); *Leventhal v. Tow*, No. 397 CV 0742 (DJS) (D. Conn. Jan. 31, 2001); *Milman v. BoxHill Sys. Corp.*, No. 98 Civ. 8640 (SAS) (S.D.N.Y. Jan. 9, 2001); *In re Cityscape Fin. Corp. Sec. Litig.*, MDL Docket No. 1234 (E.D.N.Y. Nov. 27, 2000); *Btesh v. Bahnman*, No. 3:98 CV-00213 (D. Conn. Nov. 3, 2000).[13]

---

[13] *See also Adair v. Bristol Tech. Sys.*, No. 97 Civ. 5874, No. 1999 U.S. Dist. LEXIS 17627 (S.D.N.Y. Nov. 16, 1999); *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 182 (E.D.N.Y. 1999) (one-third fee, plus expenses, is "well within the range accepted by courts in this circuit"); *Lemmer v. Golden Books Family Entm't Inc.*, No. 98 Civ. 5748 (S.D.N.Y. Oct. 12, 1999) *sub nom., Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513 (2d Cir. 1998); *Klein ex rel. Ira v. PDG Remediation*, No. 95 Civ. 4954, 1999 U.S. Dist. LEXIS 650, at *10-11 (S.D.N.Y. Jan. 26, 1999); *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 313 (S.D.N.Y. 1997), *aff'd*, (2d Cir. 1998); *In re MTC Electronic Technologies Shareholder Litig.*, No. CV-93-0876 (E.D.N.Y. Oct. 20, 1998); *Moelis v. Hyperion Capital Mgmt., Inc.*, No. 94 Civ. 3328 (S.D.N.Y. Oct. 16, 1997); *In re Baesa Sec. Litig.*, Nos. 96 Civ. 7435, 96 Civ. 8141 (S.D.N.Y. 1998); *In re JWP, Inc. Sec. Litig.*, No. 92 Civ. 5815 (S.D.N.Y. Jan. 24, 1997); *In re In-Store Adver. Sec. Litig.*, No. 90-CIV. 5594 (PKL) (S.D.N.Y. Dec. 18, 1996); *In re SLM Int'l, Inc. Sec. Litig.*, No. 94 Civ. 3327 (RLC) (S.D.N.Y. July 23, 1996); *In re Columbia Sec. Litig.*, No. 89 Civ. 6821 (LBS) (S.D.N.Y. Feb. 15, 1995); *In re Gitano Group, Inc. Cons. Sec. Litig.*, File No. 91 Civ. 1440 (SS) (S.D.N.Y. Oct. 31, 1994). Although district courts in this Circuit have awarded fees in a lower range in certain common fund cases, these lower awards were based on findings that there was little, if any, litigation or contingency risk in the case. *See, e.g., Goldberger*, 209 F.3d at 53-54 (finding that "this was a 'promising case,' with almost certain prospects of a

In *In re Buspirone Patent*, No. 01-MD-1410, slip. op. at 41-43 (S.D.N.Y. Apr. 11, 2003), Judge Koeltl, applying the *Goldberger* factors, approved a requested fee of 33-1/3% (including expenses) of a settlement fund of $220,000,000, a multiple of 8.46 over lodestar, reasoning that:

> The fee of one-third falls within the range of rates that have been approved in other class actions. Determining then whether the percentage fee is a reasonable fee in this case applying the traditional standards it's clear. . . that this is a very large and complex litigation. There is always risk involved in the litigation. The fee that's being sought is a completely contingent fee. The case was taken . . . on a contingent basis and that is entitled to greater weight than simply an hourly rate because the lawyers could have walked away having done substantial work with no recovery. This is not a case where the ground was substantially plowed before ....
>
> The requested fee award in relationship to the settlement, the plaintiff's counsel are correct that the settlement is a very good settlement for the class. It is a high percentage of possible recovery for the class and the percentage fee is within the range of reasonableness for other contingent fees. There is certainly a public policy favoring the pursuit of anti-trust litigation on the part of consumers.
>
> Looking at the lodestar as a check on the one-third requested contingent fee suggests that this fee is at the high end because the relationship between the lodestar and the fee indicates a multiplier of 8.46 and plainly results in a ... high hourly rate. This is mitigated to some degree in the case in my view because the case has settled before a substantial amount of additional work has been done which would have to be done if the case went forward to complete discovery, substantive motions, pretrial preparations and trial, to say nothing of appeal.
>
> During all that period the number of hours spent would have significantly increased. So the lodestar would have gone up and the multiplier would have gone down without any reason to believe that the ultimate recovery would have been any greater for the class. . . .

Judge Koeltl's reasoning is equally applicable in this case and supports the requested fee of 33-1/3% of the Gross Settlement Fund. As discussed more fully below, the requested award is warranted and reasonable in light of the six *Goldberger* criteria.

---

large recovery from solvent defendants," in which a preceding government investigation resulting in guilty pleas "dramatically increased [plaintiffs'] chances of success".

43

1. <u>The Time and Labor Expended by Counsel</u>

The first *Goldberger* factor – the time and effort expended by counsel – supports the requested fee award in this case. Plaintiffs' counsel have a total combined lodestar of $1,862,701.25, which represents over 5,473 hours expended in litigating this case. This enormous effort, which yielded the exceptional $16.5 million Settlement before the Court, was reasonable and necessary in light of the complexity of this case and the vigorous defense mounted by Defendants.

As discussed above and in the Joint Declaration of Co-Lead Counsel in Support of Proposed Class Action Settlement and Petition for an Award of Attorneys' Fees and Reimbursement of Expenses, during the past two years Plaintiffs' counsel have, among other things:

- Comprehensively investigated materials publicly available including SEC filings, reports of analyst conferences and materials filed with insurance regulators throughout the country;
- Investigated Plaintiffs' claims through informal discovery produced by ANR including by reviewing lengthy testimony taken in the Transamerica arbitration and analyzed thousands of pages of produced documents;
- Consulted with expert advisors regarding the accounting, actuarial and damages issues presented;
- Consulted with counsel in Bermuda on issues of Bermuda law;
- Conducted extensive and on-going legal research and drafting in connection with the preparation of the initial complaint and the Amended Complaint;
- Negotiated a confidentiality order with counsel for Defendants;
- Researched, drafted and filed oppositions to Defendants' motions to dismiss;
- Formulated litigation strategy and coordinated the work and assignments of all Plaintiffs' counsel in regular conferences among Plaintiffs' Co-Lead Counsel on a regular basis, and communicated with clients;
- Prepared for and participated in the mediation of Plaintiffs' claims;
- Negotiated the settlement with Defendants' counsel; and
- Attended to matters related to the administration of the Settlement.

44

Significantly, this was not a case in which Plaintiffs' counsel was "helped enormously" by a parallel government investigation. *See Goldberger*, 209 F.3d at 56 (holding that a quality multiplier was not merited in such circumstances). In fact, despite the multiple restatements, the Securities and Exchange Commission ("SEC") never initiated proceedings against ANR or its outside auditors KPMG.

Plaintiffs in this case alleged and were prepared to prove at trial that ANR, and its officers and directors, acted knowingly or recklessly in issuing ANR's financial statements during the Class Period, because the errors were so fundamental, and the Transameria contract such a huge portion of ANR's business, that they simply could not have approved ANR's financial statements without, at minimum, being willfully blind to the errors. Evidence in support of these contentions was developed by Plaintiffs' counsel solely through their own efforts. After defeating Defendants' motions to dismiss, Plaintiffs' counsel reviewed over a 45,000 pages of documents and testimony produced by ANR, and worked closely with accounting, actuarial and damages consultants.

The hours expended by Plaintiffs' counsel in prosecuting this case are plainly reasonable given the stage at which the Settlement was reached. Informal discovery was commenced, several experts in different disciplines were consulted, motions to dismiss were fully briefed and decided, and a mediation was held before the Honorable Nicholas Politan (Ret.), Mediator.

As the foregoing discussion makes clear, the significant time and effort expended by counsel without any guarantee of payment supports the requested 33-1/3% fee in this case.

2.  The Magnitude and Complexity of the Litigation

The second *Goldberger* factor – the magnitude and complexity of the case – also supports the requested fee award in this case. As described in detail in the preceding sections, this action involved complex accounting and actuarial issues, which were difficult to prove and explain to a

45

jury. Plaintiffs alleged that Defendants failed to recognize expenses on its income statements for incurred (and often paid) obligations to policyholders (i.e., minimum interest guarantees) as provided in their annuity policies and as imposed by state law and failed to conduct "loss recognition testing" on its Transamerica contract in the face of adverse experience that diverged drastically from expectation. Proof of Plaintiffs' claims had to be developed through ANR's books and records, including complex actuarial documents used in connection with calculations of the Company's liabilities. Expert analysis was required from an actuary with respect to actuarial standards of practice and alternative methodologies for projecting liabilities, and further expert analysis was required from insurance and accounting experts with respect to deferred acquisition costs and proper calculation of reserves for future liabilities. Moreover, even assuming arguendo that Plaintiffs prevailed on liability issues, Plaintiffs' counsel faced the equally if not more difficult task of proving damages, which also required highly technical and complex expert analysis.

Plaintiffs' counsel's ability to obtain a recovery of this magnitude in this complex case also supports the requested fee.

3.    The Risk of the Litigation

The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining [a reasonable award of attorneys' fees]." *Goldberger*, 209 F.3d at 54. "[L]itigation risk must be measured as of when the case is filed," *id.* at 55, rather than with the hindsight benefit of subsequent events. From the outset, there was a significant litigation, collectibility and contingency risk in this case.

(i)    The Risk of Establishing Liability and Damages

Unlike the litigation in *Goldberger*, which was preceded by a lengthy government investigation that resulted in guilty pleas to charges of securities fraud, in this case, Plaintiffs had

46

the heavy burden of proving that ANR's financial results had been fraudulently, not just mistakenly, misstated. As explained above, due to the complexity of the actuarial and accounting issues regarding minimum interest guarantees and deferred acquisition costs, litigation risk was immense. Plaintiffs faced the difficult task of proving their case at trial through the complex testimony of their experts and the testimony of hostile witnesses – present and former ANR and KPMG employees, including Defendants, who maintained that ANR's financial results had not been falsely stated, and that KPMG's audit complied with professional standards. Plaintiffs would also face enormous obstacles in proving that Defendants had acted knowingly or recklessly, particularly in light of Defendants' contention that they relied in good faith on KPMG.

        (ii)     The Risk of Collectibility

There were also serious collectibility issues in this case. If litigation proceeded, ANR's attorneys' fees, expert expenses, and other litigation costs would likely exhaust most, if not all, of ANR's $10 million D&O policy and, without resolution of this litigation, ANR is unlikely to be able to rehabilitate itself with its other creditors, so that a litigated judgment against ANR is likely to be uncollectible. Indeed, at the outset of the litigation, there were serious questions concerning whether ANR would be able to pay a judgment or settlement of any size and ANR's financial condition remained precarious throughout. As the true market risks associated with its annuities reinsurance business materialized and ANR's huge losses became known, ANR could no longer satisfy the financial covenants in its reinsurance contracts, nor write new business, and, ultimately, warned investors that it might no longer be able to continue as a going concern. Moreover, collecting any judgment would be significantly risky since ANR and XL Capital, the entities most likely to pay any judgment, are Bermuda corporations, and Plaintiffs faced difficulties attendant to enforcing their judgments against assets overseas. Many countries

47

recognize only judgments for common law violations and will not give effect to those entered on statutory grounds that do not comport with their own policies.

      (iii)    Contingency Risk

In addition to the enormous litigation and collectibility risks, Plaintiffs' counsel diligently and vigorously pursued this case on an entirely contingent basis. Courts have recognized that the risk of non-payment in complex cases such as this one is very real and is heightened when, as in this case, Plaintiffs' counsel press to achieve the very best result for those they represent. There are numerous class actions in which Plaintiffs' counsel expended thousands of hours and advanced significant out-of-pocket expenses and yet received no remuneration whatsoever, despite their diligence and expertise. *See, e.g., Freedman v. Value Health, Inc.*, No. 01-7567. 34 Fed. Appx. 408 (2d Cir. 2002) (affirming district court's grant of summary judgment in favor of defendants); *In re Health Management, Inc. Sec. Litig.*, No. 96-CV-889 (ADS) (E.D.N.Y. 1999) (jury verdict for auditor in securities class action case); *In re Biogen Sec. Litig.*, No. 94-12177-PBS (D. Mass. 1999) (jury verdict for defendants in securities class action case); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant); *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) (appellate court affirmed the grant of summary judgment to defendants); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (appellate court overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988, on the basis of 1994 Supreme Court opinion); *In re Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139 (N.D. Cal. 2002) (summary judgment and judgment on the pleadings granted); *In re Apple Computer Sec. Litig.*, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96, 252 (N.D. Cal. Sept. 6, 1991) (class won jury verdict against two individual defendants, but district court vacated on motion for judgment notwithstanding the verdict);

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (class won a substantial jury verdict and a motion for judgment n.o.v. was denied, but on appeal the judgment was reversed and the case dismissed, after 11 years of litigation); *see also West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) (referencing two cases which went to trial – in one case plaintiffs recovered nothing and in the other they recovered less than the amount which had been offered in settlement).[14]

The contingent nature of plaintiffs' counsel's representation is an important factor in determining a reasonable award of attorneys' fees. As the Second Circuit in *City of Detroit v. Grinnell Corp.* stated:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974), *citing Cherner v. Transitron Elec. Corp.*, 221 F. Supp. 55, 61 (D. Mass. 1963). *See also Steiner v. Williams*, No. 99 Civ. 10186, 2001 U.S. Dist. LEXIS 7097, at *18 (S.D.N.Y. May 31, 2001); *In re "Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987); *Union Carbide*, 724 F. Supp. at 164 ("[C]ontingent fee risk is the single most important factor in awarding a multiplier"); *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 747 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("Numerous cases have recognized that the attorneys' contingent fee risk is an important factor in determining the fee award.") (citations omitted). Although the Second

---

[14] Thus, observations by some courts that "all but a small percentage of class actions settle, thereby guaranteeing counsel payment of fees and minimizing the risks associated with contingency fee limitations," *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2001 U.S. Dist. LEXIS 8418, at *16 (S.D.N.Y. Jun. 22, 2001), are misguided.