UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHERRY SCHNALL, Individually and on Behalf of All Others Similarly Situated, | : : : : : |
| Plaintiff, | : CIVIL NO. : |
| v. | : : |
| | : 3:02 CV 2133 (EBB) |
| ANNUITY AND LIFE RE (HOLDINGS), LTD., XL CAPITAL, LTD., LAWRENCE S. DOYLE, FREDERICK S. HAMMER, JOHN F. BURKE, WILLIAM W. ATKIN, BRIAN O'HARA, and MICHAEL P. ESPOSITO, JR., | : : : : : : |
| Defendants. | : : |

## RULING ON KPMG US's MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

In the amended complaint in this action ("the Complaint") (Doc. # 32)[1] the plaintiffs allege that "KPMG" audited the year-end financial statements of Annuity & Life Re (Holdings), Ltd. ("ANR") for the fiscal years ending December 31, 1999, December 31, 2000, and December 31, 2001. The plaintiffs, Communications

---

[1]     This case was originally assigned the case number 3:03-cv-1826 prior to consolidation. The First Amended Class Action Complaint against KPMG US and KPMG Bermuda, the relevant complaint for purposes of this ruling, is docketed under the original case number – 3:03-cv-1826.

Workers of America and Midstream Investments Ltd., brought this suit individually and on behalf of all others who purchased securities of ANR during the Class Period, which runs from March 15, 2000 to November 19, 2002. "ANR is a Bermuda corporation, formed in 1997 as a holding company for subsidiaries whose purpose was to sell annuity and life reinsurance products." Compl. ¶ 2. In a separate class action, plaintiffs sued ANR, and others, alleging fraud relating to certain inaccuracies in ANR's financial statements. Here, plaintiffs allege that "KPMG"[2] audited ANR's financial statements for the years 1999, 2000, and 2001, and consented to the use of its audit opinions in ANR's public filings and Annual Reports. The plaintiffs further claim that KPMG was aware that ANR's liabilities were understated and its profits overstated and that its audit reports constitute material misstatements disseminated to the market. The plaintiffs allege that ANR violated Generally Accepted Accounting Practices ("GAAP") and that the KPMG defendants failed to perform the audits in accordance with Generally Accepted Auditing Standards ("GAAS"). Both defendants are alleged to have violated

---

[2]     At times, plaintiffs refer to KPMG US and KPMG Bermuda, separately. For the most part, however, plaintiffs refer to them collectively as "KPMG." This strategy by the plaintiffs is the subject of a part of KPMG US's Motion to Dismiss and is addressed in this ruling.

§ 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  KPMG US is alleged to have violated § 20(a) of the Exchange Act.  Compl. ¶¶ 272-284.

In the audit opinions, which are attributed to KPMG in Bermuda by virtue of its address on each audit report, KPMG Bermuda represented that ANR's financial statements were "fairly presented in accordance with GAAP."  Compl. ¶ 13.  The plaintiffs allege that there were several "red flags" that should have alerted KPMG to ANR's alleged GAAP violations in its financial reporting, and that KPMG should have required a restatement by ANR or withdrawn its earlier audit opinions.  Compl. ¶¶ 79(I), 117, 250.  Plaintiffs' Complaint vaguely describes KPMG US and KPMG Bermuda as two separate, but affiliated, entities that have collaborated on the performance of corporate auditing services. Whether or not substantial participation and assistance by one entity of the other in the context of a corporate audit can sufficiently establish primary liability on the part of both entities is a central question raised by KPMG US in its Motion To Dismiss.

As is discussed more comprehensively below, this Court hereby grants KPMG US's Motion To Dismiss because the plaintiffs have not alleged any misrepresentations by KPMG US, and aiding and abetting liability no longer exists.  Further, the plaintiffs

3

have not alleged facts sufficient to establish control person liability as alleged against KPMG US.

### LEGAL STANDARD

"A Rule 12(b)(6) motion to dismiss tests only the adequacy of the complaint.  United States v. City of New York, 359 F.3d 83, 87 (2d Cir. 2004).  Thus, such a motion can be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Foncello v. U.S. Dept. Of the Army, 2005 WL 2994011 (D. Conn. Nov. 7, 2005).  "[W]hile bald assertions and conclusions of law will not suffice to state a claim, the district court, before granting a motion to dismiss, must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  Tarshis v. Riese Org., 211 F.3d 30 (2d Cir. 2000) (internal citations omitted).

### DISCUSSION

I.    **Section 10(b) of the Securities Exchange Act.**

In Count One of the Complaint, plaintiffs allege a violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against "KPMG."  Compl. ¶¶ 272-81.  Plaintiffs group KPMG US and

4

KPMG Bermuda together for purposes of their section 10(b) claims; however, in other parts of the Complaint plaintiffs describe and refer to them as two separate entities.  See Compl. at pp. 111, 118 ("KPMG Bermuda and KPMG USA are *both* responsible for the fraud.") (Emphasis added); (Count II alleges a violation of section 20(a) by KPMG (USA) only).  Plaintiffs further allege that "KPMG is organized in a series of local partnerships, limited partnerships, and/or corporations," as opposed to one single international entity.  Compl. ¶ 5.  "The different local firms may act separately or together ...."  Id.

To prove a violation of Section 10(b), a plaintiff must show that the defendant (1) made a misstatement or omission of material fact, (2) with scienter, (3) in connection with the purchase and sale of securities, upon which the plaintiff reasonably relied, (4) which proximately caused the plaintiff's damages.  Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000).  The Supreme Court eliminated the private right of action based on the aiding and abetting of a Section 10(b) violation when it held "that the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation."  Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994).  "[I]f Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in

5

order to be held liable under Section 10(b).  Anything short of

such conduct is merely aiding and abetting, and no matter how

substantial that aid may be, it is not enough to trigger

liability under Section 10(b)."  In re MTC Electronic

Technologies Shareholders Litig., 898 F.Supp. 974, 987 (E.D.N.Y.

1995) ("MTC Technologies I").[3]

---

[3]
      On reconsideration, the court changed its earlier ruling
and denied the underwriter's motion to dismiss, holding that "the
underwriter's role in a public offering is such that the
representations in a registration statement or prospectus are its
own ...." In re MTC Technologies Shareholder Litigation, 993
F.Supp. 160, 162 (E.D.N.Y. 1997) ("MTC Technologies II").  That
decision, however, was based primarily on the Court's belief that
"underwriters play [a central role] in the issuance of
securities" and there is a "special reliance on them by
prospective investors with respect to statements in a
registration statement or prospectus." Id. at 161.  The court
added, "when the underwriter does not speak out, the investor
reasonably assumes that there are no undisclosed material
deficiencies." Id. at 162 (emphasis added).  In MTC Technologies
II, the issuer actually made the allegedly false statements, but
the Court, on reconsideration, held that it was justifiable for
the public to assume that the issuer's statements were approved
by its underwriter.  That justifiable assumption coupled with the
underwriter's participation in the drafting of the allegedly
false statements resulted in the possibility of primary liability
even though the statements were not directly attributed to the
underwriter.  Here, however, the Court is not presented with the
same issue; namely, the special role of an underwriter in a
securities issuance.  Rather, ANR's investors were presented with
public statements that were, in fact, attributed to an auditor.
KPMG Bermuda signed its positive audit opinions.  The relevant
question is whether another auditor – albeit an affiliated one –
which allegedly assisted KPMG Bermuda may be held primarily
liable for KPMG Bermuda's public statements.  This is
distinguishable from MTC Technologies.

The plaintiffs in MTC Technologies I alleged that the defendant-underwriters – H.J. Meyers & Co., among others – "participated in drafting and circulating" the relevant prospectus, but there was "no allegation that H.J. Meyers made any of the allegedly fraudulent representations in that prospectus." Id.  In MTC Technologies I and II, the court concluded that the allegation of mere participation, without actually making any statements, would have been insufficient to establish primary liability, except that H.J. Meyers was the only underwriter of the prospectus and, in the "special" context of an issuance of securities, investors were entitled to rely on an assumption that the underwriter's silence meant that it had approved the issuer's statements in its prospectus or registration statement.  MTC Technologies II at 162-63.[4]  In the present action, KPMG US is not alleged to be the only, or even the primary, auditor of ANR and the special relationship described in MTC Technologies does not exist here.

---

[4]    The court in MTC Technologies II was "persuaded" by the plaintiffs' "conten[tion] that, in light of the central role underwriters play in the issuance of securities and the special reliance placed on them by prospective investors, they are simply not secondary actors with respect to statements in a registration statement or prospectus." MTC Technologies II, 993 F. Supp. at 162.

"Allegations of assisting, participating in, complicity in
and similar synonyms ... all fall within the prohibitive bar of
*Central Bank*." Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir.
1997) (citations and quotation marks omitted). "[I]f an
accountant does not issue a public opinion about a company,
although it may have conducted internal audits or reviews for
portions of the company, the accountant cannot subsequently be
held responsible for the company's public statements issued later
merely because the accountant may know those statements are
likely untrue." Id. at 721, quoting In re Cascade Int'l Sec.
Litig., 894 F. Supp. 437, 443 (S.D. Fla. 1995). The plaintiffs
in Shapiro argued that the accountant-defendants "were in
complicity throughout with the principal defendants." Shapiro,
123 F.3d at 721. However the court found "[t]his assertion of
aiding and abetting does not support a claim under § 10(b) as
interpreted by the *Central Bank* Court." Id. There, the court
construed the allegations in the complaint to limit the
accountant-defendant's role to the preparation of financial
projections, which were later included in the company's offering
memoranda. Id.

In Wright v. Ernst & Young, LLP, 152 F.3d 169 (2d Cir.
1998), BT Office Products, Inc. issued a press release containing
false and misleading statements. However, contained in BT's

8

press release was a caveat indicating the release had not been

audited.  No portion of the press release was attributed to its

auditors, Ernst & Young.  The plaintiff class essentially alleged

that, though the press release was not attributed to Ernst &

Young, Ernst & Young orally approved certain of BT's financial

statements prior to BT's press release and the investors relied

on the fact of that approval.  Id. at 170.  The plaintiff class

asserted that, even though the press release warned that the

statements contained therein had not been audited, "the market

knew and relied on the fact that these financial statements were

approved by Ernst & Young."  Id.  The plaintiffs claimed that

Ernst & Young knew its statements would be disseminated to the

public by BT and therefore its assurances to BT became material

misstatements made to the public.  The plaintiff class reached a

$1.48 million settlement with BT.  Id.

Despite the allegations of Ernst & Young's oral approval of

BT's allegedly false and misleading statements, the Wright court

dismissed the complaint against Ernst & Young, holding "a

secondary actor cannot incur primary liability under the Act for

a statement not attributed to that actor at the time of its

dissemination."  Wright, 152 F.3d at 175.  Because the press

release at issue in Wright did not mention Ernst & Young or

attribute any statements to it, Ernst & Young "neither directly

nor indirectly communicated misrepresentations to investors. Therefore, the amended complaint failed to allege that Ernst & Young made a material misstatement (or omission) on which a purchaser or seller of securities relied." Id. (Quotation marks and citations omitted.)  The Second Circuit also declined to adopt the "substantial participation" test, under which a secondary actor may incur primary liability if it substantially participates in the fraudulent conduct. Id. at 176.

In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152 (D. Mass. 2002), is often cited when distinguishing between aiding and abetting liability and primary liability.  There, several KPMG entities were named as defendants in a securities fraud class action.  KPMG Belgium was the primary auditor and it allegedly received the assistance of KPMG UK, KPMG US, and KPMG Singapore while conducting the audits of a speech technology corporation called Lernout & Hauspie Speech Products, N.V. ("L & H"). Id. at 156-57.  Of the four KPMG entities allegedly involved, only KPMG Belgium signed the audit reports.  Each of the four KPMG entities filed a motion to dismiss.  Both KPMG Belgium and KPMG US, whose motions were ultimately denied, were, at one time or another, listed as L & H's principal auditors on L & H's public filings, including its Annual Reports to Shareholders. Id. at 158.

KPMG Singapore allegedly provided its professional opinion
to KPMG Belgium that the company's operations and revenues were
fairly and accurately reported in conformity with GAAP.  Lernout,
230 F. Supp. 2d at 171.  The plaintiffs in Lernout alleged "KPMG
Singapore is liable for its own fieldwork and conclusions
communicated to the market over the signature of its sister
entity, KPMG Belgium," it "substantially participated in
misstatements made by a related entity," and "the KPMG partners
who participated in [a] conference call had actual and apparent
authority to speak for KPMG Singapore."  Id.  However, the court
held that, even if KPMG Belgium relied, in issuing its audit
opinion, on the assurances made by KPMG Singapore that L & H's
Singapore operations and revenues were fairly represented, "there
is no caselaw to support plaintiff's theory that KPMG Singapore
made a material misstatement or omission upon which investors
relied."  Id.  "KPMG Singapore did not prepare, draft, edit or
provide numbers for the audit.  Its role was more akin to the
review and approval allegations which no court has found
sufficient to trigger liability after Central Bank."  Id.

While KPMG Belgium was responsible for actually issuing the
company's audit reports, KPMG Singapore, in contrast, merely
communicated a "clean" audit opinion to KPMG Belgium and, thus,
the court held KPMG Singapore could not be held primarily liable

11

under Section 10(b) for its assistance of the primary auditor.
Id. at 171; In re Elan Corp. Sec. Litig., 02 Civ. 865 (RMB)(FM),
2004 WL 1305845, at *25 (S.D.N.Y. May 18, 2004).

    In its analysis of Lernout, the Elan Corp. court recognized
the significance of the fact that certain L & H annual reports
listed KPMG U.S. as "one of L & H's 'principal auditors,'" and
concluded it was "widely known" that KPMG US had a role in the
auditing of the company.  Elan Corp., 2004 WL 1305845, at *25;
Lernout, 230 F. Supp. 2d at 166.  Also, "[p]laintiffs allege[d]
with sufficient particularity that four times a year throughout
the Class Period, KPMG US drafted portions of L & H's financial
disclosures later filed with the SEC."  Lernout, 230 F. Supp. 2d
at 166-67 (emphasis added).  Thus, the Lernout court found that
it "was appropriate to infer that ... investors reasonably
attributed the statements contained in the quarterly and annual
reports to" KPMG US.  Elan Corp., 2004 WL 1305845, at *25,
quoting Lernout, 230 F. Supp. 2d at 167.

    In In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d
319 (S.D.N.Y. 2004), Judge Lynch ruled that a defendant may be
held primarily liable where the statement at issue is not
publicly attributed to the defendant, if the defendant's
participation is sufficiently substantial that it may be deemed
to have made the statement and "where investors are sufficiently

aware of defendant's participation that they may be found to have relied on it as if the statement had been attributed to the defendant." Id. at 333. The Global Crossing ruling took into consideration the reasoning of the Lernout court and the Second Circuit's emphasis on reliance. Global Crossing, 322 F. Supp. 2d at 333. The Southern District of New York held, in Global Crossing, that primary liability may attach to secondary actors in certain circumstances where, by virtue of the public's awareness of the secondary actor's substantial participation, a public statement issued by a primary actor may also be constructively attributed to a secondary actor. Id. Such circumstances have not been alleged here.

Here, plaintiffs assert many "blanket allegation[s]" which are "vague and conclusory, and, without more, would not sustain a claim for primary liability under section 10(b)" against KPMG US. Id. Plaintiffs' few specific allegations regarding KPMG US include the claim that a representative of KPMG US, Richard H. Browne, "worked extensively with ANR from at least February 1999 through July 2002 on ANR's accounting for the Transamerica contract." Compl. ¶ 259. Plaintiffs further allege that "Browne instructed ANR on various matters, including instructions on how to amortize the DAC [Deferred Acquisition Costs] associated with Transamerica, how to write-down the DAC, how to conduct loss-

13

recognition testing, and how to account for historical and projected minimum interest guarantee payments." Id. There are no specific allegations that KPMG US representatives "actually prepar[ed] and provi[ded] certain amounts and disclosures for inclusion in the" quarterly and annual reports that were issued publicly. See Lernout, 230 F. Supp. 2d at 168-69 (where KPMG UK essentially drafted public statements and then had another KPMG entity sign off on KPMG UK's work, KPMG UK could have been held primarily liable.)[5] Further, and perhaps more significantly, there is no allegation that the public was "aware" of KPMG US's alleged participation in the ANR audits. The plaintiffs do not allege that KPMG US was, for example, listed in any of ANR's annual reports, or any other public filings, as one of ANR's principal auditors. Without more, the plaintiffs' allegations do

---

[5]      In Lernout, KPMG UK's representative, Robert McLamb, "was a key behind-the-scenes player in drafting the statement and conducting the audit, and he knew that the statements he prepared would be publicly disseminated. Absolving an auditor who prepares, edits, and drafts a fraudulent statement knowing it will be publicly disseminated simply because an affiliated auditor with which it is working under a common trademark is the one to actually sign it, would stretch Central Bank's holding too far. Under the best reading of Central Bank and its progeny, KPMG UK's role in the making of the 1998 Annual Report was sufficient to trigger primary liability if it also acted with the requisite level of scienter," which it did not. Lernout, 230 F. Supp. 2d at 168-69.

14

not amount to anything more than mere assistance, allegations
akin to aiding and abetting liability.

### KPMG US's AGENCY RELATIONSHIP

Plaintiffs have not pleaded sufficiently the authority of
KPMG US to bind KPMG Bermuda as its principal, and have not
pleaded an agency relationship between the two KPMG entities that
would provide a basis for liability of KPMG US for KPMG Bermuda's
allegedly fraudulent misstatements.  Merrill Lynch Interfunding,
Inc. v. Argenti, 155 F.3d 113, 122 (2d Cir. 1998).

The Complaint contains no allegation that KPMG US had the
"authority, whether apparent, actual or implied, to bind [KPMG
Bermuda]."  Id.  Plaintiffs do not allege joint control over the
management of the business, that the name KPMG US was listed
anywhere on the audit reports, or that there was any written
indication that KPMG US would be retained as an independent
auditor or otherwise be authorized to bind KPMG Bermuda.  Though
plaintiffs allege that both KPMG entities collaborated to some
degree on the ANR audits, "they do not cite any support for the
notion that such collaborations occurred at the behest of, on
behalf of, under the direction of, or subject to the control of
KPMG" Bermuda.  See In re Lernout & Hauspie Sec. Lit., 230
F.Supp.2d 152, 173 (D. Mass. 2002), citing Restatement (Second)
of Agency § 1 (1958) ("for an agency relationship to exist, two

15

people must agree that one person shall act on behalf of the other person and subject to his control"). Plaintiffs have not alleged an agency relationship between KPMG US and KPMG Bermuda.

### *KPMG US' Liability Under Rule 10b-5(a) and (c)*

Finally, in the their opposition, plaintiffs claim that even if KPMG US is not liable for any alleged misstatements under subsection (b) of Rule 10b-5, it is liable under subsections (a) and/or (c) for participating in a "scheme to defraud."

Rule 10b-5 states as follows: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The plaintiffs' Complaint alleges secondary wrongdoing by KPMG US involving the financial accounting, reports, and public statements of ANR and KPMG Bermuda's "clean audit" reports. This

16

secondary activity does not provide a basis for holding KPMG US
primarily liable under Rule 10b-5(a), (b) or (c).  See Goldberger
v. Bear, Stearns & Co., Inc., 2000 WL 1886605, at *4 (S.D.N.Y.
Dec. 28, 2000), citing In re Blech Sec. Litig., 961 F.Supp. 569
(S.D.N.Y. 1997).  While a defendant does not have to make a
misstatement in order to run afoul of Rule 10b-5, subsections (a)
and (c) do not provide a path around the prohibition against
secondary Section 10(b) liability.  "In short, subsections (a)
and (c) of Rule 10b-5 do not create a short cut to circumvent
Central Bank's limitations on liability for a secondary actor's
involvement in preparing misleading documents."  In re Lernout &
Hauspie Securities Lit., 230 F.Supp.2d 152, 174-75 (D. Mass.
2002).  Regardless of which subsection of Rule 10b-5 the
plaintiffs cite, the allegations in the Complaint do not
establish more than the secondary assistance by KPMG US of KPMG
Bermuda's alleged Section 10(b) violation(s).

Without more, the amended complaint fails properly to allege
a violation of Section 10(b) by KPMG US and its motion to dismiss
Count One is hereby granted.

## II.  PLAINTIFFS ALSO FAIL TO ALLEGE THE REQUIREMENTS FOR CONTROL PERSON LIABILITY UNDER SECTION 20(a)

Section 20(a) provides that "[e]very person who, directly or
indirectly, controls any person liable under any provision of

17

this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

"In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense [a] culpable participant[] in the fraud perpetrated by [the] controlled person[]." SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) (quotations and citations omitted). The plaintiffs' allegations regarding KPMG US's ability to control or influence KPMG Bermuda do not adequately establish control person liability. "Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Id. "In short, the second prong of the § 20(a) test requires a plaintiff to make two distinct factual allegations: that the

18

'status' of the controlling entity gave it 'general' power over the controlled entity; and that the controlling entity did, in fact, exercise such power." In re Lernout & Hauspie Securities Lit., 230 F.Supp.2d at 175. Allegations of collaboration on an audit and the joint defense of that audit do not meet these minimum requirements. Id.

In Judge Goettel's earlier decisions in this case, he found certain Section 20(a) claims against individual defendants to have been sufficiently pleaded. Schnall v. Annuity and Life Re (Holdings) Ltd., 02 CV 2133 (GLG), 2004 WL 231439, at *9 (D. Conn. Feb. 4, 2004). However, significant facts in that case, which are not present here, established control by those defendants over the violating parties. For example, Judge Goettel held in one case that a particular defendant had "signed multiple disclosures filed with the SEC that are alleged to have contained actionable misrepresentations, including Forms 10-K and registration statements. The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents." Id. "These approvals through signing

19

sufficiently allege control over those who have been alleged to have violated Section 10(b)."  Id.

Plaintiffs do not make similar allegations in the Complaint against KPMG US.  Nor do plaintiffs claim that KPMG US used its alleged control over KPMG Bermuda to bring about the Section 10(b) violations.  Rather, plaintiffs' allegations merely describe KPMG US's participation and assistance of KPMG Bermuda and ANR in the performance of various accounting and auditing tasks, including the defense of the underlying audits, which are not sufficient to establish control over KPMG Bermuda.

With respect to KPMG US's role in the defense of the ANR audits, the plaintiffs allege that, after the "SEC began to make inquiries of ANR and its auditors," KPMG US, among others, participated in conferences with the SEC.  Compl. ¶ 261.  During this time period, ANR and the SEC corresponded, sending copies to KPMG Bermuda and KPMG US.  Id.  Members of KPMG US "participated in telephone conferences and/or meetings with the SEC about ANR's financial reporting ... to defend ANR's financial reporting, and to lend their prestige and support to the false audit opinions issued by KPMG."  Id.  Then, in conclusory fashion, plaintiffs assert that KPMG US exercised "domination of the defense of ANR's reporting ... to the SEC," and thereby "demonstrated its control of the audit positions and public representations made with

20

respect to ANR's financial reporting ...."  Compl. ¶ 264.
Plaintiffs' factual allegations do not support this conclusion
and, likewise, do not support a Section 20(a) control-person
claim against KPMG US.

 Therefore, Count Two is hereby dismissed.


**<u>CONCLUSION</u>**

 For the foregoing reasons, KPMG US's Motion To Dismiss (Doc.
# 121) is hereby GRANTED.  The clerk is directed to dismiss KPMG
US from this case.


     SO ORDERED


     _____
     ELLEN BREE BURNS
     SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this _____ day of August, 2006.