# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| COMMUNICATION WORKERS OF AMERICA; MIDSTREAM INVESTMENTS LTD, Individually and On Behalf of All Others Similarly Situated, | § § § § | Civil Action No 03 CV 1836 (GLG) |
| Plaintiffs, | § § | |
| vs. | § § | |
| KPMG LLP (UNITED STATES) AND KPMG in BERMUDA, | § § | |
| Defendants. | § § | |

DECLARATION OF JANE D. NETTESHEIM

**<u>Table of Contents</u>**

I.     **Qualifications and Background** .......................................................................1

II.    **Bases for Opinions** ........................................................................................2

III.   **Securities prices in efficient markets reflect the market's consensus as to fair value given all publicly available information at the time of purchase or sale** ............3

IV.   **Application of the Cammer/Unger/Bell Factors to ANR common stock demonstrates that the market for ANR common stock was efficient during the Class Period** ..............................................................................................6

    *A. Cammer/Unger/Bell Factor 1: Weekly trading volume* ......................................6

    *B. Cammer/Unger/Bell Factor 2: The number of securities analysts following and reporting on ANR* ..............................................................................................8

    *C. Cammer/Unger/Bell Factor 3: The number of market makers* ............................9

    *D. Cammer/Unger/Bell Factor 4: Whether ANR was eligible to file SEC Form S-3* ............13

    *E. Cammer/Unger/Bell Factor 5: Empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate reaction in the stock price* ......................................................14

    *F. Unger/Bell Factor 6: Market capitalization* ....................................................21

    *G. Unger/Bell Factor 7: Bid/ask spread* ..............................................................22

    *H. Unger/Bell Factor 8: Public float* ..................................................................23

V.    **Conclusion** ..................................................................................................23

I, Jane D. Nettesheim, declare as follows:

I.    **Qualifications and Background**

1.    I am a financial economist and vice president of Stanford Consulting Group, Inc. ("SCG"). Since 1981, SCG has provided economic research and expert testimony for business litigation and regulatory and legislative proceedings. All SCG professionals hold masters or doctoral degrees in business, economics or operations research, and senior consultants have testified as experts in these fields. I have a B.A. in biology from the University of Colorado and an M.B.A. from the University of Hawaii. I completed the coursework in the Ph.D. program in finance at the London Business School, University of London (I did not write a dissertation and, therefore, do not have a Ph.D.). I taught managerial economics for one semester in the undergraduate program in the business school at the University of Hawaii. I taught corporate finance in the MBA programs at the City University of London for one term and at the University of San Francisco for one semester. My curriculum vitae, including a list of publications, and the list of the expert testimony I have provided at deposition or trial are attached as Exhibits 1A and 1B. The fees charged for this project are the standard hourly rates of employees of SCG. My current hourly rate is $475.

2.    Since 1990, I have served as a consultant and expert to analyze market efficiency, materiality and loss causation, and to calculate damages in a number of securities class actions. I have examined the relationship between stock price movements and changes in market and industry indices for a number of stocks in a variety of industries. I have examined the relationship between information releases and changes in stock prices for a number of companies in a variety of industries. I have analyzed various data sources for information about shareholdings and trading activity for different types of market participants. I have prepared memoranda and reports based on the results of these analyses.

1

3.     Counsel for Plaintiffs have asked me to examine and opine on the efficiency of the market for the common stock of Annuity and Life Re (Holdings), Ltd., ("ANR" or the "Company") from March 15, 2000 through November 19, 2002 (the "Class Period").  From April 17, 1998 until July 31, 2001, ANR's stock traded on the NASDAQ under the ticker "ALRE."[1]  From August 1, 2001 until at least the end of the Class Period, ANR's stock traded on the New York Stock Exchange ("NYSE") under the ticker "ANR."  If called to testify, I will offer my opinions on efficiency of the markets for ANR's common stock during the Class Period.

4.     The opinions offered in this declaration are subject to refinement or revision based on continuing analysis of the documents and materials identified in this declaration and its exhibits, as well as new or additional information which may be provided to or obtained by me in the course of this matter.  I expect to review additional information and documents, including information and documents that may become available through discovery and the reports and depositions of other expert witnesses

## II.     Bases for Opinions

5.     My opinions are based upon my professional knowledge and experience, as well as on a review of documents and information relevant to this matter and the analysis of data and application of models as described in this declaration.  The documents reviewed in part or in whole are cited in this declaration and/or its exhibits (a list of documents and materials is provided in Exhibit 2).

---

[1] The Company completed an initial public offering of its equity securities and commenced operations on April 17, 1998.

III.    **Securities prices in efficient markets reflect the market's consensus as to fair value given all publicly available information at the time of purchase or sale**

6.    Over the past thirty years, the efficient capital market hypothesis ("ECMH") has risen to a prominent position in financial and economic theory.  In its most commonly held form – known as "semi-strong" – the ECMH states that the securities markets incorporate all publicly available information.  This hypothesis has been empirically validated in numerous studies and the ECMH also has stood up against its critics.  While anomalies have occurred in financial markets, they are random and do not allow for trading strategies that would create abnormal profits.[2, 3]

7.    The fraud-on-the-market theory relies on informational efficiency, specifically that the price of the security reflects publicly available information.  For defendants' statements to have impacted stock prices, the market must be informationally efficient.  Informational efficiency

---

[2] Fama, Eugene F., "Market Efficiency, Long-term Returns, and Behavioral Finance," *Journal of Financial Economics* Vol. 49, 283-306 (1998).  As Fama states: "Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction to information is about as common as underreaction, and post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal.  Most important, consistent with the market efficiency prediction that apparent anomalies can be due to methodology, most long-term return anomalies tend to disappear with reasonable changes in technique."

[3] Malkiel, Burton G., "The Efficient Market Hypothesis and Its Critics," *Journal of Economic Perspectives*, Vol. 17, 59-82 (Winter 2003).  Malkiel writes "Before the fact, there is no way in which investors can reliably exploit any anomalies or patterns that might exist. ... these patterns are not robust and dependable in different sample periods, and some of the patterns based on fundamental valuation measures of individual stocks may simply reflect better proxies for measuring risk. ... Many of the predictable patterns that have been discovered may simply be the result of data mining."  He further quotes Richard Roll, an eminent academic financial economist and portfolio manager, "I have personally tried to invest money, my client's money and my own, in every single anomaly and predictive device that academics have dreamed up. ... I have attempted to exploit the so-called year-end anomalies and a whole variety of strategies supposedly documented by academic research.  And I have yet to make a nickel on any of these supposed market inefficiencies ... a true market inefficiency ought to be an exploitable opportunity.  If there's nothing investors can exploit in a systematic way, time in and time out, then it's very hard to say that information is not being properly incorporated into stock prices."

also has been cited recently by certain Courts as an appropriate measure of market efficiency in securities cases.[4]

8.     In an efficient market, investors can rely on the market price as reflecting all publicly available information.  In other words, the price at which an investor can buy or sell a security is the market's consensus as to that security's fair value given all of the publicly available information at the time of purchase or sale.

9.     The seminal Rule 10b-5 case of the 1980's, <u>Basic Inc. v. Levinson</u>, clarified that because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations may be presumed for purposes of a Rule 10b-5 action.

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.… Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. … The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[5]

10.    The fraud-on-the-market theory permits investors in an efficient market to rely on the market price, even though that price may contain the effects of misrepresentations or omissions. The <u>Basic</u> Court noted:

> Accord, *e.g.*, Peil v. Speiser, 806 F. 2d, at 1161 ("In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value").[6]

---

[4] *See In re PolyMedica Corp. Sec. Litig.*, No. 05-1220 slip op. (1st Cir. Dec. 13, 2005); *See also In re Excelera.com Sec. Litig.*, No. 05-1220 slip op. (1st Cir. Dec. 13, 2005).

[5] *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), at 241-242.  Quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986).

[6] *Basic* at 244.

11.    A direct empirical test of market efficiency is to examine price responsiveness to the release of new and material information.  If the security price responds quickly, the response supports a conclusion that the market for the security is efficient.  As an indirect test of efficiency, one can examine whether market conditions facilitate efficiency.  Case precedent exists on such indirect indicators of market efficiency.  The Cammer Court found that for the market for a particular security to be efficient, the following two criteria should be met:[7]

a)    it should trade in an open market in which anyone, or at least a large number of persons, can buy or sell;

b)    it should trade in a developed market which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available.  It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

12.    Specifically, the Cammer Court identified five factors that may be considered in determining whether a market for a stock is efficient and, therefore, whether security prices respond quickly to new relevant information.  These factors include both a direct empirical test, as well as indirect indicators, of the efficiency of a market for a security.  The Unger Court and the Bell Court (as well as the Krogman Court) considered these five factors in evaluating market efficiency, and three additional factors.[8]  In forming my opinion, I have considered each of the eight Cammer/Unger/Bell Factors as applied to the market for ANR common stock:[9, 10]

---

[7] *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 n. 17 (D.N.J. 1989): "Definitions of the key terms which underlie the fraud on the market theory were offered by commentators Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug.1988)" ("Bromberg").

[8] *Unger v. Amedisys* 401 F.3d 316, 323, HN10; *Bell v. Ascendant* 422 F.3d 307, 313, n10.

[9] *Cammer* at 1285–87.

    a)     whether the security trades at a large weekly volume;

    b)     whether analysts follow and report on the security;

    c)     whether the security has market makers and whether there is a potential for arbitrage activity;

    d)     whether the company is eligible to file SEC Form S-3; and

    e)     whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price;

    f)     the Company's market capitalization;

    g)     the bid/ask spread for common stock sales; and

    h)     the security's float, or shares outstanding excluding insider-owned stock.

13.     The Cammer/Unger/Bell Factors address informational efficiency, *i.e.*, whether the market conditions exist such that when information is released, the price of the company's security changes to reflect the new mix of public information.

14.     Consideration of the Cammer/Unger/Bell Factors, supports my conclusion that the market for ANR common stock during the Class Period was informationally efficient.

**IV.    Application of the Cammer/Unger/Bell Factors to ANR common stock demonstrates that the market for ANR common stock was efficient during the Class Period**

*A.   Cammer/Unger/Bell Factor 1: Weekly trading volume*

15.     A market for a stock is liquid if investors can trade a large number of shares on demand. Liquidity allows investors to buy and sell shares quickly when their assessments about the value of a company's stock have changed, facilitating a prompt price reaction to material new

---

[10] *Unger* at 323; *Bell* at 313, n10; *Krogman v. Sterritt* 202 F.R.D. 467 (N.D. Tex. 2001) at 474, 478; *O'Neil v. Appel* 165 F.R.D. 479 (W.D. Michigan 1995) at 500-501, 503.

information.  The high level of trading activity associated with trading in ANR common stock during the Class Period indicates that ANR common stock traded in a liquid market.

16.     From its initial public offering until July 31, 2001, ANR common stock was listed and traded on Nasdaq (thereafter it was listed on the NYSE).  The Cammer Court examined a stock that traded on the Nasdaq National Market System, as did ANR common stock during part of the Class Period.  The Nasdaq volume data reviewed by the Cammer Court counts both the buy transaction and the sell transaction for a transfer of stock from one investor to another (sometimes referred to as "double-counting").  However, this is the same way that ANR volume was reported when it traded on Nasdaq and the threshold for average weekly trading would be the same.  (See Exhibit 3 to this declaration for reported prices and volumes of ANR common stock.)

17.     According to one source cited by the Cammer Court, "turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[11] ANR shares issued and outstanding totaled 25.5 million at the beginning of the Class Period and 26.1 million at the end of the Class Period.  For ANR, the average weekly reported trading volume on Nasdaq, excluding partial weeks either not entirely contained within the Class Period or trading on the Nasdaq (i.e., the weeks ended March 17, 2000 and August 3, 2001), was 620,266 shares, or 2.4% of the shares outstanding.  The average weekly reported trading volume on the NYSE, excluding partial weeks either not entirely contained within the Class Period or trading on the NYSE (i.e., the weeks ended August 3, 2001 and November 22, 2002), was

---

[11] *Cammer* at 1293, quoting Bromberg.

867,727 shares, or 3.4% of the shares outstanding. (See Exhibit 4 for a summary of ANR common stock weekly trading volume and shares outstanding.)

18.    The annualized turnover ratio is the annual reported trading volume divided by the number of shares outstanding. In 1998, the average annualized turnover ratio was 215.8% on Nasdaq.[12] In 2000, 2001 and 2002, the average annualized turnover ratio was 88%, 94% and 105% for the NYSE.[13] Total trading volume of ANR common stock during the Class Period was 104.1 million shares, compared to 26.1 million shares outstanding at the end of the Class Period. This is an annualized turnover ratio of 149%.[14] ANR's annualized turnover ratio, during the Class Period, was less than the average for all stocks listed on Nasdaq in 1998, the last year this statistic was reported by Nasdaq, and higher than the average for all stocks listed on the NYSE during the Class Period.

19.    ANR's high weekly trading volume support a conclusion that the market for ANR common stock was efficient during the Class Period.

B.    *Cammer/Unger/Bell Factor 2: The number of securities analysts following and reporting on ANR*

20.    Securities analysts research and report to investors on the financial condition and prospects of a covered company. Analysts are conduits to the market for information collected from management from on-site visits, conference calls accompanying key company announcements, and other contacts with senior management. Analysts can channel new information to the market rapidly through their published reports, online reporting services such as First Call, and alerts given to clients and other employees of the same investment firm.

---

[12] 1999 Nasdaq-Amex Fact Book & Company Directory, page 59. This is the most recent book available, as Nasdaq is no longer providing this information.

[13] www.nysedata.com

[14] Share volume divided by shares outstanding divided by time period in years.

Analysts thus facilitate the dissemination of new information to investors and any corresponding share price reaction.

21.    During the Class Period, securities analysts published reports on ANR, including analysts from the following firms: Prudential Securities; Keefe, Bruyette & Woods; J.P. Morgan; Bear Stearns; Dresdner Kleinwort Wasserstein; and Putnam Lovell Securities. There were at least 90 analyst reports published on ANR during the Class Period. (See Exhibit 5 for a list of securities analyst reports covering ANR during the Class Period that are currently available on Investext and Reuters-on-Demand.) Analysts issued more than 200 reports about ANR through First Call and Bloomberg, electronic reporting services.

22.    The number of analysts and the amount of reporting on ANR during the Class Period support a conclusion that there was an efficient market for ANR common stock during that time.

C. _Cammer/Unger/Bell_ Factor 3: The number of market makers

23.    Nasdaq allows all participants equal access to the market and to market information through a simultaneous broadcast of quotes over computer terminals to over 1.2 million users and 83 countries. Market makers are independent dealers competing for market participant orders by displaying buy and sell interest in Nasdaq-listed securities. Market makers help to ensure a liquid market for a particular stock, a market in which willing buyers can readily find willing sellers, and vice versa. Market makers in a particular stock stand ready to provide stock price quotations and facilitate trading by purchasing that stock from and selling to market participants. They also buy and sell shares and may increase or reduce their inventory when pricing discrepancies exist. Market makers display both buy and sell quotes in all securities in

9

which they choose to make a market and are subject to disciplinary action if they fail to honor their quoted prices.[15]  Market efficiency can be facilitated by market maker involvement.

24.     A security's listing on a national exchange or Nasdaq means that financial information about that company is readily available to investors, at a minimum, through the company's SEC filings.  Listing on the NYSE, AMEX or Nasdaq, means that investors have access to trading prices and volumes throughout the trading day.  Rules of the national exchange require that investors buy at the lowest ask price and sell at the highest bid price prevailing at the time of their trade.[16]  Because a national exchange or Nasdaq brings together many thousands (or millions) of investors, trading prices reflect a consensus opinion as to securities' values.  The Cammer Court cited Bromberg, which suggested the following:

> at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[17]

25.     Bloomberg provided information about the number of market professionals who traded in ANR stock during the Class Period when ANR was listed on Nasdaq, as well as the total monthly volume for each participant.  Market professionals include registered market makers, Electronic Crossing Networks ("ECNs"), and other market participants.  During the Class Period when ANR was listed on Nasdaq, there were 18 to 38 active registered and ECN market makers trading ANR common stock.  (See Exhibit 6 for monthly detail.)  During the Class Period, there were 17 market makers, on average, per stock listed on Nasdaq.  Market maker trading accounted for all of the reported volume of ANR shares during the Class Period when ANR was

---

[15] "About Nasdaq" found at http://www.nasdaq.com/about/index.html, page 48.

[16] Market Structure and Trading Volume, Anderson & Dyl, pg. 2 (April 2004), available via NYSE.com

[17] *Cammer* at 1292, quoting Bromberg.

listed on Nasdaq. Further, many of the market makers trading in ANR stock each handled a sizeable volume of shares. (See Exhibit 6B for the monthly volume by market maker for ANR stock.) The large number of market makers for ANR stock supports my opinion that the market for ANR stock was efficient.

26.     The NYSE, where ANR common stock was traded after July 31, 2001 the Class Period, uses specialists to facilitate an orderly and efficient market for each security. The NYSE assigns one dealer, known as the specialist, to each security traded on the NYSE. These specialists are independent companies in corporate or partnership structures whose responsibilities require them to maintain a fair, competitive, orderly and efficient market for the securities assigned to them. Specialists achieve this function by performing four critical roles: as an auctioneer, continually showing the best bids and offers, and maintaining order in the crowd; as an agent for SuperDot orders (direct electronic routing system to and from the trading floor) as well as for brokers; as a catalyst for order flow by informing interested parties of items available in the market; and as principal, where the specialist has an obligation to enter into a transaction using its own capital if there is a willing buyer or seller with no counterparty in the marketplace. Specialists thus facilitate continuous trading during market hours. Market makers and specialists enable investors to trade promptly upon the arrival of new relevant information, and thereby new information can be rapidly reflected in securities prices.

27.     This Cammer/Unger/Bell factor also addresses the existence of arbitrageurs, generally understood to be sophisticated investors who can act rapidly to take advantage of pricing discrepancies. Arbitrage has been defined as:

> … the process of earning riskless profits by taking advantage of differential pricing for the same physical asset or security. As a widely applied investment tactic, arbitrage typically entails the sale of a security at a relatively high price and

the simultaneous purchase of the same security (or its functional equivalent) at a relatively low price.

Arbitrage activity is a critical element of modern, efficient security markets. Because arbitrage profits are by definition riskless, all investors have an incentive to take advantage of them whenever they are discovered. Granted, some investors have greater resources and inclination to engage in arbitrage than others. However, it takes relatively few of these active investors to exploit arbitrage situations and, by their buying and selling actions, eliminate these profit opportunities.[18]

28.    Short interest may be an indicator of arbitrage activity as arbitrageurs act to take advantage of and thereby eliminate any mispricing which may exist by simultaneously buying and selling securities, and/or by borrowing and selling short. A short sale is the sale of a stock that an investor does not own. When an investor holds the belief that a stock price will decline, he can borrow the stock, sell the stock, and then buy the stock back later to return it to the lender. If the price drops between the time that short seller sold the stock and he buys it back, the short seller realizes a gain. Thus, short-selling can facilitate market efficiency by allowing borrowing and selling of stock when investors believe that the price could decline.

29.    During the Class Period, 1.3% to 6.2% of ANR shares outstanding were reported as short interest. (See Exhibit 7.) Shares held by institutions are often available for borrowing by short sellers; thus the large number of institutional shareholders and their large shareholdings could facilitate market efficiency by permitting whatever short sales arbitrageurs wished to make. During the Class Period, institutional investors held almost the entire available float. Exhibit 8 shows institutional holdings reported at quarter-ends in 2000 through 2002.

---

[18] William F. Sharpe, et al., *Investments* (NJ: Prentice Hall) 1999, 6th ed., p. 284.

30.    Economist Gene D'Avolio summarized the market for short-selling in the United States by examining data from April 2000 to September 2001.[19] D'Avolio estimated that in the second quarter of 2001, as much as one-quarter of the U.S. market capitalization was available as loan supply for short-selling and that 7% of that capacity was utilized. In the database that he examined, D'Avolio found that short interest was, on average, 2.3% of shares outstanding. That there was supply available and that there appear to have been no constraints on shorting ANR's stock is demonstrated by the level of short interest (1.3% to 6.2% of shares outstanding – the average is 3.3% of shares outstanding – compared to D'Avolio's finding of 2.3% of shares outstanding, on average) and that the level of short interest varied widely.

31.    The level of short interest in ANR's common stock relative to shares outstanding and to the public float indicates that short-selling of ANR's common stock was not constrained during the Class Period and that arbitrage opportunities could be exploited, which is evidence in support of market efficiency.

D.  *Cammer/Unger/Bell Factor 4: Whether ANR was eligible to file SEC Form S-3*

32.    Form S-3 is a simplified registration form that may be used if a company has been subject to Securities Exchange Act of 1934 reporting requirements for more than one year, has filed all documents in a timely manner during the prior twelve months, and has not, since the last audited statements, failed to pay required dividends or sinking funds, or defaulted on debts or material

---

[19] Gene D'Avolio, "The market for borrowing stock," *Journal of Financial Economics*, November 2002, vol. 66, pp. 271-306. One of the largest security lenders in the world that accounts for significantly more than 10% of the total market short interest (and for many stocks the lender had sufficient supply to cover total short interest on its own) provided a proprietary database to D'Avolio. The specific data for ANR's common stock, or any stock, are not available from this database; however, D'Avolio examined a very large sample of data over a period of time that includes part of the Class Period.

leases.[20]  Thus, companies that have previously provided what the SEC deems to be sufficient

public information may incorporate prior filings by reference into current filings, and need not

repeat such information since it is already widely publicly available.  ANR filed Form S-3 on

March 1, 2002 and Form S-3/A on March 28, 2002.[21]

33.    In the <u>Cammer</u> decision, the Court stated:

> …some may concur with [Defendant's] suggestion … that companies listed on
> national stock exchanges or companies entitled to issue new securities using SEC
> Form S-3 would almost by definition involve stock trading in an 'open and
> developed' market…[22]

34.    ANR was traded on Nasdaq and then on the NYSE and did file Forms S-3 with the SEC

during the Class Period.  ANR's filing of Form S-3 with the SEC supports my conclusion that

the market for its common stock was efficient during the Class Period.

E.  *Cammer/Unger/Bell Factor 5: Empirical facts showing a cause-and-effect relationship
     between unexpected corporate events or financial releases and an immediate reaction in the
     stock price*

35.    According to the ECMH, securities prices in efficient markets incorporate all available

public information.  It is important to note that material new information is only new once, *i.e.*,

once incorporated into the market mix of information with subsequent price reaction, successive

announcements of the same information will have no additional effect on share price.  A direct

test of market efficiency is to conduct an event study to identify dates with large price

movements and to examine the information that was released to the market contemporaneous

with the stock price movements.

---

[20] www.sec.gov

[21] These Forms S-3 were never declared effective by the SEC because they were filed pursuant to
a proposed debt offering of $200 million that was subsequently withdrawn by ANR, on March
20, 2003.

[22] *Cammer* at 1276-77.

36.    Institutional investors such as pension funds, mutual funds, and investment banks, typically have ready access to minute-to-minute financial news and to online bulletins from analysts such as those disseminated through First Call. They also expend resources in analyzing the value of stocks in which they invest. Thus, the fact of significant institutional ownership is a signal that knowledgeable investors are closely and rapidly scrutinizing sources of company information and forming investment opinions that affect share price accordingly.

37.    As noted above, there was substantial institutional ownership of ANR common stock throughout the Class Period. Institutions held approximately 19.1 million shares at the start of the Class Period and as many as 23.4 million shares during the Class Period (at March 31, 2002). At the end of the Class Period, institutions held between 18.2 million shares and 13.9 million shares.[23] (See Exhibit 8.) Through September 30, 2002, institutions held almost the entire available float but had reduced their holdings significantly by December 31, 2002.[24]

38.    During the Class Period, institutional investors actively traded ANR common stock, as indicated by data from reporting institutions' filings of Form 13F with the SEC. Changes in institutional holdings of ANR shares from quarter-end to quarter-end for quarters falling within the Class Period were substantial; i.e., institutions purchased as few as 1.6 million shares during the third quarter of 2000 and at least 6.3 million shares during the third quarter of 2002. This indicates institutions were actively trading ANR stock. (See Exhibit 9.)

---

[23] Institutions which file Form 13F with the SEC report shares held as of the end of each calendar quarter.

[24] Exhibit 8 shows that institutions hold more than 100% of the shares available to them during 2001 and the first quarter of 2002. This may be caused by, *inter alia*, mis-reporting by both institutions and by insiders.

39.    The presence and trading activity of institutional investors in the market for ANR's common stock during the Class Period support a conclusion that the market for the stock was efficient during that period.

40.    Coverage of a company by wire services, financial press, and general media ensures that investors have ready access to new information about a company's condition and prospects, and facilitates rapid share price reaction to new information about the company.  Prior to, during, and after the Class Period, articles concerning ANR appeared in major news media in the United States, including electronic transmissions via Bloomberg and First Call, and were published by various new services, such as the following: *Business Wire*, *PR Newswire*, *Dow Jones News Service*, *Reuters News*, *Bloomberg News*, *Bestwire*, *Barron's*, and *The Wall Street Journal*. During the Class Period, over 200 electronic and/or printed articles were published with "Annuity & Life Re" appearing in the headline or first paragraph.  Headlines of news articles about ANR during the Class Period are included in Exhibit 10.  Titles from analyst reports during this period appear in Exhibit 5.

41.    In addition, ANR held conference calls with members of the investment community after each quarter's earnings announcement was released.  During the conference call, management described ANR's financial performance and condition, answered questions from participants, and often provided guidance on expected future financial performance.  During the Class Period, the Company conducted conference calls in conjunction with its earnings announcements.[25]

42.    The wide news coverage of ANR within the Class Period supports my conclusion that the market for ANR common stock was efficient during the Class Period.

---

[25] The Company would issue a press release prior to the earnings release indicating the date that it would report the quarter's financial results and the time scheduled for the corresponding conference call.

43.    ANR stock reacted to information and news about ANR.  The following are examples of the large price movements, net of market and industry effects, during the Class Period.

44.    On April 20, 2000, ANR fell 30.9%, or -31.3% net of market and industry effects.[26]  On April 19, after market close, ANR announced its earnings for first quarter 2000, which were less than analysts' estimates.  As a result, analysts cut their projections for 2000 and 2001.[27]

45.    On September 13 and 14, 2000, ANR fell 21.0%, or -21.1% net of market and industry effects and then rose 18.0%, or 18.2% net of market and industry effects.  On September 13 it was reported that worries about claims on its reinsurance contracts prompted the stock plunge.[28]

_____

[26] To assess the relationship between the price of ANR common stock and developments in the broad market and in the industry in which ANR competed, I examined the relationship between the daily returns on ANR's share price and the daily returns on a broad market index (the NYSE/AMEX/Nasdaq or "NAN" index supplied by CRSP) and I tested two industry indices.  I examined three control periods: (1) the one-year period prior to the start of the Class Period (March 15, 1999 to March 14, 2000); (2) the year 2000; and (3) the year 2001.  ANR stock returns were not correlated with NAN returns during the one-year period prior to the start of the Class Period or with the 2000 one-year period.  ANR stock returns were correlated with NAN returns during the 2001 one-year period; this was the control period used in the regression analysis.

ANR used what it described as the "Standard & Poor's Life/Health Index" as a comparative index in its 2000, 2001 and 2002 proxy statements.  I tested two industry indices, the Standard & Poor's 500 Life and Health Insurance Industry and the FactSet Life and Health Insurance Index, excluding ANR.  Returns from each industry index were regressed against the market index as the independent variable.  ANR stock's daily returns then were regressed as the dependent variable against the residual returns from each of these regressions (against those portions of the daily returns not explained by changes in the market index) as the independent variable, to determine whether they were significantly correlated (*i.e.*, to determine whether after excluding market effects, each industry index's daily residual returns helped to explain the daily returns on ANR stock).  The FactSet industry index was not significantly correlated with ANR's stock returns.  The final regression equation includes the market index and the S&P industry index (which was correlated with ANR's stock returns) and was estimated over the one-year control period.  See Exhibit 11 for the regression analysis.

[27] First Call Reports: Prudential Securities, April 19, 2000, 06:38pm; J.P. Morgan, April 20, 2000, 09:04am.

[28] Bloomberg, "Annuity & Life Re Shares Tumble 21% on Earnings Worries," September 13, 2000, 18:32.  Bloomberg, "Annuity & Life Re Shares Erase Bulk of Yesterday's Losses," September 14, 2000.

One analyst wrote that the decline on September 13 was due to "overdone fears concerning the mortality of the company's life reinsurance business."[29]  That analyst further said that:

> One of ALRE's insureds is generating mortality experience which is worse than pricing (or unfavorable mortality) which appears to have continued into the third quarter (through the end of July) but is no worse than the second quarter.  ALRE's two other large contracts which experienced negative mortality in the 2000 first quarter have reverted back to the mean in the second and third quarter, thus far.  If the contract with adverse mortality performs as it did in the second quarter it is unlikely to have a meaningful negative impact on second quarter results and, based on our calculations, it may only result in an $0.01 per share downside."

On September 14, other analysts reiterated "buy" ratings on ANR stock.[30]

46.    On October 26, 2001, ANR fell 26.9%, or -27.0% net of market and industry effects, after it reported (after market close on October 25) a large operating loss for the third quarter 2001 (including a write off of $25 million of deferred acquisition costs) and said that 2002 earnings were projected to be less than analysts' projections.  Analysts were surprised by the size of the write off and adverse mortality related to a large life insurance contract, and reduced their projections.[31]

47.    On January 16, 2002, ANR fell 17.1%, or -16.5% net of market and industry effects.  After market close on January 15, ANR announced that it would take "a fourth quarter charge of approximately $33 million related to minimum interest guarantees on its largest annuity

---

[29] First Call Report, J.P. Morgan, September 14, 2000, 07:58am.

[30] Bloomberg, "Annuity and Life Re Reiterated 'Buy' at Wasserstein Perella," September 14, 2000, 07:24.  Bloomberg, "Annuity and Life Re Reiterated 'Buy' at Conning," September 14, 2000, 10:42.  Bloomberg, "Annuity and Life Re Reiterated 'Strong Buy' at Prudential," September 14, 2000, 10:53.

[31] First Call Reports: Prudential Securities, October 26, 2001, 06:14am; J.P. Morgan, October 26, 2001, 08:12am; Bear Stearns, October 26, 2001, 08:36am; Prudential Securities, October 29, 2001, 06:42am; Bear Stearns, October 29, 2001, 06:55am; Keefe, Bruyette & Woods, Inc., October 29, 2001, 07:39am.

reinsurance contract."[32]   The Company also provided earnings guidance for fourth quarter 2001 (excluding the charge) and for 2002, which was below analysts' prior estimates.[33]

48.       On July 26, 2002, ANR fell 51.0%, or -51.6% net of market and industry effects and on July 29 (the next trading) rose 27.8%, or 24.1% net of market and industry effects.  After market close on July 25, ANR announced that it would report a loss for second quarter 2002 "due to a $24 million charge related to its Transamerica Re annuity reinsurance contract."  The Company would also implement FAS 133, necessitating a restatement for 2001 and the first quarter of 2002.[34]   Analyst reaction was negative[35]; later, one analyst described the sell-off on July 26 as overdone and upgraded his rating to "Buy" from "Neutral."[36]   Two rating agencies, Fitch and S&P, lowered ANR's financial strength rating from A to A-.[37]   A.M. Best lowered its financial strength rating on ANR to A- from A.[38]

---

[32] PR Newswire, "Annuity & Life Re: Fourth Quarter 2001 Charge – Additional 2002 Guidance," January 15, 2002, 05:44pm.

[33] First Call Reports: J.P. Morgan, January 16, 2002, 04:28am; Prudential Securities, January 16, 2002, 06:38am; Bear Stearns, January 16, 2002, 07:09am; Keefe, Bruyette & Woods, Inc., January 17, 2002, 01:14pm.

[34] PR Newswire, "Annuity & Life Re Will Report a Loss for the Second Quarter due to Charges on Its Transamerica Re Annuity Reinsurance Contract; Company Will Also Restate 2001 and First Quarter 2002 to Adopt FAS 133 with Minimal Cumulative Financial Impact; Life Revenues Increase 50%," July 25, 2002, 06:03pm.

[35] First Call Reports: Prudential Securities, July 25, 2002, 07:03pm; J.P. Morgan, July 26, 2002, 04:47am; Keefe, Bruyette & Woods, Inc., July 29, 2002, 01:29pm.

[36] First Call Reports: Bear Stearns, July 26, 2002, 02:06pm; Bear Stearns, July 29, 2002, 08:22am.

[37] Business Wire, "Fitch Ratings Lwrs Rtgs of Annuity & Life Re; Rtg Watch Neg," July 26, 2002, 12:55.  Business Wire, "S&P Takes Off Watch and Lowers Annuity & Life Re Rtgs," July 26, 2002, 15:48.  First Call Report, Keefe, Bruyette & Woods, Inc., July 29, 2002, 01:29pm.

[38] Business Wire, "A.M. Best Lowers Ratings of Annuity and Life Re's Operating Companies," July 29, 2002, 17:39.

49.    On August 16, 2002, ANR fell 12.2%, or -12.0% net of market and industry effects and on August 19 (the next trading) fell 11.2%, or -12.1% net of market and industry effects. After market close on August 15, ANR announced its financial results for second quarter 2002.[39] Analysts expressed concern about the possibility of future annuity DAC charges and that the Company needed to raise capital.[40] Analysts reduced their estimates.[41]

50.    On August 23, 2002, ANR fell 11.1%, or -10.3% net of market and industry effects. After market close on August 22, Fitch reported that it had lowered its financial strength rating for ANR to BBB+ from A-,[42] and J.P. Morgan lowered its estimates.[43]

51.    On September 4, 2002, ANR rose 20.9%, or 20.8% net of market and industry effects. On that day, *The Wall Street Journal* cited a Banc of America Securities report discussing ANR's valuation, and that it currently "offers investors greater potential reward than risk."[44]

52.    On November 8, 2002, ANR fell 17.3%, or -17.1% net of market and industry effects. ANR announced that its claim for breach of contract against Transamerica Re was denied by an arbitration panel.[45]

---

[39] PR Newswire, "Annuity & Life Re June 2002 Earnings Report," August 16, 2002, 10:57am. This is the corrected earnings report, ANR issued an incorrect report on August 15, 19:03. Also, analyst reports indicate that ANR announced its results after market close on August 15.

[40] First Call Reports: J.P. Morgan, August 16, 2002, 01:04am; Prudential Securities, August 16, 2002, 07:34am; Bear Stearns, August 16, 2002, 09:14am.

[41] First Call Reports: Prudential Securities, August 19, 2002, 08:16am; Keefe, Bruyette & Woods, Inc., August 19, 2002, 10:05am.

[42] Business Wire, "Fitch Lowers Ratings of Annuity & Life Re," August 22, 2002, 16:56.

[43] First Call Report, J.P. Morgan, August 22, 2002, 05:00pm.

[44] The Wall Street Journal, "Small-Stock Focus: Russell 2000 Slumps in a Down Day for Stocks," September 4, 2002.

[45] PR Newswire, "Annuity & Life Re Arbitration Claim Denied," November 8, 2002, 09:13am.

53.    On November 13, 2002, ANR fell 12.2%, or -12.5% net of market and industry effects and, on November 14, rose 8.0%, or 7.1% net of market and industry effects.  ANR announced that it would again delay its reporting of its financial results for the third quarter 2002 until November 19.[46]

54.    On November 20, 2002, ANR fell 45.1%, or -45.5% net of market and industry effects. After market close on November 19, ANR announced that it would restate its financial statements for the years 2000 and 2001 and for the first two quarters of 2002.  The Company also reported that it expected to report a loss for the third quarter 2002.[47]  Analysts noted concern at the lack of a final earnings release and the need for significant near-term capital.[48]

55.    The foregoing demonstrates that the release of unexpected information concerning ANR was associated with significant changes in ANR's share price.  This analysis indicates that during the Class Period the market for ANR common stock was efficient.

F.  _Unger/Bell_ Factor 6: Market capitalization

56.    Courts have found that a large market capitalization can be an indicator of market efficiency "because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[49]  As noted above, ANR's available float was held by institutions. From the start of the Class Period until October 25, 2001 (after which ANR first disclosed significant charges related to its Transamerica annuity contract), ANR's common stock market

---

[46] PR Newswire, "Annuity & Life Re September 30, 2002 Earnings Report Delayed," November 13, 2002, 09:35am.

[47] PR Newswire, "Annuity & Life Re to Restate Financial Statements," November 19, 2002, 07:49pm.  Bloomberg News, "Annuity & Life Shares Plunge on Earnings Restatement," November 20, 2002, 16:32.

[48] First Call Reports: Bear Stearns, November 20, 2002, 08:06am; Keefe, Bruyette & Woods, Inc., November 20, 2002, 10:32am.

[49] _Krogman_ at 478.  _O'Neil_ at 503.

capitalization (calculated as the number of shares multiplied by the prevailing share price) ranged between $427 million and $950 million, and the average market capitalization during this period was $720 million. From the start of the Class Period through October 25, 2001, ANR's market capitalization was comparable to the average market capitalization of the companies listed on Nasdaq. After October 25, 2001, as ANR's stock price declined, its market capitalization was less than the average market capitalization of the companies listed on Nasdaq; especially in 2002, when its market capitalization fell substantially. Throughout the Class Period, ANR's market capitalization was substantially less than the average market capitalization of the companies listed on the NYSE. See Exhibit 12.

57.     As of March 15, 2000, there were approximately 3,300 holders of record of the Company's outstanding common shares,[50] approximately 3,000 holders of record at March 9, 2001,[51] and approximately 2,700 holders of record as of March 7, 2002.[52] That ANR's market capitalization was comparable to the average market capitalization of companies listed on Nasdaq during the Class Period until ANR's stock price declined after ANR first disclosed significant charges related to its Transamerica annuity contract, supports a conclusion that the market for ANR stock was efficient.

G. *Unger/Bell Factor 7: Bid/ask spread*

58.     Bid/ask spreads are a measure of transaction costs and low transactions costs indicate that arbitrage opportunities can be exploited readily. Exhibit 13 contains the median and mean bid/ask spread, both as a dollar amount and percentage of the mean bid/ask prices, during the

---

[50] ANR Form 10-K for the year ended December 31, 1999.

[51] ANR Form 10-K for the year ended December 31, 2000.

[52] ANR Form 10-K for the year ended December 31, 2001.

Class Period for ANR and life/health insurance companies.[53]  ANR's bid/ask spreads were comparable to those of other comparably-sized reinsurance companies during the Class Period.

59.    That bid/ask spreads were comparable to bid/ask spreads of other comparably-sized reinsurance companies indicates that arbitrage opportunities could be exploited, which is evidence in support of market efficiency.

*H.  Unger/Bell Factor 8: Public float*

60.    Courts have held that a large float percentage (percentage of shares held by the public) can be an indicator of market efficiency.[54]  During the Class Period, there were between 25.5 million and 26.1 million shares of ANR common stock outstanding.  Insider holdings were approximately 5.0 million shares at the start of the Class Period and 5.2 million shares at the end of the Class Period.  The public float was approximately 80% of shares outstanding during the Class Period.  Thus, the majority of ANR shares were in the public float during the Class Period, which supports a conclusion that the market for ANR stock was efficient.  See Exhibit 14.

## V.    Conclusion

61.    In summary, the bases for my opinion that the market for ANR common stock was efficient throughout the Class Period include: (1) the high weekly trading volume in ANR common stock during the Class Period; (2) the significant number of securities analysts who reported on ANR; (3) the fact that the stock was traded by multiple market makers when it was listed on Nasdaq and then by the specialist when it was listed on the NYSE, and that arbitrageurs were not subject to short selling constraints; (4) the Company's filing of SEC Form S-3 during

---

[53] The companies considered are the current constituents of the S&P500 Life/Health Insurance Index and companies identified by FactSet as reinsurance companies, with a market capitalization greater than $100 million and less than $1.5 billion on March 15, 2000, December 31, 2000, December 31, 2001 or November 19, 2002.

[54] *Unger* at 323; *Bell* at 313, n10; *Krogman* at 478; *O'Neil* at 503.

the Class Period; (5) the demonstrable relationships between company-specific news releases and prompt share price reactions; (6) that its market capitalization was comparable to the average market capitalization for Nasdaq-listed stocks during 2000 and until late October 2001; (7) that its bid/ask spreads were comparable to its peers; and (8) the Company's sizeable public float.  In addition, the significant institutional ownership during the Class Period, and the extent of news coverage of ANR available to investors, are indicia of market efficiency.

62.    In this declaration I have offered evidence on the efficiency of the market for ANR common stock at issue in this matter, during the Class Period, March 15, 2000, through November 19, 2002.  Evidence of this type has been found useful by the Courts in evaluating the efficiency of markets for securities.  Sophisticated institutional investors employ investment analysts to follow the firms whose securities these investors hold or consider holding, and are able to trade promptly on new information relevant to those securities.  This rapid assimilation by investors of the extensive information flow on ANR during the Class Period and their resulting trades on new information is the very process by which the market assimilates information into securities prices.  The response of ANR securities prices to material new information during the Class Period indicates that prices of ANR securities did respond promptly to material new information in the Class Period.

My work in this matter is ongoing.  This declaration on efficiency of the market for ANR common stock is not a damages study, or a calculation of damages, or a determination regarding loss causation, and should not be construed as such.  Any report or analyses on the subjects of damages or loss causation in this matter will be submitted at a later time.  My opinions in this declaration are subject to refinement or revision based on analysis of new information which

may be provided to me, including the opinions of other experts and receipt of additional documents and data, and based on further analysis of the data and materials described herein. Furthermore, I understand that discovery in this matter is ongoing. Should additional relevant information be provided to me, my opinion on market efficiency may be supplemented at a later date.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 25, 2007, at Redwood City, California.


Jane D. Nettesheim