

--- F.3d ----  
--- F.3d ----, 2007 WL 259877 (C.A.2 (N.Y.))  
**(Cite as: --- F.3d ----)**

Page 1

**H**  
Lattanzio v. Deloitte & Touche LLPC.A.2 (N.Y.),2007.Only the Westlaw citation is currently available.
United States Court of Appeals,Second Circuit.
John LATTANZIO, Herbert Black, Peter C. Kornman, Mary Cheasty Kornman, Harold G. Gove, Harold Levinson, on behalf of themselves and all others similarly situated, R.M.F. Global, Inc., on behalf of itself and all others similarly situated, Consolidated-Plaintiffs-Appellants,
v.
DELOITTE & TOUCHE LLP, Defendant-Appellee, Warnaco Group Inc., Linda Wachner, William S. Finkelstein, Stanley P. Silverstein, Defendants.
**Docket No. 05-5805-cv**.

Argued: Oct. 11, 2006.  
Decided: Jan. 31, 2007.

Appeal from a judgment of the District Court for the Southern District of New York (Cedarbaum, J.) dismissing putative class action, which alleged that Deloitte & Touche LLP, as accountants to the issuer, violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. For the following reasons, we affirm.

Frederick W. Gerkens, III, Lovell Stewart Halebian LLP, New York, N.Y. (Christopher Lovell, on the brief), for Plaintiffs-Appellants.
Daniel F. Kolb, Davis Polk & Wardwell, New York, N.Y. (Amelia T.R. Starr, on the brief), for Defendant-Appellee.

Before JACOBS, Chief Judge, WALKER, Circuit Judge, O'CONNOR, Associate Justice Retired.[FN*]

> FN* The Honorable Sandra Day O'Connor, Associate Justice Retired of the Supreme Court of the United States, sitting by designation pursuant to 28 U.S.C. § 294(a).

DENNIS JACOBS, Chief Judge.
*1 Plaintiffs, representing a putative class of persons that purchased the stock of Warnaco Group, Inc. ("Warnaco"), appeal from the judgment of the United States District Court for the Southern District of New York (Cedarbaum, J.) dismissing their securities fraud claim against Warnaco's outside accountant, Deloitte & Touche LLP ("Deloitte"), under Fed.R.Civ.P. 12(b)(6). (Defendant Warnaco has settled.) Plaintiffs allege that Deloitte made numerous misstatements regarding Warnaco's financial condition and failed to correct previous misstatements; that the risk of Warnaco's financial collapse was thereby concealed; and that plaintiffs lost the value of their shares when Warnaco filed for bankruptcy on June 11, 2001.

In a thorough and well-reasoned opinion, the district court concluded that:
[i] Deloitte was not liable for Warnaco's quarterly statements, which it did not audit;
[ii] Deloitte had no duty during the class period to correct statements or misstatements made by Deloitte prior to the class period; and
[iii] Plaintiffs inadequately alleged loss causation in connection with the statements that Deloitte made during the class period.

For the following reasons, we reach the same conclusions as the district court.

**I**

In the months leading up to its June 11, 2001 bankruptcy filing, Warnaco had defaulted on its credit agreements, had failed to obtain waivers from its creditors, and had seen its stock price plunge to "almost zero." (Am. Class Action Compl. ¶ 5 [hereinafter "Compl."].) Plaintiffs represent a putative class of persons that purchased Warnaco common stock between August 15, 2000 and June 8, 2001 (the "Class Period"). Throughout the Class Period, Deloitte served as Warnaco's outside accountant, a role it had filled since November 1999.

In reviewing a dismissal pursuant to Fed.R.Civ.P. 12(b)(6), we assume plaintiffs' allegations to be true. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 165 (2d Cir.2005). We therefore recount the allegations of Deloitte's misstatements (and failures to correct) contained in plaintiffs' complaint.

*The Allegations as to the 1999 Form 10-K*

Warnaco's initial Form 10-K for the year 1999 was filed on March 31, 2000. Amended forms were filed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                                Page 2
--- F.3d ----, 2007 WL 259877 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

on April 3, 2000 and May 16, 2000 (collectively, the "1999 10-K"). Each of these filings contained Deloitte's statement that it had "audited the accompanying consolidated balance sheet of [Warnaco] ... in accordance with auditing standards generally accepted.... In our opinion, [the] consolidated financial statements present fairly, in all material respects, the financial position of [Warnaco] as of January 1, 2000." (Compl.¶ 80.)

The allegation as to the 1999 10-K is that total shareholder equity ("TSE") was stated as $563 million instead of $533 million. Of the $30 million overstatement, $26 million was attributed to Warnaco's failure to properly account for charge-backs resulting from the return of goods by retailers in the period from 1997 to 1999. Deloitte allegedly became aware of the improper charge-back accounting in February 2000, but did not correct Warnaco's financial statements until March 2001 (the "Charge-back Restatement").

**\*2** The remaining $4 million net overstatement was attributed to erroneous inter-company accounting between Warnaco and its wholly-owned subsidiary Designer Holdings (including an understatement of accounts payable by $18 million, which presumably was offset somehow in arriving at the $4 million net overstatement). According to plaintiffs, these misstatements "occurred when Samuel Batraki, Deloitte's senior auditor of Warnaco, became employed by Warnaco ... as a controller of Designer Holdings" in May 2000 (id.¶ ¶ 2(c), 11)-although it appears that the 1999 10-K was filed before Batraki joined Warnaco. Deloitte allegedly became aware of the errors in the inter-company Designer Holdings accounting sometime in fall 2000, but did not correct Warnaco's financial statements until August 22, 2001, after Warnaco was already in bankruptcy ("Designer Holdings Restatement").

*The Allegations as to Quarterly Statements*

Warnaco filed three quarterly statements during the Class Period: the August 15, 2000 Form 10-Q ("August 10-Q"); the November 16, 2000 Form 10-Q ("November 10-Q"); and the May 26, 2001 Form 10-Q ("May 10-Q").

The allegation as to the August 10-Q is that TSE was stated as $480 million instead of $334 million-a $146 million error. As in the 1999 10-K, $26 million of this overstatement was attributed to the errors that were later corrected in the Charge-back Restatement. Another $17 million was attributed to the inter-company accounting errors later corrected in the Designer Holdings Restatement. Additionally, plaintiffs estimate that $103 million of inventory claimed by Warnaco in the August 10-Q was actually worthless and unsaleable. Warnaco subsequently conceded a $13 million inventory overvaluation in an amended Form 10-Q\A (the "April 2001 Restatement"); the remaining $90 million has not been conceded by Warnaco or been the subject of restatement. It is alleged that Deloitte knew of the errors reflected in the April 2001 Restatement by (at least) November 3, 2000-after the filing of the August 10-Q but before the filing of the November 10-Q, discussed below.

The first allegation as to the November 10-Q is that TSE was stated as $348 million instead of $198 million-a $150 million error. As with the August 10-Q, $26 million was attributed to the Charge-back Restatement and $103 million was attributed to worthless inventory, which included $13 million attributed to the April 2001 Restatement. The Designer Holdings Restatement accounted for the remaining $20 million discrepancy.

The second allegation as to the November 10-Q is that the figures for Warnaco's long-term debt and cash were misstated to fake compliance with Warnaco's debt covenants. Two weeks before the November 10-Q was filed, Warnaco issued a press release stating that its long-term debt was $1.79 billion and its TSE was $348 million (including $227 million cash). According to plaintiffs, this debt-to-equity ratio of over five-to-one violated Warnaco's debt covenants. However, in the November 10-Q, Warnaco's cash and debt figures were each reduced by $190 million, leaving the difference unaltered, but changing the ratio to an acceptable 4.6-to-one, thus concealing Warnaco's non-compliance with its covenants. Plaintiffs allege that Deloitte was aware of the correct debt and equity information in advance of Warnaco's November 2 press release, and therefore knew that the information in the November 10-Q was false.

**\*3** The allegation as to the May 10-Q is that TSE was stated as $35 million instead of $16 million in the red-a $51 million error. The entire discrepancy was attributed to the inter-company accounting that was later corrected in the Designer Holdings Restatement.

These quarterly statements (unlike the 1999 10-K) were not audited by Deloitte, and were not accompanied by an audit opinion. However, federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----  
--- F.3d ----, 2007 WL 259877 (C.A.2 (N.Y.))  
**(Cite as: --- F.3d ----)**

Page 3

securities regulations required that Deloitte "review" the statements, see 17 C.F.R. § 210.10-01(d), and plaintiffs allege that Deloitte did.

*The Allegations as to the 2000 Form 10-K*

On April 17, 2001, Warnaco filed its Form 10-K for the year 2000 (the "2000 10-K"). The 2000 10-K stated TSE as $77 million instead of $27 million-a $50 million net discrepancy attributed to the inter-company accounting corrected by the Designer Holdings Restatement, which later conceded that the 2000 10-K understated accounts payable and liabilities by $97 million and overstated inventories by $1.2 million. The 2000 10-K (like the 1999 10-K) contained Deloitte's statement that it had "audited the accompanying consolidated balance sheet of [Warnaco] ... in accordance with auditing standards generally accepted.... In our opinion, [the] consolidated financial statements present fairly, in all material respects, the financial position of [Warnaco] as of December 30, 2000." (Compl.¶ 166.)

This audit opinion also delivered a "going concern" warning that Warnaco "was not in compliance with certain covenants of its long-term debt agreements as of December 30, 2000 as a result of losses in 2000, and [Warnaco] has a working capital deficiency as of December 30, 2000. These matters raise substantial doubt about its ability to continue as a going concern."

**II**

We review a district court's grant of a motion to dismiss de novo. Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir.2006). Plaintiffs assert two claims against Deloitte: [i] violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and [ii] breach of common law fiduciary duty.

To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege that Deloitte "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998). On this appeal, the decisive questions are whether Deloitte made an actionable misstatement and whether any such misstatement was the proximate cause of plaintiffs' losses.

**III**

Plaintiffs allege that each of Warnaco's filings discussed above was a misstatement by Deloitte, either because Deloitte made a false statement in connection with the filing or because Deloitte was silent despite a duty to correct a false statement. Deloitte argues that [i] the 10-Qs contained no statements by Deloitte within the scope of § 10(b) because they were unaudited; and [ii] Deloitte is not liable to plaintiffs for any alleged misstatements in the 1999 10-K because it was filed before the Class Period.

**\*4** The starting point for analysis is *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994), which held that § 10(b) imposes liability only on a person who makes a material misstatement or omission, and that there is therefore no liability for aiding and abetting. Id. at 177; *see also Shapiro v. Cantor,* 123 F.3d 717, 720-21 (2d Cir.1997). Accordingly, to state a § 10(b) claim against an issuer's accountant, a plaintiff must allege a misstatement that is attributed to the accountant "at the time of its dissemination," and cannot rely on the accountant's alleged assistance in the drafting or compilation of a filing. *Wright v. Ernst & Young LLP,* 152 F.3d 169, 174 (2d Cir.1998).

*The 1999 10-K*

The allegations concerning the 1999 10-K easily satisfy the standard: the filing contained an audit opinion, attributed to Deloitte, attesting to the accuracy of the allegedly false financial information. However, "[a] defendant ... is liable only for those statements made during the class period," *IBM Corp.,* 163 F.3d at 107, and the latest 1999 10-K was filed on May 16, 2000-three months before the start of the Class Period.

To surmount this hurdle, plaintiffs invoke *Wright v. Ernst & Young* for the proposition that accountants have a duty to correct misstatements in prior financial filings, the breach of which "can constitute a false or misleading statement within the meaning of § 10(b) and Rule 10b-5." 152 F.3d at 177. Thus, plaintiffs argue that Deloitte breached a duty to correct Warnaco's misstatements in the 1999 10-K, and that this breach extended into the Class Period. Even assuming that *Wright* says so much, Deloitte's statement was made (if at all) when a duty to correct

--- F.3d ----                                                                                                          Page 4
--- F.3d ----, 2007 WL 259877 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

arose, that is, when Deloitte learned that its prior statement (in the form of the audit opinion) was untrue. Otherwise *(i.e.,* if an accountant's breach of a duty to correct were not fixed at a point in time), little would be left of the limitation that "[a] defendant ... is liable only for those statements made during the class period." IBM Corp., 163 F.3d at 107; *see also* In re The Warnaco Group, Inc. Sec. Litig., 388 F.Supp.2d 307, 315 (S.D.N.Y.2005) (recognizing that if we were to adopt plaintiffs' endless breach argument, "all knowing misstatements made before the class period, which remain uncorrected, would be actionable within the class period on an omission theory").

It is alleged that Deloitte became aware of errors in the 1999 10-K in February 2000 (as to the errors related to the Charge-back Restatement) and in fall 2000 (as to the errors related to the Designer Holdings Restatement). Thus Deloitte's silence as to the Charge-back Restatement would have become a false or misleading statement in February 2000; since February 2000 predates the Class Period, it cannot be said that Deloitte's failure to correct constituted a statement made during the Class Period.

Deloitte's alleged duty to correct the errors related to the Designer Holdings Restatement arose in fall 2000, which is *within* the Class Period; however, we need not decide if Deloitte's failure to correct the 1999 10-K in fall 2000 was a statement for purposes of § 10(b) and Rule 10b-5 because, as we explain below, plaintiffs have insufficiently alleged that these errors caused their loss.

*The Quarterly Statements*

**\*5** Warnaco's quarterly statements (the August 10-Q, the November 10-Q, and the May 10-Q) were filed within the Class Period, but they did not purport to be audited by Deloitte, did not contain an audit opinion by Deloitte, and were not attributed to Deloitte when they were disseminated. See Wright, 152 F.3d at 174. Under *Central Bank,* Deloitte is not liable for merely assisting in the drafting and filing of the quarterly statements. Plaintiffs argue that Deloitte's regulatory obligation to review Warnaco's quarterly statements entails a duty to correct, and that the failure to correct amounts to a statement by Deloitte that Warnaco's statements are correct.

Absent an audit opinion, the existence of a duty to correct cannot by itself translate Deloitte's silence regarding the 10-Qs into an actionable misstatement.

"[I]f an accountant does not issue a public opinion about a company[, it is not] responsible for the company's public statements ... merely because the accountant may know those statements are likely untrue." Shapiro, 123 F.3d at 721. The accountant's duty extends only "to correct [an] earlier financial statement which [the accountant] had audited [it]self and upon which [the accountant] had issued [its] certificate." United States v. Natelli, 527 F.2d 311, 319 (2d Cir.1976); *see also* IIT v. Cornfeld, 619 F.2d 909, 927 (2d Cir.1980) (an accountant has "no independent duty to see to the correction of the portions of the prospectus other than the financial statement it prepared").

Plaintiffs accurately observe that a federal regulation required Deloitte, as Warnaco's outside accountant, to conduct a review of Warnaco's quarterly statements. Plaintiffs thereby argue that an investor (understanding Deloitte's regulatory obligation) would construe Deloitte's silence as its imprimatur. This argument rests on 17 C.F.R. § 210.10-01(d):

Prior to filing, interim financial statements included in quarterly reports on Form 10-Q ... must be reviewed by an independent public accountant using professional standards and procedures for conducting such reviews, as established by generally accepted auditing standards.... If, in any filing, the company states that interim financial statements have been reviewed by an independent public accountant, a report of the accountant on the review must be filed with the interim financial statements.

It is alleged that Deloitte's mandated review of Warnaco's quarterly statements associated Deloitte with those statements to such a degree that they became Deloitte's statements, or that the review created a regulatory duty to correct, the breach of which qualifies as a statement under § 10(b). We disagree.

*Wright* declined to adopt a "substantial participation" test for liability under § 10(b), instead holding that a party can incur liability only if a misstatement is attributed to it at the time of dissemination. 152 F.3d at 175. In so holding, we twice cited approvingly to In re Kendall Square Research Group Corp. Sec. Litig., 868 F.Supp. 26, 28 (D.Mass.1994), for the proposition that an accountant's review and approval of a company's financial statement are insufficient to support the imposition of liability on the accountant. Wright, 152 F.3d at 174, 175.

**\*6** As plaintiffs contend, a requirement that an issuer's accountant review interim financial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                                 Page 5
--- F.3d ----, 2007 WL 259877 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

statements supports an understanding among the investing public that such reviews are in fact conducted. *Wright* declined to impose accountant liability under § 10(b) notwithstanding public awareness of an accountant's review of its client's statements. True, § 210.10-01(d) is a federal regulation promulgated by the SEC. As plaintiffs admit, however, that regulation is merely a codification of prior accounting standards, which would have supported the same public understanding.

The plaintiffs in *Wright* claimed that "the market understood" the company's allegedly false press release "as an implied assertion" of accuracy by the defendant accountant. *Id.* at 176. That argument failed because, notwithstanding what the public may have understood, the accountant's "assurances were never communicated to the public." *Id.* Public understanding that an accountant is at work behind the scenes does not create an exception to the requirement that an actionable misstatement be made by the accountant. See *Central Bank,* 511 U.S. at 177. Unless the public's understanding is based on the accountant's articulated statement, the source for that understanding-whether it be a regulation, an accounting practice, or something else-does not matter.

Alternatively, plaintiffs argue that § 210.10-01(d) imposes on accountants an actionable duty under § 10(b) to correct unaudited interim financial statements, *i.e.,* that the regulation required Deloitte to review Warnaco's quarterly statements; that this review implies a duty to correct the statements if they are false; and that a breach of the duty to correct amounts to a statement for purposes of § 10(b). We reject this argument.

The private right of action under § 10(b) and Rule 10b-5 is a "judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737 (1975). "It is inconsistent with settled methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text." *Central Bank,* 511 U.S. at 177.

When filing an interim financial report, § 210.10-01(d) affords a company two options: [i] it can affirmatively state that the filing was reviewed by its accountant in accordance with the regulation, and include a report from the accountant; or [ii] it can omit mention of the mandated review, in which event no accountant's report is required. This binary choice is consistent with the emphasis that *Central Bank* and

*Wright* place on attribution at the time of dissemination as a determinant of whether a defendant has made a statement for purposes of § 10(b). If § 210.10-01(d) and the public's knowledge of what § 210.10-01(d) requires were sufficient to support liability, the option afforded by the regulation would be elided, which would be problematic because we generally avoid interpreting a regulation in a way that renders one of its provisions meaningless. See *Anderson v. Rochester-Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 216 (2d Cir.2003).

**\*7** The importance plaintiffs place on an accountant's *review* of *interim* financial statements is further eroded by the numerous duties and requirements associated with an accountant's *audit* of *annual* financials. See 15 U.S.C. § 78j-1, *et seq.* (outlining audit procedures, duties to report, required responses, and possible duties to notify). Clearly Congress knows how to impose duties on accountants, and expose them to liability, when it wants to do so. Cf. *Central Bank,* 511 U.S. at 176-77.

What purpose then does the review requirement serve? Plaintiffs argue with some force that "[n]ondisclosure to the public cannot be what is intended under the federal securities laws." However, the review requirement serves at least one purpose other than to expand the liability of accountants. As plaintiffs themselves explain: "One of the primary reasons the SEC has mandated the [interim review] is to minimize large year-end adjustments to quarterly financial statements that historically have been uncovered in the annual audit process.... [Interim review] should reduce the likelihood of quarterly restatements." (Compl. ¶ 276, *quoting* Professionals Issues Task Practice Alert 2000-4, *Quality Review Procedures for Public Companies.)* Thus the regulation serves a useful purpose apart from any opportunity afforded to detect fraud: the rolling quarterly review is procedurally integrated into the company's year-end audit and thereby tends to reduce sharp variations and year-end surprises by spreading corrections throughout the year.

In sum, misstatements contained in Warnaco's interim financial statements cannot be attributed to Deloitte, and therefore they cannot form the basis for liability under § 10(b).

*The 2000 10-K*

It is alleged that the 2000 10-K was audited by Deloitte, that it contained Deloitte's audit opinion,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                    Page 6
--- F.3d ----, 2007 WL 259877 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

that it contained false financial information, and that it was filed within the Class Period (on April 17, 2001). Accordingly, plaintiffs have sufficiently alleged that the misstatements in the 2000 10-K were Deloitte's statements under § 10(b).

### IV

Plaintiffs sufficiently allege that Deloitte made the following misstatements within the class period: those in the 1999 10-K that related to the Designer Holdings Restatement and those in the 2000 10-K. However, to state a claim under § 10(b), plaintiffs must also allege that these particular misstatements caused their alleged loss .[FN2]

> FN2. Plaintiffs must allege both transaction and loss causation in order to plead a claim under § 10(b).
> "Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.' " *Lentell,* 396 F.3d at 172 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir.2003)). Here, plaintiffs rely on the fraud-on-the-market presumption to allege transaction causation. See *Basic Inc. v. Levinson,* 485 U.S. 224, 247 (1988). There is no need to decide whether Deloitte's alleged misstatements amounted to a fraud on the market because we conclude that the complaint fails to adequately allege loss causation.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell,* 396 F.3d at 172 (internal quotation marks omitted). Loss causation is related to the tort law concept of proximate cause: [i] it "is intended 'to fix a legal limit on a person's responsibility even for wrongful acts,' " and [ii] it requires that the plaintiff's loss be foreseeable. *Id.* at 174 (quoting *Castellano v. Young & Rubicam,* 257 F.3d 171, 186 (2d Cir.2001); *see also First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769-70 (2d Cir.1994)). A misstatement "is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations ... alleged by a disappointed investor." *Lentell,* 396 F.3d at 173 (emphasis omitted).

**\*8** Plaintiffs here have failed to allege a sufficient connection between Deloitte's misstatements and the losses suffered as a result of Warnaco's bankruptcy. Plaintiffs argue that the relevant risk-the risk that was concealed by Deloitte's misstatements and that materialized to cause their loss-was not the risk of Warnaco's bankruptcy, but the risk that Deloitte's audits were not conducted in accordance with generally accepted accounting practices. But if *Lentell's* "zone of risk" could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation as an element of § 10(b) liability would be completely subsumed by the element of misstatement.

Therefore, to state a claim, plaintiffs had to allege that Deloitte's misstatements concealed the risk of Warnaco's bankruptcy. The following circumstances support our conclusion that plaintiffs alleged an insufficient connection between Deloitte's misstatements and the bankruptcy.

Even taking Warnaco's misstated financial statements at face value, it cannot be said that the risk of bankruptcy was altogether concealed. In May 2000, Warnaco reported a TSE of $563 million; twelve months later that number had dropped to $35 million-a 94% loss in one year. Clearly, Warnaco could not continue for very long in this direction.

The misstatements attributed to Deloitte are fewer (two), more sporadic (over fifteen months) and less egregious than Warnaco's misstatements to the same or similar effect. Deloitte's $4 million overstatement of TSE in the 1999 10-K and its $50 million overstatement of TSE in the 2000 10-K are by no means trivial; but as a cause of Warnaco's bankruptcy, they are to be compared with the misstatements totaling $373 million of TSE that were made in the interim financial statements or made before the Class Period-statements that cannot be attributed to Deloitte. And the $373 million does not reflect the impact of the single misstatement that is perhaps most closely related to Warnaco's eventual bankruptcy: the November 10-Q's misstatement of $190 million to conceal Warnaco's non-compliance with its debt covenants.

Deloitte warned in the 2000 10-K that Warnaco was "not in compliance with certain covenants of its long-term debt agreements," and that there was "substantial doubt" regarding Warnaco's "ability to continue as a going concern." This ominous alarm, accompanied as it was by data showing the precipitous drop in Warnaco's TSE, certainly provided "substantial indicia of the risk that"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Warnaco would file for bankruptcy. *Lentell,* 396 F.3d at 177.

This case is not a perfect analog to *Lentell,* but it is in one respect *Lentell's* mirror image. In *Lentell,* the defendant's normative "buy" or "accumulate" stock recommendations were insincere, but were accompanied by the underlying, accurate financial data, *id.* at 177, so that the plaintiffs could review the financial information and evaluate the risk for themselves. Here, Deloitte's normative statement (the "going concern" warning) was accurate, but the accompanying data (the financial information in the 2000 10-K) were not, so that plaintiffs were made aware of the risk, but could not rely on the company's financial data to evaluate its precise gravity.

**\*9** This factual distinction does not impair the applicability of *Lentell.* In light of Deloitte's "going concern" warning-and the disclosed (if understated) collapse of value-it was "unambiguously apparent" that Warnaco was in need of desperate measures and faced a risk of bankruptcy. *Id.* Plaintiffs have not alleged facts to show that Deloitte's misstatements, among others (made by Warnaco) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements. *Id.* Accordingly, plaintiffs have not alleged loss causation.

### V

We affirm the district court's dismissal of plaintiffs' breach of fiduciary duty claim for the reasons stated by the district court. On appeal, plaintiffs argue that the district court ignored two cases that show Deloitte, as Warnaco's outside accountant, owed a fiduciary duty to Warnaco's shareholders under Connecticut law. In one case, a student slipped on ice in a school courtyard, *Burns v. Bd. of Educ.,* 638 A.2d 1 (Conn.1994); in the other, the defendant in a civil suit sued the plaintiff's attorney for malpractice, *Mozzochi v. Beck,* 529 A.2d 171 (Conn.1987). Neither case conspicuously supports the proposition advanced by plaintiffs here.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

C.A.2 (N.Y.),2007.
Lattanzio v. Deloitte & Touche LLP
--- F.3d ----, 2007 WL 259877 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.