# EXHIBIT C

```
 1

 2          UNITED STATES DISTRICT COURT

 3            DISTRICT OF CONNECTICUT

 4   SHERRY SCHNALL, Individually   )
     and On Behalf of All Others    )
 5   Similarly Situated,            )
                        Plaintiffs, )
 6              vs.                  )   3:02-CV-2133 (EBB)
     ANNUITY AND LIFE RE (HOLDINGS),)
 7   LTD., XL CAPITAL, LTD.,        )
     LAWRENCE S. DOYLE, FREDERICK S.)
 8   HAMMER, JOHN F. BURKE, WILLIAM )
     W. ATKIN, BRIAN O'HARA and     )
 9   MICHAEL P. ESPOSITO, JR.,      )
                        Defendants. )
10   -------------------------------)

11

12

13          DEPOSITION OF BARBARA EASTERLING

14               New York, New York

15                 June 7, 2007

16

17

18

19

20

21

22

23

24
     Reported by:
25   Siglinde Carretero
```

ELISA DREIER
REPORTING CORP.    780 Third Avenue          Telephone: 212-557-5558
                   New York, New York 10017   Fax: 212-557-0050
                   Email:production@courtreportingedrc.com

2

1

2          June 7, 2007

3          10:43 a.m.

4

5          Deposition of BARBARA EASTERLING, held at

6     the offices of King & Spalding, LLP, 1185

7     Avenue of the Americas, New York, New York,

8     pursuant to Notice, before Siglinde Carretero,

9     a Notary Public of the State of New York.

10

11                    - oOo -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2     A P P E A R A N C E S:

 3

 4          MILBERG WEISS & BERSHAD LLP

 5          Attorneys for Plaintiffs

 6                   One Pennsylvania Plaza

 7                   New York, New York 10119

 8          BY:   BARRY A. WEPRIN, ESQ.

 9

10          SCOTT & SCOTT, LLP

11          Attorneys for Plaintiffs

12                   75 Rockefeller Plaza

13                   New York, New York 10019

14          BY:   BETH KASWAN, ESQ.

15

16          SLEVIN & HART, P.C.

17          Attorneys for Plaintiffs

18                   1625 Massachusetts Avenue, N.W.,

19                   Suite 450

20                   Washington, D.C. 20036

21          BY:   THOMAS J. HART, ESQ.

22

23

24

25
```

4

```
 1
 2    A P P E A R A N C E S:
 3
 4        KING & SPALDING, LLP
 5        Attorneys for KPMG (Bermuda)
 6            1185 Avenue of the Americas
 7            New York, New York 10036-4003
 8    BY:    PAUL A. STRAUS, ESQ.,
 9           MORDECAI GEISLER, ESQ.,
10           PATRICIA SOUNG (summer associate)
11
12                - oOo -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2          IT IS HEREBY STIPULATED AND AGREED by and

3     between the attorneys for the respective

4     parties herein, that filing and sealing be and

5     the same hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED that

7     all objections, except as to the form of the

8     question, shall be reserved to the time of

9     trial.

10          IT IS FURTHER STIPULATED AND AGREED that

11     the within deposition may be sworn to and

12     signed before any officer authorized to

13     administer an oath, with the same force and

14     effect as if signed and sworn to before the

15     Court.

16

17                    - oOo -

18

19

20

21

22

23

24

25

 1

 2          B A R B A R A   E A S T E R L I N G,  called as

 3          a witness, having been duly sworn by the Notary

 4          Public, was examined and testified as follows:

 5     EXAMINATION BY:

 6     MR. STRAUS:

 7               MR. STRAUS:  Mark this.

 8               (Defendant's Exhibit 1 through 9,

 9          documents, marked for identification, as of

10          this date.)

11          Q.    Could you state your name for the record

12     please?

13          A.    Barbara J. Easterling,

14     E-A-S-T-E-R-L-I-N-G.

15          Q.    You're here to give a deposition on

16     behalf of Communications Workers of America?

17          A.    Correct.

18               MR. WEPRIN:  Technically the Pension Fund

19          is the plaintiff, not the Communications

20          Workers of America.

21          A.    Right.

22          Q.    Have you ever been deposed before?

23          A.    Yes.

24          Q.    How many times have you been deposed?

25          A.    Twice.

```
 1                          Easterling
 2          Q.    Was one of the cases the in re PMA
 3     Securities litigation?
 4          A.    That's correct.
 5          Q.    A year ago?
 6          A.    Um.
 7          Q.    The other deposition?
 8          A.    It was a lawsuit by a member of the union
 9     against the union.
10          Q.    When was that deposition?
11          A.    That was probably 2005.
12          Q.    Do you remember the name of the case?
13          A.    I don't.  I'm trying to think of the
14     member's name.  I don't know.  I can get it for you.
15          Q.    Do you know what court that suit was in?
16          A.    It was in California, and I was deposed
17     in Washington via video conferencing.
18          Q.    Just a couple of ground rules as a
19     reminder.  I'll be asking you questions, I need you
20     to give a verbal answer so the court reporter can
21     take it down.  If you don't understand any of my
22     questions, please ask me, and I'll try to rephrase
23     it for you.
24                Could you just start by telling me a
25     little bit about your educational background,
```

8

```
1                        Easterling
2    briefly?
3         A.    I graduated a high school, and I have not
4    any college.  So that would be my educational
5    background.
6         Q.    Do you have any formal training after
7    high school?
8         A.    Lots of training, union training that we
9    have as part of CWA leadership training, stewards
10   training, along that line.
11        Q.    What's your position today with CWA?
12        A.    I'm secretary-treasurer of the
13   Communications Workers Union.
14        Q.    Do you have a position with the Pension
15   Fund?
16        A.    I'm one of the two trustees of the fund.
17        Q.    How long have you been one of the
18   trustees of the fund?
19        A.    Since I became secretary-treasurer, which
20   would be 1992.
21        Q.    Do you have any other positions with CWA?
22              MR. WEPRIN:  At this time?
23        Q.    At this time.
24        A.    I'm trustee of another fund that we have,
25   the relief fund.
```

1                          Easterling
2         Q.    How long have you been a trustee of that
3    fund?
4         A.    Since 1992.
5         Q.    Do you have any other positions with CWA?
6         A.    No.
7         Q.    Tell me, start with Communications
8    Workers of America, what is that?
9         A.    A union that represents a variety of
10   employees.  We have the telephone workers that are
11   in there.  We also have state workers.  We have
12   police officers.  We have merger partners who would
13   be IUE, the electrical workers.  We have flight
14   attendants, the AFA with us.  We have the
15   typographical union which is merged with us.  We
16   have the television technicians, which are a merger,
17   and the Newspaper Guild.
18        Q.    How many members do you have?
19        A.    750,000.
20        Q.    You're located in Washington, D.C.?
21        A.    We are.
22        Q.    Do you have any other offices?
23        A.    We have offices in all of our districts,
24   and they have -- the sectors, we call them.  The
25   sectors of the merger partners may have offices

```
 1                         Easterling
 2     throughout the country as well.  We have -- we have
 3     eight district offices.  Then we can also have state
 4     offices from those district offices.
 5         Q.    Do you have any offices outside the
 6     United States?
 7         A.    No.
 8         Q.    Do you have any offices in Bermuda?
 9         A.    No.
10         Q.    Do you have any employees in Bermuda?
11         A.    No.
12         Q.    Tell me please about the Pension Fund,
13     what's that?
14         A.    The Pension Fund is a pension fund for
15     CWA employees, and it's a fund that's been in
16     existence for a long time, with investments, money
17     managers, investment consultants to oversee it.
18         Q.    How is the fund related to the union?
19         A.    It's just a pension fund of the union.
20     The relationship being that it represents the --
21     that it pays the pensions of employees for CWA
22     employees, not the members, but the CWA employees.
23         Q.    Are any members funds invested by the
24     Pension Fund?
25                MR. WEPRIN:  Object to the form of the
```

```
 1                        Easterling
 2        question.  You can answer.
 3        Q.    If it's not clear --
 4        A.    It isn't.
 5              MR. WEPRIN:  It wasn't clear to me.
 6        Q.    I just want to pin down what funds the
 7   Pension Fund manages.
 8              MR. HART:  Kind of an ambiguous
 9        question.
10              MR. WEPRIN:  I object to the form of that
11        one.
12        Q.    Do you understand that?
13        A.    Uh-uh.  No.
14        Q.    The Pension Fund holds funds; is that
15   correct?
16              MR. WEPRIN:  Object to the form.
17        A.    Yes.
18        Q.    Whose funds are they?
19        A.    They're the funds of the Communications
20   Workers Union.
21        Q.    What's the purpose of the fund?
22        A.    Is to pay the pensions of the employees
23   of the Communications Workers.
24        Q.    Is the purpose to pay the pensions of any
25   members of the Communications Workers?
```

```
 1                      Easterling
 2        A.    No, just employees.
 3        Q.    Thank you.
 4              How many employees does CWA have?
 5        A.    I --
 6              MR. WEPRIN:  Don't guess.
 7        A.    I really don't know.  Because in each of
 8     those offices there's secretaries and -- we can
 9     obtain that information for you, but I don't have it
10     right off the tip of my fingers.
11        Q.    Is it more than a hundred?
12        A.    Yes.
13        Q.    More than a thousand?
14        A.    No.
15        Q.    Are the funds in the Pension Fund used
16     for any purpose other than paying the pensions of
17     those employees?
18        A.    No.
19        Q.    What are your responsibilities as --
20     let's take first your title as secretary-treasurer
21     of CWA, what are your responsibilities?
22        A.    To manage the dues of that are collected
23     from the members.  We have accounting procedures for
24     that.  I also have responsibility for all of the
25     buildings that are owned by the union, and manage
```

13

1                    Easterling
2    there.  I also have the responsibility to serve on
3    the Executive Board of the union, to make any
4    decisions that required of that area.  And to just
5    manage the financial portion of the union.  Manage
6    the money.
7         Q.    Now, the duties you just described, were
8    those also your duties as of 2002, or have they
9    changed?
10        A.    Yes.  No.
11        Q.    The funds that are in the Pension Plan,
12   who has paid those into the plan?
13        A.    The union.
14        Q.    Are there any employee contributions?
15        A.    No.
16        Q.    What are your duties as trustee of the
17   Pension Plan?
18        A.    I have a fiduciary responsibility for the
19   fund, to administer the fund and to make sure that
20   it's a reliable fund and one that will be able to
21   meet the obligations to the employees.
22        Q.    Does anyone report to you as trustee of
23   the fund?
24        A.    No.
25        Q.    Does anyone report to you as

```
 1                          Easterling
 2    secretary-treasurer of CWA?
 3         A.    Yes.
 4         Q.    Who reports to you?
 5         A.    I have three assistants who report to me
 6    directly.   Then I have a number of people in the
 7    accounting department, retirees office, and that
 8    would be it.
 9         Q.    Just to move things along, I've marked a
10    set of documents as exhibits, they have been
11    produced to us by your counsel, again to move along
12    quickly, I'm going to give you a stack of things.
13    We have copies of them also.
14              (Witness reviews document.)
15         Q.    I'm going to ask you to take a look
16    please at that first one which is marked as Exhibit
17    1, and tell me if you've ever seen that before?
18         A.    Yes.
19         Q.    Is this your signature on the bottom?
20         A.    It is.
21         Q.    Did you read this before you signed it?
22         A.    Yes, I did.
23         Q.    Was it correct and accurate as of the
24    time you signed it?
25         A.    Yes.
```

1                        Easterling
2         Q.    Would you take a look please, tell me if
3    it's still correct as of today?
4              MR. WEPRIN:  Object to the form of the
5         question.
6              MR. HART:  Is it correct as to how?  I'm
7         sorry?
8              (Witness reviews document.)
9         Q.    You can answer.
10             MR. WEPRIN:  Do you want her to read
11        every paragraph and say whether every single
12        paragraph is true?
13        Q.    Let's start with the first paragraph, is
14   that true as of today?
15        A.    Yes.
16        Q.    How about the second paragraph?
17             (Witness reviews document.)
18        A.    Yes.
19        Q.    The third paragraph?
20             (Witness reviews document.)
21        A.    Yes.
22        Q.    The fourth paragraph?
23             (Witness reviews document.)
24        A.    Yes.
25        Q.    The fifth paragraph?

```
 1                        Easterling
 2              (Witness reviews document.)
 3      A.    Yes.
 4      Q.    The sixth paragraph?
 5              (Witness reviews document.)
 6      A.    Yes.
 7      Q.    And is that true, the sixth paragraph is
 8  referring to the three-year period --
 9              MR. WEPRIN:  He's asking you whether --
10        well.
11              MR. STRAUS:  I'll ask the question,
12        thanks.
13      Q.    It's referring to a three-year period --
14              MR. WEPRIN:  I'm objecting to form
15        because the time is unclear because of your
16        prior question.
17              MR. STRAUS:  Let me finish the question.
18              MR. WEPRIN:  I object to the form of the
19        whole thing.
20              MR. STRAUS:  I'm restating the question.
21              MR. WEPRIN:  Good.
22      A.    So, the question is did I serve as a
23  party for a class action suit prior to the October
24  22, 2003 date?  Is that the question?
25      Q.    First in the three years prior to October
```

1                         Easterling
2    of 2003, yes.
3         A.    I'm not sure.  I may have.  I'm not sure
4    if there were any other suits taking place.
5         Q.    It's possible that you served as a
6    representative party for a class action in the three
7    years leading up to October of 2003?
8         A.    Yes.
9         Q.    Can you recall any as you sit here?
10        A.    No, I cannot.
11        Q.    Have you served as a representative party
12   for a class in an action since October of 2003?
13        A.    Yes.
14        Q.    Do you know how many actions?
15        A.    That's part of the material that was
16   given to you, but it was either six or seven that
17   are on the list.  Whatever it was, you have.
18        Q.    Is paragraph seven true as of today?
19              (Witness reviews document.)
20        A.    Yes.
21        Q.    Is paragraph eight true as of today?
22              (Witness reviews document.)
23        A.    Yes.
24        Q.    If CWA had served in a representative
25   capacity in an action in the three years leading up

```
 1                        Easterling
 2    to October of 2003, who would know that?
 3         A.    My attorney.  The attorneys would know
 4    it.
 5         Q.    Which attorney?
 6         A.    It could be -- well, probably both, the
 7    benefit counsel and Milberg.
 8         Q.    Who is the benefits counsel?
 9         A.    Tom Hart.
10         Q.    What is his firm?
11               MR. WEPRIN:  Slevin & Hart.
12               MR. HART:  Slevin & Hart, P.C.,
13         Washington, D.C.
14         A.    Slevin & Hart.
15         Q.    There's a schedule A attached to this
16    certification?
17         A.    Uh-huh.
18         Q.    Do these reflect all the purchases and
19    sales of securities in Annuity And Life Re
20    (Holdings) by the Pension Plan?
21         A.    Yes.
22         Q.    If you look at paragraph eight on the
23    first page, it says that "CWA has made the following
24    transactions in Annuity And Life Re (Holdings) since
25    February 12 of 2001."
```

```
 1                        Easterling
 2              Do you know whether CWA made any
 3    purchases of ANR securities prior to February 12th
 4    of 2001?
 5         A.    No.
 6         Q.    Who would know that?
 7         A.    Well, Milberg Weiss would know it because
 8    they monitor all of our investments.  Then of
 9    course, any of the money managers that have
10    purchased any of the instruments would know it.  I
11    think that would be it.
12         Q.    Has CWA purchased any ANR securities
13    other than common stock?
14         A.    Not to my knowledge.
15         Q.    What did you do to prepare for the
16    deposition today?
17         A.    Met with the attorneys.
18         Q.    Which attorneys did you meet with?
19         A.    Reviewed the material that I had.
20         Q.    Which attorneys did you meet with?
21         A.    With the three attorneys that are here
22    today.
23         Q.    Did you meet with any other --
24         A.    No.
25         Q.    When did you meet with them?
```

        1                        Easterling
        2        A.    I met with them Tuesday of this week.
        3        Q.    Any other time in preparation for the
        4   deposition?
        5        A.    I've had conversations, telephone
        6   conversations with my attorney Tom Hart.
        7        Q.    Were these in preparation for this
        8   deposition?
        9              MR. WEPRIN:  Object to the form.
       10        Q.    You can answer.
       11        A.    Yes.
       12        Q.    How many conversations did you have with
       13   him?
       14        A.    Maybe two.  Not more than that.
       15        Q.    Can you tell me when they were?
       16        A.    Probably when we received the
       17   information, because it goes to Tom.  Procedure is
       18   even if it came to me, it would go to Tom, he would
       19   review it, advise me as to what action I should take
       20   on it, come back to me.  We'd have a telephone
       21   conversation at some point in there.  So, when that
       22   would have taken place, would have been around the
       23   time that we received the material from Milberg
       24   Weiss.
       25        Q.    How long was that call?

```
 1                        Easterling
 2        A.    I don't -- I don't know what date that
 3   was.
 4        Q.    For how long did you meet with your
 5   counsel on Tuesday?
 6        A.    About maybe three hours.
 7        Q.    Did you review documents at that meeting?
 8        A.    Yes.
 9        Q.    Do you remember what you reviewed?
10        A.    Some of the documents I think that were
11   given to you.
12        Q.    Do you know whether you reviewed any
13   documents that were not produced in the case?
14        A.    No.  I did not.
15        Q.    Did you speak with anyone other than your
16   counsel to prepare for the deposition?
17        A.    No.
18        Q.    Did you speak with your investment
19   advisor to prepare for the deposition?
20        A.    No.
21        Q.    Did you speak with CWA's investment
22   monitor to prepare for the deposition?
23        A.    No.
24        Q.    Did you review any documents on your own
25   to prepare for the deposition, outside of the
```

1                        Easterling
2    meeting you described?
3         A.    No.
4         Q.    Do you know how many documents you
5    reviewed at that meeting?
6         A.    No, I don't.
7         Q.    More than a dozen?
8         A.    I don't think so.
9         Q.    I'm going to ask you please if you would
10   turn to the next exhibit which has been marked as
11   Exhibit 2.
12              (Witness reviews document.)
13              MR. WEPRIN:  Do you want to identify the
14         pages for the record?
15         Q.    The pages are Bates stamped CWA 273
16   through CWA 277.
17              I'll just ask if you've ever seen that
18   before?
19         A.    Yes, I signed it, so I must have seen it
20   before.
21         Q.    Did you read it before you signed it?
22         A.    Of course.
23         Q.    This is a certification that you
24   submitted in another action brought by CWA?
25         A.    Yes.

1                          Easterling

2          Q.    Who represented CWA in that case?

3          A.    Milberg Weiss, or it could have been

4    Lerach.  I think it was -- we were together.

5          Q.    Do you know when this action was brought?

6                (Witness reviews document.)

7          A.    No, I don't.

8          Q.    Do you know whether CWA was appointed

9    lead plaintiff in this case, in the case the

10   certification was submitted in?

11         A.    I want to say we were, and I think we

12   were.  But --

13         Q.    Could you take a look at the next exhibit

14   please, marked Exhibit number 3.

15               (Witness reviews document.)

16         Q.    I'll just ask you again if you've ever

17   seen that before?

18               MR. WEPRIN:  If you can, mine are not in

19         order.

20               MR. STRAUS:  Sure, this is Bates stamped

21         CWA 278 through 280.

22         A.    Okay.  That's my signature.

23         Q.    Did you read this one before you signed

24   it?

25         A.    Yes.

1                        Easterling

2          Q.    Do you know what case this was submitted

3     in?

4          A.    No, I don't.

5          Q.    Do you know the case Staehr v. Hartford,

6     that's handwritten here at the top?

7               (Witness reviews document.)

8          A.    No.

9          Q.    Do you have an idea who represented you

10    in that action?

11         A.    That would be -- I only have one group,

12    that would be Milberg Weiss.

13         Q.    Has CWA ever brought an action using

14    other counsel?

15         A.    Not to my knowledge.  I have not.  It may

16    have been before me.

17         Q.    Is there anyone else at CWA during the

18    time you've been trustee who would have commenced an

19    action?

20         A.    No.

21         Q.    If you could please look at Exhibit

22    number 4, which is Bates stamped CWA 281 through

23    283.

24               (Witness reviews document.)

25         Q.    I'll ask you the same question, if you've

1                        Easterling

2      seen that before?

3          A.    Uh-huh.

4          Q.    That's your signature?

5          A.    It is.  I've seen it before.

6          Q.    Are you familiar with a case named Ulmer

7      v. NBTY?

8          A.    No.

9          Q.    I ask you go to the next one, number

10     five, Bates stamp CWA 284 through 286.

11                (Witness reviews document.)

12         Q.    Is that your signature?

13         A.    Yes.

14         Q.    Are you aware of any case involving

15     Parkside Capital?

16         A.    I see it's PMA Capital Corporation, but

17     I'm not sure if that's -- is that the same?

18         Q.    I think this is a different one.

19         A.    Okay.  No, I am not familiar with that.

20         Q.    The next one is Exhibit 6, is Bates

21     stamped CWA 287 through 289.

22                (Witness reviews document.)

23         Q.    Is that your signature on this document?

24         A.    Yes.

25         Q.    This one appears to be in the PMA case

```
 1                        Easterling
 2    that we mentioned before?
 3         A.    Correct.
 4         Q.    Can you tell me the status of the PMA
 5    case?
 6         A.    I'm not sure.
 7         Q.    Do you know if it's still pending, if
 8    it's over?
 9         A.    I'm not sure.
10         Q.    Who would know that?  Is there anyone at
11    CWA that would know that?
12         A.    The attorneys would know it.  Or the
13    in-house counsel.
14         Q.    Of CWA?
15         A.    (Nodding head.)
16         Q.    Who is the in-house counsel?
17         A.    It's Mary O'Melveny.
18         Q.    Did you speak with Miss O'Melveny at all
19    in preparation for the deposition?
20         A.    No.
21         Q.    If you could turn to the next exhibit
22    please, number 7, Bates stamp CWA 290 through 292.
23               (Witness reviews document.)
24         Q.    Is that your signature on this exhibit?
25         A.    It is.
```

```
 1                        Easterling
 2        Q.    Was this true when you signed it, to the
 3   best of your knowledge?
 4        A.    What was the question?
 5              MR. WEPRIN:  Object to the form.
 6        Q.    Was this certification true --
 7        A.    Yes.
 8              MR. WEPRIN:  Object to the form.
 9   Compound.
10        Q.    Are you familiar with a case named CSK
11   Auto Corp.?
12        A.    No, I am not.
13        Q.    Next exhibit is marked Exhibit number 8,
14   it's Bates stamped CWA 293 through 297.
15              (Witness reviews document.)
16        Q.    Have you seen this before?
17        A.    Yes.
18        Q.    Is that your signature on it?
19        A.    It is.
20        Q.    Do you know the case called Durgin v.
21   Technical?
22              MR. WEPRIN:  Object to the form.
23              MR. HART:  Use the full name of the case.
24        Q.    Have you heard of a company called
25   Technical Olympic, USA?
```

1                          Easterling
2                 MR. WEPRIN:  Do you want to look through
3          the whole document?
4                 (Witness reviews document.)
5          A.    I don't recall this.
6          Q.    Who would know that?
7          A.    Again, it would --
8                 MR. WEPRIN:  Object to the form.
9          Q.    Let me ask that again.
10                Who would have a better idea of the
11         status of this litigation?
12         A.    It would either be the in-house attorney,
13    but even if it was in-house, Mary O'Melveny, Tom
14    Hart would be aware of it.  He's the benefits
15    attorney.
16         Q.    All right, next exhibit is number 9,
17    Bates stamp CWA 298 through 301, have you seen this
18    one before?
19                (Witness reviews document.)
20         A.    Yes.
21         Q.    Is that your signature?
22         A.    It is.
23         Q.    Have you ever heard of an action called
24    Hutton v. Hansen?
25         A.    No.

```
 1                          Easterling
 2         Q.    Or Hansen National Corporation?
 3         A.    I obviously heard of it, but not familiar
 4    with it.
 5         Q.    Who at CWA would have approved commencing
 6    these actions?
 7         A.    Me.  I would have.
 8         Q.    Is there anyone else whose approval you
 9    required?
10         A.    No.
11         Q.    Let's turn back to the first exhibit
12    please.  Before I get to that, you're seeking to
13    represent a class in this action, correct?
14         A.    Correct.
15         Q.    Do you know what the class is or consists
16    of?
17               MR. WEPRIN:  Object to the form.
18         A.    I don't understand the question.
19         Q.    What is the class that you're seeking to
20    represent?
21               MR. WEPRIN:  Object to the form.
22               (Witness reviews document.)
23         A.    I really don't understand what you mean
24    by that.
25               MR. WEPRIN:  Do you want to --
```

1                          Easterling
2                  MR. HART:  You --
3                  THE REPORTER:  One at a time.
4                  MR. STRAUS:  I talk, thank you.
5         Q.    You testified that CWA is seeking to
6    represent a class of purchasers in this action,
7    correct?
8         A.    Yes.
9         Q.    What does that class consist of, what
10   class is it seeking to represent?
11                 MR. WEPRIN:  Object to the form.
12                 Are you talking about the dates or -- I
13          mean, you can ask --
14        A.    I don't get it.
15        Q.    I can actually --
16                 MR. WEPRIN:  Can you ask the question?
17          It doesn't make sense to me, I don't think it
18          makes sense to her.
19                 MR. STRAUS:  That's enough.
20                 She testified she's seeking to represent
21          a class, I'm asking what class she's seeking to
22          represent.  It's that simple.
23                 MR. WEPRIN:  You could say a class of
24          PMA purchasers, if you want to be more
25          specific, ask that.

1                           Easterling
2              MR. STRAUS:  I'm talking this action,
3         ANR, not PMA.
4              MR. WEPRIN:  I misspoke.
5         Q.    You're seeking to represent a class of
6    purchasers of ANR securities; is that correct?
7         A.    Yes, but in this case it's the auditing
8    firm of that company.
9         Q.    Which is the defendant in this case?
10        A.    Uh-huh.
11        Q.    For the moment I'm just asking about the
12   plaintiff, the class of people who CWA is seeking to
13   sue on behalf of.
14        A.    Uh-huh, on behalf of the Pension Plan of
15   CWA.  So it would be on behalf of the employees of
16   CWA.
17        Q.    And the Pension Plan itself is seeking to
18   represent a class of purchasers; is that correct?
19             MR. WEPRIN:  Object to the form.
20        A.    Right.
21        Q.    Reading from the complaint, the class is
22   yourself and all other persons who purchased the
23   securities of ANR between March 15, 2000 and
24   November 19, 2002; is that correct?
25        A.    That's correct.

1                        Easterling
2              MR. WEPRIN:  Are you marking this?
3              MR. STRAUS:  No.
4         Q.    Turning back to the certification that's
5    Exhibit 1, in paragraph eight it says "since
6    February 12, 2001 the CWA has made the following
7    transactions."
8         A.    Uh-huh.
9              (Witness reviews document.)
10        Q.    Strike that.
11             Now, the entity that purchased the ANR
12   securities is the Pension Plan; is that correct?
13        A.    That's correct.
14        Q.    Did the other fund buy any ANR
15   securities?
16        A.    Has not.
17        Q.    Do you know why?
18        A.    The decision would be made by the money
19   manager of the account.  And so, that money manager
20   is for Pension Fund and does not manage any funds in
21   the other -- any other funds.
22        Q.    Who is the money manager for the Pension
23   Fund that purchased --
24        A.    Schroder's.
25        Q.    Is Schroder's --

1                          Easterling
2            MR. WEPRIN:  Wait until he finishes
3        before you answer.  You sort of stepped on his
4        question.
5        Q.    Is Schroder also the money manager for
6    the other fund?
7        A.    No.
8        Q.    Does Schroder have complete discretion in
9    making purchases on behalf of the Pension Fund?
10           MR. WEPRIN:  Object to the form.
11       A.    When we employ a money manager, they are
12   required to agree to guidelines by which they will
13   purchase instruments.  Once they have signed the
14   guidelines, they are required to purchase according
15   to the guidelines, but they do have discretion to
16   purchase anything within the guidelines.
17       Q.    Do they ever consult with you before
18   making the purchase?
19       A.    No, they do not.
20       Q.    Have they ever discussed a purchase with
21   you after making a purchase?
22       A.    No, they have not.
23       Q.    Have you ever discussed with Schroder an
24   investment in ANR?
25       A.    No, I have not.

```
 1                          Easterling
 2         Q.    Do you know whether anyone an behalf of
 3    CWA has spoken with Schroder regarding the
 4    investment in ANR?
 5         A.    No, I do not.
 6         Q.    Who would know that?
 7         A.    Well, if it wasn't me, it wasn't Tom,
 8    then that's it.  There was no discussion with them
 9    about that.
10         Q.    Did you review papers in this case in
11    support of a motion for CWA to be appointed as lead
12    plaintiff?
13         A.    I may have.
14         Q.    Do you know whether you reviewed them
15    before they were filed with the court?
16         A.    I believe I did.  I believe I did review
17    those.
18         Q.    Were they accurate, to your knowledge, at
19    the time you reviewed them?
20               MR. WEPRIN:  Object to the form.
21         A.    (Nodding head.)
22         Q.    Was there anything in them that was
23    inaccurate at the time you reviewed them?
24         A.    No, they were -- it would not have been
25    -- it would have been reviewed by the attorney.
```

1                         Easterling

2        Q.    Which attorney is that?

3        A.    Tom Hart.

4        Q.    Are you aware that CWA was appointed lead

5    plaintiff together with another entity called

6    Midstream Investments?

7        A.    Yes.

8        Q.    Have you ever spoken with anyone at

9    Midstream Investments?

10       A.    Have not.  I have not.

11       Q.    What do you know about Midstream

12   Investments?

13       A.    Only that they were one of the other

14   individuals that were on the case.

15       Q.    The motion to be appointed as lead

16   plaintiff, did you discuss that with counsel?

17       A.    I would have, yes.

18       Q.    Which counsel?

19       A.    Tom Hart.

20       Q.    Did you have any discussions with Milberg

21   concerning that?

22       A.    I don't believe so.

23       Q.    How did you first become aware of ANR, by

24   ANR you understand I mean Annuity And Life Re?

25       A.    Um.

36

```
 1                      Easterling
 2       Q.    How did you first become aware of the
 3   company?
 4             MR. WEPRIN:   Object to the form of the
 5       question.
 6       A.    I would have become aware of them when I
 7   received the request by Milberg Weiss to be a
 8   plaintiff in the case.
 9       Q.    So before that time, did you know that
10   CWA had purchased ANR securities?
11       A.    No, I did not.
12       Q.    How did you become aware that Milberg was
13   asking CWA to become a plaintiff in the case?
14       A.    They --
15             MR. WEPRIN:   Object to the form.
16       A.    They prepared the paperwork, it came in,
17   it went over to Tom, Tom read it, recommended that
18   we pursue --
19             MR. WEPRIN:   Please don't give any advice
20       that Mr. Hart gave you.
21       Q.    Do you remember when that was?
22       A.    No, I don't.
23       Q.    Had you ever worked with Milberg before
24   that happened?
25       A.    Yeah.
```

1                           Easterling
2          Q.    You mentioned a monitoring agreement
3    before, was what monitoring agreement -- well, what
4    is the monitoring agreement that you have?
5          A.    That they will monitor all of our
6    investments, in both of our funds, and that when
7    they discover anything that they feel is
8    inappropriate, they'll bring it to my attention and
9    see if I want to pursue it any further.  I review
10   that with my attorney.
11         Q.    When did you enter into that agreement?
12         A.    That's been some time ago.  I think you
13   have a record of that, but I don't have it.
14         Q.    Do you have any recollection at all of
15   the time frame?
16               MR. WEPRIN:  Object to form.
17         A.    I don't know.
18         Q.    Is that a written agreement?
19         A.    Yes.
20         Q.    Did you ever have an oral agreement with
21   respect to monitoring investments?
22         A.    No.
23         Q.    Did Milberg begin monitoring investments
24   before the agreement was entered into?
25         A.    No.

```
 1                    Easterling
 2        Q.    How did you come to enter into that
 3   agreement?
 4        A.    I met a young man that worked at Milberg
 5   Weiss at a social function, and just as a casual
 6   conversation, asking -- we were at the same table,
 7   asking what he did, and he told me, and I was amazed
 8   that there was such a -- a law firm that did that
 9   type of work.  And --
10        Q.    What type of work?
11        A.    That monitored investments.
12              And so, I took his card, and then made a
13   call to have a meeting with him, and he came in and
14   brought two of the attorneys from that firm, and we
15   sat down and they explained the detail of what they
16   would do if I were to agree to them becoming one of
17   the monitoring.
18        Q.    What did they say?
19              MR. WEPRIN:  Please don't give them any
20         advice.  Tell him generally what it was.
21        A.    That they would monitor all of my
22   investments, and if they found anything that was
23   questionable, or they felt was illegal, that they
24   would then advise me of what it was.  I would have
25   an option to decide what I wanted to do with that.
```

```
 1                        Easterling
 2    Whether I wanted to pursue it or not.
 3         Q.    How would you pursue it, if you did?
 4         A.    They would handle it for me.
 5         Q.    Did you understand that in providing
 6    these monitoring services, that they were acting as
 7    your attorney?
 8               MR. WEPRIN:  Object to the form of the
 9      question.
10         A.    Yes.
11         Q.    Do you consider that a valuable service?
12         A.    I consider that another pair of
13    suspenders on the pants and the belt that I had.
14    Absolutely.
15         Q.    Has any other law firm ever provided that
16    service for CWA?
17         A.    No.
18         Q.    Who were the two attorneys that -- well,
19    sorry.
20               Who was the attorney you met at the
21    dinner, do you recall?
22         A.    No.  I believe he left the firm shortly
23    after that.
24         Q.    Do you know who the attorneys were that
25    came with him to meet with you?
```

```
 1                          Easterling
 2        A.    Laura Stein and Sandra Stein.
 3        Q.    At that time had Milberg ever represented
 4   CWA in a lawsuit?
 5        A.    No, they had not.
 6        Q.    Had CWA ever brought a lawsuit prior to
 7   that time in your time as trustee?
 8        A.    No, we had not.
 9        Q.    Have you ever met an attorney named David
10   Bershad?
11        A.    No, I have not.
12        Q.    Ever met an attorney named Steven
13   Schulman?
14        A.    No, I have not.
15        Q.    Have you ever spoken with David Bershad?
16        A.    No, I have not.
17        Q.    Have you hear the name before?
18        A.    No, I have not.
19        Q.    Have you heard the name Steven Schulman?
20        A.    No.
21        Q.    Who at CWA besides yourself has had any
22   contacts with any attorneys at Milberg Weiss?
23              MR. WEPRIN:   Object to the form.
24        A.    I would -- if anybody, it would be Mary
25   O'Melveny, our attorney, but generally it would have
```

```
 1                          Easterling
 2      been Tom Hart, because he's benefits, and even Mary
 3      would have referred it to him.
 4           Q.    Do you know whether Mary has had any
 5      contact with any Milberg Weiss --
 6           A.    No, I do not, but I don't -- I do not
 7      think she has, but I don't know.
 8           Q.    Have you asked her that in connection --
 9           A.    No, I have not.
10           Q.    Do you know whether Tom Hart has had
11      contacts with Milberg?
12           A.    I'm sure he has.
13           Q.    Is there any relationship between
14      Mr. Hart's firm and Milberg Weiss?
15           A.    Not to my knowledge.
16                 MR. WEPRIN:  Object to the form.
17           Q.    Has anyone ever told you that there was a
18      relationship?
19           A.    No.
20           Q.    Whose responsibility in CWA was it to
21      commence this action?
22           A.    Mine.
23                 MR. WEPRIN:  Object to the form.
24           A.    My responsibility.
25           Q.    By this action, I mean the action in
```

42

 1                          Easterling
 2    which you're being deposed.
 3         A.    Correct.
 4         Q.    Did you consult with anyone at CWA before
 5    making the decision?
 6         A.    No, I did not.
 7         Q.    Did you consult with anyone other than
 8    Mr. Hart in making the decision?
 9         A.    No, I did not.
10         Q.    Did you consult with Mr. Hart in making
11    the decision?
12         A.    Yes.
13         Q.    Other than the monitoring agreement, do
14    you have any other agreements with Milberg Weiss?
15         A.    No, I do not
16               MR. WEPRIN:  Object to the form.
17         Q.    Do you have retention agreements in
18    connection with cases in which they represent you?
19         A.    I don't understand that question.
20         Q.    When Milberg represents you as counsel in
21    an action, have you entered into engagement
22    agreements governing that --
23               MR. WEPRIN:  Object to the form.
24         A.    I have no other agreement with Milberg
25    Weiss except the one that we have to monitor our

```
 1                        Easterling
 2    cases and move forward with them.  They don't have
 3    any other work for us.  If that's what the question
 4    was.
 5                   MR. WEPRIN:  Barbara, any time you want
 6              to take a break, let him know.
 7         Q.    What's the basis on which Milberg
 8    represents you in this action?
 9         A.    I didn't hear that.
10                   MR. WEPRIN:  Object to the form.
11         Q.    What's the basis on which Milberg
12    represents you in this action?
13                   MR. WEPRIN:  Object to the form.
14         A.    On the agreement that we have.  Just
15    fulfilling the agreement they have with us.
16         Q.    Are they entitled to fees from CWA?
17         A.    No, they are not.
18         Q.    It's on a contingency basis?
19         A.    It is.
20                   MR. STRAUS:  Mark this.
21                   (Defendant's Exhibit 10, document,
22              marked for identification, as of this date.)
23                   (Witness reviews document.)
24                   MR. HART:  Barbara, take your time
25              reading it.
```

1                         Easterling
2          Q.    I'm showing you a document that's been
3    marked as Exhibit number 10, it's been Bates stamped
4    CWA 372 through 374.   I'll ask you to please read
5    it, take your time to look at it, tell me when
6    you're done if you've ever seen it before?
7          A.    Okay, this is actually a letter to Tom
8    Hart.
9          Q.    Yes.
10               So, that's one of my first question, is
11   whether or not you've ever seen it before?
12         A.    I may not have seen this.
13               But obviously we discussed it, because I
14   am familiar with what's contained in there.
15         Q.    What is it that you're familiar with?
16         A.    I am familiar with the fact that I agreed
17   to sign the certification and be the lead plaintiff
18   in the case against ANR.
19         Q.    There's a section in the second to last
20   paragraph on the bottom --
21               MR. WEPRIN:   What page?
22         Q.    On page --
23         A.    "With respect to any monies"?
24               MR. WEPRIN:   Wait until he tells you.
25         Q.    It's page three of the fax, "with respect

```
 1                          Easterling
 2    to any monies," thank you, yes.
 3                   (Witness reviews document.)
 4         Q.    CWA 373.
 5                   The second to last paragraph, a sentence
 6    in the middle says "under the rules governing class
 7    action litigation the named plaintiffs obtain the
 8    same proportion of recovery based on their actual
 9    losses suffered as the other members of the case."
10    Next sentence, "However, it is possible to request
11    from the court the approval to provide an additional
12    amount to named plaintiffs to reimburse them for
13    reasonable costs and expenses, including lost wages
14    directly relating to their representation of the
15    case."
16                   Did you have any understanding of that?
17         A.    Yes, I did.
18         Q.    What was your understanding?
19         A.    Exactly what it says, that if I agree to
20    -- that the courts are going to determine what the
21    amount would be that I will receive or the Pension
22    Plan will receive if we are fortunate enough to win
23    the case, and if I incur any loss, like traveling to
24    testify or had anything like that, I'd be reimbursed
25    for that.
```

46

```
 1                        Easterling
 2         Q.    Are there any other kind of losses you
 3    understand you would be reimbursed for?
 4         A.    No.
 5         Q.    Has CWA received any reimbursement
 6    pursuant to this so far in this litigation?
 7         A.    None.
 8         Q.    Has it sought any reimbursement to date?
 9         A.    No, it has not.
10              MR. STRAUS:  Mark this.
11              (Defendant's Exhibit 11, document,
12         marked for identification, as of this date.)
13         Q.    I'm going to show you a document that's
14    been marked as Exhibit 11, it's Bates stamped CWA 17
15    through CWA 18.
16              (Witness reviews document.)
17         Q.    I'll ask you to look at that please, tell
18    me if you've ever seen it before?
19         A.    Okay.
20         Q.    Have you seen this before?
21         A.    Yes.
22         Q.    Is that your signature on the second
23    page?
24         A.    It is.
25         Q.    Did you read this before you signed it?
```

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1                        Easterling

2        A.    Yes, I did.

3        Q.    Is this the monitoring agreement that we

4    were discussing?

5        A.    It is.

6        Q.    Do you have now any agreement with

7    respect to this subject matter with Milberg outside

8    of this document?

9              MR. WEPRIN:   Object to the form.

10       A.    No.

11       Q.    Have you ever had any agreement with them

12   regarding monitoring securities outside of this

13   agreement?

14       A.    No.

15       Q.    Look at the first paragraph, the last

16   sentence says "In order to eliminate any possible

17   ambiguity and to set forth more clearly the parties'

18   rights, duties, and obligations, we propose that the

19   agreement be modified."

20             Do you know what that's referring to?

21       A.    No, I don't.  I read that, but I don't --

22   I don't have any idea what that is.

23       Q.    Did you read that at the time you signed

24   this?

25       A.    Uh-huh.

Case 3:02-cv-02133-EBB     Document 270-8     Filed 05/29/2008     Page 49 of 50

48

```
 1                        Easterling
 2          Q.    Did you discuss that with anyone?
 3          A.    No, it -- Tom Hart would have already
 4   seen it.
 5          Q.    Did it raise any question in your mind at
 6   the time you read it?
 7          A.    No, it didn't.
 8          Q.    Who is Eileen Brackens?
 9          A.    My assistant.
10          Q.    This is her title, executive assistant to
11   the secretary-treasurer?
12          A.    That's correct.
13          Q.    Was that her title as of January 2003?
14          A.    Yes.
15          Q.    Is that still her title?
16          A.    It is.
17          Q.    Has CWA ever received any payments from
18   Milberg Weiss?
19          A.    No.
20          Q.    Has it ever gotten a promise to be paid
21   any amounts?
22          A.    No.
23          Q.    I understand you're speaking for
24   yourself, can you say that no one at CWA --
25          A.    Yes, I can.
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

49

```
 1                    Easterling
 2        Q.   How can you say that?
 3        A.   Because there's no one else that deals
 4   with that firm other than myself and even Mary
 5   O'Melveny, the attorney.  I would -- would say she
 6   probably has had no conversation with them.  It
 7   would be Tom Hart, would be the only other person
 8   that spoke with them.
 9        Q.   Do you know whether Mr. Hart has ever
10   received any payments from them?
11        A.   No, I do not.
12        Q.   Do not know?
13        A.   Correct.
14        Q.   Have you ever discussed that with him?
15        A.   No.
16        Q.   Do you know whether he's ever been
17   promised any payments by Milberg?
18        A.   No, I do not.
19        Q.   Have you discussed that with him?
20        A.   No, I have not.
21             MR. STRAUS:  Mark this.
22             (Defendant's Exhibit 12, document,
23        marked for identification, as of this date.)
24        Q.   Ms. Easterling, did you ever learn that
25   CWA was reimbursed fees charged by Mr. Hart in
```