1                    Easterling
2    connection with this case?
3        A.    Yes.
4        Q.    When was that?
5        A.    Actually, when he filed them he told me
6    that he had filed to recover fees.  But you know,
7    I'm saying yes, but you know, actually it could have
8    been in another case that he had told me that, that
9    he had received fees for his time, which is part of
10    the agreement, for any work that he has done on the
11    case, but I don't -- I can't tell you if that's this
12    case, I think it is, but it could have been the
13    other case.
14        Q.    What is the agreement with respect to his
15    fees?
16        A.    That any time that he spends, and expense
17    that he has in conjunction with working with Milberg
18    Weiss will be reimbursed.
19        Q.    That's part of the agreement between
20    Milberg and CWA?
21        A.    It is, yes.
22        Q.    Is that true whether or not there's a
23    recovery in the action?
24            MR. WEPRIN:  Object to the form.
25        A.    I believe it is, because we pay him, and

```
 1                          Easterling
 2    I think he -- when he recovers the fees, they are
 3    returned to CWA.  He does not keep whatever it is
 4    that he receives.  He charges us for his time on the
 5    case, and when he's reimbursed, he returns the money
 6    to us.
 7         Q.    Does he charge you on an hourly basis or
 8    through some other method?
 9         A.    I believe it's an hourly basis.
10         Q.    I'm going to show you a document that's
11    been marked as Exhibit 12, it's not Bates stamped,
12    it was just produced last night by your counsel,
13    I'll ask you to please take a look at it, tell me if
14    you've ever seen it before.
15              (Witness reviews document.)
16         A.    Yes, that would be the requirement that
17    we have, uh-huh.
18              MR. WEPRIN:  The question was whether
19              you've seen it before, Barbara.
20         A.    I have, because I -- I have seen it
21    before, because I knew about it.  So obviously I saw
22    it with our other general counsel, that was general
23    counsel at the time, who has since been replaced by
24    Mary O'Melveny.
25         Q.    That's Patrick Scanlon?
```

```
 1                     Easterling
 2       A.    Correct.
 3       Q.    When was he replaced by Mary O'Melveny?
 4       A.    I would say --
 5             MR. WEPRIN:  If you can't remember --
 6             THE WITNESS:  I can't.
 7       A.    Tom knows.
 8       Q.    Do you know whether it was during 2007?
 9       A.    No, it's not 2007.  She was in place
10  before that.  Maybe 2006.  But not 2007.
11       Q.    Have you ever discussed with anyone at
12  Milberg the arrangement under which Mr. Hart's fees
13  are reimbursed?
14       A.    Not to my knowledge.
15       Q.    Have you discussed it with anyone other
16  than Mr. Hart?
17       A.    No.
18       Q.    Do you have any agreement with Scott &
19  Scott?
20       A.    No, except that we know Beth was with
21  Milberg Weiss and is now with Scott & Scott, and
22  they are handling the case at this time.
23       Q.    Does Scott & Scott represent CWA in the
24  case?
25             MR. WEPRIN:  Object to the form.
```

1                        Easterling
2        A.    They do.
3        Q.    Are there any engagement agreements with
4    them?
5        A.    I think it's just simply a continuation
6    from the time that beth was in -- was working for
7    Milberg Weiss, then the case was with Scott & Scott
8    and is continuing the agreement between them.  To my
9    knowledge.
10       Q.    Who would know that?
11       A.    Beth would know that.
12       Q.    Anyone at CWA?
13       A.    No.
14             MR. WEPRIN:  Just to clarify, when
15       Mrs. Easterling says "Beth," she means attorney
16       Kaswan.
17       A.    I do mean attorney Kaswan.
18       Q.    Serving as lead plaintiff, does CWA
19    receive anything if it were an absent class member
20    in the case?
21             MR. WEPRIN:  Object to the form.
22       A.    I don't think so.  Because if I remember,
23    it said equal distribution of whatever the
24    percentage was that the plaintiffs would get.  So we
25    would get our portion, but no more than.

```
 1                         Easterling
 2         Q.    Other than reimbursement of the expenses
 3    that we discussed?
 4         A.    Yes, correct, correct.
 5         Q.    Why would you want to serve as lead
 6    plaintiff?
 7         A.    Well, I have a fiduciary responsibility,
 8    and the loss that we sustained in the investment and
 9    the circumstances surrounding that, I think it's my
10    fiduciary responsibility to pursue a case.  And if,
11    in fact, I am asked to be the lead plaintiff, I
12    would do so.
13         Q.    Do you know whether any other plaintiffs
14    are seeking to be appointed as lead plaintiff in
15    this case?
16         A.    I do not.
17         Q.    When the motion was made to appoint CWA
18    in midstream as lead plaintiff, do you know whether
19    that was approved by anyone?
20               MR. WEPRIN:  Object to form.
21         A.    Approved by anyone?
22         Q.    I'm sorry, opposed by anyone?
23         A.    No, I do not.
24         Q.    You said that part of your duty is to
25    oversee the investment managers for the plan; is
```

1                        Easterling

2     that correct?

3          A.     That's correct.

4          Q.     How do you go about discharging that

5     duty?

6          A.     I usually receive quarterly reports from

7     the investment managers.  And then the investment

8     monitoring company also receives such reports, and

9     quarterly we sit down and take a look at what the

10    performance is and make a decision as to whether we

11    should take any action or call them in for

12    discussion, which we do, or liquidate their account.

13    That decision is made at that time, after we have

14    reviewed what their performance has been over a

15    quarter.

16         Q.     Just going back to what you said, who are

17    the investment monitors?

18         A.     That would be the Renck Monitoring

19    Service.

20         Q.     Does CWA have an agreement with Renck?

21         A.     We do.

22         Q.     What is the nature of the agreement?

23         A.     That they will prepare the guidelines for

24    the money managers, that they will investigate to

25    make sure that they're bona fide managers, then

```
1                    Easterling
2    follow those accounts very carefully to make sure
3    that they are following the guidelines, and then
4    just monitor the overall performance and provide us
5    with information on the performance.
6         Q.    Are they compensated by CWA for that?
7         A.    Yes, they are.
8         Q.    On what basis are they compensated?
9         A.    On an agreement we have.  Not on a
10   percentage or anything like that, it's just an
11   agreement we have.
12        Q.    Is that a flat rate or an hourly rate
13   based on the amount of time they spend on it?
14        A.    No, it's flat rate.
15        Q.    Now, you said that each quarter you sit
16   down with them to discuss the investments and the
17   performance?
18        A.    Correct.
19        Q.    Who sits down at those meetings?
20        A.    It will be -- we may call in money
21   managers to review, we may not.  If their product is
22   doing well and they're doing well.
23              At that meeting it would be me and the
24   other trustee, which is the president of the union,
25   and the Renck.  Generally my executive assistant,
```

1                          Easterling
2      Eileen Brackens, would sit in on that meeting as
3      well.
4           Q.    Anybody else?
5           A.    No.
6           Q.    Who is the other trustee?
7           A.    I'm sorry, Tom Hart will sit in on that
8      meeting.
9           Q.    Who is the other trustee?
10          A.    Larry Cohen, who is president of CWA.
11          Q.    Was he trustee in 2002?
12          A.    No, it would have been Morton Bahr,
13     B-A-H-R.  He's retired now.
14          Q.    Do you know where he lives now?
15          A.    He lives in Washington, D.C.
16          Q.    Have you ever had Schroder or
17     representatives of Schroder at one of these
18     meetings?
19          A.    Yes, we have.
20          Q.    Do you remember how many times?
21          A.    No, I don't.
22          Q.    Was it more than five times?
23          A.    Probably yes, over the period of time
24     that they've been there, they would have been there
25     five times easily.

58

1                      Easterling

2          Q.    Do you remember the last time you had

3     them in there?

4          A.    No, it's been a while since they've been

5     in.

6          Q.    Why did you have Schroder come in?

7          A.    I think that the money manager we had at

8     the time was leaving, and she and the person

9     replacing her, she brought her in to introduce her

10    to us.

11         Q.    Did you ever meet with them to discuss

12    their performance?

13         A.    When they came in, we did discuss their

14    performance.  The performance was -- was almost

15    without exception very well.  Schroders did very

16    well, no matter who was managing the money.

17         Q.    Do you remember when that meeting was,

18    when you had a new money manager come in?

19         A.    No, I don't.

20         Q.    Was it after 2002?

21         A.    I don't think so.  It was just before

22    that.  Might have been in 2003, but -- I think it

23    was just before that.

24         Q.    How large is the Pension Fund?

25               MR. HART:  Do you mean -- large meaning

```
 1                         Easterling
 2        what?
 3               MR. WEPRIN:  Object to form.
 4               MR. STRAUS:  Mr. Hart, you're not
 5        counsel of record in this action.
 6               MR. WEPRIN:  I object to the form of the
 7        question, but if you understand it, answer it
 8        if you can.
 9        A.     I don't know.  If you're asking how much
10   money the total amount that is in the Pension Fund?
11        Q.     Yes.
12        A.     I don't know.
13        Q.     Can you give me a ballpark?
14               Is it more than a hundred million
15   dollars?
16        A.     I can -- yeah.  Oh, yeah.  It's more than
17   that.  But I do have --
18               MR. WEPRIN:  Just answer the question.
19        A.     Oh.
20               MR. WEPRIN:  Obviously there are -- if he
21        wants to show you a document, he can show you
22        a document.  If you want to refer to a
23        document, you can ask him if you can refer to
24        the document, to a number, but if he needs
25        information and you don't have it, he knows how
```

60

1                          Easterling

2          to get it from us.

3          Q.    We'll can come back to that with the

4    document.

5          A.    Okay.

6          Q.    Is there an agreement with Schroder,

7    between CWA --

8          A.    On the guidelines, yes.  On what they

9    are, uh-huh.

10         Q.    Is there an agreement on fees?

11         A.    Yeah.   That would have been set -- that

12   would have been sent by the Renck monitoring.

13         Q.    How is Schroder compensated?

14         A.    I don't know that.  I can't tell you.

15         Q.    Have you ever discussed that with anyone?

16         A.    With the monitoring company, with Renck

17   monitoring, yes, but I just don't recall what that

18   would be.

19         Q.    How long has Renck been providing those

20   services for CWA?

21         A.    Probably -- at least 20 years.

22         Q.    Besides yourself, is there anyone at CWA

23   that's consulted when the investment managers are

24   making purchases in securities?

25         A.    No.

 1                          Easterling
 2          Q.    Do you know what materials the investment
 3    managers review when they're considering making
 4    investments?
 5          A.    No, I don't.
 6          Q.    Have you ever discussed that with them?
 7          A.    No.
 8                MR. STRAUS:   Mark this.
 9                (Defendant's Exhibit 13 and 14,
10          documents, marked for identification, as of
11          this date.)
12          Q.    Mrs. Easterling, have you ever reviewed
13    documents about an investment, at any time, about a
14    company in which the investment managers have
15    invested?
16                MR. WEPRIN:   Object to the form.
17          A.    I don't think so.
18          Q.    Have you ever reviewed any documents
19    regarding ANR?
20          A.    No, I have not.
21                MR. WEPRIN:   Object to the form.
22          Q.    Do you know what documents the investment
23    advisors consider when they're considering
24    investments?
25          A.    No.

1                    Easterling

2         Q.    Do you know in the case of ANR what

3    documents the investment manager reviewed before

4    making a purchase?

5         A.    No, I don't.

6         Q.    Have you ever discussed that with them?

7         A.    No, I have not.

8         Q.    Do you know what loss CWA is claiming

9    resulting from its purchase of ANR securities?

10              MR. WEPRIN:  Object to the form.

11        A.    Uh-huh, something in the neighborhood of

12   $300,000 of loss.

13        Q.    Do you know whether there's been an

14   analysis of what caused that loss?

15              MR. WEPRIN:  Object to the form.

16        A.    The analysis, yeah, but what the -- the

17   investigation by Milberg Weiss has given us some

18   information as to what the loss was and why.

19   DI  Q.    What information was that?

20              MR. WEPRIN:  Object to the form.  Don't

21         tell him what advice you got from Milberg

22         Weiss.  Direct her not to answer.

23        Q.    Have you discussed that information with

24   anyone other than Milberg Weiss?

25        A.    No.

```
 1                    Easterling
 2        Q.   Have you discussed it with Mr. Hart?
 3        A.   Yes.
 4        Q.   Anyone else?
 5        A.   No.
 6        Q.   Would you please turn back to Exhibit 1,
 7   if you look at the second page, again where the
 8   purchases of ANR securities are listed, do you know
 9   whether CWA has any documents evidencing those
10   purchases and sales?
11        A.   No, we would not receive a document like
12   that from the money manager.
13        Q.   Have you ever asked the money manager for
14   those documents?
15        A.   No.
16        Q.   Are you familiar with a settlement, a
17   partial settlement in this case?
18             MR. WEPRIN:  Object to the form.  You can
19        answer.
20        A.   With the litigation of ANR?  And the
21   result?  Is that what you're saying?
22        Q.   Yes.
23        A.   Yes.
24        Q.   What can you tell me about the
25   settlement?
```

```
 1                        Easterling
 2        A.    That CWA will receive somewhere around
 3   $8,000, but the total settlement was several
 4   million.
 5        Q.    Do you know which parties were involved
 6   in that settlement?
 7        A.    I think it was -- I think it was just CWA
 8   and Millstream, was that the other?
 9        Q.    Midstream --
10        A.    Plaintiff.
11        Q.    -- as plaintiffs?
12        A.    Yes.
13        Q.    Do you know which defendants were
14   involved in the settlement?
15        A.    I believe it was just ANR.
16        Q.    Did you have any involvement in
17   negotiating that settlement?
18        A.    No.
19              MR. WEPRIN:  Object to the form.
20        Q.    Did you consult with counsel at the time
21   that the settlement was being negotiated?
22        A.    No, I did not.
23        Q.    Do you know whether Mr. Hart consulted
24   with Milberg at the time the settlement was being
25   negotiated?
```

1                          Easterling
2          A.     No, I do not.
3          Q.     I'm going to show you a couple of
4     documents that have been marked as Exhibits 13 and
5     14, I'll ask you to look through those briefly, if
6     you can, and please tell me if you've ever seen them
7     before.
8                 (Witness reviews document.)
9                 MR. WEPRIN:   Is there anything in
10         particular you want her to look at?
11         Q.     First, I'd like just to know if you've
12    seen it before, Ms. Easterling, if you look at the
13    first page, there's a letter to you?
14         A.     Uh-huh.
15         Q.     So you have seen these before?
16         A.     Yes, I have.
17         Q.     Are they two of the quarterly reports
18    that Renck has provided to CWA?
19         A.     That's correct.
20         Q.     Do you keep files of these reports?
21         A.     Yes.
22         Q.     Do you know whether these reports came
23    from your files?
24         A.     Yes.
25         Q.     Do you have any other reports during

1                          Easterling
2    2002?
3         A.    No, we can obtain them from Renck, but we
4    did not have any for some reason.
5               (Witness reviews document.)
6         Q.    If you look at Exhibit 13 please, if you
7    go to page 321, did you receive this at or about
8    August of 2002 when the letter is dated?
9         A.    Yes.
10        Q.    Did you review it when you received it?
11        A.    Yes.
12        Q.    Did you have a meeting with Renck after
13   you received this?
14        A.    Yes.
15        Q.    Do you remember any of the discussions at
16   that August -- was the meeting in August of 2002, or
17   do you remember when it was?
18               MR. WEPRIN:  If you remember.
19        A.    I don't remember.  I don't remember.
20        Q.    How soon after the date of these reports
21   do you typically meet with Renck?
22        A.    It can vary depending on -- on
23   president's and my availability to meet.
24        Q.    This is describing the performance of the
25   CWA portfolios for the second quarter of 2002; is

1                         Easterling
2      that correct?
3                MR. WEPRIN:  Object to the form.
4           A.    Yes.
5           Q.    Specifically the Pension Fund that we've
6      been discussing?
7           A.    Uh-huh.
8           Q.    I have a couple of questions to make sure
9      I understand the report.  If you turn to number
10     Bates stamp CWA 304 at the front of that document?
11          A.    Uh-huh.
12          Q.    Under the heading total return equity
13     indices -- is it correct that the first list are the
14     performance of equity indices, including the Dow
15     Jones Industrial, beneath that Schroder
16     International equity only, do you know, those are
17     part of the Fund's portfolio?
18          A.    Correct.
19          Q.    Do you know which -- well, you said that
20     Schroder's was the manager that purchased the ANR
21     securities for CWA?
22          A.    Right.
23          Q.    Do you know which Schroders?
24          A.    Which one they fell in?
25          Q.    Yes.

68

1                        Easterling

2        A.    No, I don't.

3        Q.    Do you know why, looking at the

4   performance for the Schroder's large cap for the

5   second quarter 2002, there's an ANR large and mid

6   cap and small cap for first and the Fund switched

7   from large cap to small and mid cap at some point in

8   2002?

9              MR. WEPRIN:   Object to form.

10       A.    I would assume that's what happened.

11       Q.    You don't have any recollection of that?

12       A.    No.

13       Q.    Who would have made that decision?

14       A.    They could have made that decision.  They

15  probably would have -- they may have spoken to the

16  Renck about it at the time, but they could have made

17  that decision.

18       Q.    Could they have made the decision without

19  consulting --

20       A.    Yes.

21       Q.    -- with CWA?

22       A.    Yes, as long as it didn't violate the

23  guidelines, and they had -- they covered almost

24  everything.  Large, mid, small.

25       Q.    The second column under 4/1 to 6/30/2002

```
 1                        Easterling
 2    shows the performance of all these different
 3    segments for the second quarter 2002, correct?
 4         A.    Right.
 5         Q.    It looks like all of the equities, both
 6    equity indices and the CWA portfolio lost money; is
 7    that right?
 8         A.    That's correct.
 9         Q.    Looks like that's also true for the six
10    month cumulative column?
11         A.    Uh-huh.
12         Q.    That shows the performance of the
13    portfolio for January through June 30, 2002?
14         A.    Uh-huh.
15         Q.    Looks like they all lost money during
16    that six-month period as well?
17         A.    Uh-huh.  There -- their standard is the
18    S&P 500, so even though they -- Schroder's lost,
19    they still did better than the S&P.  So, that would
20    be it.  Considered at the time.
21         Q.    Do you remember talking about this
22    performance for 2002?
23               MR. WEPRIN:  Object to the form.  He
24         wants to know if you remember.
25         A.    I'm sure that we discussed it because we
```

1                       Easterling
2    discuss it as soon as we get this.  We have our --
3    as soon as possible we have a meeting, and it's
4    thoroughly discussed from one end to the other.
5         Q.    During the meeting with you, are there
6    ever discussed particular securities?
7         A.    No.  The discretion of the money manager.
8         Q.    What do you discuss about the performance
9    at these meetings?
10        A.    Increased losses, continued losses, areas
11   like that.
12        Q.    Do you ever talk about the reasons for
13   the losses?
14        A.    We do, uh-huh.
15        Q.    What can you recall about that?
16              MR. WEPRIN:  Object to the form.  You can
17        answer, go ahead.
18              Are you asking in general or asking about
19        a specific meeting?  Otherwise it's not going
20        to be make any sense.
21        A.    I can tell you generally.  I could not
22   tell you did we speak specifically to an account,
23   no.  We probably, taking a look at this, we probably
24   talked about everybody's end, you know, since the
25   indices were down, we probably would take -- would

1                        Easterling
2       just say let's take another look at that, let's look
3       and see where it goes.  See what they've done in the
4       past.  And at that point we would not have
5       liquidated any account.
6                   We do not look specifically at
7       instruments for whatever Schroder had invested in,
8       we would not have gone to that point of reviewing
9       those.
10          Q.    On page CWA 321 at the bottom, if you
11      look at that, the third entry down -- first of all,
12      what does this page show?
13          A.    It shows the investments by Schroder's.
14      The instruments that they purchased for the Pension
15      Fund.
16          Q.    For this period?
17          A.    Correct.
18          Q.    Is it showing a buy on April 3, 2002 of
19      25,000 shares of Annuity And Life Re --
20          A.    Yes.
21          Q.    -- stock?
22          A.    Well -- yes.
23          Q.    Do you need to clarify something on that?
24                (Witness reviews document.)
25          A.    No.  That's fine.

1                     Easterling

2        Q.    The next column is the price that Annuity

3    And Life paid; is that correct?

4              MR. WEPRIN:  Object to form.

5        Q.    What does the next column show?

6              MR. WEPRIN:  You misspoke.

7              MR. STRAUS:  I understand.

8              MR. WEPRIN:  I'm going to object.

9        Q.    The next column shows the price CWA paid

10   for the Annuity And Life stock, or for the stock?

11             (Witness reviews document.)

12       A.    Uh-huh, yes.

13       Q.    What does the next column show?

14             (Witness reviews document.)

15       A.    I'm not sure of that.

16             MR. WEPRIN:  This column (indicating).

17             THE WITNESS:  Oh.

18             (Witness reviews document.)

19       A.    I'm not sure what that means.

20       Q.    Do you know what the NT column reflects?

21       A.    No.

22       Q.    The final column, do you know what that

23   means?

24       A.    The amount per share I would imagine.  I

25   don't know.

```
 1                        Easterling
 2        Q.    Back at the beginning, the second column
 3   is headed account number?
 4        A.    Uh-huh.
 5        Q.    Do you know what those account numbers
 6   look like?
 7        A.    No, I don't.
 8        Q.    Do you know whether they're CWA accounts
 9   or Schroder's account numbers?
10        A.    No, I don't.
11        Q.    Do you ever review this portion of the
12   report when you receive it?
13        A.    No, we don't.
14        Q.    Have you ever discussed this portion of
15   the report with anyone?
16        A.    No, I have not.
17        Q.    Is there anyone else at CWA that would
18   have that responsibility?
19        A.    No.
20              I need a short break.
21        Q.    Sure.
22              (Recess taken.)
23
24              (Luncheon recess:  12:24 p.m.)
25
```

```
 1                        Easterling
 2              A F T E R N O O N   S E S S I O N
 3              (Time noted:  1:05 p.m.)
 4              B A B A R A   E A S T E R L I N G,
 5              resumed and testified as follows:
 6    EXAMINATION BY (Cont'd.)
 7    MR. STRAUS:
 8         Q.   Mrs. Easterling, I'm going to ask you to
 9    take another look please at Exhibit 13.  I'll ask
10    you, is there anything in here that would show you
11    what assets the Fund had under management as of
12    August of 2002?
13              MR. WEPRIN:  Object to the form.
14              (Witness reviews document.)
15         A.   Ask me that again.
16         Q.   Sure.
17              Is there anything in this report that
18    would show you what assets, what amount of assets
19    the Pension Fund had under management as of, let's
20    say June 30, 2002?
21         A.   Yes.  At the bottom of the page, at 304,
22    it's going to tell you the market value of the
23    portfolio on January 1st, and then at each quarter
24    you will see the cumulative.  So that at the very
25    end of the six-month period, they had $213 254,961.
```

```
 1                      Easterling
 2        Q.    That's as of June 30, 2002?
 3        A.    That's correct.
 4        Q.    Then according to this, as of March 31,
 5   2002, $230,342,273; is that correct?
 6        A.    Yes, that's correct.
 7        Q.    Next on that same bottom line to the left
 8   there's a number that starts 235, can you tell me
 9   what that number reflects?
10        A.    That would reflect what the market value
11   was on January 1, 2002.
12        Q.    Since 2002, has the amount of assets
13   under management by the Pension Fund gone up or
14   down?
15        A.    Up.
16        Q.    Can you give me any idea of what it is
17   today?
18        A.    Three hundred million.  Somewhere in that
19   area.
20              I don't have exact.  But I know -- yeah,
21   2002 was a terrible year, but we've done very well.
22        Q.    If you turn please to page CWA 308, can
23   you tell me what this chart shows?
24        A.    That reflects how the portfolio is
25   allocated, how the money is allocated, and because
```

```
 1                        Easterling
 2      we try to do a balance -- so that you see, the
 3      equities below at 104 million, you see international
 4      equities percentage of the pie there, the fixed
 5      income at the top, so that we would try to -- our
 6      objective is to have a balance of instruments so
 7      that if one goes down, the other goes up.  For
 8      example, bonds is a good example, bonds did well in
 9      2002 and equities did poorly.
10          Q.    If you turn please to page 323, there's
11      just a section at the bottom of the page headed
12      transactions traded away, do you know what that
13      means?
14          A.    I have no idea.
15                MR. WEPRIN:  If you know, you can
16          answer.  If not, tell him you don't know.
17          A.    I don't know.
18          Q.    Did Mr. Bahr have any role in making the
19      decision to bring this lawsuit?
20          A.    No.
21          Q.    Does he play any role in decisions to
22      make investments by CWA?
23                MR. WEPRIN:  Object to the form.
24          A.    No.
25          Q.    If you turn to the other report, which is
```

```
 1                         Easterling
 2     marked as Exhibit 14, turn to page 333.
 3          A.    Okay.
 4          Q.    You said that CWA does not have a copy of
 5     the report for the third quarter of 2002, but if you
 6     look in the third column, does that show the
 7     performance --
 8          A.    Oh, sure.
 9          Q.    -- as of the third quarter?
10          A.    Absolutely.
11          Q.    All the numbers were also negatives as of
12     the third quarter 2002?
13          A.    It sure was, yeah.
14          Q.    The numbers next to the mid cap show
15     performance of the total -- I'll ask you, what does
16     that show the performance of?
17          A.    Where?
18          Q.    Sorry, next to Schroder's mid cap in the
19     column for the third quarter.
20          A.    Shows they were down.
21          Q.    What is the mid cap, just for clarity?
22          A.    It's a type of stock that is termed mid
23     cap.  It's somewhere between large and small, but I
24     bet you can figure that one out yourself.
25          Q.    The Schroder mid cap only here, what does
```

```
 1                      Easterling
 2   that refer to?
 3             MR. WEPRIN:  Which part are you asking
 4        about?
 5             MR. STRAUS:  The whole thing.
 6        A.    That would apply specifically to that
 7   type of stock.
 8        Q.    What is the Schroder's mid cap?
 9        A.    Whatever they -- whatever the stocks were
10   that fell that that category.  I don't know what
11   they were, but whatever they were with --
12        Q.    It's a segment of the Pension's portfolio
13   that's being managed by --
14        A.    Absolutely.
15        Q.    -- Schroder's?
16        A.    Yes.
17             MR. STRAUS:  Mark this.
18             (Defendant's Exhibit 15, document,
19        marked for identification, as of this date.)
20        Q.    I am going to show you a document now
21   that's marked number 15.  It's Bates stamped CWA 19
22   through CWA 29.
23             (Witness reviews document.)
24        Q.    First I'll just ask you to look through
25   that please and tell me if you've ever seen it
```

1                        Easterling

2    before?

3              MS. KASWAN:  I'm sorry, this entire

4         thing?

5              MR. STRAUS:  So the record is clear, the

6         documents were produced to us in a PDF, so it

7         wasn't clear where the documents started or

8         ended.  I clipped those pages together based on

9         the fax line at the top of the page, pages --

10             MR. WEPRIN:  That fax line --

11             MR. STRAUS:  It doesn't look like

12        something that should be separated.

13             MR. WEPRIN:  I see, they were all faxed

14        on October 11, 2006.

15             MS. KASWAN:  So the question is did she

16        see every page of this or any part of this?

17             MR. WEPRIN:  I don't think she was the

18        one who faxed it.  You should be clear what

19        you're asking her about.

20        Q.   Well, Mrs. Easterling, I realize this is

21   a little confusing because the first page of this

22   was not produced, so I can't show you the complete

23   fax, but have you seen a fax like this before, to

24   your recollection?

25        A.   No.

```
 1                        Easterling
 2        Q.    Now let's take the first page, which
 3   appears to be the first page of an amendment to an
 4   investment advisory agreement?
 5        A.    Uh-huh.
 6        Q.    There's no second page, but I'll ask you
 7   if you believe you've seen that document before?
 8              (Witness reviews document.)
 9              MR. WEPRIN:  You're asking the amendment
10        to the investment advisory agreement?
11              MR. STRAUS:  Yes.
12              MR. WEPRIN:  The one page.
13        A.    I haven't -- I didn't see this, as far as
14   I can recall.
15        Q.    Do you know whether there is an
16   investment advisory agreement between the CWA
17   Pension Plan and Schroder's?
18        A.    If such an agreement existed in 2003?
19              Yes, I'm sure it did.  But -- okay.
20        Q.    Have you ever seen the agreement?
21        A.    I haven't -- I haven't seen this part of
22   it.
23              MR. WEPRIN:  Well, do you want to know
24        whether she believes that she's ever seen the
25        agreement?
```

```
 1                        Easterling
 2            MR. STRAUS:  I'll ask another question.
 3            MR. WEPRIN:  If it exists, is that your
 4       question?
 5       Q.   Have you ever seen any agreement between
 6   the Pension Fund and Schroder's?
 7       A.   We would have had agreements.  They
 8   probably were prepared by Tom, and may have been
 9   prepared in conjunction with Renck, but -- and would
10   be a result of something that we had discussed.
11   That much would be true.
12            But did I actually see this piece?  No.
13       Q.   I'll just say, as we've been discussing,
14   there's only one this document that is marked, it
15   appears to be a fax, only the first page of the
16   agreement is attached to the fax, would CWA have any
17   copies of agreements it has with Schroder's?
18       A.   I don't know.
19       Q.   Has anyone at CWA searched for documents,
20   searched for agreements between it and any
21   investment advisors?
22       A.   I think we tried to -- Tom asked us to
23   pull up everything that we had, and we did that.
24   This may be the only thing that we had, and may
25   not --
```

1                          Easterling

2                MR. WEPRIN:  If there was an agreement,

3          it would have been produced to you.

4          A.    Yeah.  We did everything you asked for.

5                MR. STRAUS:  I'm just asking the witness

6          what efforts were made for a search.

7                MR. WEPRIN:  You asked her about her

8          efforts, but she's obviously is not aware of

9          all the efforts everybody else made.

10         A.    Uh-huh.

11         Q.    Have you had any discussions with anyone

12    at CWA about efforts they made to search for

13    documents?

14               MR. WEPRIN:  Do you include Mr. Hart in

15         that category?

16               MR. STRAUS:  For the moment, no.

17         Q.    Did you have discussions anyone else at

18    CWA?

19         A.    No, I didn't have any conversations.

20         Q.    Have you asked anyone outside of CWA to

21    search for documents?

22         A.    I think actually Tom asked us to search

23    for documents, and he asked my secretary to ask us

24    to search for documents, which she did and gave him

25    whatever she had.

```
 1                        Easterling
 2          Q.    Do you know what she searched?
 3          A.    No.
 4          Q.    If CWA had in its files an agreement
 5     between it and Schroder's, where would that
 6     agreement be kept?
 7          A.    I'm not sure where it would be kept, or
 8     if we would keep it.
 9                MR. WEPRIN:  Can we take a second?
10                (Discussion off the record.)
11     BY MR. STRAUS:
12          A.    It may have been there was just changes
13     in three and appendix B and 15.
14          Q.    Yes, but the reason I raised the
15     question, because this page one of the amendment
16     stops in the middle of a sentence at the bottom of a
17     page, so there appears to be more of this amendment,
18     that's what we got.
19          A.    Got you.
20          Q.    If you look at the second paragraph here,
21     it says "Whereas the advisor currently managing for
22     the client, A, balance of the portfolio consisting
23     of fixed income account and a large cap account and
24     B, the client has provided the advisor with
25     instructions to liquidate the large cap account and
```

1                        Easterling
2       as of the effective date to manage a portfolio
3       consisting of the following three accounts, (i),
4       fixed income, (ii), mid cap relative value, (iii),
5       small cap value, such instructions attach hereto as
6       appendix A."
7                Do you know anything about what this
8       paragraph is describing?
9            A.    It describes exactly what it says, that
10      there will be a different set of guidelines now
11      based on what the Renck, and speaking for CWA, has
12      instructed them to liquidate the large cap and
13      instead to take that money and to reinvest it, but
14      -- but whether -- in large cap, to reinvest it in
15      fixed mid cap and small cap.
16           Q.    That was an instruction that the Pension
17      Fund gave to Schroder?
18           A.    Uh-huh.
19           Q.    Do you know why that instruction was
20      given?
21           A.    There would have been a reason, but I
22      don't recall what it would be.
23           Q.    Did you make that decision?
24           A.    It would be have occurred following a
25      meeting, and that meeting could have been -- that

```
 1                          Easterling
 2    could have been a meeting where Schroder's was in
 3    for at the meeting, or it could have been that the
 4    Renck had a meeting with Schroder and advised us and
 5    issued the new guidelines.
 6         Q.    Would your approval have been required
 7    for that change?
 8         A.    Yes.
 9         Q.    When I say "you," meaning --
10         A.    The guidelines.
11         Q.    -- the Pension Fund's approval?
12         A.    Yes.
13         Q.    Is there anyone other than you at the
14    Pension Fund who could have given that approval?
15         A.    No.
16         Q.    Did you ever have any discussions with
17    the Renck for switching from large cap to mid and
18    small cap?
19               MR. WEPRIN:  Objection to the form.
20               With anybody you're talking about?
21         Q.    With anyone.
22         A.    We could have had, but I don't recall
23    what they would be, to be honest with you.
24         Q.    As you sit here today, do you have any
25    idea why the instruction was given to switch?
```

86

1                    Easterling
2        A.    No.   Because it wasn't something that was
3    rarely done, it was something that based on the
4    condition of the market, we might make changes.   So.
5        Q.    What kind of market conditions might lead
6    the Fund to instruct it to switch from a large cap
7    account to a mid and small cap account?
8        A.    It could be a performance of the market
9    itself, but that all of a sudden the small cap
10   instruments were doing very well and we decided to
11   reallocate that.   We may have gotten another --
12   another investment manager in that had large caps
13   and said, you know, instructed Schroder to adjust
14   their instruments.
15       Q.    If you turn to, within this same fax, two
16   pages later, on CWA 21 there's an e-mail?
17       A.    Uh-huh.
18       Q.    You were cc'd on it, I ask you please
19   take a look at that, tell me if you've seen that
20   before?
21             (Witness reviews document.)
22       A.    Okay.
23       Q.    Have you seen this before?
24       A.    Yes.
25       Q.    Can you tell me what it is?

```
 1                         Easterling
 2        A.    It's just a -- it's from the monitoring
 3   company to Connie Major, who was at the time the
 4   money manager for Schroder's, and relating that
 5   they, based on the information she sent, that they
 6   were now telling her this is the way she was to
 7   invest the monies for CWA.
 8             It's just instructions from John Renck,
 9   who is the president of monitoring and evaluation,
10   which would be a normal thing for them to do.
11        Q.    Seeing this, do you have anymore
12   recollection than you have about this change?
13             MR. WEPRIN:  Object to the form.
14             (Witness reviews document.)
15             MR. WEPRIN:  Just look at that one page?
16        A.    No, no, no, no.
17        Q.    E-mail address is joanne@monteval.com?
18        A.    That's a secretary at the monitoring and
19   evaluation company.
20        Q.    So it's John Renck's company?
21        A.    That's correct.
22        Q.    If you go to page 23, not to trick you,
23   on page 22 there's a cover sheet that says appendix
24   B, investment guidelines?
25        A.    Exactly.
```

```
 1                         Easterling
 2         Q.    So I just want to ask you whether you've
 3    seen it before, what this is?
 4         A.    Yes, these would be the new guidelines,
 5    would be redrafted once we changed what the
 6    guidelines were for them to invest.
 7         Q.    Under investment goals, the first goal is
 8    to obtain stability of investment returns,
 9    consistent annual returns with minimum risk and
10    volatility?
11         A.    Correct.
12         Q.    Did you have any understanding at the
13    time of how they were to try to reach that goal?
14         A.    No.
15         Q.    In the paragraph that says investment
16    guidelines general, the heading near the bottom
17    sentence says "to maintain investments that are
18    consistent with the appropriate fiduciary standards:
19    A, safeguards and diversity in mid cap relative
20    value that a prudent expert would adhere to."
21              Do you have any understanding as to what
22    that meant at the time?
23         A.    Just what it says, we would expect them
24    to invest prudently in the mid cap size accounts to
25    the best of their ability, that's what we would
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

```
 1                        Easterling
 2    expect.
 3         Q.    Do you know what safeguards that was
 4    referring to?
 5               MR. HART:  I'm sorry, what was the
 6         question?
 7               MR. WEPRIN:  H's asking whether she
 8         knows what that word, safeguards, means.
 9               MR. HART:  I couldn't hear. That's all.
10               MR. WEPRIN:  Whether you know.
11         A.    No, no.
12         Q.    If you turn to page 26 of this, CWA 26,
13    there's a signature line there, is that your
14    signature?
15         A.    Yes, it is.
16         Q.    Do you know whether you signed it on or
17    about May 15, 2002?
18         A.    Yes.
19         Q.    Yes, you did sign it?
20         A.    Yes, I did.
21               MR. WEPRIN:  Do you remember that, or
22         you're just telling him that's what the date
23         is?
24         A.    No, I remember that, because I believe it
25    was at that point that Francis Selby took over for
```

90

1                    Easterling
2    Connie Major.  Francis Selby had expertise was in
3    mid and small cap, and I think that -- I think
4    that's probably why we made the change.
5         Q.    Francis Selby was the new money manager
6    at Schroder's?
7         A.    Correct, uh-huh.
8         Q.    This is also signed by Morton Bahr; is
9    that correct?
10        A.    Right.
11        Q.    Did he have any responsibility at all --
12   what responsibility did he have with respect to
13   investments by the Fund?
14        A.    Oh, he sat in on all -- not all the
15   meetings but most of the meetings and was aware of
16   investment companies that we used and took a -- took
17   a good role, major role in decisions that were made
18   when we met.  In between times I had the authority
19   to do anything else, but he was on board for all of
20   our meetings with the Renck and any of the money
21   managers that were brought in for special attention.
22   He was aware of all of that.
23        Q.    Were responsibilities of the trustees
24   allocated at all between the two of you?
25        A.    No.

1                          Easterling
2        Q.    Who would be, to your knowledge, more
3    knowledgeable about investments that were being made
4    by CWA, you or Mr. Bahr?
5        A.    Probably me, because I was more hands on
6    than he would have been.
7        Q.    Have you spoken with Mr. Bahr at all in
8    preparation for the deposition?
9        A.    No, I have not.
10       Q.    Have you ever spoken with Mr. Bahr
11   regarding ANR?
12       A.    No, I have not.
13       Q.    Have you spoken with him about this
14   litigation?
15       A.    No, I have not.
16             MR. STRAUS:  Mark this.
17             (Defendant's Exhibit 16, document,
18         marked for identification, as of this date.)
19       Q.    I'm going to show you a document that's
20   been marked Exhibit 16, and it's Bates stamped CWA
21   30 through CWA 39, I ask you to please take a look
22   at it, tell me if you've ever seen it before?
23             (Witness reviews document.)
24             MR. WEPRIN:  Barbara, the question is
25         whether, to your knowledge, you've ever seen

```
 1                         Easterling
 2        that before.
 3        A.    No.
 4        Q.    Did the advisor of the Fund initial the
 5   plan with notifications in writing of purchases and
 6   sales made for the account that it managed?
 7        A.    The advisor meaning the money manager?
 8        Q.    Yes.
 9        A.    No.
10             MR. WEPRIN:  Object to the form.
11        A.    The answer is no, it wasn't required.
12             MR. WEPRIN:  Other than the reports that
13        you already have, that's obviously the basis
14        for your question.
15             MR. STRAUS:  First of all, these reports
16        were provided by the monitor, not the
17        investment advisor.
18             MR. WEPRIN:  No, they came from the files
19        -- well --
20        Q.    I'm just asking whether you received any
21   notifications from the money manager when they
22   purchased --
23        A.    No.  That wasn't required.
24        Q.    Why do you say that wasn't required?
25        A.    They did not have to notify me before
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

1                        Easterling

2       they purchased something or after they purchased

3       something, they had to give that information to the

4       monitoring company on a quarterly basis.

5            Q.    Do you know whether the Pension Fund ever

6       delivered to the money manager a copy of the

7       instrument pursuant to which it was established?

8                 MR. WEPRIN:   Object to the form.  If you

9            know.

10           A.    I don't know what -- I don't --

11           Q.    I'll tell you what, I avoided pointing

12      you to the agreement because you have not seen it

13      before, but to help move along, go to page CWA 33,

14      there's a provision there in section 10A, part of

15      that paragraph says the plan was delivered to the

16      advisor, a true and complete copy of original

17      instrument, including amounts thereto pursuant to

18      which it was established and is maintained and all

19      other documents or instruments governing the plan,

20      and it goes on.

21                My question is just whether you know if

22      those documents were ever provided?

23           A.    I do not.

24           Q.    Do not know?

25           A.    I do not know.  And -- I do not know.

1                          Easterling
2        Q.    Have you ever talked to anyone about
3   whether they were or not?
4        A.    No, no.
5              (Witness conferring with counsel.)
6        Q.    I apologize if I've asked you this, but
7   have you ever spoken with anyone at John Renck's
8   firm about this litigation
9        A.    No, I have not.
10       Q.    How about anyone at that firm about ANR?
11       A.    No, I have not.
12       Q.    Have you ever spoken about ANR with the
13  other current trustee for the Pension Fund?
14       A.    The president of the union?
15       Q.    That's Mr. Cohen?
16       A.    Uh-huh.
17       Q.    Yes.
18       A.    No, I have not.
19       Q.    Is there anyone else within ANR with whom
20  you've spoken about -- sorry, within CWA with whom
21  you've spoken about ANR?
22       A.    No.  I have not.
23       Q.    Anyone else within CWA with whom you've
24  spoken about this litigation?
25       A.    No.  Nobody.

1                        Easterling

2        Q.    Have you ever had any contact with KPMG

3    in Bermuda?

4        A.    No, I have not.

5        Q.    Have you ever had any contact with KPMG

6    in the US?

7        A.    I sit on a lot of boards, and KPMG may be

8    an auditor of one of those boards, but I can't tell

9    you that.    That would be it.    Because -- I'm trying

10   to -- I don't -- I mean, it isn't like, you know, I

11   have never heard of KPMG, I have, but I'll tell you,

12   if they're auditing one of those organizations, I

13   don't know.

14       Q.    But you've not had any communications

15   with them regarding ANR?

16       A.    Absolutely not.

17       Q.    That goes for both the US firm or the

18   Bermuda firm?

19       A.    That's correct.

20       Q.    Has anyone else within CWA had any

21   communications with either firm?

22       A.    No.

23       Q.    What steps have you taken, if any, to

24   familiarize yourself with the litigation, with this

25   litigation?

1                    Easterling
2        A.    Just reviewed the papers either as they
3    came in to me or in conversations with Tom Hart or
4    with Milberg Weiss, and that would be it.  That I
5    know of.
6        Q.    Do you review papers on an ongoing basis?
7        A.    No, not unless they're sent to me for
8    that purpose.  I would not do that.
9        Q.    Does CWA have its own outside auditor?
10        A.    Yes, we do.
11        Q.    Is there one for the -- well, is there
12    one for CWA the union or only the funds?
13        A.    The same.  Yes.
14        Q.    who is the auditor?
15        A.    Calibre.  And the person handling the
16    account is Steve Reeder, R-E-E-D-E-R.
17        Q.    Does CWA publish or provide its financial
18    statements to the public?
19        A.    They're not a secret because they're
20    presented at the convention, so you've got three
21    thousand people that see what -- see our audit.  So
22    the board -- as soon as the audit is finished, the
23    board members, the entire board gets a copy of the
24    audit.  Then the financial report is made a part of
25    the record at the convention.  We have one every

1                          Easterling
2    year.
3         Q.    Annual audit?
4         A.    Yes.
5               And the convention is annual also.
6         Q.    When does the fiscal year end for CWA?
7         A.    May 31st.
8         Q.    Does that apply to CWA as well as to the
9    funds or just to CWA?
10              MR. WEPRIN:  If you know.
11        A.    I don't know.  I don't think so, but I
12   don't remember.
13              MR. WEPRIN:  Which one --
14        A.    I know that CWA's budget year end on the
15   31st of May.
16        Q.    Other than that, does CWA regularly
17   report its financial condition in anyway?
18        A.    I don't think so, uh-uh.
19        Q.    Did you have any involvement in the
20   decision to sue KPMG (Bermuda)?
21              MR. WEPRIN:  Object to the form.
22        A.    Yes.  I was asked if I would be lead
23   plaintiff in that case, and I agreed to do that
24   after conversation with Tom Hart.
25        Q.    Other than being asked whether you would

```
 1                      Easterling
 2    serve as lead plaintiff, did you have any
 3    discussions about that?
 4         A.    Yeah.
 5         Q.    I'm just asking yes or no  --
 6               MR. WEPRIN:  Don't divulge the substance,
 7         you can say whether you had any such --
 8         A.    Yes.
 9               MR. WEPRIN:  Yes, she had discussions.
10         A.    Yes, we had discussions.
11         Q.    With whom did you have a discussion?
12         A.    With the attorneys.
13         Q.    Which attorneys?
14         A.    With all three.
15         Q.    When was that?
16         A.    With Tom Hart it would have been at the
17    time that I gave approval for it.  With Milberg
18    Weiss and Scott & Scott, that would have been when
19    we met earlier this week.
20         Q.    Did you have any communications with
21    Milberg or Scott & Scott other than at that meeting
22    earlier this week --
23         A.    No.
24         Q.    -- regarding this issue?
25               MR. WEPRIN:  Object to the form.
```

1                           Easterling
2        A.    No.
3        Q.    Again, without revealing the substance,
4   I'm just asking yes or no, do you recall what
5   discussions you had regarding whether to sue KPMG
6   with Mr. Hart?
7            MR. WEPRIN:   That's a yes or no question,
8        do you recall the substance of the
9        conversation?
10       A.    Yes.
11       Q.    I take it if I asked you what the
12  discussions were, your attorneys will object?
13           MR. WEPRIN:   I would direct her not to
14       answer.
15       Q.    And you accept that?
16       A.    You can take it.
17       Q.    At the time of the settlement with ANR
18  that we were discussing earlier, or after that, did
19  CWA submit a proof of claim?
20       A.    We did not.
21       Q.    Did anyone related to CWA submit a proof
22  of claim in order to participate in the settlement
23  proceeds?
24           MR. WEPRIN:   Object to form.
25       A.    In order to get our portion?