1                        Easterling

2        Q.    Yes.

3        A.    Well, I don't know, but I'm just going to

4    say we must have.

5        Q.    Did you have any involvement in that

6    process at all?

7        A.    I may have signed the papers which

8    provided the information and made the request.

9    Through Tom.

10       Q.    Did you have to obtain any documents to

11   show or support to show that CWA made the purchases

12   it was claiming to have made?

13       A.    I didn't.  It may have been that my

14   counsel provided that to --

15             MR. WEPRIN:  Don't speculate, if you

16         don't recall --

17       A.    I don't recall.  I don't know.

18       Q.    You haven't spoken to anyone about that?

19       A.    No, I have not.

20       Q.    Have you reviewed the complaint in this

21   action?

22       A.    Yes.

23       Q.    When did you review it?

24       A.    I know I reviewed -- well.  Complaint.

25   Complaint I probably reviewed when we met when -- we

```
 1                         Easterling
 2    met -- when I met with the attorneys.
 3         Q.    Any time earlier than that?
 4         A.    Yes.
 5         Q.    When was that?
 6         A.    Tom sent that to me, and I did review it
 7    earlier.  That must have come in, about two or three
 8    weeks ago.
 9         Q.    Was that the first time you had reviewed
10    it?
11         A.    Yes.
12              MR. STRAUS:  Mark this.
13              (Defendant's Exhibit 17, document,
14         marked for identification, as of this date.)
15         Q.    I am going to show you a document that's
16    marked as Exhibit 17.  It's Bates stamped CWA 171
17    through 262.
18              (Witness reviews document.)
19         Q.    I believe that's one document with
20    exhibits, but I'm going to ask you to take a look at
21    it, tell me if you've ever seen it before.
22              MR. WEPRIN:  The complaint is 171 through
23         205.
24              MS. KASWAN:  Mine's a stipulation.
25              MR. WEPRIN:  This is the stipulation of
```

```
 1                          Easterling
 2         settlement.
 3                   MR. STRAUS:  Yes.
 4                   MS. KASWAN:  What's the question?
 5         Q.    Have you seen it before?
 6         A.    No, I don't believe I've seen this.
 7                   MR. WEPRIN:  This is the document, the
 8             stipulation of partial settlement, and then
 9             there are exhibits to it.  The question is if
10             you know if you've seen this document before.
11                   (Witness reviews document.)
12         A.    I don't answer that, because I thought
13         it's what I looked at, but I'm not --
14         Q.    I'm sorry, I didn't mean to switch on
15         you, it's not the complaint, it's the stipulation of
16         settlement.
17         A.    Oh, this is -- so this would be -- this
18         is the stipulation and agreement on ANR?
19                   MR. WEPRIN:  Right.
20                   THE WITNESS:  Not KPMG.  I got you.
21                   (Witness reviews document.)
22         A.    I don't recall this at all.
23         Q.    I'll just point you to CWA page 234,
24         which purports to be a schedule of plaintiff's
25         contention of alleged inflation, have you ever seen
```

 1                        Easterling
 2     that schedule before?
 3                 (Witness reviews document.)
 4                 MR. WEPRIN:   Is this part of the notice?
 5                 MR. STRAUS:   Yes, the notice is an
 6          exhibit.
 7                 MR. WEPRIN:   This is part of the notice
 8          that was mailed.
 9          A.    I don't recall
10                 MR. WEPRIN:   Mark this.
11                 (Defendant's Exhibit 18, document,
12          marked for identification, as of this date.)
13          Q.    I am going to show you a document that's
14     been marked as Exhibit 18, and ask if you've ever
15     seen that before?
16                 (Witness reviews document.)
17          Q.    So I don't trick you, there's an
18     affirmation at the end of this with what appears to
19     be your signature.
20          A.    Uh-huh.   Yes.   I've seen that.
21          Q.    Did you review this before it was sent
22     out?
23          A.    It was sent to me by Tom Hart  I did
24     review it with Tom.
25          Q.    On page four of this there's

1                    Easterling
2    interrogatory number three, the question is to
3    identify any payment, benefit, or anything of value
4    received or to be received by or on behalf of any
5    plaintiff in connection of any consolidated actions,
6    and --
7        A.    Uh-huh.
8        Q.    -- it identifies an amount that's a share
9    of the Schnall action settlement received by the CWA
10   plan.
11              Earlier you testified that CWA also
12   received a reimbursement of Mr. Hart's fees in
13   connection with the settlement?
14       A.    Correct.
15              MR. WEPRIN:    Object to form.
16       Q.    Other than those, has CWA or the CWA plan
17   received any benefit or anything of value --
18       A.    No.
19       Q.    -- in connection with this action?
20       A.    No, we have not.
21       Q.    Have you applied for the reimbursement of
22   any expenses other than Mr. Hart's fees?
23       A.    No, I did not.
24       Q.    Are you, CWA, seeking compensation for
25   your time here today at the deposition?

```
 1                         Easterling
 2              MR. WEPRIN:  Object to the form of the
 3         question.
 4         A.   Yes.
 5              MR. WEPRIN:  The question is are you -- I
 6         don't think --
 7         A.   Yes, I will, yes, I will apply for some
 8    part of it, but when you say time, not my time, but
 9    for the expenses.
10         Q.   Expenses associated with --
11         A.   Correct.
12         Q.   You don't intend to apply for
13    compensation for your time?
14         A.   No.
15         Q.   For your time spent traveling?
16         A.   No.
17         Q.   As you sit here today, are there any
18    expenses CWA has not yet sought reimbursement for
19    but which it intends to?
20         A.   No.
21              MR. WEPRIN:  Object to form.
22         Q.   You testified earlier that CWA -- well,
23    start with the Pension Fund, the Pension Fund did
24    not buy any ANR securities other than the ones that
25    were listed in the attachment to the certification
```

```
 1                        Easterling
 2      that I showed you; is that correct?
 3          A.    That's correct.
 4          Q.    How do you know that?
 5          A.    Well, because that's the job of Milberg
 6      Weiss, and they have access to all of our
 7      investments, and these were the only ones that they
 8      found.
 9          Q.    How long have they had access to all your
10      investments?
11          A.    Since I signed the paper in -- how
12      quickly you forget.
13               MR. WEPRIN:   Whatever the date.
14          A.    Whatever that date was that I signed the
15      agreement, from that date forward, between the
16      agreement, it was between Milberg and I, they have
17      had total access to them.  We have made them
18      available.
19          Q.    Did those include historical information,
20      in other words, how do you know whether ANR bought
21      -- sorry, how do you know whether CWA bought any ANR
22      before you signed the agreement?
23          A.    If we bought them before and they were in
24      existence at the time of signing, that was part of
25      the package.  They get to review all of our
```

```
 1                     Easterling
 2    investments that were intact at that time,
 3    regardless of when we bought them, and forward.
 4         Q.    But what if CWA had purchased ANR
 5    securities and sold them before you entered into the
 6    monitoring agreement?
 7         A.    I wouldn't know whether that would be
 8    covered or not.
 9         Q.    Who would know that?
10         A.    I'm not sure.
11               MR. WEPRIN:  Don't speculate.
12         A.    I'm not sure.  I don't have a record of
13    that.
14         Q.    Is there anyone at CWA whose
15    responsibility it would be to know that or to know
16    who to go to?
17         A.    No.
18         Q.    If you could turn please to page seven.
19               (Witness reviews document.)
20         Q.    Interrogatory number ten asks for each
21    number or fact reported in ANR's financial, it
22    states that plaintiff claims it's false, materially
23    misleading, state correct number or fact it should
24    have been and what the basis for that is claim is.
25    The interrogatory was objected on the ground that
```

```
  1                        Easterling
  2    this interrogatory is premature.
  3              Can you shed any light on the response to
  4    that interrogatory?
  5              MR. WEPRIN:  Object to the form of the
  6         question?
  7         A.   No.
  8         Q.   Do you have an understanding generally of
  9    the allegations of the complaint in this case?
 10         A.   Against ANR?  Against KMPG?
 11         Q.   Start with ANR.
 12         A.   Uh-huh.
 13         Q.   What is your understanding?
 14         A.   My understanding was that there was a
 15    fraud involved in how they reported on the
 16    performance, and that that resulted in eventually
 17    the loss of money for us, because the stock --
 18         Q.   Do you have personally any basis for
 19    knowing whether that's true or not?
 20              MR. WEPRIN:  Object to form.
 21         A.   I rely on the attorneys.
 22         Q.   Does that also go for CWA?
 23         A.   (Nodding head.)
 24              MR. WEPRIN:  You have to answer out loud.
 25         A.   Yes.
```

```
 1                         Easterling
 2              MR. WEPRIN:  If you're tired, we can take
 3         a break.  You have to answer out loud.  I'm
 4         sorry.
 5              THE WITNESS:  No, no, I'm okay.
 6         Q.   I'll ask the same question with respect
 7    to KPMG (Bermuda), do you have an understanding of
 8    the allegations against them?
 9         A.   Yes, I do.
10         Q.   What's your understanding?
11         A.   That in their auditing reports they did
12    not reveal actually what ANR was actually doing,
13    their performance, there was no cover letter that
14    would have contained any of the facts to alert any
15    investors as to what ANR was doing in the market.
16    Or with that money, really.
17              And as a result, we think that that
18    allowed our investors to continue to hold the stock,
19    even though we were not -- even though KPMG was not
20    showing in their letter that there was indeed a
21    problem in the marketplace.
22         Q.   Do you have any basis for knowing that's
23    true or not?
24              MR. WEPRIN:  Object to form.
25         A.   I've read both what -- some of the
```

```
 1                        Easterling
 2     reports, the auditing reports that KPMG supplied,
 3     and without knowing anything other than that, had I
 4     been an investor, I would have assumed that it was a
 5     bona fide company that was doing a good job.
 6          Q.    When did you read those reports?
 7          A.    Oh, when the complaint came in to us to
 8     be a lead plaintiff in the KPMG case.
 9          Q.    Was that the first time you had read
10     those?
11          A.    Yes.
12          Q.    Other than what you've testified, do you
13     have any basis for knowing whether those allegations
14     are correct?
15               MR. WEPRIN:  Object to the form.
16          A.    No.
17               MR. STRAUS:  I'm going to mark a few
18          exhibits to save time.  We can break for five,
19          ten minutes.
20               (Defendant's Exhibit 19 through 22,
21          documents, marked for identification, as of
22          this date.)
23               (Recess taken.)
24     BY MR. STRAUS:
25          Q.    Ms. Easterling, I'm going to show you a
```

1                         Easterling

2     document that's been marked as Exhibit 19, it's

3     Bates stamp --

4                MR. WEPRIN:   365.

5          Q.    I ask you to please a take look at that,

6     tell me if you've ever seen it before?

7                (Witness reviews document.)

8                MR. WEPRIN:   Do you recall?

9          Q.    Have you seen this before?

10         A.    No.

11         Q.    Do you know who Laura Stein is?

12         A.    Yes.

13         Q.    Who is she?

14         A.    She's an attorney for Milberg Weiss.

15         Q.    Have you ever met with her?

16         A.    Yes, I have.

17         Q.    In connection with this case?

18         A.    No.

19         Q.    Have you ever spoken with her in

20    connection with this case?

21         A.    I don't think so, no.

22         Q.    Have you ever communicated with any

23    Milberg Weiss attorneys other than Mr. Weprin and

24    formally Ms. Kaswan in connection with this case?

25         A.    No.


                Elisa Dreier Reporting Corp. (212) 557-5558
                  780 Third Avenue, New York, NY 10017

1                      Easterling
2         Q.    The first line of this e-mail says --
3    first of all, it's from Eileen Brackens, who is your
4    assistant; is that correct?
5         A.    Uh-huh.
6         Q.    To Pat.  Patrick Scanlon was in-house
7    counsel at the time?
8         A.    Correct.
9         Q.    Was he in-house counsel to CWA, to the
10   funds, or to both?
11        A.    To both, uh-huh, to both.
12        Q.    Laura Stein has asked for permission to
13   request the courts that CWA act as lead plaintiff in
14   a class action suit against Annuity And Life.
15              Do you have any idea how she would have
16   come to be sending this e-mail, where she would have
17   gotten the information from this for this e-mail to
18   send to Mr. Scanlon?
19              MR. WEPRIN:  Object to the form.
20        A.    I don't know really.
21        Q.    As of this time, had you ever heard of
22   ANR?
23        A.    I don't know.
24        Q.    Down below it says "the deadline for
25   filing certification as lead plaintiff is February

113

Easterling

1
2    3rd, they need to know by tomorrow afternoon if we
3    agree to be lead plaintiff."
4            So, it looks like there's a short
5    turnaround time in that decision, do you remember
6    that situation, where you had a short time to
7    decide?
8        A.    I don't know.  But that would be -- that
9    would be a proper procedure, in my absence, Eileen
10   would have called upon the attorney, and he may have
11   contacted Mr. Hart and --
12           MR. WEPRIN:  Don't speculate.
13       A.    I don't know.
14       Q.    Do you believe you were not in the office
15   at this time?
16       A.    Well, the question would arise as to why
17   it wouldn't come to me, so I would have to tell you
18   I wasn't in the office, because it would have come
19   to me.
20       Q.    Could it have come to the other trustee
21   of the fund?
22       A.    We may both have been out.
23           But she followed procedure of giving it
24   to the attorney.
25       Q.    The other trustee in January of 2003, was

1                    Easterling

2    that Mr. Cohen or Mr. Bahr?

3         A.    Mr. Bahr.

4         Q.    To your knowledge, did he have any

5    involvement at all in this litigation?

6         A.    Not to my knowledge.

7         Q.    Have you asked or ever discussed with him

8    whether he had any involvement?

9         A.    Not to my knowledge.  I don't recall

10   having conversation with him on that.

11        Q.    Do you know whether he ever was involved

12   in any litigations brought by CWA?

13             MR. WEPRIN:  Object to the form.

14        A.    I'm sure at some point he knew about

15   them, but was he directly involved?  No.

16        Q.    I am going to show you a document that's

17   been marked at Exhibit 20.

18             (Witness reviews document.)

19        Q.    This is Bates stamped CWA 366, it appears

20   to be an e-mail with you and Mr. Bahr cc'd at

21   bottom, I'll ask you to take a look --

22        A.    It's the same one.

23             MR. WEPRIN:  It's another copy of the

24        same document from a different file.

25             MR. STRAUS:  Yes.

```
 1                          Easterling
 2          Q.    I didn't notice that you were cc'd on the
 3    other e-mail, so I just wanted to clarify.  When you
 4    say this didn't come to me, you mean that because
 5    you were not sending it, you were only cc'd on it,
 6    is that what you meant?
 7          A.    Well, I don't know, because it normally
 8    would have come to me.  I could have been out of the
 9    office.  I could have -- it could have -- it could
10    have been that Laura Stein called me, but I'm out of
11    the office, I called Eileen, I tell her to -- but
12    that's all supposition, because I don't remember it.
13          Q.    You have not discussed that with her --
14          A.    No.
15          Q.    -- recently?
16                MR. STRAUS:  There are redactions made
17          on both of these, will you produce a privileged
18          log?
19                MR. WEPRIN:  Yeah, it's just attorney
20          description, providing attorney/client
21          privileged information to the client.  We kept
22          information in it redacted, if we felt it would
23          be revealing the specific advice.
24          Q.    On Exhibit 19, the handwriting at the top
25    right corner down, whose handwriting is that, do you
```

1                            Easterling

2    know?

3                (Witness reviews document.)

4        A.    I don't know what it says.

5                MR. WEPRIN:  The question is whether you

6            know the handwriting?

7        A.    No.

8                MR. WEPRIN:  The next question, if he

9            doesn't know the handwriting, he can figure it

10           out as well as you can what it says.

11       Q.    I am going to show you another document

12   that's been marked as Exhibit 21, it's stamped CWA

13   368 through CWA 370.

14                (Witness reviews document.)

15       Q.    I ask whether you've ever seen this

16   before?

17                MR. WEPRIN:  Little hard, given the level

18           of redactions.

19                THE WITNESS:  Oh, yeah.

20                MR. WEPRIN:  Most of it has been redacted

21           because of attorney/client information.

22                THE WITNESS:  That's occurring at the

23           same time.

24       A.    They faxed this --

25       Q.    I'm just going to show you, while you

```
 1                        Easterling
 2     have that, a copy of the monitoring agreement that
 3     was already marked as Exhibit 11, which you can see
 4     is dated December 11, 2002.
 5               (Witness reviews document.)
 6         Q.    Before you were not sure whether you had
 7     heard of ANR by this time, what I'm going to ask is
 8     whether, basically, if this helps figure out whether
 9     the monitoring agreement was entered into before or
10     after you became aware of the litigation?
11               MR. WEPRIN:   Object to form.   You mean
12          when she signed it, is that what you're asking
13          her?   When it was entered into is a legal --
14         Q.    I'll take December 11th, which appears to
15     be the date of the letter.
16         A.    So, I'm --
17         Q.    I'm sorry.
18         A.    I signed this --
19         Q.    You signed this apparently on December
20     11, 2002?
21         A.    Uh-huh.
22         Q.    Do you know whether at the time you
23     signed this you had ever heard of -- what I'm
24     wondering, if you compare the two documents, does
25     that help you pin down whether --
```

118

1                        Easterling
2        A.    Oh, no, it doesn't.  No.  Did I -- had I
3    heard of ANR -- no, uh-uh, no.
4        Q.    So it's possible you were aware of the
5    litigation at the time that agreement was signed?
6              MR. WEPRIN:  Object to the form.
7        A.    Possible, but -- my knowledge, when I
8    signed the agreement, I did not know there were any
9    -- you know, anything was starting down the path.
10   So, this would -- this might have been the very
11   first form we had after the agreement was signed, as
12   far as I know.
13       Q.    I'm going to show you a document that's
14   been marked as Exhibit 22 and ask if you've ever
15   seen that before?
16             (Witness reviews document.)
17             MS. KASWAN:  Perhaps you can just
18       describe it for the record.
19             MR. STRAUS:  Sure.  What we've marked as
20       Exhibit 22 is the declaration of David Scott.
21       It's in support of a motion for Communications
22       Workers of America and Midstream Investment for
23       consolidation, appointment of lead counsel, and
24       for approval of selection of lead counsel.
25       A.    I do not recall seeing this.  No.

1                        Easterling
2          Q.    I'm going to show you again the
3     stipulation of settlement which we marked as Exhibit
4     17, if you look there on page two at the bottom,
5     there is a description of the class period for the
6     class that Communications Workers are seeking to
7     represent.
8              (Witness reviews document.)
9          Q.    Can you tell me what the dates for the
10    class period are?
11         A.    March 15, 2000 through November 19, 2002.
12         Q.    If you take a look at the declaration of
13    Mr. Scott which I just showed you, marked as 22 --
14         A.    Where do you want me to look?
15         Q.    It's not page numbered, maybe I can find
16    the page for you.
17              We'll describe it when we get there.
18              This is the page I'm pointing you to,
19    it's headed Annuity And Life Re (Holdings) Limited,
20    there's a chart, it follows schedule A.
21         A.    Uh-huh.
22              (Witness reviews document.)
23              MR. WEPRIN:  Do you want to refer to the
24         class period on the top?
25              MR. STRAUS:  That's it, yes.

1                           Easterling

2        Q.    What is the class period there?

3        A.    February 12th of '01 through November 19,

4    '02.

5        Q.    Do you have any idea why the class period

6    changed?

7              MR. WEPRIN:  Object to the form.

8        A.    No.  No, I don't.

9        Q.    Have you ever discussed with anyone what

10   the class period ought to be?

11       A.    No.

12       Q.    Mrs. Easterling, can you tell me what the

13   purpose was of purchasing ANR securities --

14             MR. WEPRIN:  Object to the form.

15       Q.    -- by Schroder on behalf of the Pension

16   Fund?

17             MR. WEPRIN:  Object to form.

18       A.    No, I can't tell you that.

19       Q.    Do you know whether that investment was a

20   typical size of investment for the Pension Fund?

21             MR. WEPRIN:  Object to form.

22       A.    There really was no limits either way on

23   the investments, other than the total amount that

24   you were given permission to invest, and they had a

25   large amount.  At that point, once they have the

```
 1                          Easterling
 2      money, and they follow the guidelines, everything is
 3      at their discretion.
 4              MR. WEPRIN:  I assume they wanted to make
 5          money.
 6          Q.    So the size of the investments they made
 7      varied?
 8          A.    Yes.
 9          Q.    Do you know whether this was a large
10      investment or a small investment, where it fell?
11          A.    I don't.
12          Q.    Mrs. Easterling, are you aware of any
13      duties that CWA has as part of the lead plaintiff in
14      the case?
15              MR. WEPRIN:  Object to form.
16          A.    Duties that we have?  To provide any
17      material that's called upon, to testify if
18      necessary.  Other than that, no.
19          Q.    Do you understand that you have the duty
20      to monitor and supervise lead counsel?
21          A.    I didn't understand that, but that's
22      certainly all right with me.
23          Q.    Do you have any understanding that you
24      have a duty to attend conferences when possible?
25              MR. WEPRIN:  Object to the form.
```

```
 1                        Easterling
 2        A.    Whenever they ask me to be there for the
 3    case, I would be there for the case, if it's a
 4    conference or a trial.
 5        Q.    Do you consider yourself to have a
 6    fiduciary duty to the absent class members?
 7              MR. WEPRIN:  Object to form.
 8        A.    Yes.
 9        Q.    Do you know what line of business ANR is
10    in?
11        A.    Uh-huh.
12        Q.    What line is that?
13        A.    Reinsuring insurance companies.
14        Q.    Have you heard of a company called
15    TransAmerica?
16        A.    It's in some of the documents that I've
17    reviewed, yes.
18        Q.    Do you know what it is?
19        A.    It may have been -- I don't want to
20    speculate.
21        Q.    In purchasing the ANR securities for the
22    Pension Fund, do you know whether Schroder relied on
23    the market?
24              MR. WEPRIN:  Object to the form.
25        A.    I have no idea.
```

```
 1                        Easterling
 2              MR. STRAUS:  I'm very close to done, I
 3         know we just took a break, if we go away for
 4         five minutes to review my notes.
 5              (Recess taken.)
 6    BY MR. STRAUS:
 7         Q.   Just a few more questions.
 8              Do you consider yourself to have a
 9    fiduciary duty to the pension Fund to maximize the
10    value of the claim in this litigation?
11              MR. WEPRIN:  Object to the form.
12         A.   I have a responsibility -- fiduciary duty
13    to the Pension Plan, yes, to be able to restore as
14    much money as we've lost as possible, absolutely.
15         Q.   Earlier I asked you whether you knew what
16    the purpose was of buying the ANR securities by
17    Schroder, I just wanted to clarify that a little
18    bit, you said you didn't know.
19              What I meant was whether you knew what
20    Schroder's purpose was, what the role of the ANR
21    security purchase was within the portfolio, whether
22    it was used as a hedging device or had some other
23    purpose, do you have any idea?
24              MR. WEPRIN:  Object to the form.
25         A.   No, I would not have any idea.
```

```
 1                         Easterling
 2              MR. STRAUS:  I have no further questions
 3         at this time, subject to any documents that are
 4         produced, and we also reserve the right to ask
 5         for another representative.  I'm not sure this
 6         witness was adequately prepared pursuant to
 7         30(b0(6).
 8              MR. WEPRIN:  Couple questions.
 9    EXAMINATION BY
10    MR. WEPRIN:
11         Q.   Several times during your deposition you
12    referred to Milberg Weiss, when you refer to Milberg
13    Weiss, do you include Lerach Coughlin?
14         A.   Yes, of course.
15         Q.   Do you get regular reports from counsel
16    about pending securities litigation?
17         A.   I get quarterly reports from Lerach.
18         Q.   Does that include this litigation?
19         A.   Yes, it does.
20         Q.   He asked you questions about supervising
21    lead counsel in this litigation, is there anyone
22    that supervises lead counsel on your behalf, in your
23    opinion?
24         A.   Yes, Tom Hart is much more qualified than
25    I am, and he will be doing that.
```

1                    Easterling
2        Q.    There were questions about a settlement
3    negotiations, were you kept informed about the
4    status of the settlement negotiations by anyone?
5        A.    About the status, yes, Tom kept me
6    informed, and prior to the settlement, Tom and I
7    discussed what the settlement would be, and I agreed
8    to it.
9            MR. WEPRIN:  I have no other questions.
10    FURTHER EXAMINATION BY
11    MR. STRAUS:
12        Q.    The quarterly reports that you receive,
13    who do you receive them from?
14        A.    Lerach.
15        Q.    In connection with this litigation?
16        A.    They just send a quarterly report on all
17    of the cases that are in process.
18        Q.    How much information is provided about
19    this case?
20        A.    They're brief summaries, is what they
21    are.
22        Q.    Do you review them?
23        A.    Uh-huh, especially if we're part of one.
24        Q.    Do you remember the last one you got?
25        A.    I don't recall the last one.  It's been

126

                          Easterling

1

2    recent.  It may be laying on my desk, actually.

3              MR. STRAUS:  I have no further

4         questions.

5

6              (Time noted:  2:56 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

127

1

2                    A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK )

5                        ) ss. :

6    COUNTY OF          )

7

8          I,       BARBARA EASTERLING      , hereby

9          certify that I have read the transcript of my

10         testimony taken under oath in my deposition of

11         June 7, 2007; that the transcript is a

12         true, complete and correct record of my

13         testimony, and that the answers on the record

14         as given by me are true and correct.

15

16                                BARBARA EASTERLING

17

18   Subscribed and sworn

19   to before me on this the

20         Day of        , 2007.

21

22   Notary Public, State of New York

23

24

25

128

1

2                          C E R T I F I C A T E

3

4      STATE OF NEW YORK )

5                        ) ss. :

6      COUNTY OF QUEENS   )

7

8            I, Siglinde Carretero, a Notary Public

9      within and for the State of New York, do

10     hereby certify:

11           That   BARBARA EASTERLING   , the witness

12     whose deposition is hereinbefore set forth, was

13     duly sworn by me and that such deposition is a

14     true record of the testimony given by the

15     witness.

16           I further certify that I am not related

17     to any of the parties to this action by blood

18     or marriage, and that I am in no way interested

19     in the outcome of this matter.

20           IN WITNESS WHEREOF, I have hereunto set

21     my hand        11th day of June        , 2007.

22

23                          _____
                            Siglinde Carretero
24

25


Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

```
 1
 2    --------------------I N D E X---------------------
 3    WITNESS                EXAMINATION BY              PAGE
 4    Barbara Easterling Mr. Straus                   6, 125
 5                          Mr. Weprin                    124
 6
 7    ---------------INFORMATION REQUESTS---------------
 8    DIRECTIONS:  62
 9    RULINGS:
10    TO BE FURNISHED:
11    REQUESTS:
12    MOTIONS:
13
14    ----------------------EXHIBITS--------------------
15    DEFENDANT'S:                              FOR I.D.
16    Defendant's 1, document, Bates CWA 1-2.............6
17    Defendant's 2, document, Bates CWA 273-77..........6
18    Defendant's 3, document, Bates CWA 278-80..........6
19    Defendant's 4, document, Bates CWA 281-83..........6
20    Defendant's 5, document, Bates CWA 284-86..........6
21    Defendant's 6, document, Bates CWA 287-89..........6
22    Defendant's 7, document, Bates CWA 290-91..........6
23    Defendant's 8, document, Bates CWA 293-97..........6
24    Defendant's 9, document, Bates CWA 298-301.........6
25    Defendant's 10, document, Bates CWA 372-74........43
```

1

2    ---------------------I N D E X----------------------

3

4    ----------------------EXHIBITS----------------------

5    DEFENDANT'S:                              FOR I.D.

6    Defendant's 11, document, Bates CWA 17-18.........46

7    Defendant's 12, 3/14/05 letter....................49

8    Defendant's 13, document, Bates CWA 302-30........61

9    Defendant's 14, document, Bates CWA 331-64........61

10    Defendant's 15, document, Bates CWA 19-29.........78

11    Defendant's 16, document, Bates CWA 30-39.........91

12    Defendant's 17, document, Bates CWA 171-262......101

13    Defendant's 18, response to interrogatories......103

14    Defendant's 19, document, Bates CWA 365..........110

15    Defendant's 20, document, Bates CWA 366..........110

16    Defendant's 21, document, Bates CWA 368-70.......110

17    Defendant's 22, declaration of David Scott.......110

18

19                        - oOo -

20

21

22

23

24

25